**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JOHN BORON<br>Depew, NY 14043<br><br>BRETT CHRISTIAN<br>Cheektowaga, NY 14225<br><br>FIREARMS POLICY COALITION, INC.<br>5550 Painted Mirage Rd. Ste. 320<br>Las Vegas, NV 89149, *and*<br><br>SECOND AMENDMENT FOUNDATION<br>12500 NE 10th Place<br>Bellevue, WA, 98005,<br><br>      *Plaintiffs*,<br><br>  v.<br><br>KEVIN P. BRUEN, in his official capacity as<br>Superintendent of the New York State Police<br>New York State Police<br>1220 Washington Avenue<br>Building 22<br>Albany, NY 12226,<br><br>JOHN J. FLYNN, in his official capacity as<br>District Attorney for the County of Erie, New<br>York<br>Erie County District Attorney's Office<br>25 Delaware Ave<br>Buffalo, NY 14202,<br>      *Defendants*. | Civil Action No. |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Plaintiffs John Boron, Brett Christian ("Individual Plaintiffs"), Firearms Policy Coalition,

Inc., and Second Amendment Foundation ("Institutional Plaintiffs") (collectively "Plaintiffs"), by

and through the undersigned attorneys, file this Complaint against Defendants State Police

Superintendent Kevin P. Bruen and Erie County District Attorney John J. Flynn (collectively "Defendants") in their official capacities as the state and local officials responsible under New York law for administering and enforcing the State's laws and regulations governing carriage of firearms in public. In support of their Complaint against Defendants, Plaintiffs hereby allege as follows:

## INTRODUCTION

1.     The Constitution guarantees "the right of the people to keep and bear Arms." U.S. CONST. amend. II. When the People, by enacting that amendment, enshrined in their governing charter the right to "carry weapons in case of confrontation" for the "core lawful purpose of self-defense," *District of Columbia v. Heller*, 554 U.S. 570, 592, 630 (2008), they did not mean to leave the freedom to exercise that right at the mercy of the very government officials whose hands they sought to bind. Instead, "the right to keep and bear arms" ranks "among those fundamental rights necessary to our system of ordered liberty" and consequently "certain policy choices" are definitively "off the table." *McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 778, 790 (2010) (quoting *Heller*, 554 U.S. at 636).

2.     Plaintiffs are law-abiding citizens of New York who wish to exercise their fundamental, individual right to bear arms in public for self-defense and would, but for Defendants' enforcement of the unconstitutional laws, regulations, policies, practices, and customs at issue in this case.

3.     On June 23, 2022, the United States Supreme Court held in *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. __, 142 S. Ct. 2111 (2022), "consistent with *Heller* and *McDonald*, that the Second and Fourteenth Amendments protect an individual's right to carry a handgun for self-defense *outside the home*," and accordingly declared unconstitutional New York's "proper cause"

discretionary carry licensing scheme, *id.* at 2122.

4.      On July 1, 2022, the State of New York responded to *Bruen* in an act of defiance of the Supreme Court, enacting Senate Bill S51001 ("S51001") (June 30, 2022, Extraordinary Session), a true and correct copy of which is attached as Exhibit A. S51001 replaced one unconstitutional licensing scheme with another, and worse, implemented expansive new criminal laws that ban carry of firearms in so-called "sensitive locations" and presumptively on most property in the state—even for those who lawfully acquire and possess a license under the State's onerous new licensing scheme. The State's designation of these "sensitive" or "restricted" locations constitutes a *de facto* ban on the carriage of loaded, operable handguns for self-defense. S51001 generally took effect on September 1, 2022.

5.      As explained by New York Governor Kathy Hochul in her July 1, 2022 press statement, among other new or changed regulations, S51001 increases eligibility requirements in the carry license permitting process and restricts "the carrying of concealed weapons in sensitive locations and establish[es] that private property owners must expressly allow a person to possess a firearm, rifle, or shotgun on their property[.]"[1] "Individuals who carry concealed weapons in sensitive locations or in contravention of the authority of an owner of private property will face criminal penalties." *Id*. "The law also makes 'no carry' the default for private property, unless deemed permissible by property owners." *Id*.

6.      New York's carry regulations in designated "sensitive locations" go far beyond any constitutionally relevant historical justification, and "ordinary, law-abiding citizens," like and

---

[1] NEW YORK GOV.'S PRESS OFFICE, *Governor Hochul Signs Landmark Legislation to Strengthen Gun Laws and Bolster Restrictions on Concealed Carry Weapons in Response to Reckless Supreme Court Decision*, July 1, 2022, available at https://on.ny.gov/3nXWrvA (last visited August 31, 2022).

including Plaintiffs, are again prevented from carrying handguns in public for self-defense in almost all corners of the State, except in what Governor Hochul said were, "probably some streets."[2] This makes a mockery of the Supreme Court's holding in *Bruen*, which reaffirmed that personal security extends to more than just "those . . . who work in marbled halls, guarded constantly by a vigilant and dedicated police force," *Peruta v. California*, 137 S. Ct. 1995, 1999 (2017) (Thomas, J., dissenting from the denial of certiorari), to include ordinary, law-abiding Americans "outside the home," *Bruen*, 142 S. Ct. at 2122. Moreover, New York's designation of private property as a "restricted location[ ]" is an unprecedented designation that essentially deputizes all property owners in the State to effectuate a carry ban that the Supreme Court most recently invalidated in *Bruen*. The Second Amendment, however, cannot be so easily manipulated. Since the State's expansive restrictions on carriage in public do not allow typical law-abiding citizens to carry a loaded and operable handgun outside their home in all sorts of places of everyday life, these restrictions deny them any meaningful right to bear arms.

7.     New York's laws, regulations, policies, practices, and customs individually and collectively deny millions of individuals who reside in the State—including Individual Plaintiffs, Institutional Plaintiffs' similarly-situated members, and others like them—their fundamental, individual right to bear loaded, operable handguns outside the home.

