UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

JOHN BORON, et al.,

                              Plaintiffs,                    Case No.:  22-cv-00695-JLS

        v.

KEVIN P. BRUEN, et al.,

                              Defendants.

_____


**PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR MOTION FOR A
PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................................................. ii

INTRODUCTION ............................................................................................................... 1

STATEMENT OF FACTS .................................................................................................... 2

I.     The Supreme Court Held that New York's Proper Cause Licensing Regime is Unconstitutional in *Bruen*. ...................................................................................... 2

II.    New York Enacts S51001 with Sweeping "Sensitive Location" and "Restricted Location" Designations. ............................................................................................ 4

III.   New York's Restrictions' Effects on Plaintiffs. ........................................................ 8

ARGUMENT .................................................................................................................... 10

I.     Plaintiffs are likely to prevail on the merits. ......................................................... 10

    a.   The Second Amendment's plain text protects Plaintiffs' proposed course of conduct. ............................................................................................................ 11

    b.   S51001's Carry Provisions are not consistent with the historical tradition of firearms regulation in the United States. ......................................................... 12

        i.   New York's "Sensitive Locations" are not relevantly similar to permissible sensitive place restrictions. ...................................................... 14

        ii.  New York's "anti-carry" presumption is unprecedented. .................... 20

II.    Plaintiffs will continue to suffer irreparable harm in the absence of a preliminary injunction. ............................................................................................................. 23

III.   A preliminary injunction would be in the public interest. ...................................... 24

CONCLUSION ................................................................................................................. 24

## TABLE OF AUTHORITIES

**Cases**      **Page**

*A.H. by & through Hester v. French*, 985 F.3d 165 (2d Cir. 2021)..........................................23, 24

*Antonyuk v. Bruen*, No. 1:22-CV-0734, 2022 WL 3999791 (N.D.N.Y. Aug. 31, 2022) ........23, 24

*Brenntag Int'l Chem., Inc. v. Bank of India*, 175 F.3d 245 (2d Cir. 1999)....................................23

*Bridgeville Rifle & Pistol Club, Ltd. v. Small*, 176 A.3d 632 (Del. 2017) .................14, 15, 17, 20

*Brown v. Ent. Merch. Ass'n*, 564 U.S. 786 (2011) ........................................................................22

*District of Columbia v. Heller*, 554 U.S. 570 (2008).........................................................2, 19, 21

*Dr.'s Assocs., Inc. v. Distajo*, 107 F.3d 126, 136 (2d Cir. 1997).................................................24

*Friends of Van Cortlandt Park v. City of New York*, 95 N.Y.2d 623 (2001)................................15

*Gamble v. United States*, 139 S. Ct. 1960 (2019) .......................................................................13

*Hund v. Cuomo*, 501 F. Supp. 3d 185 (W.D.N.Y. 2020).........................................................10, 24

*Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407 (2022).........................................................22

*Khan v. State Oil Co.*, 93 F.3d 1358 (7th Cir. 1996) ...................................................................13

*McDonald v. City of Chicago*, 561 U.S. 742 (2010)....................................................................13

*Minnesota Voters All. v. Mansky*, 138 S. Ct. 1876 (2018)...........................................................22

*Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2012).......................................................................11

*New York v. United States Dep't of Homeland Sec.*, 969 F.3d 42 (2d Cir. 2020) ........................10

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022)........................ *passim*

*Peruta v. California*, 137 S. Ct. 1995 (2017)................................................................................1

*Perrin v. New York Cent. R.R. Co.*, 36 N.Y. 120 (1867) ...............................................................15

*Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63 (2020)........................................23

*Stickley v. City of Winchester*, No. CL21-206 (Va. Cir. Ct. Sept. 27, 2022) (Ex. F)....................17

*State Oil Co. v. Khan*, 522 U.S. 3 (1997)....................................................................................13

*Wisdom Import Sales Co., L.L.C. v. Labatt Brewing Co., Ltd.*, 339 F.3d 101 (2d Cir. 2003).......23

**Statutes and Legislative Materials**

U.S. CONSTITUTION, amend. II.........................................................................................................10

NEW YORK PENAL LAW

    § 265.01-d ...........................................................................................................................7
    § 265.01-e ...........................................................................................................................7
    § 265.01-e(2)(a)–(t)............................................................................................................6
    § 265.01-e(2)(d)................................................................................................................14
    § 265.01-e(2)(n)................................................................................................................18

New York City, N.Y., Rules, Tit. 56, § 1-02 ...........................................................15

Senate Bill S51001 (June 30, 2022, Extraordinary Session) ................................1, 4, 5, 6, 7, 9, 20

**Other Authorities**

*Adirondack Park Land Use Classification Statistics* (May 21, 2014), available at
https://on.ny.gov/3pXDbPM .....................................................................16

Maki Becker, *Hochul: Last-minute pistol permit seekers may be too late to avoid NY's new gun
requirements*, The Buffalo News (Aug 31, 2022), available at https://bit.ly/3KAf9nG ......10

Omri Ben-Shahar & John A. E. Pottow, *On the Stickiness of Default Rules*, 33 Fla. St. L.
Rev. 651 (2006), available at https://bit.ly/3pWXM6Y ..............................................21

Boston Common, National Park Service, available at https://bit.ly/3RHt8uI ........................17

Brief for Respondents, *New York State Rifle & Pistol Ass'n, Inc. v. Bruen* (Sept. 14, 2021) .....2, 3

Marcia Karmer, *Fresh off primary win, Gov. Kathy Hochul dives right into guns -- who can get
them and where they can take them*, CBS News New York, June 29, 2022, available
at https://cbsn.ws/3Svg4IA ........................................................................7, 8

David Kopel and Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine: Locational Limits On
The Right To Bear Arms*, 13 Charleston L. Rev. 205 (2018) ......................................18

Federal Transit Agency, *Transportation Needs of Disadvantaged Populations: Where, When,
and How?* (Feb. 2013), available at https://bit.ly/3wJLfrk .........................................19

Luis Ferré-Sadurní and Grace Ashford, *N.Y. Democrats to Pass New Gun Laws in
Response to Supreme Court Ruling*, N.Y. Times, June 30, 2022, available at
https://nyti.ms/3yTp2Yj ................................................................................1

Oliver W. Holmes, *The Stage-Coach Business In The Hudson Valley*, The Quarterly Journal
of the New York State Historical Association (1931) .................................................19

