UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

BRETT CHRISTIAN, FIREARMS POLICY COALITION,
INC., and  SECOND AMENDMENT FOUNDATION

                                     Plaintiffs,

                     v.

STEVEN A. NIGRELLI, in his official capacity as
Superintendent of the New York State Police, and JOHN J.
FLYNN, in his official capacity as District Attorney for the
County of Erie,

                                 Defendants.

No. 22-cv-00695 (JLS)


**STATE'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION
FOR A PRELIMINARY INJUNCTION**


LETITIA JAMES
Attorney General
State of New York
350 Main Place, Suite 300A
Buffalo, New York 14202


Ryan L. Belka
James M. Thompson
Assistant Attorneys General
Of Counsel

**Table of Contents**

TABLE OF AUTHORITIES ....................................................................................... iii

PRELIMINARY STATEMENT .................................................................................. 1

FACTUAL BACKGROUND....................................................................................... 3

STANDARD OF REVIEW ......................................................................................... 5

ARGUMENT .............................................................................................................. 6

    I.   PLAINTIFFS DO NOT HAVE STANDING .................................................. 6

      A.  The Organizational Plaintiffs Lack Standing Because They Have Suffered
          No Injury of Their Own .................................................................................. 6

      B.  Christian Lacks Standing To Bring a Pre-Enforcement Facial Challenge
          Because He Has Not Demonstrated An Intent To Violate The Statute
          And A Specific Threat of Enforcement ......................................................... 8

    II.  PLAINTIFFS CANNOT ESTABLISH A CLEAR OR SUBSTANTIAL
       LIKELIHOOD OF SUCCESS ON THE MERITS............................................ 10

      A.  Plaintiffs Can Only Bring a Disfavored Facial Challenge .......................... 11

         1. New York's Law Preventing Armed Persons From Entering Other People's
            Property Without Consent Is Constitutional and Deeply Rooted In Anglo-
            American Property Law and Tradition ...................................................... 12

            a.   Plaintiffs' Failed To Carry Their Burden On The First Part Of The
                Bruen Test ......................................................................................... 13

            b.   Requiring Persons Carrying Guns Onto Another's Property To Obtain
                Consent Is Consistent With American History And Tradition ...................... 16

         2. The Prohibition on Guns In Public Parks Is Constitutional .................................... 19

            a.   Plaintiff Christian Lacks Standing Because His Claim Concerns
                Adirondack Park, and the CCIA Does Not Prohibit Guns there.................... 19

            b.   New York's Law Preventing Armed Persons From Entering
                Sensitive Places Is Constitutional and Deeply Rooted In
                Anglo-American Property Law and Tradition ................................................ 21

         3. Guns May Lawfully Be Prohibited On Public Transit .......................................... 26

            a.   The Government As Property Owner May Prohibit Firearms
                On Public Transportation ..................................................................... 28

            b.   Public Transportation Can Be Protected Based On Its Critical Role
                In The School System ......................................................................... 32

c.    Places Where People Gather In Large Numbers And Confined
        Spaces Were And Are Considered Sensitive ................................... 33

d.    History Shows That The Right To Armed Travel Did Not Extend
        to the Kinds of Travel Done on Public Transportation................................... 36

e.    History Demonstrates That Firearms Could Be Prohibited On Trains .......... 37

f.    Plaintiffs' Security-Based Test is Unsupported, Ahistorical, and
        Wrong on the Facts ........................................................................ 39

III. PLAINTIFFS HAVE NOT SHOWN IRREPARABLE HARM..........................................40

IV. THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST WEIGH
        IN FAVOR OF NEW YORK'S MISSION TO PROTECT ITS CITIZENS ....................41

CONCLUSION.................................................................................................... 43

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Able v. United States*,
   44 F.3d 128 (2d Cir. 1995)................................................................................6

*Adderley v. Florida*,
   385 U.S. 39 (1966)...........................................................................................29

*Alexander v. State*,
   27 Tex. App. 533, 537 (Tex. Ct. App. 1889) ...................................................34

*Beal v. Stern*,
   184 F.3d 117 (2d Cir. 1999)...............................................................................6

*Bill & Ted's Riviera, Inc. v. Cuomo*,
   494 F. Supp. 3d 238 (N.D.N.Y. 2020) ...............................................................6

*Binderup v. Attorney General*,
   836 F.3d 336 (3d Cir. 2016), abrogated on other grounds, Bruen, 142 S. Ct..
   2111...................................................................................................................21

*Bonidy v. U.S. Postal Service*,
   790 F.3d 1121 (10th Cir. 2015) ..................................................................21, 29

*Bridgeville Rifle & Pistol Club, Ltd. v. Small*,
   176 A.3d 632 (2017) .........................................................................................39

*Carney v. Adams*
   141 S. Ct. 493 (2020)......................................................................................6, 9

*Carr v. State*,
   34 Ark. 448 (1879)............................................................................................36

*Cedar Point Nursery v. Hassid*,
   141 S. Ct. 2063 (2021) ......................................................................................14

*Christopher v. Ramsey County*,
   __ F. Supp. 3d __, 2022 WL 3348276 (D. Minn. Aug. 12, 2022).....................35

*Clapper v. Amnesty Int'l USA*,
   568 U.S. 398 (2013)............................................................................................8

*Conn. Parents Union v. Russell-Tucker*,
   8 F.4th 167 (2d Cir. 2021) ..................................................................................7

*Connecticut Citizens Defense League Inc. v. Lamont*,
    6 F.4th 439 (2021) .................................................................................... 7-8

*Consolidated Edison Co. of New York v. Public Serv. Comm'n*,
    447 U.S. 530 (1980) ........................................................................................29

*Cranley v. Nat'l Life Ins. Co. of Vt.*,
    318 F.3d 105 (2d Cir. 2003) ............................................................................11

*Davis v. Shah*,
    821 F.3d 231 (2d Cir. 2016) ............................................................................40

*Defense Distributed v. Bonta*,
    Case No. 22-cv-6200, 2022 WL 15524977 (C.D. Cal. Oct. 21, 2022) ....................38

*Diaz v. Pataki*,
    368 F. Supp. 2d 265 (S.D.N.Y. 2005) ..............................................................12

*District of Columbia v. Heller*,
    554 U.S. 570 (2008) .............................................................................. passim

*eBay Inc. v. MercExchange, L.L.C.*,
    547 U.S. 388 (2006) ........................................................................................42

*Erznoznik v. Jacksonville*,
    422 U.S. 205 (1975) ........................................................................................11

*Eslava v. State*,
    49 Ala. 355 (1873) ..........................................................................................36

*Frey v. Bruen*,
    No. 21 Civ. 5334, 2022 WL 522478 (S.D.N.Y. Feb. 22, 2022) .............................9

*GeorgiaCarry.Org, Inc. v. Georgia*,
    687 F.3d 1244 (11th Cir. 2012), abrogated in part on other grounds, Bruen,
    142 S. Ct.. 2111 ...................................................................................12, 18

*GeorgiaCarry.org, Inc. v. U.S. Army Corps of Engineers*,
    212 F. Supp. 3d 1348 (N.D. Ga. 2016) .......................................................21, 30

*GeorgiaCarry.org, Inc. v. United States Army Corps of Eng'rs*,
    788 F.3d 1318 (11th Cir. 2015) .......................................................................38

*Hall v. Garcia*,
    No. C 10-3799, 2011 WL 995933 (N.D. Cal. Mar. 17, 2011) ..............................32

*Hollingsworth v. Perry*,
    570 U.S. 693 (2013) ..........................................................................................6

*Int'l Soc'y for Krishna Consciousness, Inc. v. Lee*,
   505 U.S. 672 (1992)........................................................................................27

*Jacoby & Meyers, LLP v. Presiding Justices of the First, Second, Third and*
   *Fourth Departments*,
   852 F.3d 178 (2d Cir. 2017)............................................................................11

*Joglo Realties, Inc. v. Seggos*,
   2016 WL 449140 (E.D.N.Y. Aug. 24, 2016)...................................................40

*Kaiser Aetna v. United States*,
   444 U.S. 164 (1979)........................................................................................15

*Kennedy v. Bremerton School District*,
   142 S. Ct. 2407 (2022)....................................................................................13

*L&M Bus Corp. v. Bd. of Educ.*,
   2018 WL 2390125 (E.D.N.Y. May 25, 2018) ..................................................5

*Lawyers Cmte. for 9/11 Inquiry, Inc. v. Garland*,
   43 F.4th 276 (2d Cir. 2022) .............................................................................8

*Lederman v. N.Y. City Dep't of Parks & Rec.*,
   No. 10 Civ. 4800, 2010 WL 2813789 (S.D.N.Y. July 16, 2010) (Sullivan, J.)......................39

*Lehman v. City of Shaker Heights*,
   418 U.S. 298 (1974) (plurality opinion) .........................................................29

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992)....................................................................................6, 10

*MacWade v. Kelly*,
   460 F.3d 260 (2006)........................................................................................40

*Madden v. Queens County Jockey Club*,
   296 N.Y. 249 (1947) .......................................................................................15

*Make the Rd. N.Y. v. Cuccinelli*,
   419 F. Supp. 3d 647 (S.D.N.Y. 2019).............................................................42

*Maupin v. State*,
   89 Tenn. 367, 17 S.W. 1038 (1890)................................................................35

*McDonald v. City of Chicago*,
   561 U.S. 742 (2010)............................................................................1, 28, 32

*Miller v. Smith*,
   No. 18 Civ. 3085, 2022 WL 782735 (N.D. Ill. Mar. 14, 2022).......................32

*New York v. U.S. Dep't of Homeland Sec.*,
    969 F.3d 42 (2d Cir. 2020)................................................................................21

*Nken*,
    556 U.S. at 435...............................................................................................42

*Nken v. Holder*,
    556 U.S. 418 (2009)..........................................................................................5

*Nordyke v. King*,
    563 F.3d 439 (9th Cir. 2009) .........................................................................30

*NYSRPA v. Bruen*,
    142 S. Ct. 2111 (2022) (Kavanaugh, J., joined by Roberts, C.J., concurring) ............... *passim*

*NYSRPA v. Cuomo*,
    804 F.3d 242 (2d Cir. 2015)............................................................................42

*Otoe-Missouria Tribe v. N.Y.S. Dep't of Fin. Svcs.*,
    769 F.3d 105. (2d Cir. 2014)...........................................................................42

*Owens v. State*,
    3 Tex. App. 404, 406 (Tex. Ct. App. 1878) ............................................... 34-35

*People ex. rel. Schneiderman v. Actavis PLLC*,
    787 F.3d 638 (2d Cir. 2015).......................................................................6, 13

*People v. Adirondack Ry. Co.*,
    160 N.Y. 225 (1899).......................................................................................20

*Poole v. State*,
    17 Ga. App. 738 (Ga. Ct. App. 1916) ............................................................17

*Protect the Adirondacks! Inc. v. N.Y. State Dep't of Env'tl Conserv.*,
    175 A.D.3d 24 (3d Dep't 2019) .......................................................................20

*Rainey v. State*,
    8 Tex. App. 62, 63 (Tex. Ct. App. 1880) ........................................................34

*Restaurant Law Ctr. v. City of N.Y.*,
    360 F. Supp. 3d 192 (S.D.N.Y. 2019).............................................................11

*Salinger v. Colting*,
    607 F.3d 68 (2d Cir. 2010)..............................................................................42

*SHAD Alliance v. Smith Haven Mall*,
    66 N.Y.2d 496 (1985) .....................................................................................15

*Smith v. State*,
    50 Tenn. 511 (1871)............................................................................37

*St. Louis Sw. Ry. Co. v. Berger*,
    64 Ark. 613 (1898)............................................................................38

*State v. Pigg*,
    85 Mo. App. 399 (Mo. Ct. App. 1900) ............................................35

*Suitum v. Tahoe Reg'l Plan. Agency*,
    520 U.S. 725 n.10 (1997)..................................................................11

*Summerlin v. State*,
    3 Tex. App. 444, 446 (Tex. Ct. App. 1878)......................................31

*Time Warner Cable v. Bloomberg L.P.*,
    118 F.3d 917 (2d Cir. 1997)..............................................................41

*U.S. v. Decastro*,
    682 F.3d 160 (2d Cir. 2012)..............................................................11

*U.S. v. Dorosan*,
    350 F. App'x 874 (5th Cir. 2009) (per curiam) ................................30

*U.S. v. Masciandaro*,
    638 F.3d 458 (4th Cir. 2011) ............................................................32

*U.S. v. Masciandaro*,
    648 F. Supp. 2d 779 (E.D. Va. 2009), aff'd on other grounds, 638 F.3d 458
    (4th Cir. 2011)............................................................................25, 35

*United States v. Class*,
    930 F.3d 460 (D.C. Cir. 2019) ............................................ 29, 31-32, 39

*United States v. Salerno*,
    481 U.S. 739 (1987).....................................................................11-12

*Warden v. Nickels*,
    697 F. Supp. 2d 1221 (W.D. Wash. 2010).....................................25, 32

*Wash. State Grange v. Wash. State Republican Party*,
    552 U.S. 442 (2008)..........................................................................11

*We The Patriots USA, Inc. v. Hochul*,
    17 F.4th 266 (2d Cir.), cert. denied, 142 S. Ct. 2569 (2022) ..................13

