UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

BRETT CHRISTIAN, FIREARMS POLICY COALITION,
INC., and  SECOND AMENDMENT FOUNDATION

                                              Plaintiffs,

                              v.

STEVEN A. NIGRELLI, in his official capacity as
Superintendent of the New York State Police, and JOHN J.
FLYNN, in his official capacity as District Attorney for the
County of Erie,

                                              Defendants.

No. 22-cv-00695 (JLS)

**DECLARATION OF DR.
BRENNAN RIVAS**

1.      I am over the age of eighteen (18) years, competent to testify to the matters

contained in this declaration, and testify based on my personal knowledge and information.

2.      I am an Historian and Independent Scholar.  My chosen professional name is

Brennan Gardner Rivas. From 2021 until earlier this year, I was the Lloyd Lewis Fellow in

American History at The Newberry Library. From 2020 to 2021, I was a Bill & Rita Clements

Fellow for the Study of Southwestern America within the Clements Center for Southwest Studies

at Southern Methodist University. From 2019 to 2020, I was a Lecturer in American History at

Texas Christian University. Before that, I was a graduate student in history who conducted

research and administrative tasks on behalf of my professors, taught undergraduate survey

courses, and worked at my university library. My educational background includes a Ph.D. in

History from TCU, where my Thesis was on the development, evolution, and enforcement of

gun and weapon policy in Texas from the era of Mexican independence to the 1930s.

3.      I have been retained by the State of New York to render expert opinions in this

case. I make this declaration on the basis of my training, professional expertise, and research.

For my work in this case, I am being compensated at a rate of $200/hour for preparatory work and $300/hour for court work.

4.       My CV, detailing my education, experience, and publications, is attached to this declaration as Exhibit A. I have written a number of articles related to the regulation of guns, especially as to the history of nineteenth-century weapon policies and the socio-political context that made them possible.

5.       For this engagement, I was asked to provide expert testimony about historical gun regulations that pertained to travelers, transit companies, and transportation-related spaces.

APPLICATION OF PUBLIC CARRY LAWS TO TRAVELERS &<br>TRANSPORTATION

6.       Americans of the late-eighteenth and nineteenth centuries had regulations that restricted the presence of weapons in public spaces, including those related to transportation services. These public carry laws fell into two categories, one being designated by scholars as "Massachusetts Model" laws. These statutes drew heavily from legal language with deep roots in the English common law tradition, reaching at least as far back as the Statute of Northampton from 1328.[1]  The Statute of Northampton generally prohibited the carrying of arms in "Fairs, Markets, nor in the Presence of the Justices or Ministers nor in no Part elsewhere."[2]  The public spaces specifically named and protected under the Statute were the very public areas that people frequented in their daily lives—the town markets and gatherings, and the town itself under the direction of local officials, formed the very heart of community life. This tradition was absorbed

---

[1] Patrick J. Charles, "The Faces of the Second Amendment Outside the Home: History versus Ahistorical Standards of Review," *Cleveland State Law Review* 60, no. 1 (2012), 7-40; Saul Cornell, Saul Cornell, "The Long Arc of Arms Regulation in Public: From Surety to Permitting, 1328-1928," *UC Davis Law Review* 55, no. 5 (June 2022), 2560-2566.
[2] 2 Edw. 3, c. 3 (1328) (Eng.); see also 25 Edw. 3, st. 5, c. 2, § 13 (1350) (Eng.) (if "any Man of this Realm ride armed covertly or secretly with Men of Arms against any other . . . shall be judged Treason.").

into American law, where numerous colonies and states put in place similar measures that called for weapon-free public square.[3]  Under the Massachusetts Model, no one was permitted to carry arms into public areas without having a justifiable reason. Anyone violating this rule would have been subject to questioning by local officials and "bound" to the peace through a peace bond or surety.[4]

7.        Another type of public carry law that restricted the presence of weapons in public spaces, including those related to transportation services, took the form of concealed carry laws. States and municipalities enacted regulations like these primarily during the nineteenth century, beginning around the turn of that century. An early example incorporated the policy alongside language drawn from the Statute of Northampton: "That if any person or persons shall publicly

---

[3] A non-exhaustive list includes: 1835 Mass. Acts 750 ("If any person shall go armed with a dirk, dagger, sword, pistol, or other offensive and dangerous weapon, without reasonable cause to fear an assault or other injury, or violence to his person, or to his family or property, he may on complaint of any person having reasonable cause to fear an injury, or breach of the peace, be required to find sureties for keeping the peace."); 1786 Va. Laws 33, ch. 21, An Act forbidding and punishing Affrays (… "nor go nor ride armed by night nor by day, in fair or markets, or in other places, in terror of the Country, upon pain of being arrested and committed to prison by any Justice on his own view, or proof of others, there to abide for so long a time as a Jury, to be sworn for that purpose by the said Justice shall direct, and in like manner to forfeit his armour to the commonwealth,"); Francois Xavier Martin, A Collection of Statutes of the Parliament of England in Force in the State of North Carolina, 60-61 (Newbern 1792) ("…nor to go nor ride armed by night nor by day, in fairs, markets nor in the presence of the King's Justices, or other ministers, nor it [sic, likely "in"] no part elsewhere, upon pain to forfeit their armour to the King, and their bodies to prison at the King's pleasure,"); See also 1821 Me. Laws 285, ch. 76, § 1 (simplified to a requirement that officials "cause to be staid and arrested, all affrayers, rioters, disturbers or breakers of the peace, and such as shall ride or go armed offensively, to the fear or terror of the good citizens of this State,").

