# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK**

---

BRETT CHRISTIAN, FIREARMS POLICY
COALITION, INC., and SECOND AMENDMENT
FOUNDATION,

        *Plaintiffs*,

    v.

STEVEN A. NIGRELLI, in his official capacity as
Superintendent of the New York State Police, and
JOHN J. FLYNN, in his official capacity as District
Attorney of the County of Erie, New York,

        *Defendants*.

Civil Action No.
1:22-cv-00695-JLS

---

**AMICUS BRIEF OF EVERYTOWN FOR GUN SAFETY
IN OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

William J. Taylor, Jr.
Everytown Law
450 Lexington Avenue, #4184
New York, NY 10017
wtaylor@everytown.org
(646) 324-8215
*Counsel for Amicus Curiae*
*Everytown for Gun Safety*

## CORPORATE DISCLOSURE STATEMENT

Everytown for Gun Safety (formally, Everytown for Gun Safety Action Fund) has no parent corporations. It has no stock; hence, no publicly held company owns 10% or more of its stock.

# TABLE OF CONTENTS

INTEREST OF AMICUS CURIAE .................................................................. 1

INTRODUCTION AND SUMMARY OF ARGUMENT ............................................. 1

ARGUMENT ........................................................................................... 2

    I.      Plaintiffs Have Not Met Their Burden to Establish that the Second Amendment's Plain Text Covers Their Conduct .......................................... 2

    II.    The Proper Focus for Analysis of Historical Regulation Is 1868, Not 1791 .......... 4

    III.   This Court Should Not Dismiss the State's Historical Analogues as "Outliers".. 11

    IV.   Plaintiffs' Arguments Regarding Historical Restrictions Are Mistaken .............. 13

CONCLUSION ........................................................................................ 18

# TABLE OF AUTHORITIES

*Cases*

*Apodaca v. Oregon,*
  406 U.S. 404 (1972) ................................................................................................ 9

*Davenport v. Wash. Educ. Ass'n,*
  551 U.S. 177 (2007) .............................................................................................. 12

*District of Columbia v. Heller,*
  554 U.S. 570 (2008) ..................................................................................... passim

*Drummond v. Robinson Twp.,*
  9 F.4th 217 (3d Cir. 2021) ....................................................................................... 4

*Ezell v. City of Chicago,*
  651 F.3d 684 (7th Cir. 2011) ............................................................................... 4, 7

*Friedman v. City of Highland Park,*
  784 F.3d 406 (7th Cir. 2015) ............................................................................... 12

*Friends of Van Cortlandt Park v. City of New York,*
  95 N.Y.2d 623 (2001) ........................................................................................... 15

*Gould v. Morgan,*
  907 F.3d 659 (1st Cir. 2018) .................................................................................. 4

*Heller v. District of Columbia,*
  670 F.3d 1244 (D.C. Cir. 2011) ........................................................................... 10

*McDonald v. City of Chicago,*
  561 U.S. 742 (2010) ...................................................................................... 4, 7, 12

*New York State Rifle & Pistol Ass'n v. Bruen,*
  142 S. Ct. 2111 (2022) .................................................................................. passim

*Perrin v. New York Cent. R.R. Co.,*
  36 N.Y. 120 (1867) ............................................................................................... 15

*Ramos v. Louisiana,*
  140 S. Ct. 1390 (2020) ........................................................................................... 9

*United States v. Class,*
  930 F.3d 460 (D.C. Cir. 2019) ............................................................................... 3

*United States v. Greeno,*
  679 F.3d 510 (6th Cir. 2012) ................................................................................. 4

*United States v. Tilotta,*
  No. 3:19-cr-4768, 2022 WL 3924282 (S.D. Cal. Aug. 30, 2022) ........................... 3

*Williams v. Gallatin*,
    229 N.Y. 248 (1920) ........................................................................................ 17

### *Other Authorities*

Akhil Reed Amar, *The Bill of Rights: Creation and Reconstruction* (1998)............................. 6, 7

Brief for Independent Institute as Amicus Curiae, *New York State Rifle & Pistol Ass'n v. Bruen*,
    No. 20-843 (U.S.).................................................................................................. 8, 12

*Bulletin of the Park and Outdoor Art Association* (1901) ........................................................... 17

Cynthia S. Brenwall, *The Central Park: Original Designs for New York's Greatest Treasure*
    (2019) ...................................................................................................................... 15, 16

David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine*, 13 Charleston L.
    Rev. 205 (2018)....................................................................................................... 8, 12

David Schuyler, *The New Urban Landscape: The Redefinition of City Form in Nineteenth-
Century America* (1988)........................................................................................... 15

Frederick Law Olmsted, *The Justifying Value of a Public Park* (1881)....................................... 16

Kurt T. Lash, *Re-Speaking the Bill of Rights: A New Doctrine of Incorporation* (Jan. 15, 2021),
    https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3766917 ............................. 6, 7

Kurt T. Lash, *Respeaking the Bill of Rights: A New Doctrine of Incorporation*, 97 Ind. L.J. 1439
    (2022) ...................................................................................................................... 6

