UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| BRETT CHRISTIAN, et al., | Case No. 22-cv-00695-JLS |
| Plaintiffs, | |
| v. | |
| STEVEN A. NIGRELLI, et al., | |
| Defendants. | |

**PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF THEIR MOTION FOR A PRELIMINARY INJUNCTION**

## **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION .............................................................................................................. 1

ARGUMENT ...................................................................................................................... 1

I.     Plaintiffs Have Standing. .................................................................................. 1

II.    Plaintiffs Have Demonstrated A Likelihood of Success..................................... 4

     A.  Public Parks. ............................................................................................. 4

         i.     The State presents zero Founding Era evidence .............................. 5

         ii.    The State's late nineteenth and twentieth century evidence is too late ......................................................................................... 8

         iii.   The State's anachronistic evidence does not establish a tradition justifying its ban on carrying in all public parks........................... 10

     B.  Public Transportation................................................................................ 12

     C.  Places Presumptively Open to the Public. ................................................ 15

III.   Plaintiffs Have Demonstrated Irreparable Harm and the Public Interest. ...................... 16

CONCLUSION................................................................................................................... 16

## TABLE OF AUTHORITIES

**Cases**                                                                                      **Page**

*Agostini v. Felton*, 521 U.S. 203 (1997) ........................................................................9

*Antonyuk v. Hochul*, 2022 WL 16744700
    (N.D.N.Y Nov. 7, 2022) ........................................................5, 6, 7, 8, 11, 12, 13, 15, 16

*Bridgeville Rifle & Pistol Club, Ltd. v. Small*, 176 A.3d 632 (Del. 2017) ...................11

*Conn. Citizens Def. League, Inc. v. Lamont*, 6 F.4th 439 (2d Cir. 2021) .....................4

*Davis v. Michigan S. & N. I. R. Co.*, 22 Ill. 278 (1859)..................................................13

*District of Columbia v. Heller*, 554 U.S. 570 (2008)................................................8, 15

*Drummond v. Robinson Twp.*, 9 F.4th 217 (3d Cir. 2021) ...............................................9

*Fed. Election Comm'n v. Cruz*, 142 S. Ct. 1638 (2022) ...................................................2

*Hardaway v. Nigrelli*, 22-CV-771 (JLS), 2022 WL 16646220
    (W.D.N.Y. Nov. 3, 2022)................................................................................1, 2, 4, 14

*Heckler v. Cmty. Health Servs.*, 467 U.S. 51 (1984) .......................................................5

*Jones v. Bonta*, 34 F.4th 704 (9th Cir. 2022).............................................................9, 10

*McDonald v. City of Chicago*, 561 U.S. 742 (2010)........................................................8

*MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118 (2007)............................................2

*Mental Disability Law Clinic, Touro Law Ctr. v. Hogan*, 519 F. App'x 714 (2d Cir. 2013)..........3

*Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2012)........................................................10

*New York State Citizens' Coal. for Child. v. Velez*, No. 10-cv-3485, 2016 WL 11263164
    (E.D.N.Y. Nov. 7, 2016) ..............................................................................................3

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*,
    142 S. Ct. 2111 (2022)............................................1, 4, 7, 8, 9, 10, 11, 13, 14, 15

*Nnebe v. Daus*, 644 F.3d 147 (2d Cir. 2011) ..................................................................3

*Olsen v. Stark Homes, Inc.*, 759 F.3d 140 (2d Cir. 2014)...............................................3

*Rosner v. Metro. Prop. & Liab. Ins. Co.*, 754 N.E.2d 760 (N.Y. 2001)......................4, 5

*Rumsfeld v. FAIR*, 547 U.S. 47 (2006) ...........................................................................3

*Steffel v. Thompson*, 415 U.S. 452 (1974) ..................................................................2, 3

*Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014).............................................1, 2

*United States v. Decastro*, 682 F.3d 160 (2d Cir. 2012)................................................4

*United States v. Greeno*, 679 F.3d 510 (6th Cir. 2012) .................................................9

*Virginia v. Moore*, 553 U.S. 164 (2008) ........................................................................9

*Woods v. Devin*, 13 Ill. 746 (1852) ...............................................................................13

## Statutes and Legislative Materials

42 U.S.C. § 1983 ............................................................................................................3

Cal. Code Regs. tit. 14, § 4313 ......................................................................................11

Conn. Agencies Regs. §  23-4-1(c) ................................................................................11

1812 Del. Laws 329 .........................................................................................................7

Haw. Code R. §  13-146-19(a) .......................................................................................11

430 ILCS 66/65 .............................................................................................................11

Md. Code Regs. 08.07.06.04 .........................................................................................11

N.J. Admin. Code § 7:2-2.17(b) ....................................................................................11

17 Pa. Admin. Code § 11.215 ........................................................................................11

250 R.I. Code R. § 100-00-1.17 .....................................................................................11

## Other Authorities

Turpin Bannister, *Oglethorpe's Sources for the Savannah Plan*,
20 J. of Soc'y of Arch. Hist. 47 (1961)..................................................................6, 7

