UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

BRETT CHRISTIAN,
FIREARMS POLICY COALITION,
INC., and
SECOND AMENDMENT
FOUNDATION,                                           22-CV-695 (JLS)

       Plaintiffs,

   v.

STEVEN A. NIGRELLI, and
JOHN J. FLYNN,

       Defendants.

---

## DECISION AND ORDER
## (PRELIMINARY INJUNCTION)

Another one of New York's new restrictions imposed in the immediate
aftermath of the Supreme Court's *Bruen* decision is the private property exclusion.
That new provision makes it a felony for a license holder to possess a firearm on *all
private property*, unless the relevant property holders actually permit such
possession with a sign or by express consent.

The Supreme Court's cases addressing the individual's right to keep and bear
arms—from *Heller* and *McDonald* to its June 2022 decision in *Bruen*—dictate that
New York's private property exclusion is equally unconstitutional. Regulation in
this area is permissible *only if* the government demonstrates that the current
enactment is consistent with the Nation's historical tradition of sufficiently
analogous regulations. As set forth below, New York fails that test.

Property owners indeed have the right to exclude.  But *the state* may not unilaterally exercise that right and, thereby, interfere with the Second Amendment rights of law-abiding citizens who seek to carry for self-defense outside of their own homes.  Thus, the motion for a preliminary injunction enjoining Defendants' enforcement of this private property exclusion is granted.[1]

## BACKGROUND

Brett Christian filed this lawsuit on September 13, 2022, joined by institutional plaintiffs, Firearms Policy Coalition, Inc. ("FPC"), and Second Amendment Foundation ("SAF").  Dkt. 1.  Plaintiffs allege claims against two Defendants in their official capacities, namely, the superintendent of the New York State Police, and the Erie County District Attorney.  *See id.*

Christian, who is licensed under New York law to carry a concealed firearm, "desires to carry his firearm for self-defense purposes when going about his day-to-day life." *Id.* at 26.[2]  He alleges that he "will be unable to carry his firearm on his person throughout the State because of the State's designation of private property." *Id.*  The private property exclusion "effectively prevents" him "from going about his daily life in the state of New York while lawfully carrying his firearm for purposes

---

[1] Plaintiffs' motion and the parties' briefs also separately address two additional restrictions on carry, namely, in public parks and on public transportation.  The Court has requested further briefing on the irreparable harm issue as to those locations.  These parts of Plaintiff's motion will be addressed in a subsequent decision.

[2] Unless noted otherwise, page references refer to the number in the footer of each page of the document.

of self-defense." *Id.* at 27.  He seeks declaratory judgment and injunctive relief.  *Id.*

at 30-31.

The relevant portion of the new statute adds to the Penal Law, as relevant

here:

> § 265.01-d  Criminal possession of a weapon in a restricted location.
> 1. A person is guilty of criminal possession of a weapon in a restricted
> location when such person possesses a firearm, rifle, or shotgun and
> enters into or remains on or in private property where such person
> knows or reasonably should know that the owner or lessee of such
> property has not permitted such possession by clear and conspicuous
> signage indicating that the carrying of firearms, rifles, or shotguns on
> their property is permitted or has otherwise given express consent. . . .[3]

Plaintiffs[4] moved for a preliminary injunction seeking to enjoin Defendants

from enforcing this private property exclusion.[5]  *See* Dkt. 19.

---

[3] Section § 265.01-d(2) provides that this restriction does not apply to, among
others, persons who are "lawfully engaged in hunting activity," persons who are
"police officers" as defined in the criminal procedure law, persons who are
"designated peace officers," as well as "security guards" and "active-duty military
personnel."

[4] FPC and SAF recognize that it is "the law of this Circuit that an organization does
not have standing to assert the rights of its members in a case brought under 42
U.S.C. § 1983." Dkt. 1, ¶ 14 (quoting *Nnebe v. Daus*, 644 F.3d 147, 156 (2d Cir.
2011)).  SPC and SAF "contend that this circuit precedent is erroneous and should
be overruled by a court competent to do so." Dkt. 1, ¶ 14.  As such, this Decision
and Order does not address those Plaintiffs and will only focus on Plaintiff
Christian.

[5] Christian challenges this provision with respect to private property "open to the
public." Dkt. 19-1, at 8.  Judge Suddaby's Preliminary Injunction was not so
limited. *See Antonyuk v. Hochul*, No. 22-CV-986, 2022 WL 16744700, at *85-86
(N.D.N.Y. Nov. 7, 2022).  The State's argument is not so limited and, indeed, cites
enactments addressing private property not open to the public.  And the analysis
below, driven by the Constitution and caselaw, is not so limited.  The relief here

Christian, who resides in Cheektowaga, New York, states that he is "currently licensed to carry a handgun pursuant to New York law with a license issued by Erie County." Dkt. 19-4, ¶¶ 1, 4. Prior to the enactment of the private property exclusion, Christian "would typically bring [his] firearm with [him] on private property open to the public, including weekly visits to gas stations and monthly visits to hardware stores." *Id.* ¶ 10. He "intended to continue to do so, but for the enactment and enforcement" of the private property exclusion. *Id.* Throughout Christian's community, "establishments that are open to the public and in which [he] previously carried a firearm" have "failed to post conspicuous signage consenting to the carrying of firearms." *Id.* But for the enactment of the private property exclusion, Christian "would continue to carry a firearm in establishments such as these that neither prohibit the carrying of firearms nor post signage consenting to the carrying of firearms." *Id.*

