UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

BRETT CHRISTIAN, FIREARMS POLICY COALITION,
INC., and  SECOND AMENDMENT FOUNDATION

                                             Plaintiffs,

                    v.

STEVEN A. NIGRELLI, in his official capacity as                     No. 22-cv-00695 (JLS)
Superintendent of the New York State Police, and JOHN J.
FLYNN, in his official capacity as District Attorney for the
County of Erie,

                                             Defendants.

---

## SUPPLEMENTAL DECLARATION OF RYAN L. BELKA

RYAN L. BELKA, declares under penalty of perjury that the following is true and
correct:

1.      I am an Assistant Attorney General, of counsel to Letitia James, New York State
Attorney General, and with my co-counsel James Thompson, I represent Defendant Steven A.
Nigrelli, in his official capacity as Superintendent of the New York State Police ("Superintendent
Nigrelli"), in this action.

2.      I make this supplemental declaration in support of Defendant's Supplemental
Briefing in Support of Defendant's Opposition to Plaintiff's Motion for a Preliminary Injunction.

3.      Attached as **Exhibit A** is a true and accurate copy of excepts from Plaintiff's
deposition testimony taken under oath on November 16, 2022.

Dated: Buffalo, New York
          December 2, 2022

                                             /s/ Ryan L. Belka
                                             RYAN L. BELKA

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

BRETT CHRISTIAN, FIREARMS POLICY COALITION,
INC., and  SECOND AMENDMENT FOUNDATION

                                        Plaintiffs,


                        v.

STEVEN A. NIGRELLI, in his official capacity as
Superintendent of the New York State Police, and JOHN J.
FLYNN, in his official capacity as District Attorney for the
County of Erie,

                                        Defendants.

No. 22-cv-00695 (JLS)

## CERTIFICATE OF SERVICE

I hereby certify that on December 2, 2022, I electronically filed the foregoing with the Clerk of the District Court using its CM/ECF system.


Dated: Buffalo, New York
       December 2, 2022

LETITIA JAMES
Attorney General of the State of New York
Attorneys for Defendant Nigrelli
BY:
*s/ Ryan L. Belka*
RYAN L. BELKA
JAMES M. THOMPSON
Assistant Attorney General,
of Counsel
Main Place Tower, Suite 300A
350 Main Street
Buffalo, New York 14202
(716) 853-8440
Ryan.Belka@ag.ny.gov

A

1       UNITED STATES DISTRICT COURT

2       WESTERN DISTRICT OF NEW YORK

3        ------------------------------------------------

4       **BRETT CHRISTIAN, FIREARMS POLICY COALITION,
        INC., and SECOND AMENDMENT FOUNDATION,**

5
                Plaintiffs,
6
         -vs-         Civil Action No. 22-cv-00695 (JLS)
7
        **STEVEN A. NIGRELLI, in his official capacity as
8       Superintendent of the New York State Police,
        and JOHN J. FLYNN, in his official capacity as
9       District Attorney for the County of Erie,**

10              Defendants.
         ------------------------------------------------
11                    Examination Before Trial of **BRETT**

12      **CHRISTIAN,** held before Brooklyn Morton, Notary

13      Public, at Phillips Lytle, LLP, One Canalside,

14      125 Main Street, Buffalo, New York, on November

15      16th, 2022, commencing at 1:00 p.m. and ending

16      at 5:00 p.m., pursuant to notice.

17

18

19

20

21

22

23

24

25

<pre>
 1          A P P E A R A N C E S

 2       APPEARING FOR THE PLAINTIFFS:

 3                    PHILLIPS LYTLE, LLP
                      BY: SAM WILLIAMS, ESQ.
 4                    One Canalside
                      125 Main Street
 5                    Buffalo, New York 14203
                      (716) 847-8400
 6
         APPEARING REMOTELY FOR THE PLAINTIFFS:
 7
                      PHILLIPS LYTLE, LLP
 8                    BY: NICOLAS J. ROTSKO, ESQ.
                      One Canalside
 9                    125 Main Street
                      Buffalo, New York 14203
10                    (716) 847-8400

11       APPEARING FOR THE DEFENDANTS:

12                    STATE OF NEW YORK
                      OFFICE OF THE ATTORNEY GENERAL
13                    LETITA JAMES
                      BY: RYAN L. BELKA, ESQ.
14                    ASSISTANT ATTORNEY GENERAL
                      Main Place Tower
15                    350 Main Street
                      Buffalo, New York 14202
16                    (716) 853-8400

