```
                 UNITED STATES DISTRICT COURT
                 WESTERN DISTRICT OF NEW YORK

BRETT CHRISTIAN,                          Docket Number:
FIREARMS POLICY COALITION,       1:22-cv-00695-JLS
INC.,
SECOND AMENDMENT
FOUNDATION,                  *
                             *
Plaintiffs,                  *
                             *
                             *       Buffalo, New York
           v.                *       November 22, 2022
                             *
                             *       2:01 p.m.
                             *
STEVEN A. NIGRELLI, in his           ORAL ARGUMENT
official capacity as
Superintendent of the New
York State Police,
JOHN J. FLYNN, in his
official capacity as District
Attorney for the County of
Erie, New York,              *
                             *
Defendants,                  *
                             *
EVERYTOWN FOR GUN SAFETY,    *
                             *
Amicus.                      *
* * * * * * * * * * * * * * * *
```

```
               TRANSCRIPT OF PROCEEDINGS
       BEFORE THE HONORABLE JOHN L. SINATRA, JR.
             UNITED STATES DISTRICT JUDGE
```

APPEARANCES:

For the Plaintiffs:            COOPER & KIRK, PLLC.,
                               By JOHN W. TIENKEN, ESQ.,
                                  PETER A. PATTERSON, ESQ.,
                               1523 New Hampshire Avenue, NW,
                               Washington, DC  20036.

                               PHILLIPS LYTLE LLP,
                               By NICOLAS J. ROTSKO, ESQ.,
                               One Canalside,
                               125 Main Street,
                               Buffalo, New York  14203-2887

```
 1   For Defendant Nigrelli:     OFFICE OF THE NEW YORK STATE
                                 ATTORNEY GENERAL,
 2                               By RYAN LANE BELKA, ESQ.,
                                 Main Place Tower,
 3                               350 Main Street,
                                 Suite 300A,
 4                               Buffalo, New York  14202

 5   For the Defendant Flynn:    COUNTY OF ERIE,
                                 DEPARTMENT OF LAW,
 6                               By KENNETH R. KIRBY, ESQ.,
                                 95 Franklin Street,
 7                               Suite 1634,
                                 Buffalo, New York  14202.

 8

 9   The Courtroom Deputy:       KIRSTIE L. HENRY

10

     Court Reporter:             BONNIE S. WEBER,
11                               Notary Public,
                                 Robert H. Jackson Courthouse,
12                               2 Niagara Square,
                                 Buffalo, New York  14202,
13                               Bonnie_Weber@nywd.uscourts.gov.

14

                 Proceedings recorded by mechanical stenography,
15                     transcript produced by computer.

16

17                     (Proceedings commenced at 2:01 p.m.)

18

19             THE CLERK:  All rise.

20             The United States District Court for the Western

21   District of New York is now in session.  The Honorable John

22   Sinatra presiding.

23             THE COURT:  Please be seated.

24             THE CLERK:  Court advises parties and listeners that

25   they are strictly prohibited from recording these proceedings in
```

1  whole or in part by any device.

2          In Christian and others versus Nigrelli and others,

3  case number 22-cv-695, this is the date set for a preliminary

4  injunction hearing.

5          Counsel for the plaintiffs, please state your

6  appearances for the record.

7          **MR. TIENKEN:**  Good afternoon, Your Honor.  John

8  Tienken from Cooper & Kirk.

9          **MR. PATTERSON:**  Good afternoon, Your Honor.  Pete

10  Patterson, also from Cooper and Kirk.  Mr. Tienken is going to

11  be giving our primary argument today.

12          **MR. ROTSKO:**  Good afternoon, Your Honor.  Nick Rotsko

13  from Phillips Lytle for the plaintiffs.

14          **THE CLERK:**  And counsel for the defendants.

15          **MR. BELKA:**  Assistant Attorney General, Your Honor.

16  Office of the Attorney General, here on behalf of Steven

17  Nigrelli.

18          **MR. KIRBY:**  Assistant Erie County Attorney Kenneth R.

19  Kirby, appearing for John J. Flynn, in his official capacity as

20  district attorney for the County of Erie, New York.

21          **THE COURT:**  Good afternoon, everyone.

22          **MR. KIRBY:**  Good afternoon.

23          **THE COURT:**  So we're going to talk about private

24  property and public parks and public transportation today.

25  Let's start with private property.

1          And by the way, any new evidence?  Anything else that

2    has to come into the record or are we square on that front?

3          **MR. TIENKEN:**  No, Your Honor.

4          **MR. BELKA:**  Nothing from the defendants, Your Honor.

5          **MR. KIRBY:**  No more, Your Honor.

6          **THE COURT:**  Okay.  What about the deposition of the

7    plaintiff here?  What in that deposition, if anything, affects

8    the standing analysis?

9          And I'll start with Mr. Belka.  I've read the briefs,

10   by the way, the sur-reply.  I've read everything, so you don't

11   have to -- if there is something that you want to talk about or

12   emphasize --

13         **MR. BELKA:**  Your Honor, I think the most revelatory

14   part of the deposition was Mr. Christian's adamant observation

15   that the public statements made by political officials and from

16   the police detectives do not influence his view of whether or

17   not this CCIA, the Concealed Carry Improvement Act, would be

18   enforced against him.

