**UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK**

BRETT CHRISTIAN, *et al.*,

               *Plaintiffs*,

 v.

DOMINICK L. CHIUMENTO, *et al.*,

               *Defendants.*

No. 1:22-cv-695-JLS

### PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES.................................................................................................ii

INTRODUCTION ...........................................................................................................1

STATEMENT OF FACTS ...............................................................................................2

ARGUMENT ...................................................................................................................3

    I.       Plaintiff Christian Has Standing ................................................................3

    II.     New York's Carry Bans at Public Parks and on Private Property Open to the Public Violate the Second Amendment...................................................................4

          A.  The Second Amendment's Plain Text Covers Plaintiffs' Conduct..........................5

          B.  New York Cannot Show that its Carry Bans are Consistent With the Nation's Historical Tradition of Firearms Regulation ...............................................6

          C.  Analogies to Recognized Sensitive Places .............................................9

          D.  The State Will be Unable to Identify a Historical Tradition of Carry Bans in the Challenged Locations...........................................................................17

              1.  The No-Carry Default.................................................................17

              2.  Public Parks ...........................................................................20

CONCLUSION................................................................................................................25

# TABLE OF AUTHORITIES

**Cases**                                                                                                    **Page**

*Antonyuk v. Chiumento*,
    89 F.4th 271 (2d Cir. 2023) ........................................................3, 4, 7, 9, 17, 19, 20, 22, 24

*Bridgeville Rifle & Pistol Club, Ltd. v. Small*,
    176 A.3d 632 (Del. 2017) ...................................................................................12, 13, 21

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986)..........................................................................................................3

*Christian v. Nigrelli*,
    642 F. Supp. 3d 393 (W.D.N.Y. 2022) ........................................................5, 8, 17, 18, 19

*DiGiacinto v. Rector & Visitors of George Mason Univ.*,
    704 S.E.2d 365 (Va. 2011) ............................................................................................21

*District of Columbia v. Heller*,
    554 U.S. 570 (2008)..............................................................................................5, 15, 16

*Espinoza v. Mont. Dep't of Revenue*,
    140 S. Ct. 2246 (2020)..................................................................................................7, 8

*Kipke v. Moore*,
    No. 23-cv-1293, 2023 WL 6381503 (D. Md. Sept. 29, 2023).........................................19

*Koons v. Platkin*,
    No. 22-7464, 2023 WL 3478604 (D.N.J. May 16, 2023).....................9, 12, 18, 19, 20, 21

*Lara v. Comm'r Pa. State Police*,
    91 F.4th 122 (3d Cir. 2024)........................................................................................6, 14

*Lynch v. Donnelly*,
    465 U.S. 668 (1984).........................................................................................................6

*May v. Bonta*,
    No. 23-cv-1696, 2023 WL 8946212 (C.D. Cal. Dec. 20, 2023)...........................15, 19, 21

*McCauley v. Univ. of the Virgin Islands*,
    618 F.3d 232 (3d Cir. 2010) ...........................................................................................14

*Morse v. Frederick*,
    551 U.S. 393 (2007)........................................................................................................13

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*,
    597 U.S. 1 (2022)......................................1, 3, 4, 5, 6, 7, 8, 9, 10, 12, 16, 17, 19, 20, 22, 25

*North v. Bd. of Trs. of Univ. of Ill.*,
    137 Ill. 296, 27 N.E. 54 (1891) .................................................................................13, 14

*People v. Chairez*,
    104 N.E.3d 1158 (Ill. 2018) ...........................................................................................21

*Ramos v. Louisiana*,
    140 S. Ct. 1390 (2020)......................................................................................................6

*Range v. U.S. Att'y Gen.*,
   69 F.4th 96 (3d Cir. 2023) ................................................................................25

*Siegel v. Platkin*,
   653 F. Supp. 3d 136 (D.N.J. 2023) ...................................................................19

*Springer v. Grisham*,
   No. 23-cv-781, 2023 WL 8436312 (D.N.M. Dec. 5, 2023)................................21

*State v. Huntley*,
   25 N.C. 418 (N.C. 1843)....................................................................................23

*State v. Mizner*,
   45 Iowa 248 (1876) ............................................................................................13

*State v. Pendergrass*,
   19 N.C. 365 (1837) ............................................................................................13

*Timbs v. Indiana*,
   139 S. Ct. 682 (2019) ...........................................................................................6

*United States v. Ayala*,
   No. 8:22-cr-369, 2024 WL 132624 (M.D. Fla. Jan. 12, 2024) .........................16

*Virginia v. Moore*,
   553 U.S. 164 (2008).............................................................................................6

*Wolford v. Lopez*,
   No. 23-cv-265, 2023 WL 5043805 (D. Haw. Aug. 8, 2023)............................19

**Constitutional Provisions, Rules, Statutes, and Laws**

MD. CONST. art. 1 §§ 3, 14 (1776) ............................................................................12

N.Y. PENAL CODE
   § 265.01-e(1).........................................................................................................2
   § 265.01-e(2)(a)–(t)...............................................................................................1
   § 265.01-e(2)(d) .........................................................................................1, 2, 24
   § 265.01-d(1)....................................................................................................1, 2
   § 400.00(2)(f).......................................................................................................2
   § 400.00(3)(a) .......................................................................................................2

U.S. CONST. amend. III ...............................................................................................5

U.S. CONST. amend. IV ...............................................................................................5

FED. R. CIV. P. 56(a) ..................................................................................................3

François-Xavier Martin, *A Collection of the Statutes of the Parliament of England in Force in the State of North-Carolina* iii (Newbern: The Editor's Press, 1792) ....................................23

1 THE STATUTES AT LARGE OF VIRGINIA (William Walker Hening ed., 1808)..............15

10 PENNSYLVANIA STATUTES AT LARGE (William Stanley Ray ed., 1904)............10, 11

1 LAWS OF NEW JERSEY (Joseph Bloomfield ed., Trenton, James J. Wilson 1811) ......12

1 LAWS OF NEW YORK (Charles R. & George Webster 1802) ......................................10

1 LAWS OF NEW YORK (Websters & Skinner 2d ed. 1807) ............................................11

1 RECORDS OF THE COLONY OF RHODE ISLAND (Russell Bartlett ed. 1856) ...................15

2 LAWS OF DELAWARE (Samuel & John Adams eds., 1797) ...............................10, 11, 12

LAWS OF VERMONT (Randolph, Sereno Wright 1808) .............................................10, 11

3 ARCHIVES OF MARYLAND 103
       (William Hand Browne ed., Baltimore, Md. Hist. Soc'y 1885) ........................15

A COLLECTION OF ALL SUCH ACTS OF THE GENERAL ASSEMBLY OF VIRGINIA (1803) ..................11

A COLLECTION OF ALL THE PUBLIC ACTS OF ASSEMBLY OF THE PROVINCE OF NORTH-CAROLINA,
       293, 295 (Newbern: James Davis, 1752) ..........................................................23

A COMPILATION OF THE LAWS OF GEORGIA (Augustine Smith Clayton ed., Augusta, Adams &
       Duyckinck 1812) ..............................................................................................10

A DIGEST OF THE LAWS OF GEORGIA, (Robert & George Watkins ed., 1800) .........................11, 12

A MANUAL OF THE LAWS OF NORTH-CAROLINA (John Haywood ed., 3d ed. 1814) ....................11

ABRIDGEMENT OF THE PUBLIC PERMANENT LAWS OF VIRGINIA
       (Augustine Davis ed., 1796) ...........................................................................12

ACTS AND LAWS OF THE STATE OF CONNECTICUT (New London, Timothy Green 1784)..............11

ACTS AND RESOLVES OF MASSACHUSETTS (Adams & Nourse 1893) ...........................................11

