# Plaintiffs' Appendix to Local Rule 56 Statement of Undisputed Material Facts

**TABLE OF CONTENTS**

| Exhibit | Document Title |
|---------|----------------|
| A | Declaration of Brett Christian in Support of Plaintiffs' Motion for Preliminary Injunction (Sept. 26, 2022) |
| B | Deposition of Brett Christian (Nov. 16, 2022) |

# Exhibit A

# UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| JOHN BORON<br>Depew, NY 14043<br><br>BRETT CHRISTIAN<br>Cheektowaga, NY 14225<br><br>FIREARMS POLICY COALITION, INC.<br>5550 Painted Mirage Rd. Ste. 320<br>Las Vegas, NV 89149, *and*<br><br>SECOND AMENDMENT FOUNDATION<br>12500 NE 10th Place<br>Bellevue, WA, 98005,<br><br>*Plaintiffs*,<br><br>v.<br><br>KEVIN P. BRUEN, in his official capacity as<br>Superintendent of the New York State Police<br>New York State Police<br>1220 Washington Avenue<br>Building 22<br>Albany, NY 12226,<br><br>JOHN J. FLYNN, in his official capacity as<br>District Attorney for the County of Erie, New<br>York<br>Erie County District Attorney's Office<br>25 Delaware Ave<br>Buffalo, NY 14202,<br><br>*Defendants*. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) Civil Action No. 1:22-cv-695<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## <u>DECLARATION</u>

I, Brett Christian, hereby declare under penalty of perjury, that the following information

is true to the best of my knowledge and state the following:

1.      I am over 18 years old. I am competent to give this declaration. I am providing this declaration based on my personal knowledge and experience.

2.      I am a citizen of the United States, and a resident and citizen of the State of New York, currently residing in Cheektowaga, New York. I am a current member of Firearms Policy Coalition, Inc., and the Second Amendment Foundation.

3.      I am not prohibited under state or federal law from acquiring or possessing firearms or ammunition.

4.      I am currently licensed to carry a handgun pursuant to New York law with a license issued by Erie County.

5.      On July 1, 2022, the State enacted S51001, which implements expansive new criminal laws that ban the carry of firearms in so-called "sensitive locations" and establishes a presumption that private property in the State is a "restricted location[]" where carrying firearms is forbidden absent affirmative steps by the property owner to allow them.

6.      After September 1, 2022, three of S51001's operative provisions—New York State Penal Law § 265.01-e(2)(d) (public parks), § 265.01-e(2)(n) (public transportation), and § 265.01-d (default anti-carry rule), with respect to places open to the public—as well as Defendants' regulations, policies, and enforcement practices implementing them, have barred me from carrying a firearm for self-defense in places that I previously carried in and would intend to keep carrying in, but for the enactment and enforcement of these provisions.

7.      Prior to the enactment and enforcement of S51001, I would carry a firearm for self-defense while walking in local parks or when hiking on trails in largely wooded and marshy areas a few times each month. As these places can be far removed from any public safety response, I

would intend to keep carrying for self-defense in these places, but now I cannot because of the enactment and enforcement of S51001.

8.      Prior to the enactment and enforcement of S51001, I submitted a request for time off at my place of employment for a couple of days in November 2022. I intended to visit the Adirondacks Park, a place that I visited prior to the Covid pandemic and to which I desired to return. During my planned visit to Adirondacks Park, I intended to carry a firearm for self-defense to protect myself from both criminal attack and wildlife, especially given that many areas in Adirondacks Park are far from any public safety response. Now, because of the enactment and enforcement of S51001, I have canceled any plans to visit Adirondacks Park this year because I cannot carry a firearm for self-defense and would be left defenseless.

9.      Prior to the enactment and enforcement of S51001, I would visit downtown Buffalo by taking NFTA Metro Rail, when traffic or events downtown made driving impractical. Now I will be unable to visit downtown Buffalo by taking public transportation and carry for self-defense, as I would intend to, but for the enactment and enforcement of S51001. This is particularly problematic for me personally because, by not being allowed to carry a firearm on public transportation, I will be unable to have a firearm with me when I arrive in downtown Buffalo, where I am concerned for the personal safety of myself and those I am with.

10.     Because of the presumptive designation of private property, which is open to all members of the public, as a "restricted location," I will be unable to carry my firearm for self-defense throughout the State. Prior to the enactment of S51001, I would typically bring my firearm with me on private property open to the public, including weekly visits to gas stations and monthly visits to hardware stores. I intended to continue to do so, but for the enactment and enforcement for S51001. Now throughout my community, establishments that are open to the public and in

3

which I previously carried a firearm, have failed to post conspicuous signage consenting to the carrying of firearms. But for the enactment and enforcement of S51001, I would continue to carry a firearm in establishments such as these that neither prohibit the carrying of firearms nor post signage consenting to the carrying of firearms.

11.     The presumptive designation of private property throughout the State as a "restricted location" has particularly burdened me when driving or running errands. Because of the enactment and enforcement of S51001, when I am driving, I am unable to take any bathroom breaks, pick-up or buy food, or to get gas if I am carrying my firearm with me and there is not "clear and conspicuous signage" indicating that the "carrying of firearms . . . is permitted." Since S51001 bars even entering these locations, I must disable and store my firearm before I drive my vehicle or walk into the parking lot, which means that sometimes I must stop carrying for self-defense before I can get physically close enough to see if any "clear and conspicuous signage" exists. I am concerned that the process of disabling and storing my firearm will put me in an uncomfortable situation with passersby observing me store my firearm.

12.     By having to constantly disarm in order to comply with S51001's provisions in places that I would otherwise carry in, but for the enactment and enforcement of S51001, I am left without the ability to defend myself and I am suffering diminished personal safety on a frequent and ongoing basis.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

Executed this 26 th day of September, 2022.

Brett Christian

4

# Exhibit B

```
 1        UNITED STATES DISTRICT COURT

 2        WESTERN DISTRICT OF NEW YORK

 3         ------------------------------------------------

 4        BRETT CHRISTIAN, FIREARMS POLICY COALITION,
          INC., and SECOND AMENDMENT FOUNDATION,
 5
                  Plaintiffs,
 6
           -vs-        Civil Action No. 22-cv-00695 (JLS)
 7
          STEVEN A. NIGRELLI, in his official capacity as
 8        Superintendent of the New York State Police,
          and JOHN J. FLYNN, in his official capacity as
 9        District Attorney for the County of Erie,

10                Defendants.
           ------------------------------------------------
11                      Examination Before Trial of BRETT

12        CHRISTIAN, held before Brooklyn Morton, Notary

13        Public, at Phillips Lytle, LLP, One Canalside,

14        125 Main Street, Buffalo, New York, on November

15        16th, 2022, commencing at 1:00 p.m. and ending

16        at 5:00 p.m., pursuant to notice.

17

18

19

20

21

22

23

24

25
```

```
 1        A P P E A R A N C E S

 2    APPEARING FOR THE PLAINTIFFS:

 3                    PHILLIPS LYTLE, LLP
                      BY: SAM WILLIAMS, ESQ.
 4                    One Canalside
                      125 Main Street
 5                    Buffalo, New York 14203
                      (716) 847-8400
 6

 7    APPEARING REMOTELY FOR THE PLAINTIFFS:

 8                    PHILLIPS LYTLE, LLP
                      BY: NICOLAS J. ROTSKO, ESQ.
 9                    One Canalside
                      125 Main Street
10                    Buffalo, New York 14203
                      (716) 847-8400

11    APPEARING FOR THE DEFENDANTS:

12                    STATE OF NEW YORK
                      OFFICE OF THE ATTORNEY GENERAL
13                    LETITA JAMES
                      BY: RYAN L. BELKA, ESQ.
14                    ASSISTANT ATTORNEY GENERAL
                      Main Place Tower
15                    350 Main Street
                      Buffalo, New York 14202
16                    (716) 853-8400

17

18

19

20

21

22

23

24

25
```

**W I T N E S S E S**

WITNESS          EXAMINATION                    PAGE


BRETT CHRISTIAN

                    BY MR. BELKA          5, 131

                    BY MR. ROTSKO         122



**E X H I B I T S**

EXHIBIT        DESCRIPTION                    PAGE

1   NFTA subway ticket                48

2   Declaration                       117

3   New York State concealed carry
    license application               119

4   List of firearms                  120

4

```
 1              MR. BELKA:  Nick, usual stipulations?
 2         Do you want to read and sign?
 3              MR. ROTSKO:  Yes, please.
 4              MR. BELKA:  Okay.  And so we will
 5         probably be on an expedited basis because the
 6         actual hearing in this matter is on the 22nd
 7         and so we have to submit it to the court before
 8         that and then he is going to need an
 9         opportunity to read it and sign it before then.
10              THE REPORTER:  Okay.  So ideally, what
11         day would you like the transcript by?
12              MR. BELKA:  Nick, that's a question for
13         you -- oh, I guess it's a question for me.
14         What are we at?  Is it the 15th or 16th?
15              THE REPORTER:  The 16th.
16              MR. ROTSKO:  The 16th today.
17              MR. BELKA:  And it's Wednesday.  Friday,
18         can we do it Friday?
19              MR. ROTSKO:  Is it possible to get it
20         tomorrow by any chance?
21              MR. BELKA:  Well, but I have to pay for
22         it if it's tomorrow.
23              MR. ROTSKO:  If there's an additional
24         fee, we would be willing to cover that.
25              MR. BELKA:  That's fine.  Tomorrow is
```

1    A. No, I have not.

2    Q. Okay.  Have you ever been involved in a

3       lawsuit before?

4    A. Not to my knowledge.  I have never given

5       testimony, never been in court in this type of

6       circumstance outside of a parking ticket.

7    Q. Okay.  Is it all right if I explain the rules

8       of a deposition to you very briefly?

9    A. Yes.  That would be fine.

10   Q. Okay.  So a deposition is testimony taken as

11      if you were on the stand in court.  Do you

12      understand that?

13   A. Yes.

14   Q. And in that capacity, you have been sworn in

15      under oath.  Do you understand that?

16   A. Yes, I do.

17   Q. Okay.  And is there anything that would

18      prevent you from telling the truth today

19      during this deposition?

20   A. Not to the best of my knowledge.

21   Q. Do you have -- have you taken any medication

22      that would prevent you from telling the truth

23      today?

24   A. No, I have not.

25   Q. Have you taken alcohol or illegal drugs that

—— DEPAOLO CROSBY REPORTING SERVICES, INC. ——
135 Delaware Avenue, Suite 301, Buffalo, New York  14202
716-853-5544

```
 1            would prevent you from testifying?
 2       A.  No, I have not.
 3       Q.  One thing to know about a deposition is that
 4            it's not like a usual conversation.  You have
 5            to wait until the end of my question and then
 6            answer the question.  Do you understand?
 7       A.  Yes.
 8       Q.  The goal here is to make a clear record of the
 9            question and answer for the court reporter and
10            the best way to do that even if you anticipate
11            the answer is to not speak over each other.
12            Is that understood?
13       A.  Yes.
14       Q.  Okay.  So is it fair that to the best of your
15            knowledge and recollection I will get the
16            truth from you here today to the questions
17            that I ask you?
18       A.  Yes.
19       Q.  I don't anticipate this to be a particularly
20            long deposition.  However, if you need a
21            break, just let me know and I will ask you to
22            answer whatever pending question before we
23            take a break or if you need to go to the
24            bathroom, okay?
25       A.  Understood.
```

1    Q.  Okay.  Do you have any questions for me about
2        your deposition today?
3    A.  At this time, I do not.
4    Q.  How did you come to be a plaintiff in this
5        lawsuit?
6    A.  Well --
7            MR. ROTSKO:  Objection to the extent it
8        calls for attorney-client privilege
9        information.
10   Q.  You still have to answer to the extent -- I
11       don't want you to -- let's make this clear for
12       the record.
13           I am not asking you for any information
14       or communication that you have received
15       directly from your attorneys, okay?  But I am
16       asking if you can tell me how you came to be a
17       plaintiff in this lawsuit without divulging
18       any particular attorney-client information.
19   A.  I approached them once the passage of the CCIA
20       happened and seeing that what was written in
21       black and white, how it would impact my life.
22       I approached them and expressed interest in is
23       there something that I could do by becoming a
24       plaintiff that might help to rectify how I
25       feel my rights have been infringed upon.

─── **BRETT CHRISTIAN - 11/16/2022** ───

1    Q.  Who is them in that sentence?  Who did you

2        approach?

3    A.  I approached FPC, Firearms Policy Coalition

4        and Second Amendment Foundation.

5    Q.  And how did you approach these two

6        organizations?

7    A.  I both called and emailed.

8    Q.  And when you approached these organizations

9        about being a plaintiff in a Second Amendment

10       lawsuit, what was the response?

11   A.  They asked me some initial questions to gain

12       some information about me as a person and then

13       we proceeded from there.

14   Q.  Can you recall what any of those initial

15       questions were and were they -- strike that.

16              Can you recall the manner in which you

17       received the initial questions?

18   A.  The initial questions, to the best of my

19       knowledge, were a phone conversation.

20   Q.  And who did you speak with?

21   A.  That would have been a lawyer named John from

22       what I can remember.

23   Q.  And --

24              MR. ROTSKO:  And the contents of that

25       would be privileged.

─── **DEPAOLO CROSBY REPORTING SERVICES, INC.** ───
135 Delaware Avenue, Suite 301, Buffalo, New York  14202
716-853-5544

─── **BRETT CHRISTIAN  -  11/16/2022** ───

1          MR. BELKA:  That's fine.  Well,

2      depending.

3

4      BY MR. BELKA:

5  Q. What organization did John work for?

6  A. I believe, to the best of my knowledge, that

7      would be Firearms Policy Coalition.

8          MR. ROTSKO:  If I may interject, Ryan.

9      And I don't want to slow you down, but let's

10     talk about the last name because if it's John

11     Tienken, he's an attorney at Cooper & Kirk and

12     that would be privileged.

13         MR. BELKA:  I understand.

14

15     BY MR. BELKA:

16 Q. So do you know if the John that you spoke to

17     after you initially approached the two

18     organizational plaintiffs in this case was

19     named John Tienken?

20 A. Yes.

21 Q. And that was your first contact after having

22     called and email the organizational

23     plaintiffs?

24 A. To the best of my knowledge, yes.

25 Q. At the time of your initial phone conversation

```
 1          with John Tienken, did you enter into an
 2          attorney-client relationship with him?
 3     A.  Yes.  They agreed to take me on as a
 4          plaintiff.
 5               MR. BELKA:  Nick, I am going to ask just
 6          so that you can object, okay?
 7
 8          BY MR. BELKA:
 9     Q.  Can you please tell me the content of the
10          questions and responses you gave to John
11          Tienken in that initial conversation?
12               MR. ROTSKO:  Objection.  I would direct
13          Mr. Christian not to answer because that
14          statement clearly calls for attorney-client
15          privileged communications.
16               MR. BELKA:  And, Nick, is it fair to say
17          that any questions that I ask regarding
18          Mr. Christian's communications with attorneys
19          at Cooper & Kirk will be -- he will be directed
20          not to answer under the guise of
21          attorney-client privilege?
22               MR. ROTSKO:  I will object when
23          questions would elicit attorney-client
24          communications.
25
```

─ **BRETT CHRISTIAN  -  11/16/2022** ─

```
 1        BY MR. BELKA:
 2     Q. Did you have any further conversations with
 3        John Tienken after that initial call?
 4     A. Yes.  There has been emails and phone
 5        conversations.
 6     Q. Okay.  Can you tell me the content of those
 7        emails and phone conversations?
 8             MR. ROTSKO:  Same objection.
 9     Q. Have you had any other communications with
10        other attorneys at Cooper & Kirk?
11     A. I do not remember if they worked for that
12        particular law firm because there has -- as
13        this has gone on, more and more people have
14        become involved.  I am not the best with last
15        names.  A little bit better with first names.
16     Q. Did you have a conversation with Sam today?
17     A. Yes, I did.
18             MR. BELKA:  All right.  Sam, what's your
19        last name?
20             MR. WILLIAMS:  Williams.
21
22        BY MR. BELKA:
23     Q. Okay.  Did you have a conversation with Sam
24        Williams today?
25     A. That's correct.
```

**DEPAOLO CROSBY REPORTING SERVICES, INC.**
135 Delaware Avenue, Suite 301, Buffalo, New York  14202
716-853-5544

─── **BRETT CHRISTIAN – 11/16/2022** ───

1   Q. And do you understand that he's an attorney at
2      Cooper & Kirk?
3   A. Yes.
4   Q. Okay.  Can you tell me what you guys said to
5      each other?
6          MR. ROTSKO:  Objection.
7   Q. When did you first become involved with the
8      Firearms Policy Coalition?
9          MR. ROTSKO:  Objection.  Vagueness of
10     involved.
11  Q. That's fair.  I am going to restate.
12         Brett, when did you first become a
13     member of the Firearms Policy Coalition?
14  A. I do not remember the exact date.  I just know
15     that I recently this year towards the end of
16     August renewed my memberships to multiple
17     organizations.
18  Q. When you say "multiple organizations," do you
19     have a number of organizations in your mind?
20  A. Approximately, between three to four.
21  Q. Okay.  Can you list them for me?
22  A. Firearms Policy Coalition, Gun Owners of
23     America, Second Amendment Foundation and New
24     York State Rifle Pistol Association, if I am
25     pronouncing that correctly.

——— **BRETT CHRISTIAN  -  11/16/2022** ———

1    Q.  Is that also sometimes referred to as NYSRPA?

2    A.  That would be correct.

3    Q.  Do you know if you let your membership of any

4        of these four organizations lapse prior to the

5        end of August of this year?

