UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

BRETT CHRISTIAN, FIREARMS POLICY COALITION, INC., and SECOND AMENDMENT FOUNDATION

Plaintiffs,

v.

STEVEN G. JAMES, in his official capacity as Superintendent of the New York State Police, and JOHN J. FLYNN, in his official capacity as District Attorney for the County of Erie,

Defendants.

No. 22-cv-00695 (JLS)

**STATE'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF ITS CROSS-MOTION FOR SUMMARY JUDGMENT**

LETITIA JAMES
Attorney General
State of New York
350 Main Place, Suite 300A
Buffalo, New York 14202

Ryan L. Belka
James M. Thompson
Daniel R. MaGuire
Assistant Attorneys General
Of Counsel

## Table of Contents

Table of Authorities ................................................................................................... iii

PRELIMINARY STATEMENT ................................................................................ 1

LEGAL STANDARD & FACTUAL BACKGROUND............................................. 3

STANDARD OF REVIEW ........................................................................................ 5

ARGUMENT ............................................................................................................. 6

   I.   THE ORGANIZATIONAL PLAINTIFFS DO NOT HAVE STANDING
        BECAUSE THEY HAVE SUFFERED NO INJURY OF THEIR OWN ........................6

   II.  HISTORY AND TRADITION DEMONSTRATE THAT THE CHALLENGED
        PROVISIONS ARE CONSTITUTIONAL ..........................................................7

   A.  Plaintiffs Can Only Bring a Disfavored Facial Challenge; Pre-Enforcement
       As-Applied Challenges are Improper ....................................................... 7

   B.  The Prohibition on Guns in Public Parks Is Constitutional ....................................... 8

       1. The Second Circuit's Ruling in Antonyuk Establishes that the Parks
        Provision is Facially Constitutional ............................................................ 8

       2. The Evidence of Historical Prohibitions on Firearms in Parks
        is Overwhelming ....................................................................................... 9

       3. A Pre-Enforcement As-Applied Challenge Regarding "Rural Parks"
        is Procedurally Improper, and No Plaintiff Has Standing to Bring
        Such a Challenge ..................................................................................... 13

   C.  New York's Law Preventing Armed Persons From Entering Other People's
       Property Without Consent Is Constitutional and Deeply Rooted In
       Anglo-American Property Law and Tradition ....................................... 19

       1. The plain text of the Second Amendment does not support a right to
        carry arms onto others' private property without their consent ............................. 19

       2. The Private-Property Provision is consistent with the historical tradition
        of firearms regulation ............................................................................ 20

       a.   Many states in the Eighteenth and Nineteenth Centuries directly
       required an owner's consent to carry guns onto his or her private property .............. 20
       b.   The original public understanding of the terms used in these statutes
       covered locations open or closed to the public............................................. 23

c.   Land ............................................................................... 24
d.   Improved Land ............................................................... 25
e.   Inclosed Land ................................................................. 26
f.   Premises or Plantations ................................................. 28
g.   Further relevantly similar laws support the Private Property Provision's constitutionality  ................................................................ 30

    i.   Laws Requiring an Owner's Consent to Fire Weapons .................................. 30

    ii.  Laws Prohibiting Firearms In Places of Public Congregation ......................... 32

III. PLAINTIFFS' PROPOSED SENSITIVE PLACES FRAMEWORK
      IS AHISTORICAL AND CONTRARY TO BRUEN AND ANTONYUK .................. 34

CONCLUSION ......................................................................... 36

## Table of Authorities

**Page(s)**

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986)..................................................................................................5

*Antonyuk v. Chiumento*,
    89 F.4th 271 (2d Cir. 2023) .................................................1-4, 9, 12, 14-15, 22-24, 28, 30, 34

*Atkins v. Chilson*,
    50 Mass. 52 (1845) ...............................................................................................25

*Aymonier v. United States*,
    432 F. App'x 66 (3d Cir. 2011) ...............................................................................18

*Beatty v. Kurtz*,
    27 U.S. 566 (1829)................................................................................................27

*Beaver v. Filson*,
    8 Pa. 327 (1848)...................................................................................................29

*Binderup v. Attorney General*,
    836 F.3d 336 (3d Cir. 2016)....................................................................................9

*Blum v. Yaretsky*,
    457 U.S. 991 (1982)..............................................................................................20

*Bonidy v. U.S. Postal Service*,
    790 F.3d 1121 (10th Cir. 2015) ..........................................................................9, 34-35

*Boyer v. Smith*,
    3 Watts 449 (Pa. 1835)..........................................................................................30

*Bryant v. Maffucci*,
    923 F.2d 979 (2d Cir. 1991)....................................................................................5

*Burk v. Huber*,
    2 Watts 306 (Pa. 1834)..........................................................................................25

*Burson v. Freeman*,
    504 U.S. 191 (1992)..............................................................................................35

*Carney v. Adams*,
    592 U.S. 53 (2020)..........................................................................................6

*Cedar Point Nursery v. Hassid*,
    594 U.S. 139 (2021)........................................................................................20

*Christian v. Nigrelli*,
    642 F. Supp. 3d 393 (W.D.N.Y. 2022) ..........................................................6

*Commonwealth v. Eastabrook*,
    27 Mass. 293 (1831) ................................................................................25, 27

*Conn. Citizens Defense League, Inc. v. Thody*,
    No. 23-724, 2024 WL 177707 (2d Cir. Jan. 17, 2024) ...................................6

*Connecticut Citizens Defense League Inc. v. Lamont*,
    6 F.4th 439 (2021)...........................................................................................6

*Cranley v. Nat'l Life Ins. Co. of Vt.*,
    318 F.3d 105 (2d Cir. 2003)............................................................................7

*Davis v. Young*,
    32 Ky. 299 (1834) .........................................................................................26

*Deare v. Carr*,
    3 N.J. Eq. 513 (N.J. Ch. 1836) .....................................................................25

*Diaz v. Pataki*,
    368 F. Supp. 2d 265 (S.D.N.Y. 2005)............................................................8

*District of Columbia v. Heller*,
    554 U.S. 570 (2008) ................................................. 1, 18, 24-25, 31

*Duncan v. Walker*,
    533 U.S. 167 (2001)......................................................................................23

*Eaton v. Whitaker*,
    18 Conn. 222 (1846) .....................................................................................25

*Erznoznik v. City of Jacksonville*,
    422 U.S. 205 (1975).........................................................................................7

*Farmer v. Commonwealth*,
    35 Va. 741 (1837) ....................................................................................27, 29

*Gardiner Cotton & Woolen Factory v. Inhabitants of Gardiner*,
    5 Me. 133 (1827).............................................................................................25

*Gates & Colvin v. Green*,
    4 Paige Ch. 355 (N.Y. Ch. 1834)...................................................................28

*GeorgiaCarry.Org, Inc. v. Georgia*,
    687 F.3d 1244 (11th Cir. 2012) ....................................................................20

*GeorgiaCarry.org, Inc. v. U.S. Army Corps of Engineers*,
    212 F. Supp. 3d 1348 (N.D. Ga. 2016) ...........................................................9

*Hamburgh Mfg. Co. v. Edsall*,
    5 N.J. Eq. 249 (N.J. Ch. 1845).......................................................................29

*Hendricks' Curator v. Mon*,
    11 La. 137 (1837)...........................................................................................29

*Hildreth v. Sands*, 2 Johns.Ch. 35; 1 N.Y. Ch. Ann. 286 (N.Y. Ch. 1816) ..................................24

*Hollingsworth v. Perry*,
    570 U.S. 693 (2013).........................................................................................6

*Jacoby & Meyers, LLP v. Presiding Justices of the First, Second, Third and Fourth Departments*,
    852 F.3d 178 (2d Cir. 2017)......................................................................8, 14

*Kaiser Aetna v. United States*, 444 U.S. 164 (1979)...................................................................20

*Kipke v. Moore*,
    Nos. 1:23-cv-01293 & 1:23-cv-01295, 2023 WL 6381503 (D. Md. Sept. 29, 2023) ............34

*Lammot's Heirs v. Bowly's Heirs*,
    6 H&J 500 (Md. Ct. App. 1825).....................................................................29

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992).........................................................................................6

*Maupin v. State*,
    89 Tenn. 367, 17 S.W. 1039 (1890)...............................................................33

*McDonald v. City of Chicago*,
    561 U.S. 742 (2010).........................................................................................1

*McFarland v. Hughling*,
  1 Tenn. 263 (1807)....................................................................................29

*Moss v. Rossie Lead Mining Co.*,
  5 Hill 137 (N.Y. Sup. Ct. 1843)...............................................................26

*N.Y. State Firearms Ass'n v. James*,
  No. 23 Civ. 6524, 2024 WL 1932050 (W.D.N.Y. May 2, 2024) ...............6

*Norman v. Wells*,
  17 Wend. 136 (N.Y. Sup. Ct. 1837)..........................................................28

*NYSRPA v. Bruen*,
  597 U.S. 1 (2022)...................................1, 3-4, 9, 17, 19-20, 23, 30, 32, 34

*Or. Firearms Fed'n v. Kotek*,
  682 F. Supp. 3d 874 (D.Or. 2023) ............................................................12

*Owens v. State*,
  3 Tex. App. 404, 407 (Tex. Ct. App. 1878).............................................33

*Parker v. Smith*,
  17 Mass. 413(D.Mass. 1821) ...................................................................24

*People v. Demorio*,
  123 A.D. 665 (2d Dep't 1908) .................................................................33

*People v. Jones*,
  54 Barb. 311 (N.Y. Sup. Ct. 1863) ..........................................................28

*Perrine v. Hankinson*,
  11 N.J.L. 181 (N.J. 1829).........................................................................29

*Porter v. Quarantillo*,
  722 F.3d 94 (2d Cir. 2013).......................................................................12

*Presser v. Illinois*,
  116 U.S. 252 (1886)..................................................................................18

*Restaurant Law Ctr. v. City of New York*,
  360 F. Supp. 3d 192 (S.D.N.Y. 2019).........................................................8

*Rule v. Brine, Inc.*,
  85 F.3d 1002 (2d Cir. 1996).......................................................................6

*Spokeo, Inc. v. Robins*,
   578 U.S. 330 (2016) .................................................................................16

*State v. Commissioners of Cross Roads for Charleston Neck*,
   21 S.C.L. 149 (S.C. Ct. App. L. 1836) ...................................................27

*State v. Langford*,
   12 N.C. 253 (1827) ..................................................................................27

*Suitum v. Tahoe Reg'l Plan. Agency*,
   520 U.S. 725 (1997) ...................................................................................8

*Swan v. State*,
   11 Ala. 594 (1847) ...................................................................................29

*Thomas v. Hatch*, 3 Sumn. 170, 23 F. Cas. 946 (C.C.D. Me. 1838) .......................... 25-26

*United States v. Al Kassar*,
   660 F.3d 108 (2d Cir. 2011) .....................................................................23

*United States v. Anderson*,
   15 F.3d 278 (2d Cir. 1994) .......................................................................23

*United States v. Class*,
   930 F.3d 460 (D.C. Cir. 2019) ..................................................................34

*United States v. Cruikshank*,
   92 U.S. 542 (1875) ...................................................................................18

*United States v. Decastro*,
   682 F.3d 160 (2d Cir. 2012) .......................................................................7

*United States v. Masciandaro*,
   648 F. Supp. 2d 779 (E.D. Va. 2009) ......................................................13

*United States v. Reyna*,
   No. 3:21-cr-41, 2022 WL 17714376 (N.D. Ind. Dec. 15, 2022) ...............4

*Warden v. Nickels*,
   697 F. Supp. 2d 1221 (W.D. Wash. 2010) ...............................................12

*Wash. State Grange v. Wash. State Republican Party*,
   552 U.S. 442 (2008) ...................................................................................7

vii

*Wooley v. Inhabitants of Groton*,
  56 Mass. 305 (1848) ..................................................................27

**Constitution**

First Amendment ........................................................................13

Second Amendment .........................................1, 6-7, 9, 18-20, 24-25

Bill of Rights ............................................................................18

**Federal Statutes**

54 U.S.C.§ 104906(b)(2) .............................................................18

**State Statutes**

1890 Okla. Stat. 495-96 ...............................................................33

1889 Ariz. Sess. Laws 17 .............................................................32

1865 Fla. Laws 27 .......................................................................22

1870 Ga. Laws 421 .....................................................................32

Laws of Maryland 187 (1811) .....................................................31

1895 Mich. Pub. Acts 596............................................................10

1905 Minn. Laws 620
  Ch. 344, § 53 ..........................................................................11

New Jersey, Charter ...................................................................11

1883 Mo. Laws 76 ......................................................................32

N.Y. Env. Con. Law
  § 9-0101(6)..............................................................................16

N.Y. Penal Law
  § 265.01-d .............................................................................. 2-3
  § 265.01-e ...............................................................................3, 9

§ 265.01-e(2)(d) ...............................................................................................2, 16
§ 265.01-e(2)(d)(ii) ..............................................................................................16

Pennsylvania statute, 1722 ....................................................................................22

1869-70 Tenn. Pub. Acts 23 ..................................................................................32

1870 Tex. Gen. Laws 63 ........................................................................................32

1917 Wis. Sess. Laws 1243-44
    Ch. 668, § 3 (29.57)(4).....................................................................................11

**Federal Regulations**

1 Fed. Reg. 672, 674 (1936) ..................................................................................18

**Rules**

Fed. R. Civ. P. 56 (a) .............................................................................................5

Fed. R. Civ. P. 56 (c)(1)..........................................................................................5

Local Rule 56(a)(1&2 ..............................................................................................5

Local Rule 56.1(a)(2)..............................................................................................14

Rule 56.1 ...............................................................................................................12

**Miscellaneous Authorities**

I Noah Webster, An American Dictionary of the English Language 951 (S. Converse
    1828) ................................................................................................................26

II Noah Webster, An American Dictionary of the English Language ...........................22

54, Pub. Laws Extra Sess., Ch. 6, § 3 .....................................................................12

Black's Law Dictionary .................................................................................... 25-26

D.T. Valentine, ed., Ordinances of the Mayor, Aldermen, and Commonality of the City of
    New York 235 (C.W. Baker 1859) ......................................................................28

Darrell A.H. Miller, Constitutional Conflict and Sensitive Places ..............................13

David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine*, 13 Charleston L. Rev. 205, 290 (2018) ...................................................................................................34

Environmental Conservation, <u>Frequently Asked Questions and Answers on Hunting and Hunting-Related Activities in response to Recent Changes to New York State Firearm Laws</u> (Sept. 1, 2022), available at https://extapps.dec.ny.gov/docs/wildlife_pdf/gunlawqanda2022.pdf.....................................16

https://dec.ny.gov/places/harris-hill-state-forest ...........................................................16

https://perma.cc/M2UM-VHND ......................................................................................35

https://scholarship.law.wm.edu/wmborj/vol28/iss2/9/ ...................................................13

https://thewestendmuseum.org/ history/era/new-fields/bostons-ropewalks ..................29

<u>LAND, Black's Law Dictionary</u> (11th ed. 2019) ...................................................25, 27

National Park Service, <u>Firearms Regulations in the National Parks 1897-1936</u> .................... 17-18

Noah Webster's 1828 <u>An American Dictionary of the English Language</u>...................25

*People Used to Be Able to Walk into the White House. Legally*, Wash. Post (Sept. 23, 2014) ...................................................................................................................................35

Press Release, July 1, 2022, available at https://on.ny.gov/3BM6Hz7.............................3

Report of the Board of Commissioners of the Central Park (Jan. 1861) ........................10

United States Capitol Police, *Our History*, https://www.uscp.gov/the-department/our-history (noting that when Congress moved to Washington, DC in 1800, a "lone watchman, John Golding, was hired to protect the Capitol Building," and that the watch remained one person until 1828, when it was expanded to four)...............................35

Webster, <u>An American Dictionary of the English Language</u> ........................................... 25, 28-29

Defendant Steven G. James, sued in his official capacity as Superintendent of the New York State Police (the "Superintendent"), respectfully submits this memorandum of law, together with the State's Disputed and Undisputed Statement of Facts, and the Declarations of Dr. Terrance Young, with Exhibits, dated May 29, 204 ("Young Decl."); Joseph Barill, with Exhibits 1-2, dated May 31, 2024, ("Barill Decl."); and Ryan L. Belka, Esq., with Exhibits 1-100, dated May 31, 2022 ("Belka Decl."), in opposition to Plaintiffs' Motion for Summary Judgment ("Mot.") [ECF No. 73] and in support of the State's Cross-Motion for Summary Judgment.

## PRELIMINARY STATEMENT

The public safety laws at issue in this case are fully constitutional under the Supreme Court's precedent, under the Second Circuit's decision in Antonyuk v. Chiumento, 89 F.4th 271 (2d Cir. 2023), and under "the Nation's historical tradition of firearm regulation." NYSRPA v. Bruen, 597 U.S. 1, 24 (2022). The Second Amendment is not a "regulatory straightjacket," and when "properly interpreted… allows a variety of gun regulations." Id. at 80 (Kavanaugh, J., joined by Roberts, C.J., concurring). Importantly, states retain wide latitude to confront the regulatory challenges posed by modern firearms, including exercising the ability to set default rules for private property and to limit the possession of firearms in sensitive locations. See id. at 30 (noting about certain sensitive places that Court was "aware of no disputes regarding the lawfulness of such prohibitions"). In affirming these principles, Bruen built on previous precedent from District of Columbia v. Heller, 554 U.S. 570 (2008), establishing that the Supreme Court's case law "should not be taken to cast doubt" on measures – such as sensitive-place restrictions and disqualifications from possessing guns – which are "presumptively lawful." Id. at 626-27 & n.26; see McDonald v. City of Chicago, 561 U.S. 742, 786 (2010) (plurality op.) ("We repeat those assurances here."); see also Bruen, 597 US  at 72 (Alito, J., concurring) ("Nor have we disturbed

anything that we said in <u>Heller</u> or <u>McDonald</u>[] about restrictions that may be imposed on the possession or carrying of guns.").

Plaintiffs bring a pre-enforcement (and therefore facial) challenge against two straightforward, common-sense public safety measures: one ensuring that private property owners or lessees can make informed determinations about whether to permit or exclude guns on their property by requiring that anyone bringing a weapon onto their property obtain their express consent, N.Y. Penal Law § 265.01-d, and another prohibiting firearms in public parks, N.Y. Penal Law § 265.01-e(2)(d). Defendants oppose Plaintiff's motion for summary judgment and herein cross-move for summary judgment.

First, the Organizational Plaintiffs do not have Article III standing and must be dismissed. Second, the Second Circuit in <u>Antonyuk</u> has already determined that the public parks provision of the CCIA is substantially supported by an American tradition of firearms regulation and "has a plainly legitimate sweep." 89 F.4th at 356.  As a result, whatever disputes there may be about particular hypothetical applications of the law, summary judgment must be granted against Plaintiffs' facial challenge.  Even if a pre-enforcement as-applied challenge regarding "rural parks" were procedurally proper, it fails both for lack of standing (since the individual Plaintiff has not established an intention to carry a gun in any rural location where firearms are prohibited) and on the merits.  There is a broad body of historical precedent for laws prohibiting firearms in parks, in jurisdictions both urban and rural.

New York's Private Property Provision is also perfectly consistent with the Nation's history and tradition of firearms regulation. Indeed, there is a robust historical tradition of states requiring consent to carry weapons on private property.  And although the Second Circuit had speculated, on a preliminary basis, that terms such as "lands," "enclosed lands," "improved lands,"

or "premises or plantations" might suggest a distinction between property open or closed to the public, the original public understanding of these terms does not support one, nor does extensive case law from Early America. <u>Antonyuk</u> at 384-86. Finally, Plaintiffs' propose a new 'sensitive places' analysis that is unconnected with any substantive claim, unsupported by law or history, and inconsistent with Second Circuit and Supreme Court precedent.

### LEGAL STANDARD & FACTUAL BACKGROUND

On July 1, 2022, the CCIA was passed by the New York State Legislature in special session, then promptly signed into law. The bill was specifically designed "to align with the Supreme Court's recent decision in []<u>Bruen</u>" <u>See</u> Press Release, July 1, 2022, available at https://on.ny.gov/3BM6Hz7.

Part of the CCIA enacted the new Penal Law § 265.01-d ("Private Property Provision"), which prohibits individuals from possessing "a firearm, rifle or shotgun" on private property without the express consent of the property owner or lessee.  The Private Property Provision ensures that owners *know* when firearms are brought onto their property and empowers them to choose for themselves to allow or disallow carriage.

Penal Law § 265.01-e enumerates a set of "sensitive locations" in which individuals generally may not possess "a firearm, rifle or shotgun." <u>Id.</u> § 265.01 e(1); <u>see</u> <u>Bruen</u>, 597 U.S. at 30 (recognizing the constitutionality of "longstanding laws forbidding the carrying of firearms in sensitive places such as schools and government buildings," and that this tradition also applied to "modern regulations prohibiting the carrying of firearms in *new* and analogous sensitive places." (quotation omitted, emphasis in the original)). As relevant here, the list includes "public parks" (the "Parks Provision") <u>Id.</u> § 265.01 e(2)(d) (along with the Private Property Provision, collectively the "challenged provisions").  The challenged provisions contain exemptions for

police officers, peace officers, registered security guards, active-duty military personnel, and other statutorily designated persons.  See id. §§ 265.01-d(2)(a-g); 265.01e(3).

Under New York State Rifle & Pistol Ass'n v. Bruen, 597 U.S. 1 (2022), a plaintiff challenging a gun regulation must first establish that "the Second Amendment's plain text covers [his] conduct.  Id. at 17.  It is not enough for Plaintiff to simply assert he wishes to carry firearms for self-defense, see [ECF No. 73-1] at 5-6; he must meet his textual burden as to his specific course of conduct—here, carrying firearms into public parks and private property open to the public.  See, e.g. United States v. Reyna, No. 3:21-cr-41, 2022 WL 17714376, at * 4 (N.D. Ind. Dec. 15, 2022) ("For Step One to have any meaning, the regulated conduct must be defined specifically enough that it can meaningfully compare to the Second Amendment's plain text—a plain text that is more complex than mere possession."). If a plaintiff meets that textual burden, the government must show that "the challenged law is consistent with this Nation's historical tradition of firearms regulation." Antonyuk v. Chiumento, 89 F.4th 271, 300 (2d Cir. 2023).  This historical analysis is not a "regulatory straightjacket" and does not require a "modern-day regulation [to be] a dead ringer for historical precursors." Bruen, 597 U.S. at 30.  The government must "identify a well-established and representative historical analogue, not a historical twin." Id.

In Antonyuk, the Second Circuit established seven precepts for district courts comparing historical gun regulations to a challenged law:

First, "historical practices that long predate or postdate codification of the relevant constitutional provision may not have much bearing on the provision's scope if the practices were obsolete or anomalous." Id. at 301. Second, "a court must identify the 'societal' problem that the challenged regulation seeks to address and then ask whether past generations experienced that same problem and, if so, whether those generations addressed it in similar or different ways." Id. Third, "the absence of a distinctly similar historical regulation in the presented record, though undoubtedly relevant, can only prove so much."  The lack of historical laws on a given point might have reflected a lack of political demand rather than an unstated public belief that a law was unconstitutional. Id. at 301-302.

*Fourth*, "courts must be particularly attuned to the reality that the issues we face today are different than those faced in medieval England, the Founding Era, the Antebellum and Reconstruction.  To put it plainly, our era does not resemble those.  Thus, the lack of a distinctly similar historical regulation, though (again) no doubt relevant, may not be reliably dispositive in Second Amendment challenges to laws addressing modern concerns."  Id. at 302.  *Fifth*, the historical inquiry that courts must conduct will often involve reasoning by analogy.  When analogizing, courts should consider "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified."  Id.  *Sixth*, just as the existence of a "*distinctly similar* historical regulation is not dispositive, it is likewise not dispositive whether *comparable* historical regulations exist in significant numbers."  The absence in other jurisdictions of positive legislation distinctly similar to a proffered historical analogue does not command the inference that legislators there deemed such a regulation inconsistent with the right to bear arms.  Id. at 303. And *seventh*, when analyzing the constitutionality of a state regulation, "the prevailing understanding of the right to bear arms in 1868 and 1791 are both focal points of [the] analysis."  Id. at 304.

For a complete recitation of the facts, Defendants respectfully refer the court to the State's Disputed Statement of Material Facts and its Undisputed Statement of Material Facts filed separately herewith.  See Fed. R. Civ. P. 56 (c)(1) and Local Rule 56(a)(1&2).

## STANDARD OF REVIEW

Summary judgment is only appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56 (a). A fact is "material" if it "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, (1986). An issue of material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

"Only when reasonable minds could not differ as to the import of evidence is summary judgment proper." Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir. 1991).  In the end, the function of the court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson, 477 U.S. at 249.  "Assessments of

credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." <u>Rule v. Brine, Inc.</u>, 85 F.3d 1002, 1011 (2d Cir. 1996).

## <u>ARGUMENT</u>

## I.   THE ORGANIZATIONAL PLAINTIFFS DO NOT HAVE STANDING BECAUSE THEY HAVE SUFFERED NO INJURY OF THEIR OWN

As a threshold matter, the Organizational Plaintiffs, Firearms Policy Coalition, Inc. ("FPC") and the Second Amendment Foundation ("SAF") lack standing to sue. "The doctrine of standing [requires] that a litigant 'prove that he has suffered a concrete and particularized injury that is fairly traceable to the challenged conduct, and is likely to be redressed by a favorable judicial decision.'" <u>Carney v. Adams,</u> 592 U.S. 53, 58 (2020) (quoting <u>Hollingsworth v. Perry</u>, 570 U.S. 693, 704 (2013)). And the injury has to be *real*: "an 'injury in fact' [] must be 'concrete and particularized,' as well as 'actual or imminent.' It cannot be 'conjectural or hypothetical.'" <u>Id.</u> (quoting <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 560 (1992)). Plaintiffs have not made the requisite showing.

FPC and SAF lack standing because they cannot bring suit vicariously on behalf of their members, and because they cannot demonstrate any injury in their own right. The analysis is governed by the Second Circuit's recent decision in <u>Connecticut Citizens Defense League Inc. v. Lamont</u>, 6 F.4th 439 (2021). Accordingly, federal courts in this Circuit regularly dismiss claims brought by organizations seeking to raise derivative Second Amendment claims on behalf of their members. <u>See, e.g.,</u> <u>Conn. Citizens Defense League, Inc. v. Thody</u>, No. 23-724, 2024 WL 177707, at *3 (2d Cir. Jan. 17, 2024) (summary order); <u>N.Y. State Firearms Ass'n v. James</u>, No. 23 Civ. 6524, 2024 WL 1932050, at *3-4 (W.D.N.Y. May 2, 2024); <u>see also</u> <u>Christian v. Nigrelli</u>, 642 F.

Supp. 3d 393, 399 n.4 (W.D.N.Y. 2022) (recognizing the applicability of this binding precedent

and that the Organizational Plaintiffs in this case did not dispute it).

## II.     HISTORY AND TRADITION DEMONSTRATE THAT THE CHALLENGED PROVISIONS ARE CONSTITUTIONAL

In their motion for summary judgment, Plaintiffs allege that the Private Property Provision

and public parks are implicated by the text of the Second Amendment, that historical "sensitive

place" restrictions are the only historical analogies that can justify the challenged provisions, and

that "New York will be unable to justify such a restriction with historically grounded analogies."

[ECF No. 73-1] at 6-25.  In fact, American law and history strongly support both measures.

### A.  Plaintiffs Can Only Bring a Disfavored Facial Challenge; Pre-Enforcement As-Applied Challenges are Improper

Because Plaintiffs ask the court to declare unconstitutional two laws that have never been

enforced against them, they face an exacting standard of review.  A facial challenge to a statute

can succeed only if Plaintiffs "show that 'no set of circumstances exists under which the [statute]

would be valid, i.e., that the law is unconstitutional in all of its applications,' or at least that it lacks

a 'plainly legitimate sweep.'" United States v. Decastro, 682 F.3d 160, 168 (2d Cir. 2012) (quoting

Wash. State Grange v. Wash. State Republican Party, 552 U.S. 442, 449 (2008)); see also United

States v. Salerno, 481 U.S. 739 (1987)). Moreover, it is black-letter law that the New York State

courts must be given the opportunity to narrow the provisions of the CCIA, if necessary, during

the course of specific enforcement activities or judicial proceedings. See Erznoznik v. City of

Jacksonville, 422 U.S. 205, 216 (1975) ("[A] state statute should not be deemed facially invalid

unless it is not readily subject to a narrowing construction by the state courts"). Because of this,

"[a] plaintiff making a facial claim faces an uphill battle because it is difficult to demonstrate that

mere enactment of a piece of legislation violates the plaintiff's constitutional rights." Cranley v.

Nat'l Life Ins. Co. of Vt., 318 F.3d 105, 110 (2d Cir. 2003) (quoting Suitum v. Tahoe Reg'l Plan.

Agency, 520 U.S. 725, 736 n.10 (1997)) (cleaned up); see also Diaz v. Pataki, 368 F. Supp. 2d 265, 274 (S.D.N.Y. 2005) (same).

Here, Plaintiffs bring a "pre-enforcement" facial challenge to the challenged provisions of the CCIA.  See generally [ECF No. 73-3].  Plaintiffs attempt to avoid this conclusion by reframing their lawsuit as an as-applied challenge against limited applications of the laws that they see as more vulnerable to attack, see, e.g., ECF No. 73-1 at 2 ("Plaintiff Christian only challenges the [Private Property Provision] on private property open to the public"); id. at 24 (announcing an "as-applied challenge to non-urban parks"), however binding precedent forecloses their ability to bring an as-applied challenge against a law that has never been applied to them.  A long line of precedent within the Second Circuit establishes that any "pre-enforcement" challenge to a state law, defined as one brought "before [any plaintiffs] have been charged with any violation of law," can only be brought as a facial challenge. Jacoby & Meyers, LLP v. Presiding Justices of the First, Second, Third and Fourth Departments, 852 F.3d 178, 184 (2d Cir. 2017); accord Restaurant Law Ctr. v. City of New York, 360 F. Supp. 3d 192, 208 (S.D.N.Y. 2019).

### B.  The Prohibition on Guns in Public Parks Is Constitutional

New York's provisions are consistent with a long and robust history of government prohibitions on firearms in public parks and in analogous sensitive places.

1.  The Second Circuit's Ruling in Antonyuk Establishes that the Parks Provision is Facially Constitutional

As noted above, Christian's Complaint only brings a pre-enforcement facial challenge and, as to parks, that issue has already been resolved by Antonyuk. The Second Circuit has already found, in speaking of parks, that the Superintendent "ha[s] made a robust showing of well-established and representative tradition of regulating firearms in public forums and quintessentially crowded places, enduring from medieval England to Reconstruction America and beyond."

8

Antonyuk, 89 F.4th at 356. "As urban public parks took root as a new type of public forum, cities continued the tradition of regulating firearms in historical public forums, such as fairs and markets, to likewise keep these new public spaces, urban parks, peaceable." Id. at 359.  "§ 265.01-e is within the Nation's history of regulating firearms in quintessentially crowded areas and public forums, at least insofar as the regulation prohibits firearms in *urban* parks… [c]onsidering, then, that the law has a plainly legitimate sweep as to urban parks, the facial challenge fails." Id. at 355. Given that Plaintiff cannot bring a pre-enforcement as-applied challenge, and that the facial challenge has already been resolved in the Superintendent's favor, the cross-motion for summary judgment should be granted and the Complaint dismissed. See II. A. supra.

2.     The Evidence of Historical Prohibitions on Firearms in Parks is Overwhelming

Because sensitive places are those where, historically, carrying weapons was "altogether prohibited," Bruen, 597 U.S. at 30, these locations fall outside the textual scope of the Second Amendment.  See Binderup v. Attorney General, 836 F.3d 336, 343 (3d Cir. 2016) (sensitive place laws "comport with the Second Amendment because they affect . . . conduct unprotected by the right to keep and bear arms"), abrogated in part on other grounds, Bruen, 597 U.S.   ; see also Bonidy v. U.S. Postal Service, 790 F.3d 1121, 1125 (10th Cir. 2015) ("the Second Amendment right to carry firearms does not apply to federal buildings, such as post offices"); GeorgiaCarry.org, Inc. v. U.S. Army Corps of Engineers, 212 F. Supp. 3d 1348, 1366-67 (N.D. Ga. 2016) (finding that location was sensitive meant that "the conduct regulated by the [challenged measure] falls outside the scope of the Second Amendment.").

But, in any event, the Parks Provision satisfies Bruen's history and tradition test. For this purpose, the Supreme Court explained that courts should  reason by analogy, comparing modern regulations to historical analogues.  Bruen, 597 U.S.  at 28-30.142 S. Ct. at 2132.  Here, a review of such analogues reveals that the historical record contains a broad and well-established body of

laws restricting the carrying of weapons in local and national parks—in both urban and rural locations.

Although public parks were in their infancy as an institution during the late 19th Century, there are many examples of municipal statutes and urban planning documents banning the carrying of firearms within them.  See, e.g., Fourth Annual Report of the Board of Commissioners of the Central Park (Jan. 1861)[1], Belka Decl., ¶¶ 24-25, Ex. 12 ("All persons are forbidden . . . [t]o carry firearms"); First Annual Report of the Commissioners of Fairmount Park (Philadelphia), Supplement § 21(II) (1869), Id., ¶¶ 26-27, Ex. 13, (excerpting Pennsylvania state statute requiring that "[n]o persons shall carry fire-arms…"); Rules and Regulations of the Public Parks and Grounds of the City of Saint Paul (1888), Id., ¶¶ 28-29, Ex. 14 ("No person shall carry firearms or shoot birds in any Park or within fifty yards thereof."); 1895 Mich. Pub. Acts 596, Id., ¶¶ 30-31, Ex. 15 ("No person shall fire or discharge any gun or pistol or carry firearms" within Detroit's Belle Isle Park).[2]

These firearms restrictions in municipal and state parks applied in states, cities, and other localities nationwide.  See, e.g., Laws and Ordinances for the Government of the Municipal Corporation of the City of Williamsport, Pennsylvania 141 (1891) ("No person shall carry fire-arms… within the Park") Belka Decl., ¶ 36, Ex. 20; The Revised Ordinance of the City of St. Louis (1881) (No person shall… use or have in his possession ready for use in any… park of the city of St. Louis… any device that discharges a "fragment, bolt, arrow, pellet, or other missile") Id., ¶ 37,

---

[1]        Many of the applicable regulations to government parks were instituted on a local or city government level. Few if any of those historical records remain and fewer still are digitized and readily searchable.  While some local laws have remained through sheer happenstance (e.g. Ordinances of Wappinger Falls, New York, Park Ordinances § 1, (1898)) the available historical record is never complete and expands as more primary sources are discovered and digitized.

[2]        See also Belka Decl., ¶¶ 32-35, Exs. 16-19 (additional examples of ordinances banning firearms in parks in Chicago, Salt Lake City, St. Louis, and Pittsburgh).

Ex. 21; The Charter of the City of Wilmington, Part VII, § 7 (1893) (No person shall carry fire-arms… within the Park…) <u>Id</u>., ¶ 38,  Ex. 22; A Digest of the Laws and Ordinances for the Government of the Municipal Corporation of the City of Reading, Pennsylvania, 240 (1897) ("No person shall carry firearms, or shoot in the common, or within fifty yards thereof…) <u>Id</u>., ¶ 39, Ex. 23; A Revised Ordinances of the City of Boulder, 157 (1899) (prohibiting the carrying of firearms into 'any of the parks belonging to the City of Boulder') <u>Id</u>., ¶ 40, Ex. 24; City of Trenton, New Jersey, Charter and Ordinances, 390 (1903) ("No personal shall carry firearms… in said park or squares, or within fifty years thereof…) <u>Id</u>., ¶ 41, 25. Amendments to the Revised Municipal Code of Chicago of 1905 and New General Ordinances, 40 (1905) ("All persons are forbidden to carry firearms… within any of the Parks… of the City") <u>Id</u>., ¶ 42, Ex. 26; 1905 Minn. Laws 620, Ch. 344, § 53 (prohibiting firearms withing parks or withing "one-half mile of the outer limits" of a park, unless the firearms is unloaded and has been sealed by the park commissioner.") <u>Id</u>., ¶ 43, Ex. 27; A Digest of the Ordinances of the Town Council of the Burough of Pheonixville, 135 (1906) ("No person shall carry fire-arms… therein [Reeves Park]") <u>Id</u>., ¶ 44, Ex. 28; The Code of the City of Staunton, Virginia, 115 (1910) ("All persons are forbidden… to carry firearms… within [the park].") <u>Id</u>., ¶ 45, Ex. 29; Ordinances, Rules and Regulations of the Department of Parks of the City of New York, 7 (1916) ("No personal shall, in any park… fire or carry any firearm.") <u>Id</u>., ¶ 46, Ex. 30; The Code of the City of Birmingham, Alabama, 662 (1917) ("No person shall carry firearms… within any of such public parks.") <u>Id</u>., ¶ 47, Ex. 31; 1917 Wis. Sess. Laws 1243-44, Ch. 668, § 3 (29.57)(4) (no person shall "have in his possession or under his control therein any gun or rifle [unless unloaded and stored] while in any "state park") <u>Id</u>., ¶ 48, Ex. 32; 1921 N.C. Sess. Laws 54, Pub. Laws Extra Sess., Ch. 6, § 3 (prohibiting the carrying of a firearm in any park… unless written permission had been obtained from the manager of said park).  <u>Id</u>., ¶ 49, Ex.

33.  There are 46 additional measures dating from 1858 through 1922 attached to the Belka Declaration.  See Belka Decl., ¶¶ 53-95, Exs. 36-78.

This litany of state and municipal laws restricting access to firearms in public parks comports with the original purpose of parks as an escape from the hustle and bustle of modern industrial society.  Declaration of Dr. Terence Young (Young Decl.), ¶¶ 8-10, 19-21, 27-35.[3] Speaking of the rise of the modern parks movement, "[b]acked by a Romantic ideology, this social transformation occurred because parks contained natural scenery, which when quietly and passively contemplated, was thought to improve someone's mind and body, and thus society.  In keeping with a park's purpose and its function as a society-improving device, any features or actions in a park that interfered with natural scenery contemplation were excluded from a park, including firearms, which were specifically prohibited." Id., ¶ 8. In fact, the prohibition of firearms in parks "was considered fundamental" to the purpose and function of these spaces.  Id., ¶ 33; See also Antonyuk at 358-361.

This wealth of authority leaves no doubt that public parks from their inception were viewed as sensitive places in which governments could validly restrict carrying firearms, as multiple federal courts have held.  See, e.g., Warden v. Nickels, 697 F. Supp. 2d 1221, 1229 (W.D. Wash. 2010) (holding that a "park where children and youth recreate is a 'sensitive' place where it is permissible to ban possession of firearms"); United States v. Masciandaro, 648 F. Supp. 2d 779,

---

[3]       Plaintiffs have offered no expert evidence regarding the history of American parks or any of the other issues in this lawsuit.  Instead, they repeatedly make factual assertions based on citations not to historical statutes or laws, but to amicus briefs, law-review articles and other hearsay sources which cannot be considered on a motion for summary judgment.  See Porter v. Quarantillo, 722 F.3d 94, 97 (2d Cir. 2013) ("[A] party cannot rely on inadmissible hearsay in support of or in opposition to a motion for summary judgment" because "courts may consider only evidence that would be admissible at trial."); see, e.g., ECF No. 73-1 at 13, 20-21.  Plaintiffs attempt to hand-wave away the evidentiary issues in a footnote to their Rule 56.1 Statement, contending that these are "legislative facts" that are "unrestricted" by the Federal Rules of Evidence.  ECF No. 73-3 at 1 n.1.  The Court should follow the lead of other federal courts in refusing to consider out-of-court statements regarding historical facts for the truth of the matters asserted.  See, e.g., Or. Firearms Fed'n v. Kotek, 682 F. Supp. 3d 874, 886 (D.Or. 2023) (rejecting documents with "legislative facts" as "inadmissible hearsay" that "deserve no weight in this case").

790 (E.D. Va. 2009) ("Although <u>Heller</u> does not define 'sensitive places,' the examples given—schools and government buildings—plainly suggest that motor vehicles on National Park land fall within any sensible definition of a 'sensitive place.'"), <u>aff'd on other grounds</u>, 638 F.3d 458 (4th Cir. 2011).

Indeed, New York's Parks Provision also aligns with a recognized purpose of sensitive places, which is to promote the exercise of other fundamental rights, such as the free exercise of religion, freedom of speech, the fundamental right to vote, access to the courts or assemblage in the public square.  In other words, sensitive places are such because "they produce the kinds of public goods protected by other constitutional rights," to allow "them to effectively produce the public good and political culture that we also consider valuable." Darrell A.H. Miller, <u>Constitutional Conflict and Sensitive Places</u>, 28 Wm. & Mary Bill Rts. J. 459, 466 (2019).[4] "Public parks have 'immemorially' been open to the public for the purpose of communicating and assembling." <u>Id</u>. at 475. "The public square is a kind of First Amendment institution; designed for the people to be better able to exercise related rights to assemble 'to speak' and to petition the government."  <u>Id</u>., at 475-478. Moreover, public parks share a key trait with polling places, legislative assemblies, and courts, in that all are locations where calm reflection should prevail. Restricting guns in these places is part of an Anglo-American tradition that allows public parks to keep their inherent values as places of refuge, assembly, and free speech.  <u>See also</u>, Young Decl., ¶¶ 8-10, 19-21, 27-35.

      3.     A Pre-Enforcement As-Applied Challenge Regarding "Rural Parks" is Procedurally Improper, and No Plaintiff Has Standing to Bring Such a Challenge

---

[4] https://scholarship.law.wm.edu/wmborj/vol28/iss2/9/

As noted above, Plaintiffs can only bring a facial challenge to the CCIA, which fails as to parks because the Second Circuit has established that the Superintendent has already proven that prohibiting firearms in certain parks comports with an American tradition of firearms regulation. Antonyuk 89 F.4th at 354-363. A "pre-enforcement" challenge to a state law, defined as one brought "before [any plaintiffs] have been charged with any violation of law," can only be brought as a facial challenge. Jacoby & Meyers, LLP v. Presiding Justices of the First, Second, Third and Fourth Departments, 852 F.3d 178, 184 (2d Cir. 2017) ("pre-enforcement" challenge… can only be brought as a facial challenge"). Since Antonyuk held that "the law has a plainly legitimate sweep," 89 F.4th at 356, "the facial challenge fails," id., and Plaintiff's attempts to pivot their lawsuit to an improper pre-enforcement as-applied challenge are unavailing.

But even if a pre-enforcement as-applied challenge were procedurally proper, no plaintiff in this action has standing to bring one.  As discussed in Section I, above, the organizational plaintiffs have no injury to justify bringing such a challenge in their own right, and no ability to bring a Section 1983 claim on behalf of unspecified members.  Nor does Plaintiff Christian have standing to challenge the law as relates to "rural parks," since he does not allege any injury traceable to the statute.  At his deposition and in his Local Rule 56.1(a)(2) statement, Plaintiff Christian identified only five relevant locations where he intends to visit: Stiglmeier Park in Cheektowaga, "parts of the Clarence Bike Path which are actually two trails running from Amherst off of Transit Road into Clarence," the Shoreline Trial between Buffalo and Tonawanda, the Harris Hill State Forest in Erie County, and an allegedly cancelled trip to "Adirondacks Park." [ECF No. 73-3] ¶¶, 4-22; Christian Dep. 85:7-86:18.  As explained below, none of these places are rural parks where guns are prohibited.

14

In distinguishing between urban parks where there is an established American tradition of preventing carriage and rural parks where such a tradition had yet to be established, Antonyuk described urban parks as "communal spaces" or "quintessential public space[s]," while rural parks are "'commons' and 'wilderness areas'"… "spaces to be held by the community for shared utilitarian purposes." Antonyuk 89 F.4th at 362-63. The first three "parks" cited by Plaintiff Christian are located in condensed population centers of Cheektowaga, Amherst, and Clarence, New York. Importantly, these spaces are more akin to communal spaces that developed as respites from urban life, as described by Dr. Young (see Young Decl. ¶, ¶¶ 8-10, 19-21, 27-35).

Stiglmeier Park ([ECF No. 73-1] at ¶¶ 5-8) is a quintessential urban park surrounding by dense housing developments, sandwiched between the two busy thoroughfares of Losson Road and Como Park Boulevard in Cheektowaga, New York. Declaration of Joseph Barill (Barill Decl.), ¶¶ 5-6. Stiglmeier Park has six baseball diamonds, three softball diamonds, five tennis courts, two basketball full-court courts, two half-court basketball courts, fourteen shelters, one outdoor hockey rink, and six children's playgrounds with a lattice of hiking and walking trails throughout. Barill Decl., ¶ 7. One recent Saturday morning, Stiglmeier Park was observed to have occupied children's playgrounds, parked cars, walkers, tennis players, bikers, picnickers, baseball players, basketball players and multiple marked units patrolling the park. Barill Decl., ¶¶ 8-12.

If the court reaches this issue, which it need not do, the record shows that Stiglmeier Park is an urban park consistent with the national tradition of firearms regulation discussed in Antonyuk. See 89 F.4th at 362-63; Young Decl. ¶¶ 8-10, 19-21, 27-35. Similarly, although Plaintiff vaguely testifies to parks that are bisected by the Clarence Bike Path and the Shoreline Trail, these parks are akin to the urban parks and are quintessential public spaces where the CCIA applies and where firearms prohibited. See Belka Decl., ¶¶ 102-111 (The Niagara Greenway study indicates that

more than 850,000 individuals pass through these parks a year).  Moreover, the Clarence Bike Path and the Shoreline Trial are not public parks where carrying firearms is prohibited by § 265.01-e(2)(d).

As to Harris Hill State Forest and Adirondack Park, while parts of those areas may be rural, neither is a park where carrying firearms is prohibited.  The CCIA's sensitive places law does not apply to prevent carriage of firearms (or related activities like hunting or target shooting) in State Forests, as has been provided for in guidance documents issued before this case was ever filed.  See Belka Decl., ¶¶ 96-101. see also New York State Department of Environmental Conservation, Frequently Asked Questions and Answers on Hunting and Hunting-Related Activities in response to Recent Changes to New York State Firearm Laws (Sept. 1, 2022), available at https://extapps.dec.ny.gov/docs/wildlife_pdf/gunlawqanda2022.pdf.  The ability to carry firearms is clear from the Harris Hill State Forest website, as the top featured activity suggested is hunting.  See  https://dec.ny.gov/places/harris-hill-state-forest.    Similarly,  the  statute  itself  expressly exempts the Adirondack Park (and other forest preserve areas under N.Y. Env. Con. Law § 9-0101(6)) from the sensitive places laws.  See N.Y. Penal Law § 265.01-e(2)(d)(ii).

Simply put, the bulk of the places Plaintiff Christian wants to carry a gun are places where armed carriage is permitted, excepting Stiglmeier Park and other urban parks where the Second Circuit has already deemed the application of the sensitive places law to be constitutional.  Thus, even if a pre-enforcement as-applied challenge regarding rural parks were procedurally proper— which it is not—Plaintiff Christian has not shown an injury-in-fact "that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical," as well as "fairly traceable to the challenged conduct."  Spokeo, Inc. v. Robins, 578 U.S. 330, 338 (2016).  Any as-applied challenge would therefore fail for lack of standing.

Even if the Court were to consider Plaintiff Christian's "as-applied challenge to the carry restrictions in non-urban parks specifically," ECF No. 73-1 at 20 — despite the fact the law has never been applied to him and his failure to adduce evidence showing any intent to visit a rural park where guns are prohibited — the challenge would fail on the merits because rural parks, like urban parks, are places where firearms prohibitions are fully "consistent with this Nation's historical tradition of firearm regulation." Bruen, 597 U.S. at 34.

The first and clearest body of law supporting this historical tradition is the federal government's longstanding practice of prohibiting firearms in national parks. Although most national parks date from the 20th Century, by the end of the 19th Century federal leaders had enacted rules prohibiting firearms within park boundaries. See National Park Service, Firearms Regulations in the National Parks 1897-1936, Belka Decl., 50-51 Exs. 34-35. In June 1897, Yellowstone Park adopted a regulation stating that "[f]irearms will only be permitted in the park on written permission from the superintendent thereof. On arrival at the first station of the park guard, parties having firearms will turn them over to the sergeant in charge of the station, taking his receipt for them. They will be returned to the owners on leaving the park."[5] Id. at 1. In 1902, Sequoia and General Grant National Parks adopted rules stating that "[f]irearms will only be permitted in the park on written permission from the superintendent thereof."[6] Id. at 9. In the years that followed, national park after national park adopted policies barring firearms absent permission of the park's superintendent: Yosemite in 1902, id. at 15, Crater Lake National Park in 1902, id. at 28, Mount Rainier National Park in 1903, id. at 33, Mesa Verde National Park in 1908,

---

[5] The policy appears to have existed before that time, as only two months later the acting superintendent wrote that "[t]he regulation prohibiting firearms in the park, except on written permission from the superintendent . . . has been strictly enforced. It is essential to the protection of the park." Id.

[6] Yosemite had likewise prohibited firearms before this time. The Secretary of the Interior's Annual Report for 1905 noted that "[h]eretofore the custom has been to require persons entering the park with firearms in their possession to surrender such arms during their stay in the park…" Id. at 15.

id. at 25, Platt National Park in 1908, id. at 38, Wind Cave National Park in 1908, id., Glacier National Park in 1910, id. at 42, Rocky Mountain National Park in 1915, id. at 47, Grand Canyon National Park in 1928, id. at 61, Hawaii National Park in or before 1929, id. at 50, Acadia National Park in or before 1929, id. at 51, Lassen Volcanic National Park in or before 1929, id. at 52, Mount McKinley National Park in or before 1929, id. at 54, Grand Teton National Park in or before 1929, id. at 64, Zion and Bryce Canyon National Parks in 1929, id. at 56, Great Smoky Mountains National Park in 1932, id. at 60, and Carlsbad Caverns National Park in 1933. Id. at 59. In 1936, in the first volume of the Federal Register, the Department of the Interior banned firearms in the entire National Park System by regulation. 1 Fed. Reg. 672, 674 (1936).

The tradition is particularly relevant for two reasons. First, national parks such as Yellowstone or Yosemite are indisputably rural. Cf. Aymonier v. United States, 432 F. App'x 66, 68 (3d Cir. 2011) (finding that even the Gateway National Recreation Area, on the South end of New York Harbor, was "a 'rural or semi-rural' tract of land."). And second, national parks were federal land, and thus among the very few places where the Second Amendment actually applied directly. See District of Columbia v. Heller, 554 U.S. 570, 625 ("For most of our history, the Bill of Rights was not thought applicable to the states."); United States v. Cruikshank, 92 U.S. 542, 553 (1875) (the Second Amendment "means no more than that it shall not be infringed by Congress"); Presser v. Illinois, 116 U.S. 252, 265 (1886) (same). Yet for well over a century,[7] firearms possession was prohibited in these frequently-visited, federally-governed rural lands, with no indication that our forefathers viewed the measures as infringements on their Second Amendment rights, or ever thought to dispute them. Under Bruen's sensitive places test, such

---

[7]     It was not until 2014 that Congress passed a law permitting firearms in national parks. See National Park Service and Related Programs, Pub. L. No. 113-287, 128 Stat. 3094, 3168-69 (2014). The federal statute permits armed carriage in national parks only "in compliance with the law of the State in which the System unit is located." 54 U.S.C. § 104906(b)(2).

"longstanding" laws viewing a place as sensitive establish the measures' constitutionality, particularly where "we are also aware of no disputes regarding the lawfulness of such prohibitions." Bruen 597 U.S. at 30; see also id. ("We therefore can assume it settled that these locations were 'sensitive places' where arms carrying could be prohibited consistent with the Second Amendment.").

The national tradition of protecting the public by prohibiting weapons in rural or semi-rural parks is further demonstrated by many of the municipal laws discussed above, which were enacted by locations that today would be viewed as small towns or rural areas.  The historical laws attached to the Belka Declaration are not limited to measures passed in big cities like New York, Philadelphia, or Detroit, but also include laws from small towns and rural locations like Olean, New York; Staunton, Virginia; Danville, Illinois; or Neligh, Nebraska, none of which could plausibly be considered "urban."  See, e.g., Belka Dec. Exs. 29, 40, 64, & 57.  As explained by Dr. Young, these small town and rural area parks were also considered to be in communion with the refuge provided by a park, valorizing the preservation of these traditional values to set aside improve mind and body from societal transformation.  Young Decl., ¶¶ 8-10, 19-21, 27-35.  "In keeping with a park's purpose and its function as a society-improving device, any features or actions in a park that interfered with natural scenery contemplation were excluded from a park, including firearms, which were specifically prohibited." Id., ¶ 8.  Prohibition of firearms, in furtherance of this American tradition, in these rural and small-town parks was routine.  Id., ¶¶ 8-10, 19-21, 27-35.

### C. New York's Law Preventing Armed Persons From Entering Other People's Property Without Consent Is Constitutional and Deeply Rooted In Anglo-American Property Law and Tradition

1. The plain text of the Second Amendment does not support a right to carry arms onto others' private property without their consent

The Second Amendment does not include the right to carry guns on others' property without their consent.  Under <u>Bruen</u>, the threshold inquiry requires an analysis of the Second Amendment's text that is "informed by history," <u>Bruen</u>, 597 U.S. at 19, including the principles of "property law, tort law, and criminal law" that "provide[d] the canvas on which our Founding Fathers drafted the Second Amendment," <u>GeorgiaCarry.Org, Inc. v. Georgia</u>, 687 F.3d 1244, 1264 (11th Cir. 2012), *abrogated on other grounds by* <u>Bruen</u>, 597 U.S. 1.  Private property rights were central to the Founders, and a property owner's right to exclude was "one of the most essential sticks in the bundle of [property] rights." <u>Cedar Point Nursery v. Hassid</u>, 594 U.S. 139, 150 (2021) (quoting <u>Kaiser Aetna v. United States</u>, 444 U.S. 164, 176 (1979)).  The Private-Property Provision vindicates the rights of the property owners to control carriage on their property. Moreover, the Private Property Provision does not involve state action, in that it is the property owner, not the state, that decides whether to allow guns to be carried on his or her premises.  <u>See</u> <u>Blum v. Yaretsky</u>, 457 U.S. 991, 1004 (1982) ("[C]onstitutional standards are invoked only when it can be said that the State is *responsible* for the specific conduct of which the plaintiff complains.").  The Supreme Court's holding that individuals have a right to carry firearms "in public" does not address whether they have a presumptive right to do so on others private property, and <u>Bruen</u> nowhere suggested that the Second Amendment trumps private property rights.

> 2.  The Private-Property Provision is consistent with the historical tradition of firearms regulation

Even if the Private-Property Provision implicated the Second Amendment's plain text, the historical record demonstrates the Provision is consistent with the Nation's tradition of firearms regulation.

> > a.  Many states in the Eighteenth and Nineteenth Centuries directly required an owner's consent to carry guns onto his or her private property.

There is extensive historical support spanning the colonial era to Reconstruction and beyond that forbade carrying guns onto others' property without their permission.  In colonial 1715, the Province of Maryland enacted a law imposing criminal penalties against anyone "of evil fame, or a vagrant, or dissolute liver, that shall shoot, kill or hunt, or to be seen to carry a gun, upon any person's land, whereon there shall be a seated plantation, without the owner's leave, having been once before warned."  Belka Decl., ¶ 3, Ex. 1.  In 1721, the Pennsylvania Colony made it unlawful for anyone "to carry any gun or hunt on the improved or inclosed lands of any plantation other than his own, unless he have license or permission from the owner of such lands or plantation." Belka Decl., ¶¶ 4-5, Ex. 2. The latter statute aimed to prevent and remedy the "divers[e] abuses, damages and inconveniences" caused "by persons carrying guns and presuming to hunt on other people's lands." Id.  In 1722, the Province of New Jersey passed a nearly identical statute, similarly recognizing that "divers[e] abuses have been committed, and great Damages and Inconveniences arisen by Persons carrying of Guns and presuming to hunt on other Peoples Land." Belka Decl., ¶¶ 6-7, Ex. 3.

In 1763, the Province of New York passed a law providing that nobody "other than the Owner, Proprietor, or Possessor, or his or her white Servant or Servants," shall "carry, shoot, or discharge any Musket, Fowling-Piece, or other Fire-Arm whatsoever, into, upon, or through any Orchard, Garden, Cornfield, or other inclosed Land whatsoever, wisethin the City of New York, or the Liberties thereof, without License in Writing first had and obtained for that Purpose from such Owner, Proprietor, or Possessor."  Belka Decl., ¶¶ 8-9, Ex. 4.

In 1771, the Province of New Jersey passed another statute prohibiting a person from carrying "any Gun on any Lands not his own, and for which the Owner pays Taxes, or is in his lawful Possession, unless he hath License or Permission in Writing from the Owner or Owners or

legal Possessor."  Belka Decl., ¶¶ 10-11, Ex. 5.  Massachusetts enacted a law in 1789 that applies

to several islands in Dukes County, making it unlawful to "be seen with any gun or guns" unless

one has "the special license of the proprietors of the said Islands, or shall be able to shew sufficient

reason therefor."

Reconstruction-era evidence provides further historical support for the Private-Property

Provision, as the newly-reintegrated Southern states, under federal supervision, re-enacted their

fundamental laws.  Cf. Antonyuk, 89 F.4[th] at 304 ("the prevailing understanding of the right to

bear arms in 1868 and 1791 are both focal points of our analysis.").  In 1865, Louisiana declared

that it shall not be lawful for any person or persons to carry fire-arms on the premises or plantations

of any citizen, without the consent of the owner or proprietor, other than in lawful discharge of a

civil or military order."  Belka Decl., ¶¶ 12-13, Ex. 6.  The same year, Florida enacted a law

providing that "it shall not be lawful for any person to hunt or range[8] with a gun within the enclosed

land or premises of another."  1865 Fla. Laws 27, Belka Dec. Ex. 80. The following year, in 1866,

Texas passed a law nearly identical in substance to Louisiana's.  Belka Decl., ¶¶ 14-15, Ex. 7.

Continuing this tradition, an 1893 Oregon law made it "unlawful for any person, other than an

officer on lawful business, being armed with a gun, pistol, or other firearm, to go or to trespass

upon any enclosed premises or lands without the consent of the owner or possessor thereof."  Belka

Decl., ¶ 16-17, Ex. 8.

In Antonyuk, the Second Circuit disregarded the 1721 Pennsylvania statute, 1722 New

Jersey statute, and 1763 New York statute because those statutes established a tradition of

prohibiting illegal hunting on private lands, not a tradition of prohibiting lawful carriage of

---

[8]       "Range" as used at the time did not connote hunting, but rather meant "to rove at large, to wander without
restraint or direction."  II Noah Webster, An American Dictionary of the English Language, supra, at 414, Belka
Decl., Ex. 96.

firearms for self-defense on private property open to the public.  89 F.4th at 385.  But the statutes were not so limited.

First, while the laws mention hunting, their plain text also bars guns carriage more generally on others' property without their consent.  See, e.g., Belka Decl., Ex. 1 ("shoot, kill or hunt, *or be seen to carry a gun*"), Id. Ex. 2 ("carry any gun or hunt"), Id. Ex. 3 ("*carry any Gun, or hunt*"), Id. Ex. 4 ("*carry*, shoot, or discharge any Musket, Fowling-Piece, or other Fire-Arm whatsoever").  The Supreme Court and the Second Circuit have established that federal courts must "interpret statutes 'to give effect, if possible, to every clause and word,' and to 'avoid statutory interpretations that render provisions superfluous.'"  United States v. Al Kassar, 660 F.3d 108, 124-25 (2d Cir. 2011) (quoting Duncan v. Walker, 533 U.S. 167, 174 (2001) and United States v. Anderson, 15 F.3d 278, 283 (2d Cir. 1994)).  In the colonial era, it was not unusual for a single statute to have included multiple expressly stated purposes reflecting multiple, separate substantive provisions. There is no textual or historical basis to truncate the statute by ignoring part of its language.  Second, siloing these laws to hunting alone ignores that "[t]he regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868."  Bruen, 597 U.S. 1, 3.  New York can constitutionally decide that in the risk of confrontation with the advance firearms of 2024 hazards "great Danger [to] the Lives" of others and "grievous Injury [to] the Proprietors" no less than traipsing armed onto someone's property did in 1763, and it can respond to that threat by ensuring that owners are informed and approve of the presence of firearms on their property, just as states did in the Founding and Incorporation Eras.  Belka Decl., ¶¶ 8-9, Ex. 4.

> b.  The original public understanding of the terms used in these statutes covered locations open or closed to the public.

In Antonyuk, the Second Circuit "assume[d] without deciding" that these sources

"demonstrate a well-established and representative tradition of creating a presumption against carriage on enclosed private lands, *i.e.*, private land closed to the public." 89 F.4th at 384-85. But the Circuit found that the same had not yet been shown with regard to land open to the public, finding at that preliminary stage that "the historical record indicates that 'land,' 'improved or inclosed land' and 'premises or plantations' would have been understood to refer to private land not open to the public." Id. at 385-86. However, the Circuit stated that its conclusion was a preliminary one based on the limited record "[a]s it has been developed thus far," and that the conclusion would be different if presented with "evidence that those terms were in fact otherwise understood to apply to private property open to the public or that the statutes were in practice applied to private property open to the public." Id.. The historical record supports a broader interpretation, as each of these terms was publicly understood to cover property open to the public.

   c.  Land

  "Land," the broadest of all the terms discussed by the Second Circuit, cannot be interpreted to include a limitation to places closed to the public.  The public and legal understandings of the term at and around the time of the Founding demonstrates as much.  "Timothy Cunningham's important 1771 legal dictionary," one of the key sources cited by Justice Scalia in interpreting the Second Amendment in Heller, see 554 U.S. at 581, 587, explained that "land [] in a general and legal signification, includeth not only all kinds of grounds, as meadows, pasture, arable wood, &c. but houses and all edifices whatsoever."  2 Timothy Cunningham, A New and Complete Law Dictionary, Belka Dec. Ex. 81.

  Unsurprisingly, case law and other sources from Early America indicate that the term "land" could and did include areas open to the public.  See, e.g., Hildreth v. Sands, 2 Johns.Ch. 35, 38; 1 N.Y. Ch. Ann. 286 (N.Y. Ch. 1816) ("a ropewalk and store on the land");  Parker v. Smith, 17 Mass. 413(D.Mass. 1821) ("The plaintiffs proved that they built their store on the land

above described"); <u>Gardiner Cotton & Woolen Factory v. Inhabitants of Gardiner</u>, 5 Me. 133, 134 (1827) ("a lot of land in Gardiner, with a store upon it"); <u>Commonwealth v. Eastabrook</u>, 27 Mass. 293, 298 (1831) (cattle pens for use by customers "inclosed within the exterior fence of the same lot of land with the tavern," which included an inn serving "customers" and "drovers"); <u>Burk v. Huber</u>, 2 Watts 306, 306 (Pa. 1834) ("ten acres of land in the town of Millersburg, whereon are a tavern and other buildings, &c."); <u>Deare v. Carr</u>, 3 N.J. Eq. 513, 513 (N.J. Ch. 1836) ("a certain lot of land of about eleven acres, with a tavern upon it"); <u>Thomas v. Hatch</u>, 3 Sumn. 170, 23 F. Cas. 946 (C.C.D. Me. 1838) (synopsis) ("a strip of land on which stands a store, lately improved"); <u>Atkins v. Chilson</u>, 50 Mass. 52, 53 (1845) (action "to recover possession of a parcel of land, with a store thereon, situate[d] in Blackstone Street, in Boston"); <u>Eaton v. Whitaker</u>, 18 Conn. 222, 222-23 (1846) ("a certain lot of land and a wharf appurtenant thereto" and an agreement to "erect upon said lot of land a substantial brick store, suitable for the grocery business").

   d. Improved Land

  The same conclusion is warranted regarding "improved land."  Noah Webster's 1828 <u>An American Dictionary of the English Language</u>, repeatedly cited by Justice Scalia in <u>Heller</u> when deriving the public understanding of the Second Amendment, <u>see</u> 554 U.S. at 581, 582, 584, 595, defined "improve" as, inter alia, "to use; to occupy; to cultivate," and defined "improved" as "used; occupied; as *improved* land."  Webster, <u>An American Dictionary of the English Language</u>, supra, at 945, Belka Dec. Ex. 82.  Farms and homes constituted improved land, but so did buildings open to the public like churches, stores, or inns.  As Black's Law Dictionary explains when discussing the Seventeenth-century definition of "improved land," the term simply meant "[l]and that has been developed, esp[ecially] land occupied by buildings and structures."  <u>LAND, Black's Law Dictionary</u> (11th ed. 2019).

The applicability of the term "improved land" to areas open to the public is demonstrated in Early American case law.  See, e.g., Thomas, 23 F. Cas. at 949 (synopsis) ("a strip of land on which stands a store, lately improved"); Davis v. Young, 32 Ky. 299, 304 (1834) ("we can not believe, that a provident legislature, in enacting a law for securing peace, safety, and repose to those who improve and occupy land within the limits of this Commonwealth . . . ever intended that the dwelling house only, should be protected, and that the kitchen, the smoke house, the dairy, the barn, the corn field, or even the enclosed woodland pasture, should be unprotected"); Moss v. Rossie Lead Mining Co., 5 Hill 137, 138 (N.Y. Sup. Ct. 1843) ("fifty acres of improved land on which were several houses used as residences for workmen, stoves in the houses, a building which had been occupied as a store, a school-house, a threshing machine, &c."); see also I Acts and Resolves of the Province of the Massachusetts Bay (Vol. I, 1692-1714) at 167, Belka Dec. Ex. 83 (1694 law allowing for taxation of "all real estates, as houses, warehouses, mills, cranes, wharfs, tanyards, arable pasture and meadow ground, and all other lands inclosed or under improvement").

e.   Inclosed Land

Nor is there any basis in history to limit the definition of "inclosed land" only to places closed to the public.  Webster defined "inclose" as inter alia "to surround; to shut in; to confine on all sides; as, to inclose a field with a fence; to inclose a fort or an army with troops; to inclose a town with walls" – showing the term to apply to any kind of fenced-in property, including private property open to the public.[9]  I Noah Webster, An American Dictionary of the English Language 951 (S. Converse 1828), Belka Dec. Ex. 84.  Black's Law Dictionary is in agreement, explaining

---

[9]      Webster also defined "inclose" as "to separate from common grounds by a fence; as to inclose lands," defined "inclosed" as "surrounded; encompassed; confined on all sides; covered and sealed; fence," and defined "inclosure" as inter alia "the separation of land from common ground into distinct possessions by a fence."  Id.  None of these definitions provide any basis to hypothesize that fenced-off private lands open to the public (such as a churchyard or burial ground) or a walled building open to the public (such as a tavern or store) would somehow implicitly fall outside the definition.

that the definition of "enclosed land" stems from the Seventeenth Century and simply means "[l]and that is actually enclosed and surrounded with fences."  LAND, Black's Law Dictionary (11th ed. 2019).  Accordingly, these terms would not have been limited to private property closed to the public (i.e. domicile, family farm, etc.) but to all fenced private property regardless of whether the property was open or closed to the public.

Case law from Early America supports this interpretation.  The Court of Appeals of Law of South Carolina noted in 1836 that this was the case even with the most public of spaces, noting that "[i]n all the cities of this confederacy the custom as to their public squares, is to enclose and plant them, leaving gates for the access of the citizens.  Of this we have instances in the city square of Charleston; Washington, and other squares, in Philadelphia; the Park and Battery in New-York; and the common in Boston; besides others.  They afford air, prospect, and agreeable walks for the health and recreation of the citizens."  State v. Commissioners of Cross Roads for Charleston Neck, 21 S.C.L. 149, 153 (S.C. Ct. App. L. 1836).  And there are many examples of other courts using the terms "enclosed" or "Inclosed" to refer to spaces open to the public.  See, e.g., Eastabrook, 27 Mass. at 298 ("inclosed" area included tavern, inn, and cattle pens used by customers); State v. Langford, 12 N.C. 253, 253 (1827) ("it is not burglary to break the door of a store, situate within three feet of the dwelling, and inclosed in the same yard"); Wooley v. Inhabitants of Groton, 56 Mass. 305, 305 (1848) ("A town pound, *ex vi termini*, is an enclosed piece of land, . ."); see also Farmer v. Commonwealth, 35 Va. 741, 741 (1837) (barn "in a separate enclosure" from tavern was "a public place" when used for gambling).  The Supreme Court of the United States even repeatedly used the term "enclosed" to refer to a Lutheran church, graveyard, and schoolhouse.  See Beatty v. Kurtz, 27 U.S. 566, 567, 568, 570, 575, 577, 579-81 (1829); accord Frank F. Brightly, Brightly's Purdon's Digest: A Digest of the Statute Law of the State of Pennsylvania From the

27

Year 1700 to 1894 278 (12th ed. 1894) (1857 law forbidding slaughterhouses, soap factories, tanneries, and other noxious buildings "within two hundred yards of the enclosed grounds of any incorporated cemetery").

      f.  Premises or Plantations

The term "premises" can refer to any type of property, whether open or closed to the public, as evidenced by the fact that the Second Circuit's Antonyuk opinion itself uses the term "premises" to refer to daycare facilities, 89 F.4th at 302, churches, id. at 343, places selling alcohol, id. at 364, and "many types of retail businesses open to the public."  Id. at 350.  That broad understanding of the term comports with its Eighteenth- and Nineteenth-century dictionary definitions.  Dr. Johnson defines "premises" as "[i]n low language, houses or lands," while Noah Webster defined it as "[i]n law, land or other things mentioned in the preceding part of a deed," Webster, An American Dictionary of the English Language, supra at 345 .  Neither definition indicates any limitation as to whether those lands are open or closed to the public.

New Yorkers understood "premises" to include quintessentially public and commercial areas like taverns, with an 1859 New York City law, for instance, requiring that "[n]o tavern-keeper, keeper of a public house, garden or place of resort, nor any other person, shall suffer or permit any person to practice with or fire off any pistol, gun, fowling-piece or other fire-arms, in or upon his or her premises." D.T. Valentine, ed., Ordinances of the Mayor, Aldermen, and Commonality of the City of New York 235 (C.W. Baker 1859), Belka Dec. Ex. 84; see also, e.g., Gates & Colvin v. Green, 4 Paige Ch. 355, 355 (N.Y. Ch. 1834) (discussing "two lots in the village of Syracuse, on which there was a tavern house and out buildings" and how "[t]hese premises were leased by the defendant"); Norman v. Wells, 17 Wend. 136, 156 (N.Y. Sup. Ct. 1837) (discussing a covenant "to keep the premises occupied as a wine tavern"); People v. Jones, 54 Barb. 311, 312 (N.Y. Sup. Ct. 1863) (discussing a fraudulent application for a tavern license and instructing the

jury to determine whether "the premises in question [were] fit and proper to be thus licensed").  A host of other Early American sources similarly use the term "premises" for public or commercial spaces.  See, e.g., Perrine v. Hankinson, 11 N.J.L. 181, 182 (N.J. 1829) (plaintiff "leased to the defendant certain premises consisting of a tavern and farm for one year"); Hendricks' Curator v. Mon, 11 La. 137, 138 (1837) ("It appeared that the deceased occupied the premises in question, and kept a grocery store in a part of them"); Hamburgh Mfg. Co. v. Edsall, 5 N.J. Eq. 249 (N.J. Ch. 1845) ("the Hamburgh company had a store on their premises, where they sold dry goods, groceries, &c."); Swan v. State, 11 Ala. 594 (1847) (discussing sales of liquor by licensed merchants and shopkeepers and requirement that "the liquor be not drank . . . on the premises where they reside or have their stores"); Beaver v. Filson, 8 Pa. 327, 334 (1848) (discussing an agreement "to build a church and open a graveyard on the premises").

Meanwhile, although the term "plantation" generally connoted an agricultural enterprise (often based on slave labor) and manor house in the South, see Webster, An American Dictionary of the English Language, supra, at 345, it would be a mistake to view these areas as therefore closed to the public.  Case law indicates that these private lands would be at least partially open to the public, including for commercial operations.  See, e.g., McFarland v. Hughling, 1 Tenn. 263, 263 (1807) (discussing an agreement to rent "the plantation and tavern known by the name of New market . . . which tavern-house shall be left in good repair."); Lammot's Heirs v. Bowly's Heirs, 6 H&J 500, 500 511, 519 (Md. Ct. App. 1825) (discussing the tangled history of a "tract of land and plantation" containing "buildings and improvements" such as a "rope-walk"[10]); Farmer v. Commonwealth, 35 Va. 741, 742 (1837) ("The playing took place in a barn on the plantation of

---

[10]     "Rope-walks" were commercial enterprises where fibers were spun into rope, and where ropes were sold to customers, in addition to being manufactured.  See https://thewestendmuseum.org/history/era/new-fields/bostons-ropewalks/.

John F. Beavers, a licensed ordinary keeper, the tavern house being situated on the same plantation.
. . On the day of the gaming, many people were assembled for the purpose of mustering."); see
also Boyer v. Smith, 3 Watts 449, 453 (Pa. 1835) (defendant in Harrisburg, PA alleged to have
conveyed title by declaring "I give up the property I live on, the tavern and plantation").

Ultimately, nothing in the historical record supports an interpretation of terms like "land,"
"inclosed land," or "premises" as being limited to areas closed to the public.  To the contrary, there
is extensive "evidence that those terms were in fact otherwise understood to apply to private
property open to the public," Antonyuk, 89 F.4th at 386, demonstrating that the scope of the
historical laws supporting the Private Property Provision cannot be arbitrarily limited.

g. Further relevantly similar laws support the Private Property Provision's constitutionality

The laws discussed *supra* are direct analogues for the Private Property Provision, in that
they protect an owner or lessee's property rights by allowing armed carriage on his property only
with his consent.  But they are not the only historical analogues supporting the Provision, as there
are additional historical laws that sought to accomplish similar goals in similar ways – including
on private property open to the public.  These measures provide further support for the Private
Property Provision's constitutionality because "analogical reasoning requires only that the
government identify a well-established and representative historical *analogue*, not a historical
*twin*.  So even if a modern-day regulation is not a dead ringer for historical precursors, it still may
be analogous enough to pass constitutional muster."  Bruen, 597 U.S. at 30.

i. Laws Requiring an Owner's Consent to Fire Weapons

The laws adduced above, which require an owner's consent to carry a gun, are analogous
to an additional body of laws prohibiting anyone to *fire* a gun on another's property without his or
her consent.  For instance, Virginia in 1702 passed a law forbidding anyone to "shoot, hunt or

range upon the lands and tenements . . . of any person or persons without lycense for the same, first obtained of the owner and proprietor thereof."  III <u>The Statutes at Large; Being a Collection of all the Laws of Virginia, From the First Section of the Legislature in the Year 1619</u> 328 (William Waller Hening, ed. 1823), Belka Dec. Ex. 86.  Indiana in 1873 prohibited "hunting or shooting with any kind of firearm or firearms, on inclosed lands, without the consent of the owner or occupant thereof."  II <u>The Statutes of the State of Indiana</u> (Edwin A. Davis, ed. 1876), Belka Dec. Ex. 87.  At some time before 1883, Rhode Island similarly passed a law imposing liability against "[e]very person, not being at the time under military duty, who shall discharge any rifle . . . pistol or other small arms, except upon land owned or occupied by him or by permission of the owner or occupant of the land on or into which he may shoot . . ."  <u>The Public Statutes of the State of Rhode Island and Providence Plantations</u> 252 (E.L. Freeman & Co. 1882), Belka Dec. Ex. 88.

Each of these laws had the same functional and legal effect as a law requiring an owner's consent to carry a gun, since the Supreme Court made clear in <u>Heller</u> that a law requiring firearms to be "kept inoperable at all times… makes it impossible for citizens to use them for the core lawful purpose of self-defense."  554 U.S. at 630.  And none of these laws appears to have included an exception allowing gun holders to use a firearm in self-defense on someone else's property.  <u>Cf.</u> <u>id.</u> at 630 (finding "[t]he nonexistence of a self-defense exception" based on a law's "unequivocal text" and the presence of "other enumerated exceptions").  Yet our ancestors apparently had no dispute regarding the constitutionality of laws empowering a property owner or lessee to know and control who could legally use weapons on his or her property.[11]

---

[11]     In addition, there were many other state laws that concerned hunting only, requiring an owner's consent for hunting activity on his or her land.  <u>See, e.g.,</u> 1 Virgil Maxcy, <u>The Laws of Maryland</u> 187 (1811), Belka Dec. Ex. 97 (reprinting 1728 statute providing that "every person that shall . . . presume upon any pretence whatsoever, to come to hunt with guns or dogs within any enclosed grounds, islands, peninsulas or necks . . . without leave or license from the proprietors thereof first had and obtained . . . shall . . . forfeit . . . the sum of two hundred pounds of

ii.  Laws Prohibiting Firearms In Places of Public Congregation

Lastly, any contention that our ancestors viewed regulation of gun carriage in private property open to the public as unconstitutional is contradicted by a significant body of laws prohibiting guns in public spaces, with or without the consent of the owner.  For instance, Tennessee in 1869 prohibited deadly weapons in any "fair, race course, or public assembly of the people."  1869-70 Tenn. Pub. Acts 23, Belka Dec Ex. 89.  Texas in 1870 prohibited guns and other weapons in a broad variety of locations, including "any school room or other place where persons assembled for educational, literary or scientific purposes," any "social party or other social gathering composed of ladies and gentlemen," and "any other place where people may be assembled to muster or to perform any other public duty, or any other public assembly."  1870 Tex. Gen. Laws 63, Belka Dec. Ex. 90.  Georgia in 1870 prohibited deadly weapons in locations including "any [] public gathering in this State."  1870 Ga. Laws 421, Belka Dec. Ex. 91.  Missouri in 1883 prohibited deadly weapons in categories of places including "any [] public assemblage of persons met for any lawful purpose."  1883 Mo. Laws 76, Belka Dec. Ex. 92.  Idaho in 1889 prohibited deadly weapons "within the limits or confines of any city, town or village or in any public assembly of the State of Idaho."  Penal Code of the State of Idaho § 4781 (1901) (reprinting 1889 statute), Belka Dec. Ex. 93.  The same year, Arizona banned guns in any "place where persons are assembled for amusement or for educational or scientific purposes," any "social party or social gathering," any "other place where people may be assembled to minister or to perform any other public duty," and "any other public assembly."  1889 Ariz. Sess. Laws 17, Belka Dec.

---

tobacco."); 1875 Tenn. Acts 214, Belka Dec. Ex. 98 ("it shall be unlawful for any person n this State to hunt, trap, or net game of any kinds . . . on the land of another except by express permission of the owner or agent"); Belka Dec. Ex. 99 (1871 Illinois law forbidding "any person or persons to hunt with gun, dog, or net, within the inclosed grounds or lands of another, without first obtaining from the owner, agent, or occupant of such inclosed grounds or lands, his, her or their permission so to do.").  These laws are "relevantly similar" in that they bar the carrying of guns onto another's land without permission (if only for a specific purpose), and provide further support for the law's constitutionality.  Bruen, 142 S.Ct. at 2132

Ex. 94.  And the following year, Oklahoma prohibited carrying weapons into places including any "public exhibition of any kind, . . or to any social party or social gathering . . . or to any other public assembly."  1890 Okla. Stat. 495-96, Belka Dec. Ex. 11.

These laws went well beyond simply ensuring that owners could make an informed decision about who to allow to carry deadly weapons on their property – instead, they prohibited it altogether.  And case law indicates that these laws were strictly construed, including against the owners themselves.  For instance, in <u>Maupin v. State</u>, 89 Tenn. 367, 17 S.W. 1039 (1890), the Supreme Court of Tennessee sustained a conviction for unlawfully carrying arms in a grist-mill, despite the fact that the defendant owned the mill, operated it himself, slept there, and claimed a need for self-defense, reasoning that:

> The mill was a public place,-a place to which customers were constantly invited and daily expected to go.  In such a place a man, though he be the proprietor, may not lawfully carry pistols concealed about his person.  That the defendant had been 'threatened,' that he 'ate and slept' in the mill, cannot alter the case.

<u>Id.</u> at 1039.  The courts of other states, including New York, likewise viewed guns as flatly inappropriate in prohibited private locations open to the public, even when the person carrying the gun had the owner's permission (or was the owner himself).  <u>See, e.g.</u>, <u>Owens v. State</u>, 3 Tex. App. 404, 407 (Tex. Ct. App. 1878) ("The fact that I am the owner of the premises gives me no right to carry deadly weapons to the terror, annoyance, and danger of a social gathering which I may have invited to my own house, however much I may be protected in carrying them."); <u>People v. Demorio</u>, 123 A.D. 665, 666 (2d Dep't 1908) (affirming judgment in case involving carrying weapon in a bar claimed to be defendant's "own premises" because "[t]he statute does not contain any exception which permits the carrying while on one's own premises of such a weapon concealed about the person.").  Each of these laws barred carrying firearms altogether in broad swathes of private property open to the public, and there no indication that our ancestors viewed

them as unconstitutional.  Cf. Antonyuk, 89 F.4th at 357 (recognizing these same laws as as part of a "tradition of regulating firearms in quintessentially crowded places" that "was continued throughout the history of our nation.").  These laws further support the constitutionality of the Private Property Provision.

### III.   PLAINTIFFS' PROPOSED SENSITIVE PLACES FRAMEWORK IS AHISTORICAL AND CONTRARY TO BRUEN AND ANTONYUK

Plaintiffs assert that sensitive places "were all protected by comprehensive, government-provided security, impacting the public's need for individual weapons." [ECF No. 73-1] at 16.[12] That approach is flatly inconsistent with the Supreme Court's opinion in Bruen and the Second Circuit's in Antonyuk.  See Kipke v. Moore, Nos. 1:23-cv-01293 & 1:23-cv-01295 (consol.), 2023 WL 6381503, at *6 (D. Md. Sept. 29, 2023) ("[B]ecause Bruen conclusively named schools … [as] sensitive places, … [the] argument that sensitive places are limited to buildings with comprehensive, state-provided security is baseless.").

It is also irreconcilable with the fact that Supreme Court has also established that "government buildings" and "polling places" are sensitive.  Any number of government buildings lack enhanced security—public libraries, community recreation centers, post offices, and so on. See, e.g. United States v. Class, 930 F.3d 460, 465 (D.C. Cir. 2019) (explaining that "[m]any 'schools' and 'government buildings'—the paradigmatic 'sensitive places' identified in [Heller]—are open to the public, without any form of special security or screening" and referring to "a post office or school" as examples of "an unsecured public building") see also Bonidy v.

---

[12]   Plaintiffs attribute this idea to a journal article by two individuals frequently aligned with the gun lobby, one of whom is the NRA's Director of Litigation Counsel, claiming that Bruen "endorsed" their work. See [ECF No. 73-1] at 16 (citing David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine*, 13 Charleston L. Rev. 205, 290 (2018)). Bruen did not endorse that article; rather, it cited specific pages as one of two sources for the historical laws underlying its conclusion that legislative assemblies, polling places, and courthouses are sensitive places. See 597 U.S. at 30.

U.S. Postal Service, 790 F.3d 1121 (10th Cir. 2015) (rejecting challenge to prohibition on firearms in post offices because a post office, as a government building, is a "sensitive place"); Id. at 1123 (noting that the specific post office at issue "d[id] not regularly employ any security officers"); Id. at 1133 (Tymkovich, J., concurring in part and dissenting in part) (noting that post office did not have "security … devices").  Enhanced security is likewise not routinely present at polling places. Indeed, law enforcement officers are often "barred from the vicinity of the polls to avoid any appearance of coercion in the electoral process." Burson v. Freeman, 504 U.S. 191, 207 (1992) (plurality op.) (describing Tennessee law). Similarly, as a historical matter, even such indisputably sensitive places as the U.S. Capitol and the White House lacked serious security. See United States Capitol Police, *Our History*, https://www.uscp.gov/the-department/our-history (noting that when Congress moved to Washington, DC in 1800, a "lone watchman, John Golding, was hired to protect the Capitol Building," and that the watch remained one person until 1828, when it was expanded to four); Katie Zezima, *People Used to Be Able to Walk into the White House. Legally*, Wash. Post (Sept. 23, 2014), https://perma.cc/M2UM-VHND ("Despite being open to the public, there was very little security at the White House until a drunk man threw rocks at President John Tyler…. Abraham Lincoln … stationed guards at the White House. After the Civil War, however, security measures dropped off.").  In sum, the Supreme Court's recognition of schools, government buildings, and polling places as "sensitive places" where firearms may be prohibited, coupled with the absence of security in those locations both historically and today, forecloses any argument that government-provided security is a prerequisite to a constitutional firearms prohibition.  The Second Circuit's rejection of Plaintiff's framework in Antonyuk for analyzing sensitive places likewise forecloses Plaintiff's contention.

## <u>CONCLUSION</u>

For the reasons set forth above, the Superintendent respectfully requests that the Court deny

Plaintiffs' motion for summary judgment and grant Superintendent's cross-motion for summary

judgment.

Dated: Buffalo, New York          LETITIA JAMES
          May 31, 2024                   Attorney General
                                                  State of New York
                                                  By: /s/ Ryan L. Belka
                                                  RYAN L. BELKA
                                                  JAMES M. THOMPSON
                                                  DANIEL R. MAGUIRE
                                                  Assistant Attorneys General
                                                  350 Main Place, Suite 300A
                                                  Buffalo, NY 14202
                                                  (716) 853-8440
                                                  Ryan.Belka@ag.ny.gov
                                                  James.Thompson@ag.ny.gov
                                                  Daniel.McGuire@ag.ny.gov