UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

BRETT CHRISTIAN, FIREARMS POLICY COALITION, INC., and SECOND AMENDMENT FOUNDATION

                             Plaintiffs,

v.

STEVEN G. JAMES, in his official capacity as Superintendent of the New York State Police, and JOHN J. FLYNN, in his official capacity as District Attorney for the County of Erie,

                             Defendants.

No. 22-cv-00695 (JLS)

**STATE'S L.R. 56(a)(2) OPPOSING STATEMENT OF MATERIAL FACTS AND ITS L.R. 56(a)(1) STATEMENT OF UNDISPUTED MATERIAL FACTS**

Superintendent James submits the following Opposing Statement of Material Facts to Plaintiff's purported L.R. 56.1(a)(2) [sic] Statement of Undisputed Material Facts, referencing the correspondent paragraph in Plaintiff's statement as follows:

1. Undisputed.

2. Undisputed.

3. While Plaintiff testified that he "carried in public parks and in places affected by the no-carry default that were open to the public" his testimony is not undisputed. Plaintiff's convenient testimony that he rarely, if ever, went to public parks and other places affected by the no-carry default prior to his acquiring a concealed carry license at the age of 37, carrying aggressively for 2-3 years until the passage of the CCIA, at which point he claims to strictly abandon all activities where he perceives that the CCIA prevents him from carriage, is beyond far-fetched.  Belka Decl., ¶ 132, Ex. 100; Christian Dep., 59:8-60:5; 61:13-25; 131:8-139:6.

4. While Plaintiff's Complaint states that he "carried a firearm for self-defense while walking in local parks or when hiking on trials in largely wooded and marshy areas a few times each month" his allegation is not undisputed. Plaintiff's convenient testimony that he rarely, if ever, went to public parks prior to the acquiring a concealed carry license at the age of 37, carrying aggressively in parks for 2-3 years until the passage of the CCIA, at which point he claims to strictly abandon all park activities where he perceives that the CCIA prevents him from carriage, is beyond far-fetched. Id.

5. While Plaintiff testified that "the local parks he frequented… included Stiglmeier Park in Cheektowaga, parts of the Clarence Bike Path, and the Shoreline Trial" his testimony is not undisputed. Plaintiff's convenient testimony that he rarely, if ever, went to public parks prior to the acquiring a concealed carry license at the age of 37, carrying aggressively in parks for 2-3 years until the passage of the CCIA, at which point he claims to strictly abandon all park activities where he perceives that the CCIA prevents him from carriage, is beyond far-fetched. Id.

6. While Plaintiff testified that he hiked in Stiglmeier Park while carrying his pistol two to three times per month during the period after he obtained his concealed carry license though September 1, 2022 his testimony is not undisputed. Plaintiff's convenient testimony that he rarely, if ever, went to public parks prior to the acquiring a concealed carry license at the age of 37, carrying aggressively in parks for 2-3 years until the passage of the CCIA, at which point he claims to strictly abandon all park activities where he perceives that the CCIA prevents him from carriage, is beyond far-fetched. Belka Decl., ¶ 132, Ex. 100; Christian Dep., 59:8-60:5; 61:13-25; 131:8-139:6.

7.      While Plaintiff testified that he stopped hiking in Stiglmeier park because he could no longer carry a firearm in self-defense his testimony is not undisputed.  Plaintiff's convenient testimony that he rarely, if ever, went to public parks prior to the acquiring a concealed carry license at the age of 37, carrying aggressively in parks for 2-3 years until the passage of the CCIA, at which point he claims to strictly abandon all park activities where he perceives that the CCIA prevents him from carriage, is beyond far-fetched.  Id.

8.      Undisputed.

9.      While Plaintiff testified that he hiked once a month in the Harris Hill State Forest area, the implication being that he stopped because the CCIA prevents carriage in Harris Hill State Forest.  Plaintiff's presumption that the CCIA prevents carriage in the Harris Hill State Forest is incorrect.  State Forests are not public parks as defined in PL § 265.01e(2)(d), they are not sensitive places under the law, and carriage is not prohibited. Belka Dec., ¶ 96-101.  Moreover, any due diligence on the Department of Environmental Conservation's Harris Hill website will demonstrate that hunting and other gun related activities are permitted in the State Forest. Id.

10.     Plaintiff's presumption that the CCIA prevents carriage in the Harris Hill State Forest is incorrect.  State Forests are not public parks as defined in PL § 265.01e(2)(d), they are not sensitive places under the law, and carriage is not prohibited. Belka Dec., ¶ 96-101.  Moreover, any due diligence on the Department of Environmental Conservation's Harris Hill website will demonstrate that hunting and other gun related activities are permitted in the State Forest.  Id.

11.     Harris Hill is a State Forest where the CCIA's public parks provision does not prevent carriage. Belka Dec., ¶ 96-101.  The only public park identified by Plaintiff where the

CCIA's parks provision prevents carriage is Stiglmeier Park, which is a quintessential urban park used as a public space for communal gathering. Barill Dec., ¶¶ 4-11. Although irrelevant to the issue of sensitive places, when visited, it was not removed from public safety response as local Cheektowaga police were present at the park. Id. at ¶ 12.

12. The Clarence Bike Path is two bike paths, the Peanut Line and West Shore Trial. Belka Dec., ¶ 132, Ex. 100, Christian Dep., 85:7-14. The CCIA does not prevent carriage along the Peanut Line excepting the area where the Peanut Line bisects Memorial Park. Belka Dec., ¶ 79 see also ¶ 108. Similarly, along the West Shore Trial the CCIA does not prevent carriage except where the Trial bisects Main Street Town Park. Id, see also ¶ 109. The CCIA does not prevent carriage along the Clarence Bike Path.

13. Undisputed.

14. While Plaintiff alleges that he typically carried a firearm for self-defense on private property open to the public prior to September 1, 2022 these allegations are not undisputed. Plaintiff's convenient testimony that he was unable to concealed carry prior to acquiring a license at the age of 37, carrying aggressively in private property open to the public for 2-3 years until the passage of the CCIA, at which point he claims to unable to determine if carriage is allowed on private property because it lacks conspicuous signage allowing concealed carry. Belka Decl., ¶ 132, Ex. 100; Christian Dep., 95:20-96:25; 96:20-25; 97:1-98:2; 110:17-111:14. Where conspicuous signage allowing concealed carry is not present, Plaintiff understands that the property owner is making a choice to disallow concealed carry under the CCIA, which is the property owner's right. Belka Decl., ¶ 132, Ex. 100; Christian Dep., 49:15-52:4; 70:23-71:17.

15. While Plaintiff alleges that he typically carried a firearm with him on weekly visits to gas stations and hardware stores this testimony is not undisputed. Plaintiff's convenient

testimony that he was unable to concealed carry prior to acquiring a license at the age of 37, carrying aggressively in private property open to the public for 2-3 years until the passage of the CCIA, at which point he claims to unable to determine if carriage is allowed on private property because it lacks conspicuous signage allowing concealed carry.  Belka Decl., ¶ 132, Ex. 100; Christian Dep., 95:20-96:25; 96:20-25; 97:1-98:2; 110:17-111:14.  Where conspicuous signage allowing concealed carry is not present, Plaintiff understands that the property owner is making a choice to disallow concealed carry under the CCIA, which is the property owner's right.  Belka Decl., ¶ 132, Ex. 100; Christian Dep., 49:15-52:4; 70:23-71:17.

16. Undisputed.

17. Undisputed.

18. By failing to post conspicuous signage allowing concealed carry, Plaintiff understands that concealed carry is not allowed.  Id.; Christian Dep., 95:20-96:25; 96:20-25; 97:1-98:2; 110:17-111:14.  He agrees that it's a property owner's right to choose whether or allow or disallow concealed carry.  Id.; Christian Dep., 49:15-52:4; 70:23-71:17.

19. By failing to post conspicuous signage allowing concealed carry, Plaintiff understands that concealed carry is not allowed.  Id.; Christian Dep., 95:20-96:25; 96:20-25; 97:1-98:2; 110:17-111:14.  He agrees that it's a property owner's right to choose whether to allow or disallow concealed carry.  Id.; Christian Dep., 49:15-52:4; 70:23-71:17.  Moreover, although Plaintiff testified to these conversations, the alleged statements of an unnamed Valu cashier and an alleged unnamed 'corporate representative,' as communicated through Plaintiff, are inadmissible.  FRE § 801(c), FRCP § 56(c)(2)

20. By failing to post conspicuous signage allowing concealed carry, Plaintiff understands that concealed carry is not allowed.  Id.; Christian Dep., 95:20-96:25; 96:20-25; 97:1-

98:2; 110:17-111:14. He agrees that it's a property owner's right to choose whether or allow or disallow concealed carry. Id.; Christian Dep., 49:15-52:4; 70:23-71:17.

21. If at all, Plaintiff is burdened by the choice of property owners to restrict carriage on their property, which he agrees they can do. Id.; Christian Dep., 49:15-52:4; 70:23-71:17. As to the inconvenience, Plaintiff testified that when required, he stores his firearm safely in his car in thirty (30) seconds. Id.; Christian Dep. 101:18-104:3; 104:12-105:11. Moreover, his claim that if the defaults were reversed that property owners would not post conspicuous signage preventing carriage on their property, releasing him for the occasional 30 second burden of storing his firearm, is entirely speculative. Id.

22. If at all, Plaintiff is burdened by the choice of property owners to restrict carriage on their property, which he agrees they can do. Id.; Christian Dep., 49:15-52:4; 70:23-71:17. As to the inconvenience, Plaintiff testified that when required, he stores his firearm safely in his car in thirty (30) seconds. Id.; Christian Dep. 101:18-104:3; 104:12-105:11. Moreover, his claim that if the defaults were reversed that property owners would not post conspicuous signage preventing carriage on their property, releasing him for the occasional 30 second burden of storing his firearm, is entirely speculative. Id.

23. As to enforcement, it is undisputed that S51001 has not been enforced against the Plaintiff. Id.; Christian Dep., 30:17-31:17. Moreover, the basis of Christian's belief that it will be enforced are public statement of political leaders. [ECF No. 73-4] However, Plaintiff also refuses to believe public statements of political leaders when their statements don't advance his narrative surrounding enforcement. Belka Dec., ¶ 132, Ex. 100; Christian 78:25-81:20; 84:3-9. Plaintiff's testimony related to enforcement of the CCIA is entirely convenient and situational. Further, despite his desire to carry, Plaintiff remains subject to the choices of property owners as to whether

or not he would be allowed to carry on private property open to the public, which Plaintiff agrees property owners can do. Id.; Christian Dep., 49:15-52:4; 70:23-71:17.

24. Plaintiff has only identified a single public park where the CCIA would prohibit him from carrying a firearm, Stiglmeier Park. See [ECF No. 73-3] That private property owners choose to disallow carriage on their property is not something that a "carry ban" prevents – which Plaintiff acknowledges. Id.; Christian Dep., 49:15-52:4; 70:23-71:17; 95:20-96:25; 96:20-25; 97:1-98:2; 110:17-111:14.

25. As to enforcement, it is undisputed that S51001 has not been enforced against the Plaintiff. Id.; Christian Dep., 30:17-31:17. Moreover, the basis of Christian's belief that it will be enforced are public statements of political leaders. [ECF No. 73-4] However, Plaintiff also refuses to believe public statements of political leaders when their statements don't advance his narrative surrounding enforcement. Id.; Christian 78:25-81:20; 84:3-9. Plaintiff's testimony related to enforcement of the CCIA is entirely convenient and situational. All in all, the sum total of Plaintiff's claim is that the CCIA prevents him from carriage in Stiglmeier Park. [ECF No. 73-4] As to private property that is open to the public, Plaintiff speculates, without proof, that the CCIA has resulted in private property owners disallowing carriage, something Plaintiff himself admits that they can do. Id.; Christian Dep., 49:15-52:4; 70:23-71:17; 95:20-96:25; 96:20-25; 97:1-98:2; 110:17-111:14. Thus, it is disputed that Plaintiff has been rendered defenseless or that his personal safety has been diminished on a frequent and ongoing basis.

**STATE'S L.R. 56(a)(1) STATEMENT OF UNDISPUTED MATERIAL FACTS**

In support of the Superintendent's contemporaneously filed motion for summary judgment, Superintendent Stephen G. James, respectfully submit that the following facts are undisputed:

*Stiglmeier Park*

1.      Stiglmeier Park is an approximately 308 acre park located in a densely populated area of Cheektowaga, New York.  Barill Dec., ¶ 5.

2.      The Park is sandwiched between two major thoroughfares Losson Road and Cuomo Park Boulevard and surrounded by residential housing developments.  Barill Dec., ¶ 6.

3.      Stiglmeier Park contains the following structures and improvements:

Five (5) Tennis Courts, one (1) outdoor hockey rink, two (2) full sized basketball courts, two (2) half-court basketball courts, six (6) baseball diamonds, three (3) softball diamonds, one (1) football field, fourteen (14) shelters, six (6) children's playgrounds, and various hiking and walking trails. Barill Dec., ¶ 7.

4.      On May 18, 2024, Jospeh Barill went to Stiglmeier Park and observed the following: more than one hundred (100) people were using Stiglmeier Park on the morning of May 18, 2024 for various recreational activities including walking, biking, tennis, basketball, baseball, and family gatherings in the shelters and on the children's playgrounds.  Barill Dec., ¶¶ 8-11.

5.      During those observations, Mr. Barill noted multiple marked Cheektowaga Police vehicles patrolling the park.  Barill Dec., ¶ 12.

6.      Stiglmeier Park is an urban park as described by Antonyuk used for "communal spaces" or "quintessentially public spaces."  Antonyuk 89 F.4th at 362-63.

*Harris Hill State Forest*

7. Unlike Stiglmeier, Harris Hill is a State Forest and is not a "public park" as defined by PL § 265.01e(2)(d). Belka Decl., ¶ 96.

8. State Forests, like Harris Hill, are typically large acreages acquired for forest regeneration, watershed protection and development of forest products such as timber – along with kindred recreational purposes including, but not limited to, hunting. Belka Decl., ¶ 97.

9. The State Forest enabling statute, Environmental Conservation Law § 9-0501, requires that these Forests "shall consist… of not less than five hundred acres of contiguous lands, which shall be forever devoted to the planning, growth and harvesting of such trees as shall be deemed by the commissioner best suited for the lands to be reforested." ECL § 9-0501(1). Belka Decl., ¶ 98.

10. Harris Hill State Forest, specifically, encompasses 2,271 acres dedicated to timber protection, recreational use, watershed protection and wildlife. https://dec.ny.gov/places/harris-hill-state-forest Belka Decl., ¶ 99.

11. Carriage (or related activities like hunting or target shooting) is not prevented in State Forests. Belka Decl., ¶ 100.

12. The ability to carry firearms is clear from the Harris Hill State Forest website, as the top featured activity suggested is hunting. See https://dec.ny.gov/places/harris-hill-state-forest. Belka Decl., ¶ 101.

*Shoreline Trial*

26. Observation of the Shoreline Trial via https://empiretrail.ny.gov/buffalo-rochester/buffalo-tonawanda identifies the following parks it bisects:

- Elliot Creek Park (https://www3.erie.gov/parks/ellicott-creek)
    - Nineteen (19) retable picnic shelters, two (2) rentable buildings, nine (9) children's

- playgrounds, tennis/pickleball courts, six (6) restroom facilities, soccer/football fields, cricket fields, an eighteen (18) hole disc golf course, boat/kayak launch
- Niawanda Park[1] (https://www.tonawandacity.com/residents/parks.php)
  - Rentable banquet hall, band shell (concert venue), bathrooms, playground, picnic tables (850,000 people pass through a year per City of Tonawanda Parks, Niagara Greenway study)[2]
    - Veteran's Memorial Park (https://www.tonawanda.ny.us/youth-parks-recreation/veterans-memorial.html)
      - Six (6) rentable shelters, bathroom facilities, children's playgrounds, volleyball courts
    - Isle View Park (https://www3.erie.gov/parks/isle-view)
      - Rentable gazebo, overlook gazebo, two (2) children's playgrounds, picnic tables, boat launch
- Black Rock Canal Park (https://www3.erie.gov/parks/black-rock-canal)
  - Dog park, boat launch, pedestrian bridge
- Buffalo Harbor State Park (https://parks.ny.gov/parks/buffaloharbor/details.aspx)
  - Slip marina, boat launch, small watercraft launches, fish cleaning station, restrooms, pedestrian pier and boardwalk, children's playgrounds, two (2) covered pavilions

Belka Decl., ¶ 103.

27. These parks along the Shoreline Trial have the earmarks of the "well-established and representative tradition of regulating firearms in public forums and quintessentially crowded places, enduring from medieval England to Reconstruction America and beyond"; "regulating firearms in often-crowded public forums is 'part of the immemorial custom' of this nation." Antonyuk 89 F.4th at 358-361. Belka Decl., ¶ 104.

28. These parks bisected by the Shoreline Trial are the "communal" and "quintessential public spaces" embodied by urban parks identified in Antonyuk 89 F.4th at 362-63. Belka Decl., ¶ 105.

---

[1] Niawanda Park abuts Veteran's Memorial Park and Isle View Park. On observation, it would be fair to assume that these are a single contiguous park.

[2] Comparatively, total US population in 1791 was 3.9 million. So, about 22% of the entire US population in 1791 passes through this park each year.

*Clarence Bike Path*

29. Similar to the Shoreline Trail, Plaintiff fails to identify, but alludes to, certain parks which are bisected by the "Clarence Bike Path"… "which are actually two trails running from Amherst [New York] off of Transit Road and into Clarence." Belka Decl., ¶¶ 106 and 132, Ex. 100; Christian Depo., 85:7-14.

30. Those trials are colloquially known as the "Peanut Line" and the "West Shore Trial." Belka Decl., ¶ 107, Exhibit 79.

31. Along the Peanut Line, observation demonstrates that the Peanut Line only bisects a single park, Memorial Park[3], which contains children's playgrounds, nine (9) soccer fields, three (3) multipurpose fields, four (4) softball fields, four (4) baseball diamonds and restroom facilities. Belka Decl., ¶ 108.

32. Along the West Shore Trial, although Plaintiff fails to identify the specific parks along the Clarence Bike Path at issue, observation demonstrates that the West Shore Line bisects only a single park, Main Street Town Park[4], which contains three (3) rentable pavilions with capacity for 410 individuals, office and maintenance buildings, community pool, a clubhouse, a concert shell (audience capacity 1200), children's playgrounds, four (4) baseball diamonds, two (2) tennis courts, basketball courts, horseshoe pits, and volleyball courts. Belka Decl., ¶ 109.

33. These parks bisected by the lines of the Clarence Bike Path have the earmarks of the "well-established and representative tradition of regulating firearms in public forums and quintessentially crowded places, enduring from medieval England to Reconstruction America

---

[3] https://www4.erie.gov/clarence/memorial-park
[4] https://www4.erie.gov/clarence/main-street-town-park

and beyond"; "regulating firearms in often-crowded public forums is 'part of the immemorial custom' of this nation." Antonyuk 89 F.4th at 358-361. Belka Decl., ¶ 110.

34. These parks are the "communal" and "quintessential public spaces" embodied by urban parks identified in Antonyuk 89 F.4th at 362-63. Belka Decl., ¶ 111.

Dated: Buffalo, New York
May 31, 2024

                                        LETITIA JAMES
                                        Attorney General
                                        State of New York
                                        By: /s/ Ryan L. Belka
                                        RYAN L. BELKA
                                        JAMES M. THOMPSON
                                        Assistant Attorneys General
                                        350 Main Place, Suite 300A
                                        Buffalo, NY 14202
                                        (716) 853-8440
                                        Ryan.Belka@ag.ny.gov

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

BRETT CHRISTIAN, FIREARMS POLICY COALITION, INC., and SECOND AMENDMENT FOUNDATION

                      Plaintiffs,

v.

STEVEN G. JAMES, in his official capacity as Superintendent of the New York State Police, and JOHN J. FLYNN, in his official capacity as District Attorney for the County of Erie,

                      Defendants.

No. 22-cv-00695 (JLS)

## CERTIFICATE OF SERVICE

I hereby certify that on May 31, 2024, I electronically filed the foregoing with the Clerk of the District Court using its CM/ECF system.

Dated: Buffalo, New York
      May 31, 2024

LETITIA JAMES
Attorney General of the State of New York
Attorneys for Defendant James
BY:
*s/ Ryan L. Belka*
RYAN L. BELKA
JAMES M. THOMPSON
Assistant Attorney General,
of Counsel
Main Place Tower, Suite 300A
350 Main Street
Buffalo, New York 14202
(716) 853-8440
Ryan.Belka@ag.ny.gov