8.     Defendants clearly disfavor the right to keep and bear arms. But "[t]he very enumeration of the right takes out of the hands of government—even the Third Branch of Government—the power to decide on a case-by-case basis whether the right is *really worth* insisting upon." *Bruen*, 142 S. Ct. at 2129 (quoting *Heller*, 554 U. S., at 634).

---

[2] LUIS FERRÉ-SADURNÍ AND GRACE ASHFORD, *N.Y. Democrats to Pass New Gun Laws in Response to Supreme Court Ruling*, N.Y. TIMES, June 30, 2022, available at https://nyti.ms/3yTp2Yj (last visited August 31, 2022).

9.     Plaintiffs John Boron, Brett Christian, Firearms Policy Coalition, Inc., and Second Amendment Foundation thus bring this action to vindicate the fundamental rights that Defendants threaten to infringe.

## PARTIES

10.     Plaintiff John Boron is a natural person, an adult over the age of 21, a citizen of the United States, and a resident and citizen of the State of New York. Plaintiff Boron is a law-abiding, responsible gun owner and is not prohibited under state or federal law from acquiring or possessing firearms or ammunition. Plaintiff Boron has a license to carry a handgun issued pursuant to New York law by Erie County. Plaintiff Boron is subject to Defendants' enforcement of the State's restrictions on his right to bear arms in public, including those provisions preventing him from carrying in most all public places. Plaintiff Boron is a member of Plaintiffs FPC and SAF. Plaintiff Boron resides in Depew, New York 14043.

11.     Plaintiff Brett Christian is a natural person, an adult over the age of 21, a citizen of the United States, and a resident and citizen of the State of New York. Plaintiff Christian is a law-abiding, responsible gun owner and is not prohibited under state or federal law from acquiring or possessing firearms or ammunition. Plaintiff Christian has a license to carry a handgun issued pursuant to New York law by Erie County. Plaintiff Christian is subject to Defendants' enforcement of the State's restrictions on his right to bear arms in public, including those provisions preventing him from carrying in most all public places. Plaintiff Christian is a member of Plaintiffs FPC and SAF. Plaintiff Christian resides in Cheektowaga, NY 14225.

12.     Plaintiff Firearms Policy Coalition, Inc. ("FPC") is a non-profit organization incorporated under the laws of Delaware with a place of business in Clark County, Nevada. The purposes of FPC include defending and promoting Second Amendment rights, advancing

individual liberty, and restoring freedom. FPC serves its members and the public through legislative advocacy, grassroots advocacy, litigation and legal efforts, research, education, outreach, and other programs. FPC has members in the State of New York. FPC's members include individuals who are not prohibited under state or federal law from possessing, receiving, owning, or purchasing a firearm or ammunition. FPC's members are adversely and directly harmed by Defendants' enforcement of the laws, regulations, policies, practices, and customs challenged herein. The interests that FPC seeks to protect in this lawsuit are germane to the organization's purposes, and, therefore, FPC sues on behalf of its members, including the Individual Plaintiffs herein. Plaintiff FPC has members who have been denied their right to carry by operation of Defendants' enforcement of the laws, regulations, policies, practices, and customs challenged herein. But for Defendants' enforcement of the laws and regulations challenged herein, FPC's non-prohibited members in New York would carry a firearm outside the home for self-defense.

13.     Plaintiff Second Amendment Foundation ("SAF") is a nonprofit educational foundation incorporated under the laws of Washington with its principal place of business in Bellevue, Washington. SAF seeks to preserve the effectiveness of the Second Amendment through education, research, publishing, and legal action programs focused on the constitutionally protected right to possess firearms and firearm ammunition, and the consequences of gun control. SAF has over 700,000 members and supporters nationwide, including thousands of members in New York. SAF brings this action on behalf of those members, including the named Plaintiffs herein. SAF's members are adversely and directly harmed by Defendants' enforcement of the laws, regulations, policies, practices, and customs challenged herein.

14.     FPC and SAF recognize that "[i]t is the law of this Circuit that an organization does not have standing to assert the rights of its members in a case brought under 42 U.S.C. § 1983."

*Nnebe v. Daus*, 644 F.3d 147, 156 (2d Cir. 2011). FPC and SAF contend that this circuit precedent is erroneous and should be overruled by a court competent to do so.

15.     FPC, as an organization, has been directly injured by the enactment of S51001 and Defendants' enforcement of the laws, regulations, policies, practices, and customs challenged herein. FPC has and continues to spend time and other resources, including funding, addressing and responding to the enactment of S51001, consuming resources that would have been directed elsewhere. For example, FPC has incurred costs in legal fees analyzing how S51001 affects its members and time in preparing an informational memorandum for its members in New York. FPC has also designed and implemented a New York Hotline program to answer questions and provide legal information to its New York members and the public. FPC will incur ongoing expenses to operate the Hotline, including internal FPC staff time and expenses related to outside counsel who will assist with the Hotline. FPC expects to continue to be required to expend additional resources addressing New York's laws affecting the right to keep and bear arms, including those enacted in S51001, unless and until New York's unconstitutional laws are enjoined.

16.     SAF, as an organization, has been directly injured by the enactment of S51001 and Defendants' enforcement of the laws, regulations, policies, practices, and customs challenged herein. SAF has spent time addressing inquiries about S51001, consuming resources that would have been directed elsewhere. For example, SAF is creating a hotline to answer questions and provide legal information to its New York members and the public. SAF will incur ongoing expenses to operate the hotline, including internal SAF staff time and expenses related to outside counsel who will assist with the hotline. SAF expects to continue to be required to expend additional resources addressing New York's laws affecting the right to keep and bear arms, including those enacted in S51001, unless and until New York's unconstitutional laws are enjoined.

17.     Defendant Kevin Bruen is the Superintendent of the New York State Police. As Superintendent, he exercises, delegates, or supervises all the powers and duties of the New York Division of State Police, which is responsible for executing and enforcing New York's laws and regulations governing the carrying of firearms in public, including prescribing the form for Handgun Carry License applications. Defendant Bruen's official address is New York State Police, 1220 Washington Avenue, Building 22, Albany, NY 12226. Defendant Bruen is sued in his official capacity.

18.     Defendant John J. Flynn is the Erie County District Attorney and chief prosecutor of the county. Defendant Flynn "is the prosecutorial officer with the responsibility to conduct all prosecutions for crimes and offenses cognizable by the courts of the county in which he serves." *People v. Di Falco*, 44 N.Y.2d 482, 487, 377 N.E.2d 732, 735 (1978); N.Y. CNTY. LAW § 700(1). Defendant Flynn**'s** official address is 25 Delaware Ave, Buffalo, NY 14202. Defendant Flynn is sued in his official capacity.

## JURISDICTION AND VENUE

19.     This Court has jurisdiction over all claims for relief pursuant to 28 U.S.C. §§ 1331 and 1343.

20.     Plaintiffs seek remedies under 28 U.S.C. §§ 1651, 2201, 2202, and 42 U.S.C. §§ 1983 and 1988, as this action seeks to redress the deprivation under color of the laws, statutes, ordinances, regulations, customs, and usages of the State of New York, of the rights, privileges or immunities secured by the United States Constitution.

21.     Venue lies in this Court under 28 U.S.C. § 1391, as at least one Defendant is a resident of this District and the events giving rise to Plaintiffs' causes of action arose or exist in this District in which the action is brought.

## FACTS AND ALLEGATIONS COMMON TO ALL CLAIMS

### *The Second Amendment*

22.     In *Bruen*, the Supreme Court explained that the "Second Amendment's plain text . . . presumptively guarantees . . . a right to 'bear' arms in public for self-defense." *Bruen*, 142 S. Ct. at 2135. After all, "[m]any Americans hazard greater danger outside the home than in it." *Id.*

23.     Since the Second Amendment is "not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose," States can exercise regulatory authority in certain narrow circumstances. When doing so, the government must "affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* at 2127. In fact, *Bruen* could not be clearer in its holding that it is *the government* that bears the burden of justifying its firearm regulations. *See id.* at 2130 ("The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation."); *id.* at 2135 (explaining "the burden falls on respondents"); *id.* at 2138 (holding that "respondents have failed to meet *their burden* to identify an American tradition" (emphasis added)).

24.     In *Bruen*, the Supreme Court provided specific guidance to lower courts on how States may and may not restrict the carrying of firearms in "sensitive places."

25.     In *Bruen*, the Supreme Court elaborated on what it had termed "sensitive places" in *Heller*, i.e., those discrete areas "such as schools and government buildings" where "longstanding" "laws forbid[] the carrying of firearms." *Id.* at 2133 (quoting *Heller*, 554 U.S. at 626). And the Court instructed lower courts (and by extension States like New York) to "use analogies to *those* historical regulations of 'sensitive places' to determine [if] modern regulations prohibiting the carry of firearms in *new* and analogous places are constitutionally permissible." *Id.*

(emphasis added). The Court also explained what courts and States could not do. In *Bruen*, New York attempted to characterize its pre-*Bruen* ban of public carry as merely a "sensitive place" restriction. *Id*. at 2133–34. There, the State attempted to define "sensitive places" as "all places where people typically congregate and where law-enforcement and other public-safety professionals are presumptively available." *Id.* (internal quotation marks omitted). The Supreme Court rejected New York's capacious designation of sensitive places. "[E]xpanding the category of 'sensitive places' simply to all places of public congregation that are not isolated from law enforcement defines the category of 'sensitive places' *far too broadly*." *Id.* (emphasis added). Under *Bruen*, the designation of "sensitive places" cannot be used to "in effect exempt cities from the Second Amendment" or "eviscerate the general right to publicly carry arms for self-defense." *Id*. at 2134. Instead, the only permissible "sensitive places" are those with a "historical basis." *Id*.

### New York's Regulatory Scheme

26.     New York law generally forbids any person to "possess[ ] any firearm," N.Y. PENAL LAW § 265.01(1), without first obtaining "a license therefor," *id*. § 265.20(a)(3). Violating this ban is a class A misdemeanor, punishable by a fine of $1,000 or less or up to a year in prison. *Id*. §§ 70.15(1), 80.05(1), 265.01. Possessing a loaded firearm without a license is a class C felony, punishable by a fine of up to $5,000 or between one and fifteen years of imprisonment. *Id*. §§ 70.00(2)(c) & (3)(b), 80.00(1), 265.03.

27.     Not only does New York's draconian firearm regulatory scheme impose great risk of serious criminal penalties, a violation can also result in a lifetime ban on the exercise of the right to keep and bear firearms under state and federal law.

28.     New York's ban is subject to minor exceptions for active-duty members of the military, police officers, and the like. *Id*. § 265.20. An ordinary member of the general public who

wishes to carry a handgun outside the home for purposes of self-protection, however, can only do so if he obtains a license to "have and carry [a handgun] concealed" (a "carry license"), pursuant to Section 400.00(2)(f) of New York's Penal Law. A person seeking such a license must submit an application—on a form approved by Defendant Bruen—to the Licensing Officer for the city or county where he resides. *Id.* § 400.00(3)(a). No license is available to authorize openly carrying handguns within the State.

29.    S51001 "expands eligibility requirements for concealed carry permit applicants. Expanded application requirements include character references, firearm safety training courses, live fire testing, and background checks. Additionally, applicants who have documented instances of violent behavior will be disqualified from obtaining a concealed carry permit. Disqualifying criteria also includes misdemeanor convictions for weapons possession and menacing, recent treatment for drug-related reasons, and for alcohol-related misdemeanor convictions." (Gov. Hochul's July 1, 2011 press statement regarding S51001, *supra*.).

30.    Even after qualifying for a license, New York's regulatory scheme enforced by Defendants prevents licensed individuals from carrying in most public places.

31.    Attempting to take advantage of the narrow circumstances in which governments may restrict the public carry of firearms for self-defense in "sensitive places," New York in S51001 has *broadly* defined "sensitive locations" and invented so-called "restricted locations" to bar the carrying of firearms in the vast majority of New York State.

32.    Under S51001, "sensitive locations" include:

    a.    "any place owned or under the control of federal, state or local government, for the purpose of government administration, including courts;"" any location

providing health, behavioral health, or chemical dependance care or services;"

"any place of worship or religious observation;"

d. "libraries, public playgrounds, public parks, and zoos;"

e. "the location of any program licensed, regulated, certified, funded, or approved by the office of children and family services that provides services to children, youth, or young adults, any legally exempt childcare provider; a childcare program for which a permit to operate such program has been issued by the department of health and mental hygiene pursuant to the health code of the city of New York;"

f. "nursery schools, preschools, and summer camps;

g. "the location of any program licensed, regulated, certified, operated, or funded by the office for people with developmental disabilities;"

h. "the location of any program licensed, regulated, certified, operated, or funded by office of addiction services and supports;"

i. "the location of any program licensed, regulated, certified, operated, or funded by the office of mental health;"

j. "the location of any program licensed, regulated, certified, operated, or funded by the office of temporary and disability assistance;"

k. "homeless shelters, runaway homeless youth shelters, family shelters, shelters for adults, domestic violence shelters, and emergency shelters, and residential programs for victims of domestic violence;"

l. "residential settings licensed, certified, regulated, funded, or operated by the department of health;"

m.  "in or upon any building or grounds, owned or leased, of any educational institutions, colleges and universities, licensed private career schools, school districts, public schools, private schools licensed under article one hundred one of the education law, charter schools, non-public schools, board of cooperative educational services, special act schools, preschool special education programs, private residential or non-residential schools for the education of students with disabilities, and any state-operated or state-supported schools;"

n.  "any place, conveyance, or vehicle used for public transportation or public transit, subway cars, train cars, buses, ferries, railroad, omnibus, marine or aviation transportation; or any facility used for or in connection with service in the transportation of passengers, airports, train stations, subway and rail stations, and bus terminals;"

o.  "any establishment issued a license for on-premise consumption pursuant to article four, four-A, five, or six of the alcoholic beverage control law where alcohol is consumed and any establishment licensed under article four of the cannabis law for on-premise consumption;"

p.  "any place used for the performance, art entertainment, gaming, or sporting events such as theaters, stadiums, racetracks, museums, amusement parks, performance venues, concerts, exhibits, conference centers, banquet halls, and gaming facilities and video lottery terminal facilities as licensed by the gaming commission;"

q.  "any location being used as a polling place;"

r.   "any public sidewalk or other public area restricted from general public access for a limited time or special event that has been issued a permit for such time or event by a governmental entity, or subject to specific, heightened law enforcement protection, or has otherwise had such access restricted by a governmental entity, provided such location is identified as such by clear and conspicuous signage;"

s.   "any gathering of individuals to collectively express their constitutional rights to protest or assemble;"

t.   "the area commonly known as Times Square, as such area is determined and identified by the city of New York; provided such area shall be clearly and conspicuously identified with signage." *See* N.Y. PENAL LAW § 265.01-e(2)(a)–(t).

33.   New York makes the possession of firearms in these "sensitive locations" a Class E felony when an otherwise law-abiding, licensed firearm owner "knows or reasonably should know such location is a sensitive location." N.Y. PENAL LAW § 265.01-e.

34.   New York has also established what it terms "restricted locations." But instead of some ascertainable category of locations, this is a designation that applies to *all* "private property." All private property in the State of New York is "a restricted location" where public carry of firearms for self-defense is unlawful—unless "the owner or lessee of such property" has "permitted" "possession by clear and conspicuous signage indicating that the carrying of firearms, rifles, or shotguns on their property is permitted or has otherwise given express consent." S51001, §5; N.Y. PENAL LAW § 265.01-d.

35.     If an otherwise law-abiding, licensed firearm owner possesses a firearm and "*enters into* or *remains* on or in private property" where the owner or lessee has not put up the requisite conspicuous sign or given *express* consent, he or she has committed a Class E Felony. S51001, §5; N.Y. PENAL LAW § 265.01-d (emphasis added).

### *The Challenged "Carry Provisions"*

36.     Collectively, New York's "sensitive location" and "restricted location" designations, and Defendants' enforcement of them, are a *de facto* ban on the fundamental, individual right to bear arms in public *virtually everywhere*. Indeed, asked by reporters where New York carry license-holders would be able to legally exercise their rights after enactment of S51001, New York Governor Kathy Hochul could only affirm that New Yorkers have their Second Amendment rights to peaceably carry for self-defense on "[p]robably some streets." Accordingly, typical law-abiding citizens of New York—the vast majority of responsible citizens—effectively remain subject to a flat ban on carrying handguns outside the home for the purpose of self-defense in vast swaths of the State.

37.     Without conceding the lawfulness of any particular provision, Plaintiffs herein challenge the following "sensitive location" and "restricted location" provisions of New York law:

    a.  Penal Law § 265.01-e(2)(d) (public parks);

    b.  Penal Law § 265.01-e(2)(n) (public transportation);

    c.  Penal Law § 265.01-d (default anti-carry rule), with respect to places open to the public.

These provisions, collectively referred to as the Carry Provisions, as well as Defendants' regulations, policies, and enforcement practices implementing them, are particularly egregious

violations of Plaintiffs' constitutional rights to exercise their right to bear arms and carry them in public for purposes of self-defense.

38. *Public Parks.* Under Penal Law § 265.01-e(2)(d), New York imposes criminal liability on carry licensees who exercise their right to bear arms in "public parks." This is a prohibition of enormous scope and restricts carriage in a manner that simply cannot be "justif[ied]" as "consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2130; *see also Bridgeville Rifle & Pistol Club, Ltd. v. Small*, 176 A.3d 632, 658 (Del. 2017) ("State Parks and State Forests . . . present a far different 'place restriction' than one limiting possession of firearms in a school or courthouse—traditional 'sensitive places.'").

    a. S51001 does not itself define "public parks" but the ordinary meaning of park is capacious, meaning a separate area of land for the people to use. *See* "Park," OXFORD LEARNER'S DICTIONARIES ("[A]n area of public land in a town or a city where people go to walk, play, and relax."); "Park," DICTIONARY.COM ("[A]n area of land, usually in a largely natural state, for the enjoyment of the public, having facilities for rest and recreation, often owned, set apart, and managed by a city, state, or nation."); "Park," MERRIAM-WEBSTER DICTIONARY ("[A]n enclosed piece of ground stocked with game and held by royal prescription or grant; a tract of land that often includes lawns, woodland, and pasture attached to a country house and is used as a game preserve and for recreation; a piece of ground in or near a city or town kept for ornament and recreation; an area maintained in its natural state as a public property."); *cf.* H. L. A. HART, *Positivism and the Separation of Law and Morals*, 71 Harv. L. Rev. 593, 607 (1958). And New York has a long history of setting aside land for

public purposes as "parks." "A park is, in its strict sense, a piece of ground inclosed for purposes of pleasure, exercise, amusement or ornament." *Perrin v. New York Cent. R.R. Co.*, 36 N.Y. 120, 124 (1867). Or as the New York Court of Appeals said more recently, a park is "a recreational pleasure area set aside to promote public health and welfare." *Friends of Van Cortlandt Park v. City of New York*, 95 N.Y.2d 623, 629 (2001).

b.  Parks comes in all shapes and sizes, and include appurtenances that render them useful for the public, like trails, paths, roads, campsites, and parking. For instance, the City of New York defines "park" as "public parks, beaches, waters and land under water, pools, boardwalks, playgrounds, recreation centers and all other property, equipment, buildings and facilities now or hereafter under the jurisdiction, charge, or control of the Department [of Parks]." NEW YORK CITY, N.Y., RULES, TIT. 56, § 1-02. And, of course, parks also have "park paths," which include "any road, path or trail through or within a park that is not used for vehicular traffic" and parks include "parks waters," which not only constitute pools and bathing areas, but also any "tributary, brook, stream, [or] ocean" in or flowing into the park. *Id.* Thus, the scope of S51001 designation of "public parks" as "sensitive locations" where public carry for self-defense is illegal is profound.

c.  For instance, the State of New York Office of Parks, Recreation and Historic Preservation "oversees more than 250 parks, historic sites, recreational trails, golf course, boat launches and more, which are visited by 78 million people annually." *See* NEW YORK STATE PRESS RELEASE, *Governor Hochul*

*Announces 130 Acres Added to Sterling Forest State Park in Orange County*
(Jan. 22, 2022), available at https://on.ny.gov/3q4kyK0 (last visited August 31,
2022). The State Park system alone accounts for "over 350,000 acres of park
land" in New York State. *See* NY STATE PARKS BLOG, *Celebrate Earth Day
With State Parks!*, (April 20, 2022), available at https://bit.ly/3R8LowE (last
visited August 31, 2022). Thus, "[f]rom the shores of Long Island to the mighty
Niagara Falls," Plaintiffs cannot possess their firearms for self-defense in any
part of any state park. *See* N.Y. PARKS REC.& HIST. PRESERV., available at
https://on.ny.gov/3Q9xmJH (last visited August 31, 2022).

    d.   Upon information and belief, "public park" under S51001 also includes the
"Adirondack Park," which is under the joint responsibility of the Adirondack
Park Agency and the New York State Department of Environmental
Conservation. *See* ADIRONDACK PARK AGENCY, *The Adirondack Park*,
available at https://apa.ny.gov/about_park/ (last visited August 31, 2022). As of
May 2014, Adirondack Park consisted of a "Total Park" acreage of 5,821,421
acres of which the state land is 2,551,669 acres. *See Adirondack Park Land Use
Classification Statistics* (May 21, 2014), available at
https://on.ny.gov/3pXDbPM (last visited August 31, 2022). The State even
classifies over a million acres as "wilderness." *Id*. Yet in this Park, which
represents nearly *one-third* of the entire land area of New York State—an area
a young Theodore Roosevelt once described as having a quality of "decided
wildness"—Plaintiffs cannot lawfully carry firearms for self-defense. *See*

THEODORE ROOSEVELT AND H.D. MINOT, *The Summer Birds of the Adirondacks in Franklin County, N.Y.* (1877).

e.  Upon information and belief, "public park" under S51001 also includes the "Catskill Park," which is managed by the New York State Department of Environmental Conservation. The total park is approximately 705,000 acres of which 143,000 is classified as "wilderness" and 130,000 as "wild forest." *See* STATE OF NEW YORK, Catskill Park State Land Master Plan (Aug. 2008, amended 2014), available at https://on.ny.gov/3wJoQKL (last visited August 31, 2022). Here too, Plaintiffs cannot lawfully carry firearms for self-defense. The vast reaches of the Catskills are now a "sensitive location," a remarkable (and implausible) transformation. *Cf.* WASHINGTON IRVING, *Rip Van Winkle* (1820) (after falling asleep in the "Kaatskill mountains," Rip Van Winkle awoke to world where "everything's changed").[3]

---

[3] The State Police, in an online FAQ, has said "[c]ertain areas of *the parks* are not 'sensitive locations'" but the State Police failed to indicate which parts of these *parks*, which are otherwise covered by the plain language of the statute, are covered. *See Frequently Asked Questions Regarding Recent Changes To New York State Firearm Laws*, NEW YORK STATE POLICE (Aug. 27, 2022), available at https://on.ny.gov/3cY25fl (last visited Sept. 12, 2022) (emphasis added). The New York State Department of Environmental Conservation has only indicated that hunting is allowed. *See Frequently Asked Questions Regarding Recent Changes to New York State Firearm Laws*, NEW YORK STATE DEPARTMENT OF ENVIRONMENTAL CONSERVATION (Sept. 1, 2022), available at https://on.ny.gov/3BBlKvn (last visited Sept. 12, 2022). Since hunting is an exception to the sensitive locations provisions, the Department's guidance that *only* hunting is permissible indicates that New Yorkers carrying for self-defense, but who are not actively engaged in hunting, are unconstitutionally barred from carrying in both Adirondacks Park and Catskills Park. *Cf. Kimmel v. State of New York*, 29 N.Y.3d 386, 394, 80 N.E.3d 370, 375 (2017) ("[W]here a statute creates provisos or exceptions as to certain matters the inclusion of such provisos or exceptions is generally considered to deny the existence of others not mentioned" (internal quotation marks omitted)).

f.  "In contrast to a permissible sensitive place such as a courthouse, where visitors are screened by security," most public parks "do not have controlled entry points," can be "easily enter[ed]" with a weapon "either intentionally or by inadvertently wandering across a [park] boundary while exercising the right to . . . licensed concealed carry." *Bridgeville Rifle & Pistol Club* 176 A.3d at 659. Further, "[w]hereas courthouses are supervised by law enforcement personnel or easily accessible to law enforcement and other emergency responders" many parks are "relatively remote" and "the intervention of society on [individuals'] behalf may be too late to prevent injury." *Id.*

39.  *Public Transportation*. As relevant here, under Penal Law § 265.01-e(2)(n), New York imposes criminal liability on carry licensees who exercise their right to bear arms in "any place, conveyance, or vehicle used for public transportation or public transit . . . train cars, buses, ferries, railroad, . . .[or] marine . . . transportation; or any facility used for or in connection with service in the transportation of passengers, . . . train stations, . . . and rail stations, and bus terminals." These blanket prohibitions on carrying in and around these common modes of transportation cannot be "justif[ied]" as "consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2130.

a.  New Yorkers ride modes of public transit more than 3.8 billion times annually in over 130 transit systems throughout New York State. *See* NEW YORK PUBLIC TRANSIT ASSOCIATION, INC., *Public Transit Facts*, available at https://bit.ly/3AFgYem (last visited August 31, 2022).

b.  Public transportation is a vital part of everyday life with "[a]lmost 60 percent of people who ride public transit . . . commuting to and from work." *See id*.

20

c.  In fact, there are many common scenarios where individuals, like Plaintiffs and others, may need to bring firearms for self-defense in public transportation areas that have been designated as "sensitive locations." For instance, individuals who get off work and have to commute by bus. "When [the individuals] arrive at . . . the bus stop, they have to walk some distance through a high-crime area." *Bruen*, Oral Arg. Tr. at 67 (Nov. 03, 2021). Nevertheless, these individuals are barred from carrying a firearm for self-defense because their mode of transit to earn their livelihood happens to be public.

d.  The prohibition on carrying for self-defense in public transportation will disproportionately burden low-income New Yorkers. "Low-income workers rely more on public transit due to limited access to automobiles and the cost of maintaining a car." FEDERAL TRANSIT AGENCY, *Transportation Needs of Disadvantaged Populations: Where, When, and How?* at 30 (Feb. 2013), available at https://bit.ly/3wJLfrk (last visited August 31, 2022). In particular, public transportation is needed for "many service jobs that are often taken by low-income workers who do not have a regular 9-to-5 schedule." *Id*. at 3–4. These second or third shift workers, commuting in the odd hours of the night, are left without the ability to carry for self-defense or in-case of confrontation. Yet without question, the Second Amendment extends to "all Americans," *Heller*, 554 U.S. at 580—not just the well-heeled with their own vehicles.

e.  "In contrast to a permissible sensitive place such as a courthouse, where visitors are screened by security," many modes of public transportation "do not have controlled entry points." *Bridgeville Rifle & Pistol Club*, 176 A.3d at 659.

Further, "[w]hereas courthouses are supervised by law enforcement personnel or easily accessible to law enforcement and other emergency responders," transit stops may be comparatively "remote" and "the intervention of society on [individuals'] behalf may be too late to prevent injury." *Id.*

40.   *Private Property Open to the Public*. Under S51001, New York treats as a separate crime, the otherwise lawful possession of a firearm in so-called "restricted locations." This provision is unconstitutional to the extent that it establishes a default ban on the carry of firearms for self-defense in areas open to members of the public.

a.   As the Supreme Court reaffirmed in *Bruen*, the Second Amendment itself establishes a presumption that Plaintiffs and other licensed, law-abiding citizens have a "right to 'bear' arms in public for self-defense." *Bruen*, 142 S. Ct. at 2135.

b.   New York has now *flipped* the presumption by dictating that all private property—even in those locations open to members of the public—are now presumptively off-limits without conspicuous signage or express consent.

c.   The State's establishment of an anti-carry presumption for all private property is a massive restriction on the right to bear arms. After all, it establishes a "default rule" of interaction with strangers, i.e., members of the public coming to a property open to the public, and in these situations "default rules" are particularly "sticky." *See generally* OMRI BEN-SHAHAR & JOHN A. E. POTTOW, *On the Stickiness of Default Rules*, 33 FLA. ST. L. REV. 651 (2006), available at https://bit.ly/3pWXM6Y (last visited August 31, 2022). By "sticky," legal scholars mean that individuals have a well-known tendency to stick by the

default rule *even when* they would otherwise take a different position. *Id.* at 651–54. New York has established a default rule that imposes an additional and significant burden on those law-abiding citizens seeking to exercise their Second Amendment right to carry publicly for self-defense.

d. The State's presumption is tantamount to other state action that would similarly be violative of Constitutional rights. The State could not establish a default rule that praying before a meal is unlawful unless a restauranteur expressly consents. The State could not establish a default rule that an individual cannot wear a political t-shirt in an office park unless a leasing agent expressly consents. As in those situations, the Bill of Rights poses no obstacle to a property owner *independently* banning praying or banning political t-shirts (even if other laws might), just as a property owner can *independently* decide to bar invitees from carrying firearms. But, as in all those situations, the State may not presume to make the property owner's decision for them and place a thumb on the scale against the exercise of constitutional rights. Moreover, as relevant under *Bruen*, New York will be unable to demonstrate that this presumption is "part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." 142 S. Ct. at 2127.

e. It is not hard to see how this "sticky" default rule will effectively disable Plaintiffs and other New Yorkers from exercising their constitutional right to carry. For instance, the property owner who does not know about the new presumption will fail to post clear and conspicuous signage permitting the carrying of firearms or otherwise fail to give the express consent that the

property owner does not know is needed. A property owner who is indifferent to carrying firearms will fail to post clear and conspicuous signage or provide express consent, even though before the enactment, he would have allowed individuals to carry as a result of being indifferent to ban it. Further, a property owner, who would like to allow the carry of firearms, will fail to post the required signage or give the required consent for fear of stigma and opprobrium from other customers by having to publicly proclaim support for customers' exercise of their constitutional right to carry for self-defense.

f.   Far from honoring the Second Amendment as the Supreme Court instructed in *Bruen*, the State's new default rule broadly sweeps away the Second Amendment rights of New Yorkers and effectively shuts off most public areas from carrying for self-defense —save "[p]robably some streets."

### *The Carry Provisions Effects on Plaintiffs*

41.   Plaintiff Boron is presently licensed under New York law to carry a concealed firearm. Boron desires to carry his firearm for self-defense purposes when going about his day-to-day life. Under the Carry Provisions, Boron will be prevented from doing so. In particular, Boron will be unable to carry for self-defense when taking his weekly walk with his dog to a local park near his house, as he typically does and would intend to continue to do so, but for the enactment and enforcement of S51001. The enactment and enforcement of S51001 forces Boron to either forego carrying while walking his dog or change the time he goes to the park when he perceives it to be safe. Further, the Carry Provisions will prevent Boron from riding public transportation while carrying for self-defense, as he would intend to do, but for the enactment and enforcement of S51001. He will be unable to visit downtown Buffalo, as he commonly does every several months

24

to go out to dinner, by taking the NFTA Metro Rail and carry for self-defense, which is particularly problematic because of Boron's concerns for his public safety when he gets off the train in Buffalo. Despite his Second Amendment rights, S51001's designation of these spaces as "sensitive locations" disables him from exercising those rights.

42.     Further, Boron will be unable to carry his firearm on his person throughout the State because of the State's designation of private property, which is open to all members of the public, as "restricted locations." Boron typically brings his firearm with him on private property open to the public, such as on early morning visits to the ATM, weekly visits to gas stations, and monthly visits to hardware stores, and he intended to continue to do so, but for the enactment and enforcement of S51001. S51001's designation of private property, including private property which is open to the public, as a restricted location effectively prevents Boron from going about his daily life in the state of New York while lawfully carrying his firearm for purposes of self-defense. For example, Boron is an avid motorcyclist, riding multiple times a week when weather permits. After S51001's effective date, when riding in upstate New York, including predominantly rural areas, Boron will be unable to take any bathroom breaks, pick-up or buy food, or unable to get gas if he "possesses a firearm" and there is not "clear and conspicuous signage" indicating that the "carrying of firearms . . . is permitted." Moreover, since S51001 bars even "*entering*" these locations, Boron will often need to stop carrying for self-defense before he can get physically close enough to see if any "clear and conspicuous signage" exists. If the motorcycle he is riding lacks a safe and secure depository for his firearm, he will be unable to stop at all to even *check* the signage. This effectively means Boron must leave his firearm at home. Boron is particularly concerned that if he encounters mechanical difficulties with his motorcycle, leaving his firearm at home will leave him defenseless while waiting multiple hours on the side of a road for a service vehicle or a public

safety response. Alternatively, if Boron's motorcycle were to have a safe and secure depository where it would be lawful to store a firearm, the process of disabling and storing the firearm would risk putting Boron in an uncomfortable situation with passersby observing him do so.

43.     Plaintiff Brett Christian is presently licensed under New York law to carry a concealed firearm. Christian desires to carry his firearm for self-defense purposes when going about his day-to-day life. Under the Carry Provisions, Christian will be prevented from doing so. In particular, Christian will be unable to carry for self-defense when present in local parks or when hiking on trails in largely wooded and marshy areas as he does, weather permitting, a few times each month. These places can be far removed from any public safety response. Christian would intend to continue to carry for self-defense in parks and when on trails, but for the enactment and enforcement of S51001. Christian will be further unable to visit the Adirondacks, a place he visited before the onset of the Covid pandemic and to which he intended to return in November 2022 (by taking paid time off from work), but he will be unable to return this November and lawfully carry because of S51001. Moreover, on his visits to downtown Buffalo, he will be unable to use public transportation, like NFTA Metro Rail as he does when traffic or events downtown make driving impractical, and carry for self-defense. This is particularly problematic because of Christian's concerns for his public safety when he gets off the train in Buffalo. Despite his Second Amendment rights, S51001's designation of these spaces as "sensitive locations" disables him from exercising those rights.

44.     Further, Christian will be unable to carry his firearm on his person throughout the State because of the State's designation of private property, which is open to all members of the public, as "restricted locations." Christian typically brings his firearm with him on private property open to the public, such as weekly visits to gas stations and monthly visits to hardware stores, and

he intended to continue to do so, but for the enactment and enforcement of S51001. S51001's designation of private property, including private property which is open to the public, as a restricted location effectively prevents Christian from going about his daily life in the state of New York while lawfully carrying his firearm for purposes of self-defense. For example, after S51001's effective date, when driving or running errands, Christian will be unable to take any bathroom breaks, pick-up or buy food, or unable to get gas if he "possesses a firearm" and there is not "clear and conspicuous signage" indicating that the "carrying of firearms . . . is permitted." Moreover, since S51001 bars even "*entering*" these locations, Christian will need to disable and store his firearm before he drives his vehicle or walks into the parking lot, which means in some instances, Christian will need to stop carrying for self-defense before he can get physically close enough to see if any "clear and conspicuous signage" exists. The process of disabling and storing the firearm would risk putting Christian in an uncomfortable situation with passersby observing him do so.

45.     Plaintiffs FPC and SAF have members and supporters in New York who intend and desire to exercise their right to keep and bear arms by carrying on their person a loaded, operable handgun for lawful purposes, including self-defense, outside their homes, in case of confrontation. But for New York's unconstitutional Carry Provisions, and the Defendants' enforcement thereof, and the severe lifelong and criminal penalties associated with violations of the regulatory scheme, Plaintiffs FPC and SAF's members, including Plaintiffs Boron and Christian, would exercise their right to keep and bear arms by carrying on their person a loaded, operable handgun for lawful purposes, including immediate self-defense in case of confrontation, without the fear or risk of arrest and prosecution, and the loss of their right to keep and bear arms for engaging in constitutionally protected lawful conduct.

46.     The challenged Carry Provisions individually and collectively operate to deny Plaintiffs and other typical law-abiding individuals from carrying loaded, operable handguns on their person in case of confrontation for immediate self-defense in public places. As Defendant Bruen's subordinate First Deputy Superintendent of the State Police has said, state "troopers 'are standing ready' to ensure the new laws are followed." Maki Becker, *Hochul: Last-minute pistol permit seekers may be too late to avoid NY's new gun requirements*, THE BUFFALO NEWS (Aug 31, 2022), available at https://bit.ly/3KAf9nG (last visited Sept. 6, 2022). The State Police further added "an easy message" for individuals like Plaintiffs who seek to carry their firearms: "We have zero tolerance. If you violate this law, you will be arrested. It's as simple as that." *Id.*

<u>**COUNT ONE**</u>
**DEPRIVATION OF CIVIL RIGHTS**
**RIGHT TO KEEP AND BEAR ARMS**
**U.S. CONST., AMENDS. II AND XIV**
**(42 U.S.C. § 1983)**

47.     Plaintiffs incorporate herein by reference the foregoing paragraphs as if fully set forth herein.

48.     There is an actual and present controversy between the parties.

49.     Defendants are implementing and will enforce onerous and burdensome Carry Provisions—N.Y. PENAL LAW §§ 265.01-e(2)(d) (public parks), 265.01-e(2)(n) (public transportation), and 265.01-d (default anti-carry rule) with respect to places open to the public— and all related regulations, policies, and enforcement practices, which, individually and collectively, unconstitutionally burden, delay, chill, and/or deny law-abiding people, like and including Individual Plaintiffs and Institutional Plaintiffs' similarly situated members, the exercise of their fundamental, individual right to bear arms.

50.     Individual Plaintiffs and Institutional Plaintiffs' similarly situated members desire to exercise their right to bear arms by carrying in public for lawful purposes, including immediate self-defense in case of confrontation. "The Second Amendment's plain text . . . presumptively guarantees" Plaintiffs' "right" to do so. *Bruen*, 142 S. Ct. at 2135. In particular, Plaintiffs desire to carry a loaded, operable firearm for immediate self-defense in case of confrontation in the locations as listed and described in Paragraphs 41–44 above, and Plaintiffs would do so, but for their reasonable fear of Defendants' enforcement and threatened enforcement of New York's laws, which could lead to their arrest and prosecution, and if convicted, the loss of their rights.

51.     Defendants cannot "identify an American tradition" of firearm regulation "justifying" these Carry Provisions and related regulations, policies, and enforcement practices. *Bruen*, 142 S. Ct. at 2135. Since Defendants cannot "demonstrat[e]" that the Carry Provisions and their enforcement thereof is "consistent with the Nation's historical tradition of firearm regulation," they are unconstitutionally infringing Plaintiffs' Second Amendment rights. *Id.* at 2130.

52.     42 U.S.C. § 1983 creates a cause of action against state actors who deprive individuals of federal constitutional rights under color of state law.

53.     Defendants, individually and collectively, and under color of State law at all relevant times, have deprived the fundamental constitutional rights, privileges, and immunities of citizenship of adult persons in the State of New York, including Plaintiffs Boron and Christian, and other members of Plaintiffs FPC and SAF, through Defendants' enforcement and implementation of the Carry Provisions, which has denied, and will continue to deny and prevent by criminal sanction, the exercise of the fundamental right to bear arms in public for self-defense and in case of confrontation unless and until redressed through the relief Plaintiffs seek herein.

54.     For all the reasons asserted herein, Defendants have acted in violation of, and continue to act in violation of, 42 U.S.C. § 1983, compelling the relief Plaintiffs seek.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for the following relief:

1.     A declaratory judgment that N.Y. PENAL LAW §§ 265.01-e(2)(d) (public parks), 265.01-e(2)(n) (public transportation), and 265.01-d (default anti-carry rule) with respect to places open to the public, and Defendants' enforcement thereof, individually and/or collectively infringe upon Plaintiffs' right to bear arms protected under the Second and Fourteenth Amendments to the United States Constitution and are thus devoid of any legal force or effect;

2.     Injunctive relief restraining Defendants and their officers, agents, servants, employees, and all persons in concert or participation with them who receive notice of the injunction, from enforcing N.Y. PENAL LAW §§ 265.01-e(2)(d) (public parks), 265.01-e(2)(n) (public transportation), and 265.01-d (default anti-carry rule) with respect to places open to the public, and their regulations, policies, and practices implementing them;

3.     Plaintiffs' attorneys' fees and costs pursuant to 42 U.S.C. § 1988 and any other applicable law; and,

4.     All other and further legal and equitable relief, including injunctive relief, against Defendants as necessary to effectuate the Court's judgment, and/or as the Court otherwise deems just and equitable.

Respectfully submitted this 13th day of September 2022,

| | |
|---|---|
| David H. Thompson* | /s/ Nicolas J. Rotsko_____ |
| Peter A. Patterson* | Nicolas J. Rotsko |
| John W. Tienken* | PHILLIPS LYTLE LLP |
| COOPER & KIRK, PLLC | One Canalside |
| 1523 New Hampshire Avenue, N.W. | 125 Main Street |
| Washington, D.C. 20036 | Buffalo, NY 14203-2887 |
| (202) 220-9600 | (716) 847-5467 |
| (202) 220-9601 (fax) | (716) 852-6100 (fax) |
| dthompson@cooperkirk.com | NRotsko@phillipslytle.com |
| ppatterson@cooperkirk.com | |
| jtienken@cooperkirk.com | |

*App. to appear *pro hac vice* forthcoming

*Attorneys for Plaintiffs*