New York Gov.'s Press Office, *Governor Hochul Signs Landmark Legislation to Strengthen
Gun Laws and Bolster Restrictions on Concealed Carry Weapons in Response to Reckless
Supreme Court Decision*, July 1, 2022, available at https://on.ny.gov/3nXWrvA................6, 7

New York Public Transit Association, Inc., *Public Transit Facts*, available at
https://bit.ly/3AFgYem .................................................................................18

New York State Press Release, *Governor Hochul Announces 130 Acres Added to Sterling
Forest State Park in Orange County* (Jan. 12, 2022),
available at https://on.ny.gov/3q4kyK0 ............................................................16

NY State Parks Blog, *Celebrate Earth Day With State Parks!*, (April 20, 2022), available at
https://bit.ly/3R8LowE..................................................................................16

N.Y. Parks Rec.& Hist. Preserv., available at https://on.ny.gov/3Q9xmJH ...........................16

"Park," Oxford Learner's Dictionaries..................................................................15

Oral Arg. Tr., *New York State Rifle & Pistol Ass'n, Inc. v. Bruen* (Nov. 03, 2021)................18, 19

STATE OF NEW YORK, Catskill Park State Land Master Plan (Aug. 2008, amended 2014),
    available at https://on.ny.gov/3wJoQKL ...........................................................................16

Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical
    Framework and A Research Agenda*, 56 UCLA L. REV. 1443 (2009)............17, 18, 20, 23, 24

## INTRODUCTION

In *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), the Supreme Court affirmed that individuals have a constitutional right under the Second Amendment to publicly carry firearms for self-defense. In doing so, the Court held that New York's "proper cause" licensing regime unconstitutionally infringed this right. A little more than one week later, New York enacted Senate Bill S51001 ("S51001") (June 30, 2022, Extraordinary Session) to replace its prior unconstitutional regime. But instead of following the Supreme Court's guidance in *Bruen*, New York defied it, trading one unconstitutional set of firearms laws for another. As relevant here, S51001 establishes numerous "sensitive locations"—including parks and public transportation—where firearms are forbidden. Next, S51001 designates all private property in the State to be a "restricted location" where carrying firearms is forbidden, absent affirmative steps by the property owner to allow carriage. In doing so, the State, contrary to the Second Amendment, has established a presumption *against* carrying firearms for self-defense in public. Under S51001, "ordinary, law-abiding citizens," like and including Plaintiffs, are again prevented from carrying handguns in public for self-defense in almost all corners of the State, except in what Governor Hochul said were, "probably some streets." LUIS FERRÉ-SADURNÍ AND GRACE ASHFORD, *N.Y. Democrats to Pass New Gun Laws in Response to Supreme Court Ruling*, N.Y. TIMES, June 30, 2022, available at https://nyti.ms/3yTp2Yj (last visited Sept. 26, 2022). S51001 makes a mockery of the Supreme Court's holding in *Bruen*, which reaffirmed that personal security extends to more than just "those . . . who work in marbled halls, guarded constantly by a vigilant and dedicated police force," *Peruta v. California*, 137 S. Ct. 1995, 1999 (2017) (Thomas, J., dissenting from the denial of certiorari), but also emphatically extends to include ordinary, law-abiding Americans "outside the home," *Bruen*, 142 S. Ct. at 2122. Since the State's expansive restrictions on carriage

1

in public do not allow typical law-abiding citizens to carry a loaded and operable handgun outside their home in all sorts of places of everyday life, these restrictions deny individuals any meaningful right to bear arms. This denial of Plaintiffs' constitutional rights is causing them immediate and irreparable harm. Accordingly, Plaintiffs respectfully request this Court enter a preliminary injunction forbidding Defendants from enforcing these unconstitutional provisions while this case is litigated.[1] *See* Complaint, No. 1:22-cv-695-JLS (Sept. 13, 2022) (attached hereto as Ex. B).

## STATEMENT OF FACTS

**I.**      **The Supreme Court Held that New York's Proper Cause Licensing Regime is Unconstitutional in** ***Bruen.***

In *Bruen*, the Supreme Court considered the constitutionality of New York's "proper cause" licensing regime, which restricted licenses for carrying firearms in public to those New Yorkers who "demonstrate[d] a special need for self-protection distinguishable from that of the general community." 142 S. Ct. at 2123. The Supreme Court held that this "proper cause" requirement was unconstitutional because the text of the Second Amendment "presumptively guarantees" the "right to 'bear' arms in public for self-defense," and New York could not show that its "proper-cause requirement [was] consistent with this Nation's historical tradition of firearm regulation." *Id.* at 2135.

New York attempted to save its burdensome restrictions on carry licenses by arguing its proper cause regime reflected "a historically grounded approach to protecting sensitive places." Brief for Respondents, *Bruen*, at 34 (Sept. 14, 2021) ("New York Brief"). In *Heller*, the Supreme Court had recognized governments' narrow ability to restrict firearms in certain "sensitive places." *District of Columbia v. Heller*, 554 U.S. 570, 626–27 (2008). New York, seizing on this exception,

---

[1] Because John Boron has filed a notice of voluntary dismissal under Rule 41(a)(1)(A)(i), only Plaintiffs Brett Christian, Firearms Policy Coalition, Inc., and Second Amendment Foundation file this motion for preliminary injunction.

claimed that it was empowered to enact "sensitive-place laws," which "restrict public carry in places" *anywhere* "people typically congregate and where law-enforcement and other public-safety professionals are presumptively available." New York Brief at 34. And the State asserted that its proper cause law "functionally restrict[ed] concealed carry" in a long list of places it described as "sensitive" that went "far beyond government buildings and schools." *Id.* at 34–35 (cleaned up).

The Supreme Court explicitly rejected New York's conception of sensitive places. Instead, *Bruen* clarified that a state's power to designate "sensitive places" is limited and, consistent with the Second Amendment generally, must be based on historically grounded analogues. The Court explained that New York's attempt to "expand[] the category of 'sensitive places' simply to all places of public congregation that are not isolated from law enforcement defines the category of 'sensitive places' *far too broadly*." *Bruen*, 142 S. Ct. at 2134 (emphasis added). To allow the State to designate sensitive places so capaciously "would in effect exempt cities from the Second Amendment and would eviscerate the general right to publicly carry arms for self-defense." *Id*. at 2134. Instead, States (and courts evaluating state laws) needed to look to historical analogues of "longstanding" "laws forbidding the carrying of firearms in sensitive places such as schools," "legislative assemblies, polling places, and courthouses." *Id.* at 2133. It is only by looking to "those historical regulations of 'sensitive places' " that States (and courts) may "determine" whether "modern regulations prohibiting the carry of firearms in *new* and analogous sensitive places are constitutionally permissible." *Id.* (emphasis in original). Under this historical approach, there was "no historical basis for New York to effectively declare the island of Manhattan a 'sensitive place.'" *Id*. at 2134.

## II.     New York Enacts S51001 with Sweeping "Sensitive Location" and "Restricted Location" Designations.

Instead of heeding the holding of the Supreme Court in *Bruen*, New York has declared large swathes of the State to be a "sensitive place." On July 1, 2022, the State enacted S51001, which implements expansive new criminal laws that ban the carry of firearms in so-called "sensitive locations" and establishes a presumption that private property in the State is a "restricted location[]" where carrying firearms is forbidden absent affirmative steps by the property owner to allow them. The State's designation of these "sensitive" or "restricted" locations took effect on September 1, 2022, when S51001 generally took effect.

First, S51001 attempts to take advantage of the narrow circumstances in which governments may restrict the public carry of firearms for self-defense in "sensitive places," by *broadly* defining so-called "sensitive locations." Under S51001, "sensitive locations" include:

a.   "any place owned or under the control of federal, state or local government, for the purpose of government administration, including courts;"

b.   "any location providing health, behavioral health, or chemical dependance care or services;"

c.   "any place of worship or religious observation;"

d.   "libraries, public playgrounds, public parks, and zoos;"

e.   "the location of any program licensed, regulated, certified, funded, or approved by the office of children and family services that provides services to children, youth, or young adults, any legally exempt childcare provider; a childcare program for which a permit to operate such program has been issued by the department of health and mental hygiene pursuant to the health code of the city of New York;"

f.   "nursery schools, preschools, and summer camps;"

4

g. "the location of any program licensed, regulated, certified, operated, or funded by the office for people with developmental disabilities;"

h. "the location of any program licensed, regulated, certified, operated, or funded by office of addiction services and supports;"

i. "the location of any program licensed, regulated, certified, operated, or funded by the office of mental health;"

j. "the location of any program licensed, regulated, certified, operated, or funded by the office of temporary and disability assistance;"

k. "homeless shelters, runaway homeless youth shelters, family shelters, shelters for adults, domestic violence shelters, and emergency shelters, and residential programs for victims of domestic violence;"

l. "residential settings licensed, certified, regulated, funded, or operated by the department of health;"

m. "in or upon any building or grounds, owned or leased, of any educational institutions, colleges and universities, licensed private career schools, school districts, public schools, private schools licensed under article one hundred one of the education law, charter schools, non-public schools, board of cooperative educational services, special act schools, preschool special education programs, private residential or non-residential schools for the education of students with disabilities, and any state-operated or state-supported schools;"

n. "any place, conveyance, or vehicle used for public transportation or public transit, subway cars, train cars, buses, ferries, railroad, omnibus, marine or aviation transportation; or any facility used for or in connection with service in the

transportation of passengers, airports, train stations, subway and rail stations, and bus terminals;"

o. "any establishment issued a license for on-premise consumption pursuant to article four, four-A, five, or six of the alcoholic beverage control law where alcohol is consumed and any establishment licensed under article four of the cannabis law for on-premise consumption;"

p. "any place used for the performance, art entertainment, gaming, or sporting events such as theaters, stadiums, racetracks, museums, amusement parks, performance venues, concerts, exhibits, conference centers, banquet halls, and gaming facilities and video lottery terminal facilities as licensed by the gaming commission;"

q. "any location being used as a polling place;"

r. "any public sidewalk or other public area restricted from general public access for a limited time or special event that has been issued a permit for such time or event by a governmental entity, or subject to specific, heightened law enforcement protection, or has otherwise had such access restricted by a governmental entity, provided such location is identified as such by clear and conspicuous signage;"

s. "any gathering of individuals to collectively express their constitutional rights to protest or assemble;"

t. "the area commonly known as Times Square, as such area is determined and identified by the city of New York; provided such area shall be clearly and conspicuously identified with signage." *See* N.Y. PENAL LAW § 265.01-e(2)(a)–(t).

As Governor Hochul has made clear, "[i]ndividuals who carry concealed weapons in sensitive locations . . . will face criminal penalties." NEW YORK GOV.'S PRESS OFFICE, *Governor Hochul*

*Signs Landmark Legislation to Strengthen Gun Laws and Bolster Restrictions on Concealed Carry Weapons in Response to Reckless Supreme Court Decision*, July 1, 2022, available at https://on.ny.gov/3nXWrvA (last visited Sept. 26, 2022) ("Hochul Press Release"). Specifically, New York makes the possession of firearms in these "sensitive locations" a Class E felony when an otherwise law-abiding, licensed firearm owner "knows or reasonably should know such location is a sensitive location." N.Y. PENAL LAW § 265.01-e.

Second, S51001 "makes 'no carry' the default for private property" by "establish[ing] that private property owners must expressly allow a person to possess a firearm, rifle, or shotgun on their property[.]" Hochul Press Release. New York has implemented this new anti-carry default rule by creating what it terms "restricted locations." Instead of some ascertainable category of sensitive places, this is a designation that applies to *all* "private property." All private property in the State of New York is "a restricted location" where public carry of firearms for self-defense is unlawful—unless "the owner or lessee of such property" has "permitted" "possession by clear and conspicuous signage indicating that the carrying of firearms, rifles, or shotguns on their property is permitted or has otherwise given express consent." S51001, §5; N.Y. PENAL LAW § 265.01-d. If an otherwise law-abiding, licensed firearm owner possesses a firearm and "*enters into* or *remains* on or in private property" where the owner or lessee has not put up the requisite conspicuous sign or given *express* consent, he or she has committed a Class E Felony. S51001, §5; N.Y. PENAL LAW § 265.01-d (emphasis added).

At a press conference relating to S51001, a reporter asked Governor Hochul about the fact the law appeared to "shut[] off all the public places" from New Yorkers lawfully carrying firearms for self-defense. Marcia Karmer, *Fresh off primary win, Gov. Kathy Hochul dives right into guns -- who can get them and where they can take them*, CBS NEWS NEW YORK, June 29, 2022, available

at https://cbsn.ws/3Svg4IA (last visited Sept. 26, 2022). The Governor admitted that she "can't shut off all places," but when pressed on what places New York's new law would permit New Yorkers to carry for self-defense, Governor Hochul said, "[p]robably some streets." *Id.*

### III.   New York's Restrictions' Effects on Plaintiffs.

Plaintiff Brett Christian is a law-abiding citizen of New York that is duly licensed to carry firearms by Erie County. *See* Declaration of Brett Christian ¶¶ 2–3 (Sept. 26, 2022) (attached hereto as Ex. C) ("Christian Dec."). Plaintiffs Firearm Policy Coalition and Second Amendment Foundation are non-profit organizations with members including Individual Plaintiff in New York. *See* Declaration of Brandon Combs ¶¶ 2–4 (Sept. 28, 2022) (attached hereto as Ex. D) ("FPC Dec."); Declaration of Alan M. Gottlieb ¶¶ 2–4 (Sept. 28, 2022) (attached hereto as Ex. E) ("SAF Dec."). Both organizations have created hotlines to answer questions and provide legal information to their New York members and the public. FPC Dec ¶ 9; SAF Dec. ¶ 9. Both organizations will incur ongoing expenses to operate their respective hotlines, including internal staff time and expenses related to outside counsel who will assist with the hotlines. FPC Dec ¶¶ 7–9; SAF Dec. ¶¶ 7–9. Both organizations expect to continue to be required to expend additional resources addressing New York's laws affecting the right to keep and bear arms, including those enacted in S51001, unless and until New York's unconstitutional laws are enjoined. FPC Dec ¶ 10; SAF Dec. ¶ 10. Defendants are tasked with enforcing these restrictions.

While Plaintiffs have been harmed by many of New York's new restrictions enacted in S51001, Defendants' enforcement of three particular ones are subject of this action and motion for preliminary injunction: the designation of (1) "public parks," and (2) "public transportation" as sensitive places; and (3) the creation of an anti-carry default rule for private property, to the extent it applies to property that is already open to the public. These provisions, collectively referred to

as the Carry Provisions, as well as Defendants' regulations, policies, and enforcement practices implementing them, harm Plaintiffs as they go about their day-to-day lives and seek to carry for self-defense. Christian Dec. ¶ 6; FPC Dec. ¶ 6; SAF Dec. ¶ 6.

Because of the enactment and enforcement of these Carry Provisions, Plaintiffs are unable to go to public parks and carry for self-defense. Christian Dec. ¶¶ 7, 8; FPC Dec. ¶ 6; SAF Dec. ¶ 6. Plaintiff Christian enjoys hiking on trails a few times each month to clear his head. Christian Dec. ¶ 7. Christian was also planning a trip to visit the Adirondacks for hiking and camping in November 2022. Christian Dec. ¶ 8. But Christian will be unable to continue his hikes, while carrying for self-defense, and he has canceled his plans to explore the wilderness of the Adirondacks because he cannot be assured of defending himself. Christian Dec. ¶¶ 7, 8. Moreover, Christian will no longer continue taking public transportation, as he has previously done on visits to downtown Buffalo, because he cannot carry for self-defense while riding public transportation, which not only disables him from acting in self-defense while in transit but also after he arrives in Buffalo (because he cannot carry his firearms with him). Christian Dec. ¶ 9.

Plaintiff Christian will also be unable to carry firearms on his person throughout the State because of S51001's designation of private property, even private property open to the public, as "restricted locations." Christian Dec. ¶¶ 10, 11. Christian brings his firearm with him on private property open to the public, such as weekly visits to gas stations and monthly visits to hardware stores. Christian Dec. ¶ 10. He intended to continue to do so, but for the enactment and enforcement of S51001. Christian Dec. ¶ 10. Moreover, since S51001 bars even "entering" these locations, Plaintiff will need to disable and store his firearms before driving his vehicle or walking into parking lots, which means in some instances, Plaintiff will need to stop carrying for self-defense before he can get physically close enough to see if any "clear and conspicuous signage"

9

exists permitting him to carry. Christian Dec. ¶ 11. Not only does this put Plaintiff at risk of uncomfortable situations with passersby observing him disable and store his firearms, but the fact he has to constantly disarm greatly reduces his ability to defend himself throughout the State. Christian Dec. ¶¶ 11, 12.

Proving that the restrictions enacted by New York are no mere idle threat to the Second Amendment rights of Plaintiffs, Defendant Bruen's subordinate First Deputy Superintendent of the State Police has said that state "troopers 'are standing ready' to ensure the new laws are followed." Maki Becker, *Hochul: Last-minute pistol permit seekers may be too late to avoid NY's new gun requirements*, THE BUFFALO NEWS (Aug 31, 2022), available at https://bit.ly/3KAf9nG (last visited Sept. 26, 2022). The State Police further have added "an easy message" for individuals like Plaintiffs who seek to carry their firearms in places forbidden by S51001: "We have zero tolerance. If you violate this law, you will be arrested. It's as simple as that." *Id.*

## ARGUMENT

To issue a preliminary injunction, the Court must find that Plaintiffs have demonstrated (1) a likelihood of success on the merits, (2) irreparable harm, and (3) "that a preliminary injunction is in the public interest."[2] *Hund v. Cuomo*, 501 F. Supp. 3d 185, 206 (W.D.N.Y. 2020). Here, each of those factors weighs decisively in favor of issuing Plaintiffs' requested preliminary injunction.

### I.   Plaintiffs are likely to prevail on the merits.

The Second Amendment provides that "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST. amend. II. "When the Second Amendment's *plain text* covers an individual's conduct, the

---

[2] When the government is party to the suit, the "final two factors" of "public interest" and "balance of equities" "merge." *New York v. United States Dep't of Homeland Sec.*, 969 F.3d 42, 58–59 (2d Cir. 2020).

Constitution presumptively protects that conduct." *Bruen*, 142 S. Ct. at 2129–30 (emphasis added). Once this prima facie textual showing has been made, "[t]he *government* must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2130 (emphasis added). "*Only then* may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'" *Id.* (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50 n. 10 (1961) (emphasis added).

### a. The Second Amendment's plain text protects Plaintiffs' proposed course of conduct.

As the Supreme Court made explicit in *Bruen*, the text of the Second Amendment "presumptively protects" Plaintiffs' proposed course of conduct: "carrying handguns publicly for self-defense." 142 S. Ct. at 2130, 2134. "Nothing in the Second Amendment's text draws a home/public distinction with respect to the right to keep and bear arms." *Id.* at 2134. By including "the right to 'bear arms' " the Second Amendment also "refers to the right to 'wear, bear, or carry . . . upon the person or in the clothing or in a pocket, for the purpose . . . of being armed and ready for offensive or defensive action in a case of conflict with another person." *Id.* Thus, the "definition of 'bear' naturally encompasses public carry" and "[t]o confine the right to 'bear' arms to the home would nullify half of the Second Amendment's operative protections." *Id.* at 2134–35. After all, "[m]any Americans hazard greater danger outside the home than in it." *Id.* at 2135, (citing *Moore v. Madigan*, 702 F.3d 933, 937 (7th Cir. 2012) ("[A] Chicagoan is a good deal more likely to be attacked on a sidewalk in a rough neighborhood than in his apartment on the 35th floor of the Park Tower.")).

New York cannot dispute that Plaintiffs' proposed course of conduct is presumptively protected by the Second Amendment. *Bruen*, 142 S. Ct. at 2134 (noting New York did "not dispute this"). Plaintiffs seek to carry their firearms for purposes of self-defense as they go about their

daily lives. Plaintiffs seek to be able to walk in a public park, ride public transportation, or go to establishments open to the public like gas stations while carrying a firearm for self-defense. Christian Dec. ¶¶ 6–11; FPC Dec. ¶ 6; SAF Dec. ¶ 6. In other words, Plaintiffs seek to "possess and carry weapons in case of confrontation" in these public places because "confrontation can surely take place outside the home." *Bruen*, 142 S. Ct. at 2135.

> **b.  S51001's Carry Provisions are not consistent with the historical tradition of firearms regulation in the United States.**

States can exercise regulatory authority over the right to carry firearms in certain narrow circumstances. When doing so, the government must "affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* at 2127. *Bruen* makes clear that it is *the government* that bears the burden of justifying its firearm regulations. *See id.* at 2130 ("The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation."); *id.* at 2135 (explaining "the burden falls on respondents"); *id.* at 2138 (holding that "respondents have failed to meet *their burden* to identify an American tradition" (emphasis added)).

In considering whether the government has met its historical burden, courts are to engage in "reasoning by analogy." *Id*. at 2132. To be a genuine "analogue," the historical tradition of regulation identified by the government must be "relevantly similar" to the restriction before the Court today. *Id*. Two "metrics" are particularly salient in determining if a historical regulation is "relevantly similar": "[1] how and [2] why the regulations burden a law-abiding citizen's right to armed self-defense." *Id*. at 2133. By considering these two metrics, a court can determine if the government has demonstrated that a "modern-day regulation" is "analogous enough" to "historical precursors" that the regulation may be upheld as consistent with the Second Amendment's text and history. *Id*. at 2133. And, it is of course, the government's burden to identify a sufficiently

close historical analogue to justify the challenged restriction. *Id.* at 2130.

It is also important to identify when the key period for establishing the meaning of the Second Amendment is. Although the Court in *Bruen* formally left open the question whether, when considering state laws, the answer is 1791 (when the Second Amendment was adopted) or 1868 (when the Fourteenth Amendment was adopted), the Court's precedents establish that, for a lower court at least, 1791 must be the right answer. That is so because of the confluence of two lines of precedent. One establishes that with respect to the federal government, one must look to 1791 to determine the original meaning of provisions of the Bill of Rights. *See, e.g.*, *Gamble v. United States*, 139 S. Ct. 1960, 1975–76 (2019) (explaining that *Heller* sought to determine "the public understanding in 1791 of the right codified by the Second Amendment"). The other establishes that incorporated Bill of Rights provisions bear the same meaning when applied to the States as they do when applied to the federal government. *See, e.g.*, *McDonald v. City of Chicago*, 561 U.S. 742, 765 (2010) (explaining that the Court has "decisively held that incorporated Bill of Rights protections are all to be enforced against the States under the Fourteenth Amendment according to the same standards that protect those personal rights against federal encroachment" (internal quotation marks omitted)). The combination of these two lines of precedent leads to the inescapable conclusion that when determining the scope of the Second Amendment as applied to the States through the Fourteenth, the key date is 1791, not 1868. *See, e.g., Khan v. State Oil Co.*, 93 F.3d 1358, 1363 (7th Cir. 1996) (lower courts must follow Supreme Court holdings even with a "wobbly, moth-eaten foundation" until overruled by the Supreme court), vacated by *State Oil Co. v. Khan*, 522 U.S. 3, 20 (1997) (overruling precedent but making clear that the "Court of Appeals was correct in applying [stare decisis] . . . for it is this Court's prerogative alone to overrule one of its precedents").

In any event, *Bruen* already delineated the *one* aspect of our history and tradition that is sufficiently analogous to—and therefore capable of justifying (in circumstances not present here)—the carry restrictions that New York enacted with S51001: the limited tradition of designating certain narrow areas as "sensitive places." *Bruen*, 142 S. Ct. at 2133. The Court explained that there was a tradition of "forbidding the carrying of firearms in sensitive places such as schools and government buildings." *Id.* And while "the historical record yields relatively few 18th- and 19th-century 'sensitive places' where weapons were altogether prohibited—e.g., legislative assemblies, polling places, and courthouses—[the Court was] also aware of no disputes regarding the lawfulness of such prohibitions." *Id.* Thus, the Court held that going forward, "courts can use analogies to *those* historical regulations of 'sensitive places' to determine that modern regulations prohibiting the carry of firearms in *new* and analogous sensitive places are constitutionally permissible." *Id.* (emphasis added). In other words, courts must assess claimed sensitive place restrictions by whether they are "relevantly similar" to longstanding restrictions on students carrying firearms in schools and firearms in legislative assemblies, polling places, and courthouses.

### i. New York's "Sensitive Locations" are not relevantly similar to permissible sensitive place restrictions.

New York's designation of sensitive places in the Carry Provisions is "inconsistent with the Second Amendment" because New York will be unable to justify such restrictions with historically grounded analogies.

*Public Parks.* Under Penal Law § 265.01-e(2)(d), New York imposes criminal liability on carry licensees who exercise their right to bear arms in "public parks." This is a prohibition of enormous scope and restricts carriage in a manner that simply cannot be "justif[ied]" as "consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2130; *see also*

*Bridgeville Rifle & Pistol Club, Ltd. v. Small*, 176 A.3d 632, 658 (Del. 2017) ("State Parks and State Forests . . . present a far different 'place restriction' than one limiting possession of firearms in a school or courthouse—traditional 'sensitive places.'").

S51001 does not itself define "public parks" but the ordinary meaning of park is capacious, meaning a separate area of land for the people to use. *See*, *e.g.*, "Park," OXFORD LEARNER'S DICTIONARIES ("[A]n area of public land in a town or a city where people go to walk, play, and relax."). And New York has a long history of setting aside land for public purposes as "parks." "A park is, in its strict sense, a piece of ground inclosed for purposes of pleasure, exercise, amusement or ornament." *Perrin v. New York Cent. R.R. Co.*, 36 N.Y. 120, 124 (1867). Or as the New York Court of Appeals said more recently, a park is "a recreational pleasure area set aside to promote public health and welfare." *Friends of Van Cortlandt Park v. City of New York*, 95 N.Y.2d 623, 629 (2001).

Under the ordinary meaning of "public parks," the scope of S51001's designation of these places as "sensitive locations" is profound. Not only do parks comes in all shapes and sizes, but they also include appurtenances that render them useful for the public, like trails, paths, roads, campsites, and parking. For instance, the City of New York defines "park" as "public parks, beaches, waters and land under water, pools, boardwalks, playgrounds, recreation centers and all other property, equipment, buildings and facilities now or hereafter under the jurisdiction, charge, or control of the Department [of Parks]." NEW YORK CITY, N.Y., RULES, TIT. 56, § 1-02. And, of course, parks also have "park paths," which include "any road, path or trail through or within a park that is not used for vehicular traffic" and parks include "parks waters," which not only constitute pools and bathing areas, but also any "tributary, brook, stream, [or] ocean" in or flowing into the park. *Id.* In all of these places, public carry appears to be banned too.

The land area covered is similarly profound. For instance, the State of New York Office of Parks, Recreation and Historic Preservation "oversees more than 250 parks, historic sites, recreational trails, golf courses, boat launches and more, which are visited by 78 million people annually." *See* NEW YORK STATE PRESS RELEASE, *Governor Hochul Announces 130 Acres Added to Sterling Forest State Park in Orange County* (Jan. 12, 2022), available at https://on.ny.gov/3q4kyK0 (last visited Sept. 26, 2022). The State Park system alone accounts for "over 350,000 acres of park land" in New York State. *See* NY STATE PARKS BLOG, *Celebrate Earth Day With State Parks!,* (April 20, 2022), available at https://bit.ly/3R8LowE (last visited Sept. 26, 2022). Thus, "[f]rom the shores of Long Island to the mighty Niagara Falls," Plaintiffs cannot possess their firearms for self-defense in any part of any state park. *See* N.Y. PARKS REC.& HIST. PRESERV., available at https://on.ny.gov/3Q9xmJH (last visited Sept. 26, 2022).

"Public park" also includes places such as "Adirondack Park" and "Catskills Park." *See* Ex. B., Compl. at 18–19, ¶38(d), (e) & n. 3. These "parks" are massive. As of May 2014, Adirondack Park consisted of a "Total Park" acreage of 5,821,421 acres of which the state land is 2,551,669 acres. *See Adirondack Park Land Use Classification Statistics* (May 21, 2014), available at https://on.ny.gov/3pXDbPM (last visited Sept. 26, 2022). The State even classifies over a million acres of the Adirondack Park as "wilderness." *Id*. This park represents nearly *one-third* of the entire land area of New York State. Catskill Park is similarly imposing and similarly wild, covering approximately 705,000 acres of which 143,000 is classified as "wilderness" and 130,000 as "wild forest." *See* STATE OF NEW YORK, Catskill Park State Land Master Plan (Aug. 2008, amended 2014), available at https://on.ny.gov/3wJoQKL (last visited Sept. 26, 2022). In these vast swaths of New York, Plaintiffs cannot lawfully carry firearms for self-defense.

The wholesale designation of "public parks" as "sensitive places" cannot be justified by

reference to any "historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2126. Public parks have existed since well before the founding. *See, e.g.*, Boston Common, NATIONAL PARK SERVICE, available at https://bit.ly/3RHt8uI (last visited Sept. 26, 2022) (explaining that Boston Common, "[c]onsidered the oldest public park in the United States" and dates to 1634). Yet New York will be unable to point to any tradition at the time of the Founding banning the carry of firearms for self-defense. *See id.* (noting that in the "17th and 18th centuries, companies from Boston and surrounding communities performed *military training* on the Common"). "When a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Bruen*, 142 S. Ct. at 2131.

Moreover, the designation of "public parks" is not analogous to other permissible and historically justified "sensitive places." As one state court just recently held, "restricting firearms in public parks . . . [is] not analogous to 'longstanding' firearm restrictions" because "[t]hese areas differ from the 'sensitive places' listed in *Heller* and *Bruen*." *Stickley v. City of Winchester*, No. CL21-206, slip. op. at 32 (Va. Cir. Ct. Sept. 27, 2022) (attached hereto as Ex. F). "In contrast to a permissible sensitive place such as a courthouse, where visitors are screened by security," most public parks "do not have controlled entry points," can be "easily enter[ed]" with a weapon "either intentionally or by inadvertently wandering across a [park] boundary while exercising the right to . . . licensed concealed carry." *Bridgeville Rifle & Pistol Club*, 176 A.3d at 659. Further, "[w]hereas courthouses are supervised by law enforcement personnel or easily accessible to law enforcement and other emergency responders," many parks are "relatively remote" and "the intervention of society on [individuals'] behalf may be too late to prevent injury." *Id*.; *see also* Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical Framework and*

*A Research Agenda*, 56 UCLA L. REV. 1443, 1532 (2009) (noting that public parks are "traditionally open"). "There is no practical means of preventing armed criminals from entering. [Parks] are similar to the vast majority of land in the United States, which is outdoors, not indoors." David Kopel and Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine: Locational Limits On The Right To Bear Arms*, 13 CHARLESTON L. REV. 205, 291 (2018). Simply put, "[p]ublic parks are not sensitive places." *Id*.

   *Public Transportation.* As relevant here, under Penal Law § 265.01-e(2)(n), New York imposes criminal liability on carry licensees who exercise their right to bear arms in "any place, conveyance, or vehicle used for public transportation or public transit . . . train cars, buses, ferries, railroad, . . .[or] marine . . . transportation; or any facility used for or in connection with service in the transportation of passengers, . . . train stations, . . . and rail stations, and bus terminals." These blanket prohibitions on carrying in and around these common modes of transportation cannot be "justif[ied]" as "consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2130.

   The effect of this carry ban on modes of public transportation cannot be understated. New Yorkers ride modes of public transit more than 3.8 billion times annually in over 130 transit systems throughout New York State. *See* NEW YORK PUBLIC TRANSIT ASSOCIATION, INC., *Public Transit Facts*, available at https://bit.ly/3AFgYem (last visited Sept. 26, 2022). Public transportation is a vital part of everyday life with "[a]lmost 60 percent of people who ride public transit . . . commuting to and from work." *See id*. In fact, there are many common scenarios where individuals, like Plaintiffs and others, may need to bring firearms for self-defense in public transportation areas that have been designated as "sensitive locations." For instance, individuals who get off work and have to commute by bus. "When [the individuals] arrive at . . . the bus stop,

18

they have to walk some distance through a high-crime area." *Bruen*, Oral Arg. Tr. at 67 (Nov. 03, 2021). Nevertheless, these individuals are barred from carrying a firearm for self-defense because their mode of transit to earn their livelihood happens to be public.

Moreover, the prohibition on carrying for self-defense in public transportation will disproportionately burden low-income New Yorkers. "Low-income workers rely more on public transit due to limited access to automobiles and the cost of maintaining a car." FEDERAL TRANSIT AGENCY, *Transportation Needs of Disadvantaged Populations: Where, When, and How?* at 30 (Feb. 2013), available at https://bit.ly/3wJLfrk (last visited Sept. 26, 2022). In particular, public transportation is needed for "many service jobs that are often taken by low-income workers who do not have a regular 9-to-5 schedule." *Id.* at 3–4. These second or third shift workers, commuting in the odd hours of the night, are left without the ability to carry for self-defense or in-case of confrontation. Yet without question, the Second Amendment extends to "all Americans," *Heller*, 554 U.S. at 580—not just the well-heeled with their own vehicles.

Although modern modes of public transportation did not exist at the Founding, public transportation itself is not a new phenomenon and existed at the time of the Founding. For instance, passengers would share stagecoaches on journeys throughout the colonies before the Revolution and in the states after it. *See, e.g.,* Oliver W. Holmes, *The Stage-Coach Business In The Hudson Valley*, THE QUARTERLY JOURNAL OF THE NEW YORK STATE HISTORICAL ASSOCIATION 231–33 (1931) ("Staging had developed somewhat in the colonies before the Revolution, especially around Boston and Philadelphia.") "The first important stage line to be established in New York was set up in June 1785 along the east side of the Hudson River between New York City and Albany." *Id.* at 232. We not aware of any Founding-era tradition of banning the possession of a firearm while traveling on a stage coach.

Even if modern public transportation is considered to be a "new" sensitive place, the Supreme Court has instructed the proper "sensitive place" analysis for these "*new*" places is still to consider whether they are "analogous" to recognized longstanding sensitive places. *Bruen*, 142 S. Ct. at 2133. Here again, "[i]n contrast to a permissible sensitive place such as a courthouse, where visitors are screened by security," many modes of public transportation "do not have controlled entry points." *Bridgeville Rifle & Pistol Club*, 176 A.3d at 659. Further, "[w]hereas courthouses are supervised by law enforcement personnel or easily accessible to law enforcement and other emergency responders," transit stops may be comparatively "remote" and "the intervention of society on [individuals'] behalf may be too late to prevent injury." *Id.*

Additionally, unlike other permissible sensitive place restrictions, the ban on carrying for self-defense in public transportation effectively extends the ban to other places too. The ban on carrying on public transit "strips people of the ability to have a gun present for self-defense not just" while traveling *on* public transportation "but also on the way to and from" the public transportation. Volokh, *supra*, at 1525. After all, if you take public transit, you cannot have your firearm with you prior to boarding and you will not have it after departing. Individuals who travel by public transportation are not only deprived of their Second Amendment rights while they ride but also in *every place* that they ride to and from—every neighborhood, every restaurant, every store, every time they leave the house and do not limit themselves to private vehicles or their own two feet. These otherwise "law-abiding citizens are *stripped* of the ability to bear arms in self-defense," *id.*, and there is no historical justification for such a denial of their rights.

### ii. New York's "anti-carry" presumption is unprecedented.

Under S51001, New York treats as a separate crime, the otherwise lawful possession of a firearm in so-called "restricted locations." This provision establishes an "anti-carry" presumption throughout the State and is unconstitutional to the extent that it establishes a default ban on the

carry of firearms for self-defense in areas open to members of the public.

The Second Amendment "is the very product of an interest balancing by the people" and it "surely elevates above all other interests the right of law-abiding, responsible citizens to use arms" for self-defense." *Bruen*, 142 S. Ct. at 2131 (quoting *Heller*, 554 U.S. at 635). Because of "this balance—struck by the traditions of the American people," *id*.,—"certain policy choices" have been definitively taken "off the table," *Heller*, 554 U.S. at 636. Among these policy choices is establishing a presumption against carrying on private property open to the public because the Second Amendment itself establishes a presumption that Plaintiffs and other licensed, law-abiding citizens have a "right to 'bear' arms in public for self-defense." *Bruen*, 142 S. Ct. at 2135. New York cannot flip a presumption codified in the Constitution itself. But that is exactly what New York has done by dictating that all private property—even in those locations open to members of the public—are now presumptively off-limits without conspicuous signage or express consent.

The State's establishment of an anti-carry presumption for all private property is a significant restriction on the right to bear arms. After all, it establishes a "default rule" of interaction with strangers, i.e., members of the public coming to a property open to the public, and in these situations "default rules" are particularly "sticky." *See generally* OMRI BEN-SHAHAR & JOHN A. E. POTTOW, *On the Stickiness of Default Rules*, 33 FLA. ST. L. REV. 651 (2006), available at https://bit.ly/3pWXM6Y (last visited Sept. 26, 2022). By "sticky," legal scholars mean that individuals have a well-known tendency to stick by the default rule *even when* they would otherwise take a different position. *Id.* at 651–54.

The Second Amendment cannot be so easily manipulated with New York's novel presumption by deputizing private property owners to effect a carry ban by their indifference or acquiescence to the State's presumption. Consider other unconstitutional presumptions that a State

would be barred from establishing. The State could not establish a default rule that praying before a meal is unlawful unless a restauranteur expressly consents. *Cf. Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2421 (2022) ("The [Free Exercise] Clause protects not only the right to harbor religious beliefs inwardly and secretly. It does perhaps its most important work by protecting the ability of those who hold religious beliefs of all kinds to live out their faiths in daily life through the performance of (or abstention from) physical acts." (internal quotation marks omitted)). The State could not establish a default rule that an individual cannot wear a political t-shirt in an office park unless a leasing agent expressly consents. *Cf. Minnesota Voters All. v. Mansky*, 138 S. Ct. 1876, 1885 (2018) ("Minnesota's ban on wearing any 'political badge, political button, or other political insignia' plainly restricts a form of expression within the protection of the First Amendment."). As in those situations, the Bill of Rights poses no obstacle to a property owner *independently* banning praying or banning political t-shirts (even if other laws might), just as a property owner may be able to *independently* decide to bar invitees from carrying firearms. But, as in all those situations, the State may not presume to make the property owner's decision for them and place a thumb on the scale against the exercise of constitutional rights.

The key distinction here is that between the rights of a *property owner* and the rights of the *government*. Property owners generally have a right to determine whether someone may or may not carry firearms on their property. But honoring this right of property owners does not justify the government in establishing a default rule that *all* private property is off-limits for persons carrying firearms. That impermissibly puts a thumb on the scale against the exercise of a constitutional right. *Cf. Brown v. Ent. Merch. Ass'n*, 564 U.S. 786, 795 n.3 (2011) (reasoning that although it "perhaps follows" from parents' authority over minor children "that the state has the power to *enforce* parental prohibitions," "it does not follow that the state has the power to prevent

children from saying or hearing anything *without their parents' prior consent*").

Far from honoring the Second Amendment as the Supreme Court instructed in *Bruen*, the State's new default rule broadly sweeps away the Second Amendment rights of New Yorkers and effectively shuts off most public areas from carrying for self-defense —save "[p]robably some streets." And, as one district court has already found, there are no relevant and analogous restrictions in American history. *Antonyuk v. Bruen*, No. 1:22-CV-0734, 2022 WL 3999791, at *35 (N.D.N.Y. Aug. 31, 2022). "As a result, [S51001's] expansive definition of 'restricted locations' is not deeply rooted in the Nation's historical tradition of firearm regulation." *Id.*

## II.    Plaintiffs will continue to suffer irreparable harm in the absence of a preliminary injunction.

Irreparable harm is "certain and imminent harm for which a monetary award does not adequately compensate." *Wisdom Import Sales Co., L.L.C. v. Labatt Brewing Co., Ltd.*, 339 F.3d 101, 113 (2d Cir. 2003). Irreparable harm exists "where, but for the grant of equitable relief, there is a substantial chance that upon final resolution of the action the parties cannot be returned to the positions they previously occupied." *Brenntag Int'l Chem., Inc. v. Bank of India*, 175 F.3d 245, 249 (2d Cir. 1999). "In cases alleging constitutional injury, a strong showing of a constitutional deprivation that results in noncompensable damages ordinarily warrants a finding of irreparable harm." *A.H. by & through Hester v. French*, 985 F.3d 165, 176 (2d Cir. 2021). This is true even when the loss of constitutional rights is for "minimal periods of time." *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67 (2020) (per curiam) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality)); *see also French*, 985 F.3d at 184.

Plaintiffs will suffer irreparable harm without a preliminary injunction. As described above, their Second Amendment rights to carry firearms for self-defense are being infringed each and every day in many facets of their daily lives whether walking in a public park, riding public

transportation, or going to the gas station. Christian ¶¶ 6–12; FPC Dec. ¶ 6; SAF Dec. ¶ 6. "Whenever people are in the[se] prohibited places—places where they have a right to be, and often have a practical need to be—they are barred from protecting themselves with a firearm." Volokh, *supra*, at 1515. Yet "self-defense has to take place *wherever* [a] person happens to be." *Id*. (emphasis added). In "all the[se] locations," Plaintiffs "will suffer . . . diminished safety" because they "will not be able carry." *Antonyuk*, 2022 WL 3999791 at *36.

## III.    A preliminary injunction would be in the public interest.[3]

The public interest strongly favors injunctive relief. Although "the State has an interest in administering its laws without interference by federal equitable power, that interest is diminished when the laws at issue likely impinge a federal constitutional right." *French*, 958 F.3d at 184. Moreover, the public has a significant interest in the "strong sense of the safety that a licensed concealed handgun regularly provides, or would provide, to the many law-abiding responsible citizens in the state too powerless to physically defend themselves in public without a handgun." *Antonyuk*, 2022 WL 3999791 at *36. New York's Carry Provisions "prevent[] law-law-abiding citizens with ordinary self-defense needs from exercising their right to keep and bear arms." *Bruen*, 142 S. Ct. at 2156. It is in the public interest for this Court to vindicate that the Second Amendment is not a "second-class right" by preliminarily enjoining enforcement of the Carry Provisions. *Id*.

## CONCLUSION

For the foregoing reasons, the Court should preliminarily enjoin the Carry Provisions of

---

[3] Plaintiffs respectfully request that this Court exercise its discretion under Rule 65(c) to waive any requirement to post security because a preliminary injunction enjoining enforcement of an unconstitutional state law "would not have a financial impact" on the State and security "would not mitigate" any alleged harm to the State's enforcement interests. *Hund*, 501 F. Supp. 3d at 209; *see also Dr.'s Assocs., Inc. v. Distajo*, 107 F.3d 126, 136 (2d Cir. 1997) ("Rule 65(c) gives the district court wide discretion to set the amount of a bond, and even to dispense with the bond requirement [in certain situations].").

S51001.

Respectfully submitted, this 28th day of September 2022.

/s/ David H. Thompson

| | |
|---|---|
| Nicolas J. Rotsko | David H. Thompson* |
| PHILLIPS LYTLE LLP | Peter A. Patterson* |
| One Canalside | John W. Tienken* |
| 125 Main Street | COOPER & KIRK, PLLC |
| Buffalo, NY 14203-2887 | 1523 New Hampshire Avenue, N.W. |
| (716) 847-5467 | Washington, D.C. 20036 |
| (716) 852-6100 (fax) | (202) 220-9600 |
| NRotsko@phillipslytle.com | (202) 220-9601 (fax) |
| | dthompson@cooperkirk.com |
| | ppatterson@cooperkirk.com |
| | jtienken@cooperkirk.com |

*Admitted *pro hac vice*

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

In accordance with Federal Rule of Civil Procedure 5(b)(2)(C), I hereby certify that a true and correct paper copy of the foregoing was served to Defendants by mail to the following addresses on this 28th day of September 2022.

Kevin P. Bruen,
New York State Police
1220 Washington Avenue
Building 22
Albany, NY 12226

John J. Flynn,
Erie County District Attorney's Office
25 Delaware Ave
Buffalo, NY 14202,

/s/ David H. Thompson
David H. Thompson

25