*Weiss v. Violet Realty, Inc.*,
No. 03-CV-586E, 2004 WL 2534238 (W.D.N.Y. Nov. 5, 2004), aff'd in relevant part, vacated in part on other grounds, 160 F. App'x 119 (2d Cir. 2005) ...................................................................................................................15

Willis v. State, 105 Ga. 633 (1898) ......................................................................38

*Winter v. Natural Res. Defense Council, Inc.*,
555 U.S. 7 (2008)........................................................................................5, 42

*Wynne v. State*,
123 Ga. 566.....................................................................................................35

**CONSTITUTIONS**

First Amendment ............................................................................................26, 29

Second Amendment ........................................................................................ *passim*

Fourth Amendment ...............................................................................................40

Bill of Rights.........................................................................................................27

Del. Const.
Art. 28 (1776)..................................................................................................30

New Jersey, Charter .............................................................................................23

U.S. Const.
Art. IV § 3 .......................................................................................................30

**STATE STATUTES**

Concealed Carry Improcement Act ............................................................. *passim*

1890 Okla. Stat. 495-96 ........................................................................................34

1889 Ariz. Sess. Laws 17............................................................................31, 34, 36

ECL 9–0101 [1] .....................................................................................................20

ECL 9–0101 [6] .....................................................................................................20

1870 Ga. Laws 421 ..........................................................................................31, 37

Idaho Penal Code
§ 4781 (1901)....................................................................................................31

1715 Md. Laws 90 .................................................................................................16

1895 Mich. Pub. Acts 596 ........................................................................23

1905 Minn. Laws 620, Ch. 344
   § 53 ................................................................................................24

1878 Miss. Laws 175 ..............................................................................31

1883 Mo. Laws 76 ..................................................................................31

1741 N.J. Laws 101 ................................................................................17

1771 N.J. Laws 344 ...........................................................................17, 19

N.Y. Env. Conserv. Law
   § 9-0101 ........................................................................................20

1787 N.Y. Laws 345 ..............................................................................30

N.Y. Penal Law
   § 140.17(2) ....................................................................................15
   § 265.01-d ....................................................................................2, 4
   § 265.01-d(1) ................................................................................12

Penal Law § 265.01-e .....................................................................4, 20, 32

1893 Or. Laws 79 ...................................................................................18

1873 Pa. Laws 735 .................................................................................31

Penal Law
   § 265.01-d(2) ................................................................................18

1869-70 Tenn. Pub. Acts 23 ...................................................................34

1869-70 Tenn. Pub. Acts 23-24 ..............................................................34

1870 Tex. Gen. Laws 63 ...................................................................30-31, 34

1917 Wis. Sess. Laws 1243-44, Ch. 668
   § 3 (29.57)(4) ...............................................................................24

## MISCELLANEOUS AUTHORITIES

54, Pub. Laws Extra Sess., Ch. 6, § 3 .....................................................24

Blackstone's Commentaries ....................................................................18

Blocher & Siegal, When Guns Threaten the Public Sphere: A New Account of
Public Safety Under Heller, 116 Nw. U. L. Rev. 139, 144 (2021) ...........................3

ix

Brian A. Garner, et al., <u>Black's Law Dictionary</u> (9th Ed. 2009) ...................................................17

Darrell A.H. Miller, <u>Constitutional Conflict and Sensitive Places</u> ................................................26

James T. Mitchell et al., <u>Statutes at Large of Pennsylvania from 1682 to 1801</u> vol. III (Clarence M. Busch, Printer, 1896) ...................................................................................17

National Park Service, <u>Firearms Regulations in the National Parks 1897-1936</u> ..................... 24-25

NFTA Metro 2019 Annual Performance Report at 5, <u>available at</u> https://metro.nfta.com/media/xefnkvjb/2019-metro_annual_performance_report.pdf ................................................................................27

Report of the Board of Commissioners of the Central Park (Jan. 1861) .......................................22

3 William Blackstone, <u>Commentaries on the Laws of England</u> ch. 12 .........................................16

Defendant Steven A. Nigrelli, sued in his official capacity as Superintendent of the New York State Police, respectfully submits this memorandum of law, together with the Declarations of Ryan L. Belka, Esq., with Exhibits 1 - 88, dated November 4, 2022 ("Belka Decl."), David J. State, Esq., dated November 3, 2022 ("State Decl."), and Dr. Brennan Gardner Rivas, PhD, with Exhibits A-B, dated November 3, 2022 ("Rivas Decl."), in opposition to Plaintiffs' Motion for a Preliminary Injunction ("Mot.") [ECF No. 19].

## PRELIMINARY STATEMENT

The public safety laws at issue in this case are fully constitutional, both under the Supreme Court's precedent and as supported by American legal history and tradition.  The Second Amendment is not a "regulatory straightjacket," and when "properly interpreted . . . allows  a variety of gun regulations." NYSRPA v. Bruen, 142 S. Ct. 2111, 2162 (2022) (Kavanaugh, J., joined by Roberts, C.J., concurring).  Importantly, states retain wide latitude to confront the regulatory challenges posed by modern firearms, including exercising the ability to set default rules for private property and to limit the possession of firearms in sensitive locations.  See id. at 2133 (noting about certain sensitive places that Court was "aware of no disputes regarding the lawfulness of such prohibitions").  In affirming these principles, Bruen built on previous precedent from District of Columbia v. Heller, 554 U.S. 570 (2008), establishing that the Supreme Court's case law "should not be taken to cast doubt" on measures – such as sensitive-place restrictions and disqualifications from possessing guns – which are "presumptively lawful."  Id. at 626-27 & n.26; see McDonald v. City of Chicago, 561 U.S. 742, 786 (2010) (plurality op.) ("We repeat those assurances here."); see also Bruen, 142 S. Ct.. at 2157 (Alito, J., concurring) ("Nor have we disturbed anything that we said in Heller or McDonald[] about restrictions that may be imposed on the possession or carrying of guns.").

1

To address the ongoing crisis of gun violence in New York, consistent with <u>Bruen</u>, the State amended New York's existing gun laws via the Concealed Carry Improvement Act ("CCIA"). By this lawsuit, Plaintiffs seek to undermine the safety and protection provided by the CCIA, arguing that it infringes their rights under the Second Amendment. Among the challenged provisions is a measure ensuring that private property owners or lessees can make informed determinations about whether to permit or exclude guns on their property by requiring that anyone bringing a weapon onto their property obtain their express consent. N.Y. Penal Law § 265.01-d. The other provisions challenged in this lawsuit involve carrying weapons in two specific types of "sensitive locations" – public parks and public-transportation facilities. Plaintiffs seek a preliminary injunction arguing that these restrictions are unconstitutional, that their operation will cause Plaintiffs irreparable harm, and that the balance of the equities tips in their favor. <u>See</u> [ECF No. 19] <u>generally</u>. This motion for a preliminary injunction must fail, for any of four reasons.

<u>First</u>, Plaintiffs do not have Article III standing. <u>Second</u>, Plaintiffs have not demonstrated a likelihood of success on the merits. As an initial matter, Plaintiffs have not met their initial burden under <u>Bruen</u> to show that the Second Amendment's plain text extends to carrying guns onto private property without consent or in the challenged "sensitive places." In any event, the restrictions at issue are perfectly consistent with the Nation's history and tradition of private property rights and firearm regulation. Indeed, there is a robust and clear historical tradition of states requiring consent to carry weapons on private property, and supporting prohibitions on carrying firearms in government parks and on public transportation. <u>Third</u>, Plaintiffs fail to establish imminent, irreparable harm – any harm to Plaintiffs is entirely speculative. <u>Finally</u>, the balance of equities and the public interest weigh overwhelmingly in favor of New York's mission to protect all New

Yorkers from the threat of gun violence.  Unlike the entirely speculative harm to the Plaintiffs, the danger of irreparable harm to public safety from a preliminary injunction is very real.

Accordingly, Plaintiffs' motion for a preliminary injunction should be denied.

## FACTUAL BACKGROUND

On July 1, 2022, the CCIA was passed by the New York State Legislature in special session, then promptly signed into law by Governor Kathy Hochul. The bill was specifically designed "to align with the Supreme Court's recent decision in []Bruen" See Press Release, July 1, 2022, available at https://on.ny.gov/3BM6Hz7. In Bruen, the Supreme Court found that a single provision of New York's gun licensing regime was unconstitutional: the provision that required an applicant to demonstrate "proper cause" to obtain a license to carry a concealed weapon. The Court held that requiring such a heightened, individualized need for self-defense to obtain a license violated the Second Amendment. See Bruen at 2123 n.1. The Court did not specifically address any other provision of New York's gun licensing or related statutes.

The Sponsor's Memo for the CCIA makes it clear that the Legislature was set on complying with Bruen and "protect[ing] individuals' Second Amendment rights as determined by the Supreme Court," while at the same time enacting measures to "prevent[] death and injury by firearms." Indeed, the government has an interest in regulating guns "to preserve the peace" and "to protect against weapons threats and intimidation, as well as to prevent physical injury." Blocher & Siegal, When Guns Threaten the Public Sphere: A New Account of Public Safety Under Heller, 116 Nw. U. L. Rev. 139, 144 (2021).

The CCIA updated New York's licensing scheme to eliminate the "proper cause" requirement that was held unconstitutional by Bruen, to clarify the requirement of "good moral character," and to establish additional application and training requirements. Part of the CCIA

enacted the new Penal Law § 265.01-d ("Private Property Provision"), which prohibits individuals from possessing "a firearm, rifle or shotgun" on private property without the express consent of the property owner or lessee.  The Private Property Provision ensures that property owners or lessees are informed about guns taken onto their property, and empowers them to allow or disallow carriage on their property as they see fit.  The Private Property Provision thus establishes default expectations for private premises, while exempting specified individuals (e.g. former and current police officers, peace officers, security guards, active-duty military personnel and hunters) from its prohibition. See id. § 265.01-d(2)(a-g).

Additionally, Penal Law § 265.01-e enumerates a set of "sensitive locations" in which individuals generally may not possess "a firearm, rifle or shotgun." Id. § 265.01e(1). As relevant here, the list includes "public parks" (the "Parks Provision") and "any place, conveyance, or vehicle use for public transportation or public transit … or any facility used for or in connection with service in the transportation of passengers" Id. § 265.01e(2)(d)(n) (along with the Private Property Provision, collectively the "challenged provisions").  As with the Private Property Provision, this section contains exceptions for police officers, peace officers, registered security guards, active-duty military personnel, and other statutorily designated persons. See id. § 265.01e(3).

On September 28, 2022, Plaintiffs Brett Christian and two out-of-state advocacy groups moved for a preliminary injunction preventing enforcement of the challenged provisions.  [ECF No. 19] Christian claims pre-enforcement injury related to the CCIA's private property, parks and transportation restrictions including:  his desire to carry firearms for self-defense in "local parks" or while hiking "on trails in largely wooded and marshy areas a few times a month"; his desire to "protect himself from both criminal attack and wildlife" in a cancelled trip to "Adirondacks Park

[sic]"; his desire to protect himself and others during occasional trips on the NFTA Metro Rail (interchangeably the Buffalo light rail) when "traffic or events downtown made driving impractical"; his desire to carry firearms during "weekly visits to the gas station[ ] and monthly visits to hardware stores" where they have not "post[ed] conspicuous signage consenting to the carrying of firearms"; and, while driving, having to "disable and store [his] firearm" to "take any bathroom breaks, pick-up or buy food, or to get gas" if these private property owners have not consented to carriage on their private property.  [ECF No. 19-4] at 7-11.  Importantly, Christian has not demonstrated that challenged statute will be enforced against him.  The organizational plaintiffs allege pre-enforcement injuries related to the devotion of resources addressing and responding to the enactment and enforcement of the CCIA, incurring of legal fees analyzing how the CCIA affects its members, and designing and implementing a New York hotline program. [ECF No. 19-5 and 19-6].  As discussed more fully below, it is imperative that the State be allowed to challenge Plaintiffs' factual allegations at a hearing prior to any court decision on Plaintiffs' motion.  See Infra.I.B.

## STANDARD OF REVIEW

A preliminary injunction is "an extraordinary remedy never awarded as of right." Winter v. Natural Res. Defense Council, Inc., 555 U.S. 7, 24 (2008). The movant bears the heavy burden of establishing each of the following elements: (1) that they are likely to succeed on the merits, (2) that they are likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in their favor, and (4) that an injunction is in the public interest. Id. at 20. The final two factors – the balance of the equities and the public interest – "merge when the Government is the opposing party." L&M Bus Corp. v. Bd. of Educ., 2018 WL 2390125, at *13 (E.D.N.Y. May 25, 2018) (quoting Nken v. Holder, 556 U.S. 418, 435 (2009)).

In addition, the Second Circuit has "held the movant to a heightened standard" where, as here, an injunction alters the status quo rather than maintains it. <u>People ex. rel. Schneiderman v. Actavis PLLC</u>, 787 F.3d 638, 650 (2d Cir. 2015). Indeed, in cases such as this one, where a plaintiff asks the Court to enjoin a duly enacted law, "[r]equiring such a heightened showing is consistent with the principle that 'governmental policies implemented through legislation . . . are entitled to a higher degree of deference and should not be enjoined lightly.'" <u>Bill & Ted's Riviera, Inc. v. Cuomo</u>, 494 F. Supp. 3d 238, 244 (N.D.N.Y. 2020) (quoting <u>Able v. United States</u>, 44 F.3d 128, 131 (2d Cir. 1995)). Plaintiffs must therefore show a "clear" or "substantial" likelihood of success on the merits and make a "strong showing" of irreparable harm, in addition to showing that the preliminary injunction is in the public interest. <u>Actavis</u>, 787 F.3d at 650 (quoting <u>Beal v. Stern</u>, 184 F.3d 117, 123 (2d Cir. 1999)). Plaintiffs cannot meet this standard.

## ARGUMENT

## I.  PLAINTIFFS DO NOT HAVE STANDING

As a threshold matter, Plaintiffs lack standing to sue.  "The doctrine of standing [requires] that a litigant 'prove that he has suffered a concrete and particularized injury that is fairly traceable to the challenged conduct, and is likely to be redressed by a favorable judicial decision.'" <u>Carney v. Adams</u> 141 S. Ct. 493, 498 (2020) (quoting <u>Hollingsworth v. Perry</u>, 570 U.S. 693, 704 (2013)). And the injury has to be <u>real</u>: "an 'injury in fact' [] must be 'concrete and particularized,' as well as 'actual or imminent.'  It cannot be 'conjectural or hypothetical.'" <u>Id.</u> (quoting <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 560 (1992)).  Plaintiffs have not made the requisite showing.

### A.    The Organizational Plaintiffs Lack Standing Because They Have Suffered No Injury of Their Own

The organizational plaintiffs, Firearms Policy Coalition, Inc. (FPC) and Second Amendment Foundation (SAF), lack standing because they cannot bring suit vicariously on behalf

of their members, and because they cannot demonstrate any injury in their own right.  The analysis is governed by the Second Circuit's recent decision in <u>Connecticut Citizens Defense League Inc. v. Lamont</u>, 6 F.4th 439 (2021).  <u>CCDL</u>, like this action, was a case brought by an interest group focusing on gun issues, attempting to challenge a state measure on Second Amendment grounds. <u>Id.</u> at 441.  Although the district court granted a preliminary injunction, the Second Circuit reversed and vacated (in relevant part) on standing grounds: with regard to the organizational plaintiff, the Circuit noted its longstanding doctrine that an organization "lack[s] 'standing to assert the rights of its members," and could only bring "suit on its <u>own</u> behalf" if it could show that the organization itself suffered an "actual or threatened injury in fact."  <u>Id.</u> at 447; <u>see</u> <u>Conn. Parents Union v. Russell-Tucker</u>, 8 F.4th 167, 174 (2d Cir. 2021) ("where, as here, an organization is not directly regulated by a challenged law or regulation," it must establish "an involuntary material burden on its established core activities").  The organizational plaintiff in <u>CCDL</u> argued that it "diverted resources" in response to the challenged measure by "communicat[ing] with individuals across Connecticut" and "sen[ding] a letter to the Governor." <u>Id.</u> But the Circuit found that this was no basis for standing, when communicating with members, lobbying the government, and pursuing litigation generally were "integral to CCDL's mission to preserve the effectiveness of the Second Amendment," making the relied on actions "not a departure from CCDL's usual activities." <u>Id.</u> (cleaned up).

So too with the organizational plaintiffs here.  Plaintiff FPC states that its purpose is to "serve[] its members and the public through legislative advocacy, grassroots advocacy, litigation and legal efforts, research, education, and other programs."  [ECF No. 19-5] ¶ 3.  Plaintiff SAF likewise says its purpose is to "preserve the effectiveness of the Second Amendment through education, research, publishing, and legal action programs."  [ECF No. 19-6] ¶ 3.  And the

organizations' purported injuries amount to continuing with these grassroots advocacy activities, including by "addressing inquiries" and setting up a "hotline" to speak with members.[1]   These activities cannot be a basis for standing because they are "not a departure from [the organizations'] usual activities."[2]   CCDL, 6 F.4th at 447; see Lawyers' Committee for 9/11 Inquiry, Inc. v. Garland, 43 F.4th 276, 283 (2d Cir. 2022) (expenditure of money and resources does not confer standing if it goes to "the very mission of the plaintiff organizations").   Moreover, there is even less of a basis to pursue injunctive relief: the only ongoing harm alleged by either organization is "incur[ing] ongoing expenses to operate the hotline," and that both organizations "expect[] to continue to be required to expend additional resources addressing New York's laws."  [ECF No. 19-5] ¶¶ 9-10, [ECF No. 19-6] ¶¶ 9-10.[3]   "Such a conclusory assertion cannot support standing, and falls short of establishing a 'likelihood' of future injury."  CCDL, 6 F.4th at 448.

## B.   Christian Lacks Standing To Bring a Pre-Enforcement Facial Challenge Because He Has Not Demonstrated An Intent To Violate The Statute And A Specific Threat of Enforcement

The individual plaintiff similarly lacks any injury in fact, let alone one traceable to any of the defendants.   Plaintiff Christian submitted an affidavit alleging that his practice was to carry firearms essentially everywhere, but he has ceased to do so; in occasional outdoor hiking in

---

[1] Voluntary litigation activity is also not a sufficient basis for standing.  See Clapper v. Amnesty Int'l USA, 568 U.S. 398, 416-17 (2013); Lawyers Cmte. for 9/11 Inquiry, Inc. v. Garland, 43 F.4th 276, 283 (2d Cir. 2022).

[2] Both originations' "hotlines" appear to only be simple online contact forms.  See [ECF No. 19-5] ¶ 9, [ECF No. 19-6] ¶ 9 (providing the URLs for the two "hotlines").  And Plaintiff FPC regularly sets up such "hotlines" to communicate members and find potential plaintiffs for lawsuits, including before the passage of the New York law it is challenging here.  See, e.g., https://twitter.com/gunpolicy/status/1536830928177221633 (June 14, 2022) (seeking plaintiffs in Florida for a lawsuit and telling them to "please fill out our hotline form"); https://twitter.com/gunpolicy/status/1540108011229683717 (June 23, 2022) ("[i]f you are denied a license to carry, please let our FPC Law team know by filing a report using the FPC 2A hotline").

[3] The relevant sections of the two organizations' statements are word-for-word identical.

unspecified locations, a single canceled trip to Adirondack Park, occasional Buffalo light rail trips, and on private property where consent has not been conspicuously granted.  [ECF No. 19-4] at ¶¶ 7-11. Plaintiff states that he has to "constantly disarm … in places that I would otherwise carry in"… and he is "left without the ability to defend [himself] and [is] suffering diminished personal safety" as a result.  Id. ¶ 12.

These allegations provide no basis for standing, particularly in a pre-enforcement facial challenge such as this one.  "A plaintiff cannot establish standing by asserting an abstract general interest common to all members of the public, no matter how sincere or deeply committed a plaintiff is to vindicating that general interest on behalf of the public."  Carney, 141 S. Ct. at 499 (quotation marks omitted). Rather, in the context of a pre-enforcement facial challenge such as this one, standing requires "plausible allegations that a plaintiff intends to engage in conduct proscribed by a statute, and there exists a credible threat of prosecution thereunder." Frey v. Bruen, No. 21 Civ. 5334, 2022 WL 522478, at *4 (S.D.N.Y. Feb. 22, 2022) (quotation marks omitted). Here, Plaintiff Christian fails to alleges the first element – in fact, he acknowledges that he will continue to follow the law, see [ECF No. 19-4] ¶¶ 8, 10-11, and there are no allegations that any defendant has taken or threatened any enforcement action against him, see generally [ECF No. 19-4].  Accordingly, there is no injury-in-fact for purposes of a pre-enforcement facial challenge, and certainly none traceable to any defendant in this action.

Additionally, Plaintiff's allegations are intentionally vague and require clarification and cross-examination before this court determines standing.[4]  Allegedly "hiking trails in largely wooded and marshy areas" does not implicate activity that is clearly encompassed by the CCIA.

---

[4] At the October 3, 2022 Status Conference, the State requested pre-hearing discovery and a preliminary injunction evidentiary hearing that allowed for cross-examination on the issue of standing.  The State reiterates that request here.  Fengler, 832 F.2d 745, 747 (2d Cir. 1987).

See [ECF No. 19-4] ¶ 7. As discussed in Section II.B.2., below, the only specific allegation Plaintiff makes regarding public parks – which are a sensitive location – is that he intended to, but did not, take a trip to Adirondack Park. But that cannot provide standing to sue because firearms are not banned there, as erroneously alleged by Plaintiff.

Although plaintiff allegedly intends to take the NFTA Metro Rail at some future point when driving is "impractical," id. at ¶ 9, "[s]uch 'some day' intentions—without any description of concrete plans"—do not give rise to Article III standing, *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 564 (1992). Lastly, Plaintiff's affidavit regarding the Private Property Provision identifies unspecified "gas stations," "hardware stores," and locations to "take [ ] bathroom breaks, pick-up or buy food, or to get gas" – which, without more, cannot demonstrate any activity or location that is clearly encompassed by the CCIA. [ECF No. 19-4] ¶¶ 10-11. Plaintiff presents no evidence, for example, that these locations have not already determined to prevent (or allow) concealed carry on their property. For all of these reasons, Plaintiff has failed to establish standing and, at the very least, cross-examination of Plaintiff's allegations is necessary prior to this court making a determination on standing.

## II. PLAINTIFFS CANNOT ESTABLISH A CLEAR OR SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE MERITS

In their motion for a preliminary injunction, Plaintiffs allege that the Private Property Provision as well as government parks and transportation locations are implicated by the text of the Second Amendment, that historical "sensitive place" restrictions are the only historical analogies that can justify the challenged provisions, and that "New York will be unable to justify such a restriction with historically grounded analogies." [ECF No. 19-1] at 15-28. In fact, the historical record is replete with examples of carriage restrictions on private property, in

government parks and in locations associated with transportation.  As such, Plaintiffs cannot demonstrate a clear or substantial likelihood of success on the merits for their claims.

### A.        Plaintiffs Can Only Bring a Disfavored Facial Challenge

Here, as noted above, Plaintiffs' bring a "pre-enforcement" challenge to the challenged provisions of the CCIA.  See generally [ECF No. 19]  A long line of precedent within the Second Circuit establishes that any "pre-enforcement" challenge to a state law, defined as one brought "before [any plaintiffs] have been charged with any violation of law," can only be brought as a facial challenge. Jacoby & Meyers, LLP v. Presiding Justices of the First, Second, Third and Fourth Departments, 852 F.3d 178, 184 (2d Cir. 2017); accord Restaurant Law Ctr. v. City of N.Y., 360 F. Supp. 3d 192, 208 (S.D.N.Y. 2019).

A facial challenge to the provisions of a statute can succeed only if Plaintiffs "show that 'no set of circumstances exists under which the [statute] would be valid, i.e., that the law is unconstitutional in all of its applications,' or at least that it lacks a 'plainly legitimate sweep.'" U.S. v. Decastro, 682 F.3d 160, 168 (2d Cir. 2012) (quoting Wash. State Grange v. Wash. State Republican Party, 552 U.S. 442, 449 (2008)); see also United States v. Salerno, 481 U.S. 739 (1987)).  Moreover, it is black-letter law that the New York State courts must be given the opportunity to narrow the provisions of the CCIA, if necessary, during the course of specific enforcement activities or judicial proceedings. See Erznoznik v. Jacksonville, 422 U.S. 205, 216 (1975) ("[A] state statute should not be deemed facially invalid unless it is not readily subject to a narrowing construction by the state courts"). Because of this, "[a] plaintiff making a facial claim faces an uphill battle because it is difficult to demonstrate that mere enactment of a piece of legislation violates the plaintiff's constitutional rights." Cranley v. Nat'l Life Ins. Co. of Vt., 318 F.3d 105, 110 (2d Cir. 2003) (quoting Suitum v. Tahoe Reg'l Plan. Agency, 520 U.S. 725, 736

n.10 (1997)) (cleaned up); see also Diaz v. Pataki, 368 F. Supp. 2d 265, 274 (S.D.N.Y. 2005)

(same).

### A.     The Challenged Provisions Do Not Violate the Second Amendment

Plaintiffs' motion claims that the challenged provisions violate their Second Amendment

right to bear arms. However, plaintiffs have not met their burden under Bruen to establish this

claim. And, in any event, New York's provisions are consistent with a long and robust history of

government prohibitions on firearms on private property and in analogous sensitive places.

### 1.     New York's Law Preventing Armed Persons From Entering Other People's Property Without Consent Is Constitutional and Deeply Rooted In Anglo-American Property Law and Tradition

Because Plaintiffs bring a facial challenge, Plaintiffs must show that the Private Property

Provision is unconstitutional in all applications.  *See United States v. Salerno*, 481 U.S. 739, 745

(1987) ("[a] facial challenge to a legislative Act is, of course, the most difficult to mount

successfully, since the challenger must establish that no set of circumstances exist under which the

Act would be valid").  "One common application of the [Private Property Provision] would be

when a license holder wants to carry a firearm on private property where the [owner] prohibits

carrying."[5] GeorgiaCarry.Org, Inc. v. Georgia, 687 F.3d 1244, 1261 (11th Cir. 2012), abrogated

in part on other grounds, Bruen, 142 S. Ct.. 2111.  "To state a facial claim, therefore, Plaintiffs

must take the position that the Second Amendment protects a right to bring a firearm on another's

private property against the desires of the owner."  Id.  "Put another way, Plaintiffs must argue that

the individual right protected by the Second Amendment, in light of Heller and McDonald, trumps

a private property owner's right to exclusively control who, and under what circumstances, is

---

[5] After all, if the property owner consents to the Plaintiff bringing a weapon onto his or her
property, there is no violation of the statute.  See N.Y. Penal Law § 265.01-d(1).

allowed on his or her premises." Id.  Plaintiffs have not and cannot make this showing, which is fatal to their claims.

### a. Plaintiffs' Failed To Carry Their Burden On The First Part Of The Bruen Test

As the movants, "Plaintiffs bear the initial burden of establishing a likelihood of success on the merits." We The Patriots USA, Inc. v. Hochul, 17 F.4th 266, 281 (2d Cir.), cert. denied, 142 S. Ct. 2569 (2022). The burdens of proof on the underlying claims will inform the necessary showing at this stage. See id. As relevant here, and as plaintiffs concede (Mot. at 16-17), only when a challenger shows that "the Second Amendment's plain text covers an individual's conduct" must the government then demonstrate that its regulation is nonetheless "consistent with this Nation's historical tradition of firearm regulation." Bruen, 142 S. Ct. at 2126, 2129-30. The first step entails an analysis of "the Second Amendment's text, as informed by history." Id. at 2127; see also Heller, 554 U.S. at 595.

Under the first step of the Bruen test, a plaintiff must demonstrate that the conduct the plaintiff engaged in (or seeks to engage in) falls within the scope of the Second Amendment's guarantee.[6]  142 S. Ct. at 2129.  This burden is compounded on a motion for a preliminary injunction where a plaintiff must show a clear likelihood of success on the merits.  See Actavis, 787 F.3d at 650.  Here, with respect to the Private Property Provision, the relevant conduct is

---

[6] The burden on the first step of the Bruen test is clearly Plaintiffs' for two reasons.  First, Bruen itself makes it clear, by indicating that a presumption that the Constitution protects a plaintiff's conduct arises *after* ("when" or "because") the textual inquiry is satisfied.  See 142 S. Ct. at 2126, 2141 n.11.  If the burden were on the government throughout—in what would be an extraordinary departure from ordinary principles of constitutional litigation—the Court would have said that the presumption exists from the outset.  Second, placing the initial burden on the plaintiff accords with the Court's approach to other constitutional issues.  For example, in Kennedy v. Bremerton School District, 142 S. Ct. 2407, 2421 (2022), the Court announced that "[u]nder this Court's precedents, a plaintiff bears certain burdens to demonstrate an infringement of [their] rights under the Free Exercise and Free Speech Clauses," and only "[i]f the plaintiff carries these burdens" must the defendant then justify its actions.

carrying firearms onto private property without having to obtain express consent.  Accordingly, Plaintiffs must demonstrate that the Second Amendment's plain text protects the right to carry onto another's private property without their permission.

Rather than engage in any textual or historical analysis to demonstrate that the Second Amendment's text protects the right to carry onto another's private property without consent, Plaintiff relies entirely on Bruen to support their claim.  *See* [ECF No. 19-1] at 11.  Plaintiffs' reliance is mistaken.  Contrary to Plaintiffs' claim, Bruen did not hold that the Second Amendment's plain text enshrines the unfettered right to carry onto another's private property. Instead, the Bruen Court held that the Second Amendment's plain text guarantees "a right to 'bear arms in public for self-defense."  142 S. Ct. at 2135.  The operative word in the Supreme Court expression of that guarantee is "public."  Plaintiffs have made no attempt to show, as they must, that the right to bear arms in public for self-defense encompasses "the right to bear arms on another's private property without permission for self-defense.  That omission is fatal to plaintiffs' request for injunctive relief.

Indeed, the Supreme Court's jurisprudence provides no basis for such a conclusion.  Heller is contrary to Plaintiffs' contention that the Second Amendment covers the right to carry onto another's private property—there is no way that the Second Amendment could "elevate[] above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home," 554 U.S. at 635, if it also guaranteed the right of strangers to carry concealed guns into the same home without the resident's consent or even knowledge.  Such a conclusion would also run directly contrary of the Supreme Court's private property jurisprudence because it infringes on a property owner's right to exclude, "'a fundamental element of the property right'".  Cedar

Point Nursery v. Hassid, 141 S. Ct. 2063, 2077 (2021) (quoting Kaiser Aetna v. United States, 444 U.S. 164, 179 (1979).

This right to exclude can apply even where a property owner otherwise makes his or her premises open to the general public.  Under fundamental principles of New York property law, an owner "has the power to admit . . . only those whom he may select, and to exclude others solely of his own volition, as long as the exclusion is not founded on race, creed, color or national origin." Madden v. Queens County Jockey Club, 296 N.Y. 249, 253 (1947); accord Weiss v. Violet Realty, Inc., No. 03-CV-586E, 2004 WL 2534238, at *2 (W.D.N.Y. Nov. 5, 2004) (declaring that "this Court is aware of no federal law that prohibits a private landowner from excluding people from its property" and that the plaintiff's exclusion from a shopping mall "violates neither the U.S. Constitution nor the laws of the United States."), aff'd in relevant part, vacated in part on other grounds, 160 F. App'x 119 (2d Cir. 2005).  This "common-law power of exclusion . . . continues until changed by legislative enactment." Madden, 296 N.Y. at 254; see also SHAD Alliance v. Smith Haven Mall, 66 N.Y.2d 496, 502 (1985).  Plaintiffs have pointed to no statutory or other authority that would establish a right to carry a gun onto someone else's property without their consent, or without their right to know that the gun is entering the premises.

Ultimately, the ability to carry guns on private property must be subject to one of two default rules: either such conduct is presumptively prohibited absent affirmative consent, or it is presumptively permitted absent affirmative prohibition.  Because the Second Amendment's plain text does not protect the right to carry onto another's private property, neither default implicates the Second Amendment and the decision between the two defaults is a quintessential policy judgment appropriately (and historically) made by state legislatures.  See, e.g., N.Y. Penal Law § 140.17(2) (making it felony trespass to remain on someone else's property with an operable

firearm after a direction to leave).  In either case, the ultimate decision as to whether concealed carry is permitted on a person's property is a decision that the private property owners make for themselves.

        **b.**     **Requiring Persons Carrying Guns Onto Another's Property To Obtain Consent Is Consistent With American History And Tradition**

       The outcome is the same under the second prong of the Bruen test, as the fundamental right to control one's own property is reflected in statutes both before and after the founding that prohibited the carrying of guns onto another's land without consent.  In the 18th and 19th Centuries, multiple states had laws against carrying guns on someone else's property unless the owner or proprietor had given permission.[7]

- **Maryland in 1715** enacted a law stating that "if any person or persons whatsoever, that have been convicted of [certain crimes], or other crimes, or that shall be of evil fame, or a vagrant, or dissolute liver, that shall shoot, kill or hunt, or be seen to carry a gun, upon any person's land, whereon there shall be a seated plantation, without the owner's leave, having been once before warned, shall forfeit and pay one thousand pounds of tobacco . . . ." 1715 Md. Laws 90, Belka Decl., ¶ 3, Ex. 1.

- **Pennsylvania in 1721** enacted an act providing for criminal penalties "if any person or persons shall presume, at any time after [November 16, 1721], to carry any gun or hunt on the improved or inclosed[8] lands of any plantation other than his own, unless he have

---

[7] In 1782, Boston enacted a law that made it unlawful to bring loaded guns into buildings in town.  See D.C. v. Heller, 554 U.S. 570, 685-686 (2008) (Breyer J, dissenting) ("[T]he law would, as a practical matter, have prohibited the carrying of loaded firearms anywhere in the city, unless the carrier had no plans to enter any building or was willing to unload or discard his weapons before going inside. And Massachusetts residents must have believed this kind of law compatible with the . . . 'right to keep and to bear arms . . . .'")

[8] The term "inclosed" as referenced in these older statutes does not mean land that is physically closed in, such as by a wall or fence, but rather refers to the common-law definition of a "close," meaning one's private property.  See, e.g., 3 William Blackstone, Commentaries on the Laws of England ch. 12 ("EVERY unwarrantable entry on another's soil the law entitles a trespass by breaking his close. . . . For every man's land is in the eye of the law inclosed and set apart from his neighbour's: and that either by a visible amaterial fence, as one field is divided from another by a hedge; or, by an ideal invisible boundary, existing only in the contemplation of law . . ."); accord Ledbetter v. Fitzgerald, 1 Ar. 448, 451-52 (1839).  Moreover, the term "inclosed"

license or permission from the owner of such lands or plantation." James T. Mitchell et al., <u>Statutes at Large of Pennsylvania from 1682 to 1801</u> vol III, p. 254-55 (Clarence M. Busch, Printer, 1896), <u>Id.</u>, ¶¶ 4-5, Ex. 2. Lesser penalties were provided for "any person whatsoever who is not owner of fifty acres of land and otherwise qualified [to vote for Pennsylvania Assembly]" who "shall . . . carry any gun, or hunt in the woods or unenclosed lands, without license or permission obtained from the owner or owners of such lands." <u>Id.</u> at 256.

- **New Jersey in 1722** enacted a substantially identical law to Pennsylvania's, providing for criminal penalties "if any Person or Persons shall presume, at any Time after the Publication hereof, to carry any Gun, or hunt on the improved or inclosed Lands in any Plantation, other than his own, unless he have License of Permission from the Owner of such Lands or Plantation." 1741 N.J. Laws 101, <u>Id.</u>, ¶¶ 6-7, Ex. 3. There was a lesser fine "if any person who is not [a large property owner qualified to vote for the New Jersey General Assembly] shall at any time after the Publication hereof, carry any Gun, or hunt in the Woods or unenclosed Lands, without License or Permission obtained from the Owner or Owners of such Lands." <u>Id.</u> If the fine was not paid, offending persons could have their property seized or be "committed to Prison." <u>Id.</u>

- **New York in 1763** enacted a statute establishing criminal liability "if any Person or Persons whatsoever, other than the Owner, Proprietor, or Possessor, or his or her white Servant or Servants, do and shall . . . .carry, shoot, or discharge any Musket, Fowling-Piece, or other Fire-arm whatsoever, into, upon, or through any Orchard, Garden, Corn-Field, or other inclosed Land whatever, within the City of New-York, or the Liberties thereof, without License in Writing first had and obtained for that Purpose from such Owner, Proprietor, or Possessor . . ." 2 <u>Laws of New-York from The Year 1691, to 1773, inclusive,</u> 441-42 (Hugh Gaine, ed. 1774), <u>Id.</u>, ¶¶8-9, Ex. 4.

- **New Jersey in 1771** updated its statute, both simplifying its language and broadening its reach. The new law provided for penalties "if any Person or Persons shall presume, at any Time after the Publication hereof, to carry any Gun on any Lands not his own, and for which the Owner pays Taxes, or is in his lawful Possession, unless he hath License or Permission in writing from the Owner or Owners or legal Possessor." 1771 N.J. Laws 344, <u>Id.</u>, ¶¶ 10-11, Ex. 5.

- **Louisiana in 1865** enacted "AN ACT To prohibit the carrying of fire-arms on premises[9] or plantations of any citizen, without the consent of the owner. The law forbade "any person or persons to carry fire-arms on the premises or plantations of any citizen, without the consent of the owner or proprietor, other than in lawful discharge of a civil or military order." 1865 La. Extra Acts 14-17, <u>Id.</u>, ¶¶ 12-13, Ex. 6.

---

necessarily includes buildings as well as land. See <u>Poole v. State</u>, 17 Ga. App. 738 (Ga. Ct. App. 1916) ("A house situated upon inclosed land is necessarily included within the inclosure . . .")

[9] Likewise, "premises" is a broad term, referring either to "[t]he part of a deed that describes the land being conveyed," or to "[a] house or building, along with its grounds." Brian A. Garner, et al., <u>Black's Law Dictionary</u> (9th Ed. 2009).

- **Texas in 1866** enacted "An Act To Prohibit The Carrying Of Firearms On Premises Or Plantations Of Any Citizen Without The Consent Of The Owner."  George Paschal, ed., <u>4 Digest of the Laws of Texas Containing the Laws in Force, and the Repealed Laws on Which Rights Rest, from 1754 to 1875</u>, <u>Id.</u>, ¶¶ 14-15, Ex. 7, at 1321-22.  The statute provided that "[it] shall not be lawful for any person or persons to carry firearms on the inclosed premises or plantation of any citizen, without the consent of the owner or proprietor, other than in the lawful discharge of civil or military duty," with violations punished by fines or "imprisonment in the county jail."  <u>Id.</u>

- **Oregon in 1893** enacted "AN ACT To Prevent A Person from Trespassing upon any Enclosed Premises or Lands not His Own Being Armed with a Gun, Pistol, or other Firearm, and to Prevent Shooting upon or from the Public Highway."  1893 Or. Laws 79, <u>Id.</u>, ¶¶ 16-17, Ex. 8.  The act provided that "[i]t shall be unlawful for any person, other than an officer on lawful business, being armed with a gun, pistol, or other firearm, to go or trespass upon any enclosed premises or lands without the consent of the owner or possessor thereof."  <u>Id.</u>

Each of these statutes demonstrates that the individual right to bear arms was never understood to "trump[] a private property owner's right to exclusively control who, and under what circumstances, is allowed on his or her own premises." <u>GeorgiaCarry</u>, 687 F.3d at 1261.[10]  Indeed, many of these statutes go far beyond what the Private Property Provision requires, such as by requiring that the owner's consent be issued ahead of time in writing, or by lacking any of the exceptions New York provides in Penal Law § 265.01-d(2).  Nor do any of the statutes make a distinction regarding whether the land is otherwise open to the public; instead, they apply broadly,

---

[10] Engaging in the type of historical and textual analysis that Plaintiffs do not attempt, the Eleventh Circuit held that the Second Amendment's text did not cover the right to carry onto another's private property.  <u>GeorgiaCarry.Org, Inc. v. Georgia</u>, 687 F.3d 1244, 1266 (11th Cir. 2012).  This conclusion was supported by an in-depth analysis of the "property law, tort law, and criminal law . . . on which our Founding Fathers drafted the Second Amendment," from Blackstone's <u>Commentaries</u> through to modern case and statutory law.  <u>Id</u>. at 1261-64.  <u>GeorgiaCarry</u> remains good law even after the recent decision in <u>Bruen</u>.  Although the Eleventh Circuit noted that the test applicable at the time involved two steps, with the second one involving strict or intermediate scrutiny, the Court "need[ed] only [to] reach the first step," and declined to apply any mode of means-end analysis.  687 F.3d at 1260 n. 34; <u>cf. Bruen</u>, 142 S. Ct. at 2127 ("Step one of the predominant framework is broadly consistent with <u>Heller</u> which demands a test rooted in the Second Amendment's text, as informed by history.").

to categories such as "any Lands not his own, and for which the Owner pays Taxes," 1771 N.J. Laws 344, or to "the premises or plantations of any citizen."[11] 1865 La. Extra Acts 14.

Vindicating the fundamental right to private property by making sure an owner has the right to give informed consent to armed carriage on his or her property is entirely consistent with American history and tradition. "Plaintiffs, in essence, asks us to turn <u>Heller</u> on its head by interpreting the Second Amendment to destroy one cornerstone of liberty – the right to enjoy one's private property – in order to expand another – the right to bear arms." <u>GeorgiaCarry</u>, 687 F.3d at 126. There is no basis to do so, either in the Supreme Court's jurisprudence or in the Anglo-American legal tradition. New York's Private Property Provision should be upheld.

### 2.    The Prohibition on Guns In Public Parks Is Constitutional

### a.    Plaintiff Christian Lacks Standing Because His Claim Concerns Adirondack Park, and the CCIA Does Not Prohibit Guns there

As a threshold matter, the challenge to the law protecting public parks must fail because no plaintiff alleges any concrete intent to go onto a park where guns are prohibited. Plaintiff Christian's only specific allegation with regard to parks is that he had intended to take a trip to "Adirondacks Park [sic]," but that "because of the enactment and enforcement of S51001, I have canceled any plans to visit Adirondacks Park [sic] this year." ECF No. 19-4 ¶ 8. But the provision that the plaintiffs challenge does not apply to Adirondack Park.

---

[11] As applied to businesses or other places open to the public, the constitutionality of the Private Property Provision in the case of private property otherwise open to the public is further bolstered by a significant body of statutory and case law, discussed further in Section ⬛, below, prohibiting armed carriage on private property where the public gathers in large numbers. The Private Property Provision sweeps far less broadly than such statutes, requiring an owner's consent for armed carriage rather than prohibiting it entirely.

Despite the name, "Adirondack Park" is not a park at all under New York law; instead, the state land within it is designated as a forest preserve.[12]  See People v. Adirondack Ry. Co., 160 N.Y. 225, 230-31 (1899) (describing enactment of the forest preserve); N.Y. Env. Conserv. Law § 9-0101(1, 6) (defining the term "forest preserve" and defining the term "Adirondack [P]ark" as including "all lands located in the forest preserve counties of the Adirondacks within the following described boundaries . . .").  And New York has been very clear, both in guidance and in public statements, that the forest preserve lands within the Adirondack Park are not covered by the statute challenged here.  See, e.g., New York State Department of Environmental Conservation, Frequently Asked Questions and Answers on Hunting and Hunting-Related Activities in response to Recent Changes to New York State Firearm Laws, https://www.dec.ny.gov/docs/wildlife_pdf/gunlawqanda2022.pdf, at 3 (Sept. 1, 2022) ("Q: Can I possess a firearm, rifle, or shotgun in the Adirondacks and Catskills?  A: Yes.  Certain areas of the parks are not considered 'sensitive locations under the law,' as the state owned or managed lands are legally classified as state forest preserve . . .");[13]  see also, e.g., Anthony F. Hall, Despite GOP Claims, Guns Not Banned in Adirondack Park, New York Almanack, https://www.newyorkalmanack.com/2022/07/despite-gop-claims-guns-not-banned-in-adirondack-park/ (quoting spokesman for Governor Hochul as

---

[12] Technically, "[t]he terms 'Adirondack Park' and 'Forest Preserve' are not synonymous.  The Adirondack Park encompasses approximately six million acres of public and private land in various northern counties within certain boundaries designated by law (see ECL 9–0101 [1] ).  The Forest Preserve encompasses more than 2.5 million acres of state-owned land within the Adirondack and Catskill Parks (see ECL 9–0101[6])."  Protect the Adirondacks! Inc. v. N.Y. State Dep't of Env'tl Conserv., 175 A.D.3d 24, 26 (3d Dep't 2019).  The distinction is not meaningful for the purpose of this case, as the CCIA does not prohibit the carriage of guns on private land within the Adirondack Park.

[13] As the NYSDEC notes elsewhere in the document, certain other locations such as libraries or government administrative facilities located within the boundaries of Adirondack Park are separately considered sensitive under Section 265.01-e.  Plaintiff Christian does not allege an intent to visit any such place.

20

saying "The new law changes nothing for lawful gun owners on Forest Preserve and privately-owned lands within the Blue Line of the Adirondacks. These areas are not considered 'sensitive locations' under the law").[14]   Because Christian has not alleged any injury from a ban on his carrying a gun in this non-sensitive locale, he lacks standing to challenge New York's ban on firearms in public parks.

> **b.** **New York's Law Preventing Armed Persons From Entering Sensitive Places Is Constitutional and Deeply Rooted In Anglo-American Property Law and Tradition**

Because sensitive places are those where, historically, carrying weapons was "altogether prohibited," Bruen, 142 S. Ct. at 2133, these locations fall outside the textual scope of the Second Amendment.  See Binderup v. Attorney General, 836 F.3d 336, 343 (3d Cir. 2016) (sensitive place laws "comport with the Second Amendment because they affect . . . conduct unprotected by the right to keep and bear arms"), abrogated on other grounds, Bruen, 142 S. Ct.. 2111; see also Bonidy v. U.S. Postal Service, 790 F.3d 1121, 1125 (10th Cir. 2015) ("the Second Amendment right to carry firearms does not apply to federal buildings, such as post offices"); GeorgiaCarry.org, Inc. v. U.S. Army Corps of Engineers, 212 F. Supp. 3d 1348, 1366-67 (N.D. Ga. 2016) (finding that location was sensitive meant that "the conduct regulated by the [challenged measure] falls outside the scope of the Second amendment.  Consequently, no further evaluation of the [challenged measure] need occur.").

---

[14] Plaintiff Christian's single throwaway reference to "walking in local parks" in Paragraph 7 of his declaration similarly provides no basis for standing, particularly when it is unconnected with any threat of enforcement from any specific defendant.  "At the preliminary injunction stage, a plaintiff's burden to demonstrate standing will normally be no less than that required on a motion for summary judgment.  Accordingly, to establish standing for a preliminary injunction, a plaintiff cannot rest on mere allegations but must set forth by affidavit specific facts . . ."  New York v. U.S. Dep't of Homeland Sec., 969 F.3d 42, 59 (2d Cir. 2020).

A challenger thus bears an initial burden to show that a location designated as "sensitive" in fact plausibly falls within the Second Amendment's ambit. But whatever this step-one burden entails here, Plaintiffs' submission does not even attempt to satisfy it, alone compelling the denial of a preliminary injunction against the challenged provisions.  Plaintiffs' memorandum simply declares that because they want to carry guns everywhere outside the home, their "proposed course of conduct is presumptively protected by the Second Amendment." Mot. at 16-17. And, in particular, plaintiffs tender no evidence or argument to demonstrate that the Second Amendment right of "carrying handguns publicly for self-defense," Bruen, 142 S. Ct. at 2130, textually extends to the government-owned parks and transportation centers at issue here, under an original understanding of the right.

In any event, the Parks Provision satisfies the Bruen "historical tradition" test. For this purpose, the Supreme Court explained that reasoning by analogy, comparing modern regulations to historical analogues, would be required and appropriate.  Bruen, 142 S. Ct. at 2132.  Here, review of such analogues reveals that the historical record contains a broad and well-established body of laws restricting the carrying of weapons in local and national parks, demonstrating that restricting firearms in government-owned parks is deeply rooted in American society.

Although public parks were in their infancy as an institution during the late 19th Century, there are many examples of municipal statutes banning the carrying of firearms within them.  See, e.g., Fourth Annual Report of the Board of Commissioners of the Central Park (Jan. 1861)[15], Belka Decl., ¶¶ 24-25, Ex. 12 ("All persons are forbidden . . . [t]o carry firearms"); First Annual Report

---

[15] Many of the applicable regulations to government parks were instituted on a local or city government level.  Few if any of those historical records remain and fewer still are digitized and readily searchable.  While some local laws have remained through sheer happenstance (e.g. Ordinances of Wappinger Falls, New York, Park Ordinances § 1, (1898)) the available historical record is never complete and expands as more primary sources are discovered and digitized.

of the Commissioners of Fairmount Park (Philadelphia), Supplement § 21(II) (1869), Id., ¶¶ 26-27, Ex. 13, (excerpting Pennsylvania state statute requiring that "[n]o persons shall carry fire-arms, or shoot birds in the Park, or within fifty yards thereof"); Rules and Regulations of the Public Parks and Grounds of the City of Saint Paul (1888), Id., ¶¶ 28-29, Ex. 14 ("No person shall carry firearms or shoot birds in any Park or within fifty yards thereof."); 1895 Mich. Pub. Acts 596, Id., ¶¶ 30-31, Ex. 15 ("No person shall fire or discharge any gun or pistol or carry firearms" within Detroit's Belle Isle Park).[16]

These firearms restrictions in municipal and state parks were prevalent.  See, e.g., Laws and Ordinances for the Government of the Municipal Corporation of the City of Williamsport, Pennsylvania 141 (1891) ("No person shall carry fire-arms… within the Park) Belka Decl., ¶ 36, Ex. 20; The Revised Ordinance of the City of St. Louis (1881) (No person shall… use or have in his possession ready for use in any… park of the city of St. Louis… any device that discharges a "fragment, bolt, arrow, pellet, or other missile") Id., ¶ 37, Ex. 21; The Charter of the City of Wilmington, Part VII, § 7 (1893) (No person shall carry fire-arms… within the Park…) Id., ¶ 38, Ex. 22; A Digest of the Laws and Ordinances for the Government of the Municipal Corporation of the City of Reading, Pennsylvania, 240 (1897) ("No person shall carry firearms, or shoot in the common, or within fifty yards thereof…) Id., ¶ 39, Ex. 23; A Revised Ordinances of the City of Boulder, 157 (1899) (prohibiting the carrying of firearms into 'any of the parks belonging to the City of Boulder') Id., ¶ 40, Ex. 24; City of Trenton, New Jersey, Charter and Ordinances, 390 (1903) ("No personal shall carry firearms… in said park or squares, or within fifty years thereof…) Id., ¶ 41, 25. Amendments to the Revised Municipal Code of Chicago of 1905 and New General

---

[16] See also Belka Decl., ¶¶ 32-35, Exs. 16-19 (additional examples of ordinances banning firearms in parks in Chicago, Salt Lake City, St. Louis, and Pittsburgh).

Ordinances, 40 (1905) ("All persons are forbidden to carry firearms… within any of the Parks… of the City") Id., ¶ 42, Ex. 26; 1905 Minn. Laws 620, Ch. 344, § 53 (prohibiting firearms withing parks or withing "one-half mile of the outer limits" of a park, unless the firearms is unloaded and has been sealed by the park commissioner.") Id., ¶ 43, Ex. 27; A Digest of the Ordinances of the Town Council of the Burough of Pheonixville, 135 (1906) ("No person shall carry fire-arms… therein [Reeves Park]") Id., ¶ 44, Ex. 28; The Code of the City of Staunton, Virginia, 115 (1910) ("All persons are forbidden… to carry firearms… within [the park].") Id., ¶ 45, Ex. 29; Ordinances, Rules and Regulations of the Department of Parks of the City of New York, 7 (1916) ("No personal shall, in any park… fire or carry any firearm.") Id., ¶ 46, Ex. 30; The Code of the City of Birmingham, Alabama, 662 (1917) ("No person shall carry firearms… within any of such public parks.") Id., ¶ 47, Ex. 31; 1917 Wis. Sess. Laws 1243-44, Ch. 668, § 3 (29.57)(4) (no person shall "have in his possession or under his control therein any gun or rifle [unless unloaded and stored] while in any "state park") Id., ¶ 48, Ex. 32; 1921 N.C. Sess. Laws 54, Pub. Laws Extra Sess., Ch. 6, § 3 (prohibiting the carrying of a firearm in any park… unless written permission had been obtained from the manager of said park) Id., ¶ 49, Ex. 33 and… there are 46 others dating between 1858-1922.  See Belka Decl., ¶¶ 53-95, Exs. 36-78.

At the federal level, firearms have been prohibited in many of our national parks from the time of their foundation.[17]  Although most national parks date from the 20th Century, by the end of the 19th Century, federal leaders had already recognized the inappropriateness of firearms within park boundaries.  See National Park Service, Firearms Regulations in the National Parks 1897-1936, Belka Decl., 50-51 Exs. 34-35.  In June 1897, Yellowstone Park adopted a regulation

---

[17] While some national parks existed prior to 1916 (e.g. first national park, Yellowstone, was established in 1872) the National Parks Service was not established until 1916. https://www.nps.gov/parkhistory/hisnps/npshistory/timeline_annotated.htm

stating that "Firearms will only be permitted in the park on written permission from the superintendent thereof. On arrival at the first station of the park guard, parties having firearms will turn them over to the sergeant in charge of the station, taking his receipt for them. They will be returned to the owners on leaving the park."[18] Id. at 1. In 1902, Sequoia and General Grant National Parks adopted rules stating that "[f]irearms will only be permitted in the park on written permission from the superintendent thereof."[19] Id. at 9. Over a dozen more national parks enacted bans on firearms in the years that followed. See generally id.

This wealth of authority leaves no doubt that public parks from their inception were viewed as sensitive places in which governments could validly restrict carrying firearms. See also Warden v. Nickels, 697 F. Supp. 2d 1221, 1229 (W.D. Wash. 2010) (holding that a "park where children and youth recreate is a 'sensitive' place where it is permissible to ban possession of firearms"); U.S. v. Masciandaro, 648 F. Supp. 2d 779, 790 (E.D. Va. 2009) ("Although Heller does not define 'sensitive places,' the examples given—schools and government buildings—plainly suggest that motor vehicles on National Park land fall within any sensible definition of a 'sensitive place.'"), aff'd on other grounds, 638 F.3d 458 (4th Cir. 2011).

Here, the applicable standard does not demand tracking down and tallying up nearly identical precursor statutes until some unspecified threshold is reached. Rather, the core question is whether the Second and Fourteenth Amendment's ratifiers could naturally have concluded that

---

[18] The policy appears to have existed before that time, as only two months later the acting superintendent wrote that "[t]je regulation prohibiting firearms in the park, except on written permission from the superintendent . . . has been strictly enforced. It is essential to the protection of the park." Id.

[19] Yosemite had likewise prohibited firearms before this time. The Secretary of the Interior's Annual Report for 1905 noted that "[h]eretofore the custom has been to require persons entering the park with firearms in their possession to surrender such arms during their stay in the park…" Id. at 15.

States possessed the authority, consistent with the Constitution, to prohibit weapons in particular areas if the legislative need and will arose. Directly on-point precursor laws—which New York has adduced here *en masse*—can answer that question in the affirmative. But even in the absence of historical twins, a comparison of "how and why" old and new "regulations burden a law-abiding citizen's right to armed self-defense" can sustain a modern law. <u>Bruen</u>, 142 S. Ct. at 2132-33.

Indeed, New York's Parks Provision aligns with a recognized purpose of sensitive places, which is to promote the exercise of other fundamental rights (i.e. free exercise of religion, freedom of speech, the fundamental right to vote, access to the courts or assemblage in the public square). In other words, sensitive places are such because "they produce the kinds of public goods protected by other constitutional rights," to allow "them to effectively produce the public good and political culture that we also consider valuable." Darrell A.H. Miller, <u>Constitutional Conflict and Sensitive Places</u>, 28 Wm. & Mary Bill Rts. J. 459, 462 (2019).[20]  "Public parks have 'immemorially' been open to the public for the purpose of communicating and assembling." <u>Id</u>. at 475. "The public square is a kind of First Amendment institution; designed for the people to be better able to exercise related rights to assemble 'to speak' and to petition the government." <u>Id</u>., 475-478. Moreover, public parks share a key trait with polling places, legislative assemblies, and courts, in that all are locations where calm reflection should prevail. Restricting guns in these places is part of an Anglo-American tradition that allows public parks to keep their inherent values as places of refuge, assembly, and free speech.

### 3.     Guns May Lawfully Be Prohibited On Public Transit

Public transportation is an anachronism – Americans in the Founding or Reconstruction Era would have had no concept similar to a government-run transportation system serving millions

---

[20] https://scholarship.law.wm.edu/wmborj/vol28/iss2/9/

of citizens on a daily basis as a public service.  Prior to the twentieth century, transportation services were typically operated by private companies vested with the authority to fashion their own rules and regulations for customers.  Rivas Decl. ¶¶ 13-17.  Nor could the citizens of those times imagine the distances travelled by modern transportation, the scale of the systems, or their importance to American life.  The annual ridership of Buffalo's NFTA Metro system, at just under 24 million people, is over six times the entire population of the United States as recorded in the 1790 census; more people ride the NFTA every week than lived in New York State at the time the Bill of Rights was ratified.[21]  The Metropolitan Transit Authority, meanwhile, has a <u>daily</u> ridership of approximately 5.6 million people, or approximately 140% of the entire American population in 1790.[22]

Because of the scale and technological advancement inherent in these systems – and because of their importance to public life – there is no possible direct Founding or Reconstruction-era analogue for a modern public transportation system.  <u>Cf. Int'l Soc'y for Krishna Consciousness, Inc. v. Lee</u>, 505 U.S. 672, 681 (1992) ("When new methods of transportation develop, new methods for [constitutionally] accommodating that transportation are also likely to be needed.").  But the <u>Bruen</u> test does not require one. <u>Bruen</u> "assume[d] it settled" that guns could be prohibited in several specified types of locations,  while announcing that "modern regulations prohibiting the carry of firearms in *new* and analogous sensitive places are constitutionally permissible." 142 S. Ct. at 2133. The Court also emphasized that "cases implicating unprecedented societal concerns

---

[21] <u>Compare</u> NFTA Metro 2019 Annual Performance Report at 5, <u>available at</u> https://metro.nfta.com/media/xefnkvjb/2019-metro_annual_performance_report.pdf <u>with</u> United States Census Bureau, 1790 Census: Return of the Whole Number of Persons within the Several Districts of the United States, <u>available at</u> https://www.census.gov/library/publications/1793/dec/number-of-persons.html.

[22] <u>See</u> MTA Day-by-day ridership numbers, <u>available at</u> https://new.mta.info/coronavirus/ridership (last visited October 29, 2022).

or dramatic technological changes" – both of which are unquestionably present when considering modern public transportation – would "require a more nuanced approach."  142 S. Ct.. at 2132. The Bruen Court gives us an example of how this "nuanced approach" should function, pointing to the fact that the historical understanding of the Second Amendment does not limit its protection "only to those arms in existence in the 18th century" – in other words, to direct historical analogues – but instead creates a "general definition" that includes "modern instruments that facilitate self-defense."  Id. at 2132; see also Heller, 554 U.S. at 582.  Appropriately analyzed, New York's ban on firearms in public transportation facilities is constitutionally permissible.[23]

### a.     The Government As Property Owner May Prohibit Firearms On Public Transportation

As an initial matter, public transportation systems (including the NFTA) are owned by the government, see State Decl., ¶¶ 1-2, and the government, like any other property owner, may prohibit the carrying of deadly weapons on its own property.  The Supreme Court has repeatedly emphasized as much, first declaring in Heller that "nothing in our opinion should be taken to cast doubt on . . . laws forbidding the carrying of firearms in sensitive places such as . . . government buildings," 554 U.S. at 626, and that such measures are "presumptively lawful," id. at 627 n.26; accord McDonald, 561 U.S. at 786 (repeating this assurance).  And the Bruen Court again mentioned "government buildings" as places where firearms could be prohibited, stating that "we are [] aware of no disputes regarding the lawfulness of such prohibitions" and "[w]e therefore can

---

[23] Plaintiffs argue, based on nothing more than their own strained interpretation of Bruen, that the Supreme Court somehow limited the historical category of sensitive locations to "students carrying firearms in schools and firearms in legislative assemblies, polling places, and courthouses."  PI Mem. At 14.  The Supreme Court did no such thing, as it specifically said in the very next sentence and elsewhere throughout the opinion.  See Bruen, 142 S. Ct.. at 2133 ("we have no occasion to comprehensively define 'sensitive places' in this case"); see also id. at 2162 (Kavanaugh, J., joined by Roberts, C.J., concurring) ("We identify these presumptively lawful regulatory measures only as examples; our list does not purport to be exhaustive.").

assume it settled that these locations were 'sensitive places' where arms carrying could be prohibited consistent with the Second Amendment."   142 S. Ct.. at 2133; <u>see</u> <u>id.</u> at 2162 (Kavanaugh, J., joined by Roberts, C.J., concurring) (referencing bans on guns in "government buildings" as example of permissible regulation); <u>see also</u> <u>id.</u> at 2157 (Alito, J., concurring) ("Nor have we disturbed anything we said in <u>Heller</u> or <u>McDonald</u>[] about restrictions that may be imposed on the possession or carrying of guns.").

And the conclusion is entirely consistent with decisions affirming that the government as owner may exclude even normally constitutionally protected activity "that would disrupt the legitimate governmental purpose for which the property has been dedicated." <u>Consolidated Edison Co. of New York v. Public Serv. Comm'n</u>, 447 U.S. 530, 538 (1980); <u>see also, e.g.,</u> <u>Lehman v. City of Shaker Heights</u>, 418 U.S. 298, 304 (1974) (plurality opinion) (rejecting First Amendment challenge to advertising policy on public transit because "[n]o First Amendment forum is here to be found" and the city was acting "in a proprietary capacity"); <u>Adderley v. Florida</u>, 385 U.S. 39, 47 (1966) ("The State, no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated.").

Accordingly, a government's decision to prohibit guns on its own property does not implicate the Second Amendment, as multiple Circuit Courts have found.  <u>See, e.g.,</u> <u>United States v. Class</u>, 930 F.3d 460, 463 (D.C. Cir. 2019) (no need for judicial scrutiny because ban on guns on Capitol grounds "does not impinge upon a right protected by the Second Amendment" (quotation omitted)); <u>Bonidy</u>, 790 F.3d at 1123 (regulation banning guns was "constitutional as to all USPS property," including outdoor property open to public, "because the Second Amendment right to

bear arms has not been extended to 'government buildings.'").[24]   Indeed, the text of the Constitution itself speaks to the ability of governments, including state governments, to control their own property.  See U.S. Const. Art. IV § 3 ("The Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States and nothing in this Constitution shall be so construed as to Prejudice any Claims of the United States, or any particular State.").  Accordingly, any argument against a government's ability to prohibit guns on its own property must fail at step one of the Bruen test, which requires a plaintiff to show that "the Second Amendment's plain text covers an individual's conduct."  142 S. Ct.. at 2129-30.

    The Bruen historical analysis reaches the same result, as history is replete with examples of state laws prohibiting armed carriage on government property.  For instance, throughout American history, states have protected voters from intimidation by forbidding the carrying of weapons near voting places or election infrastructure.[25]  Legislatures and related buildings were

---

[24] See also U.S. v. Dorosan, 350 F. App'x 874, 875 (5th Cir. 2009) (per curiam) ("the Postal Service owned the parking lot . . . and its restrictions on guns stemmed from its constitutional authority as the property owner."); Nordyke v. King, 563 F.3d 439, 459 (9th Cir. 2009) ("the Second Amendment . . . does not contain an entitlement to bring guns onto government property."); vacated on other grounds, 611 F.3d 1015 (9th Cir. 2010); GeorgiaCarry.org, Inc. v. U.S. Army Corps of Engineers, 212 F. Supp. 3d 1348,  1365 n. 12 (N.D. Ga. 2016) (examining Bonidy and upholding prohibition because "Defendant Army Corps' property is government property" even though it extended beyond "buildings"), aff'd, 788 F.3d 1318 (11th Cir. 2015)

[25] See, e.g., Del. Const. Art. 28 (1776), Belka Decl., ¶ 97, Ex. 80 ("[t]o prevent any violence or force being used at . . . elections, no persons shall come armed to any of them."); 1787 N.Y. Laws 345, Id., ¶ 98, Ex. 81 ("[A]ll elections shall be free and that no person by force of arms nor by malice or menacing or otherwise presume to disturb or hinder any citizen of this State to make free election"); 1870 Tex. Gen. Laws 63, Id., ¶ 96,  Ex. 79 (prohibiting "fire-arms, whether known as a six shooter, gun or pistol of any kind" from being brought to "any election precinct on the day or days of any election, where any portion of the people of this State are collected to vote at any election.").

likewise protected.[26]   States enacted laws banning firearms or deadly weapons in courthouses,

beginning in the Reconstruction era.[27]   Public schools and universities were likewise areas where

firearms could be and were prohibited.[28]   As discussed in Section II.B.2., above, federal, state, and

local governments have long prohibited deadly weapons in government-owned parks.   And several

statutes from the relevant period contained broad language covering public functions beyond the

examples above.[29]   Each of these categories of laws demonstrates the ability and propriety of

---

[26] See Bruen, 142 S. Ct.. at 2133 (listing "legislative assemblies" among the "'sensitive places' where weapons were altogether prohibited"); Class, 930 F.3d at 463 (upholding prohibition of guns at parking lot next to Rayburn House Office Building); see also A Statute forbidding Bearing of Armour, 7 Edw. 2 170 (1313), available at https://www.legislation.gov.uk/aep/Edw2/7/0/section/wrapper1 ("in all Parliaments, Treatises, and other Assemblies, which should be made in the Realm of England for ever, that every man shall come without all Force and Armour . . ."); 63 Proceedings and Acts of the General Assembly 338, § 6 (June-July 1773); Archives of Maryland Online, available at https://bit.ly/3T7T7vA ("That no Person come into the House of Assembly, while the same is sitting, with Sword or other Weapon . . ."); see also, e.g., 1873 Pa. Laws 735, Id., ¶ 99,  Ex. 82 (banning all deadly weapons within the city limits of the state capital of Harrisburg)

[27] See, e.g., 1870 Ga. Laws 421, Belka Decl., ¶ 100, Ex. 83 ("to any court of justice"); 1883 Mo. Laws 76, Id., ¶ 101, Ex. 84 ("into any court room during the sitting of court"); see also 1870 Tex. Gen. Laws 63, Id., ¶ 96, Ex. 79 ("to any other place where people may be assembled . . . to perform any other public duty"); 1889 Ariz. Laws 16, Id., ¶ 103, Ex. 86 (same); Summerlin v. State, 3 Tex. App. 444, 446 (Tex. Ct. App. 1878) (sustaining conviction where a "pistol was found on defendant's person in a justice's cout which was in session and engaged in the trial of a cause").

[28] See, e.g., 1870 Tex. Gen. Laws 63, Belka Decl., ¶ 96,  Ex. 79 ("any school room or other place where persons are assembled for educational . . . purposes"); 1878 Miss. Laws 175, Id., ¶ 102, Ex. 85 ("any student of any university, college or school"); 1883 Mo. Laws 76, Id., ¶ 101, Ex. 84 ("any school room or place where people are assembled for educational . . . purposes"); 1889 Ariz. Sess. Laws 17, Id., ¶ 103, Ex. 86 ("any school room, or other place where persons are assembled for . . . educational purposes"); see also Bruen, 142 S. Ct.. at 2133 (noting "Heller's discussion of longstanding laws forbidding the carrying of firearms in sensitive places such as schools" and declaring that "we are [] aware of no disputes regarding the lawfulness of such prohibitions").

[29] See, e.g., 1870 Tex. Gen. Laws 63 Belka Decl., ¶ 96,  Ex. 79 ("to any other place where people may be assembled to muster or to perform any other public duty, or any other public assembly"); 1889 Ariz. Sess. Laws 17 Id., ¶ 103, Ex. 86 ("to any other place where people may be assembled to minister or to perform any other public duty."); see also, e.g., Idaho Penal Code § 4781 (1901) Id., ¶ 104, Ex. 87 (reprinting 1889 law forbidding any person "to carry . . . any . . . pistol, gun or

governments to ban the carrying of deadly weapons on government property. Application of Penal Law § 265.01-e to relatively modern forms of public transportation, like Buffalo's NFTA Meto Rail, simply carries that longstanding tradition forward.

> **b.**     **Public Transportation Can Be Protected Based On Its Critical Role In The School System**

Public transportation may also be protected from firearms due to its integral role in the education system, and in order to protect the children who depend on it to get to and from school. Schools are "the paradigmatic 'sensitive places' identified in Heller," Class, 930 F.3d at 465, having been specifically designated as sensitive by the Supreme Court not once, but three times. See Heller, 554 U.S. at 626; McDonald, 561 U.S. at 786; Bruen, 142 S. Ct.. at 2133.  And the ability (and necessity) to protect children from deadly weapons applies not only at the schoolhouse, but also when "traveling to and from it."  Hall v. Garcia, No. C 10-3799, 2011 WL 995933, at *4 (N.D. Cal. Mar. 17, 2011).

The conclusion is consistent with the bulk of post-Heller federal case law, which broadly holds "that the presence of children militates in favor of a given place being 'sensitive.'"  Miller v. Smith, No. 18 Civ. 3085, 2022 WL 782735, at *8 (N.D. Ill. Mar. 14, 2022) (collecting cases); see, e.g., Warden v. Nickels, 697 F. Supp. 2d 1221, 1229 (W.D. Wash. 2010) (law barring firearms in place "where children or youth are likely present" was "a perfectly acceptable prohibition on gun possession in a sensitive place"); see also, e.g., U.S. v. Masciandaro, 638 F.3d 458, 473 (4th Cir. 2011) (skipping over sensitive places analysis, but emphasizing that the park in question is an "area where large numbers of people, including children, congregate for recreation.  Such circumstances justify measures to secure public safety.").  And nothing in the Bruen opinion

---

other deadly weapons, within the limits or confines of any city, town or village or in any public assembly of the State of Idaho.").

implicitly limits the steps that states can take to protect children from exposure to deadly weapons. To the contrary, Bruen "assume[d] it settled that" schools full of children "were 'sensitive places' where arms carrying could be prohibited consistent with the Second Amendment." 142 S. Ct.. at 2133; see also id. at 2157 (Alito, J., concurring).

Public transportation plays an integral role in the school system, and must be afforded the same protections as the school system. Here in Buffalo, the NFTA provides over 20,000 rides per day to children traveling on special student passes, see State Decl., ¶¶ 3-4 or https://metro.nfta.com/programs/board-of-education, as well as hundreds more rides to students not specifically enrolled in the program. In addition, and on top of these numbers, the NFTA runs a "specials" program where public buses are provided to specific schools to take children home upon dismissal. See Id. Elsewhere in the State, public transportation's role is orders of magnitude greater. See James Ford, Newly proposed law would expand student MetroCard hours, terms, WPIX 11, Sept. 7, 2022, available at https://pix11.com/news/local-news/newly-proposed-law-would-expand-student-metrocard-hours-terms/ (discussing how "some one million students at New York City public, private, and parochial schools" use student MetroCards to get to school). Children do not cease being worthy of protection when they walk out the schoolhouse door, and the locations where they gather to get to and from school are just as sensitive as the places where they assemble once there.

### c. Places Where People Gather In Large Numbers And Confined Spaces Were And Are Considered Sensitive

History also clearly supports prohibitions on firearms in places where people gather in large crowds and confined spaces. Such prohibitions extended back to English law, which included general prohibitions on carrying weapons in fairs or markets, and also appeared in American law after the founding and into the Reconstruction period. See 2 Edw. 3, 320, ch. 3

(1328) (No man may "go no ride armed by night nor by day, in Fairs, Markets . . ."); 26 Hen. 8 c. 6 § 3 (1534) (no one may bring a "handgun" or "any other manner of weapon," to "any town, church, fair, market, or other congregation" within Wales); 1786 Va. Laws 35, Belka Decl. ¶ 105, Ex. 88 ("in fairs or markets"); 1869-70 Tenn. Pub. Acts 23-24, Id., ¶¶ 18-19, Ex. 9 (no person may carry a "deadly or dangerous weapon" when attending "any fair"). Likewise, statutes enacted during the Reconstruction period further recognized that places involving large gatherings of people were particularly vulnerable, and that deadly weapons did not belong there. See, e.g.,; 1869-70 Tenn. Pub. Acts 23, Id. ("fair, race course, or other public assembly of the people"); 1870 Tex. Gen. Laws 63, Id., ¶¶ 20-21, Ex. 10 ("a ball room, social party or other social gathering composed of ladies and gentlemen"); 1890 Okla. Stat. 495-96, Id., ¶¶ 22-23, Ex. 11 ("any circus, show or public exhibition of any kind, or into any ball room, or to any social party or social gathering"); 1889 Ariz. Sess. Laws 17, Id., ¶ 103, Ex. 86 (any "place where persons are assembled for amusement . . , or into any circus, show or public exhibition of any kind, or into a ball room, social party or social gathering").

And case law interpreting the statutes cited above demonstrates that the presence of the public was understood as the reason for the locations' sensitivity. See Rainey v. State, 8 Tex. App. 62, 63 (Tex. Ct. App. 1880) ("The evident intent and purpose of the law is to protect the several assemblies mentioned in the article . . . from intrusion by any person . . . going into them and carrying or having about his person any of the arms mentioned"); see, e.g., Owens v. State, 3 Tex. App. 404, 406 (Tex. Ct. App. 1878) (sustaining indictment against person who "did unlawfully and willfully go into a ball-room with a pistol about his person, the said ball-room being at Mrs. Simpson's, where an assembly was then and there congregated for social purposes."); Alexander v. State, 27 Tex. App. 533, 537 (Tex. Ct. App. 1889) (sustaining conviction where "defendant

went into a place where persons were assembled for amusement, carrying about his person a pistol"); Maupin v. State, 89 Tenn. 367, 17 S.W. 1038, 1039 (1890) ("[t]he mill was a public place, -a place to which customers were constantly invited and daily expected to go.  In such a place a man . . . may not lawfully carry pistols concealed about his person."); Wynne v. State, 123 Ga. 566 ("A barbecue on the 4th of July, at which people assembled to the number of 400 or 500, is a 'public gathering'" within the meaning of the Georgia law); State v. Pigg, 85 Mo. App. 399, 402 (Mo. Ct. App. 1900) (sustaining conviction "for going into the dwelling house of Josiah Jones, where there was a social gathering, having about his person a deadly weapon").

These laws recognize that the presence of groups of people, often in confined spaces, renders a location uniquely vulnerable to firearm violence.  In many cases the nature of such places may render armed self-defense impracticable – it may not be possible to practice armed self-defense with precision in a crowded theater or stadium.  See Owens, 3 Tex. App. at 407 (need for self-defense "affords no excuse in my wearing deadly weapons to church, or in a ball-room, or other places mentioned where . . . the lives of innocent people there assembled [would be] placed in jeopardy or sacrificed.").  Modern courts likewise recognized that the presence of large groups of people in confined spaces renders a location sensitive for Second Amendment purposes.  See, e.g., Christopher v. Ramsey County, __ F. Supp. 3d __, 2022 WL 3348276, at *5 (D. Minn. Aug. 12, 2022) ("During the State Fair, the Fairgrounds are a sensitive location with thousands of people and children present in often crowded conditions."); Masciandaro, 648 F. Supp. 2d at 790 (sensitive places include "public properties where large numbers of people, often strangers (and including children) congregate for recreational, educational, and expressive activities.").

These concerns are amplified in the case of public rail systems: enclosed spaces where strangers cram together and frequently jostle each other, increasing the risk of accidental gun

discharge and decreasing the chance of successful, tactical armed self-defense. To be sure, this category of sensitive places is not so expansive as to cover "all places of public congregation that are not isolated from law enforcement," nor could New York "effectively declare the island of Manhattan a 'sensitive place' simply because it is crowded and protected generally by the New York City Police Department." Bruen, 142 S. Ct.. 2134. But a clear-eyed reading of history demonstrates that many places where crowds gather were in fact understood as places where access to deadly weapons could be restricted, and Bruen does not state, or imply, that concentration of people is entirely irrelevant to whether a location is sensitive. All of Buffalo may not be sensitive, but a crowded metro car is.

> **d.     History Shows That The Right To Armed Travel Did Not Extend to the Kinds of Travel Done on Public Transportation**

The appropriateness of prohibiting guns on public transportation is further supported by case law demonstrating that any conception of a right to defend oneself while traveling did not extend to day-to-day travel within a local community, such as is conducted on modern public transit. And although some statutes from the relevant period had exceptions for travelers or persons on a journey, see, e.g., 1889 Ariz. Sess. Laws 17 (ban on carrying weapons does not apply "to persons traveling"), the case law demonstrates that these exceptions applied to long-distance travel, not to the sort of commute conducted on modern public transportation. See Rivas Decl. ¶ __. For instance, in Carr v. State, 34 Ark. 448, 449 (1879), the Arkansas supreme court held that "[t]he exception in the statute is to enable travelers to protect themselves on the highways, or in transit through populous places – not to allow them the privilege of mixing with the people in ordinary intercourse, about the streets, armed in a manner which, upon a sudden fit of passion, might endanger the lives of others. Travelers do not need weapons, whilst stopping in towns, any more than citizens do." Likewise, in Eslava v. State, 49 Ala. 355, 357 (1873), the Alabama

Supreme Court held that "the 'travelling or setting out on a journey,' which under the statute excuses the act, must be a travel to a distance from home, and not within the ordinary line of the person's duties, habits, or pleasure."  Tennessee likewise emphasized that the travel exception should not cover typical travel of five or six miles or "across the lines of contiguous counties" – in the way one might travel on modern public transit – because the travel exception was designed to protect against "such possible perils of the highways as are not supposed to exist among one's own neighbors," while the law prohibited the "carrying of deadly weapons on the streets, in society, in the community, or among the people with whom we are in the habit of associating." Smith v. State, 50 Tenn. 511, 513-14 (1871).

### e.    History Demonstrates That Firearms Could Be Prohibited On Trains

The Bruen test does not require specific, direct historical analogues for public transportation or any sensitive place.  Rather, the decision countenances argument by analogy, with appropriate leeway for "dramatic technological changes."  Bruen 142 S. Ct.. at 2132.  But even if the Court were to require specific analogues to a modern bus or train, preliminary research indicates that there are direct historical analogues to be found.  As discussed, there was no public transportation as such during the relevant time period; instead, train travel was provided by private transportation systems, sometimes operating under a government charter (indeed, electric train travel was totally unknown to the Founders).  Rivas Decl. ¶¶ 13-17.  For instance, the Georgia Legislature declared in the 1880s that "[t]he conductors of a train carrying passengers are invested with all the powers duties, and responsibilities of police officers while on duty on their trains."  Id. ¶ 15.  Notably, this responsibility to enforce Georgia law came at the same time as the state law, cited in Section B.3.c. above, that banned the carrying of deadly weapons in "any [] public gathering in this State."  1870 Ga. Laws 421, Belka Decl., ¶ 100, Ex. 88; see Rivas Dec. ¶¶ 6-12.

37

And history indicates that train systems could and did prevent passengers from carrying guns.  See Rivas Dec. ¶¶ 6-20.  The North Pennsylvania Railroad's June 1875 "rules and regulations," for instance, state that passenger conductors must prevent passengers from taking "into the cars guns, dogs, valises, large bundles or baskets."  Id. ¶¶ 13-17.  Court cases from the relevant period likewise demonstrate that the firearms laws were applied to train passengers.  See id. ¶¶ 6-20 (citing, inter alia, Willis v. State, 105 Ga. 633 (1898) and St. Louis Sw. Ry. Co. v. Berger, 64 Ark. 613 (1898)).

Because the regulation of train travel in the 19th Century was predominantly done by private companies, historical research is difficult and time-consuming, requiring in-person review of records that frequently exist only in paper form in archives spread across the country.  See Rivas Decl. ¶¶ 18-20.  This sort of historical research is expensive and is not conducive to being performed on an abbreviated preliminary injunction schedule such as the one adopted here.[30]  See GeorgiaCarry.org, Inc. v. United States Army Corps of Eng'rs, 788 F.3d 1318, 1324 (11th Cir. 2015) (noting the difficulty of "undertak[ing] this historical inquiry on an accelerated preliminary injunction timeline"); Defense Distributed v. Bonta, Case No. 22-cv-6200, 2022 WL 15524977, at *5 n.9 (C.D. Cal. Oct. 21, 2022) (tentative ruling) (preliminary injunction motion "was wishful-thinking, at best" because "there is no possibility this Court would expect [California] to be able to present the type of historical analysis conducted in Bruen on 31 days' notice (or even 54 days' notice).");  adopted, 2022 WL 15524983 (C.D. Cal. Oct. 24, 2022) (denying relief).

Thus, even if the Court were to require mirror-image historical analogs (which Bruen does not), the motion for a preliminary injunction should be denied on the basis of the preliminary

---

[30] The State Defendants requested 120 days to respond to the instant motion; however, the briefing schedule set by the Court allowed only 32 days.  See ECF No. 26.

historical findings discussed here.  See Lederman v. N.Y. City Dep't of Parks & Rec., No. 10 Civ. 4800, 2010 WL 2813789, at *5 (S.D.N.Y. July 16, 2010) (Sullivan, J.) (noting that even where "the ultimate burden of proof rests with the [government] on the underlying constitutional challenge, the plaintiffs must show a likelihood of success on the merits in order to secure a preliminary injunction.  As such, the fact that the Defendants have not yet developed the record sufficiently to rebut all possible assertions . . . will not be enough to warrant a preliminary injunction.").

    **f. Plaintiffs' Security-Based Test is Unsupported, Ahistorical, and Wrong on the Facts**

  Plaintiffs argue, without citing to any authority beyond a Delaware Supreme Court case that has nothing to do with transportation, that public transit is not a true sensitive place because, unlike courthouses with metal detectors, many modes of public transportation "'do not have controlled entry points'" and may not be supervised by or easily accessible to law enforcement. PI Mem. at 20 (quoting Bridgeville Rifle & Pistol Club, Ltd. v. Small, 176 A.3d 632, 659 (2017)).  As an initial note, this test has no basis in any controlling law or history, and if adopted would conflict with the Supreme Court's findings that places such as schools and polling places, which often lack such security features, are sensitive in nature.  Cf. Class, 930 F.3d at 465 (noting that "[m]any 'schools' and 'government buildings,' – the paradigmatic 'sensitive places' identified in Heller – are open to the public, . . . yet the Heller opinion leaves intact bans on firearm possession in those places").

  But even under Plaintiffs' own standard, public transportation would be manifestly sensitive.  Access to public transportation is highly regulated (open only to those who purchase an entry ticket from the government) and public transportation may often be accessed only through an entry-point manned by a public employee, such as a bus driver or station agent.  The

government devotes significant law enforcement resources to ensuring the safety of the transit system – the NFTA, for instance, maintains its own Transit Authority Police Department, with substations at all underground Metro Rail stations.[31]  And the Second Circuit has already considered the security aspects of public transportation in New York, and ruled that its vulnerability and importance are so significant that the Fourth Amendment allows for warrantless searches of passengers' belongings.  See MacWade v. Kelly, 460 F.3d 260 (2006). Far from indicating that public transportation is not sensitive, the security efforts made to protect citizens on public transportation demonstrate the longstanding recognition that such locations are vulnerable, and that they can and must be protected.

Even if this Court were to disagree with the State's merits arguments (and it should not), any "injunctive relief should be narrowly tailored to fit specific legal violations" alleged in this case. (e.g. re transport: the regulation of the right to carry firearms on the NFTA Metro Rail in Buffalo, NY.)  See Davis v. Shah, 821 F.3d 231, 265 (2d Cir. 2016).  That rule takes on even more force here where "unprecedented societal concerns [and] dramatic technological changes" can make "historical analogies . . . [not] relatively simple to draw."  Bruen, 142 S. Ct. at 2132-2133. In short, if this Court were to determine that restricting the right to carry firearms, in the sensitive locations at issue, violates the Second Amendment (and it should not), any ensuing remedy should be narrowly construed. (e.g. limited to the specific public transit authority that plaintiffs have challenged in this case.) See, Davis, 821 F.3d at 265.

### III. PLAINTIFFS HAVE NOT SHOWN IRREPARABLE HARM

In the Second Circuit, the "presumption of irreparable harm arising from a constitutional deprivation is not automatic." Joglo Realties, Inc. v. Seggos, 2016 WL 449140, at *16 (E.D.N.Y.

---

[31] See https://www.nfta.com/departments/transit-police.

Aug. 24, 2016). Instead, the Second Circuit has held that it "often will be more appropriate to" consider the nature and extent of the alleged injuries to the plaintiff absent injunctive relief. <u>Time Warner Cable v. Bloomberg L.P.</u>, 118 F.3d 917, 924 (2d Cir. 1997). Thus, the alleged violations of Plaintiffs' constitutional rights, by themselves, are not sufficient to show irreparable harm. Plaintiffs' hypothesized potential harms do not satisfy this requirement.

That property owners may refuse to consent or fail to post conspicuous signage of consent is not a violation of any Second Amendment right to carry weapons on their property.  Plaintiff must, as everyone must, respect the rights of property owners and meet their requirements in order to acquire the services they offer.  His complaints about needed to store his weapon while discovering whether or not the owners will allow his gun on their private property are beside the point.  It is their decision to make, and if he needs clarification, he can simply call ahead to see if weapons are permitted.

Similarly, Plaintiff's occasional public travel, which is identified as for convenience, is clearly not his only means of transportation.  <u>See</u> ECF No. 19-4 ¶ 9 (Plaintiff would use the Metro Rail only "when traffic or events downtown made driving impractical").  The inability to bring a gun on the metro during this litigation does not constitute irreparable harm worthy of a preliminary injunction.  And while it cannot be deduced whether or not Plaintiff's ventures to "local parks" or "hiking on trials in largely wooded and marshy areas a few times a month" are encompassed by CCIA's provisions, his voluntary decision not to go on a single visit to Adirondack Park does not constitute irreparable harm.

## IV. THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST WEIGH IN FAVOR OF NEW YORK'S MISSION TO PROTECT ITS CITIZENS

Finally, the balance of equities and considerations of the public interest weigh heavily against Plaintiffs. "[A] plaintiff seeking a preliminary injunction must demonstrate not just that

they have some likelihood of success on the merits and will suffer irreparable harm absent an injunction, but also that the balance of the equities tips in his favor and an injunction is in the public interest." Otoe-Missouria Tribe v. N.Y.S. Dep't of Fin. Svcs., 769 F.3d 105, 112 n.4. (2d Cir. 2014) (cleaned up). "These factors merge when the Government is the opposing party." Make the Rd. N.Y. v. Cuccinelli, 419 F. Supp. 3d 647, 665 (S.D.N.Y. 2019) (citing Nken, 556 U.S. at 435). Further, the reviewing court must ensure that the "public interest would not be disserved" by the issuance of the injunction. Salinger v. Colting, 607 F.3d 68, 80 (2d Cir. 2010) (citing eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 391 (2006)). In addressing the equities, "courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." Winter, 555 U.S. at 24 (internal quotation marks and citation omitted).

Here, "it is beyond cavil" that there is a "substantial, indeed compelling, governmental interest[] in public safety and crime prevention." NYSRPA v. Cuomo, 804 F.3d 242, 261 (2d Cir. 2015). Any prejudice to Plaintiffs from the denial of a preliminary injunction is outweighed by the aggregate benefit to public safety inherent in keeping firearms out of vulnerable locations. Broad legal carrying of deadly weapons in dense settings can result in spontaneous, unplanned violence even by otherwise law-abiding citizens, or in accidental shootings leading to injuries or deaths. For example, when one of the parties is armed, a dispute over cell phone use in a movie theater can escalate into unnecessary death.[32] Or a shouting match at a bowling alley can turn into a

---

[32]   See   https://www.nytimes.com/2022/02/26/us/curtis-reeves-murder-trial-acquitted.html.   The shooter was acquitted of second-degree murder because a jury determined that he acted in self-defense in response to a bag of popcorn being thrown at him.

shooting.[33] Or at a club.[34] Or in grocery stores and bars.[35] Likewise, a substantial number of gun-related injuries and deaths are caused by accidental shootings.[36] In seeking relief in the form of enjoining the challenged provisions, Plaintiffs focus only on half of this equation, ignoring the public consequences that are equally or more likely to result from the unchecked carrying of deadly weapons in sensitive locations. This balancing of the equities requires that Plaintiffs' request for a preliminary injunction be denied.[37]

## **CONCLUSION**

For the reasons set forth above, the State Defendant respectfully requests that the Court deny Plaintiffs' motion for a preliminary injunction.

Dated: Buffalo, New York
        November 4, 2022

LETITIA JAMES
Attorney General
State of New York
By: /s/ Ryan L. Belka
RYAN L. BELKA
JAMES M. THOMPSON
Assistant Attorneys General
350 Main Place, Suite 300A
Buffalo, NY 14202
(716) 853-8440
Ryan.Belka@ag.ny.gov

---

[33] See https://www.pleasantonweekly.com/news/2022/07/16/three-people-shot-at-granada-bowl-in-livermore; https://www.npr.org/2019/01/05/682499047/three-dead-after-fight-escalates-into-shooting-at-california-bowling-alley.

[34] See https://abc6onyourside.com/news/local/triple-shooting-columbus-refugee-road-weyburn-road-9-5-2021.

[35] See https://abcnews.go.com/US/wireStory/argument-leads-fatal-shooting-checkout-line-grocery-82708061.

[36] See https://injepijournal.biomedcentral.com/articles/10.1186/s40621-019-0220-0.

[37] Should this court grant Plaintiff's request for a preliminary injunction, Defendants request that the court's injunction be only applied to the individual Plaintiffs and that the effective date be stayed pending appeal, or in the alternative, stayed for three business days to allow the State Defendants to seek emergency relief in the Second Circuit.

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

BRETT CHRISTIAN, FIREARMS POLICY COALITION,
INC., and  SECOND AMENDMENT FOUNDATION

                                        Plaintiffs,

                    v.

STEVEN A. NIGRELLI, in his official capacity as
Superintendent of the New York State Police, and JOHN J.
FLYNN, in his official capacity as District Attorney for the
County of Erie,

                                        Defendants.

No. 22-cv-00695 (JLS)

## CERTIFICATE OF SERVICE

I hereby certify that on November 4, 2022, I electronically filed the foregoing with the Clerk of the District Court using its CM/ECF system.


Dated: Buffalo, New York
       November 4, 2022

LETITIA JAMES
Attorney General of the State of New York
Attorneys for Defendant Nigrelli
BY:
*s/ Ryan L. Belka*
RYAN L. BELKA
JAMES M. THOMPSON
Assistant Attorney General,
of Counsel
Main Place Tower, Suite 300A
350 Main Street
Buffalo, New York 14202
(716) 853-8440
Ryan.Belka@ag.ny.gov