[4] The peace bond was one of many processes inspired by the common law heritage that formed the basis of the "localized" law that characterized public life in early America. On "localized" law, see Laura Edwards, *The People and Their Peace: Legal Culture and the Transformation of Inequality in the Post-Revolutionary South* (Chapel Hill: University of North Carolina Press, 2009), 3-10. On peace bonds more generally, see Edwards, *The People and Their Peace*, 73-74, 96; Saul Cornell, "History, Text, Tradition, and the Future of Second Amendment Scholarship: Limits on Armed Travel under Anglo-American Law, 1688-1868," *Law and Contemporary Problems* 83, no. 3 (Summer 2020), 73-95; Saul Cornell, "Right to Carry Firearms outside of the Home: Separating Historical Myths from Historical Realities," *Fordham Urban Law Journal* 39, no. 5 (October 2012), 1719-1723. Edwards's passage on peace bonds is worth quoting at length: "Peace bonds threw enforcement back on the community, summoning family, friends, and neighbors to police the troublemakers. Bonds required one or more other people to put up the amount, making them liable if the accused broke the peace again. That economic obligation represented the signers' promise to keep the offender in line. Peace bonds put everyone else in the community on notice as well, investing them with the responsibility of policing the peace until the end of the probation period."

ride or go armed to the terror of the people[5], or privately carry any dirk, large knife, pistol or any other dangerous weapon, to the fear or terror of any person, it shall be the duty of any judge or justice, on his own view, or upon the information of any other person on oath, to bind such person or persons to their good behavior, and if he or they fail to find securities, commit him or them to jail, and if such person or persons shall continue so to offend, he or they shall not only forfeit their recognizance, but be liable to an indictment, and be punished as for a breach of the peace, or riot at common law."[6]  The approach of prohibiting the carrying of concealed weapons spread rapidly, including in slaveholding states and those removed from the Atlantic coast.[7]

---

[5] Early language for these laws, such as this one quoted from Tennessee, often made use of the phrase "to the terror of the people," which was itself an inheritance from the Statute of Northampton. Historical research by trained scholars has shown that, according to common law, the act of carrying deadly weapons in public spaces was inherently terrifying and therefore a breach of the peace. See Saul Cornell, "The Long Arc of Arms Regulation in Public: From Surety to Permitting, 1328-1928," *U.C. Davis Law Review* 55 (June 2022), 2555-2556 ("There was no requirement that one establish an intent to terrify or that the armed travel terrorized any specific person, the injury was to the King's Peace and sovereignty."); Mark Anthony Frassetto, "To the Terror of the People: Public Disorder Crimes and the Original Public Understanding of the Second Amendment," *Southern Illinois University Law Journal* 43 (2018), 65 ("Those who take a textual approach to interpreting the Statute of Northampton…argue that carrying weapons in populated public places was intrinsically terrifying and that the discussion of public terror in judicial opinions and legal treatises was an explanation for the prohibition, rather than a separate element of the crime."); Patrick J. Charles, "The Faces of the Second Amendment Outside the Home, Take Two: How We Got Here and Why It Matters," *Cleveland State Law Review* 64, no. 3 (June 2016), 381-382 ("But those that subscribe to the Standard Model view of the Second Amendment proclaim the Statute of Northampton can only be read as applying to the 'carrying arms in ways that caused public terror.' In making this claim, Standard Model writers have never provided sufficient evidence, at least in total historical context, to support it."); see also Patrick J. Charles, "The Fugazi Second Amendment: Bruen's Text, History, and Tradition Problem and How to Fix It," *Cleveland State Law Review* 71, no. 3 (2022, forthcoming), draft pp.12 ("What [English jurists'] restatements inform is that by the early-to-mid-seventeenth century, England's preeminent legal minds understood that the act of carrying dangerous weapons was sufficient to amount to an affray, 'strike a feare' or 'striketh a feare.' ") [draft available at: https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4222490]

[6] Judge Edward Scott, Laws of the State of Tennessee: Including Those of North Carolina Now in Force in this State: From the Year 1715 to the Year 1820 (Vol. I, 1821), 710. Available at the Duke Center for Firearms Law, Repository of Historical Gun Laws: https://firearmslaw.duke.edu/laws/judge-edward-scott-laws-of-the-state-of-tennessee-including-those-of-north-carolina-now-in-force-in-this-state-from-the-year-1715-to-the-year-1820-inclusive-page-710-image-714-vol-1-1821-the/

[7] A short list of examples includes: 1813 La. Acts 172, An Act Against Carrying Concealed Weapons, and Going Armed in Public Places in an Unnecessary Manner, § 1 ("That from and after the passage of this act, any person who shall be found with any concealed weapon, such as a dirk, dagger, knife, pistol, or any other deadly weapon concealed in his bosom, coat, or in any other place about him that do not appear in full open view, any person so offending, shall on conviction thereof before any justice of the peace, be subject to pay a fine…"); Revised Statutes of the State of Arkansas, Adopted at the October Session of the General Assembly of Said State, A.D. 1837 ("Every person who shall wear any pistol, dirk, butcher or large knife, or a sword in a cane, concealed as a weapon, unless upon a journey, shall be adjudged guilty of a misdemeanor, and upon conviction thereof, in the county in which the said offence shall have been committed, shall be fined in any sum not less than twentyfive dollars…").

8.      As the nineteenth century wore on, concealed carry laws became more likely to mandate a criminal penalty (often a fine) rather than engage the surety mechanism, and they also tended to provide a number of exceptions ranging from people fearing an imminent and deadly attack, peace officers, and travelers. These statutes varied from one state to another, though many left the definition of terms like "travel" and "journey" quite ambiguous. In Texas, even exempted travelers were required to place their weapons in their baggage, which did not include saddlebags.[8]

9.      Far from a blanket exception for people to go armed at all times outside their homes, the travel exception was narrowly defined by state appellate courts. The kind of "travel" which it described was not the everyday movement through public spaces like town squares and commercial districts, or the kind of travel associated with modern public transportation. Instead, it encompassed a type of travel that separated a person, small group, or family from the protections of the law that went hand-in-hand with organized society and were a fundamental feature of community life—courts, magistrates, constables, and the security of being among one's neighbors. To be a traveler was to venture outside one's community sphere and become vulnerable to dangers such as robbers and predatory animals. Wearing one's weapons in an unfamiliar town or city could fall within the travel exception so long as such carriage was limited to merely passing through the area or conducting one's business. A case from 1879 held that: "The court decided the case on the ground that defendant, whilst stopping over at Marianna, could not be said to be on a journey, and should, to avoid a breach of the law, have deposited his pistols with his baggage, and not carried them on his person. This is correct, if the appellant was

---

[8] Brennan Gardner Rivas, "The Deadly Weapon Laws of Texas: Regulating Guns, Knives, and Knuckles in the Lone Star State, 1836-1930," PhD diss. (Texas Christian University, 2019), 108-110. John Thomas Shepherd, "Who Is the Arkansas Traveler: Analyzing Arkansas's Journey Exception to the Offense of Carrying a Weapon," Arkansas Law Review 66, no. 2 (2013): 463-484.

really wearing them, or either of them, as a weapon. The exception in the statute is to enable travelers to protect themselves on the highways, or in transit through populous places—not to allow them the privilege of mixing with the people in ordinary intercourse, about the streets, armed in a manner which, upon a sudden fit of passion, might endanger the lives of others. Travelers do not need weapons, whilst stopping in towns, any more than citizens do. They should lay them aside, unless the delay be slight, and the journey soon resumed."[9]  An Alabama appellate court affirmed the decision of a lower court judge who, even though he acquiesced that the defendant had a right to carry a concealed weapon while traveling on a dangerous stretch of road, instructed the jury that " if they further believed, from all the evidence in the case, that the defendant was in the daily habit of coming to the city, engaging in his business in the city from morning until evening, mingling with the inhabitants of the city in business and social intercourse, and carried a pistol concealed about his person during this time, not being justified or excused otherwise than for the reason of his having to travel" along the dangerous stretch of roadway, "then he would be guilty, as charged in the indictment."[10] A Tennessee decision rejected the idea that a "journey" meeting the standards of a travel exception "should embrace a mere ramble in one's own neighborhood across the lines of contiguous counties."[11] The court's final word was that "The evil intended to be corrected is the carrying of deadly weapons on the streets, in society, in the community, or among the people with whom we are in the habit of associating—a habit which will ultimately convert a good man into an assassin, and a brave man

---

[9] *Carr v. State*, 34 Ark. 448 (1879).
[10] *Eslava v. State*, 49 Ala. 355 (1873).
[11] *Smith v. State*, 50 Tenn. 511 (1872).

into a coward."[12] These are only a small sample of the travel-related cases that formed the corpus

of traveler-exception jurisprudence associated with nineteenth century concealed weapon laws.[13]

10.     Judges recognized that terms like "travel" and "journey" needed to be interpreted,

and that hard-and-fast rules must remain elusive. According to an Arkansas court, "The jury, or

court sitting as such, can best judge of all the circumstances, and determine whether the spirit of

the law has been violated. No rule with regard to this can be formulated. The intent governs, and

the question of fact is, was the defendant really prosecuting his journey, only stopping for a

temporary purpose; or had he stopped to stay awhile, mingling generally with the citizens, either

for business or pleasure."[14] A contemporary Tennessee court emphasized legislative intent by

saying "It is true, the Legislature has not undertaken to define a journey, or to say whether it

shall be a long or short one, but has left the courts to interpret it in the light of good sense, and

with regard to the spirit and intent of the statute itself, with the positive injunction in the fourth

section of the Act that the courts shall give it a liberal construction so as to carry out its true

intent and meaning"—which was to reduce the needless carrying of weapons in public.[15]

---

[12] *Smith v. State*, 50 Tenn. 511 (1872).

[13] See also *Darby v. State*, 23 Tex. Ct. App. 407 (1880), "He was not a traveler. He resided in Williamson county, and was merely going from his residence to the county site of said county, a distance of about eighteen miles, intending to return the next day. These facts certainly did not constitute him a traveler, within the common meaning of that word, and within the spirit of the statute.". See also Shepherd, "Who Is the Arkansas Traveler," 466-482. The variation among nineteenth-century jurisdictions in their definition of terms did not go unnoticed by contemporaries. In his encyclopedic work on the operation of railways, Marshall Monroe Kirkman made the point that "A court in a Western state has decided that a pistol is baggage, being necessary to the protection of the traveler," while "Another court has decided that two pistols could not be considered as baggage." After exploring several other examples of such inconsistent decisions involving animals, tools, and bulky personal items, Kirkman concluded that "Questions as to what constitutes baggage are governed by many subtleties, and in determining a case particulars must be known, such as place of residence, character, habit and social status of owner of the goods." Marshall Monroe Kirkman, *The Science of Railways* (New York: World Railway Pub. Co., 1900), 281-283. Cases arising in Illinois during the 1850s held transportation companies liable for revolvers that were lost within checked luggage (*Davis v. Michigan S. &N. I. R. Co.*, 22 Ill. 278; *Woods v. Devin*, 13 Ill. 746); but in 1870, an Illinois court stated that such liability only extended to one pistol, and that the defendant's "occupation or circumstances did not require that he be furnished with any unusual store of deadly weapons," (*Chicago, R. I. & P. R. Co. v. Collins*, 56 Ill. 212).

[14] *Carr v. State*, 34 Ark. 448 (1879).

[15] *Smith v. State*, 50 Tenn. 511 (1872), "The evil intended to be corrected is the carrying of deadly weapons on the streets, in society, in the community, or among the people with whom we are in the habit of associating—a habit which will ultimately convert a good man into an assassin, and a brave man into a coward."

11.     An illustrative travel-related case arose in Texas in 1889. A man was convicted of violating the state's public carry law (which prohibited openly borne as well as concealed deadly weapons) by carrying a pistol on his travels to a distant town and keeping it on his person while he visited various establishments there. When he appealed his conviction on the ground that he was a traveler in an unfamiliar city, the appellate court disagreed. He had the right to carry the pistol on the road, in the wagon yard upon his arrival in town, and within the town "for a legitimate purpose, such as to procure a conveyance, or provisions, or to transact other business connected with the prosecution of his journey."[16] But that protection ceased when his purpose changed from business to leisure—it did not confer upon him a right to "idly stroll through its streets and visit its gambling dens and saloons and public places, armed with a pistol."[17] To do otherwise would "cause our cities and towns to be infested with armed men, while the citizens of such places would be prohibited from carrying arms to protect themselves from these privileged characters."[18] The judge's statement clearly shows that Texas courts did not understand townspeople and locals going about their everyday lives to fall within the statute's traveler exemption.

12.     Public carry laws in force during the nineteenth century, whether they took the form of the Massachusetts Model or concealed weapon statutes, applied to public spaces in American communities large and small. The exceptions which some concealed weapon laws carved out for travelers remained closely guarded by appellate courts and did not apply to everyday travel within a city or metro area like that which occurs aboard modern public transit services.

---

[16] *Stilly v. State*, 27 Tex. Ct. App. 445 (1889).
[17] *Stilly v. State*, 27 Tex. Ct. App. 445 (1889).
[18] *Stilly v. State*, 27 Tex. Ct. App. 445 (1889).

## TRANSPORTATION PROVIDERS AS PRIVATE COMPANIES

13.    Until the twentieth century, transportation services were typically operated by private companies vested with the authority to fashion their own rules and regulations for customers. Thus, even if a person deemed a "traveler" upon a "journey" according to law chose to make use of the travel exception by carrying a weapon aboard a train, such carriage would have been subject to any rules laid out by the private transportation company in question. Private companies would have had the authority to decide where and how legally transported weapons could be stowed and carried by customers aboard their vehicles and within their stations. A nineteenth century jury instruction manual contained a section for "Rules and Regulations of Carrier," which specifically stated that "a railroad company has a right to require of its passengers the observance of all reasonable rules, calculated to insure the comfort, convenience, good order and behavior of all persons on the train, and to secure the proper conduct of its business; and if a passenger wantonly disregards any such reasonable rule, the obligation to carry him farther ceases, and the company may expel him from the train at any regular station, using no more force than may be necessary for that purpose."[19] The North Pennsylvania Railroad's "rules and regulations" document for conductors (Exhibit B) specifically charged passenger conductors with the responsibility of preventing passengers from taking "into the cars guns, dogs, valises, large bundles or baskets."[20]

14.    Rail companies shipped sporting firearms for hunters but treated them like any other baggage—by separating it from the passenger and placing it in a designated baggage

---

[19] Albert W. Brickwood, *Brickwood's Sackett on Instructions to Juries*, 3 vols., 3d. ed. (Chicago: Callaghan & Company, 1908), II: 1174-1175 (Sec 1819, "Right to Prescribe Rules").
[20] "Rules and Regulations for Running the Trains on the North Pennsylvania Railroad, adopted June 1, 1875, and approved by the president (Philadelphia, 1875), 13.

space.[21] Depending upon the size and traffic of the line, some rail cars also had space for passengers to carry their own bags and stow them under their seats or by their feet, particularly if those bags were relatively small. In the event that it was legal and permissible by company policy for a passenger to transport a firearm or other deadly weapon, stowing it away in closed baggage was altogether different from carrying in one's pocket or waistband (which was de facto a violation of the law in many American jurisdictions, as previously described).

15.     As American rail infrastructure grew, the new challenges posed by rail travel— particularly the prospect of criminal activity taking place in transit—became more apparent. Conductors were considered the authority figures on trains and streetcars, and some states vested them with the same powers as policemen. In the 1880s, the Georgia legislature declared that "The conductors of a train carrying passengers are invested with all the powers duties, and responsibilities of police officers while on duty on their trains,"[22] and decided a decade later that "the conductors, motormen, and drivers of street railroad cars are invested with all the powers, duties, and responsibilities of police officers while on duty on their trains or cars, and while on duty at the termini of their lines."[23] Included within this power of conductors to police aboard their trains was a responsibility to enforce weapon regulations in effect at the time. As a result of this status, which was in some ways analogous to that of peace officers exempted from certain weapon regulations, conductors were sometimes armed on the job and expected to prevent

---

[21] In his detailed description of American rail baggage service, Marshall Monroe Kirkman wrote: "Who has not felt a tremor of apprehension as he saw his baggage melt away into the indiscriminate mass of trunks, band boxes, gripsacks, gunbags, umbrellas, burial cases, canaries and bundles that fill the station?" Kirkman, *The Science of Railways, Revised and Enlarged Edition* (New York: The World Railway Publishing Co., 1898), 389.
[22] John L. Hopkins, Clifford Anderson, and Joseph R. Lamar, *Code of the State of Georgia* (Atlanta: Foote & Davies Co., 1895), 230 (sec. 902).
[23] "Conferring Police Powers on Conductors, etc., of Street Railroads," Georgia - General Assembly, Acts and Resolutions (1890-1891), 230-231.

disorderly behavior aboard trains.[24] Still, there was not a hard-and-fast rule about it, and public sentiment did not necessarily support the carrying of firearms by conductors aboard their trains or cars.[25]

16.    Another approach to policing railways was to authorize rail companies to employ their own police forces. Statutes in Ohio and Pennsylvania from the 1860s show the legislatures of those states setting out parameters in which designated rail police could "possess and exercise all the powers, and be subject to all the liabilities of policemen of cities… ."[26] This approach was not at all unusual at the time, which was one in which powerful corporations engaged in industries as disparate as manufacturing and cattle ranching turned to private detectives and police for assistance in defending company interests against labor organizers and marketplace competitors. That legislatures made special arrangements for authorizing railway police and holding them accountable only underscores the significance of protecting the peace and safety of passengers in transit.

17.    By the early twentieth century, large railway companies had sizeable departments overseeing their railway special agents. The Union Pacific Railroad (UPRR) maintained records pertaining to the firearms owned by the company, most of which were pistols assigned for use to

---

[24] For example, a Los Angeles trolley conductor carried a pistol in 1908; see "Attempts to Rob Car and Is Killed," *San Francisco Chronicle* (San Francisco, CA), January 12, 1908, 33.

[25] For example, in 1902, an Atlanta trolley car conductor was arrested for drawing a loaded pistol on a passenger whom he had antagonized; news coverage of the incident stated: "The feature of the investigation was that the conductor was on a trolley car crowded with women as well as men, and was armed with a loaded revolver…It was a revelation to many that among the other paraphernalia of a street car conductor a loaded revolver was carried. They had seen bell punches, transfers, etc. but never before a pistol. It is said that McKinney [the conductor who had been arrested] is not the only street car conductor who is in the habit of going thus armed, and within the past six months pistols have been used more than once by street car men." See "Conductor Is Bound Over," *The Atlanta Constitution* (Atlanta, GA), May 17, 1902, 7.

[26] Joseph R. Swan and Milton Sayler, "Policemen for Railroads, An act to authorize the employment of a police force by railroad companies," *Supplement to the Revised Statutes of the State of Ohio, Embracing All Laws of a General Nature, Passed since the Publication of Swan and Critchfield's Revised Statutes, 1860* (Cincinnati, R. Clarke & Co., 1868), 121-122. See also "No. 228, An Act Empowering railroad companies to employ police forces," *Laws of the General Assembly of the State of Pennsylvania, passed at the session of 1865* (Harrisburg: Singerly & Myers, State Printers, 1865), 225-226.

specified employees. At periodic intervals, the supervisors of the special agents' division undertook inventories of company-owned firearms. Extant records from the early 1930s show that some of the firearms held in the company gun locker were classified as "confiscated guns," presumably confiscated from passengers carrying them illegally.[27] The UPRR special agents and rail watchmen were expected to be on the lookout for passengers carrying guns; correspondence from the Federal Bureau of Investigation from 1950 shows the FBI requesting the assistance of all law enforcement agencies, including the UPRR special agents, in tracking down the carriers of certain guns that had been used in the commission of crimes.[28]

TRANSPORTATION COMPANY RECORDS PERTAINING TO FIREARMS

18.     Transportation companies had the authority to set reasonable safety regulations for their passengers, and they developed internal policing agencies to enforce them. The task of tracking down these internal corporate policies would require mining the extant transit company records rather than keyword-searching databases of historical statutes. There are numerous archives, libraries, and research centers across the United States that hold collections pertaining to transportation history and the corporate records of transit companies.[29] My brief exploration of their finding aids indicates that most of these records are from 1900 or later, which aligns with the development of more modern business practices and the stabilization of the rail industry after the tumultuous decades of the Gilded Age. The stock manipulations, corruption, and overbuilding that characterized the rail industry from the 1860s through the end of the century led to companies selling out to competitors and going into receivership; when these events took

---

[27] "Firearms Records," MS 54, Box 3, Folder 1, Union Pacific Railroad collection. California State Railroad Museum Library and Archives.
[28] "Firearms Records," MS 54, Box 3, Folder 3, Union Pacific Railroad collection. California State Railroad Museum Library and Archives.
[29] https://guides.loc.gov/railroads/association-research-collections

place, records related to assets and finances would have been more likely to be retained than others. As time wore on, companies did not necessarily choose to keep their older records, and those that did sought out archival institutions to take on the responsibility of organizing and maintaining them.[30] In other words, nineteenth-century rail records are much more rare than twentieth century ones, and they are not particularly likely to contain company ridership policies. Culling these records for historical, private, company policies pertaining to gun-carrying would be exceedingly time-consuming and unlikely to produce meaningful results.

19.     The UPRR records previously cited illustrate some of the difficulties in relying upon extant corporate records to ascertain company gun policies. Even though it is one of the oldest, largest, and most influential rail companies in American history, the UPRR special services records for firearms only date back to 1931; the models of guns which the company owned demonstrates that company officials purchased much of the corporate arsenal prior to that time, yet no information pertaining to it has been retained in the "Firearms Records" segment of the collection.[31] More than that, correspondence held within the "Firearms Records" makes reference to a company "Rules" document for employees who carried firearms on the job, yet the rules themselves have not been preserved within the collection. We know that one of those rules was that employees could not carry chambered rounds in their firearms, but that is only because an employee violated that rule and accidentally shot himself—prompting a reiteration of that

---

[30] For example, the robust collections of business records held by the Newberry Library in Chicago, Illinois were donated by the companies, thus relieving them of the expense of storing and caring for them. Similarly, the archival records of the Winchester Repeating Arms Company were donated to the McCracken Research Library at the Buffalo Bill Center of the West even though the company had previously employed a historian, operated a museum, and maintained its own historical records through the mid-twentieth century. Not all companies chose to preserve or donate their historical records.

[31] Company firearms tended to be revolvers chambered for the .38 special cartridge, which was first manufactured in 1898 and became quite common among law enforcement agencies by about the 1920s. "Firearms Records," MS 54, Box 3, Folder 1, Union Pacific Railroad collection. California State Railroad Museum Library and Archives.

particular requirement from the senior management over the special agents.[32] The other rules for armed employees remain a matter of speculation, not because they did not exist but because all record of them appears to have been lost. The only remaining avenue of inquiry is to page through the entirety of the UPRR collection housed at the California State Railroad Museum in case they have been filed in a different section of the collection. The extant records remain heavily focused upon tracking company assets and implementing policies that might limit the company's liability for having an armed segment of its workforce.

20.      In conclusion, the historical record shows that public carry laws such as those in force in New York would have barred most passengers from carrying weapons aboard transit services and vehicles. The exceptions which nineteenth-century public carry laws made for travelers were not understood as including the sort of everyday, intra-city travel done on public transit today. Private transportation companies possessed the power to create their own reasonable customer/passenger rules, which in at least some instances included prohibitions against the presence of guns in passenger cars. The identification of more such policies will require additional archival research, which is sure to be time-consuming and may not produce conclusive results.

21.      I certify pursuant to 28 U.S.C. § 1746 and under penalty of perjury that to the best of my knowledge, information, and belief, the foregoing is true and correct.


Executed on __03__ November, 2022 at Fort Worth, Texas



*Brennan Gardner Rivas*
BRENNAN GARDNER RIVAS

---

[32] "Firearms Records," MS 54, Box 3, Folder 3, Union Pacific Railroad collection. California State Railroad Museum Library and Archives.

14

EXHIBIT A

# Brennan Gardner Rivas
Curriculum Vitae  ·   Oct 2022

## Employment
Lloyd Lewis Fellow in American History, The Newberry Library, 2021-2022
Bill & Rita Clements Fellow for the Study of Southwestern America, Southern Methodist
     University, Clements Center for Southwest Studies, 2020-2021
Lecturer in American History (full-time), Texas Christian University, Department of History,
     2019-2020

## Education
Ph.D., History, Texas Christian University, 2019
     Thesis: "The Deadly Weapon Laws of Texas: Regulating Guns, Knives, & Knuckles in
     the Lone Star State, 1836-1930"
     Advisor: Gregg Cantrell
M.A., History, Texas Christian University, 2013
     Thesis: "Texas Antitrust Law: Formulation and Enforcement, 1889-1903"
B.A. with Honors, History, Oklahoma State University, 2010

## Publications
*Refereed Journal Articles*
"An Unequal Right to Bear Arms: State Weapons Laws and White Supremacy in Texas, 1836-
     1900," *Southwestern Historical Quarterly* 121 (Jan 2018): 284-303.

*Law Articles*
"Strange Bedfellows: Racism and Gun Rights in American History and Current Scholarship"
in Joseph Blocher and Jake Charles, eds., *New Histories of Gun Rights and Regulation: Essays
     on the Place of Guns in American Law and Society* (New York: Oxford University Press,
     forthcoming)
"Enforcement of Public Carry Restrictions: Texas as a Case Study," *U.C. Davis Law Review*
     (May 2022)
"The Problem with Assumptions: Reassessing the Historical Gun Policies of Arkansas and
     Tennessee," *Second Thoughts*, Duke Center for Firearms Law (Jan 2022)

*Short Pieces*
"Charles F. Cooley," in *Wanted in America: Posters Collected by the Fort Worth Police
     Department, 1898-1903*, edited by LeAnna Schooley and Tom Kellam. Fort Worth: TCU
     Press, 2019.
Review of David R. Berman, *George Hunt: Arizona's Crusading Seven-Term Governor*, in
     *Southwestern Historical Quarterly* 114, no. 3 (January 2016): 327-329.

## Public History
"In the Past, Americans Confronted Gun Violence by Taking Action," *Washington Post: Made
     by History Blog* (Jun 2022)

～ Op-ed showcasing open-mindedness of 19th century Americans about experimenting with new gun control measures

"The Origin of Public Carry Laws in Texas," *Texas Gun Sense Blog* (Feb 2021)

"Texas Gun Laws," Online Primary Source Collection, hosted by Omeka
　　～ Online collection featuring primary sources from my research; feature exhibit titled "Crafting a Public Carry Law"

"The Deadly Weapon Laws of Texas," Preserving Our Past: Community History Workshop, Center for Texas Studies at TCU (Nov 2020)
　　～ Public lecture featuring special insights for genealogical researchers

"The Deadly Weapon Laws of Texas," Graduate/Undergraduate Public History Seminar, Tarleton State University (Sept 2020)
　　～ Research presentation focusing on interpretation of county court records

"When Texas Was the National Leader in Gun Control: How the Land of Gunslinger Mythology Regulated Weapons to Reduce Violence," *Washington Post: Made by History Blog* (Sept 2019)
　　～ Op-ed highlighting long history of weapon regulation in Texas

## Fellowships and Awards

Lloyd Lewis Fellowship in American History, 2021-2022
　　～ Awarded by the Newberry Library to scholars using its collection to research topics in American history

Bill & Rita Clements Fellowship for the Study of Southwestern America, 2020-2021
　　～ Awarded by the SMU Clements Center for Southwest Studies to two scholars of Texas, the Southwest, or the U.S.-Mexico borderlands who are developing first books

The Benjamin W. Schmidt Memorial Scholarship, 2018-2019
　　～ Awarded by the TCU Department of History to a PhD candidate who shows exceptional professional promise; highest departmental prize for graduate students

Texas Christian University Department of History, Shinko and Thomas McDonald Research Prize in Texas History, 2019, 2017
　　～ Awarded by the TCU Department of History to a graduate student with the best research on antebellum Texas history

## Works in Progress

*The Revolver Must Go: The Rise and Fall of a Gun Control Movement in Texas*
Aim: Scholarly monograph exploring the rise of a gun control movement in nineteenth-century Texas and the regulatory strategies which it embraced. Widespread acceptance of strict, ambitious gun control laws in the "Wild West" belies current assumptions about Texas and challenges the reigning interpretation of the Second Amendment as a guarantor of expansive gun rights
Status: Editing manuscript

"The Texas Anti-Trust Movement: Antimonopoly, Populism, and Reform in the Long Progressive Era"
Aim: Scholarly article interpreting Texas antitrust policy an example of innovative reform in the Great Plains and trans-Mississippi West
Status: Research and writing in progress

## University Teaching Experience

*Instructor of Record*

Lecturer in American History, Texas Christian University                    2019-2020
> "American History to 1877: Social Movements & the Politics of Slavery" (HIST 10603)
> "American History since 1877: The Quest for Equality" (HIST 10613)
> "History of Texas: A Transnational Look at the American Southwest" (HIST 40743)

*Graduate Student Instructor*

Teaching Assistant, Texas Christian University                    2017-2018
> American History to 1877 (HIST 10603)
> American History since 1877 (HIST 10613)

*Teaching Interests*

American History, Legal History, Southwestern Borderlands, Civil War Era, American West, Gilded Age & Progressive Era, Women's History

## Conference Presentations & Invited Talks

"Military Disarmament Orders and the Role of Reconstruction Historiography after *Bruen*," Current Perspectives on the History of Guns and Society Symposium, Wesleyan University, Middletown, Connecticut, October 2022

"Reassessing Assumptions about Historical Arkansas and Tennessee Handgun Regulations," Race and Guns Roundtable, Duke Center for Firearms Law, Durham, North Carolina, November 2021

"Enforcement of Public Carry Restrictions: Texas as a Case Study," The Second Amendment at the Supreme Court: 700 Years of History and the Modern Effects of Guns in Public, Davis, California, October 2021

"Race & Guns," Newberry Library Colloquium, Chicago, Illinois, October 2021

"Unlawful Carrying: Enforcing the Pistol Law in Texas, 1870-1920," Texas State Historical Association Annual Meeting, Corpus Christi, Texas, February 2019

"Regulating Deadly Weapons in Nineteenth-Century Texas," Invited Lecturer, Los Bexareños Hispanic Genealogical and Historical Conference, San Antonio, Texas, September 2018

"Impregnable Citadels of Capital: American Monopolies in the British Radical Press," Southern Conference on British Studies Annual Meeting, St. Pete Beach, Florida, November 2016

"Dating Violence in Texas: Why the State Family Code Obstructs Accurate Reporting about Sexual Assault," TCU Women & Gender Studies Research Symposium, 2015

## Service

Invited Guest, "How to Make the Most of Your Time in Graduate School," Dept. of History Orientation Day, 2020
> ~ Advise incoming graduate students on strategies for success in the PhD program, emphasizing importance of intellectual development

Panelist, "Everything You Wanted to Know about TCU but Were Too Afraid to Ask," Dept. of History Orientation Day, 2016
> ~ Provide honest and confidential information to prospective graduate students

Graduate Student Mentor, 2015

  ~  Informal departmental program designed to ease the transition for incoming graduate
    students

**Professional Memberships**
Society for Historians of the Gilded Age and Progressive Era
Texas State Historical Association
Southern Historical Association
American Historical Association

**Languages**
Spanish (Proficient)
Latin (Proficient)

# RULES AND REGULATIONS

### FOR

## RUNNING THE TRAINS

### ON THE

# North Pennsylvania Railroad,

*Adopted June 1, 1875.*

### AND APPROVED BY THE PRESIDENT.

---

Other Rules, Regulations and Notices, equally binding, will be issued on the Time Tables and Supplements.

---

PHILADELPHIA,

1875.

Digitized by Google

# REGULATIONS.

40   The PASSENGER CONDUCTOR will be with his train twenty minutes before starting time ; will have general charge of it from terminus to terminus ; also, of the men employed on it, and will require each and every one of them to conform strictly to these regulations.

41. He will announce his train in both public rooms at the Berks Street Depot, and will see that no person passes the gate without a ticket, and that passengers do not take into the cars guns, dogs, valises, large bundles or baskets.  He will make frequent examinations of the cars while stopping at stations for water or otherwise, to discover defective wheels, brakes, &c., or hot boxes, and shift out cars found unsound. He must see that his train is kept clean and in proper running order, and that the cars are locked at night and the windows shut down.  He must superintend the making up of his train at points where required and must see that the brakemen do not slide the wheels, or neglect their duty.

42. He will cause the name of each station at which the train may stop, to be announced, twice, audibly and distinctly, to the passengers, and must be particularly careful to direct passengers to the right train or car at transfer points.

43. He must systematize his collection of tickets and fares so that by no possibility can a passenger ride twice on the same ticket, or for a longer distance than he pays for.  Tickets and passes are to be accepted and construed strictly as they read, without deviation ; if any dispute, refer to the proper officer for correction.

(13)

Digitized by Google