Nadav Shoked, *Property Law's Search for A Public*, 97 Wash. U.L. Rev. 1517 (2020)............. 17

Transcript of Oral Argument, *New York State Rifle & Pistol Ass'n v. Bruen*, No. 20-843 (U.S.).. 8

## INTEREST OF AMICUS CURIAE

Everytown for Gun Safety ("Everytown") is the nation's largest gun-violence-prevention organization. Everytown has filed more than 50 amicus briefs in Second Amendment and other gun cases, including in challenges to New York's Concealed Carry Improvement Act ("CCIA"). *See, e.g.*, *Hardaway v. Nigrelli*, 1:22-cv-00771-JLS (W.D.N.Y. Oct. 29, 2022), Dkt. 47; *Goldstein v. Hochul*, No. 1:22-cv-08300 (S.D.N.Y. Oct. 20, 2022), Dkt. 46; *Antonyuk v. Hochul* (*Antonyuk II*), No. 1:22-cv-00986 (N.D.N.Y. Oct. 19, 2022), Dkt. 63.[1]

## INTRODUCTION AND SUMMARY OF ARGUMENT

The challenged restrictions in New York's law are constitutional under the approach to Second Amendment cases set out in *New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022), for the reasons stated in the State's Memorandum of Law in Opposition to Plaintiffs' Motion for a Preliminary Injunction (Dkt. 33) ("State's Mem.").[2] Everytown submits this amicus brief to expand on four points.[3] *First*, on the initial, textual inquiry of the *Bruen* framework, Plaintiffs have the burden to show that their proposed conduct, i.e., carrying firearms within the State's public parks, in its crowded public-transit systems, and on the private property of others,

---

[1] No party's counsel authored this brief in whole or part and, apart from Everytown, no person contributed money to fund its preparation or submission.

[2] This amicus brief addresses only aspects of Plaintiffs' claims. The Court should decline to issue a preliminary injunction, as to all defendants, for the reasons in the State's opposition.

[3] On November 3, 2022, this Court issued a preliminary injunction against New York's enforcement of its restriction on possession of a firearm at "any place of worship or religious observation." *See Hardaway v. Nigrelli*, 1:22-cv-00771-JLS (W.D.N.Y. Nov. 3, 2022), Dkt. 52 ("Hardaway Op."). Everytown respectfully submits that this Court should reconsider the arguments Everytown presented in its amicus brief in that case, *id.* (W.D.N.Y. Oct. 29, 2022), Dkt. 47, and sets out again here, when considering Plaintiffs' challenges to the specific provisions of New York's law at issue in this case.

falls within the Second Amendment's plain text, and they have failed to meet that burden. *Second*, in applying the historical inquiry of the *Bruen* framework—asking whether the regulation is "consistent with the Nation's historical tradition of firearm regulation," 142 S. Ct. at 2130—the Court should center its analysis on 1868, when the Fourteenth Amendment was ratified, not 1791. Moreover, 1868 is not a cutoff; examining "legal and other sources to determine *the public understanding* of a legal text in the period *after* its enactment or ratification" is also "a critical tool of constitutional interpretation." *District of Columbia v. Heller*, 554 U.S. 570, 605 (2008) (second emphasis added). *Third*, *Bruen*'s analysis reveals that a small number of laws can be sufficient to establish this nation's tradition of firearm regulation, at least so long as there is not overwhelming affirmative evidence of an enduring tradition to the contrary. *Fourth*, Plaintiffs' efforts to defeat the historical record rest on numerous mistaken premises.

## ARGUMENT

### I.   Plaintiffs Have Not Met Their Burden to Establish that the Second Amendment's Plain Text Covers Their Conduct

*Bruen*'s framework requires both a textual inquiry and a historical inquiry. The court first must ask whether "the Second Amendment's plain text covers an individual's conduct." 142 S. Ct. at 2129-30. If so, the court then moves on to ask whether the government has shown that its regulation is "consistent with the Nation's historical tradition of firearm regulation." *Id*. at 2130. *See generally id.* at 2134-38 (separating application of test into Part III.A (text) and Part III.B (history)).

As the State explains, Plaintiffs have the burden on the initial, textual inquiry. *See* State's Mem. at 13. Plaintiffs make virtually no effort to carry their textual burden. They assert that "the text of the Second Amendment 'presumptively protects' Plaintiffs' proposed course of conduct: 'carrying handguns publicly for self-defense.'" Plaintiffs' Memorandum of Law in Support of

Their Motion for a Preliminary Injunction (Dkt. 19-1) at 11 ("Plaintiffs' Mem."). But beyond expressing a desire to carry firearms "as they go about their daily lives," *id*. at 11-12, Plaintiffs do not try to explain how the Amendment's plain text would cover their "proposed course of conduct" as it relates to the laws they challenge, i.e., carrying firearms within the State's public parks, in its crowded public-transit systems, and on the private property of others.

To be clear, nothing in the challenged provisions of New York's law restricts Plaintiffs' ability to keep or bear arms so long as they do not choose to enter the State's parks or public transit and do not carry firearms onto other people's property without first having their consent. *Cf. United States v. Class*, 930 F.3d 460, 465-66 (D.C. Cir. 2019) ("[W]hen a state bans guns merely in particular places, such as public schools, a person can preserve an undiminished right of self-defense by not entering those places." (alteration in original) (citation omitted)). And while Plaintiffs attempt to characterize the private property protection as a "default ban" on their right to keep and bear arms in public (Plaintiffs' Mem. at 20), they make no real attempt to satisfy their burden to show that the Second Amendment's plain text confers a right to bear arms *on someone else's property*.

New York's regulations on the carrying of firearms on private property and in parks and public transit stand in stark contrast to the laws struck down in *Heller* and *Bruen*—respectively, an unusually "severe" restriction that "totally ban[ned] handgun possession in the home," *Heller*, 554 U.S. at 628-29, and a carry regime that "prevent[ed] law-abiding citizens with ordinary self-defense needs from carrying arms in public for that purpose," *Bruen*, 142 S. Ct. at 2150.[4]

---

[4] *See United States v. Tilotta*, No. 3:19-cr-4768, 2022 WL 3924282, at *5 (S.D. Cal. Aug. 30, 2022) (noting that the firearm regulation at issue "is not equivalent to near total bans on the possession of handguns in the home or in public" as in *Heller*, *McDonald*, and *Bruen*, and that, "[t]herefore, the Second Amendment's text does not cover [the challenger]'s course of conduct").

Accordingly, Plaintiffs cannot rest their textual claim on the simple assertion that they wish to carry handguns in public. At the very least, Plaintiffs should be required to prove that their desire to carry within parks, on public transit, and on other people's private property is something that the text of the Second Amendment protects. They have failed to do so, and so they are not entitled to injunctive relief.

## II.   The Proper Focus for Analysis of Historical Regulation Is 1868, Not 1791

In analyzing whether the challenged restrictions are "consistent with the Nation's historical tradition of firearm regulation," *Bruen*, 142 S. Ct. at 2130, this Court should first conclude that the most relevant time period for that inquiry centers on 1868, when the Fourteenth Amendment was ratified and made the Second Amendment applicable to the states.

Several circuits reached this conclusion in analyzing state and local laws under the Second Amendment at the first, historical step of the framework that applied prior to *Bruen*.[5] *See Gould v. Morgan*, 907 F.3d 659, 669 (1st Cir. 2018) ("Because the challenge here is directed at a state law, the pertinent point in time would be 1868 (when the Fourteenth Amendment was ratified)."); *Ezell v. City of Chicago*, 651 F.3d 684, 702 (7th Cir. 2011) ("*McDonald* [*v. City of Chicago*, 561 U.S. 742 (2010),] confirms that if the claim concerns a state or local law, the 'scope' question asks how the right was publicly understood when the Fourteenth Amendment was proposed and ratified."); *United States v. Greeno*, 679 F.3d 510, 518 (6th Cir. 2012) (following *Ezell*); *see also Drummond v. Robinson Twp.*, 9 F.4th 217, 227 (3d Cir. 2021) ("[T]he question is if the Second *and Fourteenth*

---

[5] Between *Heller* and *Bruen*, every federal court of appeals to address the issue concluded that analyzing Second Amendment claims should proceed in two steps: a historical step, in which courts examined whether the challenged law restricted conduct falling within the scope of the Second Amendment, as historically understood; and, if so, a scrutiny step, where courts examined the fit between the government's interest and the challenged law, usually under intermediate scrutiny. *See Bruen*, 142 S. Ct. at 2126-27; *Gould v. Morgan*, 907 F.3d 659, 668 (1st Cir. 2018) (citing cases), *criticized by Bruen*, 142 S. Ct. at 2124, 2126-27.

Amendments' ratifiers approved [the challenged] regulations ….." (emphasis added)).

*Bruen* does not alter that conclusion. The Supreme Court expressly left open the question "whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868"—as opposed to 1791, when the Second Amendment was ratified—"when defining its scope." *Bruen*, 142 S. Ct. at 2138 (explaining that it did not need to resolve issue because public understanding "for all relevant purposes" in case before it was the same in 1791 and 1868). Moreover, *Bruen* concluded that "[s]tep one of the predominant framework [applied in the lower courts] is broadly consistent with *Heller*." *Id.* at 2127. Accordingly, the step-one analyses in the cases just cited remain, as a general matter, good law.

To begin with, in a case involving a state law, focusing on 1868 is the only way to answer the originalist question: How did the people understand the right at the time of its adoption? There was no right to keep and bear arms constraining the states under the U.S. Constitution until 1868; as *Bruen* observed, a state "is bound to respect the right to keep and bear arms because of the Fourteenth Amendment, not the Second." *Id.* at 2137. Thus, when the people chose to extend the Bill of Rights to the states in 1868, *their* understanding of the scope of each right should control the originalist analysis today. In a case against a state, to elevate a founding-era understanding of the right over the Reconstruction-era understanding would be to reject what the people understood the right to be at the time they gave it effect.

To be sure, if the public understanding of the Bill of Rights changed between 1791 and 1868, then "[o]riginalists seem," at first glance, to be "forced to either abandon originalism or accept a world in which we have two Bills of Rights, one applicable against the federal government and invested with 1791 meanings and one incorporated against the states and invested with 1868

meanings." Kurt T. Lash, *Respeaking the Bill of Rights: A New Doctrine of Incorporation*, 97 Ind. L.J. 1439, 1441 (2022). But *Bruen* rejected the possibility of different standards for the state and federal governments. *Bruen*, 142 S. Ct. at 2137 ("[W]e have made clear that individual rights enumerated in the Bill of Rights and made applicable against the States through the Fourteenth Amendment have the same scope as against the Federal Government."). Accordingly, originalists must justify applying either the 1868 understanding or the 1791 understanding (where they conflict) to all levels of government.

Existing doctrine does not resolve this choice between 1791 and 1868: *Bruen* noted prior decisions that had "assumed" that the scope for both state and federal governments "is pegged to the public understanding … in 1791." *Id*. But if the majority believed those decisions controlled the issue, it would have said so. Instead, the Court expressly left open the question whether 1868 or 1791 is the relevant focus, and pointed to "ongoing scholarly debate on whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868 when defining its scope (as well as the scope of the right against the Federal Government)." *Id.* at 2138. And the Court then cited two scholars who support the 1868 view, Professors Akhil Amar and Kurt Lash, and none who supports the 1791 view. *See id.* (citing Akhil Reed Amar, *The Bill of Rights: Creation and Reconstruction* xiv, 223, 243 (1998), and Kurt T. Lash, *Re-Speaking the Bill of Rights: A New Doctrine of Incorporation* (Jan. 15, 2021) (manuscript, at 2), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3766917 (now published at 97 Ind. L.J. 1439)).

On Professor Amar's account, when the Fourteenth Amendment was ratified, then-contemporary understandings of incorporated rights could transform their meaning not only

against the states, but also as to the federal government.[6] More recently, Professor Lash wrote—as quoted in *Bruen*—"When the people adopted the Fourteenth Amendment into existence, they readopted the original Bill of Rights, and did so in a manner that invested those original 1791 texts with new 1868 meanings." Lash, manuscript, at 2. On this view, too, 1868 meanings bind both the state and federal governments.

There is good reason for this to be the leading originalist view: insisting that the 1791 understanding should apply against the states does not make sense in light of the Supreme Court's lengthy analysis in *McDonald* of the understanding of the right to keep and bear arms around 1868. *See* 561 U.S. at 770-78 (plurality opinion); *id.* at 826-38 (Thomas, J., concurring in part and concurring in the judgment). It would be extraordinary if the public understanding of the right in 1868 were so central to *whether* the right was incorporated against the states, but irrelevant to *what* right was incorporated. That is presumably why the Seventh Circuit, in an opinion by Judge Sykes, reads *McDonald* to have "confirm[ed] that when state- or local-government action is challenged, the focus of the original-meaning inquiry is carried forward in time; the Second Amendment's scope as a limitation on the States depends on how the right was understood when the Fourteenth Amendment was ratified." *Ezell*, 651 F.3d at 702.

Any claim that the founding era is the only relevant period is also inconsistent with the passage in *Bruen* instructing the lower courts on historical methodology through the example of

---

[6] *See* Amar, *The Bill of Rights*, at xiv (account is "attentive to the possibility" that a "particular principle in the Bill of Rights may change its shape in the process of absorption into the Fourteenth Amendment"); *id.* at 223 ("[W]hen we 'apply' the Bill of Rights against the states today, we must first and foremost reflect on the meaning and spirit of the amendment of 1866, not the Bill of 1789. … [I]n the very process of being absorbed into the Fourteenth Amendment, various rights and freedoms of the original Bill may be subtly but importantly transformed[.]"); *id.* at 243 (arguing that "the Fourteenth Amendment has a doctrinal 'feedback effect' against the federal government"); *see also id.* at 283 ("[W]ords inserted into the Constitution in 1791 must be read afresh after 1866.").

sensitive places restrictions. There, the Court indicated that restrictions on guns in legislative assemblies, polling places, and courthouses found in "18th- *and 19th-century*" laws are adequate to satisfy its historical analysis, 142 S. Ct. at 2133 (emphasis added)—an incomprehensible statement if it believed that the 18th century was the only relevant period. Notably, in the pages of the article and brief the Court cited for that proposition, all the 19th-century laws restricting guns in any of the three locations the Court listed were from the *late* 19th century.[7]

Finally, further confirmation that 1868 is the correct focus occurred in the *Bruen* oral argument, where the following exchange took place between Justice Thomas and former Solicitor General Paul Clement as counsel for the NRA's New York affiliate:

> JUSTICE THOMAS: [Y]ou mentioned the founding and you mentioned post-Reconstruction. But, if we are to analyze this based upon the history or tradition, should we look at the founding, or should we look at the time of the adoption of the Fourteenth Amendment, which then, of course, applies it to the states?
>
> MR. CLEMENT: So, Justice Thomas, I suppose, if there were a case where there was a contradiction between those two, you know, and the case arose in the states, I would think there would be a decent argument for looking at the history at the time of Reconstruction … and giving preference to that over the founding.

Tr. of Oral Arg. at 8, *Bruen* (No. 20-843).

Plaintiffs argue that this Court should instead look to 1791, because in their view, although the Supreme Court "formally left open the question" of whether 1791 or 1868 is the correct focus, its prior decisions definitively resolved the issue. *See* Plaintiffs' Mem. at 13. That is confounding; if the Supreme Court's prior decisions had the effect Plaintiffs advocate, *Bruen* would have said

---

[7] *See* David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine*, 13 Charleston L. Rev. 205, 244-47 (2018) (citing 1870 Louisiana law, 1874 and 1886 Maryland laws, 1873 Texas law, and 1874 decision upholding 1870 Georgia law); Br. for Indep. Inst. As Amicus Curiae at 11-17, *Bruen* (No. 20-843) (disputing relevance of 19th-century laws but (at 16 n.10) citing 1869 Tennessee, 1870 Texas, and 1890 Oklahoma laws that prohibited guns in (among others) polling places).

so. Instead, *Bruen* said that it "need not address this issue today." 142 S. Ct. at 2138; *see also id.*
at 2132 ("The regulatory challenges posed by firearms today are not always the same as those that
preoccupied the Founders in 1791 or the Reconstruction generation in 1868."); *id.* at 2162-63
(Barrett, J., concurring) (describing issue as a "methodological point[] that the Court does not
resolve").[8] At most, *Heller* may have assumed that 1791 was the correct focus in a case against
the federal government, without attending to the implications of that assumption for future cases
against states if the Court later closed the door on the possibility of different standards for the state
and federal governments.[9] Having confronted the issue directly in *Bruen*—and after counsel for
the NRA's affiliate said that the Reconstruction era should be the focus in a case against a state—
the Court could have resolved the question, but expressly chose not to do so.

    As explained above, the unavoidable consequence of originalist doctrine, of *Bruen*'s
discussion of originalist scholarship, and of its discussion of sensitive places is that the historical
inquiry should focus on the period around 1868, not 1791. Moreover, 1868 is not a cutoff; *Heller*
instructs that "examination of a variety of legal and other sources to determine *the public
understanding* of a legal text in the period *after* its enactment or ratification" is also "a critical tool
of constitutional interpretation." 554 U.S. at 605 (second emphasis added); *see also Bruen*, 142 S.
Ct. at 2127-28 (quoting same). *Bruen* clarified that, under this passage in *Heller*, materially later
history that *contradicts* the established original meaning of the constitutional text at the relevant
point in time would not change that meaning. *See* 142 S. Ct. at 2136-37 & 2154 n.28. But it

---

    [8] Nor did the First, Sixth, or Seventh Circuits understand *Heller* to have resolved the
question in favor of 1791. Instead, they concluded that 1868 was the correct focus in a case against
a state. *See supra* p. 4.

    [9] *See, e.g.*, *Ramos v. Louisiana*, 140 S. Ct. 1390, 1398-99 (2020) (abrogating *Apodaca v.
Oregon*, 406 U.S. 404 (1972), in which Justice Powell's "dual-track incorporation"-based
concurrence provided the fifth vote for the result).

emphasized that, conversely, "a regular course of practice can liquidate [and] settle the meaning of disputed or indeterminate terms [and] phrases in the Constitution." *Id.* at 2136 (cleaned up) (quoting decision quoting James Madison). Furthermore, *Bruen* recognized that new societal conditions may "require a more nuanced approach" to the historical inquiry. *Id.* at 2132; *see also Heller v. District of Columbia*, 670 F.3d 1244, 1275 (D.C. Cir. 2011) (Kavanaugh, J., dissenting) (explaining that "constitutional principles … must be faithfully applied not only to circumstances as they existed in 1787, 1791, and 1868, for example, but also to modern situations that were unknown to the Constitution's Framers"). If a modern societal condition that warrants a modern firearms regulation did not exist in the time period a court is examining, then self-evidently there will be no historical restrictions addressing the condition to be found in that period.

Here, state and local laws from the second half of the 19th century and early 20th century establish the meaning of the right to keep and bear arms at the time of the Fourteenth Amendment's adoption, and demonstrate the constitutionality of the provisions of New York's law challenged in this case. *See, e.g.*, State's Mem. at 16-19, 21-26, 28-38.[10] And even if this Court were to conclude (contrary to the scholars the Supreme Court cited) that the relevant date is 1791, not 1868, and even if the Court is uncertain whether the State's earlier evidence establishes the constitutionality of the challenged provisions in this case, it should then consider this later historical evidence and recognize that this evidence "settle[s] the meaning of" the right as one that allows a government to prohibit guns in parks and public transit and allows it to require the consent of private property owners before others may carry weapons on their property.

---

[10] To be clear, the question before this Court is not whether laws precisely like New York's existed in 1868 (or 1791). *Bruen* stressed that in applying analogical reasoning, the government must identify a "well-established and representative historical *analogue*, not a historical *twin*." 142 S. Ct. at 2133. Therefore, "even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Id*.

### III.   This Court Should Not Dismiss the State's Historical Analogues as "Outliers"

In granting a preliminary injunction in *Hardaway v. Nigrelli*, this Court concluded that the historical laws the State presented in support of the prohibition on firearms in places of worship were "outlier enactments" and "insufficient … in the search for an American tradition." Hardaway Op. at 35-36.[11] We respectfully submit that, to the contrary, a small number of regulations *can* establish a tradition in light of *Bruen*'s discussion of the historical restrictions justifying sensitive places.

Specifically, *Bruen* repeated *Heller*'s identification of "schools and government buildings" as sensitive places, 142 S. Ct. at 2133 (quoting *Heller*, 554 U.S. at 626), and then recognized that three additional, more specific locations—legislative assemblies, polling places, and courthouses—were also "'sensitive places' where arms carrying could be prohibited consistent with the Second Amendment," *id.* But the sources the Court cited for the historical record justifying restrictions in those three locations identified *only two laws* naming legislative

---

[11] This Court also concluded that the State's laws, largely from the late 19th century, were too "remote" and "anachronistic," and that the State had "not met its burden to show *endurance* (of any sort) *over time*." *Id.* at 35. We respectfully submit that 19th-century laws are neither remote nor anachronistic for the reasons explained, *see supra* Part II, and, with respect to new contexts like parks and public transit, regulations could not exist before the context existed (as *Bruen* recognized, *see* 142 S. Ct. at 2132). We further respectfully submit that the State does not have a burden to show endurance. The primary originalist inquiry asks how the public understood the scope of the right "*when* the people adopted" it, *Heller*, 554 U.S. at 634-35 (emphasis added)— not over some unspecified period of continuous time. Certainly, evidence from before, during, or after 1868 can all help demonstrate how the public understood the right in 1868. *See, e.g.*, *id.* at 605 ("[E]xamination of a variety of legal and other sources to determine *the public understanding* of a legal text in the period after its enactment or ratification … is a critical tool of constitutional interpretation."). But nothing in *Heller*, *Bruen*, or originalist principles says that the understanding at the time of adoption must also be a continuous one.

If the Court disagrees, we respectfully submit that it should grant the State an opportunity to establish the continuity of the laws it cited, given the practical impossibility of doing so within the timeframe and page limitations of the current briefing. *See, e.g.*, cases cited at State Mem. at 38; Decl. of Zachary Shrag, *Angelo v. District of Columbia*, No. 1:22-cv-01878 (D.D.C. Sept. 16, 2022), Dkt. 18-13.

assemblies and *two laws* naming courthouses. *See* Kopel & Greenlee, 13 Charleston L. Rev. at 235, 246; Br. for Indep. Inst. as Amicus Curiae at 11-12, *Bruen* (No. 20-843). Under *Bruen*'s sensitive places analysis, therefore, a small number of laws can be sufficient to establish this nation's tradition of firearm regulation, at least so long as there is not overwhelming affirmative evidence of an enduring tradition to the contrary.[12]

Concluding that a small number of state laws can demonstrate a "public understanding" of a limitation on the Second Amendment right is also consistent with bedrock federalism principles that entitle a state to effectuate the policy choice of its citizens within constitutional bounds. Local conditions matter. Just as states today may (or may choose not to) "experiment[] with reasonable firearms regulations," *McDonald*, 561 U.S. at 785 (plurality opinion) (cleaned up), states historically may have chosen not to regulate certain weapons, people, or conduct, not because the public understood the right to keep and bear arms to prevent such regulations, but because of democratically supported policy choices. As Judge Easterbrook explained in *Friedman v. City of Highland Park*, 784 F.3d 406 (7th Cir. 2015), "the Constitution establishes a federal republic where local differences are cherished as elements of liberty, rather than eliminated in a search for national uniformity," and "[t]he central role of representative democracy is no less part of the Constitution than is the Second Amendment." *Id.* at 412. And the fact that states have latitude to experiment with regulations that meet their unique needs means that states historically may well have chosen not to regulate to the limits of constitutional permissibility. *Cf., e.g.*, *Davenport v. Wash. Educ. Ass'n*, 551 U.S. 177, 185 (2007) ("The constitutional floor [by which the First Amendment restricts public-sector] unions' collection and spending of agency fees is not also a

---

[12] To be sure, *Bruen* expressed "doubt" that three colonial regulations "could suffice to show a tradition." 142 S. Ct. at 2142. But that tentative statement should not be given undue weight given the Supreme Court's discussion of sensitive places.

constitutional ceiling for state-imposed restrictions."). Accordingly, while state laws restricting firearms demonstrate that the people of those states understood the right to keep and bear arms to permit such restrictions, the absence of such laws in other states does not warrant any inference that their citizens considered such restrictions unconstitutional.

## IV.    Plaintiffs' Arguments Regarding Historical Restrictions Are Mistaken

This Court should conclude that Plaintiffs have failed to establish a likelihood of success on the merits for the reasons set out in the State's brief. Congruent with those historical arguments, we respond to two specific points in the Plaintiffs' discussion of the historical analysis.

*First*, Plaintiffs argue that sensitive places restrictions are permissible only if the places "are 'relevantly similar' to longstanding restrictions on students carrying firearms in schools and firearms in legislative assemblies, polling places, and courthouses." Plaintiffs' Mem. at 14. There are several errors in this argument. To begin with, *Heller* endorsed "laws forbidding the carrying of firearms in sensitive places *such as* schools and government buildings." 554 U.S. at 626 (emphasis added). Self-evidently, "schools" and "government buildings" are *examples* of sensitive places where guns may be prohibited, not an exhaustive list.[13] *Bruen* not only repeated that illustrative language ("such as"), but introduced its additional, more specific locations (legislative assemblies, polling places, and courthouses) with "*e.g.*"—establishing that these, too, were examples, not an exhaustive list. *See* 142 S. Ct. at 2133. And *Bruen* then said expressly that it "[ha[d] no occasion to comprehensively define 'sensitive places' in this case." *Id.*; *see also id.* at 2134 (confirming that, as in *Heller*, it "d[id] not undertake an exhaustive historical analysis … of the full scope of the Second Amendment" (quoting *Heller*, 554 U.S. at 626)). For Plaintiffs to

---

[13] *See also id.* at 627 n.26 ("We identify these presumptively lawful regulatory measures only as examples; our list does not purport to be exhaustive."); *Bruen*, 142 S. Ct. at 2162 (Kavanaugh, J., concurring) (same).

claim otherwise disregards the Supreme Court's carefully chosen words. Where, as here, a state canvasses the historical record and demonstrates that a challenged sensitive places law is "consistent with this Nation's historical tradition of firearm regulation," *Bruen*, 142 S. Ct. at 2135, it is absurd to suggest that the state must *also* demonstrate that its law is "relevantly similar" to restrictions in schools, government buildings, legislative assemblies, courthouses, or polling places.[14] Instead, *Bruen* was setting out an *alternative* means by which a state could defend a firearms restriction—by analogy—if the historical record did not reveal direct precursors to its challenged law.

*Second*, Plaintiffs argue that the parks restriction "simply cannot be justified as consistent with the Nation's historical tradition of firearm regulation." Plaintiffs' Mem. at 14 (cleaned up). To the contrary, the State has presented *over 60* historical laws prohibiting guns in parks (Exs. 12-33, 36-78) in addition to a compendium of historical restrictions in National Parks (Ex. 34) and the National Parks' subsequent system-wide regulation (Ex. 35). The historical laws include prohibitions on firearms in urban parks from cities across the country.[15] These prohibitions first emerged in the late 19th century because that marked the beginning of urban parks in the modern sense—in Plaintiffs' own conception, as grounds "inclosed for purposes of pleasure, exercise,

---

[14] Plaintiffs also have no basis for rewriting the list of sensitive places the Supreme Court has endorsed to omit "government buildings" and to limit prohibitions in schools only to "*students* carrying firearms." Plaintiffs' Mem. at 14 (emphasis added). *Heller* and *Bruen* say what they say.

[15] To take just one example in each of 22 states, the State cites parks prohibitions from New York, N.Y. (1858) (Ex. 36), Philadelphia, Penn. (1868) (Ex. 37), Chicago, Ill. (1881) (Ex. 39), St. Louis, Mo. (1883) (Ex. 18), Salt Lake City, Utah (1888) (Ex. 17), Grand Rapids, Mich. (1891) (Ex. 41), Springfield, Mass. (1891) (Ex. 43), Spokane, Wash. (1892) (Ex. 45), St. Paul, Minn. (1894) (Ex. 47), Indianapolis, Ind. (1896) (Ex. 49), Wilmington, Del. (1898) (Ex. 50), Boulder, Colo. (1899) (Ex. 24), Hartford, Conn. (1902) (Ex. 51), Trenton, N.J. (1903) (Ex. 25), Houston, Tex. (1904) (Ex. 56), Neligh, Neb. (1904) (Ex. 57), Los Angeles, Calif. (1906) (Ex. 63), Memphis, Tenn. (1909) (Ex. 67), Paducah, Ky. (1909) (Ex. 68), Staunton, Va. (1910) (Ex. 29), Birmingham, Ala. (1917) (Ex. 31), and Burlington, Vt. (1921) (Ex. 76).

amusement, or ornament," Plaintiffs' Mem. at 15 (quoting *Perrin v. New York Cent. R.R. Co.*, 36 N.Y. 120, 124 (1867)), or "a recreational pleasure area set aside to promote public health and welfare," *id.* (quoting *Friends of Van Cortlandt Park v. City of New York*, 95 N.Y.2d 623, 629 (2001). *See generally* David Schuyler, *The New Urban Landscape: The Redefinition of City Form in Nineteenth-Century America* 1-8 (1988) (describing the emergence in the 19th century of the "new urban landscape," whose proponents urged establishment of public parks to "create[] communal spaces for family outings, where the naturalistic landscape offered relief from cramped, dark, poorly-ventilated dwellings, and where rural scenery might sooth the 'nerves and mind' of visitors," and identifying Central Park as "the first major attempt to achieve" the proponents' goals). Given Central Park's position as the foundational paradigm of this new movement, it bears repeating that the park's original 1858 rules, brief enough to appear on a single sheet and "posted in conspicuous locations that would be easily seen by all visitors," Cynthia S. Brenwall, *The Central Park: Original Designs for New York's Greatest Treasure* 26 (2019), forbade "[a]ll persons" to "carry fire-arms":



*Id.* at 27.

Further evidence that parks as we understand them today first took hold in the second half of the 19th century comes from Frederick Law Olmsted himself, principal architect of Central Park and its first Commissioner. In 1881, Olmsted wrote: "Twenty-five years ago [i.e., in 1856] we had no parks, park-like or otherwise, which might not better have been called something else. … Allow me to use the term *park movement*, with reference to what has thus recently occurred on both continents [Europe and North America]." Frederick Law Olmsted, *The Justifying Value of a Public Park* 7-8 (1881); *see also id.* at 8 (dating the movement to 1849 in the United States, with notable developments in 1851 with the first park legislation and 1853 with commencement of the Central Park Commissioners' duties). Olmsted explained that this notion of parks was revolutionary, not an incremental development of existing ideas: "Parks have plainly not come as the direct result of any of the great inventions or discoveries of the century. They are not, with us, simply an improvement on what we had before, growing out of a general advance of the arts applicable to them." *Id.* Parks in the modern sense—and the sense in which Plaintiffs understand them, *see supra*—were thus an "unprecedented societal concern[]" in the late 19th and early 20th centuries. Under *Bruen*, that is reason enough to conclude that the State's historical park regulations amply demonstrate that the right to keep and bear arms permits its current restriction, since those regulations appeared as soon as the new societal condition of modern parks emerged.[16]

The same principles demonstrate why Plaintiffs' appeal to Boston Common is flawed. *See* Plaintiffs' Mem. at 17. During its first two centuries, the Common's core function was as common

---

[16] Although not at issue in this case because the State has explained that the parks restriction does not apply to "Adirondack Park," *see* State's Mem. at 19-21, this point holds just as much for remote, wilderness parks as it does for urban parks. For example, at the federal level, prohibitions on firearms in National Parks were enacted soon after they were established. *See id.* at 24-25.

grazing land, not as a park. *See, e.g.* Nadav Shoked, *Property Law's Search for A Public*, 97 Wash. U.L. Rev. 1517, 1556-57 (2020) ("The modern idea of the park emerged in the nineteenth century. Before, to the extent open spaces that were not privately owned existed in the midst of human settlements, such spaces consisted of grazing areas open to all. Perhaps the most famous example for this kind of park space is the Boston Common—the 'first public park in the United States'— which was used by locals as a cows' pasture for two hundred years starting with colonization in the 1630s."); *Bulletin of the Park and Outdoor Art Association* 3 (1901), *available at* https://bit.ly/3NPLSae (the "origin of Boston Common" was its purchase in 1634 when it was "laid out … for a training field, and … was ever since used for that purpose and the feeding of cattle. … There was little if any idea that it would ever be a park. … It was kept and occupied as a common till a very recent date, and it was not until 1859 that the question was finally settled by a vote of the Legislature and a vote of the city, that Boston Common should be a public park.").[17] Thus, Boston Common was a founding-era cow pasture, not (as Plaintiffs claim) a founding-era illustration of the same "general societal problem" that New York has sought to address with its prohibition on guns in parks today. And even assuming (contrary to the historical evidence above) that the Common had been a park at the founding, the fact that there was one such location for which the historical record has not (yet) yielded a prohibition on carrying firearms proves nothing about whether Bostonians historically—whether in the founding generation, the Reconstruction generation, or later—understood the right to keep and bear arms to foreclose such a prohibition. If

---

[17] In addition, Plaintiffs themselves point to evidence that the Common was used for military training in the 17th and 18th centuries—again, a very different kind of land use than a modern park. *Cf., e.g.*, *Williams v. Gallatin*, 229 N.Y. 248, 254 (1920) (forbidding park commissioner from leasing Central Park building to organization whose educational goals were insufficiently aligned with the "purpose of the system of modern parks," which was "to provide means of innocent recreation and refreshment for the weary mind and body").

public carry in Boston was rare (either because of social mores or because of carry regulations not specific to particular locations), then its inhabitants may have seen no need to enact "sensitive places" prohibitions; or they may have chosen not to regulate (if that is in fact what they chose) for policy, rather than constitutional, reasons. *See supra* pp. 12-13 (federalism requires respect for governments' decisions to legislate, or not, according to local needs).

## CONCLUSION

The Court should deny Plaintiffs' motion for a preliminary injunction.

Dated: November 11, 2022

Respectfully submitted,

/s/ William J. Taylor, Jr.
William J. Taylor, Jr.
Everytown Law
450 Lexington Avenue, #4184
New York, NY 10017
wtaylor@everytown.org
(646) 324-8215
*Counsel for Amicus Curiae*
*Everytown for Gun Safety*