Anne Beamish, *Before Parks: Landscapes in Seventeenth- and Eighteenth-Century
Boston New York, and Philadelphia*, 40 LANDSCAPE J. 1 (2021) .............................6

Amicus Br. of The Independent Institute, *Bruen*, No. 20-843 (July 20, 2021) ...........10

Census Bulletin No. 65, U.S. Census Bureau (June 8, 1901),
available at https://bit.ly/3GkuFnm ......................................................................11

*The Earliest New York City Parks*, NEW YORK CITY DEPT. OF PARKS AND RECREATION,
available at https://on.nyc.gov/3hBZXfe (last visited Nov. 17, 2022) ......................6

"Green," National Gallery of Art, available at https://bit.ly/3UM2Usk  .......................6

Johnson, et al., SECOND AMENDMENT: REGULATION, RIGHTS, AND POLICY
(3d ed. 2021) .....................................................................................................12, 13

David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine: Locational
Limits on the Right to Bear Arms*, 13 CHARLESTON L. REV. 205, 290 (2018).........14

Mark W. Smith, *'Not all History is Created Equal': In the Post-Bruen World,
the Critical Period for Historical Analogues Is when the Second Amendment
Was Ratified in 1791, and not 1868 (working draft)*, Oct. 1, 2022, *available at*
https://bit.ly/3CMSKjw (lasted visited Nov. 16, 2022) ............................................8

Supp. App'x of New York City, *NYSRPA v. New York*, No. 18-280 (U.S. 2019), available at
https://bit.ly/3TNf8Q4 ............................................................................................7

Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical
Framework and A Research Agenda*, 56 UCLA L. REV. 1443 (2009)....................13

## INTRODUCTION

"[T]he Supreme Court has made clear, individuals have the right to carry handguns publicly for self-defense." *Hardaway v. Nigrelli*, 22-CV-771 (JLS), 2022 WL 16646220, at *13 (W.D.N.Y. Nov. 3, 2022). Accordingly, New York's "exclusion[s]" in the Carry Provisions— banning ordinary law-abiding citizens from carrying for self-defense in parks, on public transportation, and presumptively on all private property open to the public—can only be "valid" if the State "'affirmatively prove[s]' that the[se] restriction[s]" are "part of the Nation's historical tradition of firearm regulation." *Id.* (quoting *New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2127 (2022). The State has not done so, thus the Carry Provisions are unconstitutional. With Plaintiffs suffering ongoing, irreparable harm and the public interest being squarely in favor of upholding constitutional rights, a preliminary injunction is warranted.

## ARGUMENT

### I.   Plaintiffs Have Standing.

To establish standing, Plaintiffs must establish a "personal stake in the outcome of the controversy" by demonstrating an injury in fact fairly traceable to the challenged conduct of Defendants that will be redressed by a favorable decision of this Court. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (internal quotation marks omitted). Plaintiff Christian has demonstrated that here. As he stated in his declaration and deposition testimony, he previously and with regularity carried for self-defense in parks, *see* Deposition of Brett Christian 85:9–84:5, 122:25–128:5 (Nov. 16, 2022) ("Christian Dep."); Declaration of Brett. Christian, Doc. 19-4 ¶¶7– 8 (Sept. 26, 2022) ("Christian Decl."), on public transportation, Christian Dep. 44:5, 45:3–5; 53:12–13, and at establishments open to the public, Christian Dep. 94:22–95:8. Christian would intend to return to these parks (among others), ride public transportation, and visit establishments again while carrying a firearm for self-defense, but for the enactment and enforcement of S51001.

Christian Dep. 126:12–129:24; Christian Decl. ¶¶7–11. His injury is S51001's immediate and actual disarmament in these locations each and every instance that he visits them without his firearm or abstains from visiting altogether because of his diminished sense of personal safety. Christian Dep. 106:2–13; 130:19–23 (noting  his carrying for self-defense "has been reduced to almost nonexistent"); Christian Decl. ¶ 12.  For purposes of standing, this Court must assume that this immediate and actual disarmament unconstitutionally infringes Plaintiff Christian's Second Amendment rights. *See Fed. Election Comm'n v. Cruz*, 142 S. Ct. 1638, 1647–48 (2022). And there is no dispute that this is traceable to Defendants and that this Court's issuance of a preliminary injunction would redress this ongoing injury. As alleged in the Complaint and as this Court has previously recognized, the State's enforcement officials have made abundantly clear that this law *will be enforced. See* Compl., Doc. 1, ¶¶ 5, 46 (Sep. 13, 2022); *Hardaway*, 2022 WL 16646220 at *4.

The State's argument boils down to the fact that Christian has not *actually* been arrested yet and has not promised to *break* the law. State's Mem. of Law in Opp'n to Pls.' Mot. for Prelim. Inj., Doc. 33 at 9–10 (Nov. 4, 2022) ("State Br."). As the Supreme Court reaffirmed this year, such a break-the-law threshold for standing "finds no support in our standing jurisprudence." *Cruz*, 142 S. Ct. at 1648. Instead, "[w]hen an individual is subject to" "threatened enforcement of a law," then "an actual arrest, prosecution, or other enforcement action is not a prerequisite to challenging the law." *Susan B. Anthony List*, 573 U.S. at 158. Indeed, it is not even necessary for an individual to "first *expose* himself to actual arrest or prosecution to be entitled to challenge a statute that he claims *deters* the exercise of his constitutional rights." *Steffel v. Thompson*, 415 U.S. 452, 459, (1974) (emphases added); *see also MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128–129 (2007). Thus, in *Steffel*, the plaintiff had standing to challenge a criminal trespass statute that had

2

caused him to *refrain* from engaging in certain handbilling activities: he "alleged . . . that . . . he had not done so because of his concern that he . . . would be arrested for violation of" the challenged law. 415 U.S. at 456. The same reasoning applies here: Plaintiff Christian has standing because he has refrained from carrying firearms in parks (and has even refrained from visiting the parks he frequented before S51001 took effect), on public transportation, and in businesses open to the public only because of the very real prospect of arrest and prosecution should he do so, as demonstrated by Defendant Nigrelli's comments. Plaintiff Christian has exercised his constitutional right to carry only three times since S51001 took effect, compared to nearly every day before, due to the State's promise that S51001 would be vigorously enforced. *See* Christian Dep. 130:19–23.

Because Plaintiff Christian has standing, there is no need for this Court to address the standing of FPC and SAF. [1] *See Rumsfeld v. FAIR*, 547 U.S. 47, 53 n.2 (2006). But FPC and SAF both have standing. Courts in the Second Circuit have found that organizations have adequately alleged standing when they have "diverted resources from education and training," fielded phone calls to counsel members about the change in the law, and investigated and advocated on their members' behalf with respect to the law's requirements. *Mental Disability Law Clinic, Touro Law Ctr. v. Hogan*, 519 F. App'x 714, 717 (2d Cir. 2013); *Olsen v. Stark Homes, Inc.,* 759 F.3d 140, 158 (2d Cir. 2014); *Nnebe v. Daus*, 644 F.3d 147, 157 (2d Cir. 2011); *N.Y. State Citizens' Coal. for Child. v. Velez*, No. 10-cv-3485, 2016 WL 11263164, at *3–5 (E.D.N.Y. Nov. 7, 2016). FPC and SAF have alleged that here. *See* Decl. of Brandon Combs, Doc. 19-5 ¶¶6–10 (Sept. 28, 2022); Decl. of Alan Gottlieb, Doc. 19-6 ¶¶6–10 (Sept. 28, 2022). In particular, they both have established

---

[1] FPC and SAF preserve the right to seek to overrule circuit precedent that an organization does not have standing to assert the rights of its members under 42 U.S.C. § 1983.

hotlines to address concerns from their members and the public to answer questions about where individuals can lawfully carry in New York State. They would not have done so, but for the unconstitutional burden imposed on New Yorkers by S51001. The hotlines represent diversion of resources from their normal activities as they were only established to address new questions and concerns about lawful carry *after* the enactment of S51001. *See Conn. Citizens Def. League, Inc. v. Lamont*, 6 F.4th 439, 447 (2d Cir. 2021).

## II.   Plaintiffs Have Demonstrated A Likelihood of Success.[2]

Plaintiffs are "ordinary, law-abiding citizens to which the Second Amendment applies," who seek "to carry handguns publicly for self-defense." *Hardaway*, 2022 WL 16646220, at *13, 14. The only question then for each of the Carry Provisions "is whether the State has met its historical burden" to "affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id*. at *10 (quoting *Bruen*, 142 S. Ct. at 2127). In this, the State carries both the burden of persuasion and the burden of production. *Bruen*, 142 S. Ct. at 2150 (noting it is New York's burden to "sift the historical materials"); *id*. at 2130 n.6. The State cannot meet its burden with the anachronistic and irrelevant evidence that it has marshaled for each of the challenged Carry Provisions.

### A.  Public Parks.

S51001 bans firearms for ordinary, law-abiding citizens in every "public park." When a New York statute does not itself define a term, courts are to resort to the term's ordinary meaning.

---

[2] Contrary to the State's assertions, there is no heightened standard applicable to these proceedings because Plaintiffs seek a prohibitory injunctive order to maintain the status quo, which is "the Constitution and the Bill of Rights." *Hardaway*, 2022 WL 16646220 at *6. In all events, Plaintiffs meet any heightened standard because they demonstrated a "clear or substantial likelihood of success on the merits" that the Carry Provisions lack a "'plainly legitimate sweep' in that [they] force[] individuals to give up their rights to armed self-defense outside the home." *Id*. at *5 & n.7, *18 (quoting *United States v. Decastro*, 682 F.3d 160, 168 (2d Cir. 2012)).

*Rosner v. Metro. Prop. & Liab. Ins. Co.*, 96 N.Y.2d 475, 479-80 (2001). The State asserts that "public park" does not apply to places that otherwise fall within this ordinary meaning, such as Adirondack *Park*, because of a press statement, FAQ document, and other statutes that indicate parts of the park are also forest preserve. The text of S51001 makes none of these distinctions, and, as the State concedes, the text of S51001 bars firearms in *some* parts of Adirondack Park. Why S51001 should be read to cover some areas of Adirondack Park but not the "*park*" areas, the State does not say. Further, the sources the State cites would not appear to tie the hands of enforcement officials were they to read "public park" differently than the litigating position the State purports to adopt here. *See* "FAQ on Hunting and Hunting-Related Activities in response to Recent Changes to New York State Firearm Laws," N.Y. Dept. of Environmental Conservation ("These questions and answers are not intended to be exhaustive, nor do they constitute legal advice."), *available at* https://on.ny.gov/3UNYUaL (last visited Nov. 17, 2022) (attached as Ex. 3); *cf. Heckler v. Cmty. Health Servs.*, 467 U.S. 51, 63 (1984).[3] Moreover, the Northern District has already implicitly found that "public park" covers Adirondack Park. *See Antonyuk v. Hochul*, 2022 WL 16744700, at *66 n. 108 (N.D.N.Y Nov. 7, 2022) ("*Antonyuk III*") (taking judicial notice of the size of Adirondack Park). In all events, regardless of whether S51001 covers Adirondack Park, "public park" clearly encompasses a vast swath of New York territory, including state parks, county parks, and all manner of urban and rural parks and trails in this State.

### i. The State presents zero Founding Era evidence.

The State's historical analysis justifying its ban on guns in all of the diverse park settings

---

[3] The FAQ document that Plaintiffs cite in their complaint, *see* Compl. ¶38(e) n.3 (attached as Ex. 2), is different from the FAQ document that Defendants cite, *see* State Br. at 20 (attached as Ex. 3)—one is 2 pages and makes no mention of lawful possession, the other is 8 pages and says possession is lawful while not purporting to offer "legal advice." The public guidance from the State is not an exemplar of clarity.

of New York immediately begins on the wrong foot when the State declares "public parks were in their infancy as an institution during the late 19th Century." State Br. at 22. Accordingly, the State confines itself to primarily late-nineteenth century evidence—relying on *zero* evidence at the time of the Founding. Yet public parks or analogous spaces were hardly foreign to the Founding era. *See* Anne Beamish, *Before Parks: Landscapes in Seventeenth- and Eighteenth-Century Boston, New York, and Philadelphia*, 40 LANDSCAPE J. 1, 2 (2021) ("The public park we know today did not emerge as a fully formed unique idea. It did not spring from a vacuum. Some early public landscapes were hardworking utilitarian spaces, some had lush plantings, some charged a fee, but most were open to all and were places where residents experimented with leisure activities and socializing and where the demand for recreational spaces developed.").

The Court need not look far for public parks and analogous spaces in the Founding. Boston Common is considered "America's oldest park" and was established in 1634. Not only was it commonly used for militia purposes (making it *not* a gun-free zone), "[t]he Common also served as a site for informal socializing and recreation" including "[s]trolling," "[h]orse- and carriage-riding," "sports," "entertainment," and "raucous celebrations." Beamish*, supra*, at 4–6. Other New England towns and cities were similarly filled with greens and commons throughout the era. *See*, e.g., "Green," National Gallery of Art, available at https://bit.ly/3UM2Usk (collecting primary sources); *see also Antonyuk III*, 2022 WL16744700 at *65. In New York, City Hall Park began as a "public common" in the 17th century. *The Earliest New York City Parks*, NEW YORK CITY DEPT. OF PARKS AND RECREATION, available at https://on.nyc.gov/3hBZXfe (last visited Nov. 17, 2022). New York's Bowling Green Park was established "for the Recreation & Delight of the Inhabitants of [New York] City" in 1733. *Id.* In the South, Savannah was planned around public squares— open green spaces which became the landscaped parks that residents know today. *See* Turpin

Bannister, *Oglethorpe's Sources for the Savannah Plan*, 20 J. of Soc'y of Arch. Hist. 47, 48 (1961) (noting Savannah's squares started initially as "open, unplanted plazas" and were "remodel[ed] . . . around 1800 . . . into landscaped neighborhood parks").

Consistent with the fact that parks or analogous open green spaces existed around the Founding, some States enacted provisions addressing perceived issues with those open spaces and firearms. Yet these regulations evidently banned *discharge* of firearms, not mere carriage for self-defense. *See, e.g.,* THE PUBLIC LAWS OF THE STATE OF RHODE-ISLAND AND PROVIDENCE PLANTATIONS 568 (1798) ("That if any person shall fire any gun, musket, blunderbuss or pistol, loaded with a bullet or shot, in or across any road, street, *square* or lane, he shall, upon conviction as aforesaid, forfeit and pay as a fine a sum not less than three dollars . . ." (emphasis added)) (attached as Ex. 4); *Antonyuk III*,  2022 WL 16744700, at *65 n.107 (citing 1812 Del. Laws 329 (prohibiting the "fir[ing] or discharg[ing] [of] any gun ordnance, musket, fowling piece, fusee or pistol within or on *any of the greens*, streets, alleys or lanes of any of the towns and villages within this State …"). Analogously, New York City in 1763 prohibited the "Fire and discharge of any gun" by "any Children, Youth, apprentices, Servants, or other persons . . . at any mark, or at random against any fence, pales or other place in any street, lane or alley, or *within any orchard, garden* or other inclosure, or *in any place where persons frequent to walk*." *See* Supp. App'x of New York City, *NYSRPA v. New York*, No. 18-280 at SA6 (U.S. 2019), available at https://bit.ly/3TNf8Q4. The Colony of New York enacted a similar provision in 1769. *See* 5 LAWS OF THE COLONY OF NEW YORK 12 (1894) (attached as Ex. 5). It is evident that firearms would be carried in green spaces frequented by passersby during the Founding. The State's failure to bring forth any evidence that the Founding generation *banned such* firearms is dispositive proof that "the challenged regulation is inconsistent with the Second Amendment." *Bruen*, 142 S. Ct. at 2131;

*Antonyuk III*, WL 16744700, at *65 ("[O]mitted from the historical record thus far presented to the Court by the State Defendants (or discovered by the Court) are historical statutes (from the relevant period) banning the carrying of guns from older-named places such as 'commons' or 'greens.'"). Moreover, because there is evidence that civic leaders addressed potential effects of firearm carriage "through materially different means"—discharge restrictions—the "modern regulation is unconstitutional."[4] *Bruen*, 142 S. Ct. at 2131.

### ii.   The State's late nineteenth and twentieth century evidence is too late.

With no evidence showing a comparable restriction to the ban on carrying in public parks contemporaneous with the Founding, the State focuses on ordinances and park regulations from the latter-half of the nineteenth century and the twentieth century. This evidence comes too late. The Founding Era is the appropriate time period for this Court's historical analysis. *See generally* Mark W. Smith, *'Not all History is Created Equal': In the Post-Bruen World, the Critical Period for Historical Analogues Is when the Second  Amendment Was Ratified in 1791, and not 1868 (working draft)*, Oct. 1, 2022, *available at* https://bit.ly/3CMSKjw (lasted visited Nov. 16, 2022). This Court is bound by two lines of Supreme Court precedent, which mandate (1) that the scope of the Second Amendment with respect to the Federal Government is based on the public understanding in 1791, *see, e.g., District of Columbia v. Heller*, 554 U.S. 570, 634–35 (2008), and (2) that incorporated Bill of Rights provisions mean the same thing when applied to the States and the Federal Government, *see, e.g.*, *McDonald v. City of Chicago*, 561 U.S. 742, 765–66 (2010).

Amicus makes three arguments to the contrary. First, Amicus argues that *Bruen* left the appropriate time period "open." Amicus Br. of Everytown For Gun Safety in Opp. to Pls.' Mot.

---

[4] Of course, "[i]t is . . . implausible that" "general prohibition[s]" against discharging a firearm "would have been enforced against a citizen acting in self-defense." *District of Columbia v. Heller*, 554 U.S. 570, 631–33 (2008).

for Prelim. Inj., Doc. 45 at 5 (Nov. 12, 2022) ("Amicus Br."). But *Bruen* merely declined to "address" the issue because it did not make a difference for the outcome of the case. 142 S. Ct. at 2138. *Bruen* did not suggest that its precedent was equivocal on this point—it acknowledged that the Supreme Court had always "assumed that the scope of the protection [of the Bill of Rights] . . . is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791," and the only debate on the issue was a "scholarly" one. *Id*. at 2137–38. It may be that, with this language, the Supreme Court was signaling that parties in future cases should address the issue, but it was not overruling cases in which it had, dispositively, "look[ed] to the statutes and common law of the founding era to determine the norms that the [Bill of Rights] was meant to preserve." *Virginia v. Moore*, 553 U.S. 164, 168 (2008) (Fourth Amendment). This Court is bound by that precedent. *Agostini v. Felton*, 521 U.S. 203, 237 (1997). There is just one Second Amendment, and its meaning was established in 1791.

Second, Amicus cites several pre-*Bruen* circuit court decisions that treated 1868 as the relevant time period and argues that *Bruen* implicitly treated them as "good law." Amicus Br. at 4–5. But looking to circuit court decisions and their approaches after *Bruen* expressly abrogated the analytical approach of each of those decisions is questionable at best. And in fact, several of the circuit cases cited by *Bruen* do not actually favor 1868, but only state that courts should review relevant history from both periods. *See United States v. Greeno*, 679 F.3d 510, 518 (6th Cir. 2012); *Drummond v. Robinson Twp.*, 9 F.4th 217, 227 (3d Cir. 2021). It does not save Amicus' argument that *Bruen* stated that the "step one" analysis some circuits applied was "broadly consistent with *Heller*." 142 S. Ct. at 2127 (cited at Amicus Br. at 5). *Bruen*'s analysis (and binding precedent) is specifically inconsistent with treating 1868 as the key date when assessing the validity of a state law under the Second Amendment. What is more, the circuits were not uniform in their treatment

of 1868 as the crucial year, *see, e.g., Jones v. Bonta*, 34 F.4th 704, 714, 719–20 (9th Cir. 2022), and the Seventh Circuit was not even internally consistent on the point and stated in other opinions that 1791 was the key date, *see Moore v. Madigan*, 702 F.3d 933, 935 (7th Cir. 2012); *see also id.* at 943 (Williams, J., dissenting). *Bruen* therefore cannot be read to have established that circuit cases focusing on 1868 are "good law" on this point.

Third, Amicus argues that the sensitive place analysis *in particular* merits looking to 1868 because *Bruen*—in setting out examples of sensitive places—used the phrase in the "18th- *and 19*th-*century*." 142 S. Ct. at 2133 (emphasis added). But this singular clause of *Bruen* does not endorse ignoring the Founding altogether—as the State and Amicus propose here—instead, it confirms that the 18th century *is* relevant. And the *early* 19th-century is part of the Founding era. What is more, even if this clause were meant to bring in Reconstruction era history, it merely reaffirms, consistent with *Heller* and the rest of the discussion in *Bruen*, that evidence from Reconstruction can be relevant to the extent that it serves as "mere confirmation of what the Court thought *had already been* established." *Id.* at 2137 (emphasis added). Indeed, the amicus brief cited by *Bruen* in support of this proposition identified colonial and Founding-era limitations on carry in all three locations identified by *Bruen*—polling places, legislative assemblies, and courts. *See* Amicus Br. of The Independent Institute, *Bruen*, No. 20-843, at 11–14 (July 20, 2021). There is no similar Founding-era precedent for banning firearms in parks.

### iii.  The State's anachronistic evidence does not establish a tradition justifying its ban on carrying in all public parks.

Even if this Court were to consider the Reconstruction era relevant for purposes other than confirming Founding Era history, the State has hardly any evidence of a tradition by this time. Instead, the State has *three* Reconstruction-era (or earlier) regulations that prohibited simple carriage of firearms in parks. *See* Doc. 33-3, State Ex. 12 (1861 Central Park), State Ex. 13 (1869

10

Fairmont Park), State Ex. 38 (1876 Village of Hyde Park).[5] Such laws representing a tiny fraction of the United States cannot "constitute a tradition that was representative of the Nation." *Antonyuk III*, 2022 WL 16744700 at *67. The rest of the State's evidence comes from a handful of municipal regulations in the 1880s, several more from the 1890s, and a significant majority from the twentieth century. "[L]ate-19th-century evidence cannot provide much insight into the meaning of the Second Amendment when it contradicts earlier evidence" nor can "20th-century historical evidence" provide any insight. *Bruen*, 142 S. Ct. at 2154 & n.28.[6]

Even putting aside the "temporal distance," *id*., the State's anachronistic evidence is insufficient. In *Bruen*, the Supreme Court instructed courts to evaluate alleged analogues based on two metrics: *how* the historical regulations they rely on burdened the right to bear arms and *why* they did so. *Bruen*, 142 S. Ct. at 2133. The State's analogues fail both tests. First, the State has not identified a *single* statewide prohibition on carrying in all parks of all kinds in all parts of a state from *any* relevant time period.[7] *See Bridgeville Rifle & Pistol Club v. Small, Ltd.*, 176 A.3d 632, 654 (Del. 2017) (holding under Delaware's analogue to the Second Amendment that State's ban of firearms in all public parks, which totaled 23,000 acres, did "not just infringe—but destroy[ed]—the core . . . right of self-defense for ordinary citizens"). Instead, the State has only identified geographically limited restrictions from city governments. The burden imposed by the

---

[5] The legislation mandating the Central Park and Fairmont Park regulations should not be double counted. *See* Doc. 33-3, State Ex. 36 (Central Park), State Ex. 37 (Fairmont Park).

[6] The Census in 1900 estimated that there were 10,602 incorporated cities, towns, villages, and boroughs in the United States. Census Bulletin No. 65, U.S. Census Bureau (June 8, 1901), available at https://bit.ly/3GkuFnm. A tradition of firearm regulation based on municipal regulation from the 1890s and 1900s should not be established by reference to less than 1% of such governments.

[7] Today, only one other state bans guns in all "public parks" statewide, *see* 430 ILCS 66/65, while only seven others ban firearms in state parks/forests. Conn. Agencies Regs. § 23-4-1(c); Haw. Code R. § 13-146-19(a); Md. Code Regs. 08.07.06.04; N.J. Admin. Code § 7:2-2.17(b); 250 R.I. Code R. § 100-00-1.17; Cal. Code Regs. tit. 14, § 4313; 17 Pa. Admin. Code § 11.215.

State's current statewide ban is thus "unreasonably disproportionate to that of its historical analogues." *Antonyuk III*, 2022 WL 16744700, at *67. Second, *why* these restrictions appear to have been enacted does not accord with the State's ban here. For example, there is at least some evidence that parks, such as New York's Central Park and Philadelphia's Fairmount Park, were intended to have controlled entry and exit points. *See* Doc. 33-3, State Ex. 12 at 3 ("All persons are forbidden—To enter or leave the Park except by the gateways."); *Id.*, State Ex. 13 at 11 ("No person shall enter or leave the Park except by such gates or avenues as may be for such purpose arranged."). As for the National Parks regulations that Respondents point to, *all but two* appear in functionally identical regulations relating to hunting or wildlife protection.[8] In a quintessential demonstration of just how different the State's current park ban is: unlike its National Park analogues, S51001 *does not* even apply to hunters or hunting but does apply to self-defense carry.

### B. Public Transportation.

The State does not attempt to identify firearm restrictions on analogous modes of public transportation available at the Founding, such as stagecoaches and ferries. This is telling because arms were carried on both forms of transportation. For example, South Carolina established a "public ferry" as early as 1725 and mandated "free" "ferriage" for "all persons under arms in times of alarms and expresses." 9 STATUTES AT LARGE OF SOUTH CAROLINA 61 (1841) (attached as Ex. 6). And arms, such as blunderbusses, were carried on stagecoaches. *See* Johnson, et al., SECOND AMENDMENT: REGULATION, RIGHTS, AND POLICY 2195 (3d ed. 2021) ("Stagecoach guards and travelers carried blunderbusses, or other short guns, such as traveling or coaching carbines, or

---

[8] *See* Doc. 33-3, State Ex. 34. While the regulations governing National Monuments in 1910 stated "No Firearms are allowed," this was replaced with a hunting prohibition by 1930. *See* State Ex. 34 at 283. In 1934, the National Park Service explicitly banned firearms in a separate section from "hunting" or "wildlife protection" for the first time.

(most often) a pair of ordinary pistols."). But the State provides not a single comparable restriction to the ban on carrying in public transportation anywhere in what would become the United States by the time of the Second Amendment's ratification. As explained above, this is dispositive evidence that the ban is unconstitutional. *Supra*, Part I.A.

Even if public transportation is considered by this Court to be without precedent at the Founding, the State's ban still fails under the two metrics that *Bruen* instructs this Court to consider when evaluating alleged historical analogues: how the ban burdens Plaintiffs' rights and why. The public transportation ban is particularly burdensome because it "strips people of the ability to have a gun present for self-defense" not just while traveling on public transportation "but also on the way to and from" public transportation. Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical Framework and A Research Agenda*, 56 UCLA L. REV. 1443, 1525 (2009). The State's ban effectively bars carrying before the journey, while on the journey, and after the journey. The State identifies not a single restriction that accomplishes such a continuing burden on the right to carry. *See Antonyuk III*, 2022 WL16744700 at *66 n.109 (collecting statutes enabling the carrying of firearms while journeying). Further, the State's focus on regulations employed by *private* railroad firms is beside the point. Plaintiffs challenge the *State*'s regulations, not what private operators of modes of transportation can do. In all events, without conceding that the burden imposed by the State's analogues would even be constitutional or represents any sort of tradition, the identified burden is certainly different than that imposed by the current State ban. After all, the *single* regulation cited by the State prohibited bringing firearms "*into the cars*," State Br. at 38, but did not apply to baggage. At the time, "it [was] not unusual" for pistols "to be carried in the trunks of travelers." *Woods v. Devin*, 13 Ill. 746, 751 (1852) (steamboats); *see also Davis v. Michigan S. & N. I. R. Co.*, 22 Ill. 278 (1859) (railroads).

13

The State devotes most of its attention to attempting to address the "why" prong. These motley points are without merit. First, the State says it can ban firearms simply because it *owns* public transportation. This proves too much—governments own sidewalks and streets too, but they cannot simply ban firearms there. *See Bruen*, 142 S. Ct. at 2135. That is because what is relevant is not the mere fact of government ownership. Instead, *Bruen* gave specific examples of *types* of government buildings where firearms could be prohibited: "legislative assemblies, polling places, and courthouses." By "analogies to *those* historical regulations," the State can potentially justify new sensitive places. *Id.* at 2133 (emphasis added). What is relevant about those places is the long tradition of the government providing comprehensive security, *see e.g.* THE PUBLIC LAWS OF THE STATE OF SOUTH CAROLINA 271 (Grimke, ed. 1790) ("The said sheriffs shall by themselves, or their lawful deputies respectively, attend all the courts hereby appointed, or directed to be held, within their respective districts.") (attached as Ex. 7); *see also* Ex. 11–30, and the fact each place historically "concentrate[s] adversarial conflict" as part of democratic governance or reflects locations where government officials are "at acute personal risk of being targets of assassination." David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine: Locational Limits on the Right to Bear Arms*, 13 CHARLESTON L. REV. 205, 290 (2018); *see also Hardaway*, 2022 WL 16646220, at *14. While the degree to which such characteristics apply to government-owned property will vary, *none* of the above apply to government-owned light rail stations in greater Buffalo. No democratic functions of government occur there, and these are not "typically secured locations" where a uniform lack of firearms is assured by government security. *Hardaway*, 2022 WL 1664620, at *14.

Second, the State makes two additional arguments relating to the ridership of public transportation, purportedly justifying the ban based on the high-density of congregating

individuals and the fact that public transportation plays an "integral role in the education system." State Br. at 32. *Bruen* squarely rejected the former: "expanding the category of 'sensitive places' simply to all places of public congregation that are not isolated from law enforcement defines the category of 'sensitive places' far too broadly." And the latter argument would only be relevant to the extent the public transportation ban was limited to school buses or the like. *See Antonyuk III*, 2022 WL 16744700 at *70. But S51001 deals with educational restrictions separately.

### C.  Places Presumptively Open to the Public.

S51001 establishes a novel default rule that presumptively bans the carrying of firearms on all private property in the State, except for when the property owner provides conspicuous signage or explicit permission. Plaintiffs only challenge this provision to the extent it applies to locations generally open to members of the public. Moreover, Plaintiffs do not challenge the ability of private property owners to *independently* determine that they will bar invitees from carrying firearms. Instead, Plaintiffs challenge the extent to which the State presumes to make the property owner's decision for them and place a definitive thumb on the scale against the exercise of constitutional rights on all property open to the public throughout the State.

The Second Amendment establishes *the* presumption with respect to public carry: a "right to 'bear' arms in public for self-defense." *Bruen*, 142 S. Ct. at 2135. This protection of public carry ensures that "certain policy choices," such as the State's new presumption, have been definitively taken "off the table." *Heller*, 554 U.S. at 636. The State argues that its novel default rule has historical analogues dating to before the Founding and Reconstruction. But none of these impose an analogous burden, nor were they motivated by a desire to impose a blanket default ban on carrying firearms in property open to the public. First, the 1715 Maryland statute applied only to those that had been "convicted" of crimes, were of "evil fame" or a "dissolute liver." It was not a

broad prohibition on ordinary, *law-abiding* citizens. Second, "six of these eight laws appear to be what are called 'anti-poaching laws,' aimed at preventing hunters . . . from taking game off of other people's lands (usually enclosed)." *Antonyuk III*, 2022 WL 16744700, at \*79. Moreover, other laws from the Founding show that if there *was* a tradition at the time of carry restrictions on private land, these were *limited* to hunting. *See, e.g.,* THE PUBLIC LAWS OF SOUTH CAROLINA, *supra*, at 276 (Ex. 7); *see also* ACTS AND LAWS OF THE STATE OF CONNECTICUT 37 (1784) (attached as Ex. 8); "Hunting," A MANUAL OF THE LAWS OF NORTH CAROLINA 234–236 (1814) (attached as Ex. 9); DIGEST OF THE LAWS OF GEORGIA 428 (1800) (attached as Ex. 10). And at least one law established that property owners had to post signage *banning* hunting for the hunting restriction to apply, *see* A MANUAL OF THE LAWS OF NORTH CAROLINA, *supra*, at 236 (Ex. 9), which is the exact opposite of New York's rule.

"Simply stated, the need to restrict fowling-piece-wielding poachers on fenced-in farms in 18th and 19th century America appears of little comparable analogousness to the need to restrict law-abiding responsible license holders in establishments that are open for business to the public today." *Antonyuk III*, 2022 WL 16744700, at \*80.

## III. Plaintiffs Have Demonstrated Irreparable Harm and the Public Interest.

Plaintiffs have demonstrated both irreparable harm and the public interest because Plaintiffs are "forced to give up their rights to armed self-defense outside the home, being left to the mercy of opportunistic, lawless individuals who might prey on them." *Hardaway*, 2022 WL 16646220 at \*17 & n.23. By enjoining the Ban, the public interest is served by vindicating Plaintiffs' constitutional rights.

## CONCLUSION

The Court should preliminarily enjoin Defendants from enforcing the Carry Provisions.

16

Respectfully submitted, this 18th day of November 2022.

Nicolas J. Rotsko

PHILLIPS LYTLE LLP

One Canalside

125 Main Street

Buffalo, NY 14203-2887

(716) 847-5467

(716) 852-6100 (fax)

NRotsko@phillipslytle.com

/s/ David H. Thompson

David H. Thompson*

Peter A. Patterson*

John W. Tienken*

COOPER & KIRK, PLLC

1523 New Hampshire Avenue, N.W.

Washington, D.C. 20036

(202) 220-9600

(202) 220-9601 (fax)

dthompson@cooperkirk.com

ppatterson@cooperkirk.com

jtienken@cooperkirk.com

*Admitted *pro hac vice*

17

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify I filed the foregoing with the Clerk of the District Court using its CM/ECF system on this 18th day of November 2022.

<u>/s/ David H. Thompson</u>
David H. Thompson