The private property exclusion has "particularly burdened" Christian "when driving or running errands." *Id.* ¶ 11. When he is driving, he is "unable to take any bathroom breaks," pick up food, or purchase gas while carrying his firearm. *Id.* He must "disable and store" his firearm before driving or walking into the parking lot, which means that, sometimes, he must "stop carrying for self-defense before" he "can get physically close enough to see if any 'clear and conspicuous signage' exists." *Id.* By having to "constantly disarm" in order to comply with the private property

---

must, however, be limited to what Christian has requested in his motion.

restriction, Christian is "left without the ability to defend" himself and is "suffering diminished personal safety on a frequent and ongoing basis." *Id.* ¶ 12.  He testified at his deposition consistently with these points.  *See* Dkt. 47-1.

The Court received submissions from the parties.[6]  The Court then held a hearing.[7]

---

[6] On October 18, 2022, Defendant Flynn submitted an affidavit in response where he stated that he "leave[s] to the State-related co-defendant the defense of the said legislation from the plaintiffs' said challenge."  Dkt. 28.  On November 4, 2022, Defendant Steven A. Nigrelli submitted a Memorandum in Opposition to Plaintiffs' Motion for a Preliminary Injunction (Dkt. 33), which attached a Declaration of Ryan L. Belka, Esq. (Dkt. 33-1), a Declaration of Dr. Brennan Rivas, PhD (Dkt. 35-2), and a Declaration of David J. State, Esq. (Dkt. 35-3).  With the Court's permission, Everytown for Gun Safety filed an *amicus curiae* brief in opposition to Plaintiffs' request for a preliminary injunction.  Dkt. 45.  Plaintiff filed a reply on November 18, 2022, Dkt. 46, and the State filed a sur-reply on November 21, 2022.  Dkt. 47. As stated by the Court in *Bruen*, "[t]he job of judges is not to resolve historical questions in the abstract; it is to resolve *legal* questions presented in particular cases or controversies.  That 'legal inquiry is a refined subset' of a broader 'historical inquiry,' and it relies on 'various evidentiary principles and default rules' to resolve uncertainties.  For example, '[i]n our adversarial system of adjudication, we follow the principle of party presentation.'  Courts are thus entitled to decide a case based on the historical record compiled by the parties."  *New York State Rifle & Pistol Assoc., Inc. v. Bruen*, __ U.S. __, 142 S.Ct. 2111, 2130n.6 (2022) (emphasis in original) (citations omitted).  The historical record itself, and not expert arguments or opinions, informs the analysis.

[7] The State requested "pre-hearing discovery and a preliminary injunction evidentiary hearing that allowed for cross-examination on the issue of standing." *See* Dkt. 33, at 9n.4.  The State deposed Christian and the parties submitted the transcript.  *See* Dkt. 47-1.  In anticipation of the deposition, the parties advised the Court that live testimony would be unnecessary.  *See* Dkt. 40.

# ANALYSIS

## I.   STANDING

The State[8] maintains that Christian lacks standing.  Dkt. 33, at 8-10.[9]  It argues that he has identified "unspecified" gas stations, hardware stores, and locations to take bathroom breaks, pick up food, or purchase gas—which, without more, "cannot demonstrate any activity or location that is clearly encompassed" by the statute.  *Id.* at 10.  The State further argues that Christian "presents no evidence" that these locations "have not already determined to prevent (or allow) concealed carry on their property."  *Id.*  Christian has standing here.

Standing relates to a court's constitutional power to hear and decide a case and, therefore, implicates subject-matter jurisdiction.  *See Spokeo, Inc. v. Robins,* 578 U.S. 330, 338 (2016).  To establish standing, "a plaintiff must show (1) an 'injury in fact,' (2) a sufficient 'causal connection between the injury and the conduct complained of,' and (3) a 'likel[ihood]' that the injury 'will be redressed by a favorable decision.'"  *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157 (2014) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)).

Only the first element of the test, *i.e.*, whether the Christian has suffered an injury-in-fact, bears discussion here (though all elements are met).  An injury-in-fact exists where a plaintiff "suffered 'an invasion of a legally protected interest'

---

[8] "The State" and the State Defendant Nigrelli are used here interchangeably, as the Attorney General's submissions functionally has as well.  *See* Dkt. 33, 47.

[9] Regarding the institutional Plaintiffs, *see* footnote 4 above.

that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo,* 578 U.S. at 336 (quoting *Lujan,* 504 U.S. at 555).  A particularized injury "affect[s] the plaintiff in a personal and individual way." *Id.* (internal quotations and citation omitted).  To be sure, the plaintiff's injury must be direct, and a plaintiff "may not raise the rights of a third-party. . . ." *See N.Y. State Nat'l Org. for Women v. Terry*, 886 F.2d 1339, 1347 (2d Cir. 1989).

Pre-enforcement challenges to criminal statutes are "cognizable under Article III." *Cayuga Nation v. Tanner*, 824 F.3d 321, 331 (2d Cir. 2016).  The Supreme Court has made it clear that a plaintiff suffers an injury-in-fact sufficient to establish standing when he or she faces "threatened enforcement of a law" that is "sufficiently imminent." *Susan B. Anthony List*, 573 U.S. at 158-59.  When challenging a law prior to its enforcement, "a plaintiff satisfies the injury-in-fact requirement where he alleges 'an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder.'" *Id.* (quoting *Babbitt v. United Farm Workers Nat. Union*, 442 U.S. 289, 297 (1979)).

A plaintiff need not first "expose himself to liability before bringing suit to challenge the basis for the threat—for example, the constitutionality of a law threatened to be enforced." *Knife Rts., Inc. v. Vance*, 802 F.3d 377, 384 (2d Cir. 2015) (quoting *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128–29 (2007)). *See also Steffel v. Thompson*, 415 U.S. 452, 459 (1974) ("[I]t is not necessary that [the plaintiff] first expose himself to actual arrest or prosecution to be entitled to

challenge [the] statute that he claims deters the exercise of his constitutional rights.").

The identification of a credible threat sufficient to satisfy the imminence requirement of injury in fact "necessarily depends on the particular circumstances at issue." *Picard v. Magliano*, 42 F.4th 89, 98 (2d Cir. 2022) (quoting *Cayuga Nation*, 824 F.3d at 331)).  Indeed, the standard articulated by the Supreme Court "'sets a low threshold and is quite forgiving to plaintiffs seeking such pre[-]enforcement review,' as courts are generally 'willing to presume that the government will enforce the law as long as the relevant statute is recent and not moribund.'" *Picard*, 42 F.4th 89 (quoting *Cayuga Nation*, 824 F.3d at 331).

Christian has established that he suffered an injury-in-fact.  He states that he would "typically bring [his] firearm with [him] on private property open to the public." Dkt. 19-4, ¶ 10.  He "intended to continue to do so, but for the enactment and enforcement" of the restriction.  *Id.*  Christian also would have also continued "to carry a firearm in establishments" that "neither prohibit the carrying of firearms nor post signage consenting to the carry of firearms" but for the restriction.  *Id.*  His activities and behavior have been impacted.

Moreover, New York Governor Kathy Hochul explained, in a July 1, 2022, press statement, that individuals "who carry concealed weapons in sensitive locations . . . will face criminal penalties." *See* NEW YORK GOV.'S PRESS OFFICE, *Governor Hochul Signs Landmark Legislation to Strengthen Gun Laws and Bolster Restrictions on Concealed Carry Weapons in Response to Reckless Supreme Court*

*Decision*, July 1, 2022, available at https://on.ny.gov/3nXWrvA (last visited Nov. 22,

2022).  On the eve of the law's enactment, Hochul criticized the Supreme Court's

decision in *Bruen* as an attempt to "strip away the rights of a governor to protect

her citizens from gun violence."  BUFFALO NEWS, *Hochul: Last-Minute Pistol Permit*

*Seekers May be too Late to Avoid NY's New Gun Requirements*, Aug 31, 2022

updated Oct 9, 2022, available at https://buffalonews.com/news/local/crime-and-

courts/hochul-last-minute-pistol-permit-seekers-may-be-too-late-to-avoid-nys-new-

gun/article_ad5100a0-2943-11ed-af06-cbe41e631955.html (last visited Nov. 22,

2022).

     In addition, First Deputy State Police Superintendent Steven Nigrelli (now

Acting Superintendent and the substituted Defendant) warned that, if "you violate

this law, you will be arrested.  Simple as that."  *See Antonyuk v. Hochul*, No. 22-CV-

0986, 2022 WL 4367410, at ¶ 9 n.1 (N.D.N.Y. Sept. 20, 2022) (quoting statement by

First Deputy Superintendent of the State Police Steven Nigrelli, "Governor Hochul

Delivers a Press Conference on Gun Violence Prevention,"

https://www.youtube.com/watch?v=gC1L2rrztQs at 37:40)).  Nigrelli explained that,

in New York State, troopers "are standing ready" to ensure that "all laws are

enforced."  *Id.*  He emphasized that the troopers will have "zero tolerance," and it is

an "easy message" that he does not need to "spell it out more than this."  *Id.*

     These public statements show that New York residents—including

Christian—face "threatened enforcement of a law" that is "sufficiently imminent."

*Susan B. Anthony List*, 573 U.S. at 158-59.  *See also Cayuga Nation*, 824 F.3d at

331 (credible threat of prosecution exists when Defendant has "announced its intention to enforce the [law] against the [plaintiff]"). Further, given the recency of the law—and lack of any indication that it will be repealed—the Court is and should be "willing to presume that the government will enforce" it. *See Picard*, 42 F.4th 89 (quoting *Cayuga Nation*, 824 F.3d at 331). Nothing in the State's sur-reply is to the contrary. On these facts, Christian has standing.[10]

## II.   PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

### A.   Preliminary Injunction Standard

Generally, a party seeking preliminary injunctive relief "must show (1) irreparable harm; (2) either a likelihood of success on the merits or both serious questions on the merits and a balance of hardships decidedly favoring the moving party; and (3) that a preliminary injunction is in the public interest." *N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*, 883 F.3d 32, 37 (2d Cir. 2018). Where, like here, the preliminary injunction "would stay government action taken in the public interest pursuant to a statutory or regulatory scheme," the moving party "must satisfy the more rigorous prong of 'likelihood of success'" at step two. *Bronx Household of Faith v. Bd. of Educ. of City of N.Y.*, 331 F.3d 342, 349 (2d Cir. 2003).

The standard may be further heightened if "(i) an injunction would alter, rather than maintain, the status quo, or (ii) an injunction will provide the movant with substantially all the relief sought and that relief cannot be undone even if the

---

[10] Judge Suddaby reached a similar conclusion in *Antonyuk*, 2022 WL 16744700, at *38-39.

defendant prevails at a trial on the merits." *Tom Doherty Assocs., Inc. v. Saban Ent., Inc.*, 60 F.3d 27, 33-34 (2d Cir. 1995). If either scenario applies, a plaintiff must show "a clear or substantial likelihood of success on the merits" at step two. *See N. Am. Soccer League*, 883 F.3d at 37 (internal quotations and citation omitted); *Tom Doherty Assocs.*, 60 F.3d at 35.

When deciding whether an injunction is mandatory and would alter the status quo, the status quo is "the last actual, peaceable uncontested status which preceded the pending controversy." *N. Am. Soccer League*, 883 F.3d at 37 (quoting *Mastrio v. Sebelius*, 768 F.3d 116, 120 (2d Cir. 2014) (per curiam)) (internal quotations omitted). The court also considers whether the injunction would "command[] some positive act"—rather than prohibit some act—by the defendant. *Mastrovincenzo v. City of New York*, 435 F.3d 78, 89 (2d Cir. 2006) (quoting *Tom Doherty Assocs.*, 60 F.3d at 34). An injunction that enjoins a defendant from enforcing a regulation "clearly prohibits, rather than compels, government action by enjoining the future enforcement." *Id.* at 90.

Moreover, the heightened standard does not apply to "any [request for an] injunction where the final relief for the plaintiff would simply be a continuation of the preliminary relief." *Tom Doherty Assocs.*, 60 F.3d at 34. Instead, the heightened standard applies when the injunction "will render a trial on the merits largely or partly meaningless, either because of temporal concerns"—like a case involving a live, televised event scheduled for the day the court granted preliminary relief—"or because of the nature of the subject of the litigation"—like a case

involving disclosure of confidential information. *Id.* at 35.  If a preliminary injunction "will make it difficult or impossible to render a meaningful remedy to a defendant who prevails on the merits at trial," then the heightened standard applies; "[o]therwise, there is no reason to impose a higher standard." *Id.*

In this case, Christian requests that this Court "vindicate that the Second Amendment is not a 'second-class right' by preliminarily enjoining enforcement" of the private property exclusion.  Dkt. 19-1, at 24.  This request seeks to prohibit Defendants from enforcing the new private property exclusion; it does not seek an order requiring Defendants to act.  In other words, Christian seeks to restore the status that existed before implementation of the private property exclusion.  He therefore seeks a prohibitory—not a mandatory—injunction.  As stated in *Hardaway*, the Constitution and the Bill of Rights represent the status quo—not 2022 legislation on the books for a few months.[11]  *See Hardaway v. Nigrelli*, No. 22-CV-771, 2022 WL 16646220, at *6 (W.D.N.Y. Nov. 3, 2022).

And relief remains available to Defendants if they prevail at trial on the merits.  If Defendants prevail, the Court could vacate any injunctive relief and allow them again to enforce the private property exclusion.

Thus, the standard remains that Christian must demonstrate: (1) irreparable harm; (2) a likelihood of success on the merits; and (3) that a preliminary injunction

---

[11] The Court recognizes that courts should not lightly enjoin enforcement of laws. The law at issue here, however, is at odds with higher law, namely—the Constitution.  The Court notes here too that Christian would meet the heightened standard in any event—even if it applied.

is in the public interest.  *See N. Am. Soccer League,* 883 F.3d at 37; *Bronx Household of Faith,* 331 F.3d at 349.

### B.    Likelihood of Success on the Merits

Christian is likely to succeed on the merits of his Second and Fourteenth Amendment claims.  As set forth below, on this historical record, New York's new private property exclusion violates the right of individuals to keep and bear arms for self-defense outside of their homes.

That right was enshrined in the Second Amendment to the Constitution, ratified in 1791: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."  U.S. Const. amend. II.  And on three recent occasions, the Supreme Court explored this right and supplied the framework that resolves this issue on this motion.  A thorough understanding of the Supreme Court's *Heller, McDonald,* and *Bruen* opinions is essential.  This Court discussed them at length in *Hardaway,* 2022 WL 16646220, at *7-14.

Most relevant here, *Bruen* held that the Second and Fourteenth Amendments "protect an individual's right to carry a handgun for self-defense *outside the home.*"  *Bruen,* 142 S.Ct. at 2122 (emphasis added).  Most gun owners "do not wear a holstered pistol at their hip in their bedroom or while sitting at the dinner table.  Although individuals often 'keep' firearms in their home, at the ready for self-defense, most do not 'bear' (*i.e.,* carry) them in the home beyond moments of actual

confrontation.  To confine the right to 'bear' arms to the home would nullify half of the Second Amendment's operative protections."  *Bruen*, 142 S.Ct. at 2134-35.

The Court continued, "[m]oreover, confining the right to 'bear' arms to the home would make little sense given that self-defense is 'the *central component* of the [Second Amendment] right itself.'"  *Id.* (quoting *District of Columbia v. Heller*, 554 U.S. 570, 599 (2008)).  *See also McDonald*, 561 U.S. at 767, 130 S.Ct. 3020.  After all, "the Second Amendment guarantees an 'individual right to possess and carry weapons in case of confrontation,' *Heller*, 554 U.S. at 592, 128 S.Ct. 2783, and confrontation can surely take place outside the home."  *Id.* at 2135.  *"Many Americans hazard greater danger outside the home than in it.  The text of the Second Amendment reflects that reality*.  The Second Amendment's plain text thus presumptively guarantees petitioners Koch and Nash a right to bear arms in public for self-defense."  *Id.* (citation omitted) (emphasis added).[12]

---

[12] *Bruen's* articulation of "in public" is not a limitation.  While *Heller* and *McDonald* were limited to the home, *Bruen* then addressed the right *outside of the home*.  The Court did not indicate that the right ceased at the property line of others.  *See, e.g., Bruen*, at 2135, 2157 ("outside the home"); *see also Heller,* 554 U.S. at 594 ("the right . . . was by the time of the founding understood to be an individual right protecting against both public and private violence.").  As stated in Justice Alito's concurrence in *Bruen*, "because many people face a serious risk of lethal violence when they venture outside their homes, the Second Amendment was understood at the time of adoption to apply under those circumstances . . . .  [As such,] a State may not enforce a law . . . that effectively prevents its law-abiding residents from carrying a gun for this purpose."  *Bruen*, 142 S.Ct. at 2157 (Alito, J., concurring).  The same is true in this case.

In this case, tracking *Bruen,* Christian is an ordinary, law-abiding citizen to whom the Second Amendment applies. *Id.* at 2134. As it did for the petitioners in *Bruen,* the Second Amendment's plain text thus presumptively guarantees Christian's right to "bear" arms for self-defense on private property outside of his own home.

*Bruen* also set forth the relevant test: "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, *the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation.* Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command." *Id.* at 2126 (citation and internal quotation omitted) (emphasis added). In other words, "the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* at 2127.

The State argues that its private property exclusion complies with *Bruen.* It cites to a few colonial and reconstruction-era enactments (Maryland in 1715, Pennsylvania in 1721, New Jersey in 1722, New York in 1763, New Jersey in 1771, Louisiana in 1865, Texas in 1866, and Oregon in 1893). Dkt. 33, at 16-18. They do not carry the State's burden, as explained at length in *Antonyuk*, 2022 WL

15

16744700, at *79-81.[13]  To Judge Suddaby's discussion of this issue in *Antonyuk*,

this Court adds a few additional points.

---

[13]     The three additional late-nineteenth century enactments cited in paragraphs
18, 20, and 22 of the Belka declaration (Dkt. 33-1) were not expressly addressed in
*Antonyuk*.  They are not generalized private property enactments, but are
enactments focused on large gatherings like fairs, assemblies, and social gatherings.
They are adequately addressed by the thrust of Judge Suddaby's analysis of the
State's cited enactments.  And they vastly post-date the Second Amendment.
     It bears consideration of what a court might do if it were addressing an
1880s-era enactment in real time—in the 1880s.  The court would be expected to
ascertain the meaning of the right codified in the Second Amendment.  It would not
be impressed by 1880s-era laws in effect in neighboring jurisdictions that
*contravened* the earlier public understanding of the right.
     In fact, *Bruen* noted that, "when it comes to interpreting the Constitution, not
all history is created equal.  'Constitutional rights are enshrined with the scope they
were understood to have *when the people adopted them*.'"  *Bruen*, 142 S.Ct. at 2136
(citing *Heller*, emphasis in original).  Courts "must also guard against giving
postenactment history more weight than it can rightly bear."  *Id.* at 2136.  In other
words, *Bruen* recognized that, "where a governmental practice has been open,
widespread, and unchallenged since the early days of the Republic, the practice
should guide our interpretation of an ambiguous constitutional provision."  *Id.* at
2137 (internal citation omitted).  And "to the extent later history contradicts what
the text says, the text controls."  *Id.*
     Indeed, "post-ratification adoption or acceptance of laws that are *inconsistent*
with the original meaning of the constitutional text obviously cannot overcome or
alter that text."  *Id.* (internal citation omitted).  Because "post-Civil War discussions
of the right to keep and bear arms 'took place 75 years after the ratification of the
Second Amendment, they do not provide as much insight into its original meaning
as earlier sources.'"  *Id.*  And although it is the Fourteenth Amendment that
requires New York to respect the right addressed by the Second Amendment, the
Court has "made clear that "individual rights enumerated in the Bill of Rights and
made applicable against the States through the Fourteenth Amendment have the
same scope as against the Federal Government."  *Id.*  The Court has "generally
assumed that the scope of the protection applicable to the Federal Government and
States is pegged to the public understanding of the right when the Bill of Rights
was adopted in 1791."  *Id.*  If this were not the case, the Second Amendment could
mean one thing *vis a vis* federal laws, and entirely something else *vis a vis* state
and local laws.
     Moreover, as the Court surveyed a few additional restrictions appearing
randomly in the late 19th-Century, the Court noted that, similarly, "we will not
stake our interpretation on a handful of temporary territorial laws that were

16

As the Supreme Court has made clear, individuals have the right to carry handguns outside their homes for self-defense.  New York's exclusion is valid only if the State "affirmatively prove[s]" that the restriction is part of the Nation's historical tradition of firearm regulation.  *Bruen*, 142 S.Ct. at 2127.  The test is rigorous because the Second Amendment is the very product of an interest balancing, already conducted by "the People," which "elevates above all other interests the right of law-abiding, responsible citizens to use arms for self-defense." *Id.* at 2131 (citing *Heller*, 554 U.S. at 635).  That balance, struck by the traditions of the American people, "demands" unqualified deference.  *Id.*[14]

Significant, too, is the Court's recognition that, when a "challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment."  *Id.* at 2131.  New York's law here concerns the same alleged societal problem addressed in *Heller*: "handgun violence," primarily in "urban

---

enacted nearly a century after the Second Amendment's adoption, governed less than 1% of the American population, and also 'contradic[t] the overwhelming weight' of other, more contemporaneous historical evidence."  *Id.* at 2154-55 (internal citations omitted).  As to certain territorial restrictions, "they appear more as passing regulatory efforts by not-yet-mature jurisdictions on the way to statehood, rather than part of *an enduring American tradition of state regulation.*" *Id.* at 2155 (emphasis added).

[14] As *Heller* recognized, citizens must be permitted to use handguns "for the core lawful purpose of self-defense."  *Heller*, 554 U.S. at 630.

area[s]." And, as in *Bruen*, there is no such tradition in the historical materials that the State has "brought to bear on that question." *Id.* at 2132.[15]

Also noteworthy is *Bruen*'s conclusion of its search for an enduring tradition: "At the end of this long journey through the Anglo-American history of public carry, we conclude that respondents have not met their burden to identify an American tradition justifying the State's proper-cause requirement. The Second Amendment guaranteed to 'all Americans' the right to bear commonly used arms in public subject to certain reasonable, well-defined restrictions. Those restrictions, for example, limited the intent for which one could carry arms, the manner by which one carried arms, or the exceptional circumstances under which one could not carry arms, such as before justices of the peace and other government officials. Apart from a few late-19th-century outlier jurisdictions, American governments simply have not broadly prohibited the public carry of commonly used firearms for personal defense. Nor, subject to a few late-in-time outliers, have American governments required law-abiding, responsible citizens to 'demonstrate a special need for self-protection distinguishable from that of the general community' in order to carry arms in public." *Id.* at 2156 (internal citations omitted).

In other words, the State's cited enactments do not demonstrate a *tradition* in support of its private property exclusion. *Bruen*, 142 S.Ct. at 2135, 2138, 2150,

---

[15] *Bruen* itself invalidated a century-old New York proper-cause requirement similarly in effect in five other states as well as the District of Columbia. That seven jurisdictions enacted similar restrictions was *insufficient* in the face of a much broader and much older public-carry tradition. If such was a failure of analogs or tradition in *Bruen*, the State's argument must also fail here.

2156.[16] *Antonyuk* made that clear.  And the notion of a "tradition" is the opposite of one-offs, outliers, or novel enactments.  "Tradition" requires "continuity."  *See generally Bruen*, 142 S.Ct. at 2135-56; *Washington v. Glucksberg*, 521 U.S. 702, 723 (1997); *Tradition*, The American Heritage Dictionary of the English Language (5th ed. 2011).  The cited enactments are of unknown or limited duration,[17] and the State has not met its burden to show *endurance* (of any sort) *over time*.[18]  For this reason, too, the State's argument fails.

The State also argues that private property owners have always had the right to exclude others from their property and, as such, may exclude those carrying concealed handguns.  *See* Dkt. 33, at 13-15.  But that right has always been one *belonging to the private property owner*—not to the State.[19]  It is the property owner who must exercise that right—not the State.  If a property owner wants to exclude,

---

[16] The *amicus curiae*, too, argues that a small number of state laws is sufficient so long as there is not overwhelming evidence of an enduring tradition to the contrary. *See* Dkt. 45, at 11-13.  This turns the test and its burden on their heads.  The *Bruen* Court itself rejected several outliers and was looking for a "broad tradition" of states "meaningfully restrict[ing] public carry."  *Bruen*, 142 S.Ct. at 2156.

[17] As *Bruen* noted, courts are "not obliged to sift the historical materials for evidence to sustain" the challenged statute; "that is [the State's] burden.  *Bruen,* 142 S.Ct. at 2150.

[18] Indeed, *Bruen* searched for an "enduring American tradition of state regulation." 142 S.Ct. at 2155.  And the Court gave little weight to territorial enactments that, like the territories themselves, were "short lived."  *Id; see also id.* at 2155 n.31 ("short lived").

[19] The Nation's historical tradition is that individuals may carry arms on private property unless the property owner chooses otherwise.  *See generally* D. Kopel & J. Greenlee, The "Sensitive Places" Doctrine: Locational Limits on the Right to Bear Arms, 13 Charleston L. Rev. 205, 290-91 (2018).

then: (1) the property owner, must (2) do so. When the State does so, it runs afoul of the Second Amendment.[20]

The State posits that a self-governing society may choose one of two default rules, namely, that carrying on private property is (a) generally permitted absent the owner's prohibition, or (b) never permitted unless the owner affirmatively consents. Dkt. 33, at 15. Maybe so. But the scope of the *right codified in the Second Amendment* demonstrates that this society—*this nation*—has historically had *the former* default arrangement. The latter proposed default was not part of any historical tradition to the contrary, and did not form a limitation of the scope of the right so codified in the Bill of Rights. Instead, the State's current policy preference is one that, because of the interest balancing *already struck by the people* and enshrined in the Second Amendment, is no longer on the table. *See Heller*, 554 U.S. at 636; *Bruen*, 142 S.Ct. at 2131.

In sum, the vast majority of land in New York is held privately, and it encompasses homes, farms, businesses, factories, vacant land, hotels, parking lots and garages, grocery stores, pharmacies, medical offices, hospitals, cemeteries, malls, sports and entertainment venues, and so on. These are places that people, exercising their rights, frequent *every day* when they move around *outside their homes*. The exclusion here makes all of these places presumptively off limits,

---

[20] The State has not identified any historical tradition for its "inversion"—whereby the government now affirmatively exercises the right to exclude concealed carriers *on behalf of all private property owners*, thereby creating *a vast default exclusion zone across the state.*

backed up by the threat of prison. The Nation's historical traditions have not countenanced such an incursion into the right to keep and bear arms across all varieties of private property spread across the land. The right to self-defense is no less important and no less recognized on private property.[21] The Constitution *requires* that individuals be permitted to use handguns for the core lawful purpose of self-defense. *McDonald*, 561 U.S. at 767. And it protects that right *outside the home*. *Bruen*, 142 S.Ct. at 2021.

Nothing in the Nation's history or traditions presumptively closes the door on that right *across all private property*. As in *Bruen*, where the Court stated that, "[n]othing in the Second Amendment's text draws a home/public distinction with respect to the right to keep and bear arms," *id.* at 14, nothing there casts outside of its protection all private property. New York's exclusion violates "the general right to publicly carry arms for self-defense." *Id.* Again, it is one of the policy choices taken "off the table" by the Second Amendment. *Heller*, 554 U.S. at 636.

For these reasons, New York's private property exclusion "violates the Fourteenth Amendment by preventing law-abiding citizens with ordinary self-defense needs from exercising their right to keep and bear arms." *Bruen,* 142 S.Ct. at 2156. Plaintiff is likely to succeed on the merits of his constitutional claim.

---

[21] Nothing in this decision purports to impact the traditional property right to exclude others, so long as *the property owner* (not the State) is the one actually exercising that right.

## C.    Irreparable Harm Absent Preliminary Injunctive Relief

Irreparable harm is "certain and imminent harm for which a monetary award does not adequately compensate." *Wisdom Imp. Sales Co., L.L.C. v. Labatt Brewing Co., Ltd.*, 339 F.3d 101, 113 (2d Cir. 2003).  Irreparable harm exists "where, but for the grant of equitable relief, there is a substantial chance that upon final resolution of the action the parties cannot be returned to the positions they previously occupied." *Brenntag Int'l Chem., Inc. v. Bank of India*, 175 F.3d 245, 249 (2d Cir. 1999).

Here, absent a preliminary injunction, Christian's constitutional rights are being violated.  Law-abiding citizens are forced to give up their rights to armed self-defense outside their homes, being left to the mercy of opportunistic, lawless individuals who might prey on them and have no concern about the private property exclusion.[22]  And for the reasons stated above in Section II.B, the State is wrong to

---

[22] Justice Alito queried, "Will a person bent on carrying out a mass shooting be stopped if he knows that it is illegal to carry a handgun outside the home?" *Bruen*, 142 S.Ct. at 2157.  He continued: "And while the dissent seemingly thinks that the ubiquity of guns and our country's high level of gun violence provide reasons for sustaining the New York law, the dissent appears not to understand that it is these very facts that cause law-abiding citizens to feel the need to carry a gun for self-defense." *Id.* at 2158.  Finally, he noted that "[t]he police cannot disarm every person who acquires a gun for use in criminal activity; nor can they provide bodyguard protection for the State's nearly 20 million residents . . . .  Some of these people live in high-crime neighborhoods.  Some must traverse dark and dangerous streets in order to reach their homes after work or other evening activities.  Some are members of groups whose members feel especially vulnerable.  And some of these people reasonably believe that unless they can brandish or, if necessary, use a handgun in the case of attack, they may be murdered, raped, or suffer some other serious injury." *Id.*  Indeed, "[o]rdinary citizens frequently use firearms to protect themselves from criminal attack.  According to survey data, defensive firearm use

suggest that irreparable harm does not exist because the case involves a policy

decision between two defaults that should be left to the legislature to decide.  *See*

Dkt. 47, at 4.  The private property exclusion is all-encompassing and leaves

Christian no alternatives as he moves around outside his home.

In an analogous case, the Supreme Court has held that the loss of "First

Amendment freedoms, for even minimal periods of time, unquestionably constitutes

irreparable injury."  *Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S.Ct. 63, 67

(2020) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)).  Here as well, there "can

be no question that the challenged restrictions, if enforced, will cause irreparable

harm."  *See id.*  Christian satisfies the irreparable harm element.

**D.    Public Interest**

The Court must consider whether a preliminary injunction is in the public

interest.  *See Bronx Household of Faith*, 331 F.3d at 349.  The State argues that

broad legal carrying in dense congregate settings can result in spontaneous violence

or accidental shootings.  *See* Dkt. 33, at 42-43.  But the State does not show that the

lawful carrying of firearms on private property has resulted in an increase in

handgun violence, or that public safety would be impaired if the private property

restriction is enjoined.

A preliminary injunction would, however, serve the public interest of

fostering self-defense across the state.  The public has a significant interest in the

---

occurs up to 2.5 million times per year."  *Id.* (citation omitted).

"strong sense of the safety that a licensed concealed handgun regularly provides, or would provide, to the many law-abiding responsible citizens in the state too powerless to physically defend themselves in public without a handgun." *Antonyuk v. Bruen*, No. 22-CV-0734, 2022 WL 3999791, at *36 (N.D.N.Y. Aug. 31, 2022). A preliminary injunction is in the public interest.

### E.   Security

Federal Rule of Civil Procedure 65(c) requires the Court to consider whether it should require plaintiffs to post security and, if so, in what amount. *See Dr.'s Assocs., Inc. v. Distajo*, 107 F.3d 126, 136 (2d Cir. 1997) ("Rule 65(c) gives the district court wide discretion to set the amount of a bond, and even to dispense with the bond requirement [in certain situations].").

On these facts, the Court will not require Christian to post security because a bond requirement does not fit the fact-pattern and interests involved in this case. *See Dr.'s Assocs.*, 107 F.3d at 135-36 (affirming district court's decision not to require security where the district court "found that [defendants] would not suffer damage or loss from being forced to arbitrate in lieu of prosecuting their state-court cases"); *see also Clarkson Co. v. Shaheen,* 544 F.2d 624, 632 (2d Cir. 1976) (Because no request for a bond was ever made in the district court, and because, under Fed. R. Civ. P. 65, "the amount of any bond to be given upon the issuance of a preliminary injunction rests within the sound discretion of the trial court.")

### F.    Scope

The State argues that Christian can only bring a facial—rather than an as-applied—challenge to the private property exclusion, which would succeed only "if Plaintiffs 'show that no set of circumstances exists under which the [statute] would be valid, *i.e.*, that the law is unconstitutional in all of its applications,' or at least that it lacks a 'plainly legitimate sweep.'" Dkt. 33, at 11 (quoting *United States v. Decastro,* 682 F.3d 160, 168 (2d Cir. 2012)).  The argument fails.

Christian has shown, at a minimum, that the private property exclusion lacks a "plainly legitimate sweep" in that it forces individuals to give up their rights to armed self-defense outside the home. *See Decastro,* 682 F.3d at 168 (to prevail on a facial challenge, a plaintiff "would need to show that no set of circumstances exists under which the statute would be valid, *i.e.*, that the law is unconstitutional in all of its applications, or at least that it lacks a plainly legitimate sweep") (internal citation omitted).  And it bears noting that neither the parties nor the Court's imagination has identified a plainly legitimate sweep.

### G.    Stay Pending Appeal

The State requests a three-day stay pending appeal.  The State's request is denied.  The factors "relevant to granting a stay pending appeal are the applicant's 'strong showing that he is likely to succeed on the merits,' irreparable injury to the applicant in the absence of a stay, substantial injury to the nonmoving party if a stay is issued, and the public interest." *Uniformed Fire Officers Ass'n v. de Blasio,* 973 F.3d 41, 48 (2d Cir. 2020) (citing *Nken v. Holder,* 556 U.S. 418, 434 (2009)).  The

first two factors "are the most critical, but a stay is not a matter of right, even if irreparable injury might otherwise result, it is an exercise of judicial discretion, and the party requesting a stay bears the burden of showing that the circumstances justify an exercise of that discretion." *Id.* (internal citation and quotation marks omitted).

Here, a stay pending appeal is not warranted. As discussed above, Plaintiff's constitutional rights are being violated absent a preliminary injunction. The State has not established irreparable injury in the absence of a stay. The balance of hardships and public interest weigh in favor of Plaintiff, also as discussed above. Finally, it is *Plaintiff* who has demonstrated that he is likely to succeed on the merits. As in *Hardaway,* legislative enactments may not eviscerate the Bill of Rights. Every day they do is one too many. *Hardaway*, 2022 WL 16646220, at *19.

## CONCLUSION

For the above reasons, the Court GRANTS the motion for a preliminary injunction as follows: it is

ORDERED that Defendants and their officers, agents, servants, employees, and all persons in concert or participation with them who receive notice of this preliminary injunction, are enjoined, effective immediately, from enforcing N.Y. Pen. L. § 265.01-d with respect to private property open to the public, and their regulations, policies, and practices implementing it;

ORDERED that this preliminary injunction shall remain in effect pending disposition of the case on the merits; and

ORDERED that no bond shall be required.

The portions of Plaintiffs' motion addressing public parks and public transportation will be addressed in a subsequent decision.

SO ORDERED.

Dated:      November 22, 2022
            Buffalo, New York

_____
JOHN L. SINATRA, JR.
UNITED STATES DISTRICT JUDGE