17

18

19

20

21

22

23

24

25
</pre>

1                          **W I T N E S S E S**

2       WITNESS        EXAMINATION                    PAGE

3

4       BRETT CHRISTIAN

5                       BY MR. BELKA           5, 131

6                       BY MR. ROTSKO          122

7

8

9                          **E X H I B I T S**

10      EXHIBIT        DESCRIPTION                     PAGE

11      1   NFTA subway ticket                48

12      2   Declaration                       117

13      3   New York State concealed carry
            license application              119

14      4   List of firearms                 120

15

16

17

18

19

20

21

22

23

24

25

**DEPAOLO CROSBY REPORTING SERVICES, INC.**
135 Delaware Avenue, Suite 301, Buffalo, New York  14202
716-853-5544

--- BRETT CHRISTIAN  -  11/16/2022 ---

1    Q. Do you have any reason to believe that your
2       membership lapsed with regard to the Second
3       Amendment between the years 2013 and
4       August 2022?
5    A. I don't believe so.
6    Q. In your mind if there is a lapse in membership
7       in either of these two organizations, it was
8       due to ineffective mail carrying?
9    A. Correct.
10   Q. What is your reasoning to believe that there's
11      a possibility of ineffective mail carrying
12      between the years 2013 and August 2022?
13   A. I have lived at different addresses throughout
14      the time.
15   Q. That's it?
16   A. Yes.
17   Q. Okay.  As it relates to the sections of the
18      CCIA that you have challenged related to
19      private property, have you been arrested under
20      that provision?
21   A. As of currently today, I have not been
22      arrested.
23   Q. Have you been approached by law enforcement to
24      arrest you for violations of the CCIA
25      regarding the sections on private property?

─────── **BRETT CHRISTIAN - 11/16/2022** ───────

1    A. As of today, I have not.

2    Q. Have you been arrested related to the sections

3       relating to New York State Parks that you have

4       challenged under the CCIA?

5    A. As of today, I have not.

6    Q. Have you been approached by law enforcement to

7       enforce the New York State Parks provisions of

8       the CCIA?

9    A. As of today, I have not.

10   Q. Have you been arrested related to the public

11      transportation sections of the CCIA that you

12      have challenged in this lawsuit?

13   A. As of today, I have not.

14   Q. And have you been approached by law

15      enforcement regarding the public

16      transportation sections of the CCIA that you

17      have challenged in this lawsuit?

18   A. As of today, I have not.

19   Q. When you say "as of today," you mean from the

20      beginning of the world until today, correct?

21   A. That's correct.  I do not have a crystal ball.

22      I don't know what tomorrow may bring and I do

23      not wish to guess at the future.

24   Q. All right.  Do you recall the testimony about

25      reviewing the words in your declaration that

——— BRETT CHRISTIAN  -  11/16/2022 ———

1          granted not a lot of people know it still
2          exists, going from the suburbs to downtown,
3          being able to carry my firearm with me
4          legally.  I no longer can do that based upon
5          what's written in black and white in the New
6          York State Penal Code.
7     Q.   How would you travel from the suburbs downtown
8          using public transportation?
9     A.   It would primarily be one of the first three
10         stations.  There's either University Station,
11         there is LaSalle and then Amherst Street
12         Station.  And then driving, parking somewhere
13         nearby, walking in, paying the 4 or 5 bucks
14         for a round trip ticket and then riding it all
15         the way down to it ends right at Canalside at
16         the arena.
17    Q.   What kind of car do you own?
18    A.   Currently, I own a 2023 Honda HR-V.
19    Q.   Is that your daily form of transport?
20    A.   Yes.
21    Q.   And you can drive your 2023 Honda HR-V
22         downtown if you choose, correct?
23    A.   Yes.
24    Q.   Do you own any other cars?
25    A.   No, I do not.

—— BRETT CHRISTIAN  —  11/16/2022 ——

```
 1       Q. Okay.  And the 2014 Buick Regal GS, was that
 2          your daily transport at that time?
 3       A. Yes.
 4       Q. And could the 2014 Buick Regal GS drive
 5          downtown?
 6       A. Yes.
 7       Q. Okay.  When you had the 2017 Buick LaCrosse,
 8          was that your daily transport?
 9       A. That would be correct.
10       Q. And could the 2017 Buick LaCrosse travel
11          downtown?
12       A. That would be correct.
13       Q. Okay.  And when you had the 2020 Honda Accord,
14          was that your daily transport?
15       A. Yes.
16       Q. And could the 2020 Honda Accord travel
17          downtown?
18       A. Mechanically, yes.  However, the theft of the
19          wheels that come equipped on the model I had
20          is -- the rate of theft is obscene to the
21          wheels and that car I tended to not want to
22          drive as much downtown because based upon
23          experiences at my job, that there would be a
24          great likelihood I would find it up on blocks
25          as we have had many occurrences at work.
```

**DEPAOLO CROSBY REPORTING SERVICES, INC.**

135 Delaware Avenue, Suite 301, Buffalo, New York  14202
716-853-5544

---
BRETT CHRISTIAN  -  11/16/2022
---

1   Q. Where is your job?

2   A. Currently, it is at Ray Laks Honda in Orchard

3      Park.

4   Q. How do you spell Ray Laks?

5   A. R-A-Y, space, L-A-K-S.

6   Q. And were the tires -- strike that.

7          What part of the 2020 Honda Accord was

8      often stolen pursuant to anecdotes from your

9      work?

10  A. In the last year we have had almost $40,000 of

11     damage done to vehicles because the model I

12     had, the sport model that had 19-inch very

13     attractive low profile sporty wheels, it is

14     among the most stolen wheels in the country.

15     In one year it was almost $40,000 of wheels

16     going missing due to theft.

17  Q. And did you ever have the wheels on your 2020

18     Honda Accord stolen?

19  A. I did not because I would be very cautious

20     about where I took the car and where I would

21     park the car because of that reason.

22  Q. Regardless, the 2020 Honda Accord could get

23     you downtown if you so chose?

24  A. Mechanically it could, yes.

25  Q. You mentioned that there are three locations

----

- BRETT CHRISTIAN - 11/16/2022 -

1        that the discussion about the ticket is

2        accurate.

3              MR. BELKA:  I accept.  Thanks for

4        creating an accommodation because it's unusual.

5              MR. ROTSKO:  I can't figure out how to

6        get that up on WebEx.

7

8        BY MR. BELKA:

9     Q. An NFTA Light Rail ticket has been placed in

10       front of you.  It's Exhibit 1 to your

11       deposition.  Do you see it?

12    A. I do.

13    Q. What's the date on that Light Rail ticket?

14    A. It was this past Sunday, the 13th.

15    Q. You are downtown today.  You didn't take the

16       Light Rail; is that right?

17    A. Correct.

18    Q. Okay.  What car did you drive to get downtown

19       today?

20    A. My 2023 Honda HR-V.

21    Q. Do you have a gun on you?

22    A. I do not.

23    Q. Why not?

24    A. The CCIA prevents me from doing so.

25    Q. Is that because Phillips Lytle prevented you

----

1      from bringing a concealed weapon onto their
2      property?
3   A. I was unable to bring one with me on person
4      because I have never been in this building
5      before and I don't know what signs are posted
6      on the property.  And if I brought it with me,
7      I would have already entered the property
8      before I would see the signs and, thus, I
9      would have broken the law.  So without having
10     that definitive knowledge of it as explicitly
11     stated on a sign that it is allowed, I chose
12     to leave it at home.
13  Q. These are your lawyers.  You could have called
14     ahead and asked what their concealed carry
15     policy is, correct?
16  A. Correct.
17  Q. Do you own a phone?
18  A. I do.
19  Q. Do you know how to use it?
20  A. Yes.
21  Q. Do you think you could have used your phone to
22     acquire that information from your lawyers?
23  A. I am unsure because I don't know who the
24     property owner is and the way that it reads, I
25     would have to first figure out who the

—— BRETT CHRISTIAN  -  11/16/2022 ——

1      property owner is.  And with the timeframe of
2      I did not know weeks or months in advance of
3      the exact location, I wasn't able to in time
4      determine that.
5    Q. When did you first learn about this
6      deposition?
7    A. I learned that it may be a thing that would
8      need to happen roughly, approximately a couple
9      weeks ago.  However, the exact date, time,
10     this is the address at this time, be here,
11     that was -- the address was provided this
12     morning to me.  The time was provided to me on
13     Monday.
14   Q. Have you ever called your lawyers -- this has
15     nothing to do with attorney-client.
16          Have you ever called your lawyers to ask
17     them a question?
18   A. Yes.
19   Q. Do you feel like you need permission to call
20     your lawyers?
21   A. No, I do not.
22   Q. Could you have called your lawyers and asked
23     the policy about concealed carry in the
24     building you would have been entering today?
25   A. Yes.  That could have been a possibility.

1     Q. And do you think your lawyers would have told
2        you the correct information as to their policy
3        on concealed carry today?
4     A. Yes.  I believe they would have.
5     Q. As it relates to public transportation, you
6        note that you take the NFTA Metro Rail, which
7        I have referred to as the NFTA Light Rail,
8        when traffic or events downtown made driving
9        impractical.  Do you recall that testimony?
10    A. Yes, I do.
11    Q. In your mind, when does traffic make driving
12       downtown impractical?
13    A. Monday through Friday and when major events
14       like Sabres games, Taste of Buffalo and events
15       such as those are going on, traffic is quite
16       heavy at those times.
17    Q. How do you know traffic is heavy on Monday
18       through Friday during Sabres games?
19    A. I have previously been to Sabres games.
20       Either work -- the company that I work for has
21       provided tickets for events as well as through
22       the week I have made trips down here to go to
23       either the Erie County Clerks's Office for
24       adding an amendment or removing an amendment
25       to my permit or to stop in to ask

--- BRETT CHRISTIAN  -  11/16/2022 ---

1           clarification about questions I have to make
2           sure I am doing things the proper way.
3                   But between the 190 and the 33, it is --
4           the 33 in the morning you want to get here
5           before 6:00 a.m. because it gets very accident
6           prone and then throughout the day by noon,
7           1 o'clock, it starts to pick up quite a bit
8           into the evening.  Not discounting Buffalo, of
9           course, weather events we may have.
10      Q.  Prior to August 2022, how often would you ride
11          the Buffalo Light Rail?
12      A.  Approximately two to three times a month, if
13          not more.
14      Q.  Is the Buffalo Light Rail the only form of --
15          strike that.
16                  Is the Buffalo Light Rail the only form
17          of public transportation that you regularly
18          take?
19      A.  That would be correct.
20      Q.  Is it fair to say -- I am looking at Exhibit 1
21          now.  November 13th, 2022 was the last time
22          you used the Buffalo Light Rail?
23      A.  Correct.
24      Q.  What event made it impractical to go downtown
25          using your car on November 13th, 2022?

```
 1      A.  A combination of even with a Honda the price
 2          of gas as well as the convenience from
 3          University Station to Canalside, the last
 4          exit, is almost precisely 20 minutes.  It's
 5          faster to do that than it is to drive, find a
 6          parking spot, pay for parking if it's through
 7          the week.  Weekends sometimes things are free.
 8          It's simply a matter of this is faster and
 9          easier.  I don't have to worry and deal with
10          the hassle of it.
11      Q.  Your affidavit -- strike that.
12              Your declaration says that you take the
13          Buffalo Light Rail when traffic or events
14          downtown make driving impractical, correct?
15      A.  Correct.
16      Q.  When you took the Buffalo Light Rail on
17          November 13th, was that due to traffic or
18          events downtown?
19      A.  That was due to --
20              MR. ROTSKO:  Objection.  Asked and
21          answered.
22      Q.  You still have to answer.
23      A.  An event in Orchard Park, not downtown.
24          Everybody is on the thruway and the 33 headed
25          to the Bills game around that time.
```

-------- BRETT CHRISTIAN - 11/16/2022 --------

1      Q. And why do you feel -- strike that.

2            Why did you feel it necessary to cancel

3         your trip to the Adirondack Park because of

4         the CCIA?

5      A. To get to the Adirondacks it's approximately 5

6         hours and 15 minutes of travel time, 6 hours

7         and 15 minutes of travel time if you don't go

8         the thruway.  Sometimes the side roads are

9         nice, slower pace, less traffic.  So with the

10        way the CCIA is, the way it is written in

11        black and white which is what I believe to be

12        the law, if I was to go on the trip, bring

13        with me my pistol and I am carrying it because

14        it is easier to keep it in a holster on your

15        person, less likelihood of getting it stolen

16        because you left it somewhere, I would have to

17        know in advance every restaurant that I may

18        decide to get food at or every gas station.

19        And then if I ended up instead of bringing a

20        sleeping bag and sleeping in the car as I

21        sometimes do, if I went the route of this time

22        I will get a hotel, knowing all the property

23        owner's policies ahead to be compliant and

24        legal, it -- too daunting, if you will.

25     Q. Your declaration to me implies that you

---BRETT CHRISTIAN  -  11/16/2022---

```
 1            thought that the CCIA applied to the
 2            Adirondack Park.  Was that your understanding
 3            at the time you signed your declaration?
 4       A.   When I signed it at the time, that was my full
 5            belief.  However, New York State political
 6            leaders have said now that it doesn't apply,
 7            but I don't see anything in writing.  So I am
 8            unsure of New York State Government's stance
 9            in that regard.
10       Q.   You understand it has been represented in this
11            lawsuit that the CCIA does not apply to
12            Adirondack Park, right?
13       A.   That's what I have heard.  However, when I go
14            to the Penal Code and I look it up, I haven't
15            seen the legislature make any changes, make
16            any addendums, amendments, corrections in that
17            regard.  And I have to believe the law
18            enforcement has no legal obligation to protect
19            me.
20                 Their duty is to enforce the law and
21            catch criminals per the Supreme Court case
22            that happened out of Ohio.  I want to say
23            Akron.  I don't remember the exact name.  I
24            would have to look it up, but because of that
25            I would have to believe any law enforcement
```

----- BRETT CHRISTIAN  -  11/16/2022 -----

1       professional whether they are New York State
2       Park rangers, DEC, if they are New York State
3       Police, local sheriff, local town, they would
4       go by this is what's written as the law, this
5       is, therefore, what we must enforce if someone
6       is violating it.
7    Q. So at least as it relates to the Adirondack
8       Park, the statement of political leaders on
9       how the CCIA applies is not enough for you?
10   A. Correct.  Let me add --
11   Q. No.
12   A. Okay.  Sorry.
13   Q. Actually, sorry.  You should be able to add.
14      Go ahead.  I didn't mean to cut you off.
15   A. If I were to go ahead and go there and carry
16      and a law enforcement professional were to
17      observe me and stop me and question me and
18      find that I was carrying, I don't believe that
19      they would find it a sufficient defense or
20      justification to say, well, the Governor or
21      the Attorney General of New York or the head
22      of the State Police has said this --
23   Q. Right.
24   A. -- you know, in a TV interview.  Much like
25      people I know now that are going through the

---

BRETT CHRISTIAN - 11/16/2022

---

1          permitting process, the way the law is written

2          it says everybody needs the new training

3          requirement and other requirements.  To have,

4          again, politicians who are elected

5          representatives and heads of various

6          departments say, well, we only interpret that

7          or we only mean it applies to downstate

8          counties like Suffolk, Nassau, Westchester and

9          the boroughs and New York City, again, I look

10         at it and I tell people they can say what they

11         want but what's actually written in the law,

12         that's the standard you are held to and this

13         is what it says currently.

14     Q.  Right.  So in the case of Adirondack Park,

15         right, you would not be comforted by the

16         statements of political leaders or the leader

17         of the State Police that Adirondack Park is

18         not -- that we are not going to enforce the

19         CCIA in Adirondack Park, right?

20     A.  Correct.

21     Q.  What kind of plans did you make to go to

22         Adirondack Park in the period of time around

23         Thanksgiving 2022?  What firm plans did you

24         make?

25     A.  I had firm plans, definitive plans.  My plans

1    Q. Because you wouldn't work Sunday?

2    A. Sunday, correct.

3    Q. But either way you didn't make this trip

4       despite political leaders and the

5       representations that have been made in this

6       case because that's not enough for you to be

7       assured that the CCIA wouldn't be enforced in

8       Adirondack Park?

9    A. Correct.

10          MR. BELKA:  Okay.  Let's take a break.

11       Five minutes.

12

13             (Recess was taken.)

14

15    BY MR. BELKA:

16    Q. One of the paragraphs in your declaration

17       mentions that you would sometimes walk in

18       local parks.  Do you recall that statement?

19    A. Yes.

20    Q. I mean, I will read it to you.  "Carry my

21       firearm for self-defense while walking in

22       local parks or when hiking on trails in

23       largely wooded and marshy areas a few times

24       each month."  Do you recall that?

25    A. Yes.

─ **BRETT CHRISTIAN** ─ **11/16/2022** ─

1    Q. Okay.  Similar to failing to provide the dates
2       on which you would have made your trip to the
3       Adirondacks, you don't mention which local
4       parks you would carry for in self-defense.  Is
5       that fair?
6    A. Yes.
7    Q. Okay.  Can you tell me what local parks you
8       are referring to in your declaration?
9    A. Yes.  The primary ones, but not all of them,
10      are Stiglmeier Park in Cheektowaga because of
11      being close to where I live, parts of the
12      Clarence Bike Path which are actually two
13      trails running from Amherst off of Transit
14      Road into Clarence.  If you remember the bike
15      path rapist, that's where that stuff happened.
16      The other one would be there's a Shoreline
17      Trail running from the north side of Buffalo
18      where Sheridan Drive approximately hits the
19      190 and it runs up through where -- or sorry,
20      where Sheridan Drive hits the 290, sorry.  And
21      that runs from there up to -- or I am getting
22      my roads confused.  I am sorry.
23           The 190 goes around Buffalo.  Where
24      Sheridan Drive hits the 190 and it runs from
25      there down to where the bridges going to Grand

1        Island are and there's a park and ride
2        directly underneath the bridges.  You go past
3        the old power plant in that section.  It's
4        called the Shoreline Trail, I believe.
5    Q.  What was the middle one that you mentioned?
6        Parts of a trail path into Clarence, what's
7        that one called?
8    A.  There's two trails.  They are both -- in
9        laymen's term people in the area just call
10       them the Clarence Bike Path, but they are two
11       bike and hiking paved trails that run through
12       the woods of that area.
13   Q.  All right.  I asked you to tell me what you
14       meant by local parks in your declaration and
15       you have identified Stiglmeier Park, the
16       Clarence Bike Path, and the Shoreline Trail;
17       is that correct?
18   A.  Yes.
19   Q.  All right.  And understood that you qualified
20       that to say primarily, were there any other
21       local parks in your mind at the time you
22       drafted your declaration, aside from
23       Stiglmeier Park, the Clarence Bike Path and
24       the Shoreline Trail?
25   A.  There are other parks I have been to.  Those

---

1          being the primary most enjoyed.  When I have
2          gone to other parks, I have not kept a running
3          list because I did not know I would need it in
4          the future.  So I cannot be certain of the
5          exact name or like the date and time without
6          speculating.
7    Q.  I mean, do you know the date and time on which
8          you have been to Stiglmeier Park?
9    A.  Stiglmeier Park, the last time I went was the
10         last Wednesday in August.
11   Q.  And what about before the last Wednesday in
12         August, when was the last time you were at
13         Stiglmeier Park?
14   A.  That would have been I went Sunday morning,
15         the first Sunday in August.
16   Q.  And before that, when was the last time you
17         were at Stiglmeier Park?
18   A.  Before that, would have been the end of July.
19   Q.  And is the end of July a specific date or
20         time?
21   A.  I would have to go back through my calendar.
22   Q.  Right.  My point is, I just want to know what
23         you mean by local parks in your declaration.
24         And you have identified Stiglmeier Park, you
25         have identified the Clarence Bike Path and the

---

—— BRETT CHRISTIAN - 11/16/2022 ——

1          Shoreline Trail primarily.  And then you note
2          other parks, but that you haven't -- you might
3          not know their names?
4      A. Correct.
5      Q. Okay.  But the reasoning you have for not
6          providing their names is that you didn't know
7          that you would be able to -- one second.  Be
8          required to come up with a date and time.  I
9          am just saying that that's consistent for the
10         other parks as well?
11     A. Correct.
12     Q. Okay.  So is it fair to read the words "local
13         parks" in your declaration in paragraph 7 as
14         Stiglmeier Park, the Clarence Bike Path, and
15         the Shoreline Trail?
16     A. Yes.
17     Q. You also note that there were hiking trails
18         and largely wooded and marshy areas a few
19         times each month?
20     A. Yes.
21     Q. Okay.  The hiking trails that you are
22         referring to, are they different than
23         Stiglmeier Park, the Clarence Bike Path, and
24         the Shoreline Trail?
25     A. Those previously mentioned trails are some of

1     it, but there are some outside of Erie County

2     in the Southern Tier.

3  Q. Okay.  Aside from the ones that we have

4     already mentioned -- I am just trying to get

5     the world of local parks and hiking trails.

6     Aside from the three that we have mentioned,

7     what else are you referring to?

8  A. There's one other primary one.  That would be

9     the Harris Hill State Forest area down near

10    Gerry, New York.

11  Q. How do you spell Gerry?

12  A. G, as in George, E-R-R-Y.  That's towards like

13    Chautauqua way.

14  Q. And when is the last time you were at the

15    hiking trails in Harris Hill?

16  A. Would have been the beginning of June around

17    Father's Day weekend.

18  Q. And what gun were you carrying?

19  A. That would have been my Ruger SP101 and 357

20    Magnum.

21  Q. Both guns?

22  A. That's all one gun.

23     MR. BELKA:  Oh, I deserve that.  Can you

24    read me back again what the gun was?

25