19         As I noted in my papers, Your Honor, the Hardaway

20   analysis, that this court is obviously familiar with, leaned

21   relatively heavily on those public statements made by political

22   officials, saying that this act would be strictly enforced.

23         Mr. Christian is clearly of the view that -- at least

24   in some circumstances, what political officials say regarding

25   enforcement of provisions of the Concealed Carry Improvement Act

1    do not necessarily affect his actions.

2         I believe that that's a relatively important part of

3    standing, because the actions taken in response to those public

4    statements were what separated the individual -- the individual

5    plaintiffs in Hardaway from the general populous.

6         Thus, this court granted them standing and a right to

7    sue.

8         Mr. Christian has put himself back with the general

9    populous and is amongst all of the other individuals who are

10   subject to the provisions of the Concealed Carry Improvement

11   Act, essentially, obviating standing in this matter.

12        **THE COURT:**  He says something along the lines that

13   he's not really interested in what State officials have to say

14   with respect to Adirondack Park.

15        Was there more?  Did he say things like that as to

16   other statements from State officials?

17        **MR. BELKA:**  Your Honor, as it related to Adirondack

18   Park, the point that he was making was that the officials'

19   statements do not affect how he views enforcement.

20        While it was particular to the Adirondack Park, I

21   believe that it applies.  I don't know that he can say on the

22   one hand, I trust all official statements regarding the

23   Concealed Carry Improvement Act, but not in this one other

24   position.

25        **THE COURT:**  He's saying that he's afraid that he's

 1   going to be arrested, but doesn't take much comfort in the

 2   assurances that Adirondack Park is not covered.

 3         Isn't that really the substance of it?

 4         **MR. BELKA:**  My read of it, Your Honor, is that he's

 5   picking and choosing between the statements that political

 6   officials are making.

 7         This court has previously relied on public statements

 8   from officials and the actions taken by plaintiffs in response

 9   to those.

10         And Mr. Christian has demonstrated that in certain

11   circumstances, what political officials are saying regarding the

12   CCIA will not change his view.

13         And I think that that's an important issue on the

14   issue of standing.

15         **THE COURT:**  Mr. Tienken, is the plaintiff improperly

16   picking and choosing between statements and affecting the

17   standing?

18         **MR. TIENKEN:**  No, Your Honor.  If anything, it's a

19   false equivalence that on the one hand, he may be skeptical of

20   the public statements of the spokesperson or the governor or of

21   various FAQ documents that state that they aren't giving legal

22   advice.

23         He's being more protective because of the public

24   statements and his reading of the text of the law.  And as we

25   submit in our reply papers, the State hasn't brought forward any

1   suggestion that any statement would tie the hands of any

2   official, were he to be arrested.

3         So we think that there is -- that statement has

4   nothing to do with his standing.

5         What does prove his standing is before September 1, he

6   would carry in parks and public transportation and in places

7   that he had permission to, private property open to the public

8   and after September 1, because of the credible fear of

9   enforcement, informed by the public statements of acting

10  Commissioner Nigrelli, he stopped to do so and continues to

11  abstain from carrying in those places, which is uncontroverted

12  testimony.

13        **THE COURT:**  All right.  Let's move onto the likelihood

14  of success on the merits prong for private property.

15        Why -- Mr. Tienken, why are the State's enactments

16  that they have cited, historical enactments, why are they

17  insufficient in this case to justify or add support to or meet

18  the State's burden?

19        **MR. TIENKEN:**  Yes, Your Honor.  The State has

20  identified several statutes from before the founding era and a

21  couple from the reconstruction era.

22        As to the founding era statutes, most of those dealt

23  with hunting.  It's clear from the text itself, these were what

24  the Northern District has referred to as anti-poaching laws.

25        And if we look to the guidelines that the Supreme

1   Court gave for how to assess analogs, in Bruen, we have to look

2   at how and why; how they tried to disarm individuals in certain

3   enclosed areas, that were not open to the public and the why was

4   hunting.

5          And with respect to the 1715 Maryland law, that was

6   explicitly limited to those who are criminals of evil fame -- or

7   evil fame or dissolute livers.  That's very different from --

8          **THE COURT REPORTER:**  I am sorry, what was that?

9          **MR. TIENKEN:**  Evil fame or dissolute liver,

10  D-I-S-S-O-L-U-T-E, space, L-I-V-E-R.

11         **THE COURT:**  Heavy drinker, maybe?

12         **MR. TIENKEN:**  Yes.  That's what I understand.

13         So with respect to the founding era, which is in our

14  view the only relevant -- the main relevant period of time to

15  inform the public meaning of the Second Amendment, they have no

16  analogs that meet the how and the why that Bruen suggests.

17         And without those analogs, these -- this -- the

18  anti-carry presumption cannot be Constitutional under Bruen.

19         **THE COURT:**  So, Mr. Belka, the legislation inverts the

20  way things used to be, doesn't it?

21         And now, says that in order to carry on private

22  property, you need to get permission in advance.  Whereas in the

23  past, you could carry unless someone told you you couldn't.

24         And so what's the -- the same inverted question that I

25  asked plaintiff's counsel; why are the State's enactments that

1  you've cited to me sufficient to meet the State's burden?

2      **MR. BELKA:**  Your Honor, I believe we've cited nine

3  statutes over nine states and territories.

4      You know, again, I've argued that the statutory

5  requirements are not necessarily a counting test in this case.

6  It demonstrates clear ability for governments to regulate

7  private lands.

8      As it relates to carriage, these are statutes that are

9  directly on point.  And while the policy determination, which I

10  think we have skipped over and I think is actually the more

11  important part of the analysis, as it relates to private

12  property, you know, governments have the ability to address

13  things in different ways.

14      And I believe that the factor that the historical

15  statutes demonstrate regulations over carriage on private land,

16  demonstrates that the State has that power.

17      And in particular, I don't think that the private

18  property section even necessarily extends to the text of the

19  Second Amendment.

20      Certainly, the plaintiffs have not made that showing.

21  And I think that that is the most important part of the private

22  property analysis is that what it is doing is allowing a method

23  for communication of property rights, as it relates to carriage

24  on private property.

25      It provides a consistent situation, where, in the

1   deposition of Mr. Christian, when asked about particular

2   situations, he knew whether or not that private property owner

3   was allowing carriage on that land.

4          I think that that's important because the analysis, as

5   it relates to historical statutes, comes after.  Only after the

6   plaintiffs have made some type of a showing that this

7   provision -- this restricted location provision of the CCIA

8   extends to and touches the Second Amendment and it does not.

9          It is a provision about property rights and

10  communicating those property rights to individuals.

11         And the decision to have signage that allows carriage

12  or signage that disallows carriage is a public policy

13  determination that is historically grounded and allowed for

14  state legislatures.

15         And it is the kind of public policy decision that is

16  not un-Constitutional and not one that should be touched or

17  reviewed by this court.

18         **THE COURT:**  So what about that argument from

19  Mr. Belka, that this isn't at all about the Second Amendment?

20         It's just about how property owners need to

21  communicate their preferences.

22         **MR. TIENKEN:**  We disagree with that position, Your

23  Honor.  And I think the way to understand it is to think about

24  what the limits of the Constitution imposes on the State and

25  other aspects.

1          So for instance, if we consider the First Amendment,

2    the State clearly could not establish a presumption that

3    individuals couldn't pray before mealtime, unless a restaurant

4    put a sticker allowing such prayers, because obviously private

5    property owners would be -- have certain rights to exclude who

6    they don't want to have in their restaurants, subject to other

7    restrictions.

8          But the State cannot impose itself in between --

9    against the exercise of Constitutional rights in that aspect.

10         And with respect to the textual analysis, the Supreme

11   Court in Heller and Bruen has already interpreted, the operative

12   words here, "people", which extends to ordinary law abiding

13   citizens; "arms", arms in common use in public or carry or bear,

14   rather, which in Bruen it refers to carrying in public.

15         So this is now shifting the burden to the State to

16   demonstrate that flipping the default presumption, which has

17   existed since at least the enactment of the Second Amendment and

18   before, public carry should now be changed.

19         **THE COURT:**  Isn't it the case, Mr. Belka, that that --

20   the right to exclude, that every property owner has, is the

21   property owner's right?

22         And then the State is exercising that right on behalf

23   of all the property owners, unless the property owner speaks,

24   isn't that where we are?

25         **MR. BELKA:**  Absolutely not, Your Honor.  In the

1  plaintiff's deposition -- number one, he admits that a private

2  property owner can exclude him from carriage on that property,

3  even if it's open to the public.

4        Number two, Cabela's, which is one of the locations

5  that we discussed in the deposition, he knew that he had the

6  right to carry on that property, due to the review of the

7  signage at that property.

8        It is -- the State is making no determination for

9  these individuals -- for these private property owners.

10       If someone does not have conspicuous signage allowing

11  concealed carry, it is disallowed.

12       The fact that you ask the cashier whether or not the

13  company policy was to allow concealed carry is the wrong

14  question.

15       Ask the cashier whether there is a sign on the door.

16  If there is a sign on the door that allows you to concealed

17  carry, you can walk right in with your gun.

18       If you -- if there isn't -- look, we have gun

19  organizations here, okay?  Which instead of -- they have a

20  number of options with the law that they disagree with.

21       One of which is voluntary litigation, which we're

22  involved in now, okay?

23       Another thing that they can do if they were truly

24  worried, okay, about the way this default provision exists, they

25  could go and educate the public and say, hey, property owner,

1  you want to allow that concealed carry?  We've made up some

2  signs for you.  You can stick them on the wall, okay?

3          But they haven't chosen that route.  Instead, they

4  have decided to engage in voluntary litigation, okay, to attack

5  a policy decision that they disagree with.

6          And there is no showing in this case that the

7  provision which relates to communication of private property

8  rights, which the plaintiff agrees they have, okay -- the manner

9  of that communication, they are just standardizing it and

10  allowing people to understand what their rights are for places

11  of public -- private property that is open to the public.

12          **THE COURT:**  What about this stickiness concept that

13  the plaintiff has identified that the way things have been is

14  going to stick?

15          And you are kind of putting shopkeepers, if you will,

16  if that's what we're talking about now, in a tough spot because

17  you are asking them to communicate -- put up a sign that says,

18  hey, bring your weapons here.

19          Does that matter?

20          **MR. BELKA:**  Well, I mean, look, the stickiness goes

21  both ways, but stickiness is ultimately a social science

22  construct, okay?

23          That people are generally going to follow the default,

24  okay?  And I understand that.

25          If that stickiness provision does not overcome the

1   private property owners right to do whatever it is they want --

2   they want to put up a sign, these guys can make signs for them,

3   okay?

4          They can ask -- they can have a little section on

5   their website, like they do for soliciting plaintiffs, by the

6   way.

7          You want your sign to allow concealed carry in New

8   York, just type us your address and information.  We'll be happy

9   to send it on over to you.

10         **THE COURT:**  But, Mr. Belka, if that's -- that's not

11  the solution to a Constitutional problem, is it?

12         **MR. BELKA:**  I don't believe it's a Constitutional

13  problem, Your Honor.  I think it's a private property -- a

14  method for private property communication and communicating your

15  private rights to the public in a standardized way, so that the

16  individuals who are concealed carrying know their rights on that

17  property.

18         If the plaintiffs thought it was a Constitutional

19  right, they should make a showing that this law affects the

20  Second Amendment.

21         **THE COURT:**  Anything further on this topic before we

22  move on, Mr. Tienken?

23         **MR. TIENKEN:**  Yes, Your Honor.  I just want to correct

24  something you said.  Bruen, the plain text interpreted to carry.

25         And the historical analysis extends to where it can be

1    carried, but I wanted to correct that -- the Court.

2        **THE COURT:**  Heller and McDonald talk about the right

3    that we all have to have firearms in our own homes and then

4    Bruen comes along and talks about that right outside the home.

5        So -- so is it your position, Mr. Belka, that

6    Christian doesn't even meet the first part of the test?

7        That the right doesn't extend to him?  Is that what I

8    was hearing you say?

9        **MR. BELKA:**  No.  What I was saying is that the word

10   public, which I think you're interpreting, right?

11       That the plaintiffs have argued that Bruen breaks down

12   the law from McDonald and Heller from our own homes, and public

13   is everywhere else.  I'm saying that private property is not

14   public carry.

15       **THE COURT:**  Okay.  I understand that argument, but

16   where is the support for that argument, Mr. Belka?

17       **MR. BELKA:**  It's in the definition of the word public,

18   Your Honor.  That public does not extend to private property

19   open to the --

20       **THE COURT:**  So Bruen is saying that you can only carry

21   on sidewalks and streets?

22       **MR. BELKA:**  No.

23       **THE COURT:**  Well, certainly that's all that's left

24   under the statute, right?  Because every other public forum is

25   blocked out.

1      **MR. BELKA:**  I don't think that the word public extends

2  to private property.

3      **THE COURT:**  What about Bruen's alternative use of the

4  phrasing "outside the home"?

5      Bruen uses them alternatively and sometimes talks

6  about the rights Heller and McDonald are talking about in the

7  home.

8      Bruen is talking about the rights in public, but they

9  are also talking about the rights outside the home.

10      **MR. BELKA:**  I -- and I understand that, Your Honor,

11  but there are clearly areas outside the home that can be

12  regulated by the law.

13      Private property, by the private property owner;

14  sensitive locations, by the Government.  The word public cannot

15  encompass everything else in the world other than your home.

16      It's clear from the text of Bruen, because sensitive

17  locations exists; because private property -- private property

18  owners' rights exist.

19      And the plaintiff in this case, Your Honor, agrees --

20  has admitted on the record that if a private property owner

21  wishes to disallow carriage on his property, that he can.

22      **THE COURT:**  All right.  To all of you, anything

23  further on this topic before we move on to parks?

24      **MR. TIENKEN:**  Nothing, Your Honor.

25      **MR. BELKA:**  Nothing, Your Honor.

1        **MR. KIRBY:**  No, Your Honor.

2        **THE COURT:**  Okay.  Public parks, how -- I read a

3   little bit in the deposition about parks; same thing with public

4   transportation regarding this plaintiff and the sur-reply,

5   making some points there.

6        And I wanted to talk about the -- first, the

7   irreparable harm concept as to this plaintiff as to public

8   parks.

9        How frequently is the plaintiff using public parks?

10  Let's set Adirondack Park aside.

11       How frequently is he using local parks on a day-to-day

12  basis, week-to-week, month-to-month?  Somebody help me out with

13  the facts here.

14       **MR. TIENKEN:**  All right.  Yes, Your Honor.  It's our

15  understanding that plaintiff uses parks at least on a monthly

16  basis.

17       He talked about in his deposition that he is a

18  frequent park goer.  He estimates, but didn't want to say

19  specifically.

20       He's been to 80 percent of the parks in New York, so

21  that he has become somebody that really enjoys hiking and being

22  in the outdoors since I think at least age 36 or 37.

23       **THE COURT:**  And so -- okay.  So he uses parks at least

24  monthly and is irreparably harmed without an injunction in this

25  case, because -- why?

1          Why is he irreparable harmed, if he can't go to parks

2    pending the determination of this case on the merits?

3          **MR. TIENKEN:**  Yes, Your Honor.  Well, it -- I would

4    direct your -- the Court's attention to the Ezell case out of

5    the Seventh Circuit, where --

6          **THE COURT:**  Is that cited in your papers?  If it's

7    not, give me the cite.

8          **MR. TIENKEN:**  It is not cited.  Let me grab it for

9    you.  It is 651 F.3d 684 and the relevant discussion is 697 to

10   700.

11         **THE COURT:**  Okay.

12         **MR. TIENKEN:**  And in that case, judge cites --

13   extensively looks at the irreparable harm.

14         The irreparable harm is not the inconvenience of, you

15   know, in that case, having to drive outside the City of Chicago

16   to exercise the Second Amendment right; it's not about the

17   incremental gas bill.

18         It's the fact that where you happen to be, you have a

19   Constitutional right to be ready and armed for self defense.

20         And that when that is denied in the place that you

21   are, that is presumed to be irreparable.

22         And so here, when Mr. Christian goes to the parks and

23   is unable to carry for self defense, he's being denied his

24   Second Amendment right.

25         And there is nothing that at the end of this

1   litigation that this court can do to compensate for the fact

2   that he has been denied what Judge Ezell -- I am sorry, what

3   Judge Sykes, you know, called that intangible quality of the

4   Second Amendment.

5          And this -- we see this in the First Amendment

6   context.

7          **THE COURT:**  I think we can all probably parallel

8   process a little bit here.

9          Does that case apply to public transportation as well?

10  To the same argument, the same concept in public transportation?

11         In other words, you know, in the deposition, he's not

12  really using the subway, is he?  I mean, he doesn't need to.

13         Once in a while he uses it, if it is convenient, but

14  he has a car and he drives.

15         Where is the irreparable harm there?

16         **MR. TIENKEN:**  Irreparable harm is the fact that he's

17  denied the ability to do that.

18         Again, we can look to the First Amendment context; a

19  time, place and manner restriction does not suddenly become

20  Constitutional because the State can say outside of this

21  jurisdiction, you can exercise your right to speak.

22         We know that the irreparable harm occurs based off of

23  where you would like to speak.

24         **THE COURT:**  Mr. Belka, how about those concepts that

25  I'm talking about there?

1          Does the fact that the plaintiff has alternatives,

2    does that matter to irreparable harm analysis?

3          **MR. BELKA:**  Of course it matters to the irreparable

4    harm analysis, Your Honor.  And I have to say I'm not familiar

5    with the Seventh Circuit case.  That was not cited in

6    plaintiff's papers.  I apologize for that.

7          But, yeah.  If he has access to a car and can drive

8    and can do all of the things and he indicates it is for

9    convenience, the difference between that and what was actually

10   put in his declaration, which essentially was when I can't get

11   downtown for traffic, that's when I take the light rail; his

12   deposition testimony was totally different from that.

13         It was about convenience and gas prices and things of

14   that nature, but the answer to your question, Your Honor, is

15   that, yes; alternatives being available do bear on irreparable

16   harm in this pre-enforcement action and challenge to the

17   Concealed Carry Improvement Act.

18         In addition, just as it relates to parks, I think that

19   the full scope of plaintiff's testimony as it relates to parks

20   is important.

21         As he testified, he did not get his concealed carry

22   license until he was about 37 years old.  And he's 40 now.  So

23   during the three year period, allegedly, we've visited --

24   because he essentially testified -- I mean, I think I wrote in

25   the sur-reply that he was sheltering in place, but I think the

1    idea was that he did not go to parks prior to getting his

2    concealed carry license.

3            And at 37, he became an outdoorsman and was at

4    80 percent of the parks in New York in three years and then

5    abruptly stopped going to the parks.

6            And the harm that was identified by Mr. Tienken, when

7    he goes to the park and does not concealed carry and puts

8    himself in danger, the plaintiff does not do that.

9            He testified, in fact, he does not go to parks post

10   the enactment of the Concealed Carry Improvement Act.

11           So the harm of going to the park and feeling like you

12   have been -- you have put yourself in danger is not something

13   that the plaintiff does.

14           **THE COURT:**  Is there any discussion about carrying

15   concealed in a park to protect yourself from wildlife?  Is that

16   something that you discussed with the plaintiff?

17           **MR. BELKA:**  Right.  He did testify that he -- when he

18   was allowed to concealed carry in parks, he would do so because

19   of bears and wild turkeys, I believe, were the two things.

20           It was unclear to me how -- as he testified to, he has

21   never had the cause to fire or discharge his weapon to defend

22   himself against the turkeys or with bears, but that was part of

23   his deposition testimony, Your Honor.

24           **THE COURT:**  Is there an alternatives argument that the

25   State has on the irreparable harm prong as to parks?

 1            Does this plaintiff have alternatives if he wants to

 2    hike?  Where else can he go?

 3            I guess he can go to the Adirondack Park portion

 4    that's not covered by the statute, right?

 5            MR. BELKA:  Right.  I'd say that that's a fairly good

 6    alternative, although, apparently, it's far away.  But there are

 7    lots of places to walk and get exercise and to enjoy the

 8    outdoors that are not public parks.

 9            THE COURT:  He can go to Ohio and Pennsylvania

10    probably, too, right?

11            MR. BELKA:  Presumably you could.  I don't believe

12    that the reach of the CCIA extends to those states.

13            THE COURT:  What about this idea that there might be

14    alternatives to using the parks for the purposes of irreparable

15    harm?

16            MR. TIENKEN:  Well, two points on the alternatives

17    argument.  The first is direct the Court's attention to the

18    discussion in Heller about the fact that DC allowed long guns,

19    but didn't ban handguns.

20            And the Supreme Court explained that the alternative

21    ability to use some other form of arm did not in any way remedy

22    or eviscerate the Second Amendment injury that was there.

23            And as for the alternatives to parks, parks have

24    existed from since before the founding and throughout the

25    history of the United States.

 1          The idea that he needs to have an alternative to

 2    exercise his Second Amendment right in a place that he would

 3    like to be, I think, again, would be inconsistent with the way

 4    the Court approaches First Amendment injuries.

 5          And it's inconsistent with the fact that there are no

 6    parks in the State.  You know, that's 750,000 acres in certain

 7    areas; parks all across the State where he cannot go.

 8          So the alternatives really are, as Governor Hochul

 9    said, and we cite in the complaint, probably some streets.

10          **THE COURT:**  Anything else on this topic, Mr. Belka?

11          I'm not finished with this topic, so --

12          **MR. BELKA:**  I understand.  I will note that the

13    Court's approach on Second Amendment issues is also

14    inconsistent, right?

15          So the balancing of the State interest and those

16    things that would matter in a First Amendment analysis are --

17    post-Bruen no longer part of the Second Amendment analysis.

18          Anyway, go ahead.

19          **THE COURT:**  So on the -- I need regarding parks --

20    public parks and public transportation, I'm going to need more

21    from both of you.

22          Mr. Kirby, you can chime in with papers, too, if you

23    like, but I'm going to need another round of briefs on

24    irreparable harm as to this plaintiff, based on the deposition,

25    as to public parks and public transportation.

1              In particular, this idea that he can -- while he

2      doesn't need to take the subway, for example, or maybe it's a

3      weaker argument as to public parks, but I think they are both

4      there and I want you both to explore them a little bit for me.

5              I took a little bit of a look, too, so add your Ezell

6      case to your submission.

7              **MR. TIENKEN:**  Yes, sir.

8              **THE COURT:**  All right.

9              And then, Mr. Belka, you will be able to read that

10     case in advance as well, and talk about it, but I'm going to

11     have simultaneous submissions, so you will have to anticipate

12     what each other is going to say.

13             I did a little bit of looking.  I didn't have enough

14     time to complete the research project myself, which is why you

15     are doing it.

16             I did a little bit of looking, for instance, this

17     morning and found a Second Circuit case.  I can't remember the

18     name of it, that talked about an ADA lawsuit against the subway

19     system in Manhattan for change -- taking ticket booths out or

20     something along those lines.

21             And the Court said there are alternatives.  There are

22     other ways to buy your ticket, so there was no irreparable harm.

23             So, anyway, that needs to be looked at carefully.  Not

24     just with the little one-off research that I did this morning,

25     so I would rather have that looked at carefully so I can get to

1    the right answer.

2          Let's do that.  Does anyone have a problem with

3    December -- I think December 2nd is a Friday?

4          Is that enough time for everybody?

5          **MR. TIENKEN:**  Yes, Your Honor.

6          **MR. BELKA:**  I'm going to take more than one minute to

7    answer whether or not that will be enough time.  One second.

8          December 2nd is fine, Your Honor.

9          **THE COURT:**  And then take a look at -- I'm not saying

10   this is a controlling case either, but it's Molloy, M-O-L-L-O-Y,

11   versus Metropolitan Transportation Authority, 94 F.3d 808 from

12   1996.

13         And, again, that could be -- maybe the case helps.

14   Maybe it doesn't help the analysis.  I don't know, but that's

15   what I was able to find in a little bit of time this morning.

16         All right.  So regarding public parks and then

17   regarding public transportation, let's talk about likelihood of

18   success on the merits.

19         First regarding public parks, Mr. Belka, why are --

20   are your enactments that you have cited for public parks now,

21   not just too late, too far away from the founding to -- to be

22   sufficiently helpful on the State's burden?

23         **MR. BELKA:**  Your Honor, I understand that the

24   plaintiffs make a point regarding the Boston Common, which, you

25   know, in the 1600s or whatever was used to graze cows.

1            But public parks as we know them today, as places of

2    congregation and leisure began closer to the end of the 19th

3    century.

4            If you look at the founding documents for Central Park

5    or organized parks systems, the end of the 19th century is

6    really it.

7            And as you can see in some of the founding documents,

8    they clearly prohibited firearms on the premises.

9            And I believe that we came up with 66 municipal or

10   city ordinances related to public parks.  And so the reason that

11   is not too far is because the public parks system, if you will,

12   only came into -- only came into existence later on in time.

13           And when it did, it was founded with the idea that

14   guns were not a part of it.

15           When the National Park System came into existence in

16   1916, every single park, except for, I think, one in Alaska,

17   completely banned firearms within their boundaries.

18           And so it is really that public parks and the way that

19   we know them now did not come into that form until later on.

20           And thus founding era documentation, which is both

21   very difficult to find -- but clearly the organization of parks

22   in places even like Central Park, this isn't West Coast -- if

23   you will, West Coast of the United States, which was founded

24   later, right?

25           This is an East Coast park.  The founding documents

1   for Central Park require that there be no firearms within the

2   park.

3        **THE COURT:**  What is the -- Mr. Tienken, what is the

4   analog to public parks that the founding era was -- where were

5   people recreating or was it that they didn't recreate back then

6   because they were just too busy working their farms?

7        **MR. TIENKEN:**  Yes, Your Honor.

8        **THE COURT:**  Where did they go if they wanted to take a

9   hike?  Look at birds?  Fish?  What else do you do in a park?

10  Bicycle?

11       **MR. TIENKEN:**  Certainly, Your Honor.  Well, as

12  colleague -- my friend on the other side said Boston Common,

13  1634.  We cited articles stating that there was recreation

14  there.

15       Bowling Green in New York City was founded for the,

16  quote, recreation and delight of its inhabitants in 1733.

17       We know that Savannah was planned to be a garden city

18  with several squares that by 1800, as we cite in the reply

19  briefs that became public parks.

20       But the key inquiry is that throughout what was not

21  foreign to the founding generation was open green spaces for the

22  public for congregation where recreation or celebration, where

23  picnics and all sorts of things happened.

24       At times they are also used for grazing, but they are

25  also used for militia practice, so we know that many of these

1    places, including village greens and commons, certainly weren't

2    gun free zones at the time.

3          And we also know from the statutes that we cite that

4    the founders addressed carrying in a materially different way.

5          They addressed it by discharge regulations, forbidding

6    things like target practice on greens or city streets where

7    passersby would be.

8          And discharge presupposes carrying.  That they did not

9    ban carrying.  And under Bruen, that's dispositive evidence that

10   there is not a tradition.

11         **THE COURT:**  What about that, Mr. Belka?

12         If the founding generation was regulating discharge,

13   then they have, by implication, allowed carriage.

14         **MR. BELKA:**  The statutes simply are just not that

15   precise, Your Honor.

16         I mean, you can look at the municipal statutes that we

17   cited and many of them both ban discharge and firearms.  Take a

18   look at the 66 --

19         **THE COURT:**  I will.

20         **MR. BELKA:**  -- municipal statutes.

21         **THE COURT:**  I will.  And I have to give myself more

22   time to look at that issue as well, so since I'm looking at

23   irreparable harm, I'll be spending more time on the merits as

24   well.

25         About public transportation, what about this argument,

1  Mr. Tienken, that Mr. Belka makes that the State is exercising

2  its rights as the owner of the property and excluding people?

3      Why is that not -- if a property owner can exclude,

4  why can't the State exclude from NFTA property, if you will?

5      **MR. TIENKEN:**  Well, just as the First Amendment

6  imposes different obligations on the Government, so too does the

7  Second Amendment.

8      So the rules are different for the Government when it

9  proposes to regulate private conduct.  And, also, we know from

10  Bruen that Bruen specified three specific government

11  buildings -- government -- types of government places,

12  legislative assemblies, poling places and courthouses, which --

13  which it said were settled.

14      That those places were the types of government

15  places -- government buildings that where -- that were sensitive

16  places and where carrying would be prohibited.

17      And we also know that the argument that merely because

18  the Government owns property would be sufficient to ban firearms

19  proves too much.

20      Obviously, the Government owns the streets and the

21  sidewalks, too, but it could not ban firearms there.

22      **THE COURT:**  Anything on that topic?

23      **MR. BELKA:**  Poling places aren't necessarily

24  government property.  I think mine takes place at a snowplow

25  location.  Either way, they are not necessarily municipal

1    places.

2          **THE COURT:**  What about the argument that the State

3    makes that some portion of the traffic on the metro rail is

4    school traffic?

5          So isn't that sufficiently like a school?

6          **MR. TIENKEN:**  No, Your Honor.  In -- as the Northern

7    District held, this is not -- the presence of children in

8    society is not some type of talisman to allow for government

9    regulation in this area.

10          Obviously, in Heller, there are children at homes and

11   firearms are allowed there.  So it's our view that that is not

12   the correct mode of analysis here.

13          **MR. BELKA:**  I object to the suggestion that children

14   are being used as a talisman in order to affect the rights of

15   other individuals.

16          Children in this case are being shuttled to and from

17   school, which is a quintessential sensitive place where guns can

18   be regulated.

19          And the transportation to and from those locations by

20   government property certainly can also be regulated under that

21   same idea of sensitive places.

22          **THE COURT:**  Talking about the sensitive places concept

23   and then the need to do these arguments by analogy, should we be

24   concerned, Mr. Belka, about the difference in security level

25   that there is no hardening of the access points to get on the

 1  metro rail, let's say?

 2        **MR. BELKA:**  So I believe that there is a -- I've read

 3  the idea that we can only prohibit guns where there is a -- you

 4  know, I'm going to mess up the pronunciation, but the

 5  magnetometer, but poling place again are a good example of that,

 6  right?

 7        Poling places are open.  There is certainly no

 8  security there.  They are obviously defined as a sensitive

 9  place.

10        And, similarly, the -- well, I would just argue that

11  transportation systems are significantly more secure at

12  access-wise than a poling place.

13        You have to buy a ticket.  You have to be going

14  somewhere.  If you start just hanging around, I just -- you --

15  you know, the points of entry analysis is not one that has been

16  established by any meaningful precedent and I don't think the

17  Court should establish one.

18        **THE COURT:**  Mr. Tienken, what's your response there?

19        **MR. TIENKEN:**  Bruen instructs that we need to look at

20  how and why the right to carry firearms is being burdened.

21        And we know that in many government places, such as

22  courthouses and legislative assemblies, one of the reasons why

23  is it is a place where there is likely to be adversarial -- you

24  know, part of the adversarial conflict of democratic

25  governments.

1          We know that there has been comprehensive security

2    provided, thus the need for any individual self defense is not

3    really as present.

4          And, third, we also know that government officials can

5    be, you know, targeted for violence and types of attempts.

6          We know that on public transit, the NFTA does not

7    provide anything comparable to that.  So we know that on that

8    metric on the why, it simply is not in the same league as these

9    other accepted sensitive places.

10          And we also would respectfully argue that the burden

11    is very -- is meaningfully different.  You know, when you are in

12    a certain location, you're restricted from the ability to have a

13    firearm while you were there.

14          But with public transportation, as Justice Alito

15    mentioned during oral argument in Bruen, it disables you from

16    having it both before, during and after your journey, which is

17    again a different how.  How it is being burdened and that's

18    meaningfully different.

19               **THE COURT:**  Anything else on that?

20               **MR. BELKA:**  Nothing else, Your Honor.

21               **THE COURT:**  What about this topic, Mr. Tienken -- this

22    topic that -- this argument that the right to travel and to

23    travel armed is not analogous to what we're talking about here.

24    It's really just to travel over long distances.

25          How do you respond to that?

1      **MR. TIENKEN:**  Respectfully, we disagree in terms of

2  the -- first off, I think that we would submit that it --

3  certainly a commute can constitute a longer distance.

4      Not necessarily in all of those cases, but I think the

5  fundamental point is that those cases that the State cites talk

6  about individuals having -- you know, not being on a journey

7  when they are in town, but not when they are going from place to

8  place.

9      And, certainly, when they are riding on public

10  transit, they are going from place to place.

11      **MR. BELKA:**  Commuter level public transportation did

12  not exist in the founding era.  This is a significant change in

13  technology.

14      And we don't believe that the cases which allow for

15  armed carriage while on a journey were contemplating the kind of

16  regular public commuter travel that exists today and is at issue

17  in this case.

18      **THE COURT:**  Okay.  Anything else that anyone feels is

19  left unsaid or have we covered everything?

20      Again, I read all the papers and all the submissions.

21      **MR. BELKA:**  So I have something, Your Honor.  We

22  mentioned in our papers -- and perhaps if there is going to be

23  supplemental briefing, I shouldn't even bring this up, but if

24  your -- Your Honor is inclined to grant a preliminary injunction

25  in this matter, one, I would note that each portion of this

 1   challenge has been stayed, albeit administratively, at the

 2   Second Circuit at various points in time throughout the

 3   litigations, right.

 4          And as such, we would request -- you know, three days

 5   to file an emergency appeal, should one be granted -- should a

 6   preliminary injunction be granted.

 7          **MR. KIRBY:**  Your Honor, on behalf of District Attorney

 8   Flynn, I would just note that because this is State legislation,

 9   the enactment of which he had nothing to do with, no cost,

10   disbursements or attorney fees related to the plaintiff's

11   applications can be granted or should be granted as against him.

12          **THE COURT:**  Okay.  Was there something beyond that,

13   Mr. Belka?

14          I had the feeling that you were going to ask for more

15   than one thing or there was more than one housekeeping item that

16   you had for me or that's it?

17          **MR. BELKA:**  I think the preamble was me thinking out

18   loud about the additional briefing schedule and how that would

19   affect any particular order that would be issued from this court

20   and whether or not it was even a good idea to mention my request

21   for a three day stay.

22          **THE COURT:**  Mr. Tienken?

23          **MR. TIENKEN:**  Nothing further, Your Honor.

24          **THE COURT:**  I am -- it is a good thing to ask, because

25   I'm very near done with the private property decision and I'm

1   going to issue a decision on that separate from parks -- public

2   parks and public transportation.

3          Those two parts of plaintiff's motion will stay open

4   until I'm finished figuring things out.

5          If I need you back for an argument, I'll set it.  I

6   don't think so.  I think that supplemental briefing will do it.

7          Anything else, folks?

8          Happy Thanksgiving.

9          **MR. BELKA:**  You, too.

10         **MR. TIENKEN:**  You too, Your Honor.

11         **MR. BELKA:**  Thank you, Your Honor.

12         **THE COURT:**  Take care.

13

14              (Proceedings concluded at 2:51 p.m.)

15                      *    *    *

16

17

18

19

20

21

22

23

24

25

1

2      In accordance with 28, U.S.C., 753(b), I certify that these

3   original notes are a true and correct record of proceedings in

4    the United States District Court for the Western District of

5        New York before the Honorable John L. Sinatra, Jr.

6

7

8

9

10   _s/ Bonnie S. Weber_                    _December 8, 2022_
       Signature                              Date

11

12   **BONNIE S. WEBER**

13   Official Court Reporter
     United States District Court

14   Western District of New York

15

16

17

18

19

20

21

22

23

24

25