James Iredell, *Laws of the State of North-Carolina* 70
       (Edenton: Hodge and Wills, 1791)...................................................................23

LAWS OF NEW HAMPSHIRE (1797)...........................................................................................11

PUBLIC LAWS OF SOUTH CAROLINA (Philadelphia, R. Aitken & Son 1790) ....................10, 11, 12

PUBLIC RECORDS OF THE COLONY OF CONNECTICUT
       (Hartford, Brown & Parsons 1850)...................................................................15

THE LAWS OF MARYLAND, ch. 25 (1799) ................................................................................11

THE PUBLIC LAWS OF RHODE ISLAND (Providence, Carter & Wilkinson 1798) ......................... 10

### **Other Authorities**

John Adams, Argument for the Defense: 3-4 December 1770, NAT'L ARCHIVES FOUNDERS
       ONLINE, https://bit.ly/35FCuRh. .....................................................................14, 15

Ian Ayres & Spurthi Jonnalagadda, *Guests with Guns: Public Support for "No Carry" Defaults
       on Private Land*, 48 J. L. MED. & ETHICS 183 (2020) .................................18, 19

Anne Beamish, *Before Parks: Public Landscapes in Seventeenth- and Eighteenth-Century
       Boston, New York, and Philadelphia*, 40 LANDSCAPE J. 1 (2021) .....................20

Omri Ben-Shahar & John A. E. Pottow, *On the Stickiness of Default Rules*, 33 FLA. ST. U. L.
       REV. 651 (2006) .................................................................................................18

Benjamin Boyd, *Take Your Guns to Church: The Second Amendment and Church Autonomy*, 8
       LIBERTY UNIV. L. REV. 653 (2014) ..............................................................14, 15

Clayton E. Cramer, *Colonial Firearm Regulation*,
16 J. FIREARMS & PUB. POL'Y 1 (2016) ............................................................................14

Luis Ferré-Sadurní & Grace Ashford, *N.Y. Democrats to Pass New Gun Laws in Response to
Supreme Court Ruling*, N.Y. TIMES (June 30, 2022), https://nyti.ms/3yTp2Yj ...................1

Stephen P. Halbrook, *Faux Histoire of the Right to Bear Arms*: Young v. Hawaii at 21, SSRN,
https://bit.ly/3QyFZA5 ..........................................................................................22, 23

THOMAS JEFFERSON, JEFFERSON'S LEGAL COMMONPLACE BOOK 521 (2019) ...........................25

NICHOLAS JOHNSON ET AL., FIREARMS LAW & THE SECOND AMENDMENT (2d ed. 2017) .............14

David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine: Locational Limits on
the Right to Bear Arms*, 13 CHARLESTON L. REV. 205 (2018)...............9, 10, 14, 15, 17, 18

Orlando Mayorquin, *Store Owner is Fatally Shot by Man Who Confronted Her About Pride
Flag,* N.Y. TIMES (Aug. 20, 2023), https://nyti.ms/3rbCMOg............................................19

Mark W. Smith, *Enlightenment Thinker Cesare Beccaria and His Influence on the Founders:
Understanding the Meaning and Purpose of the Second Amendment's Right to Keep and
Bear Arms*, 2020 PEPP. L. REV. 71 (2020) .......................................................................25

Mark W. Smith, *'Not all History is Created Equal': In the Post-Bruen World, the Critical Period
for Historical Analogues Is When the Second Amendment Was Ratified in 1791, and not
1868*, SSRN (Oct. 1, 2022), https://bit.ly/3CMSKjw .....................................................6, 7

Margaret Walls, *Parks & Recreation in the U.S.: Local Park Systems*, RES. FOR THE FUTURE
(June 2009), https://bit.ly/42gjo0D ..................................................................................20

2 RECORDS OF MASSACHUSETTS BAY 38 (Nathanial B. Shurtleff ed., 1853)................................15

*Boston Common*, NAT'L PARK SERV., https://bit.ly/3SGumtc .................................................20, 21

*Duane Park Origins*, THE HIST. MARKER DATABASE, https://bit.ly/3S92dt4 ..............................21

JOURNAL OF THE VOTES AND PROCEEDINGS OF THE PROVINCIAL CONGRESS OF NEW JERSEY
(Burlington, Isaac Collins, *reprinted* in Woodbury, Joseph Sailer 1835) ....................10, 11

JOURNAL OF THE HOUSE OF DELEGATES OF THE COMMONWEALTH OF VIRGINIA (Thomas W. White
1828) .............................................................................................................................10, 11

*The Earliest New York City Parks*, N.Y. CITY DEP'T OF PARKS & RECREATION,
https://on.nyc.gov/3hBZXfe ...............................................................................................21

Trust for Public Land, *The 150 Largest City Parks*, https://bit.ly/47VJw1Q .........................20, 21

Plaintiffs Brett Christian, Firearms Policy Coalition, Inc., and the Second Amendment Foundation respectfully submit this Memorandum in Support of their Motion for Summary Judgment under Federal Rule of Civil Procedure 56.

## INTRODUCTION

In *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, the Supreme Court held that individuals have a constitutional right to carry firearms for self-defense outside the home and declared unconstitutional New York's "proper-cause" requirement for obtaining a license. 597 U.S. 1, 71 (2022). Soon after *Bruen*, New York enacted Senate Bill S51001 in defiance. The bill replaced one unconstitutional licensing scheme with another and implemented expansive new criminal laws barring firearm carry in so-called "sensitive locations." *See* N.Y. PENAL LAW §§ 265.01-e(2)(a)–(t). Because New York has designated myriad locations sensitive, the Bill effectively bars New Yorkers from carrying *everywhere* except "[p]robably some streets."[1]

Plaintiffs are Brett Christian, a law-abiding citizen licensed to carry in New York, and two organizations—Firearms Policy Coalition, Inc. ("FPC") and the Second Amendment Foundation ("SAF")—both of whom have members licensed in New York, including Plaintiff Christian. Plaintiff Christian intends and desires to carry firearms for self-defense at the "sensitive" locations challenged here. Without conceding the lawfulness of New York's other sensitive place restrictions, Plaintiff Christian challenges those that have the greatest impact on his daily life. These are the carry restrictions in public parks and the State's conversion of all private property into a "restricted location" unless the property owner affirmatively posts signage indicating that

---

[1] Luis Ferré-Sadurní & Grace Ashford, *N.Y. Democrats to Pass New Gun Laws in Response to Supreme Court Ruling*, N.Y. TIMES (June 30, 2022), https://nyti.ms/3yTp2Yj.

carry is permitted. *See id.* §§ 265.01-e(2)(d); 265.01-d(1) (the "no-carry default"). Plaintiff Christian only challenges the no-carry default on private property open to the public.

In *Bruen*, the Supreme Court reaffirmed that any firearm regulation is constitutional only if the government shows it "is consistent with this Nation's historical tradition of firearm regulation." 597 U.S. at 17. But there is no historical tradition supporting New York's ban on lawful firearm carry in public parks and on private property open to the public. Both types of locations date back to the Founding era, but New York will be unable to point to any relevantly similar historical tradition of banning carry in them. This Court should grant summary judgment to Plaintiffs and permanently enjoin enforcement of the challenged restrictions.

**STATEMENT OF FACTS**

New York's restrictions on carry in public parks and on private property open to the public are sweeping. The no-carry default encompasses all manner of private businesses and other locations frequented in daily life. Similarly, the parks provision applies to wide swaths of the state, some of which is urban but much of which is non-urban.

To publicly carry firearms in New York for self-defense, individuals must first apply for and obtain a license by meeting the state's onerous requirements, including an extensive background check. *See* N.Y. PENAL CODE §§ 400.00(2)(f), (3)(a). But the challenged carry bans prohibit even the licensed from carrying in public parks and on private property open to the public. Possession of firearms in public parks is a Class E felony when an otherwise law-abiding, licensed firearm owner "knows or reasonably should know such location is a sensitive location." *Id.* § 265.01-e(1). And anyone who "enters into or remains on or in private property" where an owner has not given express consent that carry is allowed faces the same penalty. *Id.* § 265.01-d(1).

Plaintiff Brett Christian is a law-abiding citizen licensed to carry in New York. Plaintiffs' L.R. 56.1(a)(2) Statement of Undisputed Material Facts ("SUMF") ¶ 2. He previously carried at locations affected by the challenged bans, including local parks, hiking trails, gas stations, and hardware stores. SUMF ¶¶ 3–6, 9, 15–18. Specific locations that Plaintiff Christian frequented while carrying include Stiglmeier Park, the Shoreline Trail, the Harris Hill State Forest area, and the Clarence Bike Path. SUMF ¶¶ 5–6, 9. Plaintiff Christian has not frequented these locations since S51001 was enacted because he cannot lawfully defend himself against wildlife or criminals but would resume frequent visits if allowed to carry. SUMF ¶¶ 7–8, 10, 12–13. Many of the parks he frequented in the past, or planned to visit, while carrying are in non-urban areas far from any law enforcement. SUMF ¶ 11. Plaintiff Christian also intends and desires to keep and bear arms on private property open to the public, and only declines to do so for fear of arrest and prosecution. SUMF ¶¶ 23–24. Since the no-carry default went into effect, businesses in Plaintiff Christian's community and throughout the state have failed to post conspicuous signage informing patrons that carry is allowed, which burdens his right to self-defense while going about daily activities. SUMF ¶¶ 22–23. As of November 2022, Plaintiff Christian had carried only three times since the enactment of S51001, and he is less safe because of the law. SUMF ¶¶ 24–25.

## ARGUMENT

Summary judgment is proper when there is no genuine issue as to any material fact such that the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); FED. R. CIV. P. 56(a).

### I.    Plaintiff Christian Has Standing

The Second Circuit held that Plaintiff Christian has standing to challenge the no-carry default because "the relevant injury for standing purposes is the credible threat of arrest and

prosecution" he faces if he carries in private locations open to the public. *Antonyuk v. Chiumento*, 89 F.4th 271, 380 (2d Cir. 2023). "[T]hat injury is clearly redressable by an injunction against enforcement of" the carry restriction. *Id.* (emphasis omitted). The same reasoning applies to his challenge to the public parks provision.[2] Plaintiff Christian has standing to challenge the public parks provision because S51001 now bars him from carrying a firearm for self-defense in parks generally, and in non-urban parks specifically, where he previously carried and would intend to keep carrying. SUMF ¶¶ 4–6, 9, 11–12. He suffers injury from the "credible threat of arrest and prosecution" he faces if he carries in the parks he once frequented. *Antonyuk*, 89 F.4th at 380. His inability to carry in these locations inflicts an injury caused by New York's ban and redressable by a favorable decision by this Court.[3]

## II. New York's Carry Bans at Public Parks and on Private Property Open to the Public Violate the Second Amendment

"[T]he Second Amendment guarantees a general right to public carry," meaning ordinary, law-abiding citizens may "'bear' arms in public for self-defense." *Bruen*, 597 U.S. at 33. Accordingly, firearm carry cannot be restricted absent the "exceptional circumstances" in which such restrictions historically have been allowed. *Id.* at 38.

To determine whether a restriction on carry is constitutional under *Bruen*, the analysis begins with the question of whether the Second Amendment's plain text covers an individual's conduct; if so, the Constitution presumptively protects that conduct. *See id.* at 22–24. If that

---

[2] On appeal, New York did not challenge this Court's holding at the preliminary injunction stage that Plaintiff Christian had standing as to public parks, and the Second Circuit noted that it "see[s] no impediment to standing." *Antonyuk*, 89 F.4th at 352 n.68.

[3] Plaintiffs FPC and SAF reserve the right to seek to overrule circuit precedent that an organization does not have standing to assert the rights of its members under 42 U.S.C. § 1983. *See* Pls.' Reply in Supp. of Mot. for Prelim. Inj., Doc. No. 46 at 3–4 (Nov. 18, 2022). Plaintiffs do not brief this issue because they recognize that this Court is bound to reject their theory.

requirement is satisfied, "[t]he government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 24. In other words, it is New York's burden to "affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* at 19 (cleaned up); *see also id.* at 60 ("[W]e are not obliged to sift the historical materials for evidence to sustain [the State's] statute. That is respondents' burden."). New York will be unable to do so.

### A.  The Second Amendment's Plain Text Covers Plaintiffs' Conduct

Plaintiff Christian's proposed course of conduct—carrying a handgun in public parks and on private property open to the public—falls within the Second Amendment's plain text. *Id.* at 31–32. Thus, "the Constitution presumptively protects that conduct." *Id.* at 24.

The Supreme Court has already defined the Second Amendment's key terms. "[T]he people" includes "all Americans"; "arms" includes "all firearms"; and to "bear" simply means to "carry." *District of Columbia v. Heller*, 554 U.S. 570, 580–82, 584 (2008); *Bruen*, 597 U.S. at 32–33. Importantly, "[n]othing in the Second Amendment's text draws a home/public distinction with respect to the right to keep and bear arms." *Bruen*, 597 U.S. at 32. This makes it unlike the Third and Fourth Amendments, both of which specify particular locations. *See* U.S. CONST. amend. III; U.S. CONST. amend. IV. Thus, the "definition of 'bear' naturally encompasses public carry" for self-defense. *Bruen*, 597 U.S. at 32; *see also Christian v. Nigrelli*, 642 F. Supp. 3d 393, 404 (W.D.N.Y. 2022).

The Supreme Court's binding interpretation of these words and phrases establishes that Plaintiff Christian's proposed conduct is covered by the plain text of the Second Amendment. He is a law-abiding American seeking to carry bearable arms (handguns) for self-defense during his

daily life, including when he frequents private property open to the public and public parks. SUMF ¶¶ 2, 23. As in *Bruen*, these undisputed facts end the textual inquiry. *See* 597 U.S. at 31–32.

### B.  New York Cannot Show that its Carry Bans are Consistent With the Nation's Historical Tradition of Firearms Regulation

Under *Bruen*, the burden now shifts to New York. It must show that the challenged bans are "consistent with this Nation's historical tradition of firearm regulation." *Id.* at 34. And it must do so by offering persuasive legal history. *See id.* at 25 & n.6 (Courts "decide a case based on the historical record compiled by the parties."). But no historical tradition of analogous regulation exists. Under *Bruen*, three considerations must guide the State's presentation (and the Court's consideration) of the State's historical evidence.

First, the key historical starting point when assessing analogues under *Bruen* is the Founding era, centering on 1791. *See Lara v. Comm'r Pa. State Police*, 91 F.4th 122, 134 (3d Cir. 2024). This conclusion is the only one that comports with the Supreme Court's longstanding practice of looking to 1791 when analyzing the content of incorporated rights. *See, e.g.*, *Ramos v. Louisiana*, 140 S. Ct. 1390, 1396 (2020) (discussing the history of a unanimous jury right by referencing "young American States" and the "backdrop" of the ratification of the Bill of Rights in 1791); *Timbs v. Indiana*, 139 S. Ct. 682, 687–88 (2019) (discussing "colonial-era provisions" and the "constitutions of eight States" when analyzing the Eighth Amendment excessive fines clause); *Virginia v. Moore*, 553 U.S. 164, 168 (2008) (looking to the "statutes and common law of the founding era to determine the norms that the Fourth Amendment was meant to preserve"); *cf. Lynch v. Donnelly*, 465 U.S. 668, 674 (1984) (finding the decisions of the 1789 Congress to be of "special significance" to the Court's Establishment Clause analysis). *See also, e.g.*, Mark W. Smith, *'Not all History is Created Equal': In the Post-Bruen World, the Critical Period for Historical Analogues Is When the Second Amendment Was Ratified in 1791, and not 1868*, SSRN (Oct. 1,

2022), https://bit.ly//3CMSKjw.

While the Second Circuit has held that the "focal points" when evaluating a state law are 1791 and 1868 and the "time periods in close proximity to" those years, it was also careful to note that Reconstruction-era history cannot control to the *exclusion* of Founding-era history. *Antonyuk*, 89 F.4th at 304–05. This makes sense because when the Second Amendment was incorporated against the states, it carried with it the meaning established in 1791—"when the people adopted" it. *Bruen*, 597 U.S. at 34 (cleaned up). The Fourteenth Amendment simply established *that* the Second Amendment applied to the states, not what the Amendment means. Any contrary holding would mean that the Second Amendment has a different meaning in a new state that joins the union in 2024. Similarly, the Second Amendment would mean something different in Hawaii, which became a state in 1959, if its meaning were re-assessed the first time it applies in a state.

The Second Circuit continued by explaining that late 19th century evidence "inconsistent with the [preexisting] National tradition" is not probative. *Antonyuk*, 89 F.4th at 366. Correctly so because "not all history is created equal[,]" and courts must be careful not to overweigh historical evidence that long predates or postdates the Founding and Reconstruction eras. *Bruen*, 597 U.S. at 34; *Antonyuk*, 89 F.4th at 304. As the Second Circuit put it, "the farther we depart from these key dates, the greater the chance we stray from the original meaning of the constitutional text." *Antonyuk*, 89 F.4th at 304. Thus, "to the extent later history contradicts what the text [of the Second Amendment] says, the text controls." *Bruen*, 597 U.S. at 36; *see also id.* at 82–83 (Barrett, J., concurring) (noting that "freewheeling reliance on historical practice from the mid-to-late 19th century to establish the original meaning" of the Second Amendment is improper). And the Supreme Court's precedents teach that even extensive history will not move the needle if it long post-dates the Founding. *See, e.g.*, *Espinoza v. Mont. Dep't of Revenue*, 140 S. Ct. 2246, 2258–59

(2020) (finding unpersuasive "more than 30" provisions of state law from the "second half of the 19th century" because they were not grounded in Founding-era practices regarding the Free Exercise Clause). At most, the Supreme Court has looked to post-ratification evidence as "'mere confirmation of what the Court thought had already been established.'" *Bruen*, 597 U.S. at 37 (quoting *Gamble v. United States*, 139 S. Ct. 1960, 1976 (2019)).

Second, to be a "proper analogue[,]" a law must be "relevantly similar" based on "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 29. In other words, the modern regulation must impose a "comparable burden on the right of armed self-defense" as did the historical regulation, and for a similar reason. *Id.* This requirement means that historical laws arising in different contexts, and for different reasons, will be inapt comparators. For example, hunting regulations in 1791 tell us little about whether New York can ban carry in public parks. Such Founding era laws regulated the right to carry firearms in a particular circumstance—when hunting (the "how"). And the rationale for such restrictions included regulating hunting and reducing the taking of certain animals (the "why"). Neither has much resemblance to an individual's right to self-defense while hiking in a New York park or wilderness area today.

Third, historical analogues must be representative. Laws existing in only a handful of jurisdictions—historical "outliers"—should be disregarded. *Id.* at 30 (cleaned up). A smattering of regulations is not a "historical tradition" of regulation sufficient to inform the original public meaning of the right. *See, e.g.*, *id.* at 65 (rejecting restrictions in one state statute and two state court decisions as not representative); *id.* at 46 (doubting that "three colonial regulations could suffice to show a tradition of public-carry regulation" (emphasis omitted)); *Christian*, 642 F. Supp. 3d at 407 ("[T]he notion of 'tradition' is the opposite of one-offs, outliers, or novel enactments.");

*Koons v. Platkin*, No. 22-7464, 2023 WL 3478604, at *68 (D.N.J. May 16, 2023) (finding three Reconstruction era laws non-representative); *see also id.* at *85 (finding one state law and 25 local ordinances, covering less than 10% of the nation's population, insufficient). Similarly, the Second Circuit has held that "a one-off and short lived territorial law . . . will not carry the day if it contradicts" other evidence. *Antonyuk*, 89 F.4th at 301. While the Second Circuit at times considered territorial restrictions that it found consistent with earlier tradition, *see id.* at 359–60, Plaintiffs respectfully disagree that such restrictions should carry any weight at all. *Bruen* categorically held that all territorial laws—not merely the set that it analyzed—are afforded "little weight" because they were "localized" and "short lived," covered "miniscule territorial populations," and were "rarely subject to judicial scrutiny." 597 U.S. at 67–69.

### C.  Analogies to Recognized Sensitive Places

Recognizing that it lacks analogous regulations to support its carry restrictions, New York will likely fall back on *Bruen*'s suggestion that carry can be restricted in "sensitive places." *Id.* at 30. But the State cannot stretch that narrow exception to cover its bans without swallowing the general rule that public carry for self-defense is permitted. And it will be unable to analogize its bans to a "presumptively" lawful sensitive place restriction. *Id.* at 31. While the *Bruen* Court did not delineate an all-encompassing list of sensitive places, it mentioned only three such locations at the Founding "where weapons were altogether prohibited": legislative assemblies, polling places, and courthouses. *See* 597 U.S. at 30; *see also* David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine: Locational Limits on the Right to Bear Arms*, 13 CHARLESTON L. REV. 205, 289–90 (2018). Accordingly, this Court may analogize to "*those* historical regulations of 'sensitive places' to determine that modern regulations prohibiting the carry of firearms in *new* and analogous sensitive places are constitutionally permissible." *Bruen*, 597 U.S. at 30 (first

emphasis added). But it should not accept New York's likely attempt to link the challenged bans to these narrow categories.

Understanding *why* these places were deemed sensitive at the Founding requires analysis of what they have in common. And the three sensitive places *Bruen* identified all shared a key characteristic at the Founding. Legislative assemblies, polling places, and courthouses were all protected by comprehensive, government-provided security, impacting the public's need for individual weapons. *See e.g.*, Kopel & Greenlee, *supra*, at 292 ("When armed guards are present, the government takes the responsibility for having armed force at the ready to protect citizens."); Amicus Br. for Angus Kirk McClellan et al., *Wolford v. Lopez*, No. 23-16164 (9th Cir. Nov. 9, 2023), Doc. No. 48.

Founding-era examples of comprehensive security in these locations abound.[4] Start with legislatures. Rhode Island, Delaware, Pennsylvania, South Carolina, New York, Georgia, New Jersey, Virginia, and Vermont all enacted statutes compensating law enforcement to attend and provide security at their legislatures. *See* The Public Laws of Rhode Island 220, 222 (Providence, Carter & Wilkinson 1798) (providing fees for sheriffs, town sergeants, and constables to attend the general assembly); 2 Laws of Delaware 1100, 1118 (Samuel & John Adams eds., 1797) (similar); 10 Pennsylvania Statutes At Large 378 (William Stanley Ray ed., 1904) (referencing sergeant-at-arms and door-keeper for legislature); Public Laws of South Carolina 426, 427 (Philadelphia, R. Aitken & Son 1790) (providing for payment of door-keepers for the legislature); 1 Laws of New York 532 (Charles R. & George Webster 1802) (similar); A Compilation of the Laws of Georgia 373 (Augustine Smith Clayton ed., Augusta, Adams & Duyckinck 1812) (similar); Journal of the Votes and Proceedings of the Provincial

---

[4] Attachment A to this Brief collects Plaintiffs' historical sources for ease of reference.

CONGRESS OF NEW JERSEY 239, 240 (Burlington, Isaac Collins, *reprinted in* Woodbury, Joseph Sailer 1835) (similar); JOURNAL OF THE HOUSE OF DELEGATES OF THE COMMONWEALTH OF VIRGINIA 77 (Thomas W. White 1828) (similar); LAWS OF VERMONT 382, 387 (Randolph, Sereno Wright 1808) (similar).

The same was true of courthouses. South Carolina, Virginia, Delaware, New Jersey, New York, and Pennsylvania by statute required law enforcement officials to attend court. *See* THE PUBLIC LAWS OF SOUTH CAROLINA, *supra*, at 271 ("The Said sheriffs shall by themselves, or their lawful deputies respectively, attend all the courts hereby appointed, or directed to be held, within their respective districts"); A COLLECTION OF ALL SUCH ACTS OF THE GENERAL ASSEMBLY OF VIRGINIA 69–71 (1803) (similar); 2 LAWS OF DELAWARE, *supra*, at 1088, 1091 (similar); 1 LAWS OF NEW JERSEY 49, 50, 58 (Joseph Bloomfield ed., Trenton, James J. Wilson 1811) (similar); 1 LAWS OF NEW YORK 176 (Websters & Skinner 2d ed. 1807) (requiring during court "all justices of the peace, coroners, bailiffs, and constables within their respective counties, that they be then and there in their own persons… . And the said respective sheriffs and their officers shall then and there attend in their own proper persons."); 10 STATUTES AT LARGE OF PENNSYLVANIA, *supra*, at 57 (similar). Beyond these statutory requirements, the legislative record in other states indicates that law enforcement officials were compensated for attending judicial proceedings. *See* ACTS AND LAWS OF THE STATE OF CONNECTICUT 63–65 (New London, Timothy Green 1784); A DIGEST OF THE LAWS OF GEORGIA 471, 473–74, 478 (Robert & George Watkins eds., 1800); THE LAWS OF MARYLAND, ch. 25 (1799); ACTS AND RESOLVES OF MASSACHUSETTS 235 (Adams & Nourse 1893); LAWS OF NEW HAMPSHIRE 112–16 (1797); A MANUAL OF THE LAWS OF NORTH-CAROLINA 190–91, 196 (John Haywood ed., 3d ed. 1814); THE PUBLIC LAWS OF RHODE ISLAND, *supra*, at 220; LAWS OF VERMONT, *supra*, at 382, 287.

Polling places were similarly secured by government-provided security at the Founding, including in Georgia, Virginia, New Jersey, Maryland, Delaware, and South Carolina. *See* A DIGEST OF THE LAWS OF GEORGIA, *supra*, at 611 ("[T]he sheriff of each county or his deputy, is required to attend at such elections, for the purpose of enforcing the orders of the presiding magistrates in preserving good order."); ABRIDGEMENT OF THE PUBLIC PERMANENT LAWS OF VIRGINIA 325 (Augustine Davis ed., 1796) (similar); MD. CONST. art. 1 §§ 3, 14 (1776) (similar); LAWS OF NEW JERSEY, *supra*, at 36 (providing security at polling places); 2 LAWS OF DELAWARE, *supra*, at 984 (similar); THE PUBLIC LAWS OF SOUTH CAROLINA, *supra*, at 386–88 (table of fees includes payment to sheriffs for polling-place security).

In other words, legislative assemblies, polling places, and courthouses were "sensitive" because the government treated them as such by providing comprehensive security. Their sensitive nature was never a matter of simple government fiat. The closest thing to the comprehensive security provided at the Founding in legislative assemblies, polling places, and courthouses today is the armed guards and metal detectors at entrances to courthouses or TSA at the airport. *See Koons*, 2023 WL 3478604, at *90 ("Airports have many security measures such as Transportation Security Administration (TSA) officers, air marshals, police officers, metal detectors, and luggage scanners that all check people and their baggage for weapons and dangerous devices, like explosives."). That the government may be able to prohibit firearms in places secured by its own comprehensive security makes sense. The point of the Second Amendment is ensuring that Americans can be "armed and ready" for "ordinary self-defense needs." *Bruen*, 597 U.S. at 32, 60 (cleaned up). But when the government secures a location and protects those in it, there is less acute of a need for ordinary, law-abiding Americans to be ready to defend themselves. The problem for New York is that its public parks and private businesses open to the public do not have these

12

features. Visitors are not "screened by security[]" and such locations "do not have controlled entry points." *Bridgeville Rifle & Pistol Club, Ltd. v. Small*, 176 A.3d 632, 659 (Del. 2017). Because they lack the indicia of comprehensive security, carry cannot be banned in these locations.

New York's likely attempt to argue that carry can be restricted anywhere children are present (based on dictum from *Heller* that schools are sensitive places) must be rejected. First, as with the three sensitive places *Bruen* recognized as "presumptively lawful," it is necessary to understand precisely when, why, and how guns were historically restricted at schools. Founding-era restrictions that related to schools were limited in how they burdened Second Amendment rights. *See* Kopel & Greenlee, *supra*, at 249–52. Most importantly, they only applied to students, not faculty, staff, or visitors to campus. *See* Amicus Br. of the Ctr. for Hum. Liberty at 20–22, *Antonyuk v. Nigrelli*, No. 22-2908 (2d. Cir. Feb. 9, 2023), Doc. No. 313.[5] Thus, they did not burden Second Amendment rights in the same way as a general prohibition on carry wherever children are gathered, even accepting the questionable premise that children are usually or typically present in parks.

Finally, there was a particular reason why schools could legally disarm students: they historically exercised *in loco parentis* authority over them. *See, e.g.*, *Morse v. Frederick*, 551 U.S. 393, 413 n.3 (2007); *State v. Pendergrass*, 19 N.C. 365, 366 (1837) (recognizing that the "teacher is the substitute of the parent"); *State v. Mizner*, 45 Iowa 248, 251 (1876); *North v. Bd. of Trs. of*

---

[5] Restrictions summarized in this Brief are (1) the University of Virginia's 1825 ban on student possession in response to students' "spoiled and violent behavior" of previously "fir[ing] guns in the air, and sho[oting] at each other"; (2) Harvard's 1655 ban on students keeping guns; (3) Yale's 1795 ban on students keeping or firing guns; (4) North Carolina's 1799 ban on students keeping and using guns; (5) Rhode Island College (now Brown University)'s 1803 restriction on students keeping guns; (6) the University of Georgia's 1810 restriction on students keeping guns; and (7) Columbian College (now George Washington University)'s ban on students keeping firearms. None of these laws extended to school staff or visitors to campus.

*Univ. of Ill.*, 137 Ill. 296, 306, 27 N.E. 54, 56 (1891) ("By voluntarily entering the university, or being placed there by those having the right to control him, [the student] necessarily surrenders very many of his individual rights.").[6] Historical exercises of this authority do not support restricting firearm carry by anyone not subject to that sort of authority. Indeed, as even the dissenting opinion in *Lara* recognized, the historical evidence suggests that Founding-era restrictions by schools on student firearm possession "*was not* predicated on or justified by the student's presence at a sensitive location," but rather by the schools' "authority standing *in loco parentis*." 91 F.4th at 144–45 (Restrepo, J., dissenting) (emphasis added). It therefore follows that analogies from schools to places such as public parks lack any basis.

Second, Colonial- and Founding-era laws combine to form a robust tradition of not restricting (and sometimes requiring) firearm carry in crowded places such as public assemblies and religious services. *See* Kopel & Greenlee, *supra*, at 233–34 & n.108, 244; Clayton E. Cramer, *Colonial Firearm Regulation*, 16 J. FIREARMS & PUB. POL'Y 1 (2016); Benjamin Boyd, *Take Your Guns to Church: The Second Amendment and Church Autonomy*, 8 LIBERTY UNIV. L. REV. 653, 697–99 (2014); NICHOLAS JOHNSON ET AL., FIREARMS LAW & THE SECOND AMENDMENT 183–85 (2d ed. 2017). At one public gathering, now remembered as the Boston Massacre, British soldiers opened fire on a crowd of colonists in 1770. In defending the soldiers at trial, John Adams conceded that, in this country, "every private person is authorized to arm himself; and on the strength of this authority I do not deny the inhabitants had a right to arm themselves at that time

---

[6] Although colleges and universities were historically understood to possess *in loco parentis* authority over their students, they are no longer understood to have that authority. *See, e.g.*, *McCauley v. Univ. of the Virgin Islands*, 618 F.3d 232, 243 (3d Cir. 2010). These historical laws would accordingly not justify firearm bans on college students today.

for their defence." John Adams, Argument for the Defense: 3-4 December 1770, NAT'L ARCHIVES FOUNDERS ONLINE, https://bit.ly/35FCuRh.

And at least some Founding-era gatherings—replete with firearms— presumably included the presence of children and other vulnerable groups. For example, *Heller* cited a 1770 Georgia law requiring men to carry firearms "to places of public worship." 554 U.S. at 601. Similarly, Maryland in 1642, and Virginia in 1619 and 1642 required able-bodied men to bear arms while at church. 3 ARCHIVES OF MARYLAND 103 (William Hand Browne ed., Baltimore, Md. Hist. Soc'y 1885); Kopel & Greenlee, *supra,* 233–34 & n.108, 244; Boyd, *supra,* 697–99; 1 THE STATUTES AT LARGE OF VIRGINIA 174, 263 (William Walker Hening ed., 1808). And Connecticut in 1643, Massachusetts in 1643, and Rhode Island in 1639 all required individuals to come armed to public meetings. *See* THE PUBLIC RECORDS OF THE COLONY OF CONNECTICUT 93–95 (Hartford, Brown & Parsons 1850); 2 RECORDS OF MASSACHUSETTS BAY 38 (Nathanial B. Shurtleff ed., 1853); 1 RECORDS OF THE COLONY OF RHODE ISLAND 94 (Russell Bartlett ed., 1856). History reveals that the Founding-era tradition was to *require* the bearing of arms around vulnerable people, because disarming the vulnerable and their caretakers makes them *more vulnerable*, not less. At least one federal district court recently concluded as much. *See May v. Bonta*, No. 23-cv-1696, 2023 WL 8946212, at *11 (C.D. Cal. Dec. 20, 2023) ("Rather than delivering children to the state (sometimes with armed officers) for protection, at playgrounds parents and caregivers remain responsible for their children's safety without any immediate support[,]" and California's "prohibition on CCW permitholders carrying firearms at playgrounds and youth centers eviscerates their ability to defend themselves and their children against attack"); Order, *May v. Bonta*, No. 23-4356 (9th Cir. Jan. 6, 2024), Doc. No. 20.1 (dissolving administrative stay and denying California's motion for stay pending appeal).

Third, *Bruen* did not include schools on its list of locations where firearms could be "presumptively" banned. *See* 597 U.S. at 30–31. Rather, it cited as an example of the continuing importance of Second Amendment rights in the Reconstruction Era the *arming of teachers* in Freedmen's Bureau schools. *See id.* at 61. Far from endorsing schools as sensitive places, *Bruen* thus suggested that there is no historical tradition of barring carry in them altogether. While *Bruen* cited *Heller*'s earlier suggestion (in dicta) that "schools and government buildings" potentially could be considered "sensitive places," *Bruen* pointed to firearm regulation only at three specified places and instructed courts to "use analogies to *those* historical regulations of 'sensitive places'" when assessing the constitutionality of firearm restrictions at modern locations. *Id.* at 30 (emphasis added). It makes little sense to say that *Bruen*'s list of three specific types of government buildings is in reality a conclusion that all government buildings are sensitive. *Accord United States v. Ayala*, No. 8:22-cr-369, 2024 WL 132624, at *11 (M.D. Fla. Jan. 12, 2024). Nor is this in anyway inconsistent with *Heller*, which did not purport to "clarify the entire field[]" of Second Amendment rights and stated that "there will be time enough to expound upon the historical justifications for the exceptions we have mentioned if and when those exceptions come before us." 554 U.S. at 635. As explained, to the extent firearms historically were restricted in schools, those restrictions were limited to students over whom the schools had *in loco parentis* authority.

It also defies *Bruen*'s logic to hold that places with high concentrations of children (again, parks do not necessarily qualify) automatically become gun free zones. Instead, *Bruen* recognized a general right to public carry in many locations where children are undoubtably present, such as sidewalks and "the island of Manhattan." *See, e.g.*, 597 U.S. at 31, 33. Lastly, *Bruen* also cautioned against construing "sensitive places" "too broadly," lest the narrow exception "in effect exempt cities from the Second Amendment and [] eviscerate the general right to publicly carry arms for

16

self-defense[.]" *Id.* at 31. But that is precisely the effect of creating some nebulous category of sensitive place based merely on some undefined concentration of young persons, as it would permit the banning of firearms in all churches with Sunday Schools, at birthday parties, in community centers, and even backyard barbeques. Of course, there is no historical tradition of any of that.

It is thus not enough to say, with no limiting principle, that a place is simply "like a school" and thus sensitive because children gather there. Doing so would "eviscerate" the general right to carry for self-defense in public. Carry for self-defense and for defense of the vulnerable is *most* acute at places like public parks because vulnerable children are *less* capable of defending themselves than the average adult. Criminals and mass murderers, including those who target soft targets with vulnerable populations, will not respect New York's creation of gun free zones for private citizens—and indeed may be emboldened by the knowledge that law-abiding citizens are barred from carrying firearms at private businesses open to the public and at parks, both urban and non-urban.

### D.  The State Will be Unable to Identify a Historical Tradition of Carry Bans in the Challenged Locations

#### 1.  The No-Carry Default

Rather than presuming that licensed, law-abiding citizens have constitutional rights to carry, New York's no-carry default does the opposite. As the Second Circuit recognized, because "the restricted location provision functionally creates a universal default presumption against carrying firearms in public places, [it] seriously burden[s] lawful gun owners' Second Amendment rights." *Antonyuk*, 89 F.4th at 386. This turns our Nation's traditional regulatory approach on its head. At the Founding, "private property owners" had principal responsibility to "exclude others from their property." *Christian*, 642 F. Supp. 3d at 407, *aff'd* 89 F.4th at 386; *accord* Kopel &

Greenlee, *supra*, at 291. As such, carrying on private property is "generally permitted absent *the owner's* prohibition." *Christian*, 642 F. Supp. 3d at 407 (emphasis added).

These principles stem from the law of trespass, specifically "the well-developed concept of implied license[.]" *Koons*, 2023 WL 3478604, at *58. Generally, the public has implied consent to enter property open to the public, "unless such consent is conditioned or subsequently revoked by the property owner[.]" *Id.* And because "[t]he right to armed self-defense follows the individual everywhere he or she lawfully goes" in public, carrying on property open to the public is permitted unless the owner "withdraw[s] consent." *Id.* at *61. Given these principles, New York will be unable to root a tradition of carry bans in private property open to the public in the Founding era, nor point to any Reconstruction era regulation confirming that earlier tradition. The State's effort to flip a longstanding Second Amendment presumption cannot stand.

The reason the State has sought to flip the default rule is obvious. "Given the inertial tendency to stick with the status quo, lawmakers should expect that a 'prohibited-unless permitted' default would radically expand the private spaces where guns could not be carried." Ian Ayres & Spurthi Jonnalagadda, *Guests with Guns: Public Support for "No Carry" Defaults on Private Land*, 48 J. L. Med. & Ethics 183, 184 (2020). After all, a "default rule" of interaction with strangers—including members of the public coming to a property open to the public—is particularly "sticky." *See generally* Omri Ben-Shahar & John A. E. Pottow, *On the Stickiness of Default Rules*, 33 Fla. St. U. L. Rev. 651, 653 (2006). By "sticky," legal scholars mean that individuals have a well-known tendency to stick by the default rule even when they would otherwise take a different position. *Id.* at 651–54.

Thus, owners of private property in New York that is open to the public, which might otherwise allow or be indifferent to licensed carry on their property, may stick to the new default.

If they do, it "might have knock-on effects, reducing preferences to carry and possess firearms more generally, as it becomes increasingly inconvenient to do so." Ayres & Jonnalagadda, *supra*, at 184. Plaintiff Christian is already feeling these effects because the no-carry default has caused him to stop carrying near private businesses, and to reduce his carry practices drastically. SUMF ¶¶ 23–25. And the right of self-defense may well become necessary for Plaintiff Christian at one of these private business, as violent actors may enter them at any time. *See, e.g.*, Orlando Mayorquin, *Store Owner is Fatally Shot by Man Who Confronted Her About Pride Flag,* N.Y. TIMES (Aug. 20, 2023), https://nyti.ms/3rbCMOg.

In sum, New York cannot flip a constitutional presumption. The default is that Plaintiff Christian has a "right to 'bear' arms in public for self-defense." *Bruen*, 597 U.S. at 33. As the Second Circuit has already held in *Antonyuk*, none of the historical analogues proffered to date by New York justify the no-carry default. *See Antonyuk*, 89 F.4th at 385–86. This is so because none are relevantly similar in "how" or "why" they burden Second Amendment rights. *See id.* Plaintiffs are aware of no new historical evidence that New York could possibly offer to support the no-carry default. Every court to have faced a no-carry default has enjoined it, and this Court should do the same, permanently. *See, e.g.*, *id.* at 386; *Koons*, 2023 WL 3478604, at *68; *Christian*, 642 F. Supp. 3d at 407; *Wolford v. Lopez*, No. 23-cv-265, 2023 WL 5043805, at *29 (D. Haw. Aug. 8, 2023); *Siegel v. Platkin*, 653 F. Supp. 3d 136, 156–58 (D.N.J. 2023); *Kipke v. Moore*, No. 23-cv-1293, 2023 WL 6381503, at *14 (D. Md. Sept. 29, 2023); *May*, 2023 WL 8946212, at *15–16.[7]

---

[7] Several courts of appeals stayed these decisions pending appeal without any reasoning. The Third Circuit denied a motion to stay this aspect of the district Court's preliminary injunction order in *Koons* and *Siegel*, as did the Ninth Circuit in *May.*

### 2.  Public Parks

Plaintiff Christian brings both a facial challenge to New York's restriction on carry in public parks, and an as-applied challenge to the carry restrictions in non-urban parks specifically. For the latter category, the Second Circuit specifically "doubt[ed] that there is historical support for the regulation of firearms in wilderness parks, forests, and reserves." *Antonyuk*, 89 F.4th at 356.

"[W]hen a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Bruen*, 597 U.S. at 26. There is nothing new about parks, and there is nothing new about potential violence in parks or in public green spaces more generally. Many parks were created before 1800, including the National Mall in Washington, DC, Boston Common in Massachusetts, Battery and Duane parks in New York, and more. *See* Trust for Public Land, *The 150 Largest City Parks*, https://bit.ly/47VJw1Q ("*Largest City Parks*"); Margaret Walls, *Parks & Recreation in the U.S.: Local Park Systems*, RES. FOR THE FUTURE (June 2009), https://bit.ly/42gjo0D ("Walls"). And several dozen more parks were created in the years preceding the Fourteenth Amendment's ratification. *See Largest City Parks.*

For example, Boston Common, established in 1634, is considered "the nation's first city park." Walls at 1; *accord Koons*, 2023 WL 3478604, at *83. It was the opposite of a gun-free zone. Indeed, the space was commonly used for militia purposes, including training with firearms. *See* Anne Beamish, *Before Parks: Public Landscapes in Seventeenth- and Eighteenth-Century Boston, New York, and Philadelphia*, 40 LANDSCAPE J. 1, 3–6 (2021). And "[t]he Common also served as a site for informal socializing and recreation" including "[s]trolling," "[h]orse- and carriage-riding," "sports," "entertainment," and "raucous celebrations." *Id.*; *see also Boston Common*,

NAT'L PARK SERV., https://bit.ly/3SGumtc ("[T]he Common was a place for recreation as early as the 1660s."). In New York, City Hall Park began as a "public common" in the 17th century. *The Earliest New York City Parks*, N.Y.C. DEP'T OF PARKS & RECREATION, https://on.nyc.gov/3hBZXfe. And New York's Bowling Green Park was established in 1733. *Id.* Nearby Duane Park was also the first open space purchased "specifically for use as a public park" in 1797. *Duane Park Origins*, THE HIST. MARKER DATABASE, https://bit.ly/3S92dt4. Other examples abound in the colonies and early Republic. *See, e.g.*, *Largest City Parks* at 5–6.

Despite widespread early existence of parks—some in the largest towns of the day—there is no analogous historical tradition of banning firearm carry there by law-abiding citizens. *Accord Koons*, 2023 WL 3478604, at *82–85; *May*, 2023 WL 8946212, at *12–13; *Springer v. Grisham*, No. 23-cv-781, 2023 WL 8436312, at *7–8 (D.N.M. Dec. 5, 2023). Quite to the contrary. In fact, had the colonists left their muskets at home when they mustered on the Lexington Common (also known as the Lexington Battle Green) in April of 1775, we might still be British subjects. Even before *Bruen*, courts had rejected attempts to characterize such locations as "sensitive places." *See, e.g.*, *Small*, 176 A.3d at 658 (holding that State parks and State forests were not "sensitive places" and that the County's ban on firearms in such places was unconstitutional under Delaware's version of the Second Amendment); *People v. Chairez*, 104 N.E.3d 1158, 1176 (Ill. 2018) (holding that an Illinois statute that banned possession of firearms within 1,000 feet of a public park violated the Second Amendment and rejecting argument that that area was a "sensitive" place); *DiGiacinto v. Rector & Visitors of George Mason Univ.*, 704 S.E.2d 365, 370 (Va. 2011) (contrasting "a public street or park" with sensitive places). These locations did not become "sensitive" overnight simply because more individuals are now carrying.

For all these reasons, Plaintiffs should prevail on their facial challenge to New York's restriction on carry in parks. To be sure, the Second Circuit held in *Antonyuk* that New York presented a tradition of relevantly similar analogues supporting carry restrictions in urban public parks at the preliminary injunction stage. *Antonyuk*, 89 F.4th at 363. But New York will be unable to defeat Plaintiffs' summary judgment motion because they cannot show *any* tradition of banning carry in the numerous Colonial and Founding era parks Plaintiffs have just discussed.

Moreover, Plaintiffs respectfully disagree with the Second Circuit's use of analogues from "often-crowded public squares" and "fairs[] [and] markets" to support the parks restriction at the preliminary injunction stage. *Id.* at 362–63. The Second Circuit reached back to the 1328 Statute of Northampton, which *Bruen* unequivocally held "has little bearing on the Second Amendment adopted in 1791." 597 U.S. at 41. This was true for several reasons. First, the Court explained that it is too old to inform the meaning of the Second Amendment at the Founding. *See id*. Second, it noted that its prohibition on going or riding armed centered on large weapons used in combat because handguns were not yet invented. *See id.* at 41–42. Third, the Court reasoned that the Statute of Northampton confirmed and echoed the common law "affray" tradition that individuals cannot go armed with evil intent to terrify others. *See id.* at 40. For all these reasons, the Statute of Northampton, and its Founding-era Virginia (and alleged North Carolina) replica, *see Antonyuk*, 89 F.4th at 356, are not viable analogues to laws prohibiting carry by the law-abiding.

As the Second Circuit recognized, the Virginia law included an express "terror" element. *Id.* at 357 n.74. It thus latched on to the lack of an express terror element in the purported North Carolina law. But that law was *never* passed by the North Carolina legislature. As the references to the King in the statute indicates, it is merely a copy of the 14th Century Statute of Northampton. It appears in a 1792 publication drafted by a private lawyer who was merely surmising what British

laws remained in force in North Carolina. "Later compilers wrote that this work 'was utterly untrustworthy'" and inserted many laws that were never in force.[8] Stephen P. Halbrook, *Faux Histoire of the Right to Bear Arms:* Young v. Hawaii at 21, SSRN, https://bit.ly/3QyFZA5 (citing "Preface of the Commissioners of 1838," *Revised Code of North Carolina*, xiii (1855)). Indeed, when the North Carolina General Assembly passed an Act to enact English Statutes in 1749, it omitted the Statute of Northampton. *See* A COLLECTION OF ALL THE PUBLIC ACTS OF ASSEMBLY OF THE PROVINCE OF NORTH-CAROLINA 293, 295 (Newbern: James Davis, 1752). Moreover, James Iredell (who later became a Supreme Court Justice) was commissioned by the North Carolina General Assembly to revise and compile all laws that remained in force in the state following the Declaration of Independence.[9] He too did not include the Statute of Northampton. *See id.* To the extent the statute was *ever* in effect in North Carolina, it ceased to have any force as of January 1838. *See State v. Huntley*, 25 N.C. 418, 420 (N.C. 1843) (emphasizing the terror element implicit in the Statute of Northampton, even though the Court doubted it was ever adopted). Without the North Carolina law, New York is utterly bereft of any Founding-era statute barring carry in places at all analogous to parks without a terror element.

In any event, New York will be unable to show as a factual matter that urban parks are often, or even usually, crowded. And for all the reasons discussed *supra* in Part I.C, that a place is crowded is not enough to deem it sensitive. And some of the historical evidence New York may submit—especially from Central Park—will reveal that certain parks following Reconstruction

---

[8] The author also conceded in the preface that this work was neither edited by others nor approved by the legislature: "no act of Assembly afforded it, and . . . many, even among the most respectable, professors of the law disagree in regard to the applicability of a number of British statutes . . . ." François-Xavier Martin, *A Collection of the Statutes of the Parliament of England in Force in the State of North-Carolina* iii (Newbern: The Editor's Press, 1792).

[9] James Iredell, *Laws of the State of North-Carolina* 70 (Edenton: Hodge and Wills, 1791).

were secured by guards at the gates. That supports Plaintiffs' argument that a place may be sensitive when the government takes steps to comprehensively secure it. *See supra*, Part I.C.

Plaintiff Christian also presses an as-applied challenge to non-urban parks. He frequented such locations before the carry ban in parks and intends to do so in the future if he can carry to protect himself from wildlife and other dangers. SUMF ¶¶ 4–13. And as noted, the Second Circuit "doubt[ed] that there is historical support for the regulation of firearms in wilderness parks, forests, and reserves." *Antonyuk*, 89 F.4th at 356. As the Second Circuit reasoned, the relevant analogue "for rural parks . . . appears to be 'commons' and 'wilderness areas.'" *Id.* at 362. This makes good sense because a restriction in Central Park is categorically different, and thus disanalogous to, any restrictions (to the extent they exist) governing wilderness or forest land. But none of the analogues New York previously offered to support its carry ban in parks apply to non-urban areas, and all thus flunk *Bruen*'s requirement of relevantly similar analogues. While New York may point to a restriction or two from later historical time periods in National Parks, such restrictions were clearly geared toward hunting when considered in context. In any event, they come too late to form a widespread national historical tradition of firearm regulation. Indeed, the States' analogues at the preliminary injunction stage specifically applied to city parks, which are a far cry from non-urban parks and open wilderness. *See id.* at 361–62. Indeed—the Second Circuit has already noted that the State lacked *any* relevantly similar historical analogue, let alone sufficient analogues to form a widespread tradition of restricting carry, to ban carry in locations like Adirondack Park. *See id.* at 362.[10] Plaintiff Christian fears for his safety in several non-urban parks and will not enter them unless he can carry a firearm for self-defense against criminals and wild animals. *See* SUMF ¶¶ 7–

---

[10] Indeed, New York has since amended the public carry ban to allow carry in "forest preserve(s)" which includes Adirondack Park. *See* N.Y. PENAL CODE § 265.01-e(2)(d).

13. Moreover, many of these parks—including Harris Hill State Forest Area and others—are wilderness areas far removed from any public safety response. *See* SUMF ¶ 11. If this Court declines to permanently enjoin the parks restriction facially, it should enjoin the restriction as-applied to carry in non-urban parks.

***

In sum, New York has impermissibly designated wide swaths of its state "sensitive" gun-free zones without any historical justification. More accurately, these zones are gun-free for the law-abiding; as the Founders well knew, violent criminals are unlikely to follow public carry restrictions and therefore "[s]uch laws make things worse for the assaulted and better for the assailants." Mark W. Smith, *Enlightenment Thinker Cesare Beccaria and His Influence on the Founders: Understanding the Meaning and Purpose of the Second Amendment's Right to Keep and Bear Arms*, 2020 PEPP. L. REV. 71, 83 (2020) (explaining that the Founders were influenced by prominent Enlightenment Thinker Cesare Beccaria, who was critical of gun control laws for this reason); THOMAS JEFFERSON, JEFFERSON'S LEGAL COMMONPLACE BOOK 521 (2019) (quoting Beccaria on this point). New York thus ignores the Supreme Court's instruction that "sensitive places" are "few" and "exceptional." *Bruen*, 597 U.S. at 30, 38; *Range v. U.S. Att'y Gen.*, 69 F.4th 96, 105 (3d Cir. 2023) ("[H]istorical restrictions on firearms in 'sensitive places' do not empower legislatures to designate any place 'sensitive' and then ban firearms there[.]").

## CONCLUSION

For all these reasons, this Court should permanently enjoin New York's prohibition on carry in private businesses open to the public and its carry restrictions in public parks, both facially and as-applied to non-urban parks.

Dated: March 1, 2024                                    /s/  David H. Thompson

David H. Thompson                                       Nicolas J. Rotsko
Peter A. Patterson                                      FLUET
COOPER & KIRK, PLLC                                     1751 Pinnacle Drive, Suite 1000
1523 New Hampshire Avenue, N.W.                         Tysons, VA 22102
Washington, D.C. 20036                                  (703) 590-1234 x 210
(202) 220-9600                                          (703) 590-0366 (fax)
(202) 220-9601 (fax)                                    nrotsko@fluet.law
dthompson@cooperkirk.com
ppatterson@cooperkirk.com

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on March 1, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the Western District of New York by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/   <u>David H. Thompson         </u>

David H. Thompson