6    A.  Not that I am aware of.

7    Q.  As it relates to the Firearms Policy

8        Coalition, prior to August 2022, can you

9        recall how far back were you a member of the

10       Firearms Policy Coalition?

11   A.  I cannot remember the exact timeframe on that.

12   Q.  Do you recall if you were a member of the

13       Firearms Policy Coalition in the year 2021?

14   A.  Approximately, the earliest memory I have

15       would be around the passage of the SAFE Act

16       around 2013, approximately.

17   Q.  Is it fair to say that you joined the Firearms

18       Policy Coalition in and around the date of the

19       passage of the New York SAFE Act, S-A-F-E?

20   A.  Yes.

21   Q.  And whether or not it's an accurate

22       recollection, you believe that that was

23       sometime around 2013?

24   A.  Yes, to the best of my knowledge.

25   Q.  What did you have to do in 2013 to become a

1          member of the Firearms Policy Coalition?
2     A.  To the best of my knowledge, I am trying to
3          remember that far back.  You had to provide
4          address, name, there was a membership fee.
5          Back then I believe I would have just sent
6          cash.  I was a little more naive with the
7          mail, if you will.
8     Q.  Is that it, your address, name and cash?
9     A.  I believe so, to the best of my knowledge.
10    Q.  Do you recall between 2013 and August of 2022
11         renewing your membership at any point in time
12         for the Firearms Policy Coalition?
13    A.  I cannot remember definitive dates.  I do
14         remember sending money.
15    Q.  On how many occasions between 2013 and
16         August 2022 do you recall having sent money to
17         the Firearms Policy Coalition?
18    A.  There would be the yearly membership and then
19         depending on what court cases were going on
20         nationally, I would send extra to help.
21    Q.  How would you be alerted to yearly membership
22         dues?
23             MR. ROTSKO:  I am going to object to the
24         relevance of this line of questioning.  I don't
25         see what it has to do with the standing of

1           Mr. Christian during this lawsuit.  You can
2           answer the question, though.
3                MR. BELKA:  Also, the deposition is not
4           limited to issues of standing.  His affidavit
5           makes it clear that he is a member of these
6           organizations and I am interested in looking at
7           that.
8                MR. ROTSKO:  You did request a
9           deposition to address the issues of standing.
10                MR. BELKA:  I am going to get -- all
11           right.
12                MR. ROTSKO:  And yes, he did testify
13           that he is a member of FPC and he confirmed
14           that for you today.
15                MR. BELKA:  Right.
16                THE WITNESS:  Can you please ask it
17           again?
18                MR. BELKA:  I am going to have the court
19           reporter read it back.
20
21                     (The question was read.)
22
23                THE WITNESS:  Usually I would get
24           letters, flyers, information packets in the
25           mail.

─── **BRETT CHRISTIAN  -  11/16/2022** ───

```
 1        BY MR. BELKA:
 2     Q. And how would you be alerted to extra court
 3        cases that you would be willing to provide
 4        extra money for?
 5     A. Either word of mouth or looking online at
 6        their website, looking at various cases they
 7        are involved in that I would consider to be of
 8        importance.
 9     Q. Did you look at the website of the Firearms
10        Policy Coalition before you called and emailed
11        to become a plaintiff in this case?
12     A. Yes.
13     Q. Did you notice any requests for plaintiffs on
14        the Firearms Policy Coalition, to contact them
15        if you wanted to be a plaintiff?
16     A. That I did not.
17     Q. I just want to be clear.  Prior to
18        volunteering to be a plaintiff in this case
19        you had looked at the Firearms Policy
20        Coalition website, correct?
21     A. Correct.
22     Q. And you have never seen anything on the
23        Firearms Policy Coalition website that seeks
24        plaintiffs to challenge Second Amendment
25        issues?
```

1    A.  I have not.  I am very tunnel vision focused
2        so when I would go to their website right at
3        the top there is the tab and I would ignore
4        everything else I see and just click ongoing
5        legal action.
6    Q.  Okay.  And is it your testimony that the only
7        portion of the Firearms Policy Coalition
8        website that you looked at would be the
9        ongoing legal action section?
10   A.  Yes.
11   Q.  How did you get the contact information in
12       order to offer your services as a plaintiff to
13       the Firearms Policy Coalition?
14           MR. ROTSKO:  Objection to the
15       characterization of what Mr. Christian is doing
16       here.
17           MR. BELKA:  You still have to answer.
18           MR. ROTSKO:  You may answer.
19           THE WITNESS:  Can you ask it again,
20       please?
21
22               (The question was read.)
23
24           THE WITNESS:  A combination of word of
25       mouth locally as well as online.

```
 1         BY MR. BELKA:
 2    Q.  When you say "online," what do you mean?
 3    A.  Various pro Second Amendment news
 4         organizations.
 5    Q.  Do you have those various pro Second Amendment
 6         news organizations in your mind at this time?
 7    A.  Some, but not all.
 8    Q.  Okay.  Can you list for me the ones that you
 9         have in your mind at this time?
10    A.  Thetruthaboutguns.com, Bearingarms.com, as
11         well as YouTube creators, presenters,
12         reporters.  I am not sure what the correct
13         phrasing for that would be.
14    Q.  I think the noun is YouTubers.  Does that
15         sound right?
16    A.  I could agree to that, yes.
17    Q.  Okay.  So various YouTubers that you found
18         that are pro Second Amendment?
19    A.  Correct.
20    Q.  Okay.  Do you know if any of the -- do you
21         know if Thetruthaboutguns.com is affiliated
22         with the Firearms Policy Coalition?
23    A.  I do not.
24    Q.  Do you know if Bearingarms.com is affiliated
25         with the Firearms Policy Coalition?
```

1    A. I do not.
2    Q. Do you know if any of the various YouTubers
3       who you have identified are associated with
4       the Firearms Policy Coalition?
5    A. I do not.
6    Q. Do you know any of the names of those
7       YouTubers?
8    A. There would be Mrgunsngear.  That would be one
9       of them.  That would be the primary one.
10      There was also -- he passed away, but Chuck
11      Yeager was very active as well.  There is a
12      YouTuber by the name of Garand Thumb.  Him as
13      well.
14   Q. When you called and emailed to offer your
15      services as a plaintiff you mentioned both the
16      Firearms Policy Coalition and the Second
17      Amendment Foundation, correct?
18   A. Correct.
19   Q. Do you know which one of them you contacted or
20      -- strike that.
21          Do you know which one of them you
22      called?
23   A. First was Firearms Policy Coalition and then
24      second was the Second Amendment Foundation.
25   Q. What was the gap in time between your first

—— BRETT CHRISTIAN  -  11/16/2022 ——

```
 1          call to the Firearms Policy Coalition and your
 2          second call to the Second Amendment
 3          Foundation?
 4     A.  It was same day.
 5               MR. ROTSKO:  Objection.
 6     Q.  Did you also call Gun Owners of America?
 7     A.  Well, that would be same day as well.
 8     Q.  Did you also call NYSRPA?
 9     A.  All on the same day.
10     Q.  Did you call any other organizations other
11          than the four that we have discussed?
12     A.  No.
13     Q.  When you called did you talk to an individual
14          or leave a voicemail?
15     A.  Some were voicemails.  Some were individuals
16          that took my information and said someone
17          would contact you back.  I also sent to Second
18          Amendment Foundation and Firearms Policy
19          Coalition emails as well expressing my
20          interest.
21     Q.  What email address did you use to send those
22          emails to Firearms Policy Coalition and Second
23          Amendment Foundation?
24     A.  I believe that would be my primary email,
25          Bchristian189@gmail.com.
```

——— **BRETT CHRISTIAN - 11/16/2022** ———

1    Q. What's the significance of 189?

2    A. It is what Google assigned it when I tried to

3       create it.

4    Q. It's fair to say that 189 has no

5       representative meaning to you?

6    A. That is correct.

7    Q. Did you also email Gun Owners of America?

8    A. I cannot definitively remember either way.

9    Q. And do you recall if you emailed NYSRPA as

10      well?

11   A. I cannot definitively remember either way on

12      that one as well.

13   Q. Okay.  When you heard back from John Tienken,

14      did you understand that he was calling on

15      behalf of your -- strike that.

16          When you heard back from John Tienken,

17      did you understand that he was calling you in

18      response to your calls and emails to Firearms

19      Policy Coalition and the Second Amendment

20      Foundation?

21   A. Yes.

22          MR. ROTSKO:  Objection.  Objection.  The

23      communications between Mr. Christian and John

24      Tienken are subject to the attorney-client

25      privilege and the communications between

1      Mr. Christian and the Firearms Policy Coalition

2      and the Second Amendment Foundation are subject

3      to the work product protections as well as

4      common interest privilege.

5           So I am going to direct Mr. Christian

6      not to testify to any contents of his

7      communications between he and the other two

8      plaintiffs concerning the litigation or between

9      he and counsel, either Phillips Lytle or Cooper

10     & Kirk, nor to his mental impressions formed

11     after such conversations because that is a way

12     of revealing the contents of those

13     communications.

14

15     BY MR. BELKA:

16   Q. Do you understand the nature of the lawsuit in

17     which you are a plaintiff?

18   A. Yes, I do.

19   Q. What is the nature of the lawsuit in which you

20     are a plaintiff?

21   A. It is in regards to parts or sections of the

22     CCIA that have directly effected me that I

23     feel have violated my constitutional rights.

24        MR. BELKA:  Can you read back that

25     answer?

BRETT CHRISTIAN - 11/16/2022

1           (The answer was read.)

2

3       BY MR. BELKA:

4   Q. Other than the parts and sections of the --

5       strike that.

6           When you say the CCIA, is that shorthand

7       for the Concealed Carry Improvement Act?

8   A. That would be correct.

9   Q. And if I say CCIA, you will understand that I

10      mean the Concealed Carry Improvement Act?

11  A. Correct.

12  Q. Other than the parts and sections of the CCIA

13      that you are challenging in this lawsuit, do

14      you believe that any other section of the CCIA

15      violates your constitutional rights?

16          MR. ROTSKO:  Objection to the extent it

17      calls for legal conclusions.

18  Q. You still have to answer.

19  A. Okay.  I can only speak --

20          MR. ROTSKO:  You can answer, Brett.

21  A. Oh, okay.  I can only speak on the parts that

22      have directly effected me.  I can't speak on

23      the other parts as I don't feel at this time

24      they have effected me with what I do.

25  Q. What are the parts and sections of the CCIA

```
 1              that you have challenged in this lawsuit?
 2         A.  There is the section on how it relates to
 3              private property. There is the section on
 4              relating to parks in New York State.  I
 5              apologize.  My brain went blank completely for
 6              a second.
 7         Q.  That's okay.  I will ask it again.  What parts
 8              or sections of the CCIA have you challenged in
 9              this lawsuit?
10         A.  Parks in New York State, private property and
11              public transportation.
12         Q.  Do you recall drafting a declaration regarding
13              the parts and sections of the CCIA that you
14              have challenged in this lawsuit?
15         A.  Yes.
16         Q.  Okay.  Did you, Brett Christian, physically
17              type the declaration that you submitted in
18              this case?
19                   MR. ROTSKO:  Objection.  Work product
20              privilege.
21         Q.  You still have to answer.
22         A.  I submitted --
23                   MR. ROTSKO:  No.  No.  You don't have to
24              answer.  Who types a declaration is --
25                   MR. BELKA:  It's a --
```

1          MR. ROTSKO:  -- an action taken further

2    into litigation.  It's irrelevant as well.  He

3    swore to the words.

4

5    BY MR. BELKA:

6  Q. Understanding that your lawyer has directed

7    you not to answer my prior question, did you

8    review the declaration that you submitted in

9    this case -- strike all of that.

10         Understanding that your counsel has

11    directed you not to answer my question

12    concerning who drafted the declaration, did

13    you have an opportunity to review the

14    declaration you submitted in this case prior

15    to its submission?

16  A. Yes.  I have reviewed it.

17  Q. Okay.  And when you reviewed it, what did you

18    do with it?

19         MR. ROTSKO:  Objection.  The word what

20    is kind of vague in this context.

21  Q. That's fair.

22         Where did you first review the

23    declaration that you submitted in this case?

24  A. I reviewed that in my primary residence and

25    read through it.

```
 1      Q.  And how did you receive it?  In hard copy, by
 2          email?  How did you get it?
 3      A.  Primarily through email.
 4      Q.  When you say "primarily," why is it qualified?
 5          Did you receive the declaration by email?
 6      A.  Yes.  And then I would sometimes read it in
 7          the email and sometimes print it out and then
 8          read it.
 9      Q.  Understood.  How long did you take to review
10          the declaration you submitted in this case?
11      A.  Days.
12      Q.  When you say "days," can you approximate the
13          number of hours you took in reviewing the
14          language of the declaration that was submitted
15          in this case?
16      A.  I would read it for an hour, hour and a half
17          line-by-line.  I would wait, come back to it a
18          couple hours later, maybe the next day and
19          read it again and once I felt -- again, I am
20          not a professional lawyer so sometimes I have
21          to, pardon the phrase, Google legal speak to
22          try and understand because my goal is to have
23          everything as accurate as I possibly can to
24          the best of my knowledge.
25      Q.  And when you signed the declaration, is it
```

```
1         fair to say that you made it as accurate as
2         you possibly could to the best of your
3         knowledge?
4    A.   Yes.
5    Q.   You said that you renewed your membership to
6         the organization Second Amendment Foundation
7         in August of 2022.  Do you recall that
8         testimony?
9    A.   Yes.
10   Q.   When did you first become a member of the
11        Second Amendment Foundation?
12   A.   To the best of my knowledge, sometime between
13        within a month either way of the passing of
14        the SAFE Act in 2013.
15   Q.   And do you recall what materials you submitted
16        related to your membership in 2013 to the
17        Second Amendment Foundation?
18   A.   That would have been contact information as
19        well as money for having a paid membership.
20   Q.   And did you renew your membership to the
21        Second Amendment Foundation between the years
22        2013 and August 2022?
23   A.   To the best of my knowledge, yes.  There might
24        have been where it lapsed for a year because I
25        forgot due to being busy with work and life.
```

—— **BRETT CHRISTIAN  -  11/16/2022** ——

1    Q.  Do you have in your mind any definitive dates
2        in which your membership lapsed regarding the
3        Second Amendment Foundation?
4    A.  I cannot be definitive on that.
5    Q.  Okay.  Do you recall any period of time in
6        which your membership lapsed with regards to
7        the Firearms Policy Coalition?
8    A.  That I cannot.
9    Q.  Meaning, you can't recall?
10   A.  I cannot recall that specific information, no.
11   Q.  Do you have any reason to believe that your
12       membership lapsed at any point between 2013
13       and August 2022 regarding your membership to
14       the Firearms Policy Coalition?
15   A.  To the best of my knowledge, I cannot
16       guarantee because the U.S. Mail has for some
17       reason had an historically tough time
18       delivering all of my mail to me.  So I don't
19       always get everything in the mail in a timely
20       fashion.
21   Q.  I am asking if you have any reason to believe
22       that your membership to the Firearms Policy
23       Coalition lapsed between the years 2013 and
24       August 2022?
25   A.  I don't believe so.

1    Q.  Do you have any reason to believe that your

2        membership lapsed with regard to the Second

3        Amendment between the years 2013 and

4        August 2022?

5    A.  I don't believe so.

6    Q.  In your mind if there is a lapse in membership

7        in either of these two organizations, it was

8        due to ineffective mail carrying?

9    A.  Correct.

10   Q.  What is your reasoning to believe that there's

11       a possibility of ineffective mail carrying

12       between the years 2013 and August 2022?

13   A.  I have lived at different addresses throughout

14       the time.

15   Q.  That's it?

16   A.  Yes.

17   Q.  Okay.  As it relates to the sections of the

18       CCIA that you have challenged related to

19       private property, have you been arrested under

20       that provision?

21   A.  As of currently today, I have not been

22       arrested.

23   Q.  Have you been approached by law enforcement to

24       arrest you for violations of the CCIA

25       regarding the sections on private property?

1    A.  As of today, I have not.

2    Q.  Have you been arrested related to the sections

3        relating to New York State Parks that you have

4        challenged under the CCIA?

5    A.  As of today, I have not.

6    Q.  Have you been approached by law enforcement to

7        enforce the New York State Parks provisions of

8        the CCIA?

9    A.  As of today, I have not.

10   Q.  Have you been arrested related to the public

11       transportation sections of the CCIA that you

12       have challenged in this lawsuit?

13   A.  As of today, I have not.

14   Q.  And have you been approached by law

15       enforcement regarding the public

16       transportation sections of the CCIA that you

17       have challenged in this lawsuit?

18   A.  As of today, I have not.

19   Q.  When you say "as of today," you mean from the

20       beginning of the world until today, correct?

21   A.  That's correct.  I do not have a crystal ball.

22       I don't know what tomorrow may bring and I do

23       not wish to guess at the future.

24   Q.  All right.  Do you recall the testimony about

25       reviewing the words in your declaration that

─── **BRETT CHRISTIAN** - 11/16/2022 ───

1        you were submitting in this case?

2     A. Yes.

3     Q. Okay.  You mentioned that you would

4        intermittently review the declaration to

5        assure its accuracy to the best of your

6        knowledge?

7     A. That's correct.

8     Q. Can you approximate for me the amount of time,

9        understanding that it was intermittent, that

10       you took to review the declaration?

11            MR. ROTSKO:  Objection.  Work product.

12       You can answer that one, though, Brett.

13    A. If I had to estimate to the best of my

14       knowledge as I was not using a stopwatch to

15       keep track, I would put the total time

16       reviewing it between six to eight hours.

17    Q. And that's six to eight hours of reading,

18       Googling, trying to figure out what the words

19       say and mean?

20    A. That would be correct.

21    Q. And at the end of six to eight hours of work

22       on the declaration, you felt satisfied that it

23       represented the truth of this matter as it

24       related to you?

25    A. As humanly possible, yes.

─── **DEPAOLO CROSBY REPORTING SERVICES, INC.** ───
135 Delaware Avenue, Suite 301, Buffalo, New York  14202
716-853-5544

```
 1     Q.  Prior to the renewal of your memberships --
 2         strike that.
 3              Is it fair if I call the four
 4         organizations that you renewed your
 5         memberships to in August 2022 as gun rights
 6         groups?
 7     A.  Yes.
 8     Q.  I don't want to be unfair about it.  I just
 9         want to categorize them and I am offering the
10         term gun rights groups to categorize those
11         four organizations.  Is that fair?
12     A.  I have referred to them as civil rights
13         organizations because I consider what is in
14         the Constitution, the Bills of Rights
15         everybody's civil rights.  So I tend to use
16         that phrase more.
17     Q.  Okay.  Is it okay if I say gun rights groups?
18         You will know what I am talking about?
19     A.  Yes.
20     Q.  Okay.  And if I say gun rights groups, I am
21         talking about these four organizations that
22         you renewed your memberships to in August
23         2022, okay?
24     A.  Understood.
25              MR. ROTSKO:  I have an objection to the
```

1          defined term because to the extent you ask

2          questions about "gun rights groups" and that

3          definition lumps in two other advocacy

4          organizations that are not party to this

5          lawsuit and have nothing to do with

6          Mr. Christian's standing, I don't want the

7          questions to extend to those groups when you

8          are asking about Firearms Policy Coalition and

9          SAF for the sake of clarity.

10     Q. That's fair.

11              Prior to August 2022, did you have any

12         social media accounts?

13     A. Yes.

14     Q. Where were your social media accounts located

15         prior to August 2022?

16     A. I am not quite sure I understand the question.

17         I apologize.

18     Q. Do you know what a social media account is?

19     A. Yes.

20     Q. Okay.  What is your understanding of a social

21         media account?

22     A. That would be things like -- I am dating

23         myself, but Myspace, Facebook, Instagram.

24         That's -- I am sure there are others.  I am

25         not a big computer person for -- I like to

--- BRETT CHRISTIAN - 11/16/2022 ---

```
 1          keep my life very private.
 2     Q.   Understood.  Prior to August 2022, did you
 3          have any social media accounts?
 4     A.   Yes.
 5     Q.   Okay.  Where did you have those social media
 6          accounts?
 7               MR. ROTSKO:  Objection to the word
 8          where.  Where is kind of vague.
 9     Q.   Fair.  I will rephrase.
10               With what organizations did you have
11          social media accounts prior to August 2022?
12     A.   That would be Facebook.
13     Q.   Prior to August 2022, did you make postings on
14          your social media account at Facebook?
15     A.   Yes.
16     Q.   Prior to August 2022, did you ever post
17          regarding Second Amendment issues on your
18          account at Facebook?
19     A.   To the best of my knowledge, I can't
20          definitively say either way because I tend to
21          not want to put a lot out there for political
22          opinions or such things.  I am trying to think
23          how to phrase it here.  Bear with me.
24               Much like bumper stickers on cars
25          putting it out there, you are never going to
```

1          convince someone to an opposing viewpoint
2          where suddenly they see a bumper sticker and
3          change.  So to me all it serves to do is cause
4          riffs, stress, fighting amongst people.  I
5          tend to just not like to do that.
6      Q.  Within your consideration of becoming a
7          plaintiff in this lawsuit, did you alter in
8          any way your prior Facebook posts?
9      A.  Not that I am aware of, to the best of my
10         knowledge.
11     Q.  Did you or anyone on your behalf review your
12         Facebook posts around the time -- strike that.
13             In your consideration of becoming a
14         plaintiff in this case, did you or anyone on
15         your behalf alter past Facebook postings?
16     A.  Not that I am aware of.
17     Q.  Did you ever provide account information to
18         anyone in order to review your social media
19         posts?
20     A.  Yes.
21     Q.  Who did you provide information to -- account
22         information to regarding your social media
23         posts?
24     A.  Firearms Policy Coalition, my girlfriend.  I
25         have had an employer ask to see such things.

─────── **BRETT CHRISTIAN  -  11/16/2022** ───────

```
 1          That was back in the time of Myspace.
 2     Q.  I want to be clear.  I am talking about during
 3          the period of time in which you were
 4          considering becoming a plaintiff in this case
 5          did you provide social media account
 6          information to anyone?
 7     A.  Yes.  To Firearms Policy Coalition in that
 8          timeframe.
 9     Q.  What did you understand the purpose of your
10          providing social media account information to
11          Firearms Policy Coalition?
12              MR. ROTSKO:  I am going to object to the
13          relevance of Facebook to Mr. Christian's
14          standing, but Brett, feel free to answer the
15          question.
16              MR. BELKA:  I am going to have her read
17          it back.
18
19              (The question was read.)
20
21              THE WITNESS:  To the best of my
22          knowledge, to verify, because this was
23          primarily email, phone calling, that I was who
24          I said I was.
25
```

**DEPAOLO CROSBY REPORTING SERVICES, INC.**

```
 1        BY MR. BELKA:
 2     Q. When you say "primarily," do you believe that
 3        there was any other reason why you would
 4        provide social media account information to
 5        Firearms Policy Coalition around the time you
 6        were considering becoming a plaintiff in this
 7        case?
 8     A. Not that I am aware of.  I do not have reason
 9        to believe otherwise.
10     Q. And it's your position that you don't know if
11        somebody altered posts on your behalf in and
12        around the time you were considering becoming
13        a plaintiff in this case?
14           MR. ROTSKO:  Objection.  I don't think
15        that was the testimony.
16           MR. BELKA:  I am asking him.
17           MR. ROTSKO:  I believe you asked him if
18        it was his testimony.
19           MR. BELKA:  No.
20           MR. ROTSKO:  You can read it back from
21        the reporter.
22           MR. BELKA:  We are.
23
24              (The question was read.)
25
```

**BRETT CHRISTIAN - 11/16/2022**

```
 1            MR. ROTSKO:  So had you asked him
 2       already about that question?
 3            MR. BELKA:  I am asking if it's his
 4       position now.  All right.  Would you mind
 5       reading it back -- I am not asking to confirm
 6       prior testimony.  I am asking if it's your
 7       position, okay?  And I want you to read that
 8       question back.
 9
10            (The question was read.)
11
12            THE WITNESS:  That is correct.
13            MR. BELKA:  We have been going for about
14       an hour.  Why don't we take a five-minute break
15       and come back?  Is that okay with everyone?
16            MR. ROTSKO:  Yep.
17
18                 (Recess was taken.)
19
20       BY MR. BELKA:
21    Q. How do you think that the CCIA restricts your
22       rights as it relates to public transportation?
23    A. It prevents me from doing what I previously
24       had done frequently by being able to when
25       traveling the Buffalo subway system, which
```

**DEPAOLO CROSBY REPORTING SERVICES, INC.**
135 Delaware Avenue, Suite 301, Buffalo, New York  14202
716-853-5544

1          granted not a lot of people know it still
2          exists, going from the suburbs to downtown,
3          being able to carry my firearm with me
4          legally.  I no longer can do that based upon
5          what's written in black and white in the New
6          York State Penal Code.
7     Q.  How would you travel from the suburbs downtown
8          using public transportation?
9     A.  It would primarily be one of the first three
10         stations.  There's either University Station,
11         there is LaSalle and then Amherst Street
12         Station.  And then driving, parking somewhere
13         nearby, walking in, paying the 4 or 5 bucks
14         for a round trip ticket and then riding it all
15         the way down to it ends right at Canalside at
16         the arena.
17    Q.  What kind of car do you own?
18    A.  Currently, I own a 2023 Honda HR-V.
19    Q.  Is that your daily form of transport?
20    A.  Yes.
21    Q.  And you can drive your 2023 Honda HR-V
22         downtown if you choose, correct?
23    A.  Yes.
24    Q.  Do you own any other cars?
25    A.  No, I do not.

```
 1      Q. This is only a question as it relates to
 2         access to cars, okay?
 3             Mr. Christian, are you married?
 4      A. I am not.
 5      Q. Do you have other members of your household?
 6      A. I am a single person household.
 7      Q. So it's fair to say that the only access to a
 8         car that you have is the 2023 Honda HR-V that
 9         you previously testified to?
10      A. That would be correct.
11      Q. Okay.  You understand why I am asking?
12      A. Yes.
13      Q. Okay.  Prior to your 2023 Honda HR-V, what car
14         did you have?
15      A. The previous one was a 2020 Honda Accord.
16      Q. And prior to the 2020 Honda Accord?
17      A. That would have been a 2017 Buick LaCrosse.
18      Q. I am just going to go one more back.  What was
19         before the 2017 Buick LaCrosse?
20      A. That was a 2013 Buick Regal GS.  I can go back
21         to the first car that I had, if need be.
22      Q. I am just trying to go back in time a little
23         bit.  It appears you get a car approximately
24         every three years.  Does that sound right?
25      A. Approximately so, yes.
```

```
 1      Q. Okay.  And the 2014 Buick Regal GS, was that
 2         your daily transport at that time?
 3      A. Yes.
 4      Q. And could the 2014 Buick Regal GS drive
 5         downtown?
 6      A. Yes.
 7      Q. Okay.  When you had the 2017 Buick LaCrosse,
 8         was that your daily transport?
 9      A. That would be correct.
10      Q. And could the 2017 Buick LaCrosse travel
11         downtown?
12      A. That would be correct.
13      Q. Okay.  And when you had the 2020 Honda Accord,
14         was that your daily transport?
15      A. Yes.
16      Q. And could the 2020 Honda Accord travel
17         downtown?
18      A. Mechanically, yes.  However, the theft of the
19         wheels that come equipped on the model I had
20         is -- the rate of theft is obscene to the
21         wheels and that car I tended to not want to
22         drive as much downtown because based upon
23         experiences at my job, that there would be a
24         great likelihood I would find it up on blocks
25         as we have had many occurrences at work.
```

————— **BRETT CHRISTIAN  -  11/16/2022** —————

```
 1      Q. Where is your job?
 2      A. Currently, it is at Ray Laks Honda in Orchard
 3         Park.
 4      Q. How do you spell Ray Laks?
 5      A. R-A-Y, space, L-A-K-S.
 6      Q. And were the tires -- strike that.
 7            What part of the 2020 Honda Accord was
 8         often stolen pursuant to anecdotes from your
 9         work?
10      A. In the last year we have had almost $40,000 of
11         damage done to vehicles because the model I
12         had, the sport model that had 19-inch very
13         attractive low profile sporty wheels, it is
14         among the most stolen wheels in the country.
15         In one year it was almost $40,000 of wheels
16         going missing due to theft.
17      Q. And did you ever have the wheels on your 2020
18         Honda Accord stolen?
19      A. I did not because I would be very cautious
20         about where I took the car and where I would
21         park the car because of that reason.
22      Q. Regardless, the 2020 Honda Accord could get
23         you downtown if you so chose?
24      A. Mechanically it could, yes.
25      Q. You mentioned that there are three locations
```

1          -- strike that.
2              When you go on public transport from the
3          suburbs downtown, what method of public
4          transport do you take?
5     A.  That would primarily be the subway system.
6     Q.  What kind of subway system do we have in
7          Buffalo?
8     A.  We have -- of the original design and plans,
9          we only have a single line subway that runs
10         from the -- the University of Buffalo is
11         adjacent to it.  I don't want to call it city
12         campus.  It would be south campus I guess off
13         Main Street in Amherst.  That's the furthest
14         point and then it runs in a single line all
15         the way out to almost where -- just a little
16         bit past where we are now by Canalside.
17    Q.  All right.  If I refer to the public transport
18         method that you would regularly use from the
19         suburbs to downtown, if I call that the
20         Buffalo Light Rail, would we be talking about
21         the same thing?
22    A.  That would be correct.
23    Q.  Okay.  You mentioned three locations which you
24         might sometimes board to get on the Buffalo
25         Light Rail; is that right?

--- **BRETT CHRISTIAN  -  11/16/2022** ---

1    A. That is correct.

2    Q. What were those three locations again?

3    A. University Station, LaSalle Street Station and

4       Amherst Street Station.  I believe that's how

5       the Amherst one is pronounced.

6    Q. And how do you get yourself to University

7       Station to take the Buffalo Light Rail?

8    A. I would drive my car up Main Street from my

9       place of residence or wherever I would be,

10      park either in the NFTA -- they have a ride

11      and park, a commuter lot. I would either park

12      there or I would park at -- there is a coffee

13      shop further up from there on Main Street.

14      There's a supermarket.  Depending on if I was,

15      say, getting a cup of coffee to take with me

16      and then walk across to the station entrance.

17   Q. What's the name of that coffee shop?

18   A. It is Dunkin' Donuts.

19   Q. And what's the name of the supermarket?

20   A. I believe it is Tops.

21   Q. Does it cost money to leave your car in the

22      NFTA Ride and Park?

23   A. It does not.

24   Q. Does it cost any money to leave your car at

25      the Dunkin' Donuts parking lot?

--- **DEPAOLO CROSBY REPORTING SERVICES, INC.** ---
135 Delaware Avenue, Suite 301, Buffalo, New York  14202
716-853-5544

```
 1      A.  It does not.
 2      Q.  And does it cost any money to leave your car
 3          at the Tops supermarket parking lot?
 4      A.  It does not.
 5      Q.  Which of the three, NFTA Ride and Park
 6          commuter lot, the Dunkin' Donuts coffee shop
 7          and the Tops supermarket is closest in
 8          proximity to the University Station?
 9      A.  That would be the NFTA Ride and Park commuter
10          lot.  It is directly adjacent, if not part of
11          it.
12      Q.  Okay.  And next in proximity between the
13          three?
14      A.  That would be the Dunkin' Donuts coffee shop,
15          coffeehouse.  I don't know the exact wording,
16          but Dunkin' Donuts.
17      Q.  Okay.  And then it's your testimony then that
18          the Tops supermarket is the furthest in
19          distance from the University Station?
20      A.  Correct.
21      Q.  Where do you buy a ticket to ride the Buffalo
22          Light Rail at University Station?
23      A.  When you walk in the entrance, there are
24          automated ticket like vending machines, for
25          lack of a better word.  And you can use cash,
```

1          which is primarily what I use, and that's

2          where you purchase your ticket to get through

3          the -- I don't want to say turnstiles, but

4          gate doors to go down the escalator to the

5          station platform.

6     Q.   When you purchase a ticket at the automated

7          machine, what does that ticket look like?

8     A.   It is like a very fat letter H.  It has an

9          indentation on the one side and an indentation

10         on the other.  So it looks like a big letter

11         H.  It has like a bar code strip and then

12         something square, sparkly -- I don't want to

13         say a hologram, but something sort of of that

14         type.

15    Q.   Is it fair to say that you provided your best

16         recollection of what a ticket purchased at

17         University Station might look like for the

18         Buffalo Light Rail?

19    A.   Yes.  I don't know what to call that exact

20         thing, but it's like a hologram.  It's

21         sparkly.  This is the one from the last trip.

22    Q.   All right.  And since you have it with you,

23         why don't I take that?  Do you need this after

24         today?

25    A.   No.  Because they are one way -- they are

1          round trip tickets good for just that day.

2              MR. BELKA:  Okay.  So we are going to

3          mark Mr. Christian's Buffalo Light Rail ticket

4          as Exhibit Number 1.  Any objection, Nick?

5              MR. ROTSKO:  No.

6

7          The following were marked for identification:

8          Exhibit 1 - NFTA subway ticket

9

10             MR. ROTSKO:  We can have photocopies

11         made of that while he's there.

12             MR. BELKA:  Sure.

13

14         BY MR. BELKA:

15    Q.  I am handing you what's been marked as

16         Exhibit 1 to your deposition.  It's an NFTA

17         Light Rail pass.  Do you see it?

18    A.  Yes.

19    Q.  Okay.  And --

20             MR. ROTSKO:  Ryan, if I may interject

21         for a moment.

22             MR. BELKA:  Sure.

23             MR. ROTSKO:  Because I can't see that

24         ticket, I am going to give my objecting

25         capabilities to Sam for a moment to make sure

**BRETT CHRISTIAN  -  11/16/2022**

1        that the discussion about the ticket is

2        accurate.

3              MR. BELKA:  I accept.  Thanks for

4        creating an accommodation because it's unusual.

5              MR. ROTSKO:  I can't figure out how to

6        get that up on WebEx.

7

8        BY MR. BELKA:

9    Q. An NFTA Light Rail ticket has been placed in

10       front of you.  It's Exhibit 1 to your

11       deposition.  Do you see it?

12   A. I do.

13   Q. What's the date on that Light Rail ticket?

14   A. It was this past Sunday, the 13th.

15   Q. You are downtown today.  You didn't take the

16       Light Rail; is that right?

17   A. Correct.

18   Q. Okay.  What car did you drive to get downtown

19       today?

20   A. My 2023 Honda HR-V.

21   Q. Do you have a gun on you?

22   A. I do not.

23   Q. Why not?

24   A. The CCIA prevents me from doing so.

25   Q. Is that because Phillips Lytle prevented you

```
 1          from bringing a concealed weapon onto their
 2          property?
 3     A.   I was unable to bring one with me on person
 4          because I have never been in this building
 5          before and I don't know what signs are posted
 6          on the property.  And if I brought it with me,
 7          I would have already entered the property
 8          before I would see the signs and, thus, I
 9          would have broken the law.  So without having
10          that definitive knowledge of it as explicitly
11          stated on a sign that it is allowed, I chose
12          to leave it at home.
13     Q.   These are your lawyers.  You could have called
14          ahead and asked what their concealed carry
15          policy is, correct?
16     A.   Correct.
17     Q.   Do you own a phone?
18     A.   I do.
19     Q.   Do you know how to use it?
20     A.   Yes.
21     Q.   Do you think you could have used your phone to
22          acquire that information from your lawyers?
23     A.   I am unsure because I don't know who the
24          property owner is and the way that it reads, I
25          would have to first figure out who the
```

1       property owner is.  And with the timeframe of
2       I did not know weeks or months in advance of
3       the exact location, I wasn't able to in time
4       determine that.
5   Q.  When did you first learn about this
6       deposition?
7   A.  I learned that it may be a thing that would
8       need to happen roughly, approximately a couple
9       weeks ago.  However, the exact date, time,
10      this is the address at this time, be here,
11      that was -- the address was provided this
12      morning to me.  The time was provided to me on
13      Monday.
14  Q.  Have you ever called your lawyers -- this has
15      nothing to do with attorney-client.
16          Have you ever called your lawyers to ask
17      them a question?
18  A.  Yes.
19  Q.  Do you feel like you need permission to call
20      your lawyers?
21  A.  No, I do not.
22  Q.  Could you have called your lawyers and asked
23      the policy about concealed carry in the
24      building you would have been entering today?
25  A.  Yes.  That could have been a possibility.

1   Q. And do you think your lawyers would have told
2      you the correct information as to their policy
3      on concealed carry today?
4   A. Yes.  I believe they would have.
5   Q. As it relates to public transportation, you
6      note that you take the NFTA Metro Rail, which
7      I have referred to as the NFTA Light Rail,
8      when traffic or events downtown made driving
9      impractical.  Do you recall that testimony?
10  A. Yes, I do.
11  Q. In your mind, when does traffic make driving
12     downtown impractical?
13  A. Monday through Friday and when major events
14     like Sabres games, Taste of Buffalo and events
15     such as those are going on, traffic is quite
16     heavy at those times.
17  Q. How do you know traffic is heavy on Monday
18     through Friday during Sabres games?
19  A. I have previously been to Sabres games.
20     Either work -- the company that I work for has
21     provided tickets for events as well as through
22     the week I have made trips down here to go to
23     either the Erie County Clerks's Office for
24     adding an amendment or removing an amendment
25     to my permit or to stop in to ask

—— **BRETT CHRISTIAN** - 11/16/2022 ——

1        clarification about questions I have to make
2        sure I am doing things the proper way.
3              But between the 190 and the 33, it is --
4        the 33 in the morning you want to get here
5        before 6:00 a.m. because it gets very accident
6        prone and then throughout the day by noon,
7        1 o'clock, it starts to pick up quite a bit
8        into the evening.  Not discounting Buffalo, of
9        course, weather events we may have.
10   Q.  Prior to August 2022, how often would you ride
11        the Buffalo Light Rail?
12   A.  Approximately two to three times a month, if
13        not more.
14   Q.  Is the Buffalo Light Rail the only form of --
15        strike that.
16              Is the Buffalo Light Rail the only form
17        of public transportation that you regularly
18        take?
19   A.  That would be correct.
20   Q.  Is it fair to say -- I am looking at Exhibit 1
21        now.  November 13th, 2022 was the last time
22        you used the Buffalo Light Rail?
23   A.  Correct.
24   Q.  What event made it impractical to go downtown
25        using your car on November 13th, 2022?

```
 1      A.  A combination of even with a Honda the price
 2          of gas as well as the convenience from
 3          University Station to Canalside, the last
 4          exit, is almost precisely 20 minutes.  It's
 5          faster to do that than it is to drive, find a
 6          parking spot, pay for parking if it's through
 7          the week.  Weekends sometimes things are free.
 8          It's simply a matter of this is faster and
 9          easier.  I don't have to worry and deal with
10          the hassle of it.
11      Q.  Your affidavit -- strike that.
12              Your declaration says that you take the
13          Buffalo Light Rail when traffic or events
14          downtown make driving impractical, correct?
15      A.  Correct.
16      Q.  When you took the Buffalo Light Rail on
17          November 13th, was that due to traffic or
18          events downtown?
19      A.  That was due to --
20              MR. ROTSKO:  Objection.  Asked and
21          answered.
22      Q.  You still have to answer.
23      A.  An event in Orchard Park, not downtown.
24          Everybody is on the thruway and the 33 headed
25          to the Bills game around that time.
```

```
 1      Q. Where were you coming from when you took the
 2         Buffalo Light Rail on November 13th, 2022?
 3      A. I left my primary -- my home, my place of
 4         residence, went up Main Street, parked in the
 5         ride and park section, walked in the entrance
 6         and got on the subway system, the Light Rail
 7         at the University Station there.
 8      Q. Is it fair to say that the Bills game was the
 9         event that caused you to take the Light Rail
10         on November 13th, 2022?
11      A. The primary motivation for that time, correct.
12      Q. Because you were worried about the traffic?
13      A. Correct.
14      Q. On November 13th, 2022 did you see any NFTA
15         police officers on the Buffalo Light Rail?
16      A. No, I did not.
17      Q. On November 13th, 2022 did you see any New
18         York State police officers on the Buffalo
19         Light Rail?
20      A. No, I did not.
21      Q. Have you ever in the periods of time that you
22         have taken the Buffalo Light Rail seen a New
23         York State police officer?
24      A. Not on the Light Rail.
25      Q. Is it fair to say that New York State police
```

1        officers -- strike that.

2              As of Sunday, November 13th, 2022, you

3        understood that you had a deposition upcoming

4        in this case, correct?

5    A. Correct.

6    Q. Did you -- strike that.

7              Did anyone suggest to you that you

8        should take the Buffalo Light Rail in

9        preparation for your deposition today?

10   A. No.

11             MR. ROTSKO:  Objection to the extent

12       that it calls for attorney-client

13       communications.  He has answered the question.

14   Q. Of the three stations from which you usually

15       take the Buffalo Light Rail, University

16       Station, LaSalle Station and Amherst Street

17       Station, which one of those is the station

18       from which you most regularly depart?

19   A. Most regularly would be University Station

20       because it is the most accessible and closest.

21   Q. And of the three, University, LaSalle and

22       Amherst Stations, which one do you go to the

23       second most?

24   A. That would be LaSalle.

25   Q. And by reasons of deduction, the third most

1          frequented station is Amherst Street Station,
2          correct?
3     A.   Correct.
4     Q.   Your prior testimony was that you paid 4 or 5
5          bucks for an NFTA Rail pass.  Do you know
6          whether or not it's 4 or 5?
7     A.   I want to say it is approximately 4 bucks for
8          a round trip ticket.
9     Q.   Each time you ride the Buffalo Light Rail, you
10         pay for it on that individual trip, correct?
11    A.   Correct.
12    Q.   And at two to three trips a month over a
13         period of time, you are pretty regularly
14         paying for single round trip tickets on the
15         Buffalo Light Rail?
16    A.   Correct.
17    Q.   And while you think it's $4, you also believe
18         that it could be 5?
19    A.   If you get an all day pass, it's more.  I
20         don't frequently do that.  I usually just do
21         the one round trip.  The round trip might be
22         $4 and a penny or I don't remember if there's
23         tax on it.
24    Q.   Who do you hand your ticket to when you get on
25         the Buffalo Light Rail?

1    A.  It's an unmanned system.  When you walk

2        through there is -- it used to be turnstiles.

3        They have little dividers and there's two

4        little door gates and there is a clear lens on

5        what would have been a turnstile.  You put the

6        ticket over it, it reads it, it allows the

7        gate to unlock and one person, you just push

8        through.  They are like saloon doors to use a

9        laymen's term.

10            And then when you go to leave out of the

11       underground stations, because that is the paid

12       portion, you have to do the same thing to be

13       able to exit.  The above ground, from what I

14       understand -- they are never my starting

15       point, but those are all free.

16   Q.  And I asked this.  The type of public

17       transport that you take is the Buffalo Light

18       Rail?

19   A.  Primary type, correct.

20   Q.  Okay.  And when you say "primary type," what

21       are the other types of public transport that

22       you take?

23   A.  I may have in the last ten years once or twice

24       taken public buses.  I can't definitively

25       remember either way and I don't want to guess.

BRETT CHRISTIAN - 11/16/2022

1    Q. But in Buffalo on the NFTA system, right?

2    A. Correct.

3    Q. Approximately when did you become licensed to

4       carry a firearm in the State of New York?

5    A. Approximately somewhere between two to

6       three years ago for a New York State concealed

7       carry license.

8    Q. Did you have some other type of pistol permit

9       prior to the concealed carry permit that you

10      acquired two to three years ago?

11   A. No, I did not.

12   Q. How old are you?

13   A. 40.  I feel old for saying that.

14   Q. Do you know at what age you can begin to have

15      a pistol permit in New York State?

16   A. There's two answers to that.  For 99 percent

17      of people it is 21.  I believe members of the

18      U.S. Military that are active and serving can

19      get one between 18 and 21, but I don't know

20      anybody that ever has.

21   Q. And you are not an active member of the U.S.

22      Military?

23   A. I am not.

24   Q. So the earliest you could have received some

25      type of pistol permit in New York State is 21?

1    A. Correct.

2    Q. And is it fair to say from the ages of 21 to

3       37 you did not have any type of New York State

4       pistol permit?

5    A. Yes.

6    Q. When you applied for your concealed carry

7       permit two to three years ago, was it granted?

8    A. Yes.

9    Q. Did you have any guns that were registered

10      with New York State at the time you received

11      your concealed carry permit?

12   A. I had no pistols because there's no way to

13      acquire, own, possess one in New York without

14      one.  I have lived in New York my whole life.

15      For long guns I did not acquire any long guns

16      that would have required SAFE Act registration

17      when the SAFE Act took effect.  So I had

18      nothing that was registered then that was

19      required per the law.

20   Q. So prior to having the concealed carry

21      license, you did own and possess firearms?

22   A. Long guns, correct.

23   Q. How many long --

24          MR. ROTSKO:  Objection.  Just to be

25      clear on the terminology, when we say

——— **BRETT CHRISTIAN  -  11/16/2022** ———

```
 1        "firearms," are we using the Penal Code
 2        definition of firearms?
 3            MR. BELKA:  I am about to drill down a
 4        little bit.  Is that okay?  Why don't you just
 5        object to vagueness or something?  Just say
 6        Belka didn't define firearms, he's awful.  Just
 7        put it on the record.  We will keep going.
 8            MR. ROTSKO:  Please don't put on the
 9        record that I said that Mr. Belka is awful.
10        That was him.  Go ahead, Ryan.
11
12        BY MR. BELKA:
13     Q. Okay.  Between the ages of 21 and 37 you
14        didn't own any pistols?
15     A. That's correct.
16     Q. You had no pistol permit in the State of New
17        York?
18     A. Correct.
19     Q. At approximately the age of 37 you acquired a
20        concealed carry permit?
21     A. Correct.
22     Q. Or concealed carry license?
23     A. License.
24     Q. Okay.  After which you acquired some pistols?
25     A. That's correct.
```

```
 1      Q. Okay.  Prior to receiving the concealed carry
 2          license, you have testified that you owned
 3          long guns?
 4      A. Correct.
 5      Q. Okay.  How many long guns did you own at the
 6          time you acquired the concealed carry license?
 7      A. Approximately, the number would be around a
 8          dozen.
 9      Q. It's a gun case so I am going to ask you about
10          these guns, okay?  As it relates to these
11          approximately a dozen long guns, can you name
12          the type and manufacturer of each weapon?
13      A. Most of them I can.
14      Q. Go ahead.  Number one?
15      A. Let me preface that.  In New York there's
16          almost -- in Erie County there's no place I
17          know of to even rent a gun to try out.  You
18          have to acquire it first.  So a lot of times I
19          would go through the process of acquiring a
20          gun to then use it for target shooting or
21          whatever purpose and then I would find out
22          that I hated it or back then I had a
23          collector's license, an FFL license for the
24          pure purpose of collecting curios, relics,
25          historical.  I was much more involved with
```

1      that then.  So I had a Remington 870 shotgun
2      at one point.
3   Q. So I am not asking at any point in time.  I am
4      asking if you can to the best of your
5      knowledge recall the dozen or so long guns
6      that you had at the time you acquired your
7      concealed carry license.
8   A. I had --
9          MR. ROTSKO:  Objection to the relevance
10         of long guns to this lawsuit.  Go ahead and
11         answer.
12  A. I had a New York compliant Springfield Armory
13     M1A. I had --
14  Q. Before you go on, what does New York compliant
15     mean?
16  A. The firearm in its original configuration
17     would violate the New York SAFE Act and would
18     not be legal to have transferred to you or
19     possess.  So in order for me to acquire it,
20     the previous owner had a federal firearms
21     store, license.  I don't know the correct
22     wording there.  They permanently affixed the
23     magazine to the firearm, thus it was not a
24     detachable magazine and thus met what the law
25     spelled out.

1    Q.  Go ahead.  We have a Remington 870 and a
2        Springfield M1A.
3    A.  I had a CZ.  It's a Czechoslovakian company,
4        Scorpion Evo, nine-millimeter pistol caliber
5        carbine.  I had a Savage Arms 110 Target
6        Magnum target rifle, a Mossberg 500 shotgun
7        and then a bolt action operated AR style
8        firearm.
9    Q.  When you say "AR style," what does that mean?
10   A.  It is --
11   Q.  What does AR stand for?
12   A.  AR is a trademark term meaning ArmaLite rifle
13       and then it would be Model 15.  It has come to
14       mean a whole category of firearms that are
15       that type or that pattern.
16   Q.  I am just asking what it meant to you.
17   A.  Okay.
18   Q.  So an ArmaLite rifle.  There was a number in
19       there.
20   A.  It was -- the lower receiver was a different
21       manufacturer from the upper.  The upper is
22       Young Manufacturing.  I sourced all the parts
23       and assembled it.  The lower was Anderson and
24       the gun I went out of my way to get a barrel
25       that had no provisions for a gas port, so

 1          there was no way the firearm could ever be
 2          made to be semiautomatic and had it equipped
 3          with a bolt handle allowing you to manually --
 4          like any other hunting rifle or target rifle,
 5          you have to manually cycle each round.
 6              I went through considerable expense to
 7          acquire that and make that happen.  Those are
 8          the ones that I can definitively in my head
 9          remember.
10     Q.  Okay.  So, I mean, I was counting.  So I have
11          six out of approximately a dozen long guns
12          that you believe you possessed at the time you
13          acquired your concealed carry license in the
14          State of New York.
15     A.  There's others, but I can't remember the exact
16          make or manufacturer so I don't want to guess.
17     Q.  When you received your concealed carry
18          license, did you disclose or register any of
19          your firearms on your concealed carry license?
20     A.  For long guns, no because none of them were
21          required per New York State Law.
22     Q.  Since receiving your concealed carry license,
23          you have acquired and registered a number of
24          pistols?
25     A.  Pistols and revolvers.  I have noticed New

BRETT CHRISTIAN - 11/16/2022

```
 1          York State -- to me that would mean the same
 2          thing, a handgun, but New York State on the
 3          license and Penal Code differentiates them.
 4          So both pistols and revolvers.
 5     Q.   Okay.  Do we want to use the word handgun in
 6          order to encompass both of those?
 7     A.   Yes.
 8     Q.   Sounds great.  How many handguns have you
 9          acquired since you received your concealed
10          carry license from the State of New York?
11     A.   Bought and sold -- I currently have 11.  I
12          have probably bought and sold, trying out to
13          see what works and doesn't work for me,
14          between 20 or 25, but that is an
15          approximation.  That's my best estimate.
16     Q.   But you currently own 11?
17     A.   11, that's correct.
18     Q.   Handguns?
19     A.   Correct.
20     Q.   How many long guns do you currently own?
21     A.   Currently, four.
22     Q.   Prior to your receipt of the -- strike that.
23              Prior to the granting of your concealed
24          carry license by New York State, did you own
25          any handguns, the definition of which includes
```

```
1              pistols and revolvers.
2    A.   No.  I had not even shot one.
3    Q.   Why did you acquire a concealed carry license
4         approximately two to three years ago?
5    A.   When I applied and put in for the license and
6         asked for unrestricted, which was granted, I
7         have family -- less now because some have
8         passed away, but I have a good portion of
9         family that lives in Upstate New York;
10        Massena, Malone area, Moira, Brushton.  If
11        anybody has ever heard of those areas, it is
12        amazing because it's just the middle of
13        nowhere.
14   Q.   St. Lawrence County?
15   A.   Yes.  I also at the time worked with a friend,
16        Austin.  His family and other friends have had
17        property in the Southern Tier going down
18        towards Gowanda, Gerry.  I am not sure how to
19        say that town correctly.  So I would travel,
20        again liking to experience New York.  It is a
21        beautiful outdoor state.  It is gorgeous and
22        traveling when I would go hiking, when I would
23        go to Upstate New York to my family, Vicky and
24        John Maloney.  They have passed away.  Their
25        daughter, Melissa, has inherited the property.
```

—— BRETT CHRISTIAN  –  11/16/2022 ——

1            It has to be between 200 and 400 acres
2        they have up there of just pristine woodlands.
3        It is not developed, not anything.  I would go
4        up there, go hiking.  Up there I have
5        encountered coyotes, wild turkeys.
6            Going down towards Gowanda, Allegany,
7        that Southern Tier Chautauqua area, I have
8        encountered black bears.  Granted, New York
9        does not have grizzly bears, thankfully, and I
10       have had encounters multiple times with wild
11       life and, you know, it started to make me
12       worry for my safety because I would be out, it
13       would be remote.
14           Especially Upstate New York, not until
15       very recently did they start having reliable
16       cell service in those areas.  So I would be
17       out by myself and have encounters.  Luckily, I
18       was able to stay safe, but did not have a
19       guarantee that that would always be the case.
20   Q.  Aren't you on private land in Malone?
21   A.  Yes.  Up there --
22   Q.  That's the only question.  And when you went
23       down to Chautauqua area, were you also on
24       private land?
25   A.  The Southern Tier was a mix.

```
 1      Q. Who owned the property in Malone again?

 2      A. My friend Austin.

 3      Q. No.  No.  In Malone.

 4      A. In Malone it was my Aunt Vicky and Uncle John,

 5         last name Maloney.

 6      Q. Oh, I am saying Malone, but Maloney is the

 7         last name?

 8      A. They lived right around Moira.  It all bleeds

 9         together up there.

10      Q. Okay.  But either way, when you are up in St.

11         Lawrence County, you are on private property

12         and there's an heir.  And what's her name?

13      A. Melissa.

14      Q. Melissa, okay.

15             The land that you are talking about in

16         Upstate New York, St. Lawrence County is

17         private property, right?

18      A. Correct.

19      Q. Okay.  And Melissa, does she allow you to have

20         weapons on that private property?

21      A. When her parents passed away, we no longer

22         remained talking.  I haven't been to that part

23         of New York State, that specific part since.

24      Q. When did they pass away?

25      A. My Aunt Vicky passed away in 2017 and then my
```

1      Uncle John passed away, I want to say

2      approximately -- without looking at his

3      obituary, maybe a year ago, if not a little

4      sooner.

5   Q. But it doesn't sound like there's many future

6      trips in the plans to Upstate New York to

7      visit Melissa?

8   A. To that specific region, no.  Because I have

9      more transitioned to publicly accessible

10     regions where if a property owner passes away,

11     I suddenly wouldn't lose the right or the

12     ability to access that area.

13  Q. Do you believe that the property owner should

14     have the right to tell you not to access their

15     property if you are carrying a weapon?

16         MR. ROTSKO:  Objection.  Calls for

17     speculation.

18  Q. You still have to answer.

19  A. Oh, okay.  I didn't know.  It would be up to

20     the -- I believe it would be up to the

21     property owner to tell me that they don't want

22     to, not tell me that I am allowed to.

23  Q. But you believe that a private property owner

24     can prevent you from carriage on their land?

25  A. Yes.  If they were to ask me.

1    Q. Okay.  Do you think you should be able to

2       enter their land and not disclose that you are

3       concealing a weapon?

4             MR. ROTSKO:  Objection to relevance.

5       You can answer.

6             THE WITNESS:  Can you repeat it, please?

7

8                 (The question was read.)

9

10            THE WITNESS:  Yes.  Unless they ask me.

11

12      BY MR. BELKA:

13   Q. Brett, is it your belief that you can come to

14      my house and conceal a weapon on my property

15      and not disclose that you are doing so?

16   A. Yes.  Unless you ask me to leave, and then I

17      should leave immediately.

18            MR. ROTSKO:  Objection.  Just for

19      clarification, are we asking for philosophical

20      beliefs here or are you asking whether he --

21      are you asking him for a legal conclusion or

22      his preference?

23            MR. BELKA:  I am asking the least

24      objectionable of those questions.  I am not

25      going to clarify.  The record is going to be

1        what it is.

2             MR. ROTSKO:  Brett, if you need to ask

3        for clarification, feel free to do so.

4             MR. BELKA:  He nodded yes that he

5        understands, right?

6             THE WITNESS:  Yes.  I understand.

7             MR. ROTSKO:  You understand that --

8             MR. BELKA:  Nick, Nick, Nick, we are

9        done there, okay?  You have already provided

10        information to him.  If he wants to clarify a

11        question, he can.  Nobody is preventing him

12        from doing so, okay?  Nick, the record is going

13        to be what it is.

14             MR. ROTSKO:  Proceed.

15             MR. BELKA:  Thanks.

16

17        BY MR. BELKA:

18   Q. Your declaration explains that you submitted a

19        request for time off for a planned trip to the

20        Adirondacks.  Do you recall that?

21   A. Yes.

22   Q. We have gone over who your employer is, but

23        remind me.

24   A. Ray Laks Honda in Orchard Park.

25   Q. Okay.  And what do you do there?

—— **BRETT CHRISTIAN  –  11/16/2022** ——

1      A. My official job title is recon manager.

2      Q. You repo cars?

3      A. Recon.

4      Q. I understand.  I don't know what that means.

5         What does that mean?

6      A. So essentially outside of financing a car,

7         office administrative work, selling a car or

8         being a service writer, when you bring your

9         car in for service, everything else of the

10        business goes through me and I handle and

11        oversee and keep everything on track:  New

12        cars coming in, new cars being sold going out,

13        used cars coming in, stocking them in, getting

14        them into the shop, what work do they need,

15        sourcing parts, sending them out for repair.

16             If you bring your car as a customer in

17        to get work done, I dispatch it to the

18        technician.  Overseeing the technicians in the

19        shop, working with the parts department,

20        coordinating customer delivers for sale staff.

21        General keeping an eye on the place,

22        protecting the business interest.  Mr. Used

23        Car Manager, this car -- because of the

24        condition of it, yes, it technically meets the

25        letter of the law for New York State

1      inspection, but it would put yourself at

2      future liability selling this as a retailable

3      [sic] piece, look out for the business.

4           We just had three Accord -- speaking to

5      a manager, we just had three Accord Sports get

6      put on cinder blocks and all sets of wheels

7      taken.  It did massive amounts of damage to

8      the cars and the theft of the property.  We

9      should probably start having the sale staff

10     bring that model of car, which I owned, inside

11     the shop so it is locked inside the building.

12     Try to reduce the theft, make sure the lights

13     are on, make sure the light timers.

14          We are going into what could be a

15     snowstorm very soon in the next couple days.

16     Do the two plow trucks have the plows

17     attached, are they fueled up, are all the

18     lights working so you can see, do the wipers

19     work, they are mechanically good, all right?

20     Make sure that they are detailed.  You have to

21     pull them in every night.  Our shuttle, if you

22     come in to get your car worked on at 8 o'clock

23     in the morning and you need to be to work by

24     8:05, the shuttle better be inside so it's

25     defrosted ready to go.

1            So it's a massive amount of

2        coordination, management, overseeing.  It's a

3        mix of everything.  It keeps the business

4        profitable, sustainable and afloat and

5        productive and that is the short version.

6    Q.  Understood.  In your declaration you note that

7        you submitted a request for time off for a

8        couple of days in November 2022 and the idea

9        of that was to visit the Adirondack Park,

10       right?

11   A.  That's correct.

12   Q.  Okay.  And who is your supervisor to whom you

13       submitted this time-off request?

14   A.  At the time we just in the last three weeks

15       changed that personnel there.  That would have

16       been John Cahalan.  His name is tough so --

17   Q.  It's okay.  I just want to be clear.  I am

18       asking you who -- so your declaration says I

19       submitted a time-off request at my place of

20       employment, okay?  And I want to know to whom

21       you submitted that time-off request?

22   A.  Verbally to him and then put it in through --

23       they use a program called Workday.  He writes

24       it -- well, when he was there, he wrote it

25       also on his day planner.  He would mark off on

1      the calendar who is off so that way you didn't

2      have multiple people in the same department

3      off at the same time.

4  Q.  Okay.  And just for clarity of the record, you

5      said "verbally to him."  Who is the him to

6      which you are referring?

7  A.  John Cahalan.

8  Q.  Okay.  And your declaration says a couple of

9      days in November 2022, right?

10  A.  Correct.

11  Q.  Okay.  Now, you went through a very long

12      detailed description of the kinds of work that

13      you do for this job, right?

14  A.  Correct.

15  Q.  Okay.  And presumably a time-off request is

16      for a time specific?

17  A.  Correct.

18  Q.  Okay.  Now, you don't provide a specific time

19      in your declaration.  You say a couple of days

20      in November '22.

21  A.  I had taken off -- Wednesday is my normal day

22      off work through the week.  Next week

23      Wednesday I put in to have the 23rd off.  We

24      are closed for Thanksgiving, the 24th.  I put

25      in to have Thursday and Friday off work, which

1          I have never done.  So that way I could leave

2          town on Wednesday, go through Thanksgiving Day

3          into the weekend, return Sunday and then

4          resume work.

5      Q. Why not put the specific dates in your

6          declaration that you worked on for six to

7          eight hours to make sure it was an accurate

8          representation in this case?

9             MR. ROTSKO:  Objection.  Arguing with

10         the witnesses.

11     Q. You still have to answer.

12     A. I am not a legal person.  I am not a licensed

13         lawyer with the bar.  I didn't know -- I have

14         never been down this path before.

15     Q. At the time you wrote the declaration, did you

16         know the very specific days that you were

17         requesting time off for?

18     A. Yes.

19     Q. Is it fair to say that you did not include

20         those days in your declaration?

21     A. Yes.  I omitted the exact dates.

22     Q. Your declaration says that you canceled your

23         trip to the Adirondack Park because of the

24         CCIA, right?

25     A. Correct.

 1    Q.  And why do you feel -- strike that.

 2            Why did you feel it necessary to cancel

 3        your trip to the Adirondack Park because of

 4        the CCIA?

 5    A.  To get to the Adirondacks it's approximately 5

 6        hours and 15 minutes of travel time, 6 hours

 7        and 15 minutes of travel time if you don't go

 8        the thruway.  Sometimes the side roads are

 9        nice, slower pace, less traffic.  So with the

10        way the CCIA is, the way it is written in

11        black and white which is what I believe to be

12        the law, if I was to go on the trip, bring

13        with me my pistol and I am carrying it because

14        it is easier to keep it in a holster on your

15        person, less likelihood of getting it stolen

16        because you left it somewhere, I would have to

17        know in advance every restaurant that I may

18        decide to get food at or every gas station.

19        And then if I ended up instead of bringing a

20        sleeping bag and sleeping in the car as I

21        sometimes do, if I went the route of this time

22        I will get a hotel, knowing all the property

23        owner's policies ahead to be compliant and

24        legal, it -- too daunting, if you will.

25    Q.  Your declaration to me implies that you

—— BRETT CHRISTIAN  -  11/16/2022 ——

1           thought that the CCIA applied to the
2           Adirondack Park.  Was that your understanding
3           at the time you signed your declaration?
4      A.  When I signed it at the time, that was my full
5           belief.  However, New York State political
6           leaders have said now that it doesn't apply,
7           but I don't see anything in writing.  So I am
8           unsure of New York State Government's stance
9           in that regard.
10     Q.  You understand it has been represented in this
11          lawsuit that the CCIA does not apply to
12          Adirondack Park, right?
13     A.  That's what I have heard.  However, when I go
14          to the Penal Code and I look it up, I haven't
15          seen the legislature make any changes, make
16          any addendums, amendments, corrections in that
17          regard.  And I have to believe the law
18          enforcement has no legal obligation to protect
19          me.
20              Their duty is to enforce the law and
21          catch criminals per the Supreme Court case
22          that happened out of Ohio.  I want to say
23          Akron.  I don't remember the exact name.  I
24          would have to look it up, but because of that
25          I would have to believe any law enforcement

1          professional whether they are New York State
2          Park rangers, DEC, if they are New York State
3          Police, local sheriff, local town, they would
4          go by this is what's written as the law, this
5          is, therefore, what we must enforce if someone
6          is violating it.
7      Q. So at least as it relates to the Adirondack
8          Park, the statement of political leaders on
9          how the CCIA applies is not enough for you?
10     A. Correct.  Let me add --
11     Q. No.
12     A. Okay.  Sorry.
13     Q. Actually, sorry.  You should be able to add.
14         Go ahead.  I didn't mean to cut you off.
15     A. If I were to go ahead and go there and carry
16         and a law enforcement professional were to
17         observe me and stop me and question me and
18         find that I was carrying, I don't believe that
19         they would find it a sufficient defense or
20         justification to say, well, the Governor or
21         the Attorney General of New York or the head
22         of the State Police has said this --
23     Q. Right.
24     A. -- you know, in a TV interview.  Much like
25         people I know now that are going through the

1       permitting process, the way the law is written

2       it says everybody needs the new training

3       requirement and other requirements.  To have,

4       again, politicians who are elected

5       representatives and heads of various

6       departments say, well, we only interpret that

7       or we only mean it applies to downstate

8       counties like Suffolk, Nassau, Westchester and

9       the boroughs and New York City, again, I look

10      at it and I tell people they can say what they

11      want but what's actually written in the law,

12      that's the standard you are held to and this

13      is what it says currently.

14   Q. Right.  So in the case of Adirondack Park,

15      right, you would not be comforted by the

16      statements of political leaders or the leader

17      of the State Police that Adirondack Park is

18      not -- that we are not going to enforce the

19      CCIA in Adirondack Park, right?

20   A. Correct.

21   Q. What kind of plans did you make to go to

22      Adirondack Park in the period of time around

23      Thanksgiving 2022?  What firm plans did you

24      make?

25   A. I had firm plans, definitive plans.  My plans

1    were to travel to the west central region
2    which is northeast of like Rome, New York.  I
3    would go up.  There's a trail there that I
4    really do enjoy, Tillman.  There's also one --
5    there's a parking area for Blue Mountain off
6    of Route 28 or 8.  Without looking at a map, I
7    do sometimes jumble those.  You park there and
8    I want to say it's Swallow or Smoky Mountain
9    Trail, but Tillman is the primary one that I
10   have enjoyed in that region.
11         So I made plans.  I would take my SUV or
12   Sport Utility Vehicle, fold the seat down,
13   throw a sleeping bag in the back.  I can sleep
14   in the car if need be, but if you leave at
15   5:00 in the morning, drive the legal speed
16   limit, go there, get gas, stop for fast food,
17   you are there about 10:30, 11:00.  The trail
18   is a couple miles long; you enjoy it.  Say you
19   leave by 4:00 p.m., 5:00 p.m. before it starts
20   to get absolutely pitch black, you are back
21   before midnight.  So I can make a day of it if
22   I want to go there and back in one day.
23         Having a couple days off I had gotten
24   excited that, you know what, I have a great
25   sleeping bag with a plaid design interior.  I

```
 1            would stay warm.  It's not that cold yet and
 2            just kind of camp out.
 3        Q. So no hotel plans, right?
 4        A. On this trip, no.
 5        Q. Right.  So you didn't have any particular
 6            place that you were for sure going to stay in
 7            the Adirondack trip that was going to happen
 8            in and around Thanksgiving this year?
 9        A. Correct.
10        Q. Okay.  And did you have a definitive arrival
11            and departure date?
12        A. Wednesday the 23rd would have been the
13            departure date being the first day off work
14            staying through either Friday or Saturday and
15            then returning.  New York State weather
16            dependent of course.  I did get stuck once for
17            an extra day once up near Lake Piseco in New
18            York State.
19        Q. Okay.  But getting to the departure date just
20            because I know you were at Wednesday the 23rd,
21            the coming back date of -- just help me out
22            with the math.
23        A. Either Friday the 25th or Saturday the 26th
24            and then that gives me a day to get ready to
25            return to work.
```

BRETT CHRISTIAN - 11/16/2022

1    Q. Because you wouldn't work Sunday?

2    A. Sunday, correct.

3    Q. But either way you didn't make this trip

4       despite political leaders and the

5       representations that have been made in this

6       case because that's not enough for you to be

7       assured that the CCIA wouldn't be enforced in

8       Adirondack Park?

9    A. Correct.

10          MR. BELKA:  Okay.  Let's take a break.

11      Five minutes.

12

13          (Recess was taken.)

14

15      BY MR. BELKA:

16   Q. One of the paragraphs in your declaration

17      mentions that you would sometimes walk in

18      local parks.  Do you recall that statement?

19   A. Yes.

20   Q. I mean, I will read it to you.  "Carry my

21      firearm for self-defense while walking in

22      local parks or when hiking on trails in

23      largely wooded and marshy areas a few times

24      each month."  Do you recall that?

25   A. Yes.

1    Q. Okay.  Similar to failing to provide the dates
2       on which you would have made your trip to the
3       Adirondacks, you don't mention which local
4       parks you would carry for in self-defense.  Is
5       that fair?
6    A. Yes.
7    Q. Okay.  Can you tell me what local parks you
8       are referring to in your declaration?
9    A. Yes.  The primary ones, but not all of them,
10      are Stiglmeier Park in Cheektowaga because of
11      being close to where I live, parts of the
12      Clarence Bike Path which are actually two
13      trails running from Amherst off of Transit
14      Road into Clarence.  If you remember the bike
15      path rapist, that's where that stuff happened.
16      The other one would be there's a Shoreline
17      Trail running from the north side of Buffalo
18      where Sheridan Drive approximately hits the
19      190 and it runs up through where -- or sorry,
20      where Sheridan Drive hits the 290, sorry.  And
21      that runs from there up to -- or I am getting
22      my roads confused.  I am sorry.
23         The 190 goes around Buffalo.  Where
24      Sheridan Drive hits the 190 and it runs from
25      there down to where the bridges going to Grand

1          Island are and there's a park and ride
2          directly underneath the bridges.  You go past
3          the old power plant in that section.  It's
4          called the Shoreline Trail, I believe.
5     Q.  What was the middle one that you mentioned?
6          Parts of a trail path into Clarence, what's
7          that one called?
8     A.  There's two trails.  They are both -- in
9          laymen's term people in the area just call
10         them the Clarence Bike Path, but they are two
11         bike and hiking paved trails that run through
12         the woods of that area.
13    Q.  All right.  I asked you to tell me what you
14         meant by local parks in your declaration and
15         you have identified Stiglmeier Park, the
16         Clarence Bike Path, and the Shoreline Trail;
17         is that correct?
18    A.  Yes.
19    Q.  All right.  And understood that you qualified
20         that to say primarily, were there any other
21         local parks in your mind at the time you
22         drafted your declaration, aside from
23         Stiglmeier Park, the Clarence Bike Path and
24         the Shoreline Trail?
25    A.  There are other parks I have been to.  Those

1            being the primary most enjoyed.  When I have
2            gone to other parks, I have not kept a running
3            list because I did not know I would need it in
4            the future.  So I cannot be certain of the
5            exact name or like the date and time without
6            speculating.
7       Q.  I mean, do you know the date and time on which
8            you have been to Stiglmeier Park?
9       A.  Stiglmeier Park, the last time I went was the
10           last Wednesday in August.
11      Q.  And what about before the last Wednesday in
12           August, when was the last time you were at
13           Stiglmeier Park?
14      A.  That would have been I went Sunday morning,
15           the first Sunday in August.
16      Q.  And before that, when was the last time you
17           were at Stiglmeier Park?
18      A.  Before that, would have been the end of July.
19      Q.  And is the end of July a specific date or
20           time?
21      A.  I would have to go back through my calendar.
22      Q.  Right.  My point is, I just want to know what
23           you mean by local parks in your declaration.
24           And you have identified Stiglmeier Park, you
25           have identified the Clarence Bike Path and the

```
 1         Shoreline Trail primarily.  And then you note
 2         other parks, but that you haven't -- you might
 3         not know their names?
 4    A.   Correct.
 5    Q.   Okay.  But the reasoning you have for not
 6         providing their names is that you didn't know
 7         that you would be able to -- one second.  Be
 8         required to come up with a date and time.  I
 9         am just saying that that's consistent for the
10         other parks as well?
11    A.   Correct.
12    Q.   Okay.  So is it fair to read the words "local
13         parks" in your declaration in paragraph 7 as
14         Stiglmeier Park, the Clarence Bike Path, and
15         the Shoreline Trail?
16    A.   Yes.
17    Q.   You also note that there were hiking trails
18         and largely wooded and marshy areas a few
19         times each month?
20    A.   Yes.
21    Q.   Okay.  The hiking trails that you are
22         referring to, are they different than
23         Stiglmeier Park, the Clarence Bike Path, and
24         the Shoreline Trail?
25    A.   Those previously mentioned trails are some of
```

```
 1            it, but there are some outside of Erie County
 2            in the Southern Tier.
 3       Q.  Okay.  Aside from the ones that we have
 4            already mentioned -- I am just trying to get
 5            the world of local parks and hiking trails.
 6            Aside from the three that we have mentioned,
 7            what else are you referring to?
 8       A.  There's one other primary one.  That would be
 9            the Harris Hill State Forest area down near
10            Gerry, New York.
11       Q.  How do you spell Gerry?
12       A.  G, as in George, E-R-R-Y.  That's towards like
13            Chautauqua way.
14       Q.  And when is the last time you were at the
15            hiking trails in Harris Hill?
16       A.  Would have been the beginning of June around
17            Father's Day weekend.
18       Q.  And what gun were you carrying?
19       A.  That would have been my Ruger SP101 and 357
20            Magnum.
21       Q.  Both guns?
22       A.  That's all one gun.
23            MR. BELKA:  Oh, I deserve that.  Can you
24            read me back again what the gun was?
25
```

1              (The answer was read.)

2

3        BY MR. BELKA:

4    Q. Where did you carry it on your person when you

5        were on the hiking trails at Harris Hill in

6        the beginning of June around Father's Day of

7        this year?

8    A. That was an inside-the-waistband holster

9        concealed.

10   Q. The inside-the-waistband holster that you use

11       for your 357 Ruger, do you know the brand of

12       it?

13   A. I do not.

14   Q. Do you know what color it is?

15   A. It is light brown.  It is a little bit lighter

16       than a baseball glove.

17   Q. How do you -- how does it attach to the

18       waistband?

19   A. It has a belt clip.  The holster part, the

20       leather part goes inside the waistband.

21       There's a metal clip that goes on the outside

22       so it -- if I can try to describe it, like

23       this (indicating).  And then you would put

24       your shirt, your garment over that.

25   Q. Are you concerned at all about printing?

—— BRETT CHRISTIAN  -  11/16/2022 ——

1    A. I am.

2    Q. And what do you do to prevent printing?

3    A. Pick a gun that is suitable for the event or

4       activity that I am doing for proper retention

5       as well as the size of it and where it is

6       located on my body and then also the type of

7       holster.  Concealed means concealed.

8    Q. How many holsters do you own?

9    A. Approximately, between six or seven.

10   Q. Is it fair to say that in your declaration

11      when you refer to local parks or hiking on

12      trails in largely wooded areas and marshy

13      areas, you are referring to Stiglmeier Park,

14      the Clarence Bike Path, Shoreline Trail and

15      Harris Hill State Forest in Gerry, New York?

16   A. Primarily, yes.

17   Q. Okay.  Is there anything else that you are

18      referring to that you can articulate for me

19      here today?

20   A. Not at this time.

21   Q. Do you think that there's some other time that

22      you might be able to articulate to me what you

23      mean by local parks or when hiking on trails?

24   A. I would have to go through a map.  I am a very

25      well-traveled individual.  I have not been to

1          every park and public land and location in New
2          York State, but I have been to I would say
3          probably without going into speculation,
4          80 percent of them and I would have to --
5          these are the primary ones that I go to
6          frequently.  The other are a far more
7          infrequent amount of time between when I go.
8          Sorry.  Trying to put it together.
9               MR. ROTSKO:  Object on the grounds that
10          the question calls for speculation as well as
11          it is irrelevant given that he has identified
12          examples of parks.
13               MR. BELKA:  I disagree.  And he's
14          clarifying terms in his declaration and what
15          they mean since local parks is meaningless, but
16          that's argument and let's do that later.
17
18          BY MR. BELKA:
19      Q.  Is it fair to say that when you wrote local
20          parks or hiking trails, primarily you were
21          referring to Stiglmeier Park, the Clarence
22          Bike Path, Shoreline Trail, and Harris Hill
23          State Forest in Gerry, New York?
24      A.  Primarily, yes.
25      Q.  Within your trip to the Adirondacks and

─── **BRETT CHRISTIAN - 11/16/2022** ───

1       elsewhere in your declaration, you

2       mentioned -- well, strike that.

3              Regarding your testimony today related

4       to the planned trip to the Adirondacks and in

5       your declaration elsewhere, you refer to not

6       being able to carry on private property that

7       is open to the public and that prevents you

8       from failing to visit gas stations or hardware

9       stores.  Do you remember that testimony?

10   A. Yes.

11   Q. Okay.  And as it relates to the Adirondack

12       Park, I will just note that the travel to the

13       Adirondack Park is not identified as a barrier

14       in your declaration.

15   A. Clarification, please.  I am not

16       understanding.

17   Q. Okay.  Don't even worry about it, okay?  We

18       will just move on from a point I was making,

19       but isn't really for a deposition anyway,

20       okay?  Well, no.  Let's clarify because you

21       asked me to.

22              Okay.  In the section where you talk

23       about the time off for the Adirondack Park,

24       your declaration says that the CCIA is

25       preventing you from entering the Adirondack

1       Park, but not that the CCIA is preventing you

2       from traveling to the Adirondack Park.  Do you

3       understand that?

4  A. Yes.

5  Q. Okay.  However, elsewhere in your declaration

6       you do say that travel for you has been

7       inhibited by the CCIA, right?

8  A. Yes.

9  Q. Okay.  And do you remember those sections of

10      your declaration?

11  A. Yes.

12  Q. Okay.  You say you can't go to the gas station

13      or hardware stores because the CCIA prevents

14      it?

15  A. Yes.

16  Q. Okay.  Before we get into how the CCIA

17      prevents those things allegedly, what gas

18      stations are you visiting weekly -- strike

19      that.

20          What gas stations are you referring to

21      when you wrote your declaration?

22  A. Locally that would be Delta Sonic as I have a

23      Delta Sonic gas card.  When traveling outside

24      of Buffalo and the suburbs, to use laymen's

25      terms, it simply would be whatever is

1       available when you need gas.  I am not as
2       picky as long as it's name brand.
3   Q. Okay.  You also refer to monthly visits to
4       hardware stores.
5   A. Yes.
6   Q. What hardware stores are you referring to in
7       your declaration?
8   A. Primarily, Valu hardware stores.
9   Q. And that's Valu with no E?
10  A. Yes.
11  Q. It's mostly for her (indicating).
12          What Valu hardware store?  Like where is
13      it located?
14  A. There is one within minutes of where I live.
15      It's off of George Urban Boulevard and Dick
16      Road in a plaza across from Wegmans.
17  Q. Primarily is that the hardware store you are
18      referring to in your declaration?
19  A. Yes.
20  Q. Okay.  And it is your position that that Valu
21      on George Urban and Dick Road does not have
22      conspicuous signage that allows you to
23      concealed carry on their property, right?
24  A. Yes.
25  Q. Have you inquired as to whether or not that

```
 1        Valu hardware store allows you to concealed
 2        carry?
 3    A.  I have asked the cashier.  They did not want
 4        to give an answer because of reasons that I do
 5        not know.
 6    Q.  Is it because the cashier is the wrong person
 7        to ask?  I am legitimately asking that
 8        question.
 9    A.  When I have been there, I have seen manager --
10        I have seen everybody working the cashier and
11        I don't know what everybody's job title is.
12    Q.  Okay.  Other than asking the cashier, have you
13        made any other efforts to inquire as to the
14        policy at Valu as it relates to concealed
15        carry?
16    A.  I tried calling their corporate number to find
17        out, and the person I spoke to did not want to
18        give an answer.  They said they simply defer
19        to New York State and local law enforcement.
20    Q.  By not having conspicuous signage according to
21        the law, isn't Valu giving you an answer as to
22        their position on concealed carry?
23    A.  Yes.
24    Q.  And what is that answer as you understand it?
25    A.  That it is not allowed.
```

```
 1      Q. Okay.  And do you believe that as a property
 2         owner, Valu can tell you not to conceal carry
 3         on their property?
 4      A. Yes.  If they communicate it to me directly,
 5         personally.
 6      Q. But not through signage?
 7      A. If they were to post a sign saying
 8         specifically that's not allowed, but to have
 9         nothing posted at all is vague.  And again if
10         a police officer were to come, what exactly is
11         in writing posted that would justify what I am
12         or am not doing.
13      Q. Valu can allow you to concealed carry on their
14         property by posting conspicuous signage,
15         correct?
16      A. They could, correct.
17      Q. They have not done that, correct?
18      A. Correct.
19      Q. And in New York that means that you are not
20         allowed to concealed carry on Valu's property,
21         right?
22      A. Correct.
23      Q. And having spoken to the cashier and called
24         the corporate number, you have no indications
25         otherwise that they want you to concealed
```

———— **BRETT CHRISTIAN - 11/16/2022** ————

1    carry on their property, correct?

2    A. Correct.

3    Q. And you think that the only way they should

4    disallow you from concealed carry on their

5    property is if they say it to you directly?

6    MR. ROTSKO:  Objection.

7    Q. You still have to answer.

8    A. Not in the sense of saying it verbally, but it

9    should be explicitly posted and written much

10   like a no trespassing sign or no parking sign

11   or in Buffalo the various you can park from

12   this time to this time but not this time where

13   it's very black and white, so that way the

14   common man would understand and it would make

15   sense.

16   Q. But you understand.  You know what it means

17   when Valu fails to post conspicuous signage

18   permitting you to concealed carry.  You know

19   that means you are prohibited, right?

20   A. Correct.

21   Q. Another paragraph in your declaration is about

22   the difficulties of travel and trying to find

23   the conspicuous signage.  Do you recall that

24   paragraph?

25   A. Yes.

1    Q. Okay.  And I am going to characterize, but the

2        idea of the paragraph is the conspicuous

3        signage might be hard to find, you are on the

4        property and that makes it uncomfortable for

5        you, right?

6    A. Yes.

7    Q. Okay.  If the situation were reversed, as you

8        request, and conspicuous signage needing to be

9        posted preventing you from concealed carrying

10       on the property, wouldn't you run into the

11       exact same issue?

12           MR. ROTSKO:  Objection.  Calls for

13       speculation.

14   Q. You still have to answer.

15   A. If it was done in a way that the signage was

16       uniform, the requirements, a certain size,

17       certain font, certain words being used so it

18       was the same wherever you went.  And in ways

19       like other states like Texas does where it has

20       to be posted at the entrance to the building,

21       not the entrance to the property.  So if, for

22       example, I was to go to a supermarket to go

23       grocery shopping and I pull in the parking lot

24       and I go to walk up to the entrance and I see

25       they have a signage, I can turn around and go

1       back to my car and safely store, however the

2       law is written, my firearm.

3   Q.  What mechanism do you have in your 2023 Honda

4       HR-V to safely store your firearm?

5   A.  I have had since before I got my permit, I

6       bought it in advance -- well, I got my permit.

7       Before I took possession of my first firearm,

8       my first pistol, let me clarify, I bought a

9       safe that has a braided cable that attaches to

10      the inside of the safe.  The cable in cars I

11      wrap around the seat frame that is bolted to

12      the passenger seat of the car.  And thus, when

13      you put the pistol inside unloaded, magazine

14      ejected and you lock it, it goes under the

15      seat of the passenger seat so it's out of

16      sight even to prevent theft.

17          With my HR-V I was not able to do that

18      with the seat design so the cable runs

19      through -- in the cargo area by the rear

20      tailgate there's a metal hook that you would

21      attach like a cargo net to or tie cargo down.

22      The metal hook is welded to the body of the

23      vehicle.  I run the cable through that, secure

24      the firearm in that.  So in order to store my

25      firearm, I would make it safe, put it in there

--- **BRETT CHRISTIAN - 11/16/2022** ---

```
 1          and lock it and then throw a blanket over it.
 2          Again, prying eyes.  I don't want to have
 3          theft.  I take it very serious.
 4     Q. And where is it located in your -- this
 5          storage unit, where is it located in your
 6          Honda HR-V?
 7     A. In my HR-V it is in the cargo area behind the
 8          rear seat.  You open the tailgate to access
 9          that area.
10     Q. Oh, because the Honda HR-V is kind of like a
11          pickup truck?
12     A. That's an SUV.  It is smaller than an Equinox,
13          a CR-V.
14     Q. Oh, so when you say lift up the tailgate, you
15          mean like the very back portion?
16     A. The back cargo hatch, like the rear hatch of a
17          Station Wagon.
18     Q. You note in your declaration that people might
19          be uncomfortable if they see you disabling
20          your firearm in your car.
21     A. Yes.
22     Q. Do you remember that?
23     A. Yes.
24     Q. On what do you base that other people might be
25          concerned with your disabling of the firearm
```

1         by the tailgate of your HR-V?

2    A.   I base it upon the action I would have to go

3         through to comply, which is pull over on the

4         side of the road before entering the property,

5         get out of the driver's door, walk to the

6         back, put the tailgate up.  Then I would have

7         to first draw the pistol from a holster, I

8         would have to eject the magazine while the gun

9         is pointed in a safe direction, which in that

10        case would be straight at the ground.  I would

11        have to eject a live round, then store the

12        firearm and lock it up.  In doing that,

13        looking at New York State Law, one thing that

14        worries me is New York State Law seems to have

15        provisions for publicly displaying or having

16        out in public a firearm while hunting.  A

17        firearm meaning all guns.

18             The other thing they seem to have is if

19        you are at the gun range or a gun club, some

20        sort of sport target shooting of some type,

21        everything else seems that a police officer

22        can interpret it as brandishing because you

23        are displaying it in public.  The other thing

24        to look at for the common person in New York,

25        all the time you see in the police blotter

1       throughout the state people calling the cops
2       on other people because they think so-and-so
3       had a gun, but it was an umbrella.  They think
4       so-and-so had a gun, but it was a cellphone.
5       People in New York, as opposed to what I found
6       in my travels in other states, they tend to be
7       more skittish, more scared of guns.
8           So based upon that in my experience, I
9       would worry that either a police officer
10      driving by and here is a person on the side of
11      a public road that has a handgun in their
12      hands and there's a live round coming out or a
13      mother with her two kids driving down the road
14      might feel scared by that because it's being
15      displayed in public.  I have always felt
16      concealed means it's concealed.  It is not
17      openly waved about, if you will.
18  Q.  Isn't it the same if the private property
19      prevents you from carrying on their property?
20      You still have to go and store your firearm,
21      right?
22  A.  Yes.
23  Q.  So if they prevent you by conspicuous signage
24      or they prevent you because the law says that
25      there is no conspicuous signage and that

1              prevents you, the process of disabling your
2              firearm is going to be the same?
3         A. Correct.
4         Q. Have you ever seen other people at the
5              tailgate of their car not disabling a firearm?
6         A. Most people that I have talked to either say
7              they intend to ignore the law, which is not
8              how we have a law-abiding society.
9         Q. I am going to cut you off just because it's
10             not an answer to the question, okay?
11        A. Okay.
12        Q. The question is:  Have you ever seen other
13             people at the rear of their car with a
14             tailgate doing anything other than disarming a
15             weapon?
16        A. No, I have not.
17        Q. You have never seen somebody load groceries in
18             the back of a car?
19        A. Oh, I thought you meant have I -- I have seen
20             people at the back of a vehicle loading cargo,
21             yes.
22        Q. Right.  Okay.  Like 99 percent of the time
23             somebody is at the back of their car, they are
24             doing something other than disarming their
25             weapon, right?

────── **BRETT CHRISTIAN  -  11/16/2022** ──────

1      A.  Yes.

2      Q.  So sitting at the back of your car, okay,

3          doing something in the back of your car is not

4          necessarily suspicious in and of itself,

5          right?

6      A.  Not always, no.

7      Q.  How long does it take you to disarm and store

8          your firearm?

9      A.  If I had to estimate an approximation of time

10         because I have never timed it, it would be

11         somewhere between 30 to 40 seconds.

12             MR. BELKA:  Okay.  We are going to take

13         a break to deal with an annoying sound.  One

14         second.  Off the record.

15

16             (Recess was taken.)

17         (The question and answer were read.)

18

19     BY MR. BELKA:

20     Q.  One of the other areas that your declaration

21         addresses is when traveling the private

22         property provisions of the CCIA prevent you

23         from taking bathroom breaks.  Do you recall

24         that?

25     A.  Yes.

────── **DEPAOLO CROSBY REPORTING SERVICES, INC.** ──────
135 Delaware Avenue, Suite 301, Buffalo, New York  14202
716-853-5544

─ **BRETT CHRISTIAN - 11/16/2022** ─

1    Q. Okay.  Can you describe what you mean by that?

2    A. If I was traveling and I needed to either

3       while driving or hiking stop and use a

4       bathroom and whether it's a fast food

5       restaurant, a coffee shop, private business,

6       what have you, and I need to use the

7       facilities, I am carrying a firearm, I can't

8       go to their property now because they don't

9       have it posted and I -- or I don't know ahead

10      of time if they have it posted because trying

11      to find out who owns the property and who is

12      the legal mouthpiece to make such decisions is

13      sometimes very hard to track down.

14   Q. Have you ever tried to track it down by

15      calling ahead?

16   A. I have with some, but it gets so difficult and

17      either people don't want to comment; they

18      don't want to make a decision.  They say about

19      liability, that they are defaulting to what

20      New York State says.  So it's neither a yes or

21      no.

22   Q. Is that a direct quote from somebody that you

23      spoke to that they are defaulting to what New

24      York State said?

25   A. Yes.

─ DEPAOLO CROSBY REPORTING SERVICES, INC. ─
135 Delaware Avenue, Suite 301, Buffalo, New York  14202
716-853-5544

```
 1     Q.  Who told you that?
 2     A.  It was an employee at a Tim Hortons around the
 3         corner from me.  It is Wehrle Drive and it's
 4         either Dick Road or Cayuga Road.  M&T Bank has
 5         a facility right across the street from them.
 6         There's an OTB gambling spot directly behind
 7         that was robbed about a year ago in a brazen
 8         robbery.
 9     Q.  Were you trying to take a bathroom break at
10         this Tim Hortons near your house?
11     A.  I was on my way home.  Lunch had started to
12         rapidly disagree with me, not trying to get
13         gross, and I was unsure that I was going to
14         make it home.
15     Q.  And did you talk to that Tim Hortons employee
16         by phone or in person?
17     A.  I called them.
18     Q.  And what can you recall about what you said to
19         them and what they said to you?
20     A.  I simply asked per New York State Law do you
21         have any signage allowing the lawful
22         possession of firearms to be carried on your
23         property to know that if I would be legal to
24         do so, and they responded with they are not
25         really going to make a decision on that.  They
```

1          simply default to what New York State says and

2          then they hung up on me.

3     Q.  What level of person were you talking to at

4          Tim Hortons, like a baker or cashier?  Who

5          were you talking to?

6     A.  That I do not know.  They did not identify

7          their position in the company.

8     Q.  Right.  But you called the franchise location

9          you were trying to use the bathroom at?

10    A.  Correct.

11    Q.  Right.  And if that Tim Hortons had decided

12         not to allow concealed carry through

13         conspicuous signage, you would be in the same

14         spot, right?

15    A.  Approximately, yes.  But I would not have

16         ended up having an accident in my vehicle.  I

17         would have seen a sign and just kept going.

18    Q.  Look, I am not sure I want to clarify this,

19         but when you say "accident," are you talking

20         about a car accident, are you talking about an

21         accident related to going to the bathroom?

22    A.  A urination accident.

23    Q.  Okay.  Do you have some sort of a medical

24         condition that exacerbated or otherwise may

25         have caused that urination accident?

```
1      A. I drink a lot of coffee.
2      Q. Right.  So not a medical condition?
3      A. No medical condition.
4      Q. Right.  Can you think of any other times in
5         which you have called ahead to inquire about
6         the policy, the carriage policy at a location
7         that you were attempting to go to?
8      A. I have called ahead to both Tops and Wegmans
9         grocery stores.  I have called Cabela's on
10        Walden and also, I have called ahead to
11        Danny's on Genesee near the airport and Otto's
12        off of Union near Genesee.  They are
13        restaurants.
14     Q. Did you say Denny's like D-E-N-N-Y-S?
15     A. D-A-N-N-Y-S, Danny's.
16     Q. Okay.  And the last one was Otto's?
17     A. Otto's.
18     Q. And how do you spell Otto's?
19     A. O-T-T-O-S.
20     Q. Okay.  And in your conversation calling ahead
21        to the Tops grocery store in order to
22        determine their policy on carriage, what did
23        you say to them and what did they say to you?
24     A. Calling both to Tops and Wegmans, I inquired
25        towards the first week of September when
```

1           changes took effect if they permitted the
2           lawful, for licensed permit holders, carrying
3           of concealed firearms on their property.  With
4           both of those again I don't know the ranking
5           level, that would be the word I would select,
6           of the employee.  They both said that they
7           were declining to comment at this time.  I
8           would have to talk to a corporate location and
9           track down somebody in corporate.  Not a
10          specified person, but someone in corporate.
11      Q.  And did you do that?
12      A.  I tried, got bounced around, could not get
13          definitive answers.  Answers in the sense
14          either explicit, on-the-record verbal
15          permission or explicit, on-the-record written
16          permission.
17      Q.  Did you ever go to those locations and see
18          whether or not there was conspicuous signage?
19      A.  I have.
20      Q.  Okay.  And if you went to those locations, did
21          you see conspicuous signage?
22      A.  At Tops and Wegmans, the stores that I have
23          been to do not have anything posted saying
24          that it is allowed.
25      Q.  And so pursuant to New York State Law, what

1       did that communicate to you?

2   A.  That communicated to me that it would be a

3       violation of law to bring onto the property a

4       firearm.

5   Q.  Right.  So at the time you saw no conspicuous

6       signage on Tops and Wegmans, you knew that you

7       were not allowed to concealed carry on their

8       properties?

9   A.  Yes.  Once I went on the property.  I decided

10      to, when I made my next shopping trip, to not

11      carry at all, leave it at home because I did

12      not know what was going to happen and pulling

13      a firearm out in public to me is unsafe if you

14      are doing it at all.  So I went without and

15      that's when I see that there's nothing posted.

16  Q.  All right.  And your calling ahead to Cabela's

17      on Walden to determine their policy on

18      carriage, what did you say to them and what

19      did they say to you?

20  A.  I asked them if they permit lawful permit

21      holders to carry concealed on their person on

22      their property.  Cabela's said as long as you

23      follow New York State Law, not threatening

24      people, not waving it about, not trying to

25      commit a crime, that they do have signage

1           posted at their front door, but not the
2           entrance to the property that does allow it.
3       Q.  Through a phone call were you able to
4           determine that concealed carry on the Cabela's
5           property was allowed?
6       A.  Through a verbal phone call I was able to see
7           and then when I actually went to the property,
8           I had seen on the doors, the entrance to the
9           building that they do have it posted now.
10      Q.  Right.  But my point is, is that through a
11          phone call to Cabela's on Walden you were able
12          to determine your rights as to carriage on
13          their private property?
14      A.  I was able to determine, but not confirm
15          because on a phone call I have no guarantee
16          that the person I am speaking to is who they
17          say they are and if I were to take their word
18          and then arrive and then law enforcement,
19          something happens and they are there, it would
20          be he said, she said.  Where's my proof?
21          Where's my proof in writing?
22      Q.  Right.  And just falling back on prior
23          testimony, no state police person -- you have
24          not been arrested for violations of the CCIA,
25          right?

─── **BRETT CHRISTIAN - 11/16/2022** ───

```
 1      A. As of this date, I have not.
 2      Q. Right.  And nobody has approached you to
 3         enforce the CCIA, correct?
 4      A. Not yet.  I don't know the future.
 5      Q. Right.  You mentioned that you called Tops and
 6         Wegmans to determine their carriage policy in
 7         the first week of September, correct?
 8      A. Correct.
 9      Q. And you signed your declaration on the 26th of
10         September, correct?
11      A. Correct.
12      Q. And you could have included that information
13         in your declaration, but did not, correct?
14      A. I did not because, again, not being a legal
15         person I did not know.
16      Q. So the next question is, why --
17            MR. ROTSKO:  Objection to the extent it
18         calls for attorney-client privileged
19         communications as well as work product which is
20         protected and I direct Mr. Christian not to
21         answer with any of that information.
22            MR. BELKA:  I just want to be clear
23         about what question he's not answering.  I am
24         asking him why he did not include his calls to
25         Wegmans and Tops to determine their carriage
```

─── DEPAOLO CROSBY REPORTING SERVICES, INC. ───
135 Delaware Avenue, Suite 301, Buffalo, New York  14202
716-853-5544

```
 1        policy that he made on September 1st, the first
 2        week of September, why he did not include that
 3        in his declaration that is dated September
 4        26th.  And you are directing him not to answer
 5        that question?
 6            MR. ROTSKO:  Yes.
 7            MR. BELKA:  And the reason he is being
 8        directed not to answer that question is why?
 9            MR. ROTSKO:  The attorney-client
10        communication privilege and the work product
11        protection doctrine.
12
13        BY MR. BELKA:
14    Q.  Did you call Cabela's on Walden at around the
15        same time that you called Tops and Wegmans?
16    A.  Yes.
17    Q.  And Cabela's confirmed their carriage policy
18        on the phone with you, correct?
19    A.  Yes.
20    Q.  Why did you not include your phone call to
21        Cabela's which took place approximately the
22        week of September 1st in the declaration that
23        you signed on September 26th?
24            MR. ROTSKO:  Objection on the grounds of
25        attorney-client privileged information and work
```

```
 1            product protection doctrine.  Directing
 2            Mr. Christian not to answer that question.
 3       Q. You also mentioned that you contacted Danny's
 4            and Otto's, correct?
 5       A. Correct.
 6       Q. And did you do that at around the same time
 7            that you contacted Tops, Wegmans, and
 8            Cabela's?
 9       A. Correct.
10       Q. Right.  And that timeframe is the first week
11            of September?
12       A. Correct.
13       Q. Okay.  What did Otto's say regarding their
14            carriage policy?
15       A. Both restaurants said that they declined to
16            answer as they had not been able to make a
17            decision as the recently implemented law, they
18            were unsure of either liability to their
19            business or if they decided to allow it, what
20            met the requirements for posting signage on
21            the property.
22       Q. Both Otto's and Danny's said the exact same
23            thing, that they had not yet made a decision;
24            it was a recently implemented law and they
25            weren't sure what signage to post?
```

```
1       A. Both of them said that.  Not the exact words
2          verbatim because I did not write it down, but
3          that was the gist.  That was the scope of
4          their messages.
5       Q. Did you ever go to Otto's and Danny's to
6          determine whether or not they had conspicuous
7          signage posted?
8       A. I went the following weekend, the one after
9          Labor Day, and neither one had anything posted
10         at that time.
11      Q. By Otto's and Danny's failing to post
12         conspicuous signage, did you understand that
13         you were not allowed to carry on their
14         property?
15      A. I would have to speculate that it's not
16         allowed because they are not expressively
17         saying it is.
18      Q. All of that, the phone call to Otto's and
19         Danny's and Tops and Wegmans determining and
20         going to those locations to determine the
21         conspicuous signage, all of that happened
22         prior to you signing the declaration on
23         September 26th, 2022?
24      A. Yes.
25      Q. Okay.  And none of that is included in your
```

─── **BRETT CHRISTIAN** - 11/16/2022 ───

1      declaration, correct?

2   A. Yes.

3   Q. Why did you not include the information as it

4      relates to Tops, Wegmans, Cabela's, Danny's

5      and Otto's in your declaration?

6         MR. ROTSKO:  Objection on the grounds of

7      attorney-client privileged communications and

8      work product protection doctrine.  Directing

9      Mr. Christian not to answer that specific

10      question.

11

12      The following were marked for identification:

13      Exhibit 2  -  Declaration

14

15      BY MR. BELKA:

16   Q. Mr. Christian, I am handing you what has been

17      marked as Exhibit 2.  Do you see it?

18   A. I do.

19   Q. If you would leaf through it to the back, it's

20      a four-page document.  What is this?

21   A. This is the last page of it with my signature.

22   Q. Right.  But Exhibit 2 is what?

23   A. Clarification, please.

24   Q. Okay.  I am going to represent to you that

25      Exhibit 2 is the declaration that you have

────── BRETT CHRISTIAN  -  11/16/2022 ──────

1          submitted in this case and which we have been
2          talking about today.
3     A. Yes.
4     Q. Okay.  And you understand that the declaration
5          I was referring to, a copy of it is Exhibit 2?
6     A. Yes.
7     Q. Okay.  Do you know who John Boron is?
8     A. I do not know him personally, no.
9     Q. Okay.  So go to the front first page of
10         Exhibit 2.  You can see that John Boron's name
11         is in what we call the caption.  Do you see
12         that?
13    A. Yes, I do.
14    Q. Okay.  And do you know why Mr. Boron withdrew
15         as a plaintiff in this case?
16    A. I do not.
17    Q. Has anyone ever communicated to you anything
18         related to the withdrawal of Mr. Boron as a
19         plaintiff in this case?
20    A. No.
21            MR. ROTSKO:  Objection to the extent
22         that it calls for attorney-client
23         communications.
24
25         BY MR. BELKA:

────── DEPAOLO CROSBY REPORTING SERVICES, INC. ──────
135 Delaware Avenue, Suite 301, Buffalo, New York  14202
716-853-5544

─ **BRETT CHRISTIAN  -  11/16/2022** ─

1      Q.  If you will go to page 4 of Exhibit 2.  Is
2          that your signature?
3      A.  Yes.
4      Q.  Okay.  And you will also note that it states
5          that it was executed on this 26th day of
6          September 2022.  Do you see that?
7      A.  Yes.
8      Q.  Is that the date on which you signed the
9          document that is in front of you as Exhibit 2?
10     A.  Yes.
11             MR. BELKA:  Can you read that back?
12
13         (The question and answer were read.)
14
15         The following were marked for identification:
16         Exhibit 3  - New York State concealed carry
                        license application
17
18         BY MR. BELKA:
19     Q.  Mr. Christian, I am handing you a document
20         labeled as Exhibit 3 to your deposition.  Do
21         you see it?
22     A.  Yes, I do.
23     Q.  What is it?
24     A.  That is State of New York Pistol/Revolver
25         License Application.

─ **DEPAOLO CROSBY REPORTING SERVICES, INC.** ─
135 Delaware Avenue, Suite 301, Buffalo, New York  14202
716-853-5544

BRETT CHRISTIAN - 11/16/2022

1    Q. Okay.  Is this what we have been referring to
2       colloquially as your concealed carry
3       application for licensure?
4    A. Yes.
5    Q. Okay.  And if you go to page 2, sort of in the
6       middle, on what date did you sign this?
7    A. The 30th day of January 2020.
8    Q. And is it fair to say that you applied for a
9       concealed carry license in the State of New
10      York on or about January 30th, 2020?
11   A. Yes.
12   Q. And that's reflected in Exhibit 3?
13   A. Yes.
14
15      The following were marked for identification:
16      Exhibit 4  -  List of firearms
17
18      BY MR. BELKA:
19   Q. Mr. Christian, I am handing you an exhibit
20      marked exhibit -- strike that.
21         Mr. Christian, I am handing you a
22      document marked Exhibit 4 to your deposition.
23      Do you see it?
24   A. Yes, I do.
25   Q. Okay.  Can you tell me what it is?

—— **BRETT CHRISTIAN - 11/16/2022** ——

1    A. It appears to be from some point in time.
2       It's not dated, but a list of -- or, yeah, I
3       guess a list would be the best word.  A list
4       of the pistols or revolvers on my permit at
5       that time.
6    Q. I just counted.  It reflects ten pistols or
7       revolvers.  Do you see that?
8    A. Yes.
9    Q. And you recognize that these are a
10      representation of your pistols or revolvers
11      that were on your permit at some period of
12      time, correct?
13   A. Yes.
14   Q. Okay.  Is this a relatively recent
15      documentation of the handguns that you have on
16      your permit?
17   A. Clarification.  When you say "recent", what
18      timeframe?
19   Q. Sure.  I mean, does this in large part
20      accurately reflect the handguns on your permit
21      at this time?
22   A. For the last year I would say no.  There are
23      quite a few that I no longer own, and there's
24      quite a few new ones.
25   Q. Okay.  Can you identify for the record which

—— DEPAOLO CROSBY REPORTING SERVICES, INC. ——
135 Delaware Avenue, Suite 301, Buffalo, New York  14202
716-853-5544

1      of these weapons you no longer own at present?

2   A. The German sports guns, manufacturer one, the

3      Glock 19X and Glock 27, the -- people call it

4      CZ, but the Ceska -- I am butchering the name,

5      but it would be listed model, Shadow 2, that

6      one.  The one below it, manufacturer is

7      France, the 509C and the Smith & Wesson at the

8      very bottom, 4566.  So those I have all sold

9      and replaced with different ones.

10  Q. You sold and replaced the six identified guns

11     within the last year?

12  A. Year, year and a half.  Thereabouts, yes.

13  Q. But you did testify that you have 11 handguns.

14     So you have replaced them with other handguns?

15  A. Yes.  Correct.

16         MR. BELKA:  Brett, I don't think I have

17     any other questions for you reserving my right

18     depending on whether or not Mr. Rotsko has

19     additional questions for you.

20         Mr. Rotsko?

21         MR. ROTSKO:  Thank you, Mr. Belka.  I do

22     have some questions.

23

24     EXAMINATION BY MR. ROTSKO:

25  Q. Mr. Christian, is it correct that earlier

─── **BRETT CHRISTIAN  -  11/16/2022** ───

1        today you testified that during the period
2        after you obtained your concealed carry
3        license and September 1st, 2022, you hiked in
4        Stiglmeier Park?
5    A. Yes.
6    Q. About how many times a month, if you could
7        estimate, did you hike in Stiglmeier Park
8        during that time?
9    A. Approximately, two to three times a month.
10   Q. Did you carry a pistol in a concealed fashion
11       in Stiglmeier Park on those hikes?
12   A. Yes.
13   Q. Have you hiked in Stiglmeier Park since
14       September 1st, 2022?
15   A. I have not.
16   Q. Can you explain why not?
17   A. Based upon past experiences, not being able to
18       carry and not having the guarantee per the
19       Supreme Court that law enforcement will always
20       be there to protect me, I can't guarantee my
21       safety.  If I can't guarantee my safety or
22       have the means to protect myself, I find it
23       best to avoid going to the areas.  Don't put
24       yourself in trouble is a good way to stay
25       safe.

─── **DEPAOLO CROSBY REPORTING SERVICES, INC.** ───
135 Delaware Avenue, Suite 301, Buffalo, New York  14202
716-853-5544

1    Q.  Is there anything that could happen that
2        would -- that you would feel comfortable going
3        back to Stiglmeier Park for hikes?
4    A.  I am sorry.  Say it again.
5    Q.  Let me rephrase that.  In your -- what would
6        have to happen for you to feel comfortable to
7        return to Stiglmeier Park at the same rate
8        that you did prior to September 1st, 2022?
9    A.  I would have to know that I could exercise my
10       constitutional right to be able to have a
11       pistol or revolver for my self-defense if the
12       need arose in accordance with Article 35 of
13       New York State Law.
14   Q.  If that happened, how often would you return
15       to Stiglmeier Park as part of your routine
16       that you had prior to September 1st, 2022?
17   A.  I would like to resume my previous frequency
18       of two to three times a month to enjoy that
19       park.
20   Q.  Is it correct that earlier today you testified
21       that after you obtained a concealed carry
22       license you hiked in the Clarence Bike Path?
23   A.  Yes.
24   Q.  Are there any areas of the Clarence Bike Path
25       where you would not hike?

 1    A.  Yes.  On one of the trails when you start
 2        getting towards what is called Clarence
 3        Center.  I believe that's the actual town
 4        name.  There's a Clarence Town Park that the
 5        bike path runs through, again, to use the
 6        laymen's terms of bike path.  I don't enter
 7        that point because as far as I have been able
 8        to tell talking to law enforcement,
 9        researching on the internet, Clarence has a
10        prohibition against that.  So that part I
11        don't go into.
12    Q.  Prior to your hikes on the Clarence Bike Path,
13        to what extent, if any, did you inquire with
14        law enforcement officials about whether you
15        can carry concealed on those bike paths?
16    A.  When I first got my permit, the places that I
17        frequent I spent a couple days making phone
18        calls just to try and find out this
19        information.
20    Q.  Do you remember which law enforcement -- well,
21        were those phone calls to law enforcement?
22    A.  Yes.  For Clarence, Clarence doesn't have a
23        police department.  That was the Erie County
24        Sheriff's Office.
25    Q.  Do you recall the guidance the Erie County

—— BRETT CHRISTIAN  -  11/16/2022 ——

1        Sheriff's Office provided you?

2   A.  The person that answered the phone at the

3        sheriff's office told me that the town park,

4        the Clarence Town Park section is off limits,

5        but the rest as far as they were aware was

6        okay.

7   Q.  And on the areas of the Clarence Bike Path

8        that you used prior to September 1st, 2022,

9        and after you had your concealed carry permit,

10       did you carry a pistol in a concealed manner?

11  A.  Yes.

12  Q.  Have you walked or hiked on the Clarence Bike

13       Path after September 1st, 2022?

14  A.  No, I have not.

15  Q.  Could you explain why?

16  A.  Because, again, it is very wooded.  Clarence

17       does not have a police department of its own.

18       It relies on the sheriffs.  There's not a

19       sheriff deputy standing on every street

20       corner, every couple of feet.  The prior

21       history of the bike path, there was years and

22       years ago the rapist on there that attacked

23       women.  I have no guarantee in the future that

24       something else wouldn't happen there.

25              I have also encountered there and at

1          Stiglmeier wild turkeys.  Until I encountered

2          them, you would think that they are a joke.

3          They can be, especially when you get into the

4          fall, very aggressive and a turkey on the

5          Thanksgiving dinner plate is a lot smaller

6          than in real life.

7     Q.  If the CCIA had not taken effect on

8          September 1st, 2022, would you have continued

9          to walk the Clarence Bike Path?

10    A.  Yes.  I would have.

11    Q.  About how often did you do that prior to

12         September 1st, 2022?

13    A.  Approximately, two to three times a week.

14    Q.  Would you anticipate doing that -- excuse me.

15         I am going to start over.  Strike that

16         question.

17              Would that habit have continued in your

18         anticipation if the CCIA had not taken effect?

19    A.  Yes.

20    Q.  And would you return to that habit if the CCIA

21         was repealed or enjoined?

22    A.  Yes.

23    Q.  Earlier today you testified to hiking in

24         Harris Hill State Lands; is that correct?

25    A.  Yes.

```
 1      Q. Did that occur after you obtained the New York
 2         State concealed carry license?
 3      A. Yes.
 4      Q. Did you carry a pistol on the Harris Hill
 5         State Lands in a concealed manner?
 6      A. Yes.
 7      Q. Have you hiked -- about how often would you
 8         hike on the Harris Hill State Land?
 9      A. It would average out to about once a month.
10         More frequently in spring, summer, fall.  Less
11         frequently in winter just due to my days off
12         or time off work versus weather cooperating.
13      Q. Have you hiked at the Harris Hill State Lands
14         after September 1st, 2022?
15      A. I have not.
16      Q. Is there a reason for that?
17      A. Because I would not be able to get there, go
18         about what used to be the routine for doing
19         that and still legally have a pistol with me
20         for self-defense.
21      Q. If the CCIA was repealed or enjoined, would
22         you anticipate returning to your habit of
23         hiking in Harris Hill approximately once a
24         month?
25      A. Yes.
```

──── **BRETT CHRISTIAN  -  11/16/2022** ────

 1    Q. Prior to September 1st, 2022, did you carry a
 2       concealed pistol at the Valu Home Center that
 3       you were discussing with Mr. Belka earlier
 4       today?
 5    A. Yes.
 6    Q. Have you done so after September 1st, 2022?
 7    A. I have not.
 8    Q. Would you carry a concealed firearm on that
 9       Valu Home Center property if the CCIA was
10       repealed or enjoined?
11            MR. BELKA:  Objection.
12    Q. Go ahead and answer.
13    A. If I legally could do so, I would return to
14       doing that.
15    Q. If the Valu Home Center -- I am going to pause
16       for a moment.
17            Prior to September 1st, 2022, did you
18       carry a concealed firearm on the Delta Sonic
19       properties that you discussed with Mr. Belka
20       earlier today?
21    A. Yes.
22    Q. Have you carried a concealed firearm on those
23       premises after September 1st, 2022?
24    A. I have not.
25    Q. Are you able to estimate -- let me pause.

──── DEPAOLO CROSBY REPORTING SERVICES, INC. ────
135 Delaware Avenue, Suite 301, Buffalo, New York  14202
716-853-5544

1          After September 1st, 2022, when the CCIA

2      took effect, have you reduced the number of

3      instances where you carry concealed outside of

4      the home?

5  A. Yes.

6  Q. Are you able to estimate by how much you have

7      reduced your carry of a concealed firearm --

8      pistol, excuse me?

9          MR. BELKA:  Objection.

10  Q. I am going to strike that question.  Well, I

11      am going to ask another question.

12          Mr. Christian, are you able to estimate

13      the extent to which your reduction -- or the

14      extent to which you have reduced your carry of

15      a concealed firearm after the CCIA took effect

16      on September 1st, 2022?

17          MR. BELKA:  Objection.

18  Q. You may answer.

19  A. It has been reduced to almost nonexistent.  It

20      would be easier to count on three fingers the

21      number of places and times that I have been

22      able to carry.  It has virtually turned into

23      an inability for me to do so.

24          MR. ROTSKO:  Thank you for your

25      patience, Mr. Christian and Mr. Belka.  I don't

```
 1        have any other questions right now, although I
 2        do reserve my right to re-cross if need be.

 3

 4        REEXAMINATION BY BY MR. BELKA:
 5    Q. Very briefly.  How old were you on
 6        January 30th, 2020, when you received your
 7        concealed carry license -- or strike that.
 8             How old were you on January 30th, 2020,
 9        when you applied for your concealed carry
10        license?
11    A. Approximately, between 37 to 38 years of age.
12    Q. Right.  So just as shorthand I am going to
13        refer to you as being 36 as prior to your
14        receiving your concealed carry license.  Would
15        that be accurate?
16    A. Yes.
17    Q. Up until the time that you were 36 years old
18        and you could not conceal carry, how many
19        times did you walk in Stiglmeier Park?
20    A. Less frequently.  It would have been maybe one
21        to two times a year.
22    Q. So is it fair to say that upon receipt of your
23        concealed carry license, you increased the
24        frequency in which you walked in Stiglmeier
25        Park from one to two times a year to two to
```

1        three times a month?

2   A.  Yes.

3   Q.  When you were 36, again that's prior to you

4        receiving your concealed carry license, how

5        many times a week did you walk on the Clarence

6        Bike Path?

7   A.  Less frequent.  Approximately two to three

8        times a year.

9   Q.  And is it fair to say that upon receiving your

10       concealed carry license you increased the

11       number of times you walked on the Clarence

12       Bike Path from two to three times a year to

13       two to three times a week?

14  A.  Yes.

15  Q.  When was the bike path rapist?  Approximately

16       what year in Buffalo?

17  A.  I don't remember the exact year.

18  Q.  My mother is law enforcement and was one of

19       the individuals who sat as a dummy in order to

20       catch the bike path rapist, and my wife was

21       pretty young at the time so I am going to go

22       like sometime in the 1980s.  Does that sound

23       right?

24  A.  Without looking it up, I would defer to that

25       then.

—— **BRETT CHRISTIAN** - 11/16/2022 ——

1   Q. But it was a pretty long time ago, a couple of
2      decades at least?
3   A. Yes.
4   Q. Okay.  And the aggressive wild turkeys, have
5      you ever had cause to use your weapon from the
6      time you received your concealed carry permit
7      until September 1st, 2022, in order to prevent
8      wild turkey attacks?
9   A. Under Article 35 it has never gotten to the
10     point where I would need to use it.
11  Q. What's Article 35?
12  A. New York State Article 35 on the use of deadly
13     force when it is justified in relation to
14     protecting human life.
15  Q. That's for discharge of firearms, right?
16  A. Relating to the discharge of firearms, I
17     believe would be under the use of deadly
18     force.
19  Q. Okay.  Did you ever wave your handgun at the
20     wild turkeys?
21  A. No.
22  Q. Did the concealed carry effect the wild
23     turkey's aggressiveness when you were on the
24     Clarence Bike Path?
25  A. I cannot speculate on their motivations.

```
 1      Q. Right.  Okay.  So when you were 36, again this
 2         is before you get the concealed carry permit,
 3         how many times a month did you go to the
 4         Harris Hill State Lands?
 5      A. Before I got the permit?
 6      Q. Before.
 7      A. It would have been one to two times a year.
 8      Q. And is it fair to say upon receiving your
 9         concealed carry permit that the amount of time
10         you visited the Harris Hill State Lands
11         increased from one to two times a year to one
12         time a month?
13      A. Yes.  On average.
14      Q. When you were 36 did you ever go to Valu Home
15         Centers?
16      A. Yes.
17      Q. Prior when you were 36 did you go to Valu Home
18         Centers less frequently than you did after
19         your receipt of your concealed carry license?
20      A. Yes.
21      Q. So when you received your concealed carry
22         license, you went to Valu more often than you
23         had done prior?
24      A. Yes.
25      Q. Did you have any less need for hardware
```

1          supplies before and after you received your
2          concealed carry license?
3     A.   No.
4     Q.   As it relates to Delta Sonic, prior to -- when
5          you were 36 -- strike all of that.
6               When you were 36 and going to Delta
7          Sonic, did you go less frequently at 36 than
8          you did after you received your concealed
9          carry permit?
10    A.   Yes.  I was driving less.
11    Q.   You were driving less?
12    A.   Before I got my permit, I didn't drive as much
13         as after I got my permit.  So I wasn't using
14         as much gas.
15    Q.   What was the motivating factor for driving
16         more?
17    A.   To experience the outdoors of New York State.
18    Q.   But only while concealed carrying?
19    A.   I would carry when I had my permit before
20         September 1st.  I would carry wherever the law
21         allowed and whenever the law allowed.
22    Q.   But not when you were 36 because when you were
23         36 you had no concealed carry permit?
24    A.   Yes.  So then when I was 36 there would be
25         many instances I simply wouldn't do things

```
 1        because I wouldn't be able to guarantee my
 2        safety.
 3     Q. You sat in your home as a 36-year-old man,
 4        okay, and did not experience the world
 5        including going to Delta Sonic, okay, until
 6        you received your concealed carry license?
 7     A. Not -- let me back up here.
 8             MR. ROTSKO:  Objection.
 9             MR. BELKA:  I want you to answer that
10        question.
11             MR. ROTSKO:  Yes.  You can answer the
12        question.
13             MR. BELKA:  Read it back.
14
15             (The question was read.)
16
17             THE WITNESS:  I would not -- so I worked
18        long hours.  I don't have usually a 9:00 to
19        5:00 day.  A lot of times I will have a 7:00 or
20        8:00 a.m. day until 6:00, 7:00, 8:00, 9:00,
21        10:00 at night.  If it's 8 o'clock at night and
22        I am leaving work and I needed to run to the
23        store in winter when it gets dark out, there's
24        times I would go shopping after I got my
25        permit.  Wegmans used to be 24 hours before
```

DEPAOLO CROSBY REPORTING SERVICES, INC.
135 Delaware Avenue, Suite 301, Buffalo, New York  14202
716-853-5544

---

**BRETT CHRISTIAN - 11/16/2022**

1      COVID did its thing.  I would go grocery

2      shopping at midnight, 1:00 in the morning.  I

3      am leaving work; it's convenient.  I don't have

4      to worry about my safety.  I can stop at, you

5      know, Delta Sonic at 8:45 at night before they

6      close on a Friday night, Saturday night.  I can

7      get gas; I don't have to worry, and I can go to

8      any Delta Sonic that I wanted.  I could go to

9      any Wegmans I wanted, any Tops.  Now, for

10     example, the Tops up from me on Union Road, the

11     Wegmans up from me on Union Road.

12          Like I have seen at work, the criminal

13     element seems to be more emboldened with the

14     bail reform.  I worry that there is now a

15     greater likelihood of having a bad encounter

16     and my attitude is, don't put yourself in what

17     you would consider to be an unsafe situation.

18     I don't feel free to go to the grocery store

19     whenever they are open.  I now prefer to go

20     early in the morning when most people are

21     asleep on a Sunday morning.

22

23     BY MR. BELKA:

24  Q. This question is not about now.  This question

25     is about when you were 36 or prior to having a

---

```
1        concealed carry license to the period in which
2        you had a concealed carry license.  Did you go
3        to Delta Sonic less frequently before you had
4        your concealed carry license as opposed to
5        when you had your concealed carry license?
6   A.  I made less stops.
7            MR. ROTSKO:  Objection.  Asked and
8        answered.
9   Q.  You still have to answer.
10  A.  I made less stops because I simply was not
11       driving as much.
12  Q.  Because you were going fewer locations because
13       you didn't have a concealed carry permit?
14  A.  Correct.
15  Q.  You can count on three fingers the amount of
16       times you have concealed carried after the
17       implementation of the CCIA.  What are those
18       three times?
19  A.  When I went to Cabela's and I recently added a
20       new handgun and a more suitable bear caliber.
21       That was recently a few weeks ago.
22  Q.  When you say bear caliber, B-E-A-R?
23  A.  B-E-A-R.
24  Q.  Okay.
25  A.  When I went to Wolcott Guns on Walden to use
```

─── **BRETT CHRISTIAN** - 11/16/2022 ───

1        the shooting range at a gun store and there

2        were two trips there:  One to buy ammo and one

3        to use the gun store -- or gun range.  Sorry.

4    Q. Those are the three, Cabela's, Wolcott and

5        Wolcott?

6    A. Correct.

7            MR. BELKA:  That's all for me unless you

8        have anything else, Nick.

9            MR. ROTSKO:  I do not have anything

10        else.

11            MR. BELKA:  The deposition has ended.  I

12        only want a PDF.

13            MR. ROTSKO:  PDF is sufficient for us as

14        well.

15            MR. BELKA:  And billing me.  Nick, are

16        you okay if the exhibits are attached to the

17        transcript, copies of the exhibits?

18            MR. ROTSKO:  Yes.

19

20        (Deposition concluded at 5:00 p.m.)

21

22

23

24

25