31

*Birmingham, Ala.--- Ordinances---*

# THE CODE

## of

# CITY OF BIRMINGHAM

## ALABAMA

UNIVERSITY OF ILLINOIS LIBRARY

PREPARED BY

HENRY L. ANDERTON

JUL 8   1919

BY AUTHORITY OF THE COMMISSION
OF THE CITY OF BIRMINGHAM



# 1917

Digitized by Google

## CHAPTER XLIV

---

# Parks and Public Places

Sec. 1542.  **All Parks Dedicated to Public Use.**  All
the parks heretofore marked out and dedicated to the
city, and all public parks hereafter acquired by the city
shall be and remain set apart and dedicated to the use
of the public as parks and public grounds, and the same
shall be regulated and governed in such manner as the
Commission may from time to time ordain.

Sec. 1543.  **For the Protection of Parks.**  Any per-
son who wilfully or maliciously breaks, cuts, disfigures,
injures or destroys any tree, shrub, plant or flower within
the enclosure of any of the public parks of the city, or any
railing, structure or monument therein, or who shall hitch
any horse or animal to any tree or shrub therein, shall,
on conviction, be fined not less than one nor more than one
hundred dollars.

Sec. 1544.  **Conduct in Parks.**  No person shall en-
ter or leave any of the public parks of the City of Bir-
mingham except by the gateways; no person shall climb
or walk upon the walls or fences thereof; no person shall
turn or lead any cattle, horses, goat, swine or other ani-
mals into any of such parks; no person shall carry fire-
arms or throw stones or other missiles within any of such
public parks; no person shall expose any article or thing
for sale within any of such parks, nor shall any hawking
or peddling be allowed therein; no threatening, abusive,
insulting or indecent language shall be allowed in any
part of any of such parks calculated to provoke a breach
of the peace, nor shall any person tell fortunes or play at
any game of chance at or with any table or instrument
of gaming nor commit any obscene or indecent act there-

in; no person shall post or otherwise affix any bills, notice or other paper upon any structure or thing within any such park nor upon any gate or enclosure thereof; no person shall play upon any musical instrument, nor shall any person take into, carry or display in any such public park any flag, banner, target or transparency; no military company shall parade, drill or perform therein any military or other movements; no person shall light, make or use any fire in any such public park; no person shall go upon the grass, lawn or turf of the parks, except when and where the word "common" is posted, indicating that persons are at that time and place at liberty to go on the grass.

Sec. 1545. **Commission May Close Entrances.** The Commission may direct that any of the entrances to the public parks be closed at any time, and when so closed in obedience to such directions no person shall enter at any such place.

Sec. 1546. **Obstructions on Plats Along Public Streets.** It shall be unlawful for any person in possession of any lot or parcel of ground abutting on any public highway in the City of Birmingham to erect, maintain or permit any other person to erect or maintain or to continue or fail to remove within a reasonable time after notice or knowledge of the presence thereof of any wire, chain, rope or other obstruction or guard on any grass plat or parkway on any public highway in the City of Birmingham, unless such guard or obstruction shall conform to the following specifications, to-wit: The upright posts or stakes shall be made of dressed lumber four inches square and shall extend above the ground not less than three feet and shall be painted white. The cross bar shall consist of some rigid material and may be made either of iron pipe, an iron bar or a wooden bar which shall be placed at a height of not less than three feet above the surface of the ground and such bar or pipe shall also be painted white and shall be securely fastened to the said stakes or posts, which stakes shall be firmly placed in the ground and not more than eight feet apart.

Digitized by Google

Sec. 1547.  **Guards or Stakes Not to be Placed Within Six Inches of Paved Sidewalk.**  No guards or stakes shall be placed on any grass plat or parkway on any public highway in the City of Birmingham within six inches of the paved portion of the sidewalk.

Sec. 1548.  **Agents, Tenant and Owner Charged With Removing Obstructions.**  The owner of the abutting property, as well as the person in possession thereof, whether as agent, tenant or owner, shall be under the duty of removing all guards or obstructions from said parkways or grass plats which do not conform to the foregoing specifications.

Sec. 1549.  **Names of Parks.**  The various parks and public places owned by the city shall be named and known as follows:  Avondale Park, Behrens Park, Caldwell Park, Capitol Park, East Park, Ensley Park, Halls Park, Idlewild Park, Lakeview Park, Linn Park, Magnolia Park, Mineral Wells and Reservoir Park, North Birmingham Park, North Haven Park, Phelan Park, Rhodes Park, West Park, Woodlawn Park, Woodward Park.

———————

## CHAPTER XLV

———————

# Pawnbrokers

Sec. 1550.  **Definition.**  Pawnbroker under this chapter is and shall be defined to be one whose business it is to lend money upon a pawn or pledge.

Sec. 1551.  **Shall Keep Register of Pawns.**  It shall be the duty of each person in business in the City of Birmingham as a pawnbroker to keep at his place of business a book in which he shall enter, or cause to be entered in writing, a minute description of all personal

Digitized by Google

32



HEINONLINE

DATE DOWNLOADED: Wed Nov  2 12:32:54 2022
SOURCE: Content Downloaded from *HeinOnline*

Citations:

Bluebook 21st ed.
1917 1197 .

ALWD 7th ed.
, , 1917 1197 .

Chicago 17th ed.
"," Wisconsin - Biennial Session : 1197-1252

AGLC 4th ed.
'' Wisconsin - Biennial Session 1197

OSCOLA 4th ed.
'' 1917 1197

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and
 Conditions of the license agreement available at
 *https://heinonline.org/HOL/License*
-- The search text of this PDF is generated from  uncorrected OCR text.

No. 666, A.]                    [Published July 16, 1917.

# CHAPTER 668

AN ACT to repeal sections 62.04 to 62.58, inclusive, and sections 4562d, 4567b, and 4567c; to create a new chapter to be numbered 29, and sixty-four new sections thereof, to be numbered 29.01 to 29.63, inclusive; to amend sections 4567d and 4567f; and to create sections 4562d and 172—41, relating to wild animals, and the regulation of the enjoyment, disposition and conservation thereof, prescribing penalties, and creating a conservation fund.

*The people of the State of Wisconsin, represented in Senate and Assembly, do enact as follows:*

SECTION 1. Sections 62.04 to 62.58, inclusive, and sections 4562d, 4567b, and 4567c of the statutes are repealed.

SECTION 2. A new chapter is added to the statutes, to be numbered and entitled as follows: "CHAPTER 29. WILD ANIMALS, AND THE REGULATION OF THE ENJOYMENT, DISPOSITION AND CONSERVATION THEREOF."

SECTION 3. Sixty-four new sections are added to the statutes, to be inserted in chapter 29, and to be numbered and to read:

## TABLE OF CONTENTS

### CHAPTER 29

WILD ANIMALS, AND THE REGULATION OF THE ENJOYMENT, DISPOSITION AND CONSERVATION THEREOF; GENERAL CONTROL AND REGULATION

29.01  General definitions:
          (1) Wild animal.
          (2) Carcass.
          (3) Game; game fish; rough fish.
          (4) Waters classified.
          (5) Hunting.
29.02  Title to wild animals.
29.03  Public nuisances.
29.04  Abandoned dams.
29.05  Police powers; searches; seizures.
          (1) Arrests.
          (2) Investigations.
          (3) Search warrants.

1198          LAWS OF WISCONSIN—Ch. 668.

          (4) Opening packages.
          (5) Access to storage places.
          (6) Seizure and confiscation of game, or game fish.
          (7) Seizure and confiscation of property.
          (8) Entire shipment affected.
          (9) Exemption from liability.
29.06   Sales of confiscated game and apparatus.
29.07   Assistance of police officers.
29.08   Interstate comity.

### GAME LICENSES

29.09   General provisions.
          (1) License requisite.
          (2) Form of application.
          (3) Form of license.
          (4) Duplicates.
          (5) Supply of blanks.
          (6) Licenses issued by county clerks.
          (7) Return of fees by county clerks.
          (8) Record of licenses issued.
29.10   Resident hunting licenses.
29.11   Settlers' hunting licenses.
29.12   Nonresident hunting licenses.
29.13   Trapping licenses.
29.14   Hook and line fishing licenses.
29.15   Other licenses.
29.16   Interstate license privileges.
29.17   Certificates to scientists.

### CLOSE SEASONS

29.18   Close seasons for wild mammals and birds.
29.19   Close seasons for hook and line fishing.
29.195  Close season in Rush lake.
29.20   Close seasons for crawfish and frogs.

### CONSERVATION COMMISSION

29.21   Powers of commission.

### METHODS OF HUNTING AND FISHING

29.22   General restrictions on hunting.
          (1) Prohibited methods.
          (2) Possession of ferrets.
          (3) Guide licenses.
          (4) Guides as special deputies.

LAWS OF WISCONSIN—Ch. 668.        1199

29.23   Deer hunting.
      (1) Prohibited methods.
      (2) Dogs in camp.
29.24   Fur-bearing animals; methods of taking.
29.25   Game birds; hunting.
      (1) Prohibited methods.
      (2) Open water defined.
      (3) Live decoys.
      (4) Use of dogs.
**29.26   Prohibited fishing under particular conditions.**
29.27   Prohibited methods of fishing.
      (1) Hook and line fishing; spearing.
      (2) Snag lines.
29.28   Ice fishing.
29.29   Noxious substances.
      (1) Explosives; stupefactives.
      (2) Medicated bait.
      (3) Deleterious substances.

### FISHING WITH NETS AND SET LINES

29.30   Fishing with nets and set lines.
      (1) License required.
      (2) Restrictions on use of nets.
29.31   Dip nets in inland waters.
29.32   Minnow nets.
      (1) Use limited.
      (2) Inland waters.
      (3) Outlying waters.
29.33   Net and set hook fishing in outlying waters.
      (1) License authorized.
      (2) Form of license.
      (3) License period and fees.
      (4) Metal tags.
      (5) Reserve waters.
      (6) Close seasons.
      (7) Prohibited nets.
      (8) Bass, muskellunge and sturgeon.
      (9) Undersize fish.
     (10) Possession, sale, and transportation.
     (11) Penalty.
     (12) Reports.
29.34   Net licenses; Mississippi river waters.
      (1) License authorized.
      (2) Bond.

1200          LAWS OF WISCONSIN—Ch. 668.

     (3) License period; nets specified.
     (4) License fees.
     (5) Metal tags.
     (6) Protected fish.
     (7) Reserve waters.
     (8) Temporary ponds; shipments.
     (9) Reports.
29.35  Net licenses; whitefish and cisco in inland lakes.
29.36  Net licenses; rough fish in Winnebago waters.
29.37  Set line licenses; inland waters.

### CLAMMING

29.38  Clamming licenses.

### POSSESSION OF GAME

29.39  Possession during close season, or in excess of bag limits.
29.40  Possession of deer.
     (1) Deer tags.
     (2) Home consumption.
     (3) Heads and skins.
29.41  Skins of fur-bearing animals.
29.42  Possession of game birds.
     (1) Without license.
     (2) Nests and eggs.

### TRANSPORTATION OF GAME

29.43  Transportation; general provisions.
     (1) During close season.
     (2) Trunks, valises.
     (3) Transportation employes.
     (4) Labeling game shipments.
29.44  Interstate transportation.
29.45  Transportation of deer.
29.46  Transportation of game birds.
29.47  Transportation of fish.
     (1) Time limitation.
     (2) From inland waters.
     (3) From outlying waters.
     (4) Shipments from inland points.
     (5) Foreign shipments.
     (6) Injurious fish minnows.

LAWS OF WISCONSIN—Ch. 668.          1201

## COMMERCE IN GAME

29.48   Sale of game.
29.49   Serving of game to guests.
      (1) Prohibited.
      (2) Free lunch.
      (3) Penalty.

## PROPAGATION OF WILD ANIMALS

29.50   Propagation privileged.
29.51   State propagation of fish.
      (1) State fish hatcheries.
      (2) Transplantation of fish.
      (3) Delivery of spawn.
      (4) Removal of spawn or fish from state.
      (5) Unlawful fishing by employes.
29.52   Private fish hatcheries.
29.54   State propagation of wild mammals and birds.
29.55   Wild animals for parks.
29.56   Forest county game refuge.
29.57   Wild life refuges.
      (1) Establishment.
      (2) Enclosure.
      (3) Publication.
      (4) Absolute protection.
      (5) Animals procured by the commission.

## DESTRUCTION OF INJURIOUS ANIMALS

29.58   Muskrats injuring dams.
29.59   Beaver causing damage.
      (1) Complaint.
      (2) Supervision.
      (3) Disposition of animals.
      (4) Sale and disposition of proceeds.
      (5) In Price, Rusk and Sawyer counties.
      (6) Penalty.
29.595  Deer causing damage.
29.60   Bounties on wolves.
      (1) Rate of bounty.
      (2) Presentation of claim.
      (3) Examination of carcass.
      (4) Payment by county.

          (5) Payment by state.
          (6) Return of skin.
          (7) Blanks.
          (8) Poisoned baits for wolves, wildcats and lynxes.
29.61   Destruction of other injurious animals; rewards.
29.62   Removal of injurious rough fish.

## PENALTIES

29.63   General penalty provisions.
          (1) Penalties.
          (2) "Person" defined.
          (3) Revocation of license.
          (4) Construction of penalty provisions.
          (5) Presumptions.
          (6) Reward to informers.

## GENERAL CONTROL AND REGULATION

29.01 GENERAL DEFINITIONS. The following terms, wherever used in this chapter, shall be construed to apply as follows:

(1) Wild animal. "Wild animal" means any mammal, bird, fish, or other creature of a wild nature endowed with sensation and the power of voluntary motion.

(2) Carcass. "Carcass" means the dead body of any wild animal to which it refers, including the head, hair, skin, plumage, skeleton, or any other part thereof.

(3) Game; game fish; rough fish. "Game" includes all varieties of mammals or birds for which, at any time of the year anywhere within the state, a close season is prescribed in or pursuant to this chapter; "game fish" includes all varieties of fish except rough fish; and, until the state conservation commission otherwise determines "rough fish" includes chubs, dace, suckers, carp, red horse, sheephead, eelpout, dogfish, garfish, buffalo fish, and lawyers, in all waters, and pickerel in lakes Winnebago, Winneconne, Poygan, Big Butte des Morts, Little Butte des Morts, and in the Fox river in Winnebago county.

(4) Waters classified. All waters within the jurisdiction of the state are classified as follows: Lakes Superior and Michigan and the harbors and bays immediately connected therewith, Green Bay, Sturgeon Bay, Sawyer's Harbor, and the Fox river from its mouth up to the dam at De Pere are "outlying waters." All other waters are "inland waters."

(5) Hunting. "Hunt" or "hunting" includes shooting,

shooting at, pursuing, taking, catching, or killing of any wild animal or animals.

29.02   TITLE TO WILD ANIMALS.   (1) The legal title to, and the custody and protection of, all wild animals within this state is vested in the state for the purposes of regulating the enjoyment, use, disposition, and conservation thereof.

(2) The legal title to any such wild animal, or carcass or part thereof, taken or reduced to possession in violation of this chapter, remains in the state; and the title to any such wild animal, or carcass or part thereof, lawfully acquired, is subject to the condition that upon the violation of any of the provisions of this chapter relating to the possession, use, giving, sale, barter, or transportation of such wild animal, or carcass or part thereof, by the holder of such title, the same shall revert, ipso facto, to the state. In either case, any such wild animal, or carcass or part thereof, may be seized forthwith, wherever found, by the state conservation commission or its deputies.

29.03   PUBLIC NUISANCES.   The following are declared public nuisances:

(1) Any net of any kind, or other device, trap, or contrivance for fishing operated without a license or without a metal tag as required by law; or set, placed, or found in any waters where the same is prohibited to be used, or in a manner prohibited by law.

(2) Any unlicensed set line, cable, rope, or line, with more than one fish line attached thereto; or any licensed set line set, placed, or found in any waters where the same is prohibited to be used, or in a manner prohibited by law; or any fish line left in the water unattended, whether having one or more hooks attached.

(3) Any screen set in public waters to prevent the free passage of fish, or set in any stream which has been stocked by state authories.

(4) Any building, enclosure, structure, or shelter placed, occupied, or used on the ice of any waters in violation of this chapter.

(5) Any unlicensed trap, snare, spring gun, set gun, net or other device or contrivance which might entrap, ensnare, or kill game; or any trap without a metal tag attached as required by law.

(6) Any boat, together with its machinery, sails, tackle and equipment, or any lamp, light, gun, pivot gun, swivel gun, or other firearm used in violation of this chapter; or any boat,

1204        LAWS OF WISCONSIN—Ch. 668.

floating raft, box, or blind set in open water and used in hunting game birds.

(7) Any decoys set in any water during the close season for waterfowl, or in excess of the number authorized to be used, or more than two hundred feet from the weeds, rushes, or other vegetation in which the hunter is concealed; and any decoys left in the water unattended.

(8) Any dog found running deer at any time, or used in violation of this chapter.

(9) Any ferret, rat, weasel, or guinea pig in possession or used while hunting.

29.04   (1) ABANDONED DAMS.  The state conservation commission may remove or cause to be removed, in such manner as they may deem fit, old and abandoned dams in streams in the state of Wisconsin, upon giving sixty days' notice in writing to the owner thereof, if he can be found.  If the owner of such dam be unknown or cannot, by due diligence, be found, the commission shall publish notice once each week for four successive weeks in some newspaper published in the county in which such dam is situated.

(2) Whenever the conservation commission shall determine that the conservation of any species or variety of wild animals will be promoted thereby, the commission is authorized to maintain and repair any dam located wholly upon lands the title to which is in the state either as proprietor or in trust for the people; subject, however, to the powers of the railroad commission to fix the level and regulate the flow of the public waters.

29.05   POLICE POWERS; SEARCHES; SEIZURES.   (1) Arrests.  The state conservation commission and its deputies are hereby authorized to execute and serve all warrants and processes issued by any justice of the peace or police magistrate or by any court having jurisdiction under any law relating to wild animals, in the same manner as any constable may serve and execute such process; and to arrest, with or without a warrant, any person detected in the actual violation, or whom such officer has reasonable cause to believe guilty of the violation of any of the provisions of this chapter, and to take such person before any court and make proper complaint.

(2) Investigations.  Such officers shall, upon receiving notice or information that any provision of this chapter has been violated, as soon as possible make a thorough investigation thereof, and cause proceedings to be instituted if the proofs at hand warrant it.

(3) Search warrants.  Upon complaint made to any magis-

Case 1:22-cv-00695-JLS   Document 77-9   Filed 05/31/24   Page 16 of 190

trate who has authority to issue warrants in criminal cases, by
any person that he knows or has good reason to believe that
any wild animal, or carcass or part thereof, caught, taken, killed,
or had in possession contrary to the provisions of this chapter,
is concealed in any particular house or place, the magistrate
shall examine such complainant on oath, reduce his complaint
to writing, describing as particularly as may be the place where
said wild animal, or carcass or part thereof, is alleged to be con-
cealed, and cause the same to be subscribed by the person com-
plaining. If it appears to the magistrate that there is reason-
able cause to believe that the facts alleged in said complaint are
true he shall immediately issue his warrant, reciting therein the
substance of the complaint and the description of the premises
described therein, and requiring the officer to whom it is directed
to forthwith search such premises and seize any such wild ani-
mal, or carcass or part thereof, and bring the same when found,
and the person in whose possession the same is found, before
the magistrate who issued the warrant, or before some other
magistrate or court having jurisdiction of the case. The
officer executing such warrant shall state in his return, as partic-
ularly as may be, the property seized, which shall be safely
kept under the direction of the court or magistrate so long as
necessary for the purpose of being used as evidence on any
trial; and if such trial results in a conviction, the property so
seized shall be confiscated.

(4) Opening packages. The state conservation commission
and its deputies may examine any packages in the
possession of a common carrier which they suspect or have rea-
son to believe contains contraband wild animals, or carcasses
or parts thereof, or is falsely labeled in violation of the provi-
sions of this chapter; and every such common carrier, and every
agent, servant, or employe thereof, shall permit any such officer
to examine and open any such package. Any package so opened
shall be restored to its original condition.

(5) Access to storage places. They shall be permitted by
the owner or occupant of any cold storage warehouse or build-
ing used for the storage or retention of wild animals, or car-
casses or parts thereof, to enter and examine said premises; and
the said owner or occupant, or his agent, servant, or employe,
shall deliver to any such officer any wild animal, or carcass or
part thereof, in his possession during the close season therefor,
whether taken within or without the state.

(6) Seizure and confiscation of game, or game fish. They
shall seize and confiscate in the name of the state any wild

animal, or carcass or part thereof, caught, killed, taken, had in possession or under control, sold or transported in violation of this chapter; and any such officer may, with or without warrant, open, enter and examine all buildings, camps, vessels or boats in inland or outlying waters, wagons, automobiles or other vehicles, cars, stages, tents, suitcases, valises, packages, and other receptacles and places where he has reason to believe that wild animals, taken or held in violation of this chapter, are to be found; but no dwelling house or sealed railroad cars shall be searched for the above purposes without a warrant.

(7) Seizure and confiscation of property. They shall seize and forthwith confiscate or destroy any apparatus, appliance, or device declared by any provision of this chapter to be a public nuisance; and shall seize and hold subject to the order of the commission, any other apparatus, appliance, or any vehicle, or device, which they shall have reason to believe is being used in violation of this chapter, and if it be proven that the same is, or has been within six months previous to such seizure, used in violation of this chapter the same shall be confiscated.

(8) Entire shipment affected. Confiscation of any part of a shipment under this section shall include the entire shipment.

(9) Exemption from liability. Each commissioner and each deputy conservation warden, in the performance of his official duties, shall be exempt from any and all liability to any person for acts done or permitted or property destroyed by authority of law; and in any action brought against any such commissioner or warden personally, arising from alleged excess of his authority, the taxable costs awarded to either party shall include a reasonable attorney's fee, to be fixed by the court, provided the party has appeared therein by an attorney of a court of record.

29.06 SALES OF CONFISCATED GAME AND APPARATUS. (1) All confiscated wild animals, or carcasses or parts thereof, and all confiscated apparatus, appliances, or devices shall, if not destroyed as authorized by law, be sold at the highest price obtainable, by the state conservation commission or its deputies, or by an agent on commission under the written authority and supervision of the state conservation commission or its deputies. The net proceeds of such sales, after deducting the expense of seizure and sale and any such commissions, shall be promptly remitted by the warden by whom or under whose authority and supervision the sales are made, to the state conservation commission and by it paid into the state treasury; the remittance to be accompanied by a complete and certified

report of such sales, supported by proper vouchers covering all deductions made for expenses and commissions, to be filed for record in the office of the state conservation commission.

(2) On any such sales of wild animals, or carcasses or parts thereof, the warden or agent selling them shall issue to each purchaser a certificate, on forms to be prepared and furnished by the state conservation commission, covering such sales. The animals, or carcasses or parts thereof, so purchased shall be consumed or otherwise disposed of by the purchaser within five days thereafter, but shall not be resold, bartered, or exchanged, in whole or in part, to any other person, except as provided in subsection (3).

(3) Confiscated fish or game sold to the keeper, manager, or steward of any restaurant, club, hotel, or boarding house may be served to the guests thereof; but in such case the certificate covering the purchase shall be hung in public view in the place where the fish or game is served, and such fish or game shall at the time of sale be tagged by the warden or agent selling it, such tag to show the date of sale and be returned to said warden or agent within five days thereafter.

29.07 ASSISTANCE OF POLICE OFFICERS. All sheriffs, deputy sheriffs, coroners, and other police officers are ex officio deputy conservation wardens, and shall assist the state conservation commission and its deputies in the enforcement of this chapter whenever notice of a violation thereof is given to either of them by the commission or its deputies.

29.08 INTERSTATE COMITY. (1) Whenever and so long as any other state confers upon the officers of this state reciprocal powers, any officer of such other state, who is by the laws of said state authorized or directed to enforce the laws of said state relating to the protection of wild animals, is hereby designated an agent of said state within this state. It shall be lawful for said officer to follow any wild animal, or carcass or part thereof unlawfully shipped or taken from his state into this state, seize and convey the same back to his own state; and so far as concerns any such wild animal, or carcass or part thereof, the laws of the state from which the same was brought into this state are hereby adopted as the laws of this state. Transportation companies shall deliver to such officer, upon submission of proper proof of his official capacity, any wild animal, or carcass or part thereof, so demanded or seized by him. Said officer may dispose of any such wild animal, or carcass or part thereof, within this state, in accordance with the laws of the state from which the same was taken or shipped, under the

supervision of any conservation commissioner or deputy conservation warden of this state, whose expenses for his assistance shall be a lien upon such wild animal or carcass or part thereof, or the proceeds thereof.

(2) Except as provided in subsection (1), the state conservation commission or its deputies shall seize, hold and dispose, according to the laws of this state, of any wild animal, or carcass or part thereof, brought or shipped into or through this state, or attempted to be carried through this state, in violation of the laws of any other state.

(3) The state game warden of every other state, and his deputies and all other officers therein charged with the enforcement of the laws relating to wild animals are hereby designated agents of this state for the taking possession, seizing, holding and disposing, within such state, of any wild animal, or carcass or part thereof, protected by the laws of this state.

(4) Whenever and so long as any other state confers upon the officers of this state reciprocal powers, the state conservation commission is hereby authorized to appoint persons who shall have been appointed game wardens or deputy game wardens of such other state to act as and have all the powers of deputy conservation wardens of this state, but without compensation from this state.

## GAME LICENSES

29.09 GENERAL PROVISIONS. (1) Hunting, trapping or fishing without a license prohibited. Except as expressly provided, no person shall hunt, trap or fish any game or game fish unless a license therefor has been duly issued to him which shall be carried on his person at the time and shall be exhibited to the state conservation commission or its deputies on demand. Such licenses shall be issued only to persons, and not more than one of the same series to the same person in any year. No licensee shall transfer his license or deer tag to or permit the use thereof by any other person, nor shall any person while hunting, trapping or fishing use or carry any license, or guide's badge, issued to another. No hunting license shall be issued to any person who is less than fifteen years of age; nor to any person who is not a citizen of the United States, except as provided in section 29.11. Indians hunting, fishing or trapping off Indian reservation lands are subject to all provisions of this chapter.

(2) Form of application. The application for such license shall state the residence and post-office address of the applicant, a description of his person, and such other facts, showing him

LAWS OF WISCONSIN—Ch. 668.          1209

to be entitled to the license for which he applies, as may be required by the commission, and shall be verified by the affidavit of the applicant; but no written or verified application shall be required for any hook and line fishing license. Each such application shall be accompanied by the license fee prescribed for the license applied for.

(3) Form of license. Each license shall state for what year the same is issued and the date of expiration, and except as otherwise provided shall be effective only from the first day of May until the next succeeding thirtieth day of April, subject to the conditions, limitations and restrictions prescribed in this chapter. Each license issued shall further state the name and residence of the licensee, a description of his person, and such other matter as may be determined by the commission; shall bear upon its face a true signature of the licensee; and shall be signed by the officer who issues it.

(4) Duplicates. Whenever any such license is lost the person to whom the same was issued may present to the commission an affidavit proving such loss, together with a fee of fifty cents, whereupon the latter shall issue a duplicate license to such person.

(5) Supply of blanks. The commission shall prepare, procure the printing of, and supply all necessary blanks for such licenses and applications. The licenses shall be numbered consecutively, at the time of printing, in a separate series for each kind of license; and each license blank shall be provided with a corresponding stub numbered with the serial number of the license. Each requisition for the printing of such license blanks shall specify the serial numbers thereof.

(6) Licenses issued by county clerk. Of each license issued by a county clerk he shall retain the stub for record in his office. He shall also keep an alphabetical index of the names of all persons to whom he issues licenses, such names to be entered therein at the time the licenses are issued. The state conservation commission or its deputies may at any time examine such records.

(7) Return of fees by county clerk. Of the fees paid for such licenses the county clerk may retain ten per cent as compensation for his services to the state; the remainder he shall return to the state conservation commission on the first day of each month, with a report of the number of licenses issued by him during the preceding month and the amount of money thus remitted. All stubs of licenses issued and all unused license blanks shall be returned by the county clerk to the commission at the close of the year for which they are supplied.

(8) Record of licenses issued. A complete record of all licenses issued shall be kept by the commission, which shall also be accountable for all unused license blanks.

29.10 RESIDENT HUNTING LICENSES. Resident hunting licenses shall be issued subject to the provisions of section 29.09, by the county clerks of the several counties upon blanks supplied to them by the state conservation commission, to residents of each such county duly applying therefor who have resided in this state for at least one year next preceding the application. The fee for each such license is one dollar. Such license does not grant the privilege of hunting deer unless the licensee is in possession of a deer tag numbered to correspond with his license, which shall be issued to him by the state conservation commission on application and the payment of an additional fee of ten cents. The commission may cause such tags to be issued through agents, but no commission to be allowed for the sale of such tags.

29.11 SETTLERS' HUNTING LICENSES. Settlers' hunting licenses subject to the provisions of section 29.09 may be issued by the state conservation commission in its discretion, to actual settlers in this state duly applying therefor who have resided in this state less than one year next preceding the application. A bona fide settler shall be a person who has either purchased or rented, or has negotiations in progress to purchase or rent residence property in Wisconsin and who has moved to and settled in this state. Such licenses shall be in substantially the same form, subject to the same conditions and restrictions, and entitle the holder to the same rights, privileges and immunities as a resident hunting license. No nonresident hunting license shall be issued in the same year to any person to whom a settlers' hunting license has been issued, and no settlers' hunting license to any holder of a nonresident hunting license.

29.12 NONRESIDENT HUNTING LICENSES. (1) Nonresident hunting licenses shall be either general or limited, and shall be issued by the state conservation commission, subject to the provisions of section 29.09, to persons duly applying therefor who are not residents of this state or who have resided therein less than one year next preceding the application. The fee for each such general license is fifty dollars, and for each such limited license twenty-five dollars.

(2) Each such general license shall extend to the hunting of all wild animals during the open season therefor, respectively, and shall be accompanied by a deer tag, numbered to correspond with the license and to be supplied without additional fee.

(3) Each such limited license shall extend to the hunting of all wild animals during the open season therefor, respectively, except deer. The holder of such limited license may at any time before its expiration surrender the same for cancellation, and in lieu thereof, upon payment of an additional fee of twenty-five dollars, the commission shall issue to him a general license as prescribed in subsection (2).

29.13 TRAPPING LICENSES. (1) Trapping licenses, which shall authorize the use of traps for trapping fishers, martens, minks, muskrats, raccoons, and skunks, shall be issued by the state conservation commission, subject to the provisions of section 29.09, to persons duly applying therefor who have resided in this state for at least one year next preceding the application. The fee for each such license is one dollar.

(2) All shipments of hides must be marked showing the number and kinds of hides in the package, the name and address of the shipper, and the number of his trapping license.

(3) On or before June first next after the expiration of his license, such licensee shall report to the state conservation commission, by affidavit, on blanks furnished by the commission, the number of his license, the number and value of each variety of animals taken, and such other information as may be required on the blanks furnished.

29.14 HOOK AND LINE FISHING LICENSES. (1) Any person, other than nonresident males over the age of sixteen years, may without a license take, catch or kill with hook and line fish of any variety, subject to all other conditions, limitations and restrictions prescribed in this chapter.

(2) Any male nonresident over the age of sixteen years shall have the rights of a resident to take, catch or kill fish of any variety with hook and line in outlying waters; but not in inland waters unless a license has been duly issued to him, subject to the provisions of section 29.09, by the state conservation commission. Each such license shall be provided with three coupons each of which shall entitle the licensee to make one shipment of game fish as provided in section 29.47, but no more. One coupon shall be attached to each shipment so made. The agent of any common carrier who shall accept any such shipment without a coupon attached shall be guilty of a violation of this chapter and shall be punished by a fine of not less than twenty-five dollars nor more than fifty dollars. The fee for each such license is one dollar. The commission may cause such licenses to be issued through agents for a compensation of ten per cent of the license fees collected therefor; but no such

compensation shall be paid to any of its regular deputies or other employes.

29.15 OTHER LICENSES. Guiding licenses, net and set line licenses, and clamming licenses, shall be issued by the state conservation commission as provided in subsection (3) of section 29.22 and sections 29.33, 29.34, 29.35, 29.36, 29.37 and 29.38, respectively.

29.16 INTERSTATE LICENSE PRIVILEGES. Whenever and so long as the states of Minnesota or Iowa confer upon the licensees of this state reciprocal rights, privileges and immunities, any hook and line or other fishing license, or clamming license issued by such other state shall entitle the licensee to all the rights, privileges and immunities, in and upon the boundary waters between such state and this state, enjoyed by the holders of equivalent licenses issued by this state; subject, however, to the duties, responsibilities and liabilities imposed on its own licensees by the laws of this state.

29.17 CERTIFICATES TO SCIENTISTS. (1) The state conservation commission may grant, on satisfactory testimonials of well-known scientists only, a certificate to any member of an incorporated society of natural history, or to any professor of any university, school or college, or to any person properly accredited by any such institution, or to any custodian of a public museum, authorizing such person or institution to collect for scientific purposes only, any nests, eggs, or wild animals, except deer. Such specimens may be transported by any common carrier; but no person to whom such certificate is issued shall dispose of any such specimen except in exchange for scientific purposes. All such certificates shall expire on the first day of January following the date of their issue, and shall not be transferable.

(2) The application for such certificate shall be made upon blanks to be furnished by the state conservation commission, shall be accompanied by a fee of two dollars, and the applicant shall execute and deliver to the state conservation commission a bond running to the state of Wisconsin, in the sum of one hundred dollars, with two sureties, and conditioned that if the applicant shall well and faithfully observe and comply with all the requirements of this section, and the certificate issued thereunder, said obligation to be null and void, otherwise to remain in full force. Each said surety shall be worth and qualify in at least the sum of one hundred dollars, over and above all his debts and liabilities, in property within this state not exempt from sale on execution.

(3) The certificate of any person convicted of a violation of this section shall be forfeited and revoked, and such convicted person shall not be entitled to another certificate for the period of one year from and after the date of such conviction.

## CLOSE SEASONS

29.18  CLOSE SEASONS FOR WILD MAMMALS AND BIRDS.  A close season is established for each variety of wild animals and birds listed in the following table, extending during all the time in each year except the period embraced within the dates, both inclusive, set opposite the name of each variety or each locality, respectively, in the column headed "Open Season"; and, except as expressly provided in this chapter, no person shall hunt or trap any such wild mammal or bird at any time other than the open season therefor, nor in the open season in excess of the number designated opposite each variety or each locality, respectively, in the column headed "Bag Limit," nor wild birds of more than one variety except a mixed bag limit of twenty each day in the open season, but containing not more than the bag limit of any one variety.  Wild ducks and American coots or mudhens shall be deemed, collectively, as one variety:

| Kind of Animal and Locality | Open Season | Bag Limit |
| --- | --- | --- |
| (1) Moose, elk... | None... | ... |
| (2) Deer: | | |
|     (a) Any deer in the velvet, or in the red or blue coat, in any county... | None... | ... |
|     (b) Any deer in the counties of Adams, Brown, Buffalo, Calumet, Columbia, Crawford, Dane, Dodge, Door, Dunn, Fond du Lac, Grant, Green, Green Lake, Iowa, Jefferson, Juneau, Kenosha, Kewaunee, La Crosse, Lafayette, Manitowoc, Marquette, Milwaukee, Monroe, Outagamie, Ozaukee, Pepin, Portage, Racine, Richland, Rock, Sauk, Sheboygan, Vernon, Walworth, Washington, Waukesha, Waupaca, Waushara, and Winnebago... | None... | ... |
|     (c) Any deer not specified in paragraph (a) in any county not specified in paragraph (b)... | Nov. 21 to Nov. 30, | One each year |
| (3) Bear... | Nov. 10 to Dec. 1... | No limit |
| (4) Beaver, otter... | None... | ... |
|     (a) Beaver in Price Rusk, and Sawyer counties as stipulated in subsection (5) of section 29.59... | Dec. 1 to Dec. 31, 1917 & 1918... | No limit |
| (5) Fisher, marten, mink, skunk... | Nov. 15 to Feb. 1... | No limit |
| (6) Musk rat: | | |
|     (a) In the counties of Polk, Barron, Rusk, Price, Lincoln, Langlade, Forest, Marinette, Florence, Iron, Oneida, Vilas, Ashland, Washburn, Sawyer, Burnett, Douglas, Bayfield | Oct. 25 to April 20 | No limit |
|     (b) In any other place... | Oct. 25 to April 10. | No limit |

1214      LAWS OF WISCONSIN—Ch. 668.

| Kind of Animal and Locality | Open Season | Bag Limit |
| --- | --- | --- |
| (7) Raccoon........................ ....... ............ | Oct. 15 to Jan. 1.... | Five each day |
| (8) Squirrels of any variety....... ...   ....  .... | Oct. 15 to Jan. 1.... | Five each day |
|   (a) In Dodge, Keno-ha, Racine, Wauke-sha, Washington, Ozaukee, Mil-waukee counties.................... | None..... .  ....... | ................. |
| (9) Rabbit: | | |
|   (a) In Columbia, Crawford, Door, Grant, Iowa, Jackson, Juneau, Monroe, Outagamie, Pierce, Polk, Richland, Rusk, Sauk, Sawyer, Sheboygan, and Winnebago counties....... ... | All year........ ... | No limit |
|   (am) In Dane county....  ...  ......  .... | Oct. 1 to Mar. 1 .... | No limit |
|   (b) In Dodge, Jefferson, Kenosha, Ozau-kee, Racine, Walworth, Washing-ton, and Waukesha counties........ | Nov. 1 to Jan. 1.... | Five each day |
|   (c) In Clark, Green and Wood counties.. | Oct. 15 to Feb 1.... | Ten each day |
|   (d) In any other place .................. | Sept. 7 to Feb. 1.... | No limit |
| (10) Wild swan. .....  ... .. ................. | None ....... .... | ...................... |
| (11) Wild goose, brant............................ | Sept. 7 to Dec. 20 .. | Ten each day |
| (12) Wild duck, including American coot or mudhen, but excepting wood duck ..... | Sept. 7 to Dec. 10 .. | Fifteen each day |
| (13) Wood duck, wood cock. .................. | None............. .... | ................ ............ |
| (14) Plover, snipe, rail, rice hen... | Sept. 7 to Dec 20.. | Fifteen each day |
| (15) Partridge or ruffed grouse, spruce hen..... | None until Oct. 1 to Nov. 1, 1919.... | Five each day |
| (16) Prairie chicken or pinnated grouse,sharp-tailed grouse..................... ........ | None until Sept. 7 to Oct. 1, 1919 .... | Five each day |
| (17) Mongolian, Chinese, or English pheasant, Hungarian partridge ....  ...... ....... | None,......... .... | .................... |
| (18) Quail or bobwhite......................... | None............. .... | .................... |
| (19) Crows, English sparrows, blackbirds, sharp-shinned hawks, Cooper's hawks, great horned owls... ......  ....  ....... | All year........... | No limit |
| (20) Song birds, and all other wild birds not specified above.......... ............... | None............. .... | .................... |

(Penalty $50.00-$100 00 plus $5.00 for each bird.)

29.19   CLOSE SEASONS FOR HOOK AND LINE FISH-
ING. A close season is established for each variety of fish
listed in the following table, extending during all the time in
each year except the period embraced within the dates, both
inclusive, set opposite the name of each variety of each locality,
respectively, in the column headed "Open Season"; and, ex-
cept as expressly provided in this chapter, no person shall take,
capture, or kill fish of any such variety with hook and line at
any time other than the open season therefor, nor in the open
season in excess of the quantity; or under the minimum length
for each fish, designated opposite each variety or each locality,
respectively, in the columns headed "Bag Limit". Such meas-
urement of length shall be taken in a straight line from the tip
of the nose to the utmost end of the tail fin.

| Kind of Fish and Locality | Open Season | Bag Limit | |
|---|---|---|---|
| | | Quantity | Minimum length |
| (1) Large and small mouthed black bass, Oswego bass, green bass, and yellow bass, in Big Green Lake, Green Lake county...... ...... | July 1 to Mar. 1 | Ten each day........ | 10 inches |
| (1a) In all other waters large and small mouthed black bass .. | June 15 to Mar. 1 | Ten each day... .... | 10 inches |
| (1b) In all other waters Oswego bass, green bass and yellow bass................ | May 29 to Mar. 1 | Ten each day........ | 10 inches |
| (2) White bass: | | | |
| (a) In the Big Wolf river from Lake Poygan to New London. .......... | All the year...... | No limit . ........... | 7 inches |
| (b) In all other waters ...... | May 29 to Mar. 1 | No limit ............. | 7 inches |
| (3) Strawberry bass, calico bass, silver bass, crappie, rockbass | All year......... | No limit ............ | No limit |
| (3m) Rock bass: | | | |
| (a) In Green Lake county... | All year.......... | | |
| (b) In all other inland and outlying waters....... | May 29 to Mar. 1 | Thirty each day.... | 6 inches |
| (4) Trout of any variety, except lake trout, in all waters..... | May 1 to Aug. 31 | Thirty-five each day | 7 inches . |
| (5) Pike of any variety............ | May 29 to Mar. 1 | Ten each day........ | 13 inches |
| (6) Pickerel ................. .... | May 29 to Mar. 1 | Fifteen each day.... | 16 inches |
| (7) Muskellunge ................. | May 29 to Mar. 1 | Two each day........ | 24 inches |
| (8) Sturgeon, and the spawn, eggs and fry thereof ........ ..... | None............ | | |
| (9) Catfish........................ | May 29 to Mar. 1 | Ten each day........ | 15 inches |
| (a) On Mississippi river.... | May 29 to Mar. 1 | No limit ............ | 15 inches |
| (10) Bullhead..................... | All year .......... | 30 lbs. each day..... | No limit |
| (11) Perch: | | | |
| (a) In counties bordering on the Mississippi river and in Lakes Winnebago, Butte des Morts and Poygan, Fox river and Wolf river and tributary streams within Winnebago county..... | May 29 to Mar. 1 | No limit ............. | No limit |
| (b) In all other waters...... | All year ..... .... | No limit............. | No limit |
| (12) Sunfish: roach: | | | |
| (a) In counties bordering on the Mississippi river... | May 29 to Mar. 1 | No limit............ | No limit |
| (b) In all other waters ...... | All year.......... | No limit........... | No limit |

(Penalty $50.00-$100.00.)

There shall be no close season for hook and line fishing, except for large and small mouthed black bass, sturgeon and trout, in any of the following described waters: In the waters of Juneau, Lafayette, and Green counties, except in the Wisconsin river between Juneau and Adams in the waters of lakes Winnebago in Fond du Lac, Calumet and Winnebago counties, in Buffalo lake, Marquette county, in Puckaway lake in Marquette and Green Lake counties, in Lake Poygan in Winnebago and Waushara counties in lakes Winneconne, Big and

1216      LAWS OF WISCONSIN—Ch. 668.

Little Butte des Morts in Winnebago county, in the Fox river in Marquette, Green Lake, Waushara and Winnebago counties, in the Wolf river in Winnebago county and in Waupaca county as far as the city limits of New London, in the Rock and Crawfish rivers and Lake Koshkonong in Rock, Jefferson and Dodge counties. During the period from March 1 to May 28, both dates inclusive, live or dead minnows shall not be used for bait in any of the above waters specified in Jefferson county. The open season for hook and line fishing in the waters of the Mississippi river, except for large and small mouthed black bass, shall open on May 1.

29.195   There shall be no closed season except from the first day of March to the succeeding twentieth day of May for any fish, except trout, in Rush lake or in the streams flowing into said lake, situate in Fond du Lac and Winnebago counties, and fish therein may be taken in any manner, except with explosives, during the open season, except trout; provided, that no person shall have more than fifty pounds of such fish, taken from said Rush lake or said streams flowing into said lake, in his possession or under his control in any one day.

29.20   CLOSE SEASON FOR CRAWFISH AND FROGS. No person shall take, catch, or kill, in any waters of this state, or have in possession, any crawfish or crab of any variety between the first day of March and the next succeeding first day of July; or any frog from March 1 to May 1 of each year; but nothing in this section shall prevent any person from having frogs in his possession who is in the business of propagating frogs, or where the same are used for scientific or educational purposes.


CONSERVATION COMMISSION

29.21   POWERS OF COMMISSION.   (1) The state conservation commission shall have power to issue orders determining in what manner, in what numbers, in what places and at what times the taking, catching, or killing of wild animals shall be inconsistent with the proper protection, propagation and conservation of fish, birds or mammals protected by law in this state, and the perpetuation of wild life. No such order providing protection or additional protection to any such wild animals shall be issued except upon petition filed with said commissioners, and after hearing thereon as hereinafter provided.

(2) Ten or more persons of any township or twenty-five or

Case 1:22-cv-00695-JLS   Document 77-9   Filed 05/31/24   Page 28 of 190

more persons of any county, may file with the state conservation commission a petition signed with their names and addresses, requesting the granting of protection or additional protection within such county, to one or more species of wild animals designated in said petition. And such petition shall state the extent such protection or additional protection is desired and the grounds therefor. If after hearing the petitioners, the conservation commission shall determine to entertain the petition it shall order a public hearing to be held thereon within the town or county described in the petition, within twenty days from the filing of said petition. At least ten days prior to such public hearing notice thereof containing a brief statement of the grounds upon which application is made therefor, and the time and place of hearing shall be published in a newspaper having a general circulation in the district to be affected, and a copy of such notice shall be mailed to each petitioner, at the address given in the petition.

(3) If upon such hearing the conservation commission find and determine that the protection or additional protection requested, is necessary for the proper protection, propagation and conservation of the designated wild animals within the designated territory, the commission shall issue an order prohibiting or regulating during the open season therefor, the taking of any or all species of fish, birds or mammals within such territory. At least thirty days before the date fixed for such order to take effect, copies of the same should be filed in the office of the clerk for each county containing a district or any part of a district in which such order or regulation shall apply. and cause the same to be published in a newspaper having general circulation in the town, county or district in which such regulation shall apply, or to cause the same to be published by means of at least five large notices posted in or near public buildings or on the highways within said territory, and when the territory affected is less than a township in area, in conspicuous places on the boundaries thereof.

(4) Any order issued by the state conservation commission pursuant to this section shall have the force of law, and the penalties prescribed for violations of the provisions of this chapter shall follow and be applicable to violations of any such order, to the same effect and extent, respectively, as though such order had been enacted a part of this chapter.

77—L.

## METHODS OF HUNTING AND FISHING

**29.22 GENERAL RESTRICTIONS ON HUNTING.** (1) Prohibited methods. No person shall hunt game with any means other than the use of a gun held at arm's length and discharged from the shoulder; or place, spread or set any net, pitfall, snare, spring gun, pivot gun, swivel gun, or other similar contrivance for the purpose of catching, or which might catch, take or ensnare game; or use or have in his possession or under his control any ferret, rat, weasel, or guinea pig while hunting; and no person shall carry with him in any vehicle, any gun or rifle unless the same is unloaded, and knocked down or enclosed within a carrying case. No person while hunting or in possession of firearms shall have in possession or under control any light used for the purpose of shining deer.

(2) Possession of ferrets. No person shall have in his possession or under his control at any time any ferret unless a permit therefor has been issued to him by the state conservation commission; but such permit shall not authorize the use of any ferret for hunting game except in Door county.

(3) Guide licenses. No person shall engage, or be employed, for any compensation or reward, to guide, direct, or assist any other person in hunting, trapping, or fishing unless a license therefor, subject to the provisions of section 29.09, has been duly issued to him by the state conservation commission. The fee for each such license is one dollar. The applicant shall deliver to the state conservation commission a bond running to the state of Wisconsin, in the sum of two hundred dollars, with two sureties, and conditioned that if the applicant shall well and faithfully observe and comply with all the requirements of this chapter, and the guide license issued thereunder, said obligation shall be null and void, otherwise to remain in full force. But this subsection does not apply to the employment of labor by, or services rendered to, the licensee of any net fishing license.

(4) Guides as special deputies. Each licensed guide may be a special deputy conservation warden, appointed by the commission and shall execute the same oath of office and bond as required by regularly salaried wardens. Licensed guides may be employed for temporary service as a regular deputy conservation warden, for any period not exceeding fifty days in any one year, at a compensation to be fixed by the commission.

**29.23 DEER HUNTING.** (1) Prohibited methods. No

person shall hunt deer between one hour after sunset and one hour before sunrise, of the following morning; or in the water or on the ice of any stream, lake, or pond; or with a dog or dogs; or with the aid of artificial light; nor place any salt in any place for the purpose of enticing deer thereto, or construct, occupy, or use any elevated scaffold or other device for the purpose of hunting, watching for, or killing deer.

(2) Dogs in camps. During the period from November 10 to December 10, in the counties where there is an open season for deer, no person shall hunt any wild animal with a dog or dogs; nor have a dog or dogs in his possession or under his control in or about a hunting or logging camp, unless a permit therefor has been issued to him by the state conservation commission.

29.24   FUR-BEARING ANIMALS; METHODS OF TAK-ING. (1) No person shall hunt any fisher, marten, mink, or muskrat with the aid of any spear, gun, or dog, disturb or molest any raccoon den or tree for the purpose of capturing the raccoons, or any muskrat house, beaver house or beaver dam; or set any trap or traps at any time within five hundred feet of any beaver house or beaver dam.

(2) The owner or occupant of any land, and any member of his family may without license hunt thereon rabbits at any time, and squirrels during the open season therefor.

(3) Except as provided in subsection (2), no person shall have in his possession or under his control, or use, for hunting rabbits, any ferret, snare, trap, or any device or contrivance designed or used for the purpose of driving rabbits out of their holes or dens. The owner or occupant or any person upon written request of the owner or occupant of any land in the county of Door may use a ferret thereon for hunting rabbits.

29.25   GAME BIRDS; HUNTING. (1) Prohibited methods. No person shall hunt any game bird between sunset and thirty minutes before sunrise of the following morning; or by shooting it or at it from any boat, canoe, raft, blind, contrivance or device in open water, or from any boat or craft other than such as are propelled by paddle, oars, or pole or with the use of more than fifty decoys within, or any decoys beyond, two hundred feet from the blind or covering in which the hunter is located, or with any decoys left in the water unattended; or any game bird other than wild geese and brant with the use of a rifle.

(2) Open water defined. Open water is any water outside

1220        LAWS OF WISCONSIN—Ch. 668.

or beyond a  natural growth of vegetation extending over the
water surface, and of such height as to offer partial or whole
concealment for the hunter.

(3) Live decoys.  The set of twenty-five decoys allowed for
each hunter used on the water in hunting game birds may in-
clude not more than five live decoys; but each such live decoy
so used shall be provided with a registration tag, which shall be
issued by the state conservation commission to any holder of
a hunting license on payment of a fee of ten cents for each
tag.

(4) Use of dogs.  No person carrying or being in possession
of a gun shall run or use a dog or dogs in the field, or upon
lands frequented by game birds or upon which game birds may
be found, between the first day of August and the seventh day
of September in each year.

29.26  PROHIBITED FISHING UNDER PARTICULAR
CONDITIONS.  No person shall take, capture, or kill fish of
any variety, during the close season for trout, in streams and
creeks containing trout; or at any time in or from any spring
hole or artificial well connected with any of the waters of this
state; or by means of shutting or drawing off water for that
purpose; nor shall any person take, capture or kill fish within
two hundred feet of any fishway, lock or dam otherwise than
with a hook and line.  No fish of any variety shall be taken
in any manner within five hundred feet below any fishway, lock
or dam in the counties of Burnett, Washburn, Sawyer, Oneida,
Florence, Vilas, Iron, Ashland, Bayfield, Douglas, and north of
townships number 35 in Price and Forest counties, and within
three hundred feet above and five hundred feet below the dam
at Kilbourn on the Wisconsin river.  No person shall take or
catch fish from a boat or float in Flites pond on the Big Rush
O'Cree creek in the town of Plainfield, Waushara county.

29.27  PROHIBITED  METHODS  OF  FISHING.  (1)
Hook and line fishing; spearing.  No person shall take, catch,
kill, or fish for fish of any variety with more than three lines,
or with any line equipped with more than two hooks or one
trolling spoon or artificial bait, or with more than such number
of lines and hooks left in the water unattended, unless a license
for a set line shall be procured therefor; or any game fish by
any means other than angling or trolling, except as provided
in subsection (2) of section 29.28 and section 29.30; nor shall
any person use a spear for the purpose of taking, catching or
killing any rough fish at any time in nonnavigable waters con-

taining trout, or during the close season for trout in navigable waters containing trout, or at any time in Lake Mason, commonly known as Briggsville pond, or the inlet, outlet or marshes adjacent to the same, or in Pine lake, in the town of Hancock, and Fish lake, in the towns of Hancock and Deerfield, Waushara county, or in the Chain of Lakes, Mirror or Shadow lakes, in the towns of Farmington, Dayton, Waupaca, and the city of Waupaca, Waupaca county, or in Devil's lake, Sauk county, or in the waters known as Koenig's mill pond, situated in sections seven, eight, seventeen and eighteen of township nine north, of range six east, town of Prairie du Sac, or in the nighttime in any other inland waters.

(2) Snag lines. No person shall set, place, use, have, or control any snag line or snag pole, meaning any line, cable, or pole to which a number of fishhooks or clusters of fishhooks of any kind or description are attached, and designated to be placed in or drawn through the water for the purpose of catching or drawing such hooks into the body of fish. Violations of this subsection shall be punished by a fine of not less than one hundred nor more than two hundred dollars, or by imprisonment in the county jail not less than six months nor more than nine months, or by both such fine and imprisonment.

29.28   ICE FISHING.   (1) No person shall take, catch, or kill fish of any variety through the ice on Silver lake, situated within the city limits of Portage, Columbia county; Pine lake, town of Hancock, and Fish lake, towns of Hancock and Deerfield, and the mill pond in the village of Wautoma, Waushara county; Lake Nocquebay in Marinette county; Lake Mason, commonly known as Briggsville pond, in the counties of Adams and Marquette; Shell lake, Washburn county; Chain of Lakes in townships thirty-seven and thirty-eight north, of range twelve west, in Washburn county; Spring lake and the upper mill lake in the village and town of Palmyra, Jefferson county; Big Slough in Lewiston, Columbia county; Devil's lake and Mears lake, and tributary streams; the waters known as Koenig's mill pond, in sections seven, eight, seventeen and eighteen of township nine north, of range six east, town of Prairie du Sac, and Mirror lake, in Sauk county; Twin lakes, in the town of Lincoln, Polk county; any lake in the counties of Langlade, Portage, Marquette, except in Buffalo lake, and Shawano. The bag limit for cisco in any lake in Waukesha county shall be twenty-five each day, except in Pine lake where there shall be no bag limit.

(2) Spears may be used for spearing pickerel through the

ice of the Mississippi river, Lake Pepin, Lake St. Croix, and the lakes, bays, bayous and sloughs tributary thereto and connected therewith.

(3) Fish shanties or shelters may be used on the ice of the Mississippi river, Lake Geneva in Walworth county, Lakes Winnebago, Winneconne, Big and Little Butte des Morts, and Poygan; Beaver Dam lake; the Fox river in Brown county; the Oconto river within the limits of the city of Oconto; all lakes in Waukesha county, except Phantom and Howitt's lakes; and where there is not less than fifty feet of water in Big Green lake. Wind shields may be used on the ice of Mendota, Monona, Waubesa and Kegonsa lakes in Dane county.

29.29 NOXIOUS SUBSTANCES. (1) Explosives; stupefactives. No person shall take, capture or kill fish of any variety in any waters of this state by means of dynamite or other explosives or poisonous or stupefying substances; or place in any waters of this state explosives which might cause the destruction of fish, except for the purpose of raising dead bodies whenever ordered by the public authorities, or for the purpose of clearing a channel or breaking a log jam; or have in his possession or under his control, upon any inland waters, any dynamite or other explosives for the purpose of taking, catching or killing fish. Violations of this subsection shall be punished by a fine of not less than two hundred nor more than five hundred dollars, or by imprisonment in the county jail not less than nine months nor more than one year, or by both such fine and imprisonment.

(2) Medicated bait. No person shall use, set, lay or prepare in any of the waters of this state any lime, poison, medicated bait, fish berries, or any other substance deleterious to fish life or which might attract fish in unusual numbers; but the feeding of cisco with oatmeal for the purpose of catching such fish with hook and line through the ice, is lawful.

(3) Deleterious substances. No person shall cast, deposit, or throw overboard from any boat, vessel or other craft into any waters within the jurisdiction of the state, or deposit or leave upon the ice thereof until it melts, any fish offal; or throw or deposit, or permit to be thrown or deposited, into any waters within the jurisdiction of the state any lime, tanbark, ship ballast, stone, sand, slabs, decayed wood, sawdust, sawmill refuse, planing mill shavings, or any acids or chemicals or waste or refuse arising from the manufacture of any article of commerce, or any other substance deleterious to fish life other than authorized drainage and sewage from municipalities.

Case 1:22-cv-00695-JLS   Document 77-9   Filed 05/31/24   Page 34 of 190

## FISHING WITH NETS AND SET LINES

**29.30  FISHING WITH NETS AND SET LINES.**  (1) License required.  Nets and set lines may be used for the purpose of taking, catching, or killing rough fish and game fish, subject to the conditions, limitations and restrictions prescribed in this chapter; but no person shall set, place or use in any waters of this state any net, trap, snare, set hook, or set line, which is intended to or might take, catch or kill fish of any variety, other than a landing net, dip net, minnow seine or minnow dip net, unless a license therefor has been duly issued to such person.

(2) Restrictions on the use of licensed nets and set lines. The use of licensed nets and set lines is subject, further, to the following conditions:

(a) No apron or other device shall be used in any pound net, which might prevent the escape of small fish through the meshes of the net when it is set or raised.

(b) No net of any kind shall be set so as to shut off more than one-half of any channel or passageway of any stream, or set within one thousand feet of any other net in said stream.

(c) No licensee shall join his net to that of any other licensee.

(d) At each end of every licensed net or set line, when set in any waters. shall be placed and maintained a white flag of not less than sixteen inches square, with the upper end of the staff extending at least two feet above the water, and numbered with figures at least three inches in height corresponding with the number of the license authorizing the use of such net or set line.

(e) The licensees of licensed nets or set lines used in outlying waters shall, on their boats, carry the state conservation commission, or its deputies, to and from their nets or set lines when set and, on demand of such officer, shall raise the same for his inspection; and any such officer is authorized, in the presence or absence of the licensee. at any time, to raise any set line in any waters, with as little damage as may be, for inspection. If any such licensee shall refuse to carry any such officer as herein provided his license shall be revoked and cancelled.

(f) No license net shall be drawn or lifted at any time between one hour after sunset and sunrise of the following morning, in any waters other than Lake Superior, Lake Michigan, Green Bay, the Fox river beyond a distance of 500 feet below the dam at De Pere, and Sturgeon Bay·

1224        LAWS OF WISCONSIN—Ch. 668.

(g) No fish of any kind shall be taken or retained in **any** net, when drawn or lifted, other than the kind or kinds **expressly** authorized to be taken or retained in such net, as provided **in** this chapter; and except as provided in paragraph (h) any such other kind or kinds of fish coming into or taken in such nets shall be immediately returned, carefully and with as little injury as possible, to the waters from which they were taken.

(h) All rough fish taken in net in inland water shall be brought to shore and buried, sold, or otherwise lawfully disposed of; but none of such fish shall be returned to any waters of this state.

(i) Whenever the size of mesh of any net is specified in this chapter it shall be the size of such mesh, stretch measure, at the time of its use.

29.31  DIP NETS IN INLAND WATERS.  (1) No person shall set, use or operate any dip net in any of the inland waters of the state for taking, catching or killing of any variety of fish other than as specified in this section.

(2) Dip nets not exceeding eight feet in diameter with meshes of not less than three inches may be used for taking, catching or killing rough fish in the Fond du Lac river within three miles of its mouth; in Silver creek in the town of Ripon, Fond du Lac county, from the old Arcade dam to the Green Lake county line; in the Big Wolf river; in Butternut lake, Ashland and Price counties; in the Manitowoc river from its mouth up to Ripp's bridge in the town of Rockland, Manitowoc county, and in all the streams and rivers flowing into Lake Michigan in that part of such streams beginning at the mouth and extending ten miles inland.

29.32  MINNOW NETS.  (1) Use limited.  No person shall set, use or operate any minnow seine or minnow dip net in any of the waters of this state for taking, catching or killing fish of any variety, other than as specified in this section.

(2) Inland waters.  Minnow seines not exceeding forty feet in length and five feet in depth, and minnow dip nets not exceeding six feet in diameter may be used in all inland waters for taking, catching or killing rough fish minnows for bait only; but not in any such waters, creeks or streams inhabited by trout or in which trout have been planted, or in Turtle creek in Walworth and Rock counties, unless supervised by the state conservation commission or its deputies.

(3) Outlying waters.  Minnow seines not exceeding one hundred feet in length and five feet in depth and minnow dip nets

LAWS OF WISCONSIN—Ch. 668.        1225

not exceeding six feet in diameter may be used in Lake Superior, Lake Michigan, Green Bay, Sturgeon Bay, and the Fox river below the dam at De Pere, for taking, catching, or killing rough fish minnows for bait only.

29.33  NET AND SET HOOK FISHING IN OUTLYING WATERS.  (1) License authorized.  Net or set hook licenses which shall authorize the use of one or more of the kinds of nets or lines of set hooks named in this section, as limited herein, for the taking, catching, or killing of fish in the waters of Lake Superior, Lake Michigan, Green Bay, Sturgeon Bay, and the Fox river below the dam at De Pere, shall be issued, subject to the provisions of section 29.09, by the state conservation commission to any person duly applying therefor.

(2) Form of license.  In addition to the facts required by section 29.09, each application for such license, and the license issued thereon, shall state the name and kind of vessel and whether with or without a steam lifter, and the number and kind of nets or set hooks to be covered by the license applied for.

(3) License period and fees.  Each such license shall be effective only from the first day of January until the thirty-first day of December of the same year; and the fee for each license issued to any resident of this state is two dollars for a gill net or nets; five dollars for each seine; two dollars for each pound net and leader; five dollars for trap net or nets, fyke net or nets, drop net or nets, with leaders; and one dollar for each trammel net, or for set hooks.  The fee for each license issued to any nonresident is the same as the resident fee, except for gill nets operated in conjunction with or from any vessel; and for gill nets so operated, two dollars for any vessel propelled by oars, paddle, or pole, fifty dollars for any other vessel propelled otherwise than by steam, one hundred dollars for any steam vessel without a steam lifter, and two hundred dollars for any steam vessel with a steam lifter.

(4) Metal tags.  No such licensed net or set hooks shall be used until the same are equipped with metal tags stamped to designate the kind of net or set hooks and number of the license covering the same.  One such tag shall be securely fastened to each two thousand lineal feet, or fraction thereof, of gill net or set hooks; one to each pound net; one to each five hundred lineal feet, or fraction thereof, of seine; and one to each fyke, drop, trap, submarine or trammel net.  Such tags shall be furnished by the state conservation commission to the licensee at the time of issuing the license, on payment of a fee of twenty-

five cents for each tag, except that tags for gill nets shall be fifty cents.

(5) Reserve waters. The following waters are reserve waters, and no nets of any kind shall be set therein, namely: In Lake Superior within one-fourth mile from the entry of the channel between Wisconsin Point and Minnesota Point, or from any harbor, pier or breakwater, or from the mouth of any stream flowing into Lake Superior, or from the shore line of Douglas county. In Lake Michigan and Green Bay within one-fourth mile of any harbor, pier or breakwater, or from the mouth of any stream flowing into Lake Michigan or Green Bay, or within one mile from any harbor, pier or breakwater in Milwaukee county, or within one mile from the shore line of Milwaukee county. In the waters of Lake Michigan or Green Bay no gill net shall be set within one-fourth mile from the shore line of Door county and no net of any kind shall be used in the following bays or harbors in Door county, namely: Sturgeon Bay, Little Sturgeon Bay, Fish Creek Harbor, Eagle Harbor, Bailey's Harbor, Mud Bay, North Bay, Rowley's Bay, and Washington Harbor and Detroit Harbor in Washington Island. No gill net of less than four inches stretch measure shall be set in less than forty fathoms of water, except in Green Bay proper.

(6) Close seasons. For the purpose of this subsection the waters of Green Bay shall be considered to include all that area south of a line drawn between Limekiln Bluff in Door county and the mouth of the Menominee river in Marinette county, and including the Fox river as far as the dam at De Pere, and all the waters of Green Bay north of the above described line shall be subject to the law covering Lake Michigan.

(a) In Green Bay there shall be a close season on lake trout and whitefish from October 21 to November 21. A close season for pike and pickerel from March 10 to May 1. A close season for all varieties of fish, except lake trout and whitefish from the first day of April to the fifteenth day of May, inclusive.

(b) In Lake Michigan there shall be a close season on lake trout and whitefish from October 21 to November 21.

(c) In Lake Superior there shall be a close season for lake trout and whitefish from September 15 to November 1.

(7) Prohibited nets. Minnow nets. For the purpose of this subsection the waters of Green Bay shall be considered to include all that area south of a line drawn between Limekiln Bluff in Door county and the mouth of the Menominee river in Marinette county and including the Fox river as far as the dam

at De Pere. All the waters of Green Bay north of the above described line shall be subject to the law covering Lake Michigan.

(a) In Green Bay nets with a mesh not less than four inches may be used for the taking of lake trout and whitefish. Gill nets with a mesh not less than two and three-eights inches may be used for taking herring, chub, bluefin, or perch. Seines with a mesh of not less than three inches, and pound nets with a mesh of not more than two inches in the pound may be used. No nets of any kind shall be set for the purpose of catching any variety of fish during the close season for such fish and from the first day of April to the fifteenth day of May, inclusive, except gill nets with mesh of not less than four inches for the purpose of taking lake trout or whitefish, no nets of any kind shall be set in the waters of Green Bay. During the period from January 1 to March 10 gill nets with a mesh of two and one-eighth inches may be used under the ice for the purpose of catching herring.

(b) In Lake Superior gill nets with a mesh of not less than four inches may be used for the purpose of taking lake trout and whitefish. Gill nets with a mesh of not less than two and three-eighths inches may be used during the months of November and December for the purpose of taking herring. Seines with a mesh of not less than three inches and pound nets with a mesh of not more than two inches in the pound may be used. No nets of any kind shall be set or used for the purpose of taking any variety of fish during the close season for such fish.

(c) In Lake Michigan gill nets with a mesh of not less than four inches may be used for the purpose of taking lake trout and whitefish. Gill nets with a mesh of not less than two and one-half inches may be used for the purpose of taking herring, chub, bluefin and perch but no such nets shall be set in less than forty fathoms of water. Seines with a mesh of not less than three inches and pound nets with a mesh of not more than two inches in the pound may be used. No nets of any kind shall be set for the purpose of taking any variety of fish during the close season for such fish.

(d) In Green Bay and Lake Michigan minnow seines fifty feet long and five feet deep may be used for taking rough fish minnows for bait. Each set hook licensee may use not more than two thousand feet of gill net with a mesh of one and three-eighths inches, except in reserve waters, for the purpose of taking bloaters for bait. The provisions of subdivision (d) of

subsection (7) of section 29.33, shall not take effect until January 1, 1918.

(e) All nets with a mesh other than such as above specified and all nets used in violation of this chapter are contraband nets and shall be seized and confiscated whenever found in the water or on any vessel, dock or reel. Any such contraband nets so found shall be deemed sufficient evidence of the use of such nets by the owner thereof.

(8) Bass, muskellunge and sturgeon. All black bass, muskellunge and sturgeon taken in any net shall be immediately returned alive and without avoidable injury, to the waters from which taken.

(9) Under size fish. No licensee of any net or set hooks shall transport or cause to be transported, fish of any of the varieties mentioned in this subsection of a length less than that specified for each variety; and such measurement of length shall be taken in a straight line from the tip of the nose to the utmost end of the tail fin, except that the measurement of dressed fish be of the length of the carcass, namely:

| | | |
|---|---|---|
| Lake trout | 12 | inches |
| Whitefish | 13 | " |
| Suckers | 10 | " |
| Carp | 12 | " |
| Suckers with head and tail off | 7 | " |
| Perch | 8 | " |
| Perch with head and tail off | .5 | " |
| Pike | 13 | " |
| Pike with head and tail off | 10 | " |
| Pickerel | 16 | " |
| Pickerel with head and tail off | 11 | " |
| Catfish | 15 | " |
| Catfish with head off | 13 | " |
| Any other variety | 7 | " |

Any licensee taking such undersize fish shall bring them to shore and immediately notify the state conservation commission or its deputy; and the latter shall take possession of such fish and deliver them to some state, county, or charitable institution, or otherwise dispose of the same.

(10) Possession, sale and transportation. No such licensee and no other person shall transport or cause to be transported, or deliver or receive or offer to deliver or receive for transportation or have in possession or under control any fish of the varieties mentioned in subsection (9) of a length less than that

specified therein for each variety, respectively, whether lawfully or unlawfully taken within or without the state. When ever such undersize fish are received by or offered to any person for transportation in the course of business, such person shall forthwith notify the state conservation commission, or its deputy, stating full particulars.

(11) Penalty. Any violation of subsections (1), (5), (6), (7), (8), (9), and (10) of section 29.33 shall be punished by a fine of not less than three hundred dollars nor more than five hundred dollars, or by imprisonment in the county jail for not less than six months nor more than nine months, or by both such fine and imprisonment.

(12) Reports. On or before January 10 following the expiration of his license, each such licensee shall report to the state conservation commission in writing, on blanks furnished by the said commission, the number of his license, the kind, number and size of nets, the length of lines of set hooks used, number of lineal feet of gill nets, the number of pounds and value of each variety of fish caught; and such other information as may be required on the blanks furnished. Such report shall be subscribed to before a notary public or a justice of the peace.

29.34   NET LICENSES; MISSISSIPPI RIVER WATERS. (1) License authorized. Net licenses which shall authorize the use of nets, as limited herein, during the period of time extending from the fifteenth day of June to the next succeeding fifteenth day of April, for taking, catching, or killing fish in the waters of the Mississippi river, Lake Pepin, and Lake St. Croix, and the lakes, bays, bayous, and sloughs tributary thereto and connected therewith, shall be issued subject to the provisions of section 29.09 by the state conservation commission to any resident of the state duly applying therefor.

(2) Bond. Before any such license is issued, the applicant shall execute and deliver to the state conservation commission a bond running to the state of Wisconsin, in the sum of two hundred dollars, with two sureties, and conditioned that if the applicant shall well and faithfully observe and comply with all the provisions of this chapter, said obligation to be null and void, otherwise to remain in full force. Each said surety shall be worth and qualify in at least the sum of two hundred dollars, over and above all his debts and liabilities, in property within this state not exempt from sale on execution.

(3) License period; nets specified. Each such license shall

1230        LAWS OF WISCONSIN—Ch. 668.

expire on the fifteenth day of April next succeeding the date of its issue, and shall authorize the use of one or more of the following nets only: Seines not exceeding a total length of four thousand feet, and having meshes of not less than five inches on the wings or four inches in the center of the pot, the pot not exceeding one hundred and fifty feet in length; gill nets having meshes of not less than seven inches; pound or hoop nets having meshes of not less than six inches in the leaders, five inches in the hearts, or three inches in the hoops; and bait nets to be used without leads, having meshes of not less than three inches, and not more than a four-foot hoop front.

(4) License fees.  The fee for each such license is as follows: For seines, one dollar per hundred for the first five hundred lineal feet, two dollars per hundred for the second five hundred lineal feet, three dollars per hundred for the third five hundred lineal feet, four dollars per hundred for the fourth five hundred lineal feet, five dollars per hundred for the fifth five hundred lineal feet, and six dollars for each one hundred lineal feet over twenty-five hundred; for gill nets, five dollars for the first two thousand lineal feet, and five dollars for each additional one thousand lineal feet; for pound or hoop nets, five dollars for each seven hundred lineal feet of leader and one pound, and five dollars for each additional pound; for bait nets, one dollar each.

(5) Metal tags.  No such licensed net shall be used until the same is equipped with metal tags stamped to designate the kind of net and number of the license covering the same.  One such tag shall be securely fastened to each five hundred lineal feet, or fraction thereof, of seine; one to each two thousand lineal feet, or fraction thereof, of gill net; and one to each fyke, hoop, or bait net.  Such tags shall be furnished by the state conservation commission to the licensee at the time of issuing the license, on payment of a fee of twenty-five cents for each tag.

(6) Protected fish.  No such licensed net shall be used for taking, catching, or killing any of the following named fish: catfish of any variety under fifteen inches in length in the rough, or twelve inches dressed with the head detached; pike of any variety, bass of any variety, crappies, sunfish, pickerel, sturgeon, or perch.

(7) Reserve waters.  No such licensed net shall be used for taking, catching, or killing fish of any kind in any of the following named waters:  Rice lake, French lake, Mud lake, Round lake, Long lake, French slough, Spring creek, Spring slough,

and Black river in La Crosse county; Courtois pond, Pickerel, Spring, Nigger and Frenchtown sloughs and Gordon bay, in Crawford county; the De Soto bay, Long slough, T slough, Green lake, Pick's lake and all sloughs, lakes and bayous from De Soto bay to the main channel of the Mississippi river and as far north as Battle Bar in Vernon county; Cassville sloughs from Glen Haven to Cassville; Daley lake, Wyalusing bay and Glen lake between Wyalusing and the Burlington railway bridge, Plondke and Harris sloughs, Crawford lake, Ferry lake, and Bertram lake, all in Grant county; Trention lake, Trention slough, Mud lake and Mero slough in Pierce; and Beef slough in Buffalo county; and the Mississippi river within fifteen hundred feet of the mouth of the Chippewa river.

(8) Temporary ponds; shipments. Each such licensee may construct temporary fish ponds and keep his fish therein until they can be marketed; and a card shall be attached to each shipment thereof, on which shall be written "Shipped under section 29.34," the signature of the licensee, and the number of his license.

(9) Reports. Each such licensee shall keep a strict record and account as to each variety of fish and the number of pounds thereof taken by him in such licensed nets; and shall report thereon to the state conservation commission on or before the fifteenth day of May covering his operations during the preceding year.

29.35 NET LICENSES; WHITEFISH AND CISCO IN INLAND LAKES. (1) Net licenses which shall authorize the use of not exceeding one hundred lineal feet of gill net, with meshes not less than two and three-fourths inches, or dip nets with a diameter of not more than eight feet and with meshes not less than one and one-half inches, for taking, catching or killing whitefish in any of the inland waters of the state containing whitefish, or not exceeding one hundred lineal feet of gill net, with meshes not less than two inches, for the purpose of catching ciscos in any of the inland waters of the state containing cisco may be issued by the state conservation commission, subject to the provisions of section 29.09, to any resident of the state duly applying therefor. Such licenses may also be issued by the commission in its discretion, for the catching of whitefish or ciscos, respectively, in any other inland waters. The fee for each such license is fifty cents.

(2) Each such license shall be limited to such period of twenty days as shall be fixed by the state conservation commission, and no such whitefish licensee shall have in his possession

or under his control at any time more than one hundred pounds of whitefish.

(3) No such licensed net shall be used until the same is equipped with a metal tag, stamped to designate the kind of net and number of the license covering the same, to be securely fastened to each net. Such tag shall be furnished by the commission at the time of issuing the license. Spears may be used in the waters of Vilas county during the period from October 15 to November 15 for the purpose of spearing cisco.

29.36 NET LICENSES; ROUGH FISH IN WINNEBAGO WATERS. (1) The state conservation commission may upon application therefor issue to any person a license to use and operate a seine, fyke, hoop net or a turtle net in lakes Winnebago, Winneconne, Poygan, Butte des Morts, Little Butte des Morts, and the Fox and Wolf rivers, for the purpose of taking and catching rough fish between the fifteenth day of June of each year and the next succeeding first day of April. All the following varieties of fish so caught shall be the property of the licensee, i. e., pickerel, buffalo fish, carp, eelpout, dogfish, sheepshead, billfish, red horse, suckers, lawyers and lizards.

(2) The fee for each such license is as follows: For a seine of five hundred feet and not over one thousand feet, twenty-five dollars; of one thousand feet or over, fifty dollars each; for seines of less than five hundred feet, or fyke, hoop or turtle nets, five dollars each. No nets shall be used until the same are equipped with metal tags, stamped to designate the kind of net and numbered to correspond with the number of the license authorizing the operation of said net or nets, one such metal tag to be securely fastened to each net. Such metal tag shall be furnished to the licensee by the state conservation commission on the payment of a fee of twenty-five cents for each tag. Any licensee operating a seine, seines, fyke or hoop net, under the provisions of this section, shall do so under the direction and personal supervision of the state conservation commission or one of its deputies, but not otherwise; but the state conservation commission may order one deputy to direct and supervise the operation of a seine, seines, fyke or hoop nets by more than one licensee.

(3) All licenses under the provisions of this section shall be issued upon the express condition that each licensee operating a seine or seines shall pay to the state conservation commission one-half cent per pound for all fish taken under such license and which are packed ready to be shipped or otherwise disposed of. Any and all moneys so received by the commission shall be paid into the state treasury.

LAWS OF WISCONSIN—Ch. 668.        1233

(4) Any licensee shall be allowed to ship or transport to any place he desires any fish taken under the provisions of this section, except those required to be immediately returned to the waters.  A card shall be attached to the package or box in which the same shall be shipped, on which shall be written "Shipped under section 29.36," the signature of the licensee, and the number of his license.

(5) Each such licensee may construct temporary fish ponds and keep his fish therein until they can be marketed.

29.37  SET LINE LICENSES; INLAND WATERS.  (1) Set line licenses which shall authorize the use of one set line only, with not exceeding twenty-five hooks, for taking, catching or killing fish, shall be issued, subject to the provisions of section 29.09, by the county clerk of the county bordering on the waters where such set lines are intended and permitted to be used, to any person duly applying therefor.

(2) Each such license shall be limited to the period of time extending from the twenty-ninth day of May to the next succeeding fifteenth day of February.  The fee for each such license is one dollar.

(3) No such licensed set line shall be used until the same is equipped with a metal tag, stamped to designate the number of the license covering the same, which shall be securely fastened to one end of the set line.  Such tag shall be furnished by the state conservation commission to the county clerk, and by the latter to the licensee at the time of issuing the license, on payment of a fee of twenty-five cents.  All fees received by county clerks for such metal tags shall be returned and reported in the same manner as are license fees, as prescribed in section 29.09, but without deduction.

(4) Such licensed set lines may be used only in the following waters:  Big Wolf river in Waupaca and Outagamie counties; Lake Winnebago, Lake Butte des Morts, Little Butte des Morts, Lake Winneconne, Lake Poygan, Lake Puckaway, and the river connecting said lakes, Fox river, except below the dam at De Pere; Wisconsin river from the north line of Sauk county to its mouth; Black river from the north line of Jackson county to its mouth; the Chippewa river from its mouth to the dam at Jim Falls, Chippewa county; Menomonee river bordering on Marinette county; the Pecatonica river in Green county; and the Mississippi river, Lake Pepin and Lake St. Croix.

(5) In the Mississippi river, Lake Pepin and Lake St. Croix, Big Wolf river in Waupaca and Winnebago counties; in the

Fox river in Winnebago county and in Outagamie county as far as the dam at De Pere; in Lake Winnebago, Lake Winneconne, Lake Butte des Morts, Little Butte des Morts, Lake Poygan, three hundred hooks may be used but in such waters no frog, minnow or live bait shall be used. No licensed set line shall be equipped with any hooks smaller than 5/0.

## CLAMMING

29.38   Clamming licenses.   (1) No person who is not a resident of this state or who has resided in this state less than one year next previous shall take, catch or kill any clam in the inland waters of this state unless a license therefor has been duly issued to him. Such licenses shall be issued subject to the provisions of section 29.09 by the state conservation commission to all such persons duly applying therefor. The fee for each such license is fifty dollars. Each such licensee may use one boat only, in the exercise of his clamming privilege.

(2) No person shall take, catch or kill any mussels in any of the waters of this state at any time with the use of a dredge.

## POSSESSION OF GAME

29.39   POSSESSION DURING CLOSE SEASON, OR IN EXCESS OF BAG LIMIT.   No person shall have in his possession or under his control, or have in storage or retention or as common carrier for any one person, any game, game fish, or other wild animal or carcass or part thereof, during the close season therefor, or in excess of the bag limit for one day or below the minimum size thereof at any one time during the open season, whether lawfully or unlawfully taken within or without the state.

29.40   POSSESSION OF DEER; HEADS AND SKINS.   (1) Deer tags.   Any person having lawfully killed a deer shall immediately attach and leave attached to the carcass, or part thereof, the deer tag corresponding to his license; and no person shall have in his possession or under his control, or have in storage or as a common carrier, any such carcass, or part thereof, without such tag attached.

(2) Home consumption.   Any person residing in this state having lawfully killed a deer, may have in his possession and consume the meat thereof in his own family at any time, but must leave the tag attached thereto.

(3) Heads and skins.   The head and skin of any deer lawfully killed, when severed from the rest of the carcass, are not

subject to the provisions of this chapter; but no person shall have in his possession or under his control the green head or green skin of a deer between the tenth day of January and the succeeding 21st day of November of each year, or at any time a deer head in the velvet, or a deer skin in the red, blue or spotted coat.

29.41  SKINS OF FUR-BEARING ANIMALS.  The skin of any fur-bearing animal lawfully killed, when separated from the rest of the carcass is not subject to the provisions of this chapter; but no person shall have in his possession or under his control the skin of any fisher, marten, mink, or muskrat showing that the same has been shot or speared, nor the green skin of any fur-bearing animal from the fifth day after the beginning of the close season for such animal until the ending thereof.

29.42  POSSESSION OF GAME BIRDS.  (1) Without license.  No person, other than the holder of a hunting license or scientist's certificate duly issued to him and in force and carried by him on his person, shall have in his possession or under his control any game bird, or animal, or the carcass or any part thereof.

(2) Nests and eggs.  No person shall take or needlessly destroy, or have in his possession or under his control, except by virtue of a scientist's certificate, the nest or eggs of any wild bird for which a close season is prescribed in this chapter.

## TRANSPORTATION OF GAME

29.43  TRANSPORTATION;  GENERAL  PROVISIONS.  (1) During close season.  No person shall transport or cause to be transported, or deliver or receive or offer to deliver or receive for transportation, any game or game fish or carcass or part thereof during the close season therefor, whether lawfully or unlawfully taken within or without the state.  Whenever any game or game fish or carcass or part thereof is offered to any person for transportation during the close season therefor such person shall forthwith notify the state conservation commission or its deputy, stating full particulars of such offer and by whom made.

(2) Trunks; valises.  No person shall carry with him or under his control in any trunk, valise, or other package or enclosure, at any time, any game or game fish, or carcass or part thereof.

(3) Transportation employes.  No employe of any railroad, express, or other transportation company, and no steward, porter, or other employe of any dining, parlor or sleeping car shall

have in his personal possession or under his personal control, at any time while in such service, any game or game fish, or carcass or part thereof.

(4) Labeling game shipments. No person shall transport or cause to be transported, or deliver or receive for transportation, any package or parcel containing any wild animal or carcass or part thereof, unless the same is labeled in plain letters on the address side of such package or parcel so as to disclose the name and address of the consignor, the name and address of the consignee, and the number of pounds of each kind of fish or the number of each variety of other wild animals; or carcasses, or parts thereof, contained therein; and unless the consignor is the owner of such shipment and shall deliver to the common carrier therewith, either personally, or by agent, a writing signed by him personally, stating that he is the owner of the shipment.

29.44 INTERSTATE TRANSPORTATION OF GAME. No person shall transport or cause to be transported, or deliver or receive or offer to deliver or receive for transportation, into or through this state, any game or game fish or carcass or part thereof from any other state in violation of the laws of such state relating to the transportation thereof; nor any game or game fish or carcass or part thereof lawfully transported from any other state, nor have the same in his possession or under his control, during the close season or in excess of the limitations prescribed for such animal in this chapter, unless a permit therefor has been duly issued to such person by the state conservation commission; but any person who has lawfully killed a deer in this state may, on his license only, take such deer into any adjoining state, if the laws thereof permit, and ship the same from any point in that state to any point within this state.

29.45 TRANSPORTATION OF DEER. (1) No common carrier shall receive for transportation or transport or attempt to transport any deer, or carcass or part thereof, otherwise than as provided in this section.

(2) Each holder of a resident hunting license, settlers' hunting license, or nonresident general hunting license, may transport or cause to be transported one deer between the last ten days of November of each year; but must accompany the same from the point of shipment to the point of destination.

(3) The place of delivery of any such shipment by a resident licensee shall be within the state, and by a nonresident licensee may be either within the state or at his residence without the state.

29.46  TRANSPORTATION OF GAME BIRDS.  (1) No common carrier shall receive for transportation or transport or attempt to transport any game bird, or carcass or part thereof, otherwise than as follows:  Each holder of a hunting license may carry with him openly, in his personal possession, a mixed bag of not more than twenty such birds, but not more than the bag limit for one day of any one variety; but no such licensee resident within this state shall carry or convey any such bird beyond the borders of the state.

29.47  TRANSPORTATION OF FISH.  (1) Time limitation.  No person shall transport or cause to be transported, or deliver or receive or offer to deliver or receive for transportation, any game fish taken from inland waters, during the period extending from the first day of January to the last day of the close season for such fish, in each year.

(2) From inland waters.  No person shall transport or cause to be transported, or deliver or receive or offer to deliver or receive for transportation, at any time, any game fish taken from inland waters other than as follows:

(a) One shipment only of not more than one package, and containing not more than twenty pounds of game fish of any variety other than those named in paragraphs (c) and (d) of this subsection, or containing in lieu thereof not more than two such fish of any weight, may be transported by any resident to any point within the state, or by any nonresident licensee to any point without the state in each period of seven days.  Nonresident hook and line fishing licenses may be issued by the state conservation commission to any nonresident female over the age of sixteen years for the purpose of making shipment without the state, under the provisions of this section.

(b) Any shipment containing more than twenty but not exceeding fifty pounds of game fish of any variety other than those named in paragraphs (c) and (d) of this subsection may be transported only to a point within this state, and must be accompanied by the owner from the point of shipment to the point of destination.

(c) Thirty-five trout of any variety other than lake trout may be transported to any point within or without the state, when accompanied by the owner from the point of shipment to the point of destination.

(d) One shipment only, containing not more than twenty pounds of lake trout taken from inland waters, may be transported by any person in each period of seven days, to any point within or without this state, when accompanied by the owner from the point of shipment to the point of destination.

(3) From outlying waters.  The transportation of fish taken in outlying waters is subject to the following limitations:

(a) No green fish of any variety shall be shipped from any port located on outlying waters during the close season for such fish, except the first three days thereof.

(b) Pike and pickerel of lawful size and lawfully taken from outlying waters may be transported to points within or without the state without limitation as to quantity; but all such shipments shall be billed only from a port on outlying waters directly to their destination, and shall not be rebilled or reshipped from any other point within the state.

(4) Shipments from inland points.  Any shipment of game fish of any variety originating at any point in this state other than ports located on outlying waters is subject to the provisions of this section governing the transportation of game fish taken from inland waters.

(5) Foreign shipments.  Pike and pickerel in a frozen state, whether dressed or not dressed, legally taken or imported from any foreign country, are not subject to any of the provisions of this chapter except subsection (10) of section 29.33; but the person importing, transporting, dealing in, or selling such fish shall keep a separate record of all shipments and consignments thereof, containing the number of pounds, the date received, the name of the consignor, and the name of the carrier transporting the same, which shall be at all times open to inspection by the state conservation commission or its deputies.

(6) Injurious fish.  Live carp minnows and dogfish minnows shall not be transported within the state.

## COMMERCE IN GAME

29.48  SALE OF GAME.  Except as provided by section 29.52 no person shall sell, purchase, or barter, or offer to sell, purchase, or barter, or have in his possession or under his control for the purpose of sale or barter, any deer, squirrel, game bird, black bass, muskellunge, or trout other than lake trout, or the carcass or part thereof, at any time; nor any other game fish taken from inland waters during the period extending from the first day of January to the next succeeding twenty-ninth day of May of each year; nor any other game or other wild animal, or carcass or part thereof, during the close season therefor. This section applies, whether such animals were lawfully or unlawfully taken within or without the state.

29.49  SERVING OF GAME TO GUESTS.  (1) Prohibited. Except as provided by section 29.52 no innkeeper, manager or

steward of any restaurant, club, hotel, boarding house, saloon, logging camp, or mining camp shall sell, barter, serve or give, or cause to be sold, bartered, served, or given to the guests or boarders thereof the meat of any deer, squirrel, game bird, or trout other than lake trout, or the carcass or part thereof, at any time; nor any other game fish taken from inland waters during the period extending from the first day of January to the next succeeding twenty-ninth day of May of each year; nor any frog or other game or other wild animal, or carcass or part thereof, during the close season therefor, except rabbits in counties containing a city of the first class.   This section applies, whether such animals were lawfully or unlawfully taken within or without the state.

(2) Free lunch.   The giving, offering, or affording opportunity to take free lunch in any of the places named in the preceding subsection shall be held to be embraced within the prohibitions thereof.

(3) Penalty.   Violations of this section shall be punished by a fine of not less than two hundred nor more than five hundred dollars, or by imprisonment in the county jail not less than nine months nor more than one year, or by both such fine and imprisonment.

## PROPAGATION OF WILD ANIMALS

29.50   PROPAGATION PRIVILEGED.   Nothing in the foregoing provisions concerning the protection of wild animals shall affect the operation of state hatcheries, the removal of fish which have died from natural causes or the removal of deleterious fish by the state conservation commission or under its authority; or the propagation or transportation, collecting and transplanting of fish or fish fry by state authority; nor the transportation of fish into or through this state or out of it by the commissioners of fisheries of other states or of the United States; nor the operation of private fish hatcheries, or the propagation of fish in private waters, or the transportation and sale of fish therefrom as hereinafter provided; but the state conservation commission, or its agents and employes, shall not furnish fish or fry from state hatcheries to private ponds, private clubs, corporations or preserves, and shall not plant them in waters where the general public is not allowed the rights and privileges enjoyed by any individual.

29.51   STATE PROPAGATION OF FISH.   (1) State fish hatcheries.   The state conservation commission shall have gen-

eral charge of the following matters, and all necessary powers therefor, namely:

(a) The propagation and breeding of fish of such species and varieties as they may deem of value.

(b) The collection and diffusion of useful information in regard to the propagation and conservation of fish.

(c) The government and control, care, supply, and repair of the state fish hatcheries and the grounds used therefor, whether owned or leased, and the buildings, ponds, fish car and other apparatus, and all other property belonging to or held by the state for the propagation of fish.

(d) The purchase and establishment and control, in like manner, of new hatcheries when appropriations shall be made by law, and the establishment of such temporary hatching stations as they may deem necessary.

(e) The receiving from the commissioners of fisheries of the United States, and from the commissioners of fisheries of other states, or other persons, of all spawn, fry or fish donated to the state or purchased, and in the most practical ways, by exchange or otherwise, to procure, receive, distribute, and dispose of spawn and fish; to make contracts and carry on the same for the transportation of fish cars, cans, commissioners and employes by land or water as may be most advantageous to the state; and to take such other measures as in their judgment shall best promote the abundant supply of food fishes in the waters of the state.

(f) The commission shall keep an inventory of the property of the several hatcheries, with the cost of each article, and account in detail and separately of the expenses of each hatchery; also of the distribution of the fish, of maintaining and repairing property and of such improvements as may from time to time be ordered.

(2) Transplantation of fish. The commission may take or cause to be taken fish at all seasons of the year from any waters of the state for stocking other waters, or for the purpose of securing eggs for artificial propagation in the state hatcheries. Such fish or eggs shall be taken only under a special permit issued by the commission, and then only in the presence of the commission or its deputies. Such permit shall specify the kinds of fish that may be taken and the manner in which they may be taken; and shall be subject to the conditions that the holder shall pay for the services of and furnish free transportation and meals on his boat to a competent person approved by the com-

mission to spawn the fish and fertilize the eggs, and that such eggs shall be delivered at such place as may be designated by the commission and forwarded to some state hatchery for propagation.

(3) Delivery of spawn. Any person fishing in any waters of this state shall deliver, on demand, to the state conservation commission or its deputies or authorized agents, all kinds of fish, during the spawning season, for the purpose of being stripped of their eggs and milk; and the person receiving them shall, immediately after having stripped the fish, return them to the person from whom received. Any such person shall permit the commission, or its deputies, or authorized agents to enter any boats, docks, grounds or other places where such fish may be, for the purpose of stripping the same while alive, and shall render such assistance as may be necessary to expedite the work of mixing the eggs and milk for proper impregnation.

(4) Removal of spawn or fish from state. No person shall remove any fish eggs or live fish from this state except as authorized by law, unless a permit therefor has been issued to him by the state conservation commission.

(5) Unlawful fishing by employes. No employe of the commission, and no other person, while engaged in catching wild fish from the public waters for purposes of artificial propagation, shall take or have in his possession or under his control any kind of fish other than those he has been directed, by the commission or its deputy or agent, to take therefrom.

29.52 PRIVATE FISH HATCHERIES. (1) No person shall stock any private fish hatchery with fish or fry obtained from any Wisconsin state fish hatchery, or from any waters of the state except when such fish have been taken in a lawful manner.

(2) The term "private fish hatchery" includes only private ponds, with or without buildings, used for the purpose of propagating fish and located as follows:

(a) At the headwaters of or along a stream for a distance of not to exceed one mile, on private land possessed and controlled by the owner or owners of such hatchery.

(b) On private land where the supply of water for the hatchery is furnished by springs or artificial wells.

(c) On private land where the supply of water for the hatchery is obtained by the use of flumes, pipes, or ditches from flowing streams, provided that said flumes, pipes, or ditches, shall be properly screened so as to prevent fish from passing from such streams to the ponds of such hatchery.

(3) The owner or lessee of any private hatchery shall report to the state conservation commission the name, if any, and location of such hatchery, whereupon the commission shall inspect, and in its discretion number and register such hatchery and immediately inform the owner or lessee of the number given such hatchery; such owner or lessee shall, however, pay a registration fee of five dollars, and all expenses of inspection except the salary of the employe who inspects the hatchery.

(4) Each package or box containing fish propagated and raised in any private hatchery and shipped or offered for shipment shall be branded with an iron brand as follows: "Shipped from the private fish hatchery of (insert name of owner or lessee, location, and number of hatchery)" and such brands shall not be used on packages containing fish not taken from such private hatchery.

(5) Any person who shall, without permission of the owner, trespass or fish on the waters of a private hatchery or fish pond properly registered with the state conservation commission, shall be punished by a fine of not less than fifteen dollars nor more than twenty-five dollars and in default of payment thereof shall be imprisoned in the county jail for not less than ten days nor more than twenty days; provided, that the owner of such private fish hatchery or fish pond gives notice by maintaining signboards, at least one foot square, in at least two conspicuous places to every forty acres. Prosecutions under this subsection shall be by the owner of such private hatchery or pond.

29.54 STATE PROPAGATION OF WILD MAMMALS AND BIRDS. (1) The state conservation commission is authorized to take or purchase wild mammals and birds and their eggs for propagation. The distribution thereof shall be made throughout the various parts of the state under the supervision and direction of the commission, and according to such regulations as they shall prescribe.

(2) No person shall take, remove, sell, or transport from the public waters of this state to any place beyond the borders of the state, any duck potato, wild celery, or any other plant or plant product except wild rice native in said waters and commonly known to furnish food for game birds.

29.55 WILD ANIMALS FOR PARKS. (1) The state conservation commission may, on application of any park board, grant permit to take, have, sell, barter, or transport, at any time, live wild animals for park purposes.

(2) The state conservation commission may, on application

of any person, grant a permit to such person to take and transport wild animals for propagation within the state, under the supervision of the commission or its deputies

29.56  FOREST COUNTY GAME REFUGE.  Townships thirty-eight north, of range twelve and thirteen east, Forest county, shall be known as the Forest County Refuge.  No person shall at any time or in any manner, hunt any game within said refuge.

29.57  WILD LIFE REFUGES.  (1) Establishment.  The owner or owners of any tract, or contiguous tracts, of land comprising in the aggregate not less than one hundred and sixty acres located outside the limits of any city or village, may apply to the state conservation commission for the establishment of said lands as a wild life refuge.  The commission may thereupon employ such means as it may deem wise to inform itself regarding the premises; and if, upon inspection, investigation, hearing, or otherwise, it shall appear to the satisfaction of the commission that the establishment of said lands as a wild life refuge will promote the conservation of one or more useful species or varieties not native within this state, it may by order designate and establish the said lands as a wild life refuge.

(2) Enclosure.  Within thirty days after the date of such order the owner or owners of the said lands shall enclose the same, wherever the same are not already enclosed by a fence, with a single substantial wire, and shall post and maintain along the said wire or fence, at each interval of twenty rods, signs or notices, furnished by the state conservation commission, proclaiming the establishment of said refuge.

(3) Publication.  No such order shall be effective until at least thirty days after the date of its issue; nor unless the commission shall have caused notice thereof to be given by its publication, once in each week for three successive weeks next preceding the date of its effect, in at least one newspaper published in the county embracing the said lands.  Thereupon the said lands shall be a wild life refuge, and shall so remain for a period of not less than five years, from and after the date of effect stated in said order.

(4) Absolute Protection.  No owner of lands embraced within any such wild life refuge, and no other person whatever, shall hunt or trap within the boundaries of any wild life refuge, state park, or state fish hatchery lands; nor have in his possession or under his control therein any gun or rifle, unless the same is unloaded and knocked down or enclosed within its carry-

1244        LAWS OF WISCONSIN—Ch. 668.

ing case; but nothing herein shall prohibit, prevent, or interfere with the state conservation commission, or its deputies, agents or employes, in the destruction of injurious animals.

(5) Animals procured by commission. The state conservation commission may place within any such wild life refuge, for the purpose of propagation, wild animals of any species or variety.

## DESTRUCTION OF INJURIOUS ANIMALS

29.58  MUSKRATS INJURING DAMS.  The owner or lessee of any dam may in any manner capture or kill muskrats at any time when said muskrats are injuring or destroying such dams or the levees connected therewith; but shall not sell, barter, or give to any other person the skin of any muskrat captured or killed during the close season therefor.

29.59  BEAVER CAUSING DAMAGE.  (1) Complaint. Upon complaint in writing, by the owner or lessee of any lands, to the state conservation commission, that beaver are causing damage thereto the commission shall employ such means as it may deem wise to inquire into the matter; and if, upon inspection, investigation, hearing, or otherwise, it shall appear to the satisfaction of the commission that the facts stated in such complaint are true, it may, by written permit, authorize the said owner or lessee to capture and remove such beaver, as hereinafter prescribed.

(2) Supervision. No beaver shall be captured or killed under such permit except only during such period of time, from and after the first day of January in each year, as may be limited by the commission, and then only under the direct supervision of a deputy conservation warden.

(3) Disposition of animals.  The owner or lessee shall capture, alive and without avoidable injury, such number of beaver as may be designated by the commission, for delivery to zoological parks or collections or for transplantation to other localities within the state; all others shall be killed and skinned with care to conserve the value of the skins, which shall be shipped without delay to Madison, consigned to the state conservation commission.

(4) Sale and disposition of proceeds.  All such skins shall be sold by the commission, in the manner of a sale of confiscated game, and the proceeds paid into the conservation fund.

(5) In Price, Rusk, and Sawyer counties.  Licenses for the taking, catching or killing of beaver in Price, Rusk, and Sawyer

counties during the open season therefor, as provided in sub-division (a) of subsection (3m) of section 62.16, may be issued by the conservation commission to residents who duly apply therefor and no person shall take, catch or kill beaver in said counties without procuring such a license.   Said license shall cover the period for the month of December in the year for which the same was issued and the fee therefor shall be two dollars and fifty cents for each such license.   No skin of any beaver taken, caught or killed under said license shall be delivered, transported or shipped unless it has attached thereto a distinctive tag to be prescribed and furnished by the state conservation commission.   Licensees shall dispose of all beaver skins on or before the twentieth day of January following the date of the issuance of the license and every licensee shall on or before the thirtieth day of January following the date of the issuance of his license return the same to the state conservation commission for cancellation together with a complete report on a blank to be furnished by the said commission stating the number of beavers taken, caught or killed, the name of the town in which the same were taken, caught or killed, the disposition of the hides and the amount received therefor.   Any resident of Price, Rusk and Sawyer counties who have suffered or is likely to suffer damage because of any beaver dam on his land shall notify the game warden of his district of such fact.   After the expiration of five days after giving such notice, said resident may open said dam.   No resident of said county shall be allowed any claim against this state for damages sustained on account of beaver during the years 1917 and 1918.

(6) Penalty.   Violations of this section shall be punished by a fine of not less than two hundred nor more than five hundred dollars, or by imprisonment in the county jail not less than nine months nor more than one year, or by both such fine and imprisonment.

29.595   DEER CAUSING DAMAGE.   Upon complaint in writing by the owner or lessee of any lands, to the state conservation commission, that deer are causing damage therein the commission shall inquire into the matter; and if upon inspection, investigation, hearing, or otherwise, it shall appear to the satisfaction of the commission that the facts stated in each such complaint are true, it may capture or destroy such deer, and dispose of the same as provided in subsections (3) and (4) of section 29.59.

29.60   BOUNTIES ON WOLVES.   (1) Rate of bounty.

The county board of each county shall provide for the payment of a reward to each person who shall kill any wolf or wolf cub within such county, at the following rate: For each wolf cub killed between the first day of April and the first day of September in any year, five dollars; and for each wolf killed at any time, ten dollars. An equal amount shall be paid by the state, in each case, from the appropriation for bounties for the destruction of wolves.

(2) Presentation of claim. Any person claiming such reward shall, at his own expense, deliver the skin of the animal entire with the skull attached at the nose, within six days after the killing of such animal and in well-preserved condition, to the county clerk of the county wherein said animal was killed, together with a certificate in substantially the following form:

To the county clerk of_____county: I, the undersigned, hereby state and declare that on the_____day of_____ \_\_\_\_191\_\_\_\_, in the town of_____, county of_____, I did kill, or cause to be killed_____mature wolves,_____ \_\_\_\_wolf cubs, the skin\_\_ and head\_\_ of which I herewith present for your inspection. I further declare that I did not raise or rear, or cause to be raised or reared for me, any wolf, nor have I spared the life of any wolf in my power to kill.

Dated this_____day of_____, 191\_\_\_\_
Witness:

_____          _____
(Address)_____          Claimant.

(3) Examination of carcass. Thereupon the county clerk and the register of deeds, or their duly authorized deputies, shall make a careful examination to ascertain that the skin is that of a wolf or wolf cub; that it has not been previously marked for bounty, and that the claimant's certificate is true and correct. If the county clerk and register of deeds are unable to identify the skin and skull, they shall transmit the same, for identification, to the state conservation commission; and in any such case the decision of the commission shall be final, and if the skin be found to be of a wolf or wolf cub it shall be returned to the county clerk, except the skull, which may be destroyed by the commission or deposited in some scientific museum.

(4) Payment by county. When convinced that the claim is just and true, the county clerk shall cause the skull, if still attached, to be removed from the skins and destroyed, and the skin to be marked by a longitudinal slit, not less than six inches long, in the scalp between the ears. He shall thereupon draw

an order on the county treasurer for the amount payable by the county on said claim; and he and the register of deeds shall sign in duplicate a certificate in the following form:

We, the undersigned, county clerk and register of deeds, respectively, of_____county, hereby certify that according to the records and the evidence which we have examined and marked as provided by law, _____, whose post-office address is _____, is entitled to_____dollars, state bounty on _____which he certifies _____killed in the town of____ _____, county of_____, on the_____day of _____, 19____, and for which this county has paid him_____ dollars.

Dated at _____, this _____ day of _____, 191__

_____
County Clerk.

_____
Register of Deeds.

(5) Payment by state.  One of said duplicates shall be transmitted to the state conservation commission who shall examine and certify such claims, and the amount payable by the state thereon shall be audited and paid, as other state accounts are paid, from the appropriation for bounties for the destruction of wolves.

(6) Return of skin.  At the request of the claimant the skin which has been marked for bounty shall be returned to him at his own expense; but the cost of transporting specimens from the county clerk to the state conservation commission shall be borne by the county, and the cost of returning said specimens, or transmitting them to other points for identification for bounties for the destruction of wolves.

(7) Blanks.  All blanks required to carry out the provisions of this section shall be furnished by the state conservation commission and charged to the appropriation for bounties for the destruction of wolves; and the chairman and clerk of each town shall obtain from the county clerk and keep on hand blank certificates for the use of claimants.

(8) Poisoned baits for wolves, wildcats and lynxes.  For the destruction of wolves, wildcats or lynxes it is lawful to put out baits containing poison between the first day of December and the first day of March, but the same shall not be placed within eighty rods of a dwelling house, and the person putting out such baits shall, before doing so, post in three public places in the town notice of putting out such baits, describing the land

1248        LAWS OF WISCONSIN—Ch. 668.

and location where such baits are placed and the date when put out, and within three days after the first day of March shall take up and effectively destroy the same. For the failure or neglect to so post such notices or to so take up and destroy said baits the person so putting out the same shall be liable for all damages resulting therefrom and shall be punished as provided in the last section of this chapter. The same reward shall be paid for any wolf so destroyed by poison as is herein provided for otherwise killing wolves.

29.61  DESTRUCTION OF OTHER INJURIOUS ANI-MALS; REWARDS. (1) The county board of any county may direct that every person who shall kill any crow shall be entitled to a reward of not to exceed fifteen cents, or any sharpshinned or cooper's hawk twenty-five cents, or any pocket gopher twenty-five cents, or any streaked gopher ten cents, or any English sparrow four cents, or any blackbird four cents, or any rattlesnake fifty cents.

(2) Any person claiming such reward shall exhibit the head or rattles of the animal so killed to the chairman of the town or the president of the village wherein it was killed and present an affidavit to such president or chairman stating that said head or rattles are of the animal killed by him and that he has not spared the life of any such animal or bird within his power to kill. Such chairman or president shall then issue a certificate in the following form:

STATE OF WISCONSIN⎫
    County of_____⎬ss.
                        ⎭

I,_____, chairman of the town of_____(or president of the village of_____), do certify that_____ _____ has this day exhibited to me the head (or rattles) of _____, which he claims to have killed in said town (village). and that the head (or rattles) of said_____was (were) destroyed in my presence, and that the said_____is on presentation of this certificate to the town clerk (village clerk), within twenty days from the date hereof, entitled to an order on the town (village) treasurer for the sum of_____ dollars. to be drawn from the general fund of said town (village).

    Dated this_____day of_____, 19____.

                        _____
                        Chairman (President)
                    of the town (village) of_____

(3) The town or village clerk, respectively, shall on the production of the certificate of the chairman of the town, or president of the village, issue to the holder thereof an order on the town or village treasurer, respectively, for the amount stated in said certificate.

(4) The treasurers of the various villages and towns shall, at the close of their accounts on the thirtieth day of October in each year certify to the county clerk the amount of money expended by their respective towns and villages under the provisions of this section. Such treasurer shall attach to the certificate an affidavit stating that the account is just and that his town or village has actually expended the amount therein stated. The certificate and affidavit shall be placed on file in the office of the county clerk and the account shall be audited by the county board and the amount thereof paid to the treasurers of the respective towns and villages from any money in the general fund of the county not otherwise appropriated.

29.62 REMOVAL OF INJURIOUS ROUGH FISH. (1) The state conservation commission is authorized to take rough fish by means of nets, or cause the same to be so taken, from any of the inland waters of this state other than those specified in subsection (2), whenever it shall find that such fish are detrimental to, retard the propagation of, or destroy game fish therein.

(2) The authority granted to the commission by subsection (1) does not extend to Lake Koshkonong; any stream or river flowing into Green Bay or Lake Michigan except that part of the Fox river and its tributaries above the Menasha dam; the Mississippi river, Lake Pepin, Lake St. Croix, and the lakes, bays, bayous and sloughs tributary thereto and connected therewith; and any stream or river flowing into the Mississippi river, within a distance of forty miles above the mouth of such stream or river.

(3) All fish taken under the authority of this section shall be disposed of by the commission to the best interests of the state; and temporary fish ponds may be created in the waters of this state for the purpose of keeping such fish until the same can be advantageously disposed of.

## PENALTIES

29.63 GENERAL PENALTY PROVISIONS. (1) Penalties. Any person who, for himself, or by his agent, servant, or employe, or who, as agent, servant, or employe for another,

violates any of the provisions of this chapter shall be punished, respectively, as follows:

(a) For the unlawful use of any gill net in taking, catching or killing fish of any variety in any waters, or for the use of any net in taking, catching or killing trout of any variety in inland waters, by a fine of not less than two hundred nor more than five hundred dollars, or by imprisonment in the county jail not less than nine months nor more than one year, or by both such fine and imprisonment.

(b) For hunting, trapping, fishing, or clamming without a license duly issued, whenever a license therefor is required by the provisions of this chapter, or for hunting, under a receipt or other evidence of having filed an application, in anticipation of the issuance and delivery of such license, or for the violation of any provision relating to deer, by a fine of not less than fifty nor more than one hundred dollars, or by imprisonment in the county jail not less than thirty days nor more than one year, or by both such fine and imprisonment.

(c) For the violation of any provision relating to game birds, by a fine of not less than fifty nor more than one hundred dollars, and in addition thereto five dollars for each bird affected by such violation, or by imprisonment in the county jail not less than thirty days nor more than six months, or by both such fine and imprisonment.

(d) For any violation for which no other penalty is prescribed, by a fine of not less than fifty nor more than one hundred dollars, or by imprisonment in the county jail not less than thirty days nor more than six months, or by both such fine and imprisonment.

(2) "Person" defined. The word "person" as used in this section includes natural persons, firms, associations, and corporations.

(3) Revocation of license. Upon conviction of any person for any violation under any license issued to such person, such license shall be immediately revoked and canceled, and no license shall be issued to such person for a period of one year thereafter.

(4) Construction of penalty provisions. No penalty prescribed in any section of this chapter shall be held to be diminished because the violation for which it is prescribed falls also within the scope of a more general prohibition.

(5) Presumptions. In any prosecution under this section it shall not be necessary for the state to allege or prove that

LAWS OF WISCONSIN—Ch. 668.           1251

the animals were not domesticated or were not taken for scientific purposes, or were taken or in possession or under control without a license or permit therefor; but the person claiming that such animals were domesticated, or were taken for scientific purposes, or were taken or in possession or under control under a license or permit duly issued, shall have the burden of proving such fact or facts.

(6) Reward to informers. Any person other than the regular employes of the state conservation commission, informing of the violation of any provision of this chapter and assisting in the prosecution of the offender to conviction shall receive one-third of any fine imposed and collected thereupon.

SECTION 5. A new section is added to the statutes to be numbered and to read: Section 4562d. Any person who shall break, remove or interfere with any seal or tag attached to any animal, carcass, article or other thing by the state conservation commission, or who shall meddle or interfere with any animal, carcass, article or other thing with such seal or tag attached, or who shall counterfeit any such seal or tag, attached or unattached, shall be punished by a fine of not less than two hundred nor more than five hundred dollars, or by imprisonment in the county jail not less than nine months nor more than one year, or by both such fine and imprisonment.

SECTION 6. Sections 4567d and 4567f of the statutes are amended to read: Section 4567d. Any person who shall enter upon the grounds of any state fish hatchery for the purpose of unlawfully killing or taking any fish therefrom shall be punished by *a* fine of not less than * * * *one hundred* dollars nor more than * * * *two hundred* dollars, or by imprisonment not less than * * * *thirty* days nor more than * * * *sixty* days.

Section 4567f. Any person who shall injure any fish, or in any manner interfere harmfully with the ponds, streams, troughs or other property of the state fish hatchery, without lawful authority so to do, shall be punished by a fine of not less than * * * *fifty* dollars nor more than one hundred dollars; but this section shall in no wise change or affect any liability for arson or other burnings, nor burglary or other breakings, nor larceny of any property.

SECTION 7. A new section is added to the statutes, to be numbered 172—41 and to read: Section 172—41. All moneys, except fines, accruing to the state by reason of any provision of chapter 29 of the statutes, or otherwise received or collected

1252      LAWS OF WISCONSIN--Ch. 669.

by each and every person for or in behalf of the state conservation commission, if not payable into the forest reserve fund, shall constitute the "conservation fund" and shall be paid, within one week after receipt, into the state treasury and credited to said fund.   No money shall be expended or paid from the conservation fund except in pursuance of an appropriation by law; but any unappropriated surplus in said fund may be expended subject to the approval of the governor, secretary of state, and state treasurer, for additional equipment, new buildings, new hatcheries, or hatchery ponds, property, improvements, increasing the warden force at any particular period, or any other similar special purpose except road work or improvement work on the state parks.

SECTION 8.   The section and subsection titles are inserted in this bill for convenience of reference; but are not a part of this enactment.

SECTION 9.   This act shall take effect July 1, 1917.

Approved July 12, 1917.

No. 594, S.]                              [Published July 16, 1917.

# CHAPTER 669

AN ACT to create section 4391m of the statutes, prohibiting the use of dynamite, blasting powder or other explosive for any purpose within the boundaries of any state park of Wisconsin, and providing a penalty.

*The people of the State of Wisconsin, represented in Senate and Assembly, do enact as follows:*

SECTION 1.   A new section is added to the statutes to read: Section 4391m.   Any person who discharges or explodes or causes to be discharged or exploded for any purpose any dynamite, blasting powder or other similar explosive at any place or point within the boundaries of any park owned by the state of Wisconsin, unless the use of such explosive is necessary for carrying on works of improvement done by, for or under the authority of the state or done by, for or under the authority of the county or town wherein such park in whole or in part is situated, shall be deemed guilty of a misdemeanor and upon conviction thereof shall be punished for the first offence by a fine of not less than fifty dollars nor more than one hundred dollars or by imprisonment in the county jail for not less than thirty days nor more than six months, and for a second or subsequent offense by both such fine and imprisonment.   This

33




DATE DOWNLOADED: Wed Nov  2 12:34:10 2022
SOURCE: Content Downloaded from *HeinOnline*

Citations:

Bluebook 21st ed.
1921 53 .

ALWD 7th ed.
, , 1921 53 .

Chicago 17th ed.
"," North Carolina - Public Laws and Resolutions, Extra Session - 1921 : 53-54

AGLC 4th ed.
'' North Carolina - Public Laws and Resolutions, Extra Session - 1921 53

OSCOLA 4th ed.
'' 1921 53

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and
   Conditions of the license agreement available at
   *https://heinonline.org/HOL/License*
-- The search text of this PDF is generated from  uncorrected OCR text.

*First.* To supplement the funds in those counties specified in section two of this act, in order to provide a six months school term in each of said counties; <span>Supplements to county funds.</span>

*Second.* After the provisions of section two have been complied, with, then the State Board of Education shall apportion the residue of the funds provided in this section in order to pay the salaries of the county superintendents and assistant superintendents for six months, and all city superintendents, all supervisors not otherwise provided for, all principals of elementary schools having ten or more teachers, and principals of standard high schools, for three months. <span>Apportionment of residue.</span> <span>County superintendents and assistants. City superintendents. Supervisors. Principals of elementary and high schools.</span>

SEC. 5. That section five thousand four hundred and eighty-eight of the Consolidated Statutes, as amended, be and the same is hereby further amended by adding at the end thereof the following: *"Provided,* that no action in the nature of a writ of mandamus shall be brought against the board of county commissioners to compel said board to levy a rate of taxation greater than the rate authorized by the General Assembly." <span>Proviso: mandamus for increase of tax rate not to lie.</span>

SEC. 6. All laws and clauses of laws in conflict with the provisions of this act are hereby repealed. <span>Repealing clause.</span>

SEC. 7. This act shall be in full force and effect on and after the date of its ratification.

Ratified this the 20th day of December, A.D. 1921.

---

## CHAPTER 6

### AN ACT TO PROTECT ANIMALS AND GAME IN PARKS AND GAME RESERVATIONS IN EITHER PRIVATE OR PUBLIC PARKS OR PLACES.

*The General Assembly of North Carolina do enact:*

SECTION 1. That it shall be unlawful for any person or persons to hunt, trap, capture, willfully disturb, or kill any animal or bird of any kind whatever, or take the eggs of any bird within the limits of any park or reservation for the protection, breeding, or keeping of any animals, game, or other birds, including buffalo, elk, deer, and such other animals or birds as may be kept in the aforesaid park or reservation, by any person or persons either in connection with the Government of the United States, or any department thereof, or held or owned by any private person or corporation. <span>Protection of game in parks or reservations.</span>

SEC. 2. That any person or persons who shall hunt, trap, capture, willfully disturb, or kill any animal or bird, or take the eggs of any bird of any kind or description in any park or reservation <span>Misdemeanor.</span>

Punishment.

as described in section one of this act, at any time during the year, shall be guilty of a misdemeanor, and shall be fined or imprisoned in the discretion of the court for each and every offense.

Carrying weapons in parks or reservations.
Misdemeanor.

, SEC. 3. That any person who shall carry a pistol, revolver, or gun in any park or reservation such as is described in section one of this act, without having first obtained the written permission of the owner or manager of said park or reservation, shall be guilty of a misdemeanor, or shall be fined or imprisoned, in the discretion of the court, for each and every offense.

Punishment.

Application of act.

SEC. 4. That the provisions of this act shall apply only to that part of the State of North Carolina situated west of the main line of the Southern Railway running from Danville, Virginia, by Greensboro, Salisbury, Charlotte, and Atlanta, Georgia.

Repealing clause.

SEC. 5. All laws and clauses of laws in conflict with this act are hereby repealed.

SEC. 6. That this act shall be in force from and after its ratification.

Ratified this the 15th day of December, A.D. 1921.

---

## CHAPTER 7

### AN ACT TO CHANGE THE MONTH DURING WHICH ACCOUNTS OF STATE OFFICERS ARE EXAMINED BY COMMISSIONERS OF THE LEGISLATURE.

*The General Assembly of North Carolina do enact:*

Date changed.

SECTION 1. That section seven thousand six hundred and ninety-two of the Consolidated Statutes be and the same is hereby amended by striking out the word "December" in line six of said section and inserting in lieu thereof the word "July."

SEC. 2. That this act shall be in force from and after its ratification.

Ratified this the 10th day of December, A.D. 1921.

---

## CHAPTER 8

### AN ACT TO AUTHORIZE THE TREASURER TO BORROW NOT EXCEEDING $710,000 FOR THE STATE PUBLIC SCHOOL FUND.

Preamble: tax at special session.

Purpose.

Whereas the special session of the General Assembly of one thousand nine hundred and twenty, chapter ninety-one, section one, Public Laws, provided a State tax of thirteen cents for the purpose of paying "one-half the annual salary of the county superintendents and three months salary of all teachers of all sorts

34

# FIREARMS REGULATIONS IN THE NATIONAL PARKS

## 1897—1936

**May 13, 2008**

**Background**

This information has been compiled to provide National Park Service employees more complete insight into the history of NPS firearms regulations.  The first Servicewide regulations were adopted in 1936.[1]  Although it has not been widely noted, those regulations prohibited firearms and required that they be surrendered when visitors entered the parks.  Visitors could obtain written permission to carry them through the park if the weapons were "sealed."

The current Servicewide regulations governing weapons in parks were adopted in almost their present form in 1983, and published at 36 CFR 2.4.[2]  However, in 1984, several adjustments were made to:
a.  Make it clear that Alaska had different rules, and individual parks might have some variations in park-specific special regulations.
b.  Re-order some of the wording to make it easier to follow.
c.  Add a definition of what constitutes a "residential dwelling."
d.  Add the word "temporarily" in front of the word "inoperable."
e.  Clarify that the regulations applied on privately owned lands and waters under the legislative jurisdiction of the US.
f.  Add a definition for the word "unloaded."

Item 1.e above was further amended in 1987 to clarify that the regulations apply "regardless of land ownership, on all lands and waters within a park area that are under the legislative jurisdiction of the U.S."

Prior to adoption of the 1936 Servicewide regulations, parks adopted park-specific regulations prohibiting weapons—the first (apparently) being Yellowstone National Park in 1897.  Attached is a compilation of those regulations.  Due to difficulty in retrieving archival materials, there are some gaps in this compilation.  We will continue our efforts to fill these gaps, so check www.nps.gov/policy/Firearms.pdf to ensure you have the latest edition.  We invite park superintendents to provide the NPS Office of Policy any additional information they may have that would help in this effort.

---

[1] The 1936 regulations are on-line at http://www.nps.gov/policy/1936Regulations.pdf
[2] 36 CFR 2.4 is on-line at http://edocket.access.gpo.gov/cfr_2007/julqtr/pdf/36cfr2.4.pdf

# FIREARMS REGULATIONS
## 1897 – 1936

### TABLE OF CONTENTS

|  |  | Page(s) |
|---|---|---|
| 1. Yellowstone National Park | | |
| (a) | June 1, 1897 | 1 |
| (b) | April 1, 1899 | 3 |
| (c) | July 1, 1900 | 3 |
| (d) | February 7, 1902 | 3 |
| (e) | July 2, 1908 | 5 |
| (f) | May 27, 1911 | 5 |
| (g) | April 15, 1918 | 5 |
| (h) | February 18, 1929 | 6 |
| (i) | January 11, 1930 | 6 |
| (j) | December 20, 1930 | 7 |
| (k) | January 23, 1932 | 7 |
| (l) | December 21, 1932 | 8 |
| 2. Sequoia and General Grant National Parks | | |
| (a) | June 2, 1902 (Sequoia) | 9 |
| (b) | June 2, 1902 (Gen'l Grant) | 9 |
| (c) | March 30, 1907 | 11 |
| (d) | March 30, 1912 | 11 |
| (e) | April 15, 1918 | 11 |
| (f) | January 14, 1928 | 12 |
| (g) | January 2, 1930 | 12 |
| (h) | December 6, 1930 | 13 |
| (i) | December 21, 1932 | 14 |
| 3. Yosemite National Park | | |
| (a) | June 2, 1902 | 15 |
| (b) | February 29, 1908 | 18 |
| (c) | June 1, 1909 | 19 |
| (d) | March 30, 1912 | 19 |
| (e) | May 11, 1914 | 20 |
| (f) | April 15, 1918 | 21 |
| (g) | November 24, 1928 | 21 |
| (h) | January 14, 1930 | 22 |
| (i) | December 8, 1930 | 23 |
| (j) | January 13, 1932 | 23 |
| (k) | December 21, 1932 | 24 |
| 4. Mesa Verde National Park | | |
| (a) | March 19, 1908 | 25 |

        (b)   March 30, 1912                                      25
        (c)   April 15, 1918                                      26
        (d)   December 11, 1928                                   26
        (e)   March 1, 1930                                       27
        (f)   January 8, 1931                                     27
        (g)   December 21, 1932                                   28

5.   Crater Lake National Park
        (a)   August 27, 1902                                     28
        (b)   June 10, 1908                                       29
        (c)   March 30, 1912                                      29
        (d)   April 15, 1918                                      30
        (e)   January 19, 1928                                    30
        (f)   December 28, 1929                                   31
        (g)   January 14, 1931                                    31
        (h)   January 15, 1932                                    32
        (i)   December 21, 1932                                   32

6.   Mount Rainier National Park
        (a)   August 1, 1903                                      33
        (b)   June 10, 1908                                       34
        (c)   March 30, 1912                                      34
        (d)   April 15, 1918                                      35
        (e)   November 22, 1928                                   35
        (f)   December 30, 1929                                   36
        (g)   December 8, 1930                                    36
        (h)   December 21, 1932                                   37

7.   Platt National Park
              June 10, 1908                                       38

8.   Wind Cave National Park
        (a)   June 10, 1908                                       38
        (b)   March 30, 1912                                      38
        (c)   April 15, 1918                                      39
        (d)   March 8, 1926                                       39
        (e)   December 28, 1929                                   40
        (f)   December 2, 1930                                    40
        (g)   December 21, 1932                                   41
        (h)   In effect 1933                                      41

9.   Glacier National Park
        (a)   December 3, 1910                                    42
        (b)   March 30, 1912                                      42
        (c)   May 13, 1914                                        43
        (d)   April 15, 1918                                      43

    (e)  December 12, 1928          44
    (f)   March 6, 1930             44
    (g)  December 3, 1930           45
    (h)  December 21, 1932          46

10.  Rocky Mountain National Park
    (a)  May 29, 1915              47
    (b)  April 15, 1918            48
    (c)  January 17, 1928           48
    (d)  January 2, 1930            48
    (e)  December 6, 1930           49
    (f)   December 21, 1932          50

11.  Hawaii National Park
    (a)  In effect 1929            50
    (b)  December 21, 1932          51

12.  Acadia National Park
    (a)  In effect 1929            51
    (b)  In effect 1930            52
    (c)  January 14 and December 21, 1932    52

13.  Lassen Volcanic National Park
    (a)  In effect 1929            52
    (b)  In effect 1930            52
    (c)  January 14, 1932          53
    (d)  December 21, 1932          54

14.  Mount McKinley National Park
    (a)  In effect 1929            54
    (b)  In effect 1930            55
    (c)  January 29, 1932          56

15.  Zion and Bryce Canyon National Parks
    (a)  January 12, 1929           56
    (b)  In effect 1931            57
    (c)  February 6, 1932          57
    (d)  December 21, 1932          58

16.  National Monuments
    (a)  November 19, 1910          59
    (b)  In effect 1930            59

17.  Carlsbad Caverns National Park
        February 28, 1933          59

18.  Great Smoky Mountains National Park
    (a)   May 9, 1932    60
    (b)   March 10, 1933    60
    (c)   In effect 1934/35    60

19.  Grand Canyon National Park
    (a)   January 16, 1928    61
    (b)   January 2, 1930    61
    (c)   January 9, 1931    62
    (d)   February 15, 1932    62
    (e)   December 21, 1932    63

20.  Grand Teton National Park
    (a)   In effect 1929    64
    (b)   In effect 1930    64
    (c)   January 29, 1932    64

21.  General (Service-wide) regulations
      June 18, 1936    65


Appendix A:
    1872 Yellowstone regulations    67
Appendix B:
    1881 Yellowstone regulations    68
Appendix C:
    1888 Yellowstone regulations    69

FIREARMS REGULATIONS
1897 – 1936


YELLOWSTONE NATIONAL PARK[3]

1.  Regulations of June 1, 1897 –

(5)  Hunting or killing, wounding or capturing, of any bird or wild animal, except dangerous animals, when necessary to prevent them from destroying life or inflicting an injury, is prohibited.  The outfits[4], including guns, traps, teams, horses, or means of transportation used by persons engaged in hunting, killing, trapping, ensnaring, or capturing such birds or wild animals, or in possession of game killed in the park under other circumstances than prescribed above, will be forfeited to the United States, except in cases where it is shown by satisfactory evidence that the outfit is not the property of the person or persons violating this regulation and the actual owner thereof was not a party to such violation.  Firearms will only be permitted in the park on written permission from the superintendent thereof.  On arrival at the first station of the park guard, parties having firearms will turn them over to the sergeant in charge of the station, taking his receipt for them.  They will be returned to the owners on leaving the park.

"Rules and Regulations of the Yellowstone National Park," June 1, 1897.  *Annual Reports of the Department of the Interior for the Fiscal Year Ended June 30, 1898, Miscellaneous Reports [vol. 3]* (Washington:  Gov't Printing Office, 1898), p. 972.  See also, Act of May 7, 1894, ch. 72, 28 Stat. 73, in particular, §4 (28 Stat. 74).

N.B.  In his report to the Secretary of August 31, 1897, the acting superintendent, Maj. Gen. S.B.M. Young, United States Volunteers (Colonel Third Cavalry), wrote in connection with this regulation:

Carrying Firearms through the Park

The custom of carrying firearms through the park has been almost universal among those who live in the neighboring States and travel in their own conveyances, or on saddle animals accompanied by pack animals.  During the first half of the season it was found that many firearms, fastened with red tape and sealing wax at the point of entry, had broken seals at the point of exit.  In many cases it was evident that the seals were broken by accident; others showed signs of having been broken and resealed.  To remedy this a new system of sealing has been adopted similar to that used by express companies . . . .  The regulation prohibiting firearms in the park, except on written permission from the superintendent [in which case the arms were sealed], has been strictly enforced.  It is essential to the protection of the park.

---

[3]  The very first park regulations were apparently promulgated by Secretary of the Interior Columbus Delano at the time of the dedication of YELL.  They are attached hereto as Appendix A.

[4]  The first park regulations to mention "outfits," were the YELL regulations of July 1, 1888, reproduced in Appendix C.  The interim regulations, dated May 4, 1881, are found in Appendix B.

A certain sentiment of hostility toward the park and of antagonism toward the efforts of the authorities to protect the wild animals from destruction has existed and continues to exist among the ranchers and the people of the settlements near the park boundaries.  This feeling of hostility seems to be due to an idea, which prevails widely, that a reservation of any part of the public domain for the perpetual benefit of the whole people is an invasion and an abridgement of the private rights of the people of the adjoining region.  This idea naturally arises from an ignorance of the benefits that result from such reservations to the people of the whole country and an equal ignorance of the advantages which accrue to the inhabitants of the immediate vicinity.  In consequence of the benefits which have already resulted to this region from the existence of this park as a breeding place from which the surplus game may wander down into the adjoining country where it may be freely taken, and from the opportunities afforded by the park for remunerative employment during the summer season, there is already a marked diminution of this hostile feeling.  As these benefits come to be better understood I believe that this hostility will further diminish, and my best efforts shall be devoted to the encouragement of a friendly sentiment toward the park among the citizens of the surrounding country.

*Annual Reports of the Department of the Interior for the Fiscal Year Ended June 30, 1897. Miscellaneous Reports [vol. 3]* (Washington:  Gov't Printing Office, 1897), pp. 781-82.

In his report for the year prior to the regulation's adoption, Acting Superintendent Young stated:

Over 200 stand of arms have been taken from persons entering the park by the two main thoroughfares, including those taken from parties found inside, and as a probable resultant, young broods of quail and grouse abound throughout the park.  The deer, bear, lynx, fox, coon, tree squirrel, and chipmunk, although not scarce, are not so plentiful as they should be in their natural home in the park.  If firearms, hunters, and trappers are kept out of the park they will multiply and become plentiful, and their instinctive fear of man will gradually so lessen in a few years that visitors will be enabled to see and study them in their natural state.  These animals drift down below the heavy snow line in winter and the supply that is taken by ranchmen and hunters outside the park boundaries will be a sufficient trimming in numbers to promote a healthful breeding and growth in the natural game nursery within the boundaries.

*Report of Secretary of the Interior; Being Part of the Message and Documents Communicated to the Two Houses of Congress at the Beginning of the Second Session of the Fifty-Fourth Congress.  In Five Volumes.* (Washington:  Gov't Printing Office, 1896), vol. III, p. 740.

After the regulation's promulgation, the Sec'y of the Interior commented as follows:

The regulations prohibiting firearms in the park, except under written permission of the superintendent, have been strictly observed, the enforcement thereof being essential to the best interest of the park.

2

*Annual Reports of the Department of the Interior for the Fiscal Year Ended June 30, 1897, Report of the Secretary of the Interior [vol.1] (Washington:  Gov't Printing Office, 1897)*, p. LXXXIII.

2.  Regulations of April 1, 1899 –

   (5)  Hunting or killing, wounding, or capturing of any bird or wild animal, except dangerous animals, when necessary to prevent them from destroying life or inflicting an injury, is prohibited.  The outfits, including guns, traps, teams, horses, or means of transportation used by persons engaged in hunting, killing, trapping, ensnaring, or capturing such birds or wild animals, or in possession of game killed in the park under other circumstances than prescribed above, will be forfeited to the United States, except in cases where it is shown by satisfactory evidence that the outfit is not the property of the person or persons violating this regulation and the actual owner thereof was not a party to such violation.  <u>Firearms will only be permitted in the park on written permission from the superintendent thereof.  On arrival at the first station of the park guard, parties having firearms will turn them over to the sergeant in charge of the station, taking his receipt for them.  They will be returned to the owners on leaving the park.</u>

   "Rules and Regulations of the Yellowstone National Park," April 1, 1899.  *Annual Reports of the Department of the Interior for the Fiscal Year Ended June 30, 1900*, p. 535.

3.  Regulations of July 1, 1900 –

   (5)  Hunting or killing, wounding or capturing of any bird or wild animal, except dangerous animals, when necessary to prevent them from destroying life or inflicting an injury, is prohibited.  The outfits, including guns, traps, teams, horses, or means of transportation used by persons engaged in hunting, killing, trapping, ensnaring, or capturing such birds or wild animals, or in possession of game killed in the park under other circumstances than prescribed above, will be forfeited to the United States, except in cases where it is shown by satisfactory evidence that the outfit is not the property of the person or persons violating this regulation, and the actual owner thereof was not a party to such violation.  <u>Firearms will only be permitted in the park on written permission from the superintendent thereof.  On arrival at the first station of the park guard, parties having firearms will turn them over to the sergeant in charge of the station, taking his receipt for them.  They will be returned to the owners on leaving the park.</u>

   *Annual Reports of the Department of the Interior for the Fiscal Year Ended June 30, 1901, Miscellaneous Reports, Part I* (Washington:  Gov't Printing Office, 1901), p. 540.

4.  Regulations of February 7, 1902 –

   (5)  Hunting or killing, wounding, or capturing of any bird or wild animal, except dangerous animals when necessary to prevent them from destroying life or inflicting an injury, is prohibited.  The outfits, including guns, traps, teams, horses, or means of transportation used by persons engaged in hunting, killing, trapping, ensnaring, or capturing such birds or wild animals, or in possession of game killed in the park under

other circumstances than prescribed above, will be forfeited to the United States, except in cases where it is shown by satisfactory evidence that the outfit is not the property of the person or persons violating this regulation, and the actual owner thereof was not a party to such violation.  <u>Firearms will only be permitted in the park on written permission from the superintendent thereof.  On arrival at the first station of the park guard, parties having firearms will turn them over to the sergeant in charge of the station, taking his receipt for them.  They will be returned to the owners on leaving the park</u>.

"Rules and Regulations of the Yellowstone National Park," February 7, 1902.  *Annual Reports of the Department of the Interior for the Fiscal Year Ended June 30, 1904.  Miscellaneous Reports.  Part I. Bureau Officers, etc.* (Washington:  Gov't Printing Office, 1904), p. 367.

Superintendent S.B.M. Young included the following in his annual report for FY '07:

Evidence of poaching in former unfrequented portions of the park difficult of access have been found particularly in the northwest corner, where within the last fortnight a trapper's cabin, supplied with provisions, cooking utensils, and bedding, was found . . . .
In addition to the trails shown on the map crossing the boundary lines of the park there are numerous other trails – all originally made by hunters, trappers, and prospectors.  There are now four main entrance roads leading into the park – north, east, south, and west – which seem to be sufficient for all purposes concerning the park and for accommodation of visitors.  Applications have come to this office from far and near for permission to enter the park on these various trails with arms, in order to pass through the park for the purpose of hunting outside of the park.  All such applications for permits to carry guns unsealed through any portion of the park have been refused, but permission to carry sealed guns has been granted to persons who enter the park at one of the regular stations where their guns may be sealed, and make exit at one of the regular stations (their route through the park being particularly specified) where their guns may be unsealed and condition reported upon.  Permits to carry game or game trophies through the park have been refused.  There has been much adverse criticism by hunters and guides on these rulings, but the best interests of the park demand that is shall no longer continue a thoroughfare for sportsmen, hunters, and game-slaughterers.

*Reports of the Department of the Interior for the Fiscal Year Ended June 30, 1907.  Administrative Reports in 2 Volumes.* (Washington:  Gov't Printing Office, 1907), pp. 551-52.

In 1908, Young added:

Poachers and other violators of the law were arrested in every quarter of the park, and several arrests were made outside the park in Wyoming and Montana on information and evidence furnished by park scouts, and the parties were convicted.  It is evident, however, that many poachers escaped arrest.  There are not sufficient scouts for thorough protection against poachers.

*Reports of the Department of the Interior for the Fiscal Year Ended June 30, 1908. Administrative Reports in 2 Volumes.* (Washington:  Gov't Printing Office, 1908), p. 409.

5.  Regulations of July 2, 1908 –

(5)  Hunting or killing, wounding or capturing any bird or wild animal, except dangerous animals when necessary to prevent them from destroying life or inflicting an injury, is prohibited.  The outfits, including guns, traps, teams, horses, or means of transportation used by persons engaged in hunting, killing, trapping, ensnaring, or capturing such birds or wild animals, or in possession of game killed in the park under other circumstances than prescribed above, will be forfeited to the United States, except in cases where it is shown by satisfactory evidence that the outfit is not the property of the person or persons violating this regulation, and the actual owner thereof was not a party to such violation.  <u>Firearms will only be permitted in the park on written permission from the superintendent thereof.  On arrival at the first station of the park guard, parties having firearms, traps, nets, seines, or explosives will turn them over to the sergeant in charge of the station, taking his receipt for them.  They will be returned to the owners on leaving the park</u>.

*Laws and Regulations Relating to the Yellowstone National Park, Wyoming* (Washington: Gov't Printing Office, 1908), p. 13.

6.  Regulations of May 27, 1911 –

(5)  Hunting or killing, wounding, or capturing any bird or wild animal, except dangerous animals when necessary to prevent them from destroying life or inflicting an injury, is prohibited.  The outfits, including guns, traps, teams, horses, or means of transportation used by persons engaged in hunting, killing, trapping, ensnaring, or capturing such birds or wild animals, or in possession of game killed in the park under other circumstances than prescribed above, will be forfeited to the United States, except in cases where it is shown by satisfactory evidence that the outfit is not the property of the person or persons violating this regulation, and the actual owner thereof was not a party to such violation.  <u>Firearms will only be permitted in the park on written permission from the superintendent thereof.  On arrival at the first station of the park guard parties having firearms, traps, nets, seines, or explosives will turn them over to the sergeant in charge of the station, taking his receipt for them.  They will be returned to the owners on leaving the park</u>.

*Reports of the Department of the Interior for the Fiscal Year Ended June 30, 1911. Administrative Reports in 2 Volumes.  Volume I* (Washington:  Gov't Printing Office, 1912), p. 575.

7.  Regulations in effect April 15, 1918 –

(4)  *Hunting*.—The park is a sanctuary for wild life of every sort and no one may frighten, hunt or kill, wound or capture any bird or wild animal in the park, except

dangerous animals when it is necessary to prevent them from destroying life or inflicting injury.

The outfits, including guns, traps, teams, horses, or means of transportation used by persons engaged in hunting, killing, trapping, ensnaring, or capturing such birds or wild animals, or in possession of game killed on the park lands under circumstances other than prescribed above, must be taken up by the superintendent and held subject to the order of the Director of the National Park Service, except in cases where it is shown by satisfactory evidence that the outfit is not the property of the person or persons violating this regulation, and the actual owner was not a party to such violation.  Firearms will be permitted in the park only on written permission of the superintendent.  Visitors entering or traveling through the park to places beyond must, at entrance, report and surrender all firearms, traps, nets, seines, or explosives in their possession to the first park officer, and in proper cases may obtain his written leave to carry them through the park sealed.

*General Information Regarding Yellowstone National Park – Season of 1918* (Washington: Gov't Printing Office, 1918), p. 67.

8.  Regulations of February 18, 1929 –

(4)  *Hunting*.—The park is a sanctuary for wild life of every sort, and hunting, killing, wounding, capturing, or frightening any bird or wild animal in the park, except dangerous animals when it is necessary to prevent them from destroying life or inflicting injury, is prohibited.

The outfits, including guns, traps, teams, horses, or means of transportation used by persons engaged in hunting, killing, trapping, ensnaring, or capturing birds or wild animals, or in possession of game killed on the park lands under circumstances other than prescribed above, shall be taken up by the superintendent and held subject to the order of the Director of the National Park Service, except in cases where it is shown by satisfactory evidence that the outfit is not the property of the person or persons violating this regulation and the actual owner was not a party to such violation.  Firearms are prohibited in the park except on written permission of the superintendent.  Visitors entering or traveling through the park to places beyond shall, at entrance, report and surrender all firearms, traps, nets, seines, or explosives in their possession to the first park officer and in proper cases may obtain leave to carry them through the park sealed.  The Government assumes no responsibilities for loss or damage to any firearms, traps, nets, seines, or other property so surrendered to any park officer nor are park officers authorized to accept responsibility of custody of any property for the convenience of visitors.

*Circular of General Information Regarding Yellowstone National Park* (1929), pp. 61-62.

9.  Regulations of January 11, 1930 –

(4)  *Hunting*.—The park is a sanctuary for wild life of every sort, and hunting, killing, wounding, capturing, or frightening any bird or wild animal in the park, except dangerous animals when it is necessary to prevent them from destroying life or inflicting injury, is prohibited.

The outfits, including guns, traps, teams, horses, or means of transportation used by persons engaged in hunting, killing, trapping, ensnaring, or capturing birds or wild animals, or in possession of game killed on the park lands under circumstances other than prescribed above, shall be taken up by the superintendent and held subject to the order of the Director of the National Park Service, except in cases where it is shown by satisfactory evidence that the outfit is not the property of the person or persons violating this regulation and the actual owner was not a party to such violation.  Firearms are prohibited in the park except on written permission of the superintendent.  Visitors entering or traveling through the park to places beyond shall, at entrance, report and surrender all firearms, traps, nets, seines, or explosives in their possession to the first park officer, and in proper cases may obtain leave to carry them through the park sealed.  The Government assumes no responsibilities for loss or damage to any firearms, traps, nets, seines, or other property so surrendered to any park officer, nor are park officers authorized to accept responsibility of custody of any property for the convenience of visitors.

*Circular of General Information Regarding Yellowstone National Park* (1930), p. 64.

10.  Regulations of December 20, 1930 –

(4)  *Hunting*.—The park is a sanctuary for wild life of every sort, and hunting, killing, wounding, capturing, or frightening any bird or wild animal in the park, except dangerous animals when it is necessary to prevent them from destroying life or inflicting injury, is prohibited.

The outfits, including guns, traps, teams, horses, or means of transportation used by persons engaged in hunting, killing, trapping, ensnaring, or capturing birds or wild animals, or in possession of game killed on the park lands under circumstances other than prescribed above, shall be taken up by the superintendent and held subject to the order of the Director of the National Park Service, except in cases where it is shown by satisfactory evidence that the outfit is not the property of the person or persons violating this regulation and the actual owner was not a party to such violation.  Firearms are prohibited in the park except on written permission of the superintendent.  Visitors entering or traveling through the park to places beyond shall, at entrance, report and surrender all firearms, traps, nets, seines, or explosives in their possession to the first park officer, and in proper cases may obtain leave to carry them through the park sealed.  The Government assumes no responsibilities for loss or damage to any firearms, traps, nets, seines, or other property so surrendered to any park officer, nor are park officers authorized to accept responsibility of custody of any property for the convenience of visitors.

*Circular of General Information Regarding Yellowstone National Park* (1931), pp. 56-57.

11.  Regulations of January 23, 1932 –

(4)  *Hunting*.—The park is a sanctuary for wild life of every sort, and all hunting or the killing, wounding, frightening, or capturing at any time of any wild bird or animal, except dangerous animals when it is necessary to prevent them from destroying life or inflicting personal injury, is prohibited within the limits of the park.

Molesting, teasing, or touching the bears is prohibited.  Persons feeding bears do so at their own risk and peril.

The outfits, including guns, traps, teams, horses, or means of transportation of every nature or description used by any person or persons engaged in hunting, killing, ensnaring, or capturing birds or wild animals within the limits of the park shall be taken up by the superintendent and held subject to the order of the Director of the National Park Service. Possession within said park of the dead bodies or any part thereof of any wild bird or animals shall be prima facie evidence that the person or persons having the same are guilty of violating this regulation.

During the hunting season arrangements may be made at entrance stations to identify and transport through the park, carcasses of birds or animals killed outside of the park.

Firearms are prohibited within the park except upon written permission of the superintendent.  Visitors entering or traveling through the park to places beyond, shall, at entrance, report and surrender all firearms, traps, nets, seines, or explosives in their possession to the first park officer, and in proper cases may obtain his written permission to carry them through the park sealed.  The Government assumes no responsibility for the loss or damage to any firearms, traps, nets, or other property so surrendered to any park officer, nor are park officers authorized to accept the responsibility of custody of any property for the convenience of visitors.

NOTE.—The foregoing regulation is in effect a declaration of the law on this subject contained in section 4 of the act of Congress approved May 7, 1894 (28 Stat. 73), entitled: "An act to protect the birds and animals of Yellowstone National Park, and to punish crimes in said park, and for other purposes."

*Circular of General Information Regarding Yellowstone National Park* (1932), pp. 57-58.

12.  Regulations of December 21, 1932 –

 (4)  *Hunting*.—The park is a sanctuary for wild life of every sort, and all hunting, or the killing, wounding, frightening, or capturing at any time of any wild bird or animal, except dangerous animals when it is necessary to prevent them from destroying human lives or inflicting personal injury, is prohibited within the limits of the park.

Feeding directly from the hand, touching, teasing, or molesting bears is prohibited. Persons photographing bears do so at their own risk and peril.

The outfits, including guns, traps, teams, horses, or means of transportation of every nature or description used by any person or persons engaged in hunting, killing, ensnaring, or capturing birds or wild animals within the limits of the park shall be forfeited to the United States and may be seized by the officers of the park and held pending the prosecution of any person or persons arrested under the charge of violating this regulation, and upon conviction, such forfeiture shall be adjudicated as a penalty in addition to other punishment.  Such forfeited property shall be disposed of and accounted for by and under the authority of the Secretary of the Interior.  Possession within said park of the dead bodies or any part thereof of any wild bird or animals shall be prima facie evidence that the person or persons having the same are guilty of violating this regulation.

During the hunting season, arrangements may be made at entrance stations to identify and transport through the park, carcasses of birds or animals killed outside of the parks.

8

Firearms are prohibited within the park except upon written permission of the superintendent.  Visitors entering or traveling through the park to places beyond, shall, at entrance, report and surrender all firearms, traps, seines, nets, or explosives in their possession to the first park officer, and in proper cases may obtain his written permission to carry them through the parks sealed.  The Government assumes no responsibility for the loss or damage to any firearms, traps, nets, or other property so surrendered to any park officer, nor are park officers authorized to accept the responsibility of custody of any property for the convenience of visitors.

NOTE.—The foregoing regulation is in effect a declaration of the law on this subject contained in section 4 of the act of Congress approved May 7, 1894 (28 Stat. 73), entitled: "An act to protect the birds and animals in Yellowstone National Park, and to punish crimes in said park, and for other purposes."

*General Information Regarding Yellowstone National Park* (Washington:  Gov't Printing Office, 1933), pp. 48-49.

SEQUOIA AND GENERAL GRANT NATIONAL PARKS

1.  Regulations of Sequoia National Park of June 2, 1902 –

(6)  Hunting or killing, wounding, or capturing any bird or wild animal on the park lands, except dangerous animals when necessary to prevent then from destroying life or inflicting an injury, is prohibited.  The outfits, including guns, traps, teams, horses, or means of transportation used by persons engaged in hunting, killing, trapping, ensnaring, or capturing such birds or wild animals, or in possession of game killed on the park lands under other circumstances than prescribed above, will be taken up by the superintendent and held subject to order of the Secretary of the Interior, except in cases where it is shown by satisfactory evidence that the outfit is not the property of the person, or persons, violating this regulation and the actual owner thereof was not a party to such violation. Firearms will only be permitted in the park on written permission from the superintendent thereof.

"Rules and Regulations of the Sequoia National Park," June 2, 1902.  *Annual Reports of the Department of the Interior for the Fiscal Year Ended June 30, 1903*, *Miscellaneous Reports, Part I* (Washington:  Gov't Printing Office, 1903), p. 551.

2.  Regulations of General Grant National Park of June 2, 1902 –

(6)  Hunting or killing, wounding, or capturing any bird or wild animal on the park lands, except dangerous animals when necessary to prevent then from destroying life or inflicting an injury, is prohibited.  The outfits, including guns, traps, teams, horses, or means of transportation used by persons engaged in hunting, killing, trapping, ensnaring, or capturing such birds or wild animals, or in possession of game killed on the park lands under other circumstances than prescribed above, will be taken up by the superintendent and held subject to order of the Secretary of the Interior, except in cases where it is shown by satisfactory evidence that the outfit is not the property of the person, or persons,

9

violating this regulation and the actual owner thereof was not a party to such violation. <u>Firearms will only be permitted in the park on written permission from the superintendent thereof</u>.

> "Rules and Regulations of the General Grant National Park," June 2, 1902. *Annual Reports of the Department of the Interior for the Fiscal Year Ended June 30, 1903*, *Miscellaneous Reports, Part I* (Washington:  Govt' Printing Office, 1903), p. 553.

<u>N.B.</u>  The acting superintendent of Sequoia and Gen'l Grant National Parks added the following to his annual report for the Fiscal Year ended June 30, 1905:

> In my opinion, tourists entering this park have no use for guns.  Hunting is at no time permitted, and the game is not threatening or dangerous.  The excuse might be offered that the tourists were en route to the forest reserve and were simply taking their guns through.  I would therefore recommend that the carrying of guns through the park be permitted only on the Mineral King road, which is a county road, and that it be made generally known that no gun will be permitted within the park at any other place without first obtaining the permission of the acting superintendent, and that this permission be generally denied, except to those for whom the acting superintendent himself could be individually responsible.  The sealing of guns would soon lead to the belief that the general right to carry guns in the park exists, and that the absence of one authorized to seal the gun at the point where the park was entered was sufficient justification for entering the park with an unsealed gun.  Notices and regulations are soon ignored and lose their effect when privileges begin to be considered as rights, and the work of the rangers and guards is increased, as a practice once tolerated, because of a misunderstanding or mistaken belief, grows into an ungovernable nuisance and a source of never-ending trouble.  I therefore consider it best to have it generally known that no persons will be permitted to carry guns in the park, except over the Mineral King road, above mentioned.  There would then be no excuse for a man being found in the park with an unsealed gun.  Rangers and guards can not be at all points, especially along the reserve, at which people enter.

> *Annual Reports of the Department of the Interior for the Fiscal Year Ended June 30, 1905. Report of the Secretary of the Interior and Bureau Officers, etc.* (Washington:  Gov't Printing Office, 1905), pp. 712-13.

The next year, the Secretary of the Interior commented thus:

> The rules and regulations were carefully observed by the soldiers, and their duties were performed in a thorough and satisfactory manner.  The visitors to the parks seemed disposed to confirm to all the requirements, while the residents in the vicinity of the parks seemed interested in having the regulations obeyed.  Violations of the regulations occurred in but two instances:  A man brought a pistol into Sequoia Park without having it sealed; it was taken from him and will be held until the close of the season.  Another man was found hunting in Sequoia Park; his gun was taken from him and he was ejected from the park.

*Annual Reports of the Department of the Interior for the Fiscal Year Ended June 30, 1906. Report of the Secretary of the Interior and Bureau Officers, etc.* (Washington:  Gov't Printing Office, 1906), p. 203

3.  Regulations [of both parks] of March 30, 1907 –

(6)  Hunting or killing, wounding or capturing any bird or wild animal on the park lands, except dangerous animals when necessary to prevent them from destroying life or inflicting an injury, is prohibited.  The outfits, including guns, traps, teams, horses, or means of transportation used by persons engaged in hunting, killing, trapping, ensnaring, or capturing such birds or wild animals, or in possession of game killed on the park lands under other circumstances than prescribed above, will be taken up by the superintendent and held subject to order of the Secretary of the Interior, except in cases where it is shown by satisfactory evidence that the outfit is not the property of the person, or persons, violating this regulation, and the actual owner thereof was not a party to such violation. <u>Firearms will only be permitted in the park on written permission from the superintendent thereof</u>.

*Laws and Regulations Relating to the Sequoia and General Grant National Parks, California* (Washington:  Gov't Printing Office, 1908), pp. 9, 11.

4.  Regulations of March 30, 1912 –

(6)  Hunting or killing, wounding or capturing any bird or wild animal on the park lands, except dangerous animals when necessary to prevent them from destroying life or inflicting an injury, is prohibited.  The outfits, including guns, traps, teams, horses, or means of transportation used by persons engaged in hunting, killing, trapping, ensnaring, or capturing such birds or wild animals, or in possession of game killed on the park lands under other circumstances than prescribed above, will be taken up by the superintendent and held subject to the order of the Secretary of the Interior, except in cases where it is shown by satisfactory evidence that the outfit is not the property of the person, or persons, violating this regulation and the actual owner thereof was not a party to such violation. <u>Firearms will only be permitted in the park on written permission from the superintendent thereof</u>.

*Reports of the Department of the Interior for the Fiscal Year Ended June 30, 1912. Administrative Reports in 2 Volumes.  Volume I* (Washington:  Gov't Printing Office, 1913), p. 683.

5.  Regulations in effect April 15, 1918 –

(4)  *Hunting*.—The park is a sanctuary for wild life of every sort and no one may frighten, hunt or kill, wound or capture any bird or wild animal in the park, except dangerous animals when it is necessary to prevent them from destroying life or inflicting injury.

The outfits, including guns, traps, teams, horses, or means of transportation used by persons engaged in hunting, killing, trapping, ensnaring, or capturing such birds or wild

animals, or in possession of game killed on the park lands under circumstances other than prescribed above, must be taken up by the superintendent and held subject to the order of the Director of the National Park Service, except in cases where it is shown by satisfactory evidence that the outfit is not the property of the person or persons violating this regulation, and the actual owner was not a party to such violation.  <u>Firearms will be permitted in the park only on written permission of the superintendent.  Visitors entering or travelling through the park to places beyond must, at entrance, report and surrender all firearms, traps, nets, seines, or explosives in their possession to the first park officer, and in proper cases may obtain his written leave to carry them through the park sealed.</u>

> *General Information Regarding Sequoia and General Grant National Parks – Season of 1918* (Washington:  Gov't Printing Office, 1918), pp. 33-34.

6. Regulations of January 14, 1928 –

(4)  *Hunting*.—The parks are sanctuaries for wild life of every sort and all hunting or the killing, wounding, frightening, or capturing at any time of any wild bird or animal, except dangerous animals, when it is necessary to prevent them from destroying human lives or inflicting personal injury, is prohibited within the limits of said parks.

The outfits, including guns, traps, teams, horses, or means of transportation of every nature or description, used by any person or persons engaged in hunting, killing, trapping, ensnaring, or capturing birds or wild animals within the limits of said parks, shall be taken up by the superintendent and held subject to the order of the Director of the National Park Service.  Possession within said parks, or either of them, of the dead bodies, or any part thereof, of any wild bird or animal shall be prima facie evidence that the person or persons having same are guilty of violating this regulation.  <u>Firearms are prohibited within the parks except upon written permission of the superintendent.  Visitors entering or traveling through the parks to places beyond shall, at entrance, report and surrender all firearms, traps, nets, seines, or explosives in their possession to the first park officer, and in proper cases may obtain his written leave to carry them through the parks sealed.  The Government assumes no responsibility for loss or damage to any firearms, traps, nets, seines, or other property so surrendered to any park officer, nor are park officers authorized to accept the responsibility of custody of any property for the convenience of visitors.</u>

NOTE.—The foregoing regulation is in effect a declaration of the law on this subject contained in sections 5 and 6 of the act of Congress, approved June 2, 1920 (41 Stat. 732), accepting the cession by the State of California of exclusive jurisdiction of the lands embraced within the Yosemite National Park, Sequoia National Park, and General Grant National Park, respectively, and for other purposes.

This act by its terms applies to all lands within said parks, whether in public or private ownership.

> *Circular of General Information Regarding Sequoia and General Grant National Parks* (Washington:  Gov't Printing Office, 1928), p. 23.

7. Regulations of January 2, 1930 –

12

(4) *Hunting*.—The parks are sanctuaries for wild life of every sort and all hunting or the killing, wounding, frightening, or capturing at any time of any wild bird or animal, except dangerous animals, when it is necessary to prevent them from destroying human lives or inflicting personal injury, is prohibited within the limits of said parks.

Molesting, teasing, or touching the bears is prohibited.

The outfits, including guns, traps, teams, horses, or means of transportation of every nature or description, used by any person or persons engaged in hunting, killing, trapping, ensnaring, or capturing birds or wild animals within the limits of said parks shall be taken up by the superintendent and held subject to the order of the Director of the National Park Service.  Possession within said parks, or either of them, of the dead bodies, or any part thereof, of any wild bird or animal shall be prima facie evidence that the person or persons having same are guilty of violating this regulation.  <u>Firearms are prohibited within the parks except upon written permission of the superintendent.  Visitors entering or traveling through the parks to places beyond shall, at entrance, report and surrender all firearms, traps, nets, seines, or explosives in their possession to the first park officer, and in proper cases may obtain his written permission to carry them through the parks sealed.  The Government assumes no responsibility for loss or damage to any firearms, traps, nets, seines, or other property so surrendered to any park officer, nor are park officers authorized to accept the responsibility of custody of any property for the convenience of visitors</u>.

NOTE.—The foregoing regulation is in effect a declaration of the law on this subject contained in sections 5 and 6 of the act of Congress approved June 2, 1920 (41 Stat. 732), accepting cession by the State of California of exclusive jurisdiction of the lands embraced within the Yosemite National Park, Sequoia National Park, and General Grant National Park, respectively, and for other purposes.

This act by its terms applies to all lands within said parks, whether in public or private ownership.

*Circular of General Information Regarding Sequoia and General Grant National Parks* (1930), p. 33-34.

8.  Regulations of December 6, 1930 –

(4) *Hunting*.—The parks are sanctuaries for wild life of every sort and all hunting or the killing, wounding, frightening, or capturing at any time of any wild bird or animal, except dangerous animals, when it is necessary to prevent them from destroying human lives or inflicting personal injury, is prohibited within the limits of said parks.

Molesting, teasing, or touching the bears is prohibited.

The outfits, including guns, traps, teams, horses, or means of transportation of every nature or description, used by any person or persons engaged in hunting, killing, trapping, ensnaring, or capturing birds or wild animals within the limits of said parks shall be taken up by the superintendent and held subject to the order of the Director of the National Park Service.  Possession within said parks, or either of them, of the dead bodies, or any part thereof, of any wild bird or animal shall be prima facie evidence that the person or persons having same are guilty of violating this regulation.  <u>Firearms are prohibited within the parks except upon written permission of the superintendent.  Visitors entering or traveling through the parks to places beyond shall, at entrance, report and surrender all firearms,</u>

13

traps, nets, seines, or explosives in their possession to the first park officer, and in proper cases may obtain his written permission to carry them through the parks sealed.  The Government assumes no responsibility for loss or damage to any firearms, traps, nets, seines, or other property so surrendered to any park officer, nor are park officers authorized to accept the responsibility of custody of any property for the convenience of visitors.

NOTE.—The foregoing regulation is in effect a declaration of the law on this subject contained in sections 5 and 6 of the act of Congress approved June 2, 1920 (41 Stat. 732), accepting cession by the State of California of exclusive jurisdiction of the lands embraced within the Yosemite National Park, Sequoia National Park, and General Grant National Park, respectively, and for other purposes.

This act by its terms applies to all lands within said parks, whether in public or private ownership.

*Circular of General Information Regarding Sequoia National Park and General Grant National Park* (1931), pp. 43-44.

9.  Regulations of December 21, 1932 –

(4)  *Hunting.*—The parks are a sanctuary for wild life of every sort, and all hunting or the killing, wounding, frightening, or capturing at any time of any wild bird or animal, except dangerous animals when it is necessary to prevent them from destroying human lives or inflicting personal injury, is prohibited within the limits of the parks.

Feeding directly from the hand, touching, teasing, or molesting bears is prohibited. Persons photographing bears do so at their own risk and peril.

The outfits, including guns, traps, teams, horses, or means of transportation of every nature or description used by any person or persons engaged in hunting, killing, trapping, ensnaring, or capturing birds or wild animals within the limits of the parks shall be forfeited to the United States and may be seized by the officers of the park and held pending the prosecution of any person or persons arrested under the charge of violating this regulation, and upon conviction, such forfeiture shall be adjudicated as a penalty in addition to other punishment.  Such forfeited property shall be disposed of and accounted for by and under the authority of the Secretary of the Interior.  Possession within said parks of the dead bodies or any part thereof of any wild bird or animal shall be prima facie evidence that the person or persons having the same are guilty of violating this regulation.

During the hunting season arrangements may be made at entrance stations to identify and transport through the parks carcasses of birds or animals killed outside of the parks.

Firearms are prohibited within the parks except upon written permission of the superintendent.  Visitors entering or traveling through the parks to places beyond shall, at entrance, report and surrender all firearms, traps, seines, nets, or explosives in their possession to the first park officer, and in proper cases may obtain his written permission to carry them through the parks sealed.  The Government assumes no responsibility for the loss or damage to any firearms, traps, nets, or other property so surrendered to any park officer, nor are park officers authorized to accept the responsibility of custody of any property for the convenience of visitors.

NOTE.—The foregoing regulation is in effect a declaration of the law on this subject contained in sections 5 and 6 of the act of Congress approved June 2, 1920 (41 Stat. 732),

accepting cession by the State of California of exclusive jurisdiction of the lands embraced within the Yosemite National Park, Sequoia National Park, and General Grant National Park, respectively, and for other purposes.

This act by its terms applies to all lands within said parks, whether in public or private ownership.

*General Information Regarding Sequoia and General Grant National Parks* (Washington: Gov't Printing Office, 1933), pp. 37-38.


YOSEMITE NATIONAL PARK

1.  Regulations of June 2, 1902 –

(6)  Hunting or killing, wounding or capturing any bird or wild animal on the park lands, except dangerous animals when necessary to prevent them from destroying life or inflicting an injury, is prohibited.  The outfits, including guns, traps, teams, horses, or means of transportation used by persons engaged in hunting, killing, trapping, ensnaring, or capturing such birds or wild animals, or in possession of game killed on the park lands under other circumstances than prescribed above, will be taken up by the superintendent and held subject to order of the Secretary of the Interior, except in cases where it is shown by satisfactory evidence that the outfit is not the property of the person or persons violating this regulation and the actual owner thereof was not a party  to such violation. Firearms will only be permitted in the park on written permission from the superintendent thereof.

"Rules and Regulations of the Yosemite National Park," June 2, 1902.  *Annual Reports of the Department of the Interior for the Fiscal Year Ended June 30, 1903*, *Miscellaneous Reports, Part I* (Washington:  Govt' Printing Office, 1903), p. 526.

In his Annual Report for 1905, Secretary Hitchcock commented on Yosemite's firearm regulation as follows:

The duty of enforcing the regulation prohibiting the killing of game in the park continues to be a matter of considerable difficulty.  Heretofore the custom has been to require persons entering the park with firearms in their possession to surrender such arms during their stay in the park, or, when the parties desired to leave the reservation by a different route, the arms were sealed up and delivered to the owners, with a permit to carry the sealed arms through the park.  It has been found, however, that this system afforded no protection to the game in the park, inasmuch as persons entering the reservation with the object of hunting would have their arms sealed up by the first detachment of troops they met and as soon as they were out of sight would break the seals; thereafter, if they met other troops, they would claim that their arms had not been previously sealed; and there being no means of disproving this statement, the second detachment could only again put seals upon the weapons, to be a second time broken, so that the owners could use the weapons in violation of the park regulations.

15

Owing to this practice, the sealing of arms has been discontinued during the past season, and persons entering the park have been required by the first patrol they encountered to surrender any weapons in their possession.  A large number of applications for permits to carry rifles and shotguns into the park for alleged "protection" were received; but as the applicants declined to give any information regarding their plans and purposes, only one such request was granted.  In the case of parties of tourists consisting partly of women permits to carry revolvers were given to some of the men in the party.  Notwithstanding these precautions, it has been impracticable to prevent entirely the killing of game in the park, as entrance thereto can be had at almost any point, and hunters can thus sometimes evade the various detachments of troops patrolling the reservation.

*Annual Reports of the Department of the Interior for the Fiscal Year Ended June 30, 1905. Report of the Secretary of the Interior and Bureau Officers, etc.* (Washington:  Gov't Printing Office, 1905), pp. 165-66.

Captain H.C. Benson, Fourth Cavalry, the acting superintendent of Yosemite reported as follows:

### Permits to Carry Arms

Numerous letters have been prepared at the instance of one Congressman, requesting that a number of parties who are desirous of making trips through the park be permitted to carry firearms for their protection, promising to conform to all the regulations.  Regulations positively prohibit the killing of game.  The carrying of firearms in the Yosemite National Park, or any national park, means that the person so carrying them is on a hunting trip; and it is so recognized throughout this part of the country.  These letters were never presented, as stated in the body of the letter, but were always mailed to the acting superintendent by the party desiring a permit, with the request that the permit be forwarded to him saying nothing, however, about his intention of conforming to the rules and regulations.  Letters were therefore addressed to these people, requesting that they inform the acting superintendent of the date when they expected to reach the park, where they expected to enter, what places they expected to visit, and how long they expected to remain, requesting also a statement from each member of the party that the arms would not be used for the killing of game.  In no instance whatever have these questions been answered.  In some cases the letters were not answered at all, while in other instances their reply simply was that the party had changed his mind and would not visit the Yosemite, and others, again, stated that they had decided not go on a camping trip this year.  The spectacle of from five to seven men arriving on the park limits on the first day of the "open" season, each an provided with a rifle, and the majority of them with shotguns also, all for the purpose of "protection," would be an amusing one were it not for the fact that it meant the slaughter of game within the park.  Under the circumstances, but one such permit was granted.  Permits were given for the carrying of revolvers by men when they were accompanied by women, but in no other cases.

It was positively known to the acting superintendent that the sealing of arms in previous years was but a farce, as the seals were broken immediately upon leaving the detachments, in many cases, and that when the next detachment was encountered the statement was made that the guns had not been previously sealed.  As there was nothing to disprove this statement, the guns would be again sealed to be again broken and used in violation of park regulations.  For this reason, arms have not been sealed this season.

The protection of game is a very difficult matter, due to the fact that entrance can be had to the park at almost any point whatever, and to the fact that all of the inhabitants of this region believe that the game in the mountains belongs to them.  With the withdrawal of the troops, there is absolutely nothing to prevent the annual influx of hunters.  The game having been driven from the higher mountains by the snow and having grown quite tame during the summer from not being interfered with or frightened, fall easy prey to the unscrupulous.

Id. at 697-98.

In his report for the Fiscal Year ended June 30, 1906, Secretary Hitchcock stated:

[According to the Yosemite superintendent] the Yosemite Valley has, under the control of the State of California, been a death trap to game unfortunate enough to enter it.  Practically every person living in the valley kept a rifle, shotgun, and revolver, and game of every description was considered legitimate prey.  It is hoped that within a short time, now that the rules and regulations prescribed by the Department for the protection of game can be enforced in Yosemite Valley, that the game will soon learn that it is a safe retreat and not a death trap.

The rules do not permit the carrying of firearms in the park.  In the early part of the season two men were arrested by the park rangers for killing deer in the park; they were prosecuted under the State game laws and each fined . . . .

*Annual Reports of the Department of the Interior for the Fiscal Year Ended June 30, 1906. Report of the Secretary of the Interior and Bureau Officers, etc.* (Washington:  Gov't Printing Office, 1906), p. 195.

The acting superintendent gave an example of the constant battle against poaching in his annual report:

In the latter part of August, 1906, a letter was received from the Department stating that Mr. W.T. Scoon, of Modesto, Cal., with a party of friends, would make a trip through the reservation for protection, promising to conform to all the regulations.  Notice was received by me from Mr. Scoon on September 5 that it was his purpose, with his party of four, to leave Modesto on or about the 10th of September.  I thereafter requested him to advise me as to the names of the people who would compose his party and the point at which he expected to enter the park, in order to make arrangements for their reception at the point of entrance, to which he replied,

17

under date of September 11, stating "We will go up on the Oak Flat road by the way of Crockers and there will be in the party A.N. Crow, R.B. Crow, James Klo, and myself, and the party expects to leave Modesto September 13."

As there is absolutely no reason for carrying firearms for "protection" in the park, and the rules do not permit the carrying of firearms, and noting that the two members of this party, namely, the Crow Brothers, have on previous occasions killed game in the park when they were carrying firearms under a permit in which they had stipulated to conform to the rules and regulations, I sent an officer and two men to accompany this party in order that they might secure the "protection" they desired.  They seemed much surprised and greatly put out that they were to be furnished with this protection.  They stated that they had no intention whatever of hunting generally, but desired only to kill two or three bucks, just sufficient for their own use.  They remained several days, debating whether they would go on the trip if they were not permitted to hunt, but finally moved to Poopenaut Valley, remained there several days, then went to Lake Eleanor for a few days, and finally left the park.  It was undoubtedly their intention of going on a hunting trip pure and simple, as each man carried a rifle and a shotgun and they were provided with thirty days' rations.  They remained in the park but ten days.  It was not "protection" they desired of their firearms, but a definite intention to violate the rules and regulations of the park by hunting.

. . . .  Immediately upon the withdrawal of the troops from the park it is overrun with pot hunters, and these same men often remain throughout the entire winter, killing and trapping all the game in their vicinity.

As the park can be entered from all points of the compass it is impracticable to keep these hunters out except by constant patrolling on the part of troops or rangers.  As the rangers live, one on the south side and the other to the far southwest of the park, and make no attempt to patrol except a few miles from the residence of one, and that only on a wagon road, their services during winter are of but little value, and the game receives scarcely any protection from them.

   Id. at 653-54.

2.  Regulations of February 29, 1908[5] –

   (4)  Hunting or killing, wounding or capturing any bird or wild animal on the park lands, except dangerous animals when necessary to prevent them from destroying life or inflicting an injury, is prohibited.  The outfits, including guns, traps, teams, horses, or

---

[5] In connection with YOSE, as early as 1896 the Sec'y of the Interior noted that "all persons [were] required to surrender" firearms, no permits for their carry being issued.  Given "the depredations upon the game and song birds" it was felt that this policy was necessary, in order "[t]o prevent as far as possible trespass and flagrant violation of the rules of the park during the close-season . . . of California."  The Sec'y went on to state that "[p]ersons entering by trails from the north and east on which there were no permanent guard posts, were, when discovered, disarmed by patrol parties.  Notwithstanding the adoption of such stringent measures firearms have been occasionally smuggled in by campers."  *Report of the Secretary of the Interior* [etc.] (Washington:  Gov't Printing Office, 1896), vol. 1, p. CV.

18

means of transportation used by persons engaged in hunting, killing, trapping, ensnaring, or capturing such birds or wild animals, or in possession of game killed on the park lands under other circumstances than prescribed above, will be taken up by the superintendent and held subject to the order of the Secretary of the Interior, except in cases where it is shown by satisfactory evidence that the outfit is not the property of the person or persons violating this regulation, and the actual owner thereof was not a party to such violation. <u>Firearms will only be permitted in the park on written permission from the superintendent thereof</u>.

*Laws and Regulations Relating to the Yosemite National Park, California* (Washington: Gov't Printing Office, 1908), p. 15.

3.  Regulations of June 1, 1909 –

    (4)  Hunting or killing, wounding or capturing any bird or wild animal on the park lands, except dangerous animals when necessary to prevent them from destroying life or inflicting an injury, is prohibited.  The outfits, including guns, traps, teams, horses, or means of transportation used by persons engaged in hunting, killing, trapping, ensnaring, or capturing such birds or wild animals, or in possession of game killed on the park lands under other circumstances than prescribed above, will be taken up by the superintendent and subject to the order of the Secretary of the Interior, except in cases where it is shown by satisfactory evidence that the outfit is not the property of the person or persons violating this regulation and the actual owner thereof was not a party to such violation. <u>Firearms will only be permitted in the park on written permission from the superintendent thereof.  On arrival at the first station of the park guard, parties having firearms, traps, nets, seines, or explosives, will turn them over to the sergeant in charge of the station, taking his receipt for them.  They will be returned to the owners on leaving the park</u>.

    *Reports of the Department of the Interior for the Fiscal Year Ended June 30, 1909. Administrative Reports in 2 Volumes.  Volume I* (Washington:  Gov't Printing Office, 1910), p. 436.

4.  Regulations of March 30, 1912 –

    (4)  Hunting or killing, wounding or capturing any bird or wild animal on the park lands, except dangerous animals when necessary to prevent them from destroying life or inflicting an injury, is prohibited.  The outfits, including guns, traps, teams, horses, or means of transportation used by persons engaged in hunting, killing, trapping, ensnaring, or capturing such birds or wild animals, or in possession of game killed on the park lands under other circumstances than prescribed above, will be taken up by the superintendent and subject to the order of the Secretary of the Interior, except in cases where it is shown by satisfactory evidence that the outfit is not the property of the person or persons violating this regulation and the actual owner thereof was not a party to such violation. <u>Firearms will only be permitted in the park on written permission from the superintendent thereof.  On arrival at the first station of the park guard, parties having firearms, traps, nets, seines, or explosives, will turn them over to the sergeant in charge of the station, taking his receipt for them.  They will be returned to the owners on leaving the park</u>.

> *Reports of the Department of the Interior for the Fiscal Year Ended June 30, 1912.*
> *Administrative Reports in 2 Volumes.  Volume I* (Washington:  Gov't Printing Office, 1913),
> pp. 670-71.

5.  Regulations of May 11, 1914 –

(4)  Hunting or killing, wounding or capturing any bird or wild animal on the park lands, except dangerous animals when necessary to prevent them from destroying life or inflicting an injury, is prohibited.  The outfits, including guns, traps, teams, horses, or means of transportation used by persons engaged in hunting, killing, trapping, ensnaring, or capturing such birds or wild animals, or in possession of game killed on the park lands under other circumstances than prescribed above, will be taken up by the superintendent and subject to the order of the Secretary of the Interior, except in cases where it is shown by satisfactory evidence that the outfit is not the property of the person or persons violating this regulation and the actual owner thereof was not a party to such violation.  <u>Firearms will only be permitted in the park on written permission from the superintendent thereof.  On arrival at the first station of the park guard, parties having firearms, traps, nets, seines, or explosives, will turn them over to the sergeant in charge of the station, taking his receipt for them.  They will be returned to the owners on leaving the park</u>.

> *Reports of the Department of the Interior for the Fiscal Year Ended June 30, 1914.*
> *Administrative Reports in 2 Volumes.  Volume I* (Washington:  Gov't Printing Office, 1915),
> p. 738.

In his annual report for Fiscal Year 1916, the superintendent addressed the firearms regulation as follows:

Approximately 1,500 firearms of various sorts and calibers have been sealed or taken up during the year.  At present firearms carried by through automobile passengers are sealed and the owners are permitted to retain possession.  In such cases the number of guns sealed is stated on the permit and the seals are broken by the ranger at the point of exit.  Those brought into the park by people on foot or horseback are taken up and turned in to the supervisor's office, whence they are shipped to the owner at the latter's risk.  This method of handling firearms has proven very satisfactory.  There should, however, be incorporated in the firearms regulations a clause stating, in effect, that in cases where arms once sealed are later found with seals broken, or in cases where arms are brought into the park unsealed in direct violation of the regulations, or in cases where there is any attempt to evade the regulations by denial of possession or concealment, said arms shall be promptly confiscated and the party shall forfeit all claim thereto.

> *Reports of the Department of the Interior for the Fiscal Year Ended June 30, 1916.  Volume*
> *I* (Washington:  Gov't Printing Office, 1917), p. 794.

For Fiscal Year 1917, the superintendent noted:

Firearms to the number of 1,794, of various classes, were handled by the ranger department during the year. Of these 1,236 were sealed at the park entrances, and 558 were taken up by the park rangers at various points and were later returned to their respective owners. The method of handling firearms was the same as that used through the latter part of the 1916 season. Firearms carried by automobile passengers are sealed at the park entrance and are allowed to remain in the possession of the owner. In this case the number of guns sealed is noted on the permit by the ranger issuing the permit and the seals are in turn broken by the ranger at point of exit. Those brought into the park by people on foot or horseback are taken up and turned into the supervisor's office, whence they are shipped to the owners at the latter's risk. Likewise, in cases where persons are found in the park with firearms which have not been sealed, such firearms are taken up and handled in the same manner. In the latter case, unless the owner can readily explain the reason for carrying unsealed firearms, additional penalties in the way of fines are imposed.

*Reports of the Department of the Interior for the Fiscal Year Ended June 30, 1917. Volume I* (Washington: Gov't Printing Office, 1918), p. 935.

6. Regulations in effect April 15, 1918 –

(5) *Hunting*.—The park is a sanctuary for wild life of every sort, and no one may frighten, hunt or kill, wound or capture any bird or wild animal in the park, except dangerous animals when it is necessary to prevent them from destroying life or inflicting injury.

The outfits, including guns, traps, teams, horses, or means of transportation used by persons engaged in hunting, killing, trapping, ensnaring, or capturing such birds or wild animals, or in possession of game killed on the park lands under circumstances other than prescribed above, must be taken up by the superintendent and held subject to the order of the Director of the National Park Service, except in cases where it is shown by satisfactory evidence that the outfit is not the property of the person or persons violating this regulation, and the actual owner was not a party to such violation. <u>Firearms will be permitted in the park only on written permission of the superintendent. Visitors entering or traveling through the park to places beyond must, at entrance, report and surrender all firearms, traps, nets, seines, or explosives in their possession to the first park officer, and in proper cases may obtain his written leave to carry them through the park sealed.</u>

*General Information Regarding Yosemite National Park – Season of 1918* (Washington: Gov't Printing Office, 1918), pp. 33-34.

7. Regulations of November 24, 1928 –

(5) *Hunting*.—The park is a sanctuary for wild life of every sort, and all hunting or the killing, wounding, frightening, or capturing at any time of any wild bird or animal, except dangerous animals when it is necessary to prevent them from destroying human lives or inflicting personal injury, is prohibited within the limits of said park.

The outfits, including guns, traps, teams, horses, or means of transportation of every nature or description used by any person or persons engaged in hunting, killing, trapping,

ensnaring, or capturing birds or wild animals within the limits of said park shall be taken up by the superintendent and held subject to the order of the Director of the National Park Service.  Possession within said park of the dead bodies or any part thereof of any wild bird or animal shall be prima facie evidence that the person or persons having same are guilty of violating this regulation.  <u>Firearms are prohibited within the park except upon written permission of the superintendent.  Visitors entering or traveling through the park to places beyond shall, at entrance, report and surrender all firearms, traps, nets, seines, or explosives in their possession to the first park officer, and in proper cases may obtain his written leave to carry them through the park sealed.  The Government assumes no responsibility for the loss or damage to any firearms, traps, nets, seines, or other property so surrendered to any park officer, nor are park officers authorized to accept the responsibility of custody of any property for the convenience of visitors.</u>

NOTE.  The foregoing regulation is in effect a declaration of the law on this subject contained in sections 5 and 6 of the act of Congress, approved June 2, 1920 (41 Stat. 732), accepting cession of the State of California of exclusive jurisdiction of the lands embraced within the Yosemite National Park, Sequoia National Park, and General Grant National Park, respectively, and for other purposes.

This act by its terms applies to all lands within said park whether in public or private ownership.

*Circular of General Information Regarding Yosemite National Park* (1929), pp. 41-42.

8.  Regulations of January 14, 1930 –

(5)  *Hunting*.—The park is a sanctuary for wild life of every sort, and all hunting or the killing, wounding, frightening, or capturing at any time of any wild bird or animal, except dangerous animals when it is necessary to prevent them from destroying human lives or inflicting personal injury, is prohibited within the limits of said park.

The outfits, including guns, traps, teams, horses, or means of transportation of every nature or description used by any person or persons engaged in hunting, killing, trapping, ensnaring, or capturing birds or wild animals within the limits of said park shall be taken up by the superintendent and held subject to the order of the Director of the National Park Service.  Possession within said park of the dead bodies or any part thereof of any wild bird or animal shall be prima facie evidence that the person or persons having same are guilty of violating this regulation.  <u>Firearms are prohibited within the park except upon written permission of the superintendent.  Visitors entering or traveling through the park to places beyond shall, at entrance, report and surrender all firearms, traps, nets, seines, or explosives in their possession to the first park officer, and in proper cases may obtain his written permission to carry them through the park sealed.  The Government assumes no responsibility for loss or damage to any firearms, traps, nets, seines, or other property so surrendered to any park officer, nor are park officers authorized to accept the responsibility of custody of any property for the convenience of visitors.</u>

NOTE.—The foregoing regulation is in effect a declaration of the law on this subject contained in sections 5 and 6 of the act of Congress, approved June 2, 1920 (41 Stat. 732), accepting cession by the State of California of exclusive jurisdiction of the lands embraced within the Yosemite National Park, Sequoia National Park, and General Grant National Park, respectively, and for other purposes.

This act by its terms applies to all lands within said park whether in public or private ownership.

*Circular of General Information Regarding Yosemite National Park* (1930), p. 45.

9.  Regulations of December 8, 1930 –

(5)  *Hunting*.—The park is a sanctuary for wild life of every sort, and all hunting or the killing, wounding, frightening, or capturing at any time of any wild bird or animal, except dangerous animals when it is necessary to prevent them from destroying human lives or inflicting personal injury, is prohibited within the limits of said park.

The outfits, including guns, traps, teams, horses, or means of transportation of every nature or description used by any person or persons engaged in hunting, killing, trapping, ensnaring, or capturing birds or wild animals within the limits of said park shall be taken up by the superintendent and held subject to the order of the Director of the National Park Service.  Possession within said park of the dead bodies or any part thereof of any wild bird or animal shall be prima facie evidence that the person or persons having same are guilty of violating this regulation.  Firearms are prohibited within the park except upon written permission of the superintendent.  Visitors entering or traveling through the park to places beyond shall, at entrance, report and surrender all firearms, traps, nets, seines, or explosives in their possession to the first park officer, and in proper cases may obtain his written permission to carry them through the park sealed.  The Government assumes no responsibility for loss or damage to any firearms, traps, nets, seines, or other property so surrendered to any park officer, nor are park officers authorized to accept the responsibility of custody of any property for the convenience of visitors.

NOTE.—The foregoing regulation is in effect a declaration of the law on this subject contained in sections 5 and 6 of the act of Congress, approved June 2, 1920 (41 Stat. 732), accepting cession by the State of California of exclusive jurisdiction of the lands embraced within the Yosemite National Park, Sequoia National Park, and General Grant National Park, respectively, and for other purposes.

This act by its terms applies to all lands within said park whether in public or private ownership.

*Circular of General Information Regarding Yosemite National Park* (Washington:  Gov't Printing Office, 1931), pp. 45-46.

10.  Regulations of January 13, 1932 –

(4)  *Hunting*.—The park is a sanctuary for wild life of every sort, and all hunting or the killing, wounding, frightening, or capturing at any time of any wild bird or animal, except dangerous animals when it is necessary to prevent them from destroying life or inflicting personal injury, is prohibited within the limits of the park.

The outfits, including guns, traps, teams, horses, or means of transportation of every nature or description used by any person or persons engaged in hunting, killing, ensnaring, or capturing birds or wild animals within the limits of the park shall be taken up by the superintendent and held subject to the order of the Director of the National Park Service.  Possession within said park of the dead bodies or any part thereof of any wild bird or

animals shall be prima facie evidence that the person or persons having the same are guilty of violating this regulation.

During the hunting season arrangements may be made at entrance stations to identify and transport through the park, carcasses of birds or animals killed outside of the park.

Firearms are prohibited within the park except upon written permission of the superintendent.  Visitors entering or traveling through the park to places beyond, shall, at entrance, report and surrender all firearms, traps, nets, seines, or explosives in their possession to the first park officer, and in proper cases may obtain his written permission to carry them through the park sealed.  The Government assumes no responsibility for the loss or damage to any firearms, traps, nets, or other property so surrendered to any park officer, nor are park officers authorized to accept the responsibility of custody of any property for the convenience of visitors.

NOTE.—The foregoing regulation is in effect a declaration of the law on this subject contained in sections 5 and 6 of the act of Congress approved June 2, 1920 (41 Stat. 732), accepting cession by the State of California of exclusive jurisdiction of the lands embraced within the Yosemite National Park . . . and for other purposes.

This act by its terms applies to all lands within said park whether in public or private ownership.

*Circular of General Information Regarding Yosemite National Park* (1932), pp. 42-43.

11.  Regulations of December 21, 1932 –

(4)  *Hunting*.—The park is a sanctuary for wild life of every sort, and all hunting or the killing, wounding, frightening, or capturing at any time of any wild bird or animal, except dangerous animals when it is necessary to prevent them from destroying human lives or inflicting personal injury, is prohibited within the limits of the park.

The outfits, including guns, traps, teams, horses, or means of transportation of every nature or description used by any person or persons engaged in hunting, killing, ensnaring, or capturing birds or wild animals within the limits of the park shall be forfeited to the United States and may be seized by the officers of the park and held pending the prosecution of any person or persons arrested under the charge of violating this regulation, and upon conviction such forfeiture shall be adjudicated as a penalty in addition to other punishment.  Such forfeited property shall be disposed of and accounted for by and under the authority of the Secretary of the Interior.  Possession within said park of the dead bodies or any part thereof of any wild bird or animal shall be prima facie evidence that the person or persons having the same are guilty of violating this regulation.

During the hunting season arrangements may be made at entrance stations to identify and transport through the park, carcasses of birds or animals killed outside of the park.

Feeding directly from the hand, touching, teasing, or molesting bears is prohibited. Persons photographing bears do so at their own risk and peril.

Firearms are prohibited within the park except upon written permission of the superintendent.  Visitors entering or traveling through the park to places beyond shall, at entrance, report and surrender all firearms, traps, seines, nets, or explosives in their possession to the first park officer, and in proper cases may obtain his written permission to carry them through the park sealed.  The Government assumes no responsibility for the loss or damage to any firearms, traps, nets, or other property so surrendered to any park

officer, nor are park officers authorized to accept the responsibility of custody of any property for the convenience of visitors.

NOTE.—The foregoing regulation is in effect a declaration of the law on this subject contained in sections 5 and 6 of the act of Congress approved June 2, 1920 (41 Stat. 732), accepting cession by the State of California of exclusive jurisdiction of the lands embraced within the Yosemite National Park, Sequoia National Park, and General Grant National Park, respectively, and for other purposes.

This act by its terms applies to all lands within said parks, whether in public or private ownership.

*General Information Regarding Yosemite National Park* (Washington:  Gov't Printing Office, 1933), pp. 34-35.

MESA VERDE NATIONAL PARK

1.  Regulations of March 19, 1908 –

(8)  Hunting or killing, wounding or capturing any bird or wild animal on the park lands, except dangerous animals when necessary to prevent them from destroying life or inflicting an injury, is prohibited.  The outfits, including guns, traps, teams, horses, or means of transportation used by persons engaged in hunting, killing, trapping, ensnaring, or capturing such birds or wild animals, or in possession of game killed on the park lands under other circumstances than those prescribed above, will be taken up by the superintendent and held subject to the order of the Secretary of the Interior, except in cases where it is shown by satisfactory evidence that the outfit is not the property of the person or persons violating this regulation and the actual owner thereof was not a party to such violation.  Firearms will be permitted in the park only on written permission from the superintendent thereof.

*Laws and Regulations Relating to the Mesa Verde National Park, Colorado* (Washington: Gov't Printing Office, 1908), p. 9.

2.  Regulations of March 30, 1912 –

(8)  Hunting or killing, wounding or capturing any bird or wild animal on the park lands, except dangerous animals when necessary to prevent them from destroying life or inflicting an injury, is prohibited.  The outfits, including guns, traps, teams, horses, or means of transportation used by persons engaged in hunting, killing, trapping, ensnaring, or capturing such birds or wild animals, or in possession of game killed on the park lands under other circumstances than prescribed above, will be taken up by the superintendent and held subject to the order of the Secretary of the Interior, except in cases where it is shown by satisfactory evidence that the outfit is not the property of the person or persons violating this regulation and the actual owner thereof was not a party to such violation.  Firearms will be permitted in the park only on written permission from the superintendent.

> *Reports of the Department of the Interior for the Fiscal Year Ended June 30, 1912. Administrative Reports in 2 Volumes.  Volume I* (Washington:  Gov't Printing Office, 1913), pp. 715-16.

3.  Regulations in effect April 15, 1918 –

    (5)  *Hunting*.—The park is a sanctuary for wild life of every sort and no one should frighten, hunt or kill, wound or capture any bird or wild animal in the park except dangerous animals when it is necessary to prevent them from destroying life or inflicting injury.

    The outfits, including guns, traps, teams, horses, or means of transportation used by persons engaged in hunting, killing, trapping, ensnaring, or capturing such birds or wild animals, or in possession of game killed on the park lands under circumstances other than prescribed above, must be taken up by the superintendent and held subject to the order of the Director of the National Park Service, except in cases where it is shown by satisfactory evidence that the outfit is not the property of the person or persons violating this regulation, and the actual owner was not a party to such violation.  <u>Firearms will be permitted in the park only on written permission of the superintendent.  Visitors entering or travelling through the park to places beyond must, at entrance, report and surrender all firearms, traps, nets, seines, or explosives in their possession to the first park officer, and, in proper cases, may obtain his written leave to carry them through the park sealed</u>.

> *General Information Regarding Mesa Verde National Park – Season of 1918* (Washington:  Gov't Printing Office, 1918), p. 47.

4.  Regulations of December 11, 1928 –

    (5)  *Hunting*.—The park is a sanctuary for wild life of every sort, and hunting, killing, wounding, capturing, or frightening any bird or wild animal in the park, except dangerous animals when it is necessary to prevent them from destroying life or inflicting injury, is prohibited.

    The outfits, including guns, traps, teams, horses, or means of transportation used by persons engaged in hunting, killing, trapping, ensnaring, or capturing birds or wild animals, or in possession of game killed on the park lands under circumstances other than prescribed above, shall be taken up by the superintendent and held subject to the order of the Director of the National Park Service, except in cases where it is shown by satisfactory evidence that the outfit is not the property of the person or persons violating this regulation, and the actual owner was not a party to such violation.  <u>Firearms are prohibited in the park except on written permission of the superintendent.  Visitors entering or traveling through the park to places beyond shall, at entrance, report and surrender all firearms, traps, nets, seines, or explosives in their possession to the first park officer, and, in proper cases may obtain his written leave to carry them through the park sealed.  The Government assumes no responsibilities for loss or damage to any firearms, traps, nets, seines, or other property so surrendered to any park officer, nor are park officers authorized to accept the responsibility of custody of any property for the convenience of visitors</u>.

*Circular of General Information Regarding Mesa Verde National Park* (Washington:  Gov't Printing Office, 1929), p. 54.

5.  Regulations of March 1, 1930 –

(5)  *Hunting.*—The park is a sanctuary for wild life of every sort, and hunting, killing, wounding, capturing, or frightening any bird or wild animal in the park, except dangerous animals when it is necessary to prevent them from destroying life or inflicting injury, is prohibited.

The outfits, including guns, traps, teams, horses, or means of transportation used by persons engaged in hunting, killing, trapping, ensnaring, or capturing birds or wild animals, or in possession of game killed on the park lands under circumstances other than prescribed above, shall be taken up by the superintendent and held subject to the order of the Director of the National Park Service, except in cases where it is shown by satisfactory evidence that the outfit is not the property of the person or persons violating this regulation, and the actual owner was not a party to such violation.  <u>Firearms are prohibited in the park except on written permission of the superintendent.  Visitors entering or traveling through the park to places beyond shall, at entrance, report and surrender all firearms, traps, nets, seines, or explosives in their possession to the first park officer, and in proper cases may obtain his written leave to carry them through the park sealed.  The Government assumes no responsibilities for loss or damage to any firearms, traps, nets, seines, or other property so surrendered to any park officer, nor are park officers authorized to accept the responsibility of custody of any property for the convenience of visitors.</u>

*Circular of General Information Regarding Mesa Verde National Park* (Washington:  Gov't Printing Office, 1930), p. 56.

6.  Regulations of January 8, 1931 –

(5)  *Hunting.*—The park is a sanctuary for wild life of every sort, and hunting, killing, wounding, capturing, or frightening any bird or wild animal in the park, except dangerous animals when it is necessary to prevent them from destroying life or inflicting injury, is prohibited.

The outfits, including guns, traps, teams, horses, or means of transportation used by persons engaged in hunting, killing, trapping, ensnaring, or capturing birds or wild animals, or in possession of game killed on the park lands under circumstances other than prescribed above, shall be taken up by the superintendent and held subject to the order of the Director of the National Park Service, except in cases where it is shown by satisfactory evidence that the outfit is not the property of the person or persons violating this regulation, and the actual owner was not a party to such violation.  <u>Firearms are prohibited in the park except on written permission of the superintendent.  Visitors entering or traveling through the park to places beyond shall, at entrance, report and surrender all firearms, traps, nets, seines, or explosives in their possession to the first park officer, and in proper cases may obtain his written leave to carry them through the park sealed.  The Government assumes no responsibilities for loss or damage to any firearms, traps, nets, seines, or other property so surrendered to any park officer, nor are park officers</u>

<u>authorized to accept responsibility of custody of any property for the convenience of visitors</u>.

> *Circular of General Information Regarding Mesa Verde National Park* (Washington:  Gov't Printing Office, 1931), p. 57.

7.  Regulations of December 21, 1932 –

(4)  *Hunting.*—The park is a sanctuary for wild life of every sort, and all hunting, killing, wounding, capturing, or capturing at any time of any wild bird or animal, except dangerous animals when it is necessary to prevent them from destroying human lives or inflicting personal injury, is prohibited within the limits of the park.

The outfits, including guns, traps, teams, horses, or means of transportation of every nature or description used by any person or persons engaged in hunting, killing, ensnaring, or capturing birds or wild animals within the limits of the park shall be taken up by the superintendent and held subject to the order of the Director of the National Park Service.  Possession within said park of the dead bodies or any part thereof of any wild bird or animal shall be prima facie evidence that the person or persons having the same are guilty of violating this regulation.

During the hunting season, arrangements may be made at entrance stations to identify and transport through the park, carcasses of birds or animals killed outside of the park.

<u>Firearms are prohibited within the park except upon written permission of the superintendent.  Visitors entering or traveling through the park to places beyond shall, at entrance report and surrender all firearms, traps, seines, nets, or explosives in their possession to the first park officer, and in proper cases may obtain his written permission to carry them through the park sealed.  The Government assumes no responsibility for loss or damage to any firearms, traps, nets, or other property so surrendered to any park officer, nor are park officers authorized to accept the responsibility of custody of any property for the convenience of visitors.</u>

> *General Information Regarding Mesa Verde National Park* (Washington:  Gov't Printing Office, 1933), pp. 55-56.

<u>CRATER LAKE NATIONAL PARK</u>

1.  Regulations of August 27, 1902 –

(4)  Hunting or killing, wounding or capturing, any bird or wild animal on the park lands, except dangerous animals when necessary to prevent them from destroying life or inflicting an injury, is prohibited.  The outfits, including guns, traps, teams, horses, or means of transportation used by persons engaged in hunting, killing, trapping, ensnaring, or capturing such birds or wild animals, or in possession of game killed on the park lands under other circumstances than prescribed above, will be taken up by the superintendent and held subject to order of the Secretary of the Interior, except in cases where it is shown by satisfactory evidence that the outfit is not the property of the person or persons violating this regulation, and the actual owner thereof was not a party to such violation.

Firearms will only be permitted in the park on written permission from the superintendent thereof.

> "Rules and Regulations of the Crater Lake National Park," August 27, 1902. *Annual Reports of the Department of the Interior for the Fiscal Year Ended June 30, 1903. Miscellaneous Reports. Part I. Bureau Officers, etc.* (Washington:  Gov't Printing Office, 1903), p. 567.

2.  Regulations of June 10, 1908 –

(4)  Hunting or killing, wounding or capturing any bird or wild animal on the park lands, except dangerous animals when necessary to prevent them from destroying life or inflicting an injury, is prohibited.  The outfits, including guns, traps, teams, horses, or means of transportation used by persons engaged in hunting, killing, trapping, ensnaring, or capturing such birds or wild animals, or in possession of game killed on the park lands under other circumstances than prescribed above, will be taken up by the superintendent and held subject to the order of the Secretary of the Interior, except in cases where it is shown by satisfactory evidence that the outfit is not the property of the person or persons violating this regulation and the actual owner thereof was not a party to such violation. Firearms will only be permitted in the park on written permission from the superintendent thereof.

> *Laws and Regulations Relating to the Crater Lake National Park, Oregon* (Washington:  Gov't Printing Office, 1908), p. 6.

N.B.  In his annual report for Fiscal Year 1911, superintendent W.F. Arant addressed the system of surrendering firearms upon arrival thus:

> During the last season all guns were taken at the superintendent's office, checked, and returned upon presentation of the coupon when the visitor was ready to depart from the park.

> As a matter of safety and a prevention of violation of the rules and regulations of the reserve this mode was not objectionable, but was laborious and somewhat inconvenient to both the management of the park and the public.  Under this method there are usually from 20 to 50 guns in the office all the time.  I made requisition to the department for gun seals, such as are used in the Yellowstone Park, with instructions regarding their use.

> *Reports of the Department of the Interior for the Fiscal Year Ended June 30, 1911. Administrative Reports in 2 Volumes.  Volume I* (Washington:  Gov't Printing Office, 1912), p. 657.

3.  Regulations of March 30, 1912 –

(4)  Hunting or killing, wounding or capturing any bird or wild animal on the park lands, except dangerous animals when necessary to prevent them from destroying life or inflicting an injury, is prohibited.  The outfits, including guns, traps, teams, horses, or

means of transportation used by persons engaged in hunting, killing, trapping, ensnaring, or capturing such birds or wild animals, or in possession of game killed on the park lands under other circumstances than prescribed above, will be taken up by the superintendent and held subject to the order of the Secretary of the Interior, except in cases where it is shown by satisfactory evidence that the outfit is not the property of the person or persons violating this regulation and the actual owner thereof was not a party to such violation. Firearms will only be permitted in the park on written permission from the superintendent thereof.

> *Reports of the Department of the Interior for the Fiscal Year Ended June 30, 1912.*
> *Administrative Reports in 2 Volumes.  Volume I* (Washington:  Gov't Printing Office, 1913),
> p. 730.

4.  Regulations in effect April 15, 1918 –

(4)  *Hunting*.—The park is a sanctuary for wild life of every sort and no one should frighten, hunt or kill, wound or capture any bird or wild animal in the park except dangerous animals when it is necessary to prevent them from destroying life or inflicting injury.

The outfits, including guns, traps, teams, horses, or means of transportation used by persons engaged in hunting, killing, trapping, ensnaring, or capturing such birds or wild animals, or in possession of game killed on the park lands under circumstances other than prescribed above, must be taken up by the superintendent and held subject to the order of the Director of the National Park Service, except in cases where it is shown by satisfactory evidence that the outfit is not the property of the person or persons violating this regulation, and the actual owner was not a party to such violation.  Firearms will be permitted in the park only on written permission of the superintendent.  Visitors entering or travelling through the park to places beyond must, at entrance, report and surrender all firearms, traps, nets, seines, or explosives in their possession to the first park officer, and, in proper cases, may obtain his written leave to carry them through the park sealed.

> *General Information Regarding Crater Lake National Park – Season of 1918* (Washington:
> Gov't Printing Office, 1918), pp. 14-15.

5.  Regulations of January 19, 1928 –

(4)  *Hunting*.—The park is a sanctuary for wild life of every sort, and hunting, killing, wounding, capturing, or frightening any bird or wild animal in the park, except dangerous animals, when it is necessary to prevent them from destroying life or inflicting injury, is prohibited.

The outfits, including guns, traps, teams, horses, or means of transportation used by persons engaged in hunting, killing, trapping, ensnaring, or capturing birds or wild animals or in possession of game killed on the park lands under circumstances other than prescribed above shall be taken up by the superintendent and held subject to the order of the Director of the National Park Service, except in cases where it is shown by satisfactory evidence that the outfit is not the property of the person or persons violating this regulation, and the actual owner was not a party to such violation.  Firearms are prohibited

in the park except on written permission of the superintendent.  Visitors entering or traveling through the park to places beyond, shall, at entrance, report and surrender all firearms, traps, nets, seines, or explosives in their possession to the first park officer, and, in proper cases, may obtain his written leave to carry them through the park sealed.  The Government assumes no responsibility for loss or damage to any firearms, traps, nets, seines, or other property so surrendered to any park officers nor are park officers authorized to accept the responsibility of custody of any property for the convenience of visitors.

*Circular of General Information Regarding Crater Lake National Park* (Washington:  Gov't Printing Office, 1929), p. 13.

6.  Regulations of December 28, 1929 –

(4)  Hunting.—The park is a sanctuary for wild life of every sort, and hunting, killing, wounding, capturing, or frightening any bird or wild animal in the park, except dangerous animals, when it is necessary to prevent them from destroying life or inflicting injury, is prohibited.

The outfits, including guns, traps, teams, horses, or means of transportation used by persons engaged in hunting, killing, trapping, ensnaring, or capturing birds or wild animals or in possession of game killed on the park lands under circumstances other than prescribed above, shall be taken up by the superintendent and held subject to the order of the Director of the National Park Service, except in cases where it is shown by satisfactory evidence that the outfit is not the property of the person or persons violating this regulation, and the actual owner was not a party to such violation.  Firearms are prohibited in the park except on written permission of the superintendent.  Visitors entering or traveling through the park to places beyond shall, at entrance, report and surrender all firearms, traps, nets, seines, or explosives in their possession to the first park officer, and in proper cases, may obtain his written leave to carry them through the park sealed.  The Government assumes no responsibilities for loss or damage to any firearms, traps, nets, seines, or other property so surrendered to any park officers, nor are park officers authorized to accept the responsibility of custody of any property for the convenience of visitors.

*Circular of General Information Regarding Crater Lake National Park* (Washington:  Gov't Printing Office, 1930), p. 13.

7.  Regulations of January 14, 1931 –

(4)  *Hunting*.—The park is a sanctuary for wild life of every sort, and hunting, killing, wounding, capturing, or frightening any bird or wild animal in the park, except dangerous animals, when it is necessary to prevent them from destroying life or inflicting injury, is prohibited.

The outfits, including guns, traps, teams, horses, or means of transportation used by persons engaged in hunting, killing, trapping, ensnaring, or capturing birds or wild animals or in possession of game killed on the park lands under circumstances other than prescribed above, shall be taken up by the superintendent and held subject to the order of

the Director of the National Park Service, except in cases where it is shown by satisfactory evidence that the outfit is not the property of the person or persons violating this regulation and the actual owner was not a party to such violation.  Firearms are prohibited in the park except on written permission of the superintendent.  Visitors entering or traveling through the park to places beyond shall, at entrance, report and surrender all firearms, traps, nets, seines, or explosives in their possession to the first park officer, and, in proper cases, may obtain his written leave to carry them through the park sealed.  The Government assumes no responsibilities for loss or damage to any firearms, traps, nets, seines, or other property so surrendered to any park officer, nor are park officers authorized to accept responsibility of custody of any property for the convenience of visitors.

*Circular of General Information Regarding Crater Lake National Park* (1931), pp. 14-15.

8.  Regulations of January 15, 1932 –

(4)  *Hunting*.—The park is a sanctuary for wild life of every sort, and all hunting or the killing, wounding, frightening, or capturing at any time of any wild bird or animal, except dangerous animals when it is necessary to prevent them from destroying life or inflicting personal injury, is prohibited within the limits of the park.

The outfits, including guns, traps, teams, horses, or means of transportation of every nature or description used by any person or persons engaged in hunting, killing, ensnaring, or capturing birds or wild animals within the limits of the park shall be taken up by the superintendent and held subject to the order of the Director of the National Park Service. Possession within said park of the dead bodies or any part thereof of any wild bird or animal shall be prima facie evidence that the person or persons having the same are guilty of violating this regulation.

During the hunting season arrangements may be made at entrance stations to identify and transport through the park, carcasses of birds or animals killed outside of the park.

Firearms are prohibited within the park except upon written permission of the superintendent.  Visitors entering or traveling through the park to places beyond, shall, at entrance, report and surrender all firearms, traps, nets, seines, or explosives in their possession to the first park officer, and in proper cases may obtain his written leave to carry them through the park sealed.  The Government assumes no responsibility for the loss or damage to any firearms, traps, nets, or other property so surrendered to any park officer, nor are park officers authorized to accept the responsibility of custody of any property for the convenience of visitors.

NOTE.  The foregoing regulation is in effect a declaration of the law on this subject contained in section 4 and 5 of the act of Congress approved August 21, 1916 (39 Stat. 521), accepting cession by the State of Oregon of exclusive jurisdiction of the lands embraced in the Crater Lake National Park, and for other purposes.

This act by its terms applies to all lands within said park whether in public or private ownership.

*Circular of General Information Regarding Crater Lake National Park* (1932), pp. 22-23.

9.  Regulations of December 21, 1932 –

(4)  *Hunting.*—The park is a sanctuary for wild life of every sort, and all hunting or the killing, wounding, frightening, or capturing at any time of any wild bird or wild animal, except dangerous animals when it is necessary to prevent them from destroying human lives or inflicting personal injury, is prohibited within the limits of the park.

The outfits, including guns, traps, teams, horses, or means of transportation of every description used by any person or persons engaged in hunting, killing, ensnaring, or capturing birds or wild animals within the limits of the park shall be forfeited to the United States and may be seized by the officers of the park and held pending the prosecution of any person or persons arrested under the charge of violating this regulation, and upon conviction, such forfeiture shall be adjudicated as a penalty in addition to other punishment.  Such forfeited property shall be disposed of and accounted for by and under the authority of the Secretary of the Interior.  Possession within said park of the dead bodies or any part thereof of any wild bird or animal shall be prima facie evidence that the person or persons having the same are guilty of violating this regulation.

During the hunting season, arrangements may be made at entrance stations to identify and transport through the park, carcasses of birds or animals killed outside of the park.

Firearms are prohibited within the park except on written permission of the superintendent.  Visitors entering or traveling through the park to places beyond, shall, at entrance, report and surrender all firearms, traps, seines, nets or explosives in their possession to the first park officer and in proper cases may obtain his written leave to carry them through the park sealed.  The Government assumes no responsibility for loss or damage to any firearms, traps, nets, or other property so surrendered to any park officer, nor are park officers authorized to accept responsibility of custody of any property for the convenience of visitors.

Note.—The foregoing regulation is in effect a declaration of the law on this subject contained in sections 4 and 5 of the act of Congress approved August 21, 1916 (39 Stat. 521), accepting cession by the State of Oregon of exclusive jurisdiction of the lands embraced in the Crater Lake National Park, and for other purposes.

This act by its terms applies to all lands within said park whether in public or private ownership.

*General Information Regarding Crater Lake National Park* (Washington:  Gov't Printing Office, 1933), pp. 20-21.


Mount Rainier National Park

1.  Regulations of August 1, 1903 –

(2)  The hunting or killing, wounding or capturing of any bird or wild animal on the Government lands in the park, except dangerous animals when necessary to prevent them from destroying life or inflicting an injury, is prohibited.  Firearms will only be permitted in the reservation on the written permission of the acting superintendent.

"Regulations Governing Mount Rainier National Park."  *Annual Reports of the Department of the Interior for the Fiscal Year Ended June 30, 1904.  Miscellaneous Reports.  Part I. Bureau Officers, etc.* (Washington:  Gov't Printing Office, 1904), p. 442.

N.B.  In his annual report, the acting superintendent commented on this regulation thus:

> Public sentiment very strongly indorses the regulation which prohibits carrying firearms within the limits of the park except by written permit issued by the acting superintendent.  This regulation has been thoroughly enforced by the forest rangers without any special difficulty.  In one instance they were obliged to take the guns from two men who were in the park under the pretext of being prospectors, but who were actually there to kill whatever large game they might come across.  This was not long after the regulation was issued, and they were, perhaps, not at the time aware that guns were prohibited.

Id. at 440.

2. Regulations of June 10, 1908 –

(4)  Hunting or killing, wounding or capturing any bird or wild animal on the park lands, except dangerous animals when necessary to prevent them from destroying life or inflicting an injury, is prohibited.  The outfits, including guns, traps, teams, horses, or means of transportation used by persons engaged in hunting, killing, trapping, ensnaring, or capturing such birds or wild animals, or in possession of game killed on the park lands under other circumstances than prescribed above, will be taken up by the superintendent and held subject to the order of the Secretary of the Interior, except in cases where it is shown by satisfactory evidence that the outfit is not the property of the person or persons violating this regulation and the actual owner thereof was not a party to such violation.  Firearms will only be permitted in the park on written permission from the superintendent thereof.

*Laws and Regulations Relating to the Mount Rainier National Park, Washington* (Washington:  Gov't Printing Office, 1908), p. 8.

3. Regulations of March 30, 1912 –

(4)  Hunting or killing, wounding, or capturing any bird or wild animal on the park lands, except dangerous animals when necessary to prevent them from destroying life or inflicting an injury, is prohibited.  The outfits, including guns, traps, teams, horses, or means of transportation used by persons engaged in hunting, killing, trapping, ensnaring, or capturing such birds or wild animals, or in possession of game killed on the park lands under other circumstances than prescribed above, will be taken up by the superintendent and held subject to the order of the Secretary of the Interior, except in cases where it is shown by satisfactory evidence that the outfit is not the property of the person or persons violating this regulation and the actual owner thereof was not a party to such violation.  Firearms will only be permitted in the park on written permission from the superintendent thereof.

34

> *Reports of the Department of the Interior for the Fiscal Year Ended June 30, 1912.*
> *Administrative Reports in 2 Volumes. Volume I* (Washington: Gov't Printing Office, 1913),
> p. 700.

4. Regulations in effect April 15, 1918 –

(4) *Hunting*.—The park is a sanctuary for wild life of every sort and no one should frighten, hunt or kill, wound or capture any bird or wild animal in the park except dangerous animals when it is necessary to prevent them from destroying life or inflicting injury.

The outfits, including guns, traps, teams, horses, or means of transportation used by persons engaged in hunting, killing, trapping, ensnaring, or capturing such birds or wild animals, or in possession of game killed on the park lands under circumstances other than prescribed above, must be taken up by the superintendent and held subject to the order of the Director of the National Park Service, except in cases where it is shown by satisfactory evidence that the outfit is not the property of the person or persons violating this regulation, and the actual owner was not a party to such violation. <u>Firearms will be permitted in the park only on written permission of the superintendent. Visitors entering or travelling through the park to places beyond must, at entrance, report and surrender all firearms, traps, nets, seines, or explosives in their possession to the first park officer, and, in proper cases, may obtain his written leave to carry them through the park sealed.</u>

> *General Information Regarding Mount Rainier National Park – Season of 1918* (Washington: Gov't Printing Office, 1918), p. 33.

5. Regulations of November 22, 1928 –

(4) *Hunting*.—The park is a sanctuary for wild life of every sort and hunting, killing, wounding or capturing, or frightening any bird or wild animal in the park, except dangerous animals when it is necessary to prevent them from destroying life or inflicting injury, is prohibited.

The outfits, including guns, traps, teams, horses, or means of transportation used by persons engaged in hunting, killing, trapping, ensnaring, or capturing such birds, or wild animals, or in possession of game killed on the park lands under circumstances other than prescribed above, shall be taken up by the superintendent and held subject to the order of the Director of the National Park Service, except in cases where it is shown by satisfactory evidence that the outfit is not the property of the person or persons violating this regulation, and the actual owner was not a party to such violation. <u>Firearms are prohibited in the park except on written permission of the superintendent. Visitors entering or travelling through the park to places beyond must, at entrance, report and surrender all firearms, traps, nets, seines, or explosives in their possession to the first park officer, and, in proper cases, may obtain his written leave to carry them through the park sealed. The Government assumes no responsibilities for loss or damage to any firearms, traps, nets, seines or other property so surrendered to any park officer nor are park officers authorized to accept the responsibility of custody of any property for the convenience of visitors.</u>

*Circular of General Information Regarding Mount Rainier National Park* (Washington: Gov't Printing Office, 1929), p. 28.

6.  Regulations of December 30, 1929 –

(4)  *Hunting*.—The park is a sanctuary for wild life of every sort and hunting, killing, wounding, capturing, or frightening any bird or wild animal, except dangerous animals when it is necessary to prevent them from destroying human lives or inflicting injury, is prohibited.

The outfits, including guns, traps, teams, horses, or means of transportation used by persons engaged in hunting, killing, trapping, ensnaring, or capturing birds or wild animals, or in possession game killed on the park lands under circumstances other than prescribed above, shall be taken up by the superintendent and held subject to the order of the Director of the National Park Service, except in cases where it is shown by satisfactory evidence that the outfit is not the property of the person or persons violating this regulation, and the actual owner was not a party to such violation.  <u>Firearms are prohibited in the park except on written permission of the superintendent.  Visitors entering or traveling through the park to places beyond must, at entrance, report and surrender all firearms, traps, nets, seines, or explosives in their possession to the first park officer, and, in proper cases may obtain his written permission to carry them through the park sealed. The Government assumes no responsibilities for loss or damage to any firearms, traps, nets, seines, or other property so surrendered to any park officer nor are park officers authorized to accept the responsibility of custody of any property for the convenience of visitors</u>.

*Circular of General Information Regarding Mount Rainier National Park* (1930), p. 29.

7.  Regulations of December 8, 1930 –

(4)  *Hunting*.—The park is a sanctuary for wild life of every sort, and hunting, killing, wounding, capturing, or frightening any bird or wild animal in the park, except dangerous animals when it is necessary to prevent them from destroying life or inflicting injury, is prohibited.

The outfits, including guns, traps, teams, horses, or means of transportation used by persons engaged in hunting, killing, trapping, ensnaring, or capturing birds or wild animals, or in possession of game killed on the park lands under circumstances other than prescribed above, shall be taken up by the superintendent and held subject to the order of the Director of the National Park Service, except in cases where it is shown by satisfactory evidence that the outfit is not the property of the person or persons violating this regulation, and the actual owner was not a party to such violation.  <u>Firearms are prohibited in the park except on written permission of the superintendent.  Visitors entering or traveling through the park to places beyond must, at entrance, report and surrender all firearms, traps, nets, seines, or explosives in their possession to the first park officer, and in proper cases, may obtain his written leave to carry them through the park sealed.  The Government assumes no responsibilities for loss or damage to any firearms, traps, nets, seines, or other property so surrendered to any park officer, nor are park officers</u>

<u>authorized to accept responsibility of custody of any property for the convenience of visitors</u>.

*Circular of General Information Regarding Mount Rainier National Park* (Washington: Gov't Printing Office, 1931), pp. 28-29.

8.  Regulations of December 21, 1932 –

(4)  *Hunting*.—The park is a sanctuary for wild life of every sort, and all hunting or the killing, wounding, frightening, or capturing at any time of any wild bird or animal, except dangerous animals when it is necessary to prevent them from destroying human lives or inflicting personal injury, is prohibited within the limits of the park.

The outfits, including guns, traps, teams, horses, or means of transportation of every nature or description used by any person or persons engaged in hunting, killing, ensnaring, or capturing birds or wild animals within the limits of the park shall be forfeited to the United States and may be seized by the officers of the park and held pending the prosecution of any person or persons arrested under the charge of violating this regulation, and upon conviction such forfeiture shall be adjudicated as a penalty in addition to other punishment.  Such forfeited property shall be disposed of and accounted for by and under authority of the Secretary of the Interior.  Possession within said park of the dead bodies or any part thereof of any wild bird or animal shall be prima facie evidence that the person or persons having the same are guilty of violating this regulation.

During the hunting season arrangements may be made at entrance stations to identify and transport through the park, carcasses of birds or animals killed outside of the park.

<u>Firearms are prohibited within the park except upon written permission of the superintendent.  Visitors entering or traveling through the park to places beyond, shall, at entrance, report and surrender all firearms, traps, seines, nets, or explosives in their possession to the first park officer, and in proper cases may obtain his written permission to carry them through the park sealed.  The Government assumes no responsibility for the loss or damage to any firearms, traps, nets, or other property so surrendered to any park officer, nor are park officers authorized to accept the responsibility of custody of any property for the convenience of visitors.</u>

NOTE.—The foregoing regulation is in effect a declaration of the law on this subject contained in sections 4 and 5 of the act of Congress approved June 30, 1916 (39 Stat. 243), accepting cession by the State of Washington of exclusive jurisdiction of the lands embraced within the Mount Rainier National Park.

This act by its terms applies to all lands within said park whether in public or private ownership.

*General Information Regarding Mount Rainier National Park* (Washington:  U.S. Gov't Printing Office, 1933), pp. 27-28.

PLATT NATIONAL PARK[6]

Regulations of June 10, 1908 –

(6)  Hunting or killing, wounding or capturing any bird or wild animal on the park lands, except dangerous animals when necessary to prevent them from destroying life or inflicting an injury, is prohibited.  The outfits, including guns, traps, teams, horses, or means of transportation used by persons engaged in hunting, killing, trapping, ensnaring, or capturing such birds or wild animals, or in possession of game killed on the park lands under other circumstances than prescribed above, will be taken up by the superintendent and held subject to the order of the Secretary of the Interior, except in cases where it is shown by satisfactory evidence that the outfit is not the property of the person or persons violating this regulation and the actual owner thereof was not a party to such violation. Firearms will only be permitted in the park on written permission from the superintendent thereof.

*Laws and Regulations Relating to the Platt National Park, Oklahoma* (Washington:  Gov't Printing Office, 1908), pp. 11-12.

WIND CAVE NATIONAL PARK

1.  Regulations of June 10, 1908 –

(5)  Hunting or killing, wounding or capturing any bird or wild animal on the park lands, except dangerous animals when necessary to prevent them from destroying life or inflicting an injury, is prohibited.  The outfits, including guns, traps, teams, horses, or means of transportation used by persons engaged in hunting, killing, trapping, ensnaring, or capturing such birds or wild animals, or in possession of game killed on the park lands under other circumstances than prescribed above, will be taken up by the superintendent and held subject to the order of the Secretary of the Interior, except in cases where it is shown by satisfactory evidence that the outfit is not the property of the person or persons violating this regulation and the actual owner thereof was not a party to such violation. Firearms will only be permitted in the park on written permission from the superintendent thereof.

*Laws and Regulations Relating to the Wind Cave National Park, South Dakota* (Washington: Gov't Printing Office, 1908), p. 7.

2.  Regulations of March 30, 1912 –

(5)  Hunting or killing, wounding or capturing any bird or wild animal on the park lands, except dangerous animals when necessary to prevent them from destroying life or

---

[6] Originally Sulphur Springs Reservation, renamed and redesignated Platt National Park June 29, 1906; combined with Arbuckle National Recreation Area and additional lands and renamed and redesignated Chickasaw National Recreation Area March 17, 1976.

inflicting an injury, is prohibited.  The outfits, including guns, traps, teams, horses, or means of transportation used by persons engaged in hunting, killing, trapping, ensnaring, or capturing such birds or wild animals, or in possession of game killed on the park lands under other circumstances than prescribed above, will be taken up by the supervisor and held subject to the order of the Secretary of the Interior, except in cases where it is shown by satisfactory evidence that the outfit is not the property of the person or persons violating this regulation and the actual owner thereof was not a party to such violation. <u>Firearms will only be permitted in the park on written permission from the supervisor thereof.</u>

> *Reports of the Department of the Interior for the Fiscal Year Ended June 30, 1915. Administrative Reports in 2 Volumes.  Volume I* (Washington:  Gov't Printing Office, 1916), p. 1046.

3.  Regulations in effect April 15, 1918 –

   (4)  *Hunting*.—The park is a sanctuary for wild life of every sort and no one may frighten, hunt or kill, wound or capture any bird or wild animal in the park, except dangerous animals when it is necessary to prevent them from destroying life or inflicting injury.

   The outfits, including guns, traps, teams, horses, or means of transportation used by persons engaged in hunting, killing, trapping, ensnaring, or capturing such birds or wild animals, or in possession of game killed on the park lands under circumstances other than prescribed above, must be taken up by the superintendent and held subject to the order of the Director of the National Park Service, except in cases where it is shown by satisfactory evidence that the outfit is not the property of the person or persons violating this regulation, and the actual owner was not a party to such violation.  <u>Firearms will be permitted in the park only on written permission of the superintendent.  Visitors entering or travelling through the park to places beyond must, at entrance, report and surrender all firearms, traps, nets, seines, or explosives in their possession to the first park officer, and in proper cases may obtain his written leave to carry them through the park sealed.</u>

> *General Information Regarding Wind Cave National Park – Season of 1918* (Washington: Gov't Printing Office, 1918), pp. 16-17.

4.  Regulations of March 8, 1926 –

   (4)  *Hunting*.—The park is a sanctuary for wild life of every sort, and hunting, killing, wounding, capturing, or frightening any bird or wild animal in the park, except dangerous animals when it is necessary to prevent them from destroying life or inflicting injury, is prohibited.

   The outfits, including guns, traps, teams, horses, or means of transportation used by persons engaged in hunting, killing, trapping, ensnaring, or capturing birds or wild animals, or in possession of game killed on the park lands under circumstances other than prescribed above, shall be taken up by the superintendent and held subject to the order of the Director of the National Park Service, except in cases where it is shown by satisfactory evidence that the outfit is not the property of the person or persons violating this

regulation, and the actual owner was not a party to such violation.  <u>Firearms are prohibited in the park except on written permission of the superintendent.  Visitors entering or traveling through the park to places beyond shall, at entrance, report and surrender all firearms, traps, nets, seines, or explosives in their possession to the first park officer, and, in proper cases, may obtain his written leave to carry them through the park sealed.</u>

<u>The Government assumes no responsibilities for loss or damage to any firearms, traps, nets, seines or other property so surrendered to any park officer nor are park officers authorized to accept the responsibility of custody of any property for the convenience of visitors.</u>

*Circular of General Information Regarding Wind Cave National Park* (Washington:  Gov't Printing Office, 1929), pp. 9-10.

5.  Regulations of December 28, 1929 –

(4)  *Hunting*.—The park is a sanctuary for wild life of every sort, and hunting, killing, wounding, capturing, or frightening any bird or wild animal in the park, except dangerous animals when it is necessary to prevent them from destroying life or inflicting injury, is prohibited.

The outfits, including guns, traps, teams, horses, or means of transportation used by persons engaged in hunting, killing, trapping, ensnaring, or capturing birds or wild animals, or in possession of game killed on the park lands under circumstances other than prescribed above, shall be taken up by the superintendent and held subject to the order of the Director of the National Park Service, except in cases where it is shown by satisfactory evidence that the outfit is not the property of the person or persons violating this regulation, and the actual owner was not a party to such violation.  <u>Firearms are prohibited in the park except on written permission of the superintendent.  Visitors entering or traveling through the park to places beyond shall, at entrance, report and surrender all firearms, traps, nets, seines, or explosives in their possession to the first park officer and in proper cases may obtain leave to carry them through the park sealed.  The Government assumes no responsibilities for loss or damage to any firearms, traps, nets, seines, or other property so surrendered to any park officer, nor are park officers authorized to accept responsibility of custody of any property for the convenience of visitors.</u>

*Circular of General Information Regarding Wind Cave National Park* (1930), pp. 9-10.

6.  Regulations of December 2, 1930 –

(4)  *Hunting*.—The park is a sanctuary for wild life of every sort, and hunting, killing, wounding, capturing, or frightening any bird or wild animal in the park, except dangerous animals when it is necessary to prevent them from destroying life or inflicting injury, is prohibited.

The outfits, including guns, traps, teams, horses, or means of transportation used by persons engaged in hunting, killing, trapping, ensnaring, or capturing birds or wild animals, or in possession of game killed on the park lands under circumstances other than prescribed above, shall be taken up by the superintendent and held subject to the order of the Director of the National Park Service, except in cases where it is shown by satisfactory

evidence that the outfit is not the property of the person or persons violating this regulation, and the actual owner was not a party to such violation.  <u>Firearms are prohibited in the park except on written permission of the superintendent.  Visitors entering or traveling through the park to places beyond shall, at entrance, report and surrender all firearms, traps, nets, seines, or explosives in their possession to the first park officer, and in proper cases may obtain his written leave to carry them through the park sealed.</u>

<u>The Government assumes no responsibilities for loss or damage to any firearms, traps, nets, seines, or other property so surrendered to any park officer, nor are park officers authorized to accept responsibility of custody of any property for the convenience of visitors.</u>

*Circular of General Information Regarding Wind Cave National Park* (Washington:  Gov't Printing Office, 1931), pp. 9-10.

7.  Regulations of December 21, 1932 –

(4)  *Hunting*.—The park is a sanctuary for wild life of every sort, and all hunting or the killing, wounding, frightening, or capturing at any time of any wild bird or animal, except dangerous animals when it is necessary to prevent them from destroying human lives or inflicting personal injury, is prohibited within the limits of the park.

The outfits, including guns, traps, teams, horses, or means of transportation of every nature or description used by any person or persons engaged in hunting, killing, ensnaring, or capturing birds or wild animals within the limits of the park, under circumstances other than prescribed above, shall be taken up by the superintendent and held subject to the order of the Director of the National Park Service, except in cases where it is shown by satisfactory evidence that the outfit is not the property of the person or persons violating this regulation, and the actual owner was not a party to such violation.

During the hunting season, arrangements may be made at entrance stations to identify and transport through the park, carcasses of birds or animals killed outside of the park.

<u>Firearms are prohibited within the park except upon written permission of the superintendent.  Visitors entering or traveling through the park to places beyond, shall, at entrance, report and surrender all firearms, traps, seines, nets, or explosives in their possession to the first park officer, and in proper cases may obtain his written permission to carry them through the park sealed.  The Government assumes no responsibility for the loss or damage to any firearms, traps, nets, or other property so surrendered to any park officer, nor are park officers authorized to accept the responsibility of custody of any property for the convenience of visitors.</u>

*General Information Regarding Wind Cave National Park* (Washington:  U.S. Gov't Printing Office, 1933), pp. 9-10.

8.  Regulations in effect 1933 –

(4)  *Hunting*.—The park is a sanctuary for wild life of every sort, and all hunting, killing, wounding, frightening, capturing or attempting to capture at any time of any wild bird or animal, except dangerous animals when it is necessary to prevent them from

destroying human lives or inflicting personal injury, is prohibited within the limits of the park.

The outfits, including guns, traps, teams, horses, or means of transportation of every description used by any person or persons engaged in hunting, killing, ensnaring, or capturing birds or wild animals within the limits of the park, under circumstances other than prescribed above, shall be taken up by the superintendent and held subject to the order of the Director of the Office of National Parks, except I cases where it is shown by satisfactory evidence that the outfit is not the property of the person or persons violating this regulation, and the actual owner was not a party to such violation.

During the hunting season, arrangements may be made at entrance stations to identify and transport through the park carcasses of birds or animals killed outside of the park.

Firearms and traps are prohibited within the park except on written permission of the superintendent.  Visitors entering or traveling through the park to places beyond shall, at entrance, report and surrender, if required, all firearms, traps, seines, nets or explosives in their possession to the first park officer, and in proper cases may obtain his written leave to carry them through the park sealed.  The Government assumes no responsibility for the loss or damage to any firearms, traps, nets, or other property so surrendered to any park officer, nor are park officers authorized to accept responsibility of custody of any property for the convenience of visitors.

> *General Information Regarding Wind Cave National Park* (Washington:  Gov't Printing Office, 1934), p. 11.

GLACIER NATIONAL PARK

1.  Regulations of December 3, 1910 –

(4)  Hunting or killing, wounding or capturing any bird or wild animal on the park lands, except dangerous animals when necessary to prevent them from destroying life or inflicting an injury, is prohibited. The outfits, including guns, traps, teams, horses, or means of transportation used by persons engaged in hunting, killing, trapping, ensnaring, or capturing such birds or wild animals, or in possession of game killed on the park lands under other circumstances than prescribed above, will be taken up by the superintendent and held subject to the order of the Secretary of the Interior, except in cases where it is shown by satisfactory evidence that the outfit is not the property of the person or persons violating this regulation and the actual owner thereof was not a party to such violation. Firearms will only be permitted in the park on written permission from the superintendent thereof.  On arrival at the first station of the park guard, parties having firearms, traps, nets, seines, or explosives will turn them over to the officer in charge of the station, taking his receipt for them.  They will be returned to the owners on leaving the park.

> *Laws, Regulations, and General Information Relating to Glacier National Park, Montana 1910* (Washington:  Gov't Printing Office, 1911), p. 6.

2.  Regulations of March 30, 1912 –

(4)  Hunting or killing, wounding or capturing any bird or wild animal on the park lands, except dangerous animals when necessary to prevent them from destroying life or inflicting an injury, is prohibited.  The outfits, including guns, traps, teams, horses, or means of transportation used by persons engaged in hunting, killing, trapping, ensnaring, or capturing such birds or wild animals, or in possession of game killed on the park lands under other circumstances than prescribed above, will be taken up by the superintendent and held subject to the order of the Secretary of the Interior, except in cases where it is shown by satisfactory evidence that the outfit is not the property of the person or persons violating this regulation, and the actual owner thereof was not a party to such violation. Firearms will only be permitted in the park on written permission from the superintendent thereof.  On arrival at the first station of the park guard parties having firearms, traps, nets, seines, or explosives will turn them over to the sergeant in charge of the station, taking his receipt for them.  They will be returned to the owners on leaving the park.

> *Reports of the Department of the Interior for the Fiscal Year Ended June 30, 1912. Administrative Reports in 2 Volumes.  Volume I* (Washington:  Gov't Printing Office, 1913), p. 752.

3.  Regulations of May 13, 1914 –

(4)  Hunting or killing, wounding, or capturing any bird or wild animal on the park lands, except dangerous animals when necessary to prevent them from destroying life or inflicting an injury, is prohibited.  The outfits, including guns, traps, teams, horses, or means of transportation used by persons engaged in hunting, killing, trapping, ensnaring, or capturing such birds or wild animals, or in possession of game killed on the park lands under other circumstances than prescribed above, will be taken up by the superintendent and subject to the order of the Secretary of the Interior, except in cases where it is shown by satisfactory evidence that the outfit is not the property of the person or persons violating this regulation and the actual owner thereof was not a party to such violation. Firearms will only be permitted in the park on written permission from the superintendent thereof.  On arrival at the first station of the park guard, parties having firearms, traps, nets, seines, or explosives will turn them over to the officer in charge of the station, taking his receipt for them.  They will be returned to the owners on leaving the park.

> *Reports of the Department of the Interior for the Fiscal Year Ended June 30, 1914. Administrative Reports in 2 Volumes.  Volume I* (Washington:  Gov't Printing Office, 1915), p. 833.

4.  Regulations in effect April 15, 1918 –

(4)  *Hunting.*—The park is a sanctuary for wild life of every sort and no one should frighten, hunt or kill, wound or capture any bird or wild animal in the park except dangerous animals when it is necessary to prevent them from destroying life or inflicting injury.

The outfits, including guns, traps, teams, horses, or means of transportation used by persons engaged in hunting, killing, trapping, ensnaring, or capturing birds or wild animals, or in possession of game killed on the park lands under circumstances other than

prescribed above, must be taken up by the superintendent and held subject to the order of the Director of the National Park Service, except in cases where it is shown by satisfactory evidence that the outfit is not the property of the person or persons violating this regulation, and the actual owner was not a party to such violation.  <u>Firearms will be permitted in the park only on written permission of the superintendent.  Visitors entering or travelling through the park to places beyond must, at entrance, report and surrender all firearms, traps, nets, seines, or explosives in their possession to the first park officer, and, in proper cases, may obtain his written leave to carry them through the park sealed</u>.

 *General Information Regarding Glacier National Park – Season of 1918* (Washington:  Gov't Printing Office, 1918), p. 65.

5.  Regulations of December 12, 1928 –

 (4)  *Hunting*.—The park is a sanctuary for wild life of every sort, and all hunting or the killing, wounding, frightening, pursuing, or capturing at any time of any bird or wild animal, except dangerous animals, when it is necessary to prevent them from destroying human lives or inflicting personal injury, is prohibited within the limits of said park.

 The outfits, including guns, traps, teams, horses, or means of transportation of every nature or description used by any person or persons within said park limits when engaged in hunting, killing, trapping, ensnaring, or capturing birds or wild animals, shall be taken up by the superintendent and held subject to the order of the Director of the National Park Service.  Possession within said park of the dead bodies, or any part thereof, of any wild bird or animal shall be prima facie evidence that the person or persons having same are guilty of violating this regulation.  <u>Firearms are prohibited within the park except upon written permission of the superintendent.  Visitors entering or traveling through the park to places beyond shall, at entrance, report and surrender all firearms, traps, nets, seines, or explosives in their possession to the first park officer, and in proper cases may obtain his written leave to carry them through the park sealed.  The Government assumes no responsibility for the loss or damage to any firearms, traps, nets, seines, or other property so surrendered to any park officer, nor are park officers authorized to accept the responsibility of custody of any property for the convenience of visitors</u>.

 NOTE.  The foregoing regulation is in effect a declaration of the law on this subject contained in sections 4 and 5 of the act of Congress, approved August 22, 1914 (38 Stat. 700) accepting cession by the State of Montana of exclusive jurisdiction over the lands embraced within the Glacier National Park.

 This act by its terms applies to all lands within the park, whether in public or private ownership.

 *Circular of General Information Regarding Glacier National Park* (1929), pp. 33-34.

6.  Regulations of March 6, 1930 –

 (4)  *Hunting*.—The park is a sanctuary for wild life of every sort, and all hunting or the killing, wounding, frightening, pursuing, or capturing at any time of any bird or wild animal, except dangerous animals, when it is necessary to prevent them from destroying human lives or inflicting personal injury, is prohibited, within the limits of said parks.

The outfits, including guns, traps, teams, horses, or means of transportation of every nature or description used by any person or persons within said park limits when engaged in hunting, killing, trapping, ensnaring, or capturing birds or wild animals, shall be taken up by the superintendent and held subject to the order of the Director of the National Park Service.  Possession within said park of the dead bodies, or any part thereof, of any wild bird or animal shall be prima facie evidence that the person or persons having same are guilty of violating this regulation.  <u>Firearms are prohibited within the park except upon written permission of the superintendent.  Visitors entering or traveling through the park to places beyond shall, at entrance, report and surrender all firearms, traps, nets, seines, or explosives in their possession to the first park officer, and in proper cases may obtain his written permission to carry them through the park sealed.  The Government assumes no responsibility for loss or damage to any firearms, traps, nets, seines, or other property so surrendered to any park officer, nor are park officers authorized to accept the responsibility of custody of any property for the convenience of visitors.</u>

NOTE.—This paragraph is in effect a declaration of the law on this subject contained in sections 4 and 5 of the act of Congress approved August 22, 1914 (38 Stat. 700), accepting the cession by the State of Montana of exclusive jurisdiction over the lands embraced within the Glacier National Park.

This act by its terms applies to all lands within the park, whether in public or private ownership.

Game killed or taken within the park, and firearms in possession therein, in violation of these regulations, shall be forfeited to the United States, and any employee of the park assigned to police duty shall have authority to search without a warrant any automobile or other vehicle, or any container therein, for such game or firearms and to seize the same if found, when he has reasonable grounds for belief that the automobile or other vehicle, or container therein, contains game or firearms subject to forfeiture as provided herein.

*Circular of General Information Regarding Glacier National Park* (Washington:  Gov't Printing Office, 1930), p. 33.

7.  Regulations of December 3, 1930 –

(4)  *Hunting*.—The park is a sanctuary for wild life of every sort, and all hunting or the killing, wounding, frightening, pursuing, or capturing at any time of any bird or wild animal, except dangerous animals when it is necessary to prevent them from destroying human lives or inflicting personal injury, is prohibited within the limits of said park.

The outfits, including guns, traps, teams, horses, or means of transportation of every nature or description used by any person or persons within said park limits when engaged in hunting, killing, trapping, ensnaring, or capturing birds or wild animals, shall be taken up by the superintendent and held subject to the order of the Director of the National Park Service.  Possession within said park of the dead bodies, or any part thereof, of any wild bird or animal shall be prima facie evidence that the person or persons having same are guilty of violating this regulation.  <u>Firearms are prohibited within the park except upon written permission of the superintendent.  Visitors entering or traveling through the park to places beyond shall, at entrance, report and surrender all firearms, traps, nets, seines, or explosives in their possession to the first park officer, and in proper cases may obtain his written permission to carry them through the park sealed.  The Government assumes no</u>

responsibility for loss or damage to any firearms, traps, nets, seines, or other property so surrendered to any park officer, nor are park officers authorized to accept the responsibility of custody of any property for the convenience of visitors.

Game killed or taken within the park, and firearms in possession therein, in violation of these regulations, shall be forfeited to the United States, and any employee of the park assigned to police duty shall have authority to search without a warrant any automobile or other vehicle, or any container therein, for such game or firearms and to seize the same if found, when he has reasonable grounds for belief that the automobile or other vehicle, or container therein, contains game or firearms subject to forfeiture as provided therein.

NOTE.—This paragraph is in effect a declaration of the law on this subject contained in sections 4 and 5 of the act of Congress approved August 22, 1914 (38 Stat. 700), accepting cession by the State of Montana of exclusive jurisdiction over the lands embraced within the Glacier National Park.

This act by its terms applies to all lands within the park, whether in public or private ownership.

*Circular of General Information Regarding Glacier National Park* (1931), pp. 29-30.

8. Regulations of December 21, 1932 –

(4) *Hunting*.—The park is a sanctuary for wild life of every sort, and all hunting or the killing, wounding, frightening, or capturing at any time of any wild bird or animal, except dangerous animals when it is necessary to prevent them from destroying human lives or inflicting personal injury, is prohibited within the limits of the park.

Feeding directly from the hand, touching, teasing, or molesting bears is prohibited. Persons photographic bears do so at their.

The outfits, including guns, traps, teams, horses, or means of transportation of every nature or description used by any person or persons engaged in hunting, killing, ensnaring, or capturing birds or wild animals within the limits of the park shall be forfeited to the United States and may be seized by the officers of the park and held pending the prosecution of any person or persons arrested under the charge of violating this regulation, and upon conviction, such forfeited property shall be disposed of and accounted for by and under the authority of the Secretary of the Interior.  Possession within said park of the dead bodies or any part thereof of any wild bird or animal shall be prima facie evidence that the person or persons having the same are guilty of violating this regulation.

During the hunting season, arrangements may be made at entrance stations to identify and transport through the park, carcasses of birds or animals killed outside of the park.

Firearms are prohibited within the park except upon written permission of the superintendent.  Visitors entering or traveling through the park to places beyond shall, at entrance, report and surrender all firearms, traps, seines, nets, or explosives in their possession to the first park officer, and in proper cases may obtain his written permission to carry them through the park sealed.  The Government assumes no responsibility for loss or damage to any firearms, traps, nets, or other property so surrendered to any park officer, nor are park officers authorized to accept the responsibility of custody of any property for the convenience of visitors.

NOTE.—The foregoing regulation is in effect a declaration of the law on this subject contained in sections 4 and 5 of the act of Congress approved August 22, 1914 (38 Stat.

700), accepting cession by the State of Montana of exclusive jurisdiction of the lands embraced within the National Park.

This act by its terms applies to all lands within said park whether in public or private ownership.

*General Information Regarding Glacier National Park* (Washington: Gov't Printing Office, 1933), p. 23.


Rocky Mountain National Park

1.  Regulations of May 29, 1915 –

(5)  The park is a sanctuary for wild life of every sort, and no one should frighten, hunt or kill, wound or capture any bird or wild animal in the park except dangerous animals when it is necessary to prevent them from destroying life or inflicting injury.

(6)  The outfits, including guns, traps, teams, horses, or means of transportation used by persons engaged in hunting, killing, trapping, ensnaring, or capturing such birds or wild animals, or in possession of game killed on the park lands under other circumstances than prescribed above, must be taken up by the superintendent and held subject to the order of the Secretary of the Interior, except in cases where it is shown by satisfactory evidence that the outfit is not the property of the person or persons violating this regulation and the actual owner was not a party to such violation.  <u>Firearms will be permitted in the park only on written permission of the supervisor.  Visitors entering or travelling through the park to places beyond should, at entrance, report and surrender all firearms, traps, nets, seines, or explosives in their possession to the first park officer, and, in proper cases, may obtain his written leave to carry them through the park sealed.</u>

"Rules and Regulations Approved May 29, 1915."  *Reports of the Department of the Interior for the Fiscal Year Ended June 30, 1915*, *Administrative Reports in 2 Volumes* (Washington: Gov't Printing Office) vol. 1, p. 1124.


In his annual report for Fiscal Year 1916, the superintendent added:

There is no evidence of the slaughter of game during the past year in the park, a strict vigilance having been kept during the winter months for hunters and trappers. Mountain sheep are plentiful and no doubt increasing, and have been seen more frequently by tourists than in former years.  It is now possible to approach them quite closely, and one instance is known where an automobile came within 30 feet of a group which did not disturb them.  One ranger reports seeing 182 in one group near Specimen Mountain.

Firearms are not allowed in the park and notice to this effect is posted at all entrances.

*Reports of the Department of the Interior for the Fiscal Year Ended June 30, 1916.  Volume I* (Washington: Gov't Printing Office, 1917), p. 794.

2.  Regulations in effect April 15, 1918 –

    (4)  *Hunting*.—The park is a sanctuary for wild life of every sort and no one may frighten, hunt or kill, wound or capture any bird or wild animal in the park, except dangerous animals when it is necessary to prevent them from destroying life or inflicting injury.

    The outfits, including guns, traps, teams, horses, or means of transportation used by persons engaged in hunting, killing, trapping, ensnaring, or capturing such birds or wild animals, or in possession of game killed on the park lands under circumstances other than prescribed above, must be taken up by the superintendent and held subject to the order of the Director of the National Park Service, except in cases where it is shown by satisfactory evidence that the outfit is not the property of the person or persons violating this regulation, and the actual owner was not a party to such violation.  <u>Firearms will be permitted in the park only on written permission of the superintendent.  Visitors entering or travelling through the park to places beyond must, at entrance, report and surrender all firearms, traps, nets, seines, or explosives in their possession to the first park officer, and, in proper cases, may obtain his written leave to carry them through the park sealed</u>.

    *General Information Regarding Rocky Mountain National Park – Season of 1918*
    (Washington:  Gov't Printing Office, 1918), pp. 26-27.

3.  Regulations of January 17, 1928 –

    (4)  *Hunting*.—The park is a sanctuary for wild life of every sort, and hunting, killing, wounding or capturing, or frightening any bird or wild animal in the park, except dangerous animals when it is necessary to prevent them from destroying life or inflicting injury, is prohibited.

    The outfits, including guns, traps, teams, horses, or means of transportation used by persons engaged in hunting, killing, trapping, ensnaring, or capturing birds or wild animals, or in possession of game killed on the park lands under circumstances other than prescribed above, shall be taken up by the superintendent and held subject to the order of the Director of the National Park Service, except in cases where it is shown by satisfactory evidence that the outfit is not the property of the person or persons violating this regulation, and the actual owner was not a party to such violation.  <u>Firearms are prohibited in the park except on written permission of the superintendent.  Visitors entering or traveling through the park to places beyond shall, at entrance, report and surrender all firearms, traps, nets, seines, or explosives in their possession to the first park officer, and, in proper cases, may obtain his written leave to carry them through the park sealed.  The Government assumes no responsibilities for loss or damage to any firearms, traps, nets, seines or other property so surrendered to any park officer nor are park officers authorized to accept the responsibility of custody of any property for the convenience of visitors</u>.

    *Circular of General Information Regarding Rocky Mountain National Park* (Washington: Gov't Printing Office, 1929), p. 30.

4.  Regulations of January 2, 1930 –

(4) *Hunting.*—The park is a sanctuary for wild life of every sort and hunting, killing, wounding, capturing, or frightening any bird or wild animal in the park, except dangerous animals when it is necessary to prevent them from destroying life or inflicting injury, is prohibited.

The outfits, including guns, traps, teams, horses, or means of transportation used by persons engaged in hunting, killing, trapping, ensnaring, or capturing birds or wild animals, or in possession game killed on the park lands under circumstances other than prescribed above, shall be taken up by the superintendent and held subject to the order of the Director of the National Park Service, except in cases where it is shown by satisfactory evidence that the outfit is not the property of the person or persons violating this regulation, and the actual owner was not a party to such violation.  <u>Firearms are prohibited in the park except on written permission of the superintendent.  Visitors entering or traveling through the park to places beyond shall, at entrance, report and surrender all firearms, traps, nets, seines, or explosives in their possession to the first park officer, and in proper cases may obtain his written leave to carry them through the park sealed.  The Government assumes no responsibilities for loss or damage to any firearms, traps, nets, seines, or other property so surrendered to any park officer, nor are park officers authorized to accept the responsibility of custody of any property for the convenience of visitors.</u>

*Circular of General Information Regarding Rocky Mountain National Park* (1930), p. 29.

5.  Regulations of December 6, 1930 –

(5) *Hunting.*—The park is a sanctuary for wild life of every sort, and hunting, killing, wounding, capturing, or frightening any bird or wild animal in the park, except dangerous animals when it is necessary to prevent them from destroying life or inflicting injury, is prohibited.

The outfits, including guns, traps, teams, horses, or means of transportation used by persons engaged in hunting, killing, trapping, ensnaring, or capturing birds or wild animals, or in possession of game killed on the park lands under circumstances other than prescribed above, shall be taken up by the superintendent and held subject to the order of the Director of the National Park Service, except in cases where it is shown by satisfactory evidence that the outfit is not the property of the person or persons violating this regulation, and the actual owner was not a party to such violation.  <u>Firearms are prohibited in the park except on written permission of the superintendent.  Visitors entering or traveling through the park to places beyond shall, at entrance, report and surrender all firearms, traps, nets, seines, or explosives in their possession to the first park officer, and in proper cases may obtain his written leave to carry them through the park sealed.  The Government assumes no responsibilities for loss or damage to any firearms, traps, nets, seines, or other property so surrendered to any park officer, nor are park officers authorized to accept the responsibility of custody of any property for the convenience of visitors.</u>

*Circular of General Information Regarding Rocky Mountain National Park* (Washington: Gov't Printing Office, 1931), p. 30.

6.  Regulations of December 21, 1932 –

(4)  *Hunting*.—The park is a sanctuary for wild life of every sort, and all hunting or the killing, wounding, frightening, or capturing at any time of any wild bird or animal, except dangerous animals when it is necessary to prevent them from destroying human lives or inflicting personal injury, is prohibited within the limits of the park.

The outfits, including guns, traps, teams, horses, or means of transportation of every nature or description used by any person or persons engaged in hunting, killing, ensnaring, or capturing birds or wild animals within the limits of the park shall be forfeited to the United States and may be seized by the officers of the park and held pending the prosecution of any person or persons arrested under the charge of violating this regulation, and upon conviction such forfeiture shall be adjudicated as a penalty in addition to other punishment.  Such forfeited property shall be disposed of and accounted for by and under authority of the Secretary of the Interior.  Possession within said park of the dead bodies or any part thereof of any wild bird or animal shall be prima facie evidence that the person or persons having the same are guilty of violating this regulation.

During the hunting season arrangements may be made at entrance stations to identify and transport through the park, carcasses of birds or animals killed outside of the park.

Firearms are prohibited within the park except upon written permission of the superintendent.  Visitors entering or traveling through the park to places beyond, shall, at entrance, report and surrender all firearms, traps, seines, nets, or explosives in their possession to the first park officer, and in proper cases may obtain his written permission to carry them through the park sealed.  The Government assumes no responsibility for the loss or damage to any firearms, traps, nets, or other property so surrendered to any park officer, nor are park officers authorized to accept the responsibility of custody of any property for the convenience of visitors.

NOTE.—The foregoing regulation is in effect a declaration of the law on this subject contained in sections 4 and 5 of the act of Congress approved March 2, 1929 (45 Stat. 1536), accepting cession by the State of Colorado of exclusive jurisdiction of the lands embraced in the Rocky Mountain National Park.

This act by its terms applies to all lands within said park whether in public or private ownership.

*General Information Regarding Rocky Mountain National Park* (Washington:  U.S. Gov't Printing Office, 1933), p. 26.


HAWAII NATIONAL PARK

1.  Regulations in effect 1929 –

(4)  *Hunting*.—The park is a sanctuary for wild life of every sort, and hunting, wounding, capturing, or frightening any bird or animal in the park, except the wild goat, as provided in Rule 1, is prohibited.  Firearms are prohibited in the park except on written permission of the superintendent, who also has authority to waive inquiry as to the possession of firearms by visitors traveling through the park to places beyond.

*Circular of General Information Regarding Hawaii National Park* (Washington:  Gov't Printing Office, 1929), p. 14.

2.  Regulations of December 21, 1932 –

    (4)  *Hunting*.—The park is a sanctuary for wild life of every sort, and all hunting or the killing, wounding, frightening, or capturing at any time of any wild bird or animal, except wild goats and pigs as provided in Rule I, is prohibited within the limits of the park.

    The outfits, including guns, traps, teams, horses, or means of transportation of every nature or description used by any person or persons engaged in hunting, killing, ensnaring, or capturing birds or wild animals within the limits of the park, shall be forfeited to the United States and may be seized by the officers of the park and held pending the prosecution of any person or persons arrested under the charge of violating this regulation, and upon conviction, such forfeiture shall be adjudicated as a penalty in addition to other punishment.  Such forfeited property shall be disposed of and accounted for by and under the authority of the Secretary of the Interior.  Possession within said park of the dead bodies or any part thereof of any wild bird or animal shall be prima facie evidence that the person or persons having the same are guilty of violating this regulation.

    During the hunting season arrangements may be made at entrance stations to identify and transport through the park carcasses of birds or animals killed outside of the park.

    <u>Firearms are prohibited within the park, except upon written permission of the superintendent.  Visitors entering or traveling through the park to places beyond, shall, at entrance, report and surrender all firearms, traps, seines, nets, or explosives in their possession to the first park officer, and in proper cases may obtain his written permission to carry them through the park sealed.  The Government assumes no responsibility for loss or damage to any firearms, traps, nets, or other property so surrendered to any park officer, nor are park officers authorized to accept the responsibility of custody of any property for the convenience of visitors.</u>

    NOTE.—The foregoing regulations is [sic] in effect a declaration of the law on this subject as contained in sections 4 and 5 of the act of Congress approved April 19, 1930 (46 Stat. 227), to provide for the exercise of sole and exclusive jurisdiction by the United States over the Hawaii National Park in the Territory of Hawaii, and for other purposes.

    The act by its terms applies to all lands within said park, whether in public or private ownership.

    *General Information Regarding Hawaii National Park* (Washington:  Gov't Printing Office, 1933), p. 17.

<u>ACADIA NATIONAL PARK</u>

1.  Regulations in effect 1929 –

    (4)  *Hunting*.—The park is a sanctuary for wild life of every sort, and hunting, killing, wounding, capturing, or frightening any bird or wild animal in the park is prohibited.

<u>Firearms are prohibited in the park except on written permission of the superintendent</u>.

*Circular of General Information Regarding Acadia National Park* (Washington:  U.S. Gov't Printing Office, 1929), p. 13.

2.  Regulations in effect 1930 –

(4)  *Hunting*.—The park is a sanctuary for wild life of every sort, and hunting, killing, wounding, capturing, or frightening any bird or wild animal in the park is strictly prohibited.  No light shall be used for the purpose of observing the wild life in the park except as authorized in writing by the superintendent.
<u>Firearms are prohibited in the park except on written permission of the superintendent</u>.

*Circular of General Information Regarding Acadia National Park* (1930), p. 12.

3.  Regulations of January 14 and December 21, 1932 –

(4)  Hunting.—The park is a sanctuary for wild life of every sort, and hunting, killing, wounding, capturing, or frightening any bird or wild animal in the park is prohibited.  No light shall be used for the purpose of observing the wild life in the park except as authorized in writing by the superintendent.
<u>Firearms are prohibited in the park except on written permission of the superintendent</u>.

*Circular of General Information Regarding Acadia National Park* (1932), p. 13; *General Information Regarding Acadia National Park* (1933), p. 16.


<u>LASSEN VOLCANIC NATIONAL PARK</u>

1.  Regulations in effect 1929 –

(4)  *Hunting*.—The park is a sanctuary for wild life of every sort, and hunting, killing, wounding, capturing, or frightening any bird or wild animal in the park is prohibited.
<u>Firearms are prohibited in the park except on written permission of the superintendent</u>.

*Circular of General Information Regarding Lassen Volcanic National Park* (Washington: Gov't Printing Office, 1929), p. 11.

2.  Regulations in effect 1930 –

(4)  *Hunting*.—The park is a sanctuary for wild life of every sort, and all hunting or the killing, wounding, frightening, or capturing at any time of any wild bird or animal, except dangerous animals when it is necessary to prevent them from destroying human lives or inflicting personal injury, is prohibited within the limits of said park.
The outfits, including guns, traps, teams, horses, or means of transportation of every nature or description used by any person or persons engaged in hunting, killing, trapping, ensnaring, or capturing birds or wild animals within the limits of said park, shall be taken

up by the superintendent and held subject to the order of the Director of the National Park Service.  Possession within said park of the dead bodies or any part thereof of any wild bird or animal shall be prima facie evidence that the person or persons having same are guilty of violating this regulation.  <u>Firearms are prohibited within the park except upon written permission of the superintendent.  Visitors entering or traveling through the park to places beyond shall, at entrance, report and surrender all firearms, traps, nets, seines, or explosives in their possession to the first park officer, and in proper cases may obtain his written permission to carry them through the park sealed.  The Government assumes no responsibility for the loss or damage to any firearms, traps, nets, seines, or other property so surrendered to any park officer, nor are park officers authorized to accept the responsibility of custody of any property for the convenience of visitors</u>.

NOTE.  The foregoing regulation is in effect a declaration of the law on this subject contained in section 4 and 5 of the act of Congress, approved April 26, 1928 (45 Stat. 463), accepting cession by the State of California of exclusive jurisdiction of the lands embraced within the Lassen Volcanic National Park, and for other purposes.

This act by its terms applies to all lands within said park, whether in public or private ownership.

*Circular of General Information Regarding Lassen Volcanic National Park* (1930), pp. 12-13.

3.  Regulations of January 14, 1932 –

(4)  *Hunting*.—The park is a sanctuary for wild life of every sort, and all hunting or the killing, wounding, frightening, or capturing at any time of any wild bird or animal, except dangerous animals when it is necessary to prevent them from destroying life or inflicting personal injury, is prohibited within the limits of the park.

The outfits, including guns, traps, teams, horses, or means of transportation of every nature or description used by any person or persons engaged in hunting, killing, ensnaring, or capturing birds or wild animals within the limits of the park shall be taken up by the superintendent and held subject to the order of the Director of the National Park Service.  Possession within said park of the dead bodies or any part thereof of any wild bird or animal shall be prima facie evidence that the person or persons having the same are guilty of violating this regulation.

During the hunting season arrangements may be made at entrance stations to identify and transport through the park, carcasses of birds or animals killed outside of the park.

<u>Firearms are prohibited within the park except upon written permission of the superintendent.  Visitors entering or traveling through the park to places beyond, shall, at entrance, report and surrender all firearms, traps, nets, seines, or explosives in their possession to the first park officer, and in proper cases may obtain his written leave to carry them through the park sealed.  The Government assumes no responsibility for the loss or damage to any firearms, traps, nets, or other property so surrendered to any park officer, nor are park officers authorized to accept the responsibility of custody of any property for the convenience of visitors</u>.

NOTE.  The foregoing regulation is in effect a declaration of the law on this subject contained in section 4 and 5 of the act of Congress, approved April 26, 1928 (45 Stat. 463), accepting cession by the State of California of exclusive jurisdiction of the lands embraced within the Lassen Volcanic National Park, and for other purposes.

This act by its terms applies to all lands within said park whether in public or private ownership.

*Circular of General Information Regarding Lassen Volcanic National Park* (1932), p. 16.

4.  Regulations of December 21, 1932 –

(4)  *Hunting*.—The park is a sanctuary for wild life of every sort, and all hunting or the killing, wounding, frightening, or capturing at any time of any wild bird or animal, except dangerous animals when it is necessary to prevent them from destroying human lives or inflicting personal injury, is prohibited within the limits of the park.

The outfits, including guns, traps, teams, horses, or means of transportation of every nature or description used by any person or persons engaged in hunting, killing, ensnaring, or capturing birds or wild animals within the limits of the park shall be forfeited to the United States and may be seized by the officers of the park and held pending the prosecution of any person or persons arrested under the charge of violating this regulation, and upon conviction such forfeiture shall be adjudicated as a penalty in addition to other punishment.  Such forfeited property shall be disposed of and accounted for by and under the authority of the Secretary of the Interior.  Possession within said park of the dead bodies or any part thereof of any wild bird or animal shall be prima facie evidence that the person or persons having the same are guilty of violating this regulation.

During the hunting season arrangements may be made at entrance stations to identify and transport through the park carcasses of birds or animals killed outside of the park.

Firearms are prohibited within the park, except upon written permission of the superintendent.  Visitors entering or traveling through the park to places beyond shall, at entrance, report and surrender all firearms, traps, seines, nets, or explosives in their possession to the first park officer, and in proper cases may obtain his written permission to carry them through the park sealed.  The Government assumes no responsibility for the loss or damage to any firearms, traps, nets, or other property so surrendered to any park officer, nor are park officers authorized to accept the responsibility of custody of any property for the convenience of visitors.

NOTE.—The foregoing regulation is in effect a declaration of the law on this subject as contained in sections 4 and 5 of the act of Congress approved April 26, 1928 (45 Stat. 463), accepting cession by the State of California of exclusive jurisdiction of the lands embraced within the Lassen Volcanic National Park, and for other purposes.

The act by its terms applies to all lands within said park, whether in public or private ownership.

*General Information Regarding Lassen Volcanic National Park* (Washington:  Gov't Printing Office, 1933), pp. 16-17.

MOUNT MCKINLEY NATIONAL PARK

1.  Regulations in effect 1929 –

(4) *Hunting.*—The park is a sanctuary for wild life of every sort, and hunting, killing, wounding, capturing, or frightening any bird or wild animal in the park, except dangerous animals when it is necessary to prevent them from destroying life or inflicting injury, is prohibited.

The outfits, including guns, traps, teams, horses, or means of transportation used by persons engaged in hunting, killing, trapping, and snaring, or capturing birds or wild animals, or in possession of game killed on the park lands under circumstances other than prescribed above shall be taken up by the superintendent and held subject to the order of the Director of the National Park Service, except in cases where it is shown by satisfactory evidence that the outfit is not the property of the person or persons violating this regulation and the actual owner was not a party to such violation. Firearms are prohibited in the park except on written permission of the superintendent. Visitors entering or traveling through the park to places beyond shall, at entrance, report and surrender all firearms, traps, nets, seines, or explosives in their possession to the first park officer, and in proper cases may obtain his written leave to carry them through the park sealed. The Government assumes no responsibilities for loss or damage to any firearms, traps, nets, seines, or other property so surrendered to any park officer, nor are park officers authorized to accept the responsibility of custody of any property for the convenience of visitors.

No game meat shall be taken into the park without prior permission in writing from the superintendent or his nearest representative.

*Circular of General Information Regarding Mount McKinley National Park* (Washington: Gov't Printing Office, 1929), p. 19.

2.  Regulations in effect 1930 –

(4) *Hunting.*—The park is a sanctuary for wild life of every sort, and hunting, killing, wounding, capturing, or frightening any bird or wild animal in the park, except dangerous animals when it is necessary to prevent them from destroying life or inflicting injury, is prohibited.

The outfits, including guns, traps, teams, horses, or means of transportation used by persons engaged in hunting, killing, trapping, and snaring, or capturing birds or wild animals, or in possession of game killed on the park lands under circumstances other than prescribed above shall be taken up by the superintendent and held subject to the order of the Director of the National Park Service, except in cases where it is shown by satisfactory evidence that the outfit is not the property of the person or persons violating this regulation and the actual owner was not a party to such violation. Firearms are prohibited in the park except on written permission of the superintendent. Visitors entering or traveling through the park to places beyond shall, at entrance, report and surrender all firearms, traps, nets, seines, or explosives in their possession to the first park officer, and in proper cases may obtain his written permission to carry them through the park sealed. The Government assumes no responsibilities for loss or damage to any firearms, traps, nets, seines, or other property so surrendered to any park officer, nor are park officers authorized to accept the responsibility of custody of any property for the convenience of visitors.

No game meat shall be taken into the park without prior permission in writing from the superintendent or his nearest representative.

*Circular of General Information Regarding Mount McKinley National Park* (Washington: Gov't Printing Office, 1930), pp. 21-22.

3. Regulations of January 29, 1932 –

(4) *Hunting.*—The park is a sanctuary for wild life of every sort, and all hunting or the killing, wounding, frightening, or capturing at any time of any wild bird or animal, except dangerous animals when it is necessary to prevent them from destroying life or inflicting personal injury, is prohibited within the limits of the park.

The outfits, including guns, traps, teams, horses, or means of transportation of every nature or description used by any person or persons engaged in hunting, killing, ensnaring, or capturing birds or wild animals within the limits of the park shall be taken up by the superintendent and held subject to the order of the Director of the National Park Service. Possession within said park of the dead bodies or any part thereof of any wild bird or animal shall be prima facie evidence that the person or persons having the same are guilty of violating this regulation.

During the hunting season arrangements may be made at entrance stations to identify and transport through the park, carcasses of birds or animals killed outside of the park.

Firearms are prohibited within the park except upon written permission of the superintendent.  Visitors entering or traveling through the park to places beyond, shall, at entrance, report and surrender all firearms, traps, nets, seines, or explosives in their possession to the first park officer, and in proper cases may obtain his written leave to carry them through the park sealed.  The Government assumes no responsibility for the loss or damage to any firearms, traps, nets, or other property so surrendered to any park officer, nor are park officers authorized to accept the responsibility of custody of any property for the convenience of visitors.

*Circular of General Information Regarding Mount McKinley National Park* (1932), pp. 22-23.

ZION AND BRYCE CANYON NATIONAL PARKS

1. Regulations of January 12, 1929 –

(4) *Hunting.*—The park is a sanctuary for wild life of every sort, and hunting, killing, wounding, capturing, or frightening any bird or animal in the park, except dangerous animals when it is necessary to prevent them from destroying life or inflicting injury, is prohibited.

The outfits, including guns, traps, teams, horses, or means of transportation used by persons engaged in hunting, killing, trapping, ensnaring, or capturing birds or wild animals, or in possession of game killed on the park lands under circumstances other than prescribed above, shall be taken up by the superintendent and held subject to the order of the Director of the National Park Service, except in cases where it is shown by satisfactory evidence that the outfit is not the property of the person or persons violating this

56

regulation and the actual owner was not a party to such violation.  <u>Firearms are prohibited in the park except on written permission of the superintendent</u>.

<u>Visitors entering or traveling through the park to places beyond shall at entrance, report and surrender all firearms, traps, nets, seines, or explosives in their possession to the first park officer and in proper cases may obtain his written leave to carry them through the park sealed.  The Government assumes no responsibilities for loss or damage to any firearms, traps, nets, seines, or other property so surrendered to any park officer, nor are park officers authorized to accept the responsibility of custody of any property for the convenience of visitors</u>.

*Circular of General Information Regarding Zion and Bryce Canyon National Parks*
(Washington:  Gov't Printing Office, 1929), p. 14.

2.  Regulations in effect 1931 –

(4)  *Hunting*.—The park is a sanctuary for wild life of every sort, and hunting, killing, wounding, capturing, or frightening any bird or animal in the park, except dangerous animals when it is necessary to prevent them from destroying life or inflicting injury, is prohibited.

The outfits, including guns, traps, teams, horses, or means of transportation used by persons engaged in hunting, killing, trapping, ensnaring, or capturing birds or wild animals, or in possession of game killed on the park lands under circumstances other than prescribed above, shall be taken up by the superintendent and held subject to the order of the Director of the National Park Service, except in cases where it is shown by satisfactory evidence that the outfit is not the property of the person or persons violating this regulation and the actual owner was not a party to such violation.  <u>Firearms are prohibited in the park except on written permission of the superintendent</u>.

<u>Visitors entering or traveling through the park to places beyond shall at entrance report and surrender all firearms, traps, nets, seines, or explosives in their possession to the first park officer and in proper cases may obtain his written leave to carry them through the park sealed.  The Government assumes no responsibilities for loss or damage to any firearms, traps, nets, seines, or other property so surrendered to any park officer, nor are park officers authorized to accept the responsibility of custody of any property for the convenience of visitors</u>.

*Circular of General Information Regarding Zion and Bryce Canyon National Parks*
(Washington:  Gov't Printing Office, 1931), p. 20.

3.  Regulations of February 6, 1932 –

(4)  *Hunting*.—The park is a sanctuary for wild life of every sort, and all hunting or the killing, wounding, frightening, or capturing at any time of any wild bird or animal, except dangerous animals when it is necessary to prevent them from destroying life or inflicting personal injury, is prohibited within the limits of the park.

The outfits, including guns, traps, teams, horses, or means of transportation of every nature or description used by any person or persons engaged in hunting, killing, ensnaring, or capturing birds or wild animals within the limits of the park shall be taken up by the

superintendent and held subject to the order of the Director of the National Park Service. Possession within said park of the dead bodies or any part thereof of any wild bird or animal shall be prima facie evidence that the person or persons having the same are guilty of violating this regulation.

During the hunting season arrangements may be made at entrance stations to identify and transport through the park carcasses of birds or animals killed outside of the park.

Firearms are prohibited within the park except upon written permission of the superintendent.  Visitors entering or traveling through the park to places beyond, shall, at entrance, report and surrender all firearms, traps, nets, seines, or explosives in their possession to the first park officer, and in proper cases may obtain his written leave to carry them through the park sealed.  The Government assumes no responsibility for the loss or damage to any firearms, traps, nets, or other property so surrendered to any park officer, nor are park officers authorized to accept the responsibility of custody of any property for the convenience of visitors.

*Circular of General Information Regarding Zion and Bryce Canyon National Parks* (1932), pp. 20-21.

4.  Regulations of December 21, 1932 –

(4)  *Hunting*.—The park is a sanctuary for wild life of every sort, and all hunting or the killing, wounding, frightening, or capturing at any time of any wild bird or animal, except dangerous animals when it is necessary to prevent them from destroying human lives or inflicting personal injury, is prohibited within the limits of the park.

The outfits, including guns, traps, teams, horses, or means of transportation of every nature or description, used by any person or persons engaged in hunting, killing, ensnaring, or capturing birds or wild animals within the limits of the park shall be shall be taken up by the superintendent and held subject to the order of the Director of the National Park Service.  Possession within said park of the dead bodies or any part thereof of any wild bird or animal shall be prima facie evidence that the person or persons having the same are guilty of violating this regulation.

During the hunting season arrangements may be made at entrance stations to identify and transport through the park carcasses of birds or animals killed outside of the park.

Firearms are prohibited within the park, except upon written permission of the superintendent.  Visitors entering or traveling through the park to places beyond, shall, at entrance, report and surrender all firearms, traps, seines, nets, or explosives in their possession to the first park officer, and in proper cases may obtain his written permission to carry them through the park sealed.  The Government assumes no responsibility for the loss or damage to any firearms, traps, nets, or other property so surrendered to any park officer, nor are park officers authorized to accept the responsibility of custody of any property for the convenience of visitors.

*General Information Regarding Zion and Bryce Canyon National Parks* (Washington:  Gov't Printing Office, 1933), pp. 16-17.

NATIONAL MONUMENTS

1.  Regulations of November 19, 1910[7] –

    (2)  <u>No firearms are allowed</u>.[8]

    *Reports of the Department of the Interior for the Fiscal Year Ended June 30, 1912. Administrative Reports in 2 Volumes.  Volume I* (Washington:  Gov't Printing Office, 1913), p. 769.

2.  Regulations in effect 1930[9] –

    (5)  *Hunting*.—The national monuments are sanctuaries for wild life of every sort, and the hunting, killing, wounding, capturing, or frightening of any bird or wild animal in any monument is strictly prohibited, except poisonous snakes or dangerous animals when it is necessary to prevent them from destroying life or inflicting injury.

    *Glimpses of Our National Monuments* (Washington:  U.S. Gov't Printing Office, 1933), p. 71.

    <u>N.B.</u>  Note that the explicit firearm prohibition of the 1910 regulation has been deleted.


<u>CARLSBAD CAVERNS NATIONAL PARK</u>

Regulations of February 28, 1933 –

    (1)  Preservation of Natural Features and Curiosities.

* * *

    <u>No</u> canes, umbrellas, or sticks of any kind, or <u>firearms</u> or any other explosive material <u>will be permitted to be taken into the caverns</u>.

* * *

---

[7] Prior to being promulgated for general application to all national monuments, this same regulation was prescribed for Muir Woods National Monument, on September 10, 1908. *General Information Regarding the National Monuments Set Aside under the Act of Congress Approved June 8, 1906* (Washington:  Gov't Printing Office, 1917), p. 9.

[8] National Monuments administered by the Department of the Interior at the time, and administered by the National Park Service today, include:  Devils Tower, Montezuma Castle, El Morro, Chaco Canyon, Muir Woods, Pinnacles, Tumacacori, Mukuntuweap (now part of Zion NP), Natural Bridges, Gran Quivira, Sitka, Rainbow Bridge, Colorado, and Petrified Forest.  See, *Reports of the Department of the Interior for the Fiscal Year Ended June 30, 1912.  Administrative Reports in 2 Volumes.  Volume I* (Washington:  Gov't Printing Office, 1913), p. 769.

[9] National Monuments administered by the National Park Service in 1930:  Arches, Aztec Ruins, Capulin Mtn., Casa Grande, Chaco Canyon, Colorado, Craters of the Moon, Devils Tower, Dinosaur, El Morro, Fossil Cycad, Geo. Washington's Birthplace, Glacier Bay, Gran Quivira, Hovenkeep, Katmai, Lewis and Clark Cavern, Montezuma Castle, Muir Woods, Natural Bridges, Navajo, Petrified Forest , Pinnacles, Pipe Spring, Rainbow Bridge, Scotts Bluff, Shoshone Cavern, Sitka, Tumacacori, Verendyre, Wupatki, and Yucca House. *Glimpses of Our National Monuments* (Washington:  U.S. Gov't Printing Office, 1930), pp. I-II.

(3) Hunting.—The park is a sanctuary for wildlife of every sort, and hunting, killing, wounding, capturing, or frightening any bird or wild animal in the park, except dangerous animals when it is necessary to prevent them from destroying life or inflicting injury, is prohibited.

Story, Isabella F., *Carlsbad Caverns National Park* (Washington:  U.S. Gov't Printing Office, 1935), p. 23.

GREAT SMOKY MOUNTAINS NATIONAL PARK

1.  Regulations of May 9, 1932 –

(4)  *Hunting*.—The park is a sanctuary for wild life of every sort, and all hunting or the killing, wounding, frightening, pursuing, or capturing at any time of any bird or wild animal, except dangerous animals, when it is necessary to prevent them from destroying human lives or inflicting personal injury, or taking the eggs of any bird, is prohibited within the limits of said park.  <u>Firearms are prohibited within the park except upon written permission of the superintendent</u>.

*General Information [Regarding] Great Smoky Mountains National Park* (1932), p. 11.

2.  Regulations of March 10, 1933 –

(4)  Hunting.—The park is a sanctuary for wild life of every sort, and all hunting or the killing, wounding, frightening, pursuing, or capturing at any time of any bird or wild animal, except dangerous animals, when it is necessary to prevent them from destroying human lives or inflicting personal injury, or taking the eggs of any bird, is prohibited within the limits of said park.  <u>Firearms are prohibited within the park except upon written permission of the superintendent</u>.

*General Information Regarding Great Smoky Mountains National Park* (Washington:  1933), p. 16.

3.  Regulations in effect 1934/35 –

(4)  *Hunting*.—The park is a sanctuary for wildlife of every sort, and all hunting or the killing, wounding, frightening, pursuing, capturing or attempting to capture at any time of any bird or wild animal, except dangerous animals, when it is necessary to prevent them from destroying human lives or inflicting personal injury, or taking the eggs of any bird, is prohibited within the limits of said park.  <u>Firearms are prohibited within the park except upon written permission of the superintendent</u>.  The outfits, including guns, teams, traps, horses, or means of transportation of every nature or description used by any person or persons engaged in hunting, killing, ensnaring, or capturing birds or wild animals within the limits of the park shall be forfeited to the United States and may be seized by the officers of the park and held pending the prosecution of any person or persons arrested under the charge of violating this regulation, and upon conviction such forfeiture shall be

adjudicated as a penalty in addition to other punishment.  Such forfeited property shall be disposed of and accounted for by and under the authority of the Secretary of the Interior.  Possession within said park of the dead bodies or any part thereof of any wild bird or animal shall be prima facie evidence that the person or persons having the same are guilty of violating this regulation.  During the hunting season arrangements may be made at entrance stations to identify and transport through the park, carcasses of birds or animals killed outside of the park.

    *General Information Regarding Great Smoky Mountains National Park* (1933[10]), p. 16.


GRAND CANYON NATIONAL PARK

1. Regulations of January 16, 1928[11] –

    (4)  *Hunting*.—The park is a sanctuary for wild life of every sort and hunting, killing, wounding, capturing, or frightening any bird or animal in the park is prohibited.
    The outfits, including guns, traps, teams, horses, or means of transportation used by persons engaged in hunting, killing, trapping, ensnaring, or capturing birds or wild animals, or in possession of game killed on the park lands, shall be taken up by the superintendent and held subject to the order of the Director of the National Park Service, except in cases where it is shown by satisfactory evidence that the outfit is not the property of the person or persons violating this regulation, and the actual owner was not a party to such violation.  Firearms are prohibited in the park except on written permission of the superintendent.  Visitors entering or traveling through the park to places beyond, shall, at entrance, report and surrender all firearms, traps, nets, seines, or explosives in their possession to the first park officer and in proper cases may obtain his written leave to carry them through the park sealed.  The Government assumes no responsibility for loss or damage to any firearms, traps, nets, or other property so surrendered to any park officer, nor are park officers authorized to accept the responsibility of custody of any property for the convenience of visitors.

    *Circular of General Information Regarding Grand Canyon National Park* (Washington:  U.S. Gov't Printing Office, 1929), p. 43.

2. Regulations of January 2, 1930 –

---

[10] While the publication date given on the face of the pamphlet states "1933," this regulation would appear to be later in date, given that (1) the regulation of March 10, 1933 (see part I at < http://www.nps.gov/policy/Firearmsregs.pdf>) appears to have been significantly expanded, and (2) the pamphlet was found in a bound volume of similar brochures dated 1936.

[11] In a 1928 article entitled "U.S. National Parks Magnificent Schools," Dr. Frank Thomas, formerly the park naturalist at Yellowstone, gave potential visitors to the parks a few helpful tips, including the following:

        Don't carry any firearms.  They'll only be sealed at the park entrance, and you lose the gun and a stiffish fine besides if you tamper with the seal.

*The Science News-Letter*, Vol. 13, No. 366, American Traveler Number (April 14, 1928), pp. 227, 228.

(4) *Hunting*.—The park is a sanctuary for wild life of every sort and hunting, killing, wounding, capturing, or frightening any bird or animal in the park is prohibited.

The outfits, including guns, traps, teams, horses, or means of transportation used by persons engaged in hunting, killing, trapping, ensnaring, or capturing birds or wild animals, or in possession of game killed on the park lands, shall be taken up by the superintendent and held subject to the order of the Director of the National Park Service, except in cases where it is shown by satisfactory evidence that the outfit is not the property of the person or persons violating this regulation, and the actual owner was not a party to such violation.  Firearms are prohibited in the park except on written permission of the superintendent.  Visitors entering or traveling through the park to places beyond, shall, at entrance, report and surrender all firearms, traps, nets, seines, or explosives in their possession to the first park officer and in proper cases may obtain his written leave to carry them through the park sealed.  The Government assumes no responsibility for loss or damage to any firearms, traps, nets, or other property so surrendered to any park officer, nor are park officers authorized to accept the responsibility of custody of any property for the convenience of visitors.

*Circular of General Information Regarding Grand Canyon National Park* (Washington:  U.S. Gov't Printing Office, 1930), p. 44.

3.  Regulations of January 9, 1931 –

(4) *Hunting*.—The park is a sanctuary for wild life of every sort, and hunting, killing, wounding, capturing, or frightening any bird or animal in the park is prohibited.

The outfits, including guns, traps, teams, horses, or means of transportation used by persons engaged in hunting, killing, trapping, ensnaring, or capturing birds or wild animals, or in possession of game killed on the park lands, shall be taken up by the superintendent and held subject to the order of the Director of the National Park Service, except in cases where it is shown by satisfactory evidence that the outfit is not the property of the person or persons violating this regulation and the actual owner was not a party to such violation.  Firearms are prohibited in the park except on written permission of the superintendent.  Visitors entering or traveling through the park to places beyond, shall, at entrance, report and surrender all firearms, traps, nets, seines, or explosives in their possession to the first park officer and in proper cases may obtain his written leave to carry them through the park sealed.  The Government assumes no responsibilities for loss or damage to any firearms, traps, nets, seines, or other property so surrendered to any park officer, nor are park officers authorized to accept responsibility of custody of any property for the convenience of visitors.

*Circular of General Information Regarding Grand Canyon National Park* (Washington: Gov't Printing Office, 1931), p. 44.

4.  Regulations of February 15, 1932 –

(4) *Hunting*.—The park is a sanctuary for wild life of every sort, and all hunting or the killing, wounding, frightening, or capturing at any time of any wild bird or animal,

except dangerous animals when it is necessary to prevent them from destroying life or inflicting personal injury, is prohibited within the limits of the park.

The outfits, including guns, traps, teams, horses, or means of transportation of every nature or description used by any person or persons engaged in hunting, killing, ensnaring, or capturing birds or wild animals within the limits of the park shall be taken up by the superintendent and held subject to the order of the Director of the National Park Service. Possession within said park of the dead bodies or any part thereof of any wild bird or animal shall be prima facie evidence that the person or persons having the same are guilty of violating this regulation.

During the hunting season arrangements may be made at entrance stations to identify and transport through the park, carcasses of birds or animals killed outside of the park.

Firearms are prohibited within the park except upon written permission of the superintendent. Visitors entering or traveling through the park to places beyond, shall, at entrance, report and surrender all firearms, traps, nets, seines, or explosives in their possession to the first park officer, and in proper cases may obtain his written leave to carry them through the park sealed. The Government assumes no responsibility for the loss or damage to any firearms, traps, nets, or other property so surrendered to any park officer, nor are park officers authorized to accept the responsibility of custody of any property for the convenience of visitors.

*Circular of General Information Regarding Grand Canyon National Park* (1932), p. 47.

5. Regulations of December 31, 1932 –

(4) *Hunting.*—The park is a sanctuary for wild life of every sort, and all hunting or the killing, wounding, frightening, or capturing at any time of any wild bird or animal, except dangerous animals when it is necessary to prevent them from destroying human lives or inflicting personal injury, is prohibited within the limits of the park.

The outfits, including guns, traps, teams, horses, or means of transportation of every nature or description used by any person or persons engaged in hunting, killing, ensnaring, or capturing birds or wild animals within the limits of the park, shall be taken up by the superintendent and held subject to the order of the Director of the National Park Service. Possession within said park of the dead bodies or any part thereof of any wild bird or animal shall be prima facie evidence that the person or persons having the same are guilty of violating this regulation.

During the hunting season arrangements may be made at entrance stations to identify and transport through the park, carcasses of birds or animals killed outside of the park.

Firearms are prohibited within the park except upon written permission of the superintendent. Visitors entering or traveling through the park to places beyond, shall, at entrance, report and surrender all firearms, traps, seines, nets, or explosives in their possession to the first park officer, and in proper cases may obtain his written permission to carry them through the park sealed. The Government assumes no responsibility for loss or damage to any firearms, traps, nets, or other property so surrendered to any park officer, nor are park officers authorized to accept the responsibility of custody of any property for the convenience of visitors.

*General Information Regarding Grand Canyon National Park* (Washington: Gov't Printing Office, 1933), p. 35.


<u>GRAND TETON NATIONAL PARK</u>

1.  Regulations in effect 1929 –

(4)  *Hunting.*—The park is a sanctuary for wild life of every sort, and hunting, killing, wounding, capturing, or frightening any bird or wild animal in the park, except dangerous animals when it is necessary to prevent them from destroying life or inflicting injury, is prohibited.

The outfits, including guns, traps, teams, horses, or means of transportation used by persons engaged in hunting, killing, trapping, ensnaring, or capturing birds or wild animals, or in possession of game killed on the park lands under circumstances other than prescribed above, shall be taken up by the superintendent or his authorized representative at the park and held subject to the order of the Director of the National Park Service, except in cases where it is shown by satisfactory evidence that the outfit is not the property of the person or persons violating this regulation and the actual owner was not a party to such violation.  <u>Firearms are prohibited in the park except on written permission of the superintendent or his authorized representative</u>.

*Circular of General Information Regarding Grand Teton National Park* (Washington:  U.S. Gov't Printing Office, 1929), p. 17.

2.  Regulations in effect 1930 –

(4)  *Hunting.*—The park is a sanctuary for wild life of every sort, and hunting, killing, wounding, capturing, or frightening any bird or wild animal in the park, except dangerous animals when it is necessary to prevent them from destroying life or inflicting injury, is prohibited.

The outfits, including guns, traps, teams, horses, or means of transportation used by persons engaged in hunting, killing, trapping, ensnaring, or capturing birds or wild animals, or in possession of game killed on the park lands under circumstances other than prescribed above, shall be taken up by the superintendent or his authorized representative at the park and held subject to the order of the Director of the National Park Service, except in cases where it is shown by satisfactory evidence that the outfit is not the property of the person or persons violating this regulation, and the actual owner was not a party to such violation.  <u>Firearms are prohibited in the park except on written permission of the superintendent or his authorized representative</u>.

*Circular of General Information Regarding Grand Teton National Park* (Washington:  U.S. Gov't Printing Office, 1930), p. 16.

3.  Regulations of January 29, 1932 –

(4)  *Hunting.*—The park is a sanctuary for wild life of every sort, and all hunting or the killing, wounding, frightening, or capturing at any time of any wild bird or animal, except dangerous animals when it is necessary to prevent them from destroying life or inflicting personal injury, is prohibited within the limits of the park.

The outfits, including guns, traps, teams, horses, or means of transportation of every nature or description used by any person or persons engaged in hunting, killing, ensnaring, or capturing birds or wild animals within the limits of the park shall be taken up by the superintendent and held subject to the order of the Director of the National Park Service. Possession within said park of the dead bodies or any part thereof of any wild bird or animal shall be prima facie evidence that the person or persons having the same are guilty of violating this regulation.

During the hunting season arrangements may be made at entrance stations to identify and transport through the park, carcasses of birds or animals killed outside of the park.

Firearms are prohibited within the park except upon written permission of the superintendent.  Visitors entering or traveling through the park to places beyond, shall, at entrance, report and surrender all firearms, traps, nets, seines, or explosives in their possession to the first park officer, and in proper cases may obtain his written leave to carry them through the park sealed.  The Government assumes no responsibility for the loss or damage to any firearms, traps, nets, or other property so surrendered to any park officer, nor are park officers authorized to accept the responsibility of custody of any property for the convenience of visitors.

*Circular of General Information Regarding Grand Teton National Park* (1932), pp. 15-16.


GENERAL REGULATION[12]

Regulation of June 18, 1936 –

(7)  *Protection of wildlife.*—The parks and monuments are sanctuaries for wildlife of every sort, and all hunting, or the killing, wounding, frightening, capturing, or attempting to capture at any time of any wild bird or animal, except dangerous animals when it is necessary to prevent them from destroying human lives or inflicting personal injury, is prohibited within the limits of the parks and monuments.

---

[12] The general regulation states it is "for the proper use, management, government, and protection of, and maintenance of good order in all the National Parks, National Monuments, National Military Parks, National Historical Parks, Battlefield Sites, and miscellaneous memorials which are, or hereafter may be, under the administrative jurisdiction of the National Park Service of the Department of the Interior:  *Provided, however,* That these rules and regulations shall not apply to National Cemeteries or to National Capital Parks.  All previous rules and regulations . . . except such local subsidiary regulations as are continued in force under the provisions hereof . . . are hereby repealed."  Id.  Such "subsidiary regulations" included explicit special regulations, such as those for mining in Death Valley National Monument (section 16), and the prohibition on fishing in Muir Woods National Monument (section 9), contained in the general regulation itself.  Other park-specific regulations were clearly contemplated therein, for example, those regulating the hours of swimming at Hot Springs National Park (section 2(m)), and restricting the use of spring water at Platt National Park (section 4).  No special regulations, either explicit or implicit, were included with respect to firearms.  Id. at 673-75.

Unauthorized possession within a park or monument of the dead body of any part thereof of any wild bird or animal shall be prima facie evidence that the person or persons having the same are guilty of violating this regulation.

During the hunting season arrangements must be made at entrance stations to identify and transport through the parks and monuments, where necessary, the carcasses of birds or animals legally killed outside the parks and monuments.  Failure to make such arrangements shall be deemed a violation of this regulation.

(8)  *Firearms, etc*.—Firearms, explosives, traps, seines, and nets are prohibited within the parks and monuments, except upon written permission of the superintendent or custodian.  Visitors entering or traveling through the parks and monuments to places beyond shall, at entrance, report and, if required to do so, surrender all such objects in their possession to the first park or monument officer, and, in proper cases, may obtain his written permission to carry them through the park or monument sealed.  Failure to obtain such written permission shall be deemed a violation of this regulation.  The Government assumes no responsibility for the loss of, or damage to, any such objects so surrendered to any park or monument officer, nor are park or monument officers authorized to accept the responsibility or custody of any other property for the convenience of the visitors.

1 *Federal Register* 672, 673-74 (June 27, 1936).

# APPENDIX A

### Original Rules and Regulations of Yellowstone National Park

1st.  All hunting, fishing, or trapping within the limits of the Park, except for purposes of recreation, or to supply food for visitors or actual residents, is strictly prohibited; and no sales of fish or game taken within the park shall be made outside of its boundaries.

2nd.  Persons residing within the park, or visiting it for any purpose whatever, are required under severe penalties to extinguish all fires which it may be necessary to make, before leaving them.  No fires must be made within the park except for necessary purposes.

3rd.  No timber must be cut in the park without a written permit from the superintendent.

4th.  Breaking the siliceous or calcareous borders or deposits surrounding or in the vicinity of the springs or geysers for any purpose, and all removal, carrying away, or sale of specimens found within the park, without the consent of the superintendent, is strictly prohibited.

5th.  No person will be permitted to reside permanently within the limit of the park without permission from the Department of the Interior, and any person now living within the park shall vacate the premises occupied by him within thirty days after having been served with a written notice so to do, by the superintendent or his deputy, said notice to be served upon him in person or left at his place of residence.

Source:  *Report of the Secretary of the Interior; Being Part of the Message and Documents Communicated to the Two Houses of Congress at the Beginning of the Third Session of the Forty-Fifth Congress, in Two Volumes* (Washington:  Gov't Printing Office, 1878), vol. I, pp. 993-94.

# APPENDIX B

### 1881 Rules and Regulations of Yellowstone National Park

\* \* \*

4.  Hunting, trapping, and fishing, except for purposes of procuring food for visitors or actual residents, are prohibited by law; and no sales of game or fish taken inside the Park shall be made for purposes of profit within its boundaries or elsewhere.

\* \* \*

Approved by Sec'y of the Interior S.J. Kirkwood, May 4, 1881.

Source:  *Annual Report of the Secretary of the Interior on the Operations of the Department for the Year Ended June 30, 1881, in Four Volumes* (Washington:  Gov't Printing Office, 1882), vol. II, p. 819.

68

# APPENDIX C

## 1888 Rules and Regulations of Yellowstone National Park

\* \* \*

5.  Hunting, capturing, injuring, or killing any bird or animal within the Park is prohibited. The outfits of persons found hunting or in possession of game killed in the Park will be subject to seizure and confiscation.

\* \* \*

Approved by Sec'y of the Interior William F. Vilas, July 1, 1888.

Source:  *Report of the Secretary of the Interior for the Fiscal Year Ending June 30, 1888.  In Six Volumes* (Washington:  Gov't Printing Office, 1888), vol. III, p. 656.

35

FEDERAL REGISTER, *Saturday, June 27, 1936*

## TREASURY DEPARTMENT.

### Bureau of Internal Revenue.

[T. D. 4649]

WITHHOLDING OF INCOME TAX UNDER SECTIONS 143 AND 144 OF THE REVENUE ACT OF 1936

*Collectors of Internal Revenue and Others Concerned:*

Paragraph A. The Revenue Act of 1936 (Public, No. 740, Seventy-fourth Congress, second session, H. R. 12395), was approved by the President, June 22, 1936, 9 p. m. eastern standard time.

Paragraph B. Section 143 (Title I, Income Tax) of the Act, relating to withholding of tax at the source, provides:

SEC. 143. WITHHOLDING OF TAX AT SOURCE.—(a) *Tax-Free Covenant Bonds.—*

(1) *Requirement of withholding.*—In any case where bonds, mortgages, or deeds of trust, or other similar obligations or a corporation, issued before January 1, 1934, contain a contract or provision by which the obligor agrees to pay any portion of the tax imposed by this title upon the obligee, or to reimburse the obligee for any portion of the tax, or to pay the interest without deduction for any tax which the obligor may be required or permitted to pay thereon, or to retain therefrom under any law of the United States, the obligor shall deduct and withhold a tax equal to 2 per centum of the interest upon such bonds, mortgages, deeds of trust, or other obligations, whether such interest is payable annually or at shorter or longer periods, if payable to an individual, a partnership, or a foreign corporation not engaged in trade or business within the United States and not having any office or place of business therein: *Provided,* That if the liability assumed by the obligor does not exceed 2 per centum of the interest, then the deduction and withholding shall be at the following rates: (A) 10 per centum in the case of a nonresident alien individual (except that such rate shall be reduced, in case of a resident of a contiguous country, to such rate, not less than 5 per centum, as may be provided by treaty with such country), or of any partnership not engaged in trade or business within the United States and not having any office or place of business therein and composed in whole or in part of nonresident aliens, (B) in the case of such a foreign corporation, 15 per centum, and (C) 2 per centum in the case of other individuals and partnerships: *Provided further,* That if the owners of such obligations are not known to the withholding agent the Commissioner may authorize such deduction and withholding to be at the rate of 2 per centum, or, if the liability assumed by the obligor does not exceed 2 per centum of the interest, then at the rate of 10 per centum.

(2) *Benefit of credits against net income.*—Such deduction and withholding shall not be required in the case of a citizen or resident entitled to receive such interest, if he files with the withholding agent on or before February 1 a signed notice in writing claiming the benefit of the credits provided in section 25 (b); nor in the case of a nonresident alien individual if so provided for in regulations prescribed by the Commissioner under section 215.

(3) *Income of obligor and obligee.*—The obligor shall not be allowed a deduction for the payment of the tax imposed by this title, or any other tax paid pursuant to the tax-free covenant clause, nor shall such tax be included in the gross income of the obligee.

(b) *Nonresident aliens.*—All persons, in whatever capacity acting, including lessees or mortgagors of real or personal property, fiduciaries, employers, and all officers and employees of the United States, having the control, receipt, custody, disposal, or payment of interest (except interest on deposits with persons carrying on the banking business paid to persons not engaged in business in the United States and not having an office or place of business therein), dividends, rent, salaries, wages, premiums, annuities, compensations, remunerations, emoluments, or other fixed or determinable annual or periodical gains, profits, and income (but only to the extent that any of the above items constitutes gross income from sources within the United States), of any nonresident alien individual, or of any partnership not engaged in trade or business within the United States and not having any office or place of business therein and composed in whole or in part of nonresident aliens, shall (except in the cases provided for in subsection (a) of this section and except as otherwise provided in regulations prescribed by the Commissioner under section 215) deduct and withhold from such annual or periodical gains, profits, and income a tax equal to 10 per centum thereof, except that such rate shall be reduced, in the case of a nonresident alien individual a resident of a contiguous country, to such rate (not less than 5 per centum) as may be provided by treaty with such country: *Provided,* That no such deduction or withholding shall be required in the case of dividends paid by a foreign corporation unless (1) such corporation is engaged in trade or business within the United States or has an office or

place of business therein, and (2) more than 85 per centum of the gross income of such corporation for the three-year period ending with the close of its taxable year preceding the declaration of such dividends (or for such part of such period as the corporation has been in existence) was derived from sources within the United States as determined under the provisions of section 119: *Provided further,* That the Commissioner may authorize such tax to be deducted and withheld from the interest upon any securities the owners of which are not known to the withholding agent. Under regulations prescribed by the Commissioner, with the approval of the Secretary, there may be exempted from such deduction and withholding the compensation for personal services of nonresident alien individuals who enter and leave the United States at frequent intervals.

(c) *Return and payment.*—Every person required to deduct and withhold any tax under this section shall make return thereof on or before March 15 of each year and shall on or before June 15, in lieu of the time prescribed in section 56, pay the tax to the official of the United States Government authorized to receive it. Every such person is hereby made liable for such tax and is hereby indemnified against the claims and demands of any person for the amount of any payments made in accordance with the provisions of this section.

(d) *Income of recipient.*—Income upon which any tax is required to be withheld at the source under this section shall be included in the return of the recipient of such income, but any amount of tax so withheld shall be credited against the amount of income tax as computed in such return.

(e) *Tax paid by recipient.*—If any tax required under this section to be deducted and withheld is paid by the recipient of the income, it shall not be re-collected from the withholding agent; nor in cases in which the tax is so paid shall any penalty be imposed upon or collected from the recipient of the income or the withholding agent for failure to return or pay the same, unless such failure was fraudulent and for the purpose of evading payment.

(f) *Refunds and credits.*—Where there has been an overpayment of tax under this section any refund or credit made under the provisions of section 322 shall be made to the withholding agent unless the amount of such tax was actually withheld by the withholding agent.

(g) *Withholding before enactment of act.*—Notwithstanding the provisions of subsections (a) and (b), the deduction and withholding for any period prior to the tenth day after the date of the enactment of this Act shall be upon the items of income and at the rates prescribed in section 143 (a) and (b) of the Revenue Act of 1934, as amended, in lieu of the items and rates prescribed in such subsections.

Paragraph C. Section 144 (Title I, Income Tax) of the Act, relating to payment of corporation income tax at the source, provides:

SEC. 144. PAYMENT OF CORPORATION INCOME TAX AT SOURCE.—(a) *General Rule.*—In the case of foreign corporations subject to taxation under this title not engaged in trade or business within the United States and not having any office or place of business therein, there shall be deducted and withheld at the source in the same manner and upon the same items of income as is provided in section 143 a tax equal to 15 per centum thereof, except that in the case of dividends the rate shall be 10 per centum, and except that in the case of corporations organized under the laws of a contiguous country such rate of 10 per centum with respect to dividends shall be reduced to such rate (not less than 5 per centum) as may be provided by treaty with such country; and such tax shall be returned and paid in the same manner and subject to the same conditions as provided in that section: *Provided,* That in the case of interest described in subsection (a) of that section (relating to tax-free covenant bonds) the deduction and withholding shall be at the rate specified in such subsection.

(b) *Withholding Before Enactment of Act.*—Notwithstanding the provisions of subsection (a), the deduction and withholding for any period prior to the tenth day after the date of the enactment of this Act shall be upon the items of income and at the rates prescribed in section 144 of the Revenue Act of 1934, as amended, in lieu of the items and rates prescribed in such subsection.

Paragraph D. Section 147 (b) (Title I, Income Tax) of the Act, relating to returns of information at the source, provides:

SEC. 147. INFORMATION AT SOURCE.— * * *

(b) *Returns Regardless of Amount of Payment.*—Such returns may be required, regardless of amounts, (1) in the case of payments of interest upon bonds, mortgages, deeds of trust, or other similar obligations of corporations, and (2) in the case of collections of items (not payable in the United States) of interest upon the bonds of foreign countries and interest upon the bonds of and dividends from foreign corporations by persons undertaking as a matter of business or for profit the collection of foreign payments of such interest or dividends by means of coupons, checks, or bills of exchange.

Paragraph E. Section 62 (Title I, Income Tax) of the Act, relating to rules and regulations, provides:

SEC. 62. RULES AND REGULATIONS.—The Commissioner, with the approval of the Secretary, shall prescribe and publish all needful rules and regulations for the enforcement of this title.

Paragraph F. Pursuant to the above-quoted provisions of the Act, the following regulations are hereby prescribed with respect to withholding of tax at the source:

ARTICLE 1. *Domestic, foreign, resident, and nonresident persons.*—For the purpose of these regulations, a domestic corporation is one organized or created in the United States, including only the States, the Territories of Alaska and Hawaii, and the District of Columbia, or under the law of the United States or of any State or Territory, and a foreign corporation is one which is not domestic. A foreign corporation engaged in trade or business within the United States, or having an office or place of business therein, is referred to in these regulations as a resident foreign corporation, and a foreign corporation not engaged in trade or business within the United States and not having an office or place of business therein, as a nonresident foreign corporation. A partnership engaged in trade or business within the United States or having an office or place of business therein is referred to in these regulations as a resident partnership, and a partnership not engaged in trade or business within the United States, and not having any office or place of business therein, as a nonresident partnership. As used in these regulations, the term "nonresident alien" includes a nonresident alien individual and a nonresident alien fiduciary.

ART. 2. *Withholding tax at source.*—(a) *Withholding in general.*—Withholding of a tax of 10 per cent is required in the case of fixed or determinable annual or periodical income paid to a nonresident alien or to a nonresident partnership, composed in whole or in part of nonresident alien individuals, except (1) income from sources without the United States, including interest on deposits with persons carrying on the banking business paid to persons not engaged in business in the United States and not having any office or place of business therein, (2) interest upon bonds or other obligations of a corporation containing a tax-free covenant and issued before January 1, 1934. (3) dividends paid by a foreign corporation unless (a) such corporation is engaged in trade or business within the United States or has an office or place of business therein, and (b) more than 85 percent of the gross income of such corporation for the three-year period ending with the close of its taxable year preceding the declaration of such dividends (or for such part of such period as the corporation has been in existence) was derived from sources within the United States, as determined under the provisions of section 119, (4) dividends distributed by a corporation organized under the China Trade Act, 1922, to a resident of China, and (5) except that such rate of 10 per cent shall be reduced, in the case of a resident of a contiguous country, to such rate, not less than 5 per cent, as may be provided by treaty with such country.

A tax of 10 per cent must be withheld from interest on bonds or securities not containing a tax-free covenant, or containing a tax-free covenant and issued on or after January 1, 1934, if the owner is unknown to the withholding agent, except where such interest represents income from sources without the United States.

For withholding in the case of income paid to nonresident foreign corporations see article 11.

Resident or domestic fiduciaries are required to deduct the income tax at the source from all fixed or determinable annual or periodical gains, profits, and income paid to nonresident alien beneficiaries, to the extent that such items constitute gross income from sources within the United States. Income paid to a nonresident alien fiduciary which is otherwise subject to the withholding provisions of the Act is not exempt from withholding by reason of the fact that the beneficiaries of the income are citizens or residents of the United States.

A debtor corporation having an issue of bonds or other similar obligations which appoints a duly authorized agent to act in its behalf under the withholding provisions of the Act, is required to file notice of such appointment with the Commissioner of Internal Revenue, Sorting Section, Washington, D. C., giving the name and address of the agent.

If in connection with the sale of its property, payment of the bonds or other obligations of a corporation is assumed by the assignee, such assignee, whether an individual, partnership, or corporation, must deduct and withhold such taxes as would be required to be withheld by the assignor had no such sale or transfer been made.

For withholding in the case of dividends distributed by a corporation organized under the China Trade Act, 1922, see articles 4 and 12.

(b) *Tax-free covenant bonds issued before January 1, 1934.*—The withholding provisions of section 143 (a) (1) are applicable only to bonds, mortgages, or deeds of trust, or other similar obligations of a corporation which were issued before January 1, 1934, and which contain a tax-free covenant. For the purpose of section 143 (a) (1) bonds, mortgages, or deeds of trust, or other similar obligations of a corporation are issued when delivered. If a broker or other person acts as selling agent of the obligor the obligation is issued when delivered by the agent to the purchaser. If a broker or other person purchases the obligation outright for the purpose of holding or reselling it, the obligation is issued when delivered to such broker or other person. In order that the date of issue of bonds, mortgages, or deeds of trust, or other similar obligations of corporations, containing a tax-free covenant may be readily determined by the owner, for the purpose of preparing the ownership certificates required under these regulations the "issuing" or debtor corporation shall indicate, by an appropriate notation, the date of issue or use the phrase, "Issued on or after January 1, 1934", on each such obligation or in a statement accompanying the delivery of such obligation.

In cases where on or after January 1, 1934, the maturity date of bonds or other obligations of a corporation is extended, the bonds shall be considered to have been issued on or after January 1, 1934. The interest on such obligations is not subject to the withholding provisions of section 143 (a) but falls within the class of interest described in section 143 (b).

In the case of interest upon bonds or other obligations of a corporation containing a tax-free covenant and issued before January 1, 1934, paid to an individual, fiduciary, or a partnership, whether resident or nonresident, withholding of a tax of 2 percent is required, except that if the liability assumed by the obligor in connection with such a covenant does not exceed 2 percent of the interest, withholding is required at the rate of 10 percent in the case of a nonresident alien, or a nonresident partnership composed in whole or in part of nonresident alien individuals, or if the owner is unknown to the withholding agent. The rates of withholding applicable to the interest on bonds or other obligations of a corporation containing a tax-free covenant, and issued before January 1, 1934, are applicable to interest on such obligations issued by a domestic corporation or a resident foreign corporation. However, withholding is not required in the case of interest payments on such bonds or obligations if such interest is not to be treated as income from sources within the United States under section 119 (a) (1) (B) of the Act, and the payments are made to a nonresident alien or a partnership composed in whole of nonresident aliens. A nonresident foreign corporation having a fiscal or paying agent in the United States is required to withhold a tax of 2 percent upon the interest on its tax-free covenant bonds issued before January 1, 1934, paid to a citizen or resident of the United States, individual, or fiduciary, or a partnership any member of which is a citizen or resident.

For withholding in the case of interest upon bonds or other obligations of a corporation containing a tax-free covenant and issued before January 1, 1934, paid to nonresident foreign corporations see article 11.

Bonds issued under a trust deed containing a tax-free covenant are treated as if they contain such a covenant. If neither the bonds nor the trust deeds given by the obligor to secure them contain a tax-free covenant, supplemental agreements executed by the obligor corporation and the trustee containing a tax-free covenant which modify the original trust deeds to that extent are of the same effect from the date of their proper execution as if they had been part of the original deeds of trust, and the bonds from such date are subject to the provisions of section 143 (a), provided ap-

propriate authority exists for the modification of the trust deeds in this manner. The authority must be contained in the original trust deeds or actually secured from the bondholders.

In the case of corporate bonds or other obligations containing a tax-free covenant, issued before January 1, 1934, the corporation paying a Federal tax, or any part of it, for someone else pursuant to its agreement is not entitled to deduct such payment from gross income on any ground nor shall the tax so paid be included in the gross income of the bondholder. The amount of the tax may nevertheless be claimed by the bondholder as a credit against the total amount of income tax due in accordance with section 143 (d). In the case, however, of corporate bonds or other obligations containing an appropriate tax-free covenant, the corporation paying for someone else, pursuant to its agreement, a State tax or any tax other than a Federal tax may deduct such payment as interest paid on indebtedness.

(c) *Withholding under Revenue Act of 1934, as amended.*— The withholding provisions of section 143 and section 144 of the Revenue Act of 1936 (which are merely administrative provisions providing for the collection at the source of the tax imposed under other sections of the Act) do not apply for any period prior to the tenth day after the date of the enactment of that Act, that is, for any period prior to July 2, 1936. For such prior period withholding shall be upon the items of income and at the rates provided by the Revenue Act of 1934, as amended.

ART. 3. *Fixed or determinable, annual or periodical income.*—Only fixed or determinable annual or periodical income is subject to withholding. The Act specifically includes in such income, interest, dividends, rent, salaries, wages, premiums, annuities, compensations, remunerations, and emoluments. But other kinds of income are included, as, for instance, royalties.

Income is fixed when it is to be paid in amounts definitely predetermined. Income is determinable whenever there is a basis of calculation by which the amount to be paid may be ascertained. The income need not be paid annually if it is paid periodically; that is to say, from time to time, whether or not at regular intervals. That the length of time during which the payments are to be made may be increased or diminished in accordance with someone's will or with the happening of an event does not make the payments any the less determinable or periodical. A salesman working by the month for a commission on sales which is paid or credited monthly receives determinable periodical income. The distributable share of the income of an estate or trust from sources within the United States paid by a fiduciary to a nonresident alien beneficiary constitutes fixed or determinable annual or periodical income within the meaning of section 143 (b). The income derived from the sale in the United States of property, whether real or personal, is not fixed or determinable annual or periodical income.

ART. 4 (a). *Exemption from withholding.*—Withholding from interest on corporate bonds or other obligations issued prior to January 1, 1934, containing a tax-free covenant shall not be required in the case of a citizen or resident if he files with the withholding agent when presenting interest coupons for payment, or not later than February 1 following the taxable year, an ownership certificate on Form 1000 stating that his net income does not exceed his personal exemption and credit for dependents. To avoid inconvenience a resident alien should file a certificate of residence on Form 1078 with withholding agents, who shall forward such certificates to the Commissioner of Internal Revenue, Sorting Section, Washington, D. C., with a letter of transmittal.

The income of domestic corporations and of resident foreign corporations is free from withholding.

No withholding from dividends paid by a corporation organized under the China Trade Act, 1922, is required unless the dividends are treated as income from sources within the United States under section 119 of the Act and are distributed to—

(1) A nonresident alien other than a resident of China at the time of such distribution;

(2) A nonresident partnership composed in whole or in part of nonresident aliens (other than a partnership resident in China); or

(3) A nonresident foreign corporation (other than a corporation resident in China).

The salary or other compensation for personal services of a nonresident alien individual who enters and leaves the United States at frequent intervals, shall not be subject to deduction and withholding of income tax at the source, provided he is a resident of Canada or Mexico. Such a nonresident alien shall file on Form 1040B, with the collector of internal revenue for the district in which he is employed, a true and accurate return of his total income from all sources within the United States, including the compensation for personal services rendered in the United States.

The following items of fixed or determinable annual or periodical income from sources within the United States received by a citizen of France residing in France, or a corporation organized under the laws of France, are not subject to the withholding provisions of the Revenue Act of 1936, since such income is exempt from Federal income tax under the provisions of the convention and protocol between the United States and France, signed April 27, 1932, and effective January 1, 1936 (C. B. XIV–2, 535):

(1) Amounts paid as consideration for the right to use patents, secret processes and formulas, trade marks and other analogous rights;

(2) Income received as copyright royalties; and

(3) Private pensions and life annuities.

The items of fixed and determinable income enumerated above paid to citizens of France residing in France and corporations organized under the laws of France are not subject to the withholding provisions of the Revenue Act of 1936, The person paying such income should be notified by letter from the French citizen or corporation, as the case may be, that the income is exempt from taxation under the provisions of the convention and protocol referred to above. Such letter from a citizen of France shall contain his address and a statement that he is a citizen of France residing in France. The letter from such corporation shall contain the address of its office or place of business and a statement that it is a corporation organized under the laws of the Republic of France, and shall be signed by an officer of the corporation giving his official title. The letter of notification or a copy thereof should be immediately forwarded by the recipient to the Commissioner of Internal Revenue, Sorting Section, Washington, D. C.

(b) *Discontinuance of exemption certificates.*—A nonresident alien individual not engaged in trade or business within the United States and not having an office or place of business therein is subject to the tax imposed by section 211 (a) of the Act on gross income and is not entitled to any personal exemption or credit for dependents. Although a nonresident alien individual who is engaged in trade or business within the United States or has an office or place of business therein is entitled to the personal exemption of $1,000 (and a credit for dependents if he is a resident of Canada or Mexico), he is subject to the normal tax and the surtax imposed by sections 11 and 12 of the Act by reason of the provisions of section 211 (b) and the benefit of the personal exemption and credit for dependents may not be received by filing a claim therefor with the withholding agent. Accordingly, the use of exemption certificates by nonresident alien individuals as provided for in prior regulations is hereby discontinued. For relief from withholding with respect to compensation for personal services in the case of nonresident aliens, residents of Canada or Mexico, who enter and leave the United States at frequent intervals, see article 4 (a).

ART. 5. *Ownership certificates for bond interest.*—In accordance with the provisions of section 147 (b), citizens and resident individuals and fiduciaries, resident partnerships

and nonresident partnerships all of the members of which are citizens or residents, owning bonds, mortgages, or deeds of trust, or other similar obligations issued by a domestic corporation, a resident foreign corporation, or a nonresident foreign corporation having a fiscal agent or a paying agent in the United States, when presenting interest coupons for payment shall file ownership certificates for each issue of such obligations regardless of the amount of the coupons.

In the case of interest payments on overdue coupon bonds, the interest coupons of which have been exhausted, ownership certificates are required to be filed when collecting the interest in the same manner as if interest coupons were presented for collection.

In all cases where the owner of bonds, mortgages, or deeds of trust, or other similar obligations of a corporation is a nonresident alien, a nonresident partnership composed in whole or in part of nonresident aliens, a nonresident foreign corporation, or where the owner is unknown, an ownership certificate for each issue of such obligations shall be filed when interest coupons for any amount are presented for payment. The ownership certificate is required whether or not the obligation contains a tax-free covenant. However, ownership certificates need not be filed by a nonresident alien, a partnership composed in whole of nonresident aliens, or a nonresident foreign corporation in connection with interest payments on such bonds, mortgages, or deeds of trust or other similar obligations of a domestic or resident foreign corporation qualifying under section 119 (a) (1) (B) of the Revenue Act of 1936, or of a nonresident foreign corporation.

The ownership certificate shall show the name and address of the debtor corporation, the name and address of the owner of the obligations, a description of the obligations, the amount of interest and its due date, the rate at which tax is to be withheld, and the date upon which the interest coupons were presented for payment.

Ownership certificates need not be filed in the case of interest payments on obligations of a State, Territory, or any political subdivision thereof, or the District of Columbia; or obligations of a corporation organized under Act of Congress, if such corporation is an instrumentality of the United States; or the obligations of the United States or its possessions. (See section 22 (b) (4) of the Act.) Ownership certificates are not required to be filed in connection with interest payments on bonds, mortgages, or deeds of trust, or other similar obligations issued by an individual or a partnership. Ownership certificates are not required where the owner is a domestic corporation, a resident foreign corporation, or a foreign government.

When interest coupons detached from corporate bonds are received unaccompanied by ownership certificates, unless the owner of the bonds is known to the first bank to which the coupons are presented for payment, and the bank is satisfied that the owner is a person who is not required to file an ownership certificate, the bank shall require of the payee a statement showing the name and address of the person from whom the coupons were received by the payee, and alleging that the owner of the bonds is unknown to the payee. Such statement shall be forwarded to the Commissioner with the monthly return on Form 1012. The bank shall also require the payee to prepare a certificate on Form 1001, crossing out "owner" and inserting "payee" and entering-the amount of the interest on line 3, and shall stamp or write across the face of the certificate "Statement furnished", adding the name of the bank.

Ownership certificates are required in connection with interest payments on registered bonds as in the case of coupon bonds, except that if ownership certificates are not furnished by the owner of such bonds, ownership certificates must be prepared by the withholding agent.

ART. 6. *Form of certificate for citizens or residents.*—For the purpose of article 5, Form 1000 shall be used in preparing ownership certificates of citizens or residents of the United States (individual or fiduciary), resident partnerships, and nonresident partnerships all of the members of which are citizens or residents. If the obligations are issued by a nonresident foreign corporation having a fiscal or paying agent in the United States, Form 1000 should be modified to show the name and address of the fiscal agent or the paying agent in addition to the name and address of the debtor corporation.

ART. 7. *Form of certificate for nonresident aliens, nonresident foreign corporations, and unknown owners.*—For the purpose of article 5, Form 1001 shall be used in preparing ownership certificates (a) of nonresident aliens, (b) of nonresident partnerships composed in whole or in part of nonresident aliens, (c) or nonresident foreign corporations, and (d) where the owner is unknown.

For the purpose of this article and articles 5, 6, and 9, existing ownership certificate forms, properly modified, may be used pending the issuance of revised forms.

ART. 8. *Return and payment of tax withheld.*—Every withholding agent shall make on or before March 15 an annual return on Form 1013 of the tax withheld from interest on corporate bonds or other obligations. This return should be filed with the collector for the district in which the withholding agent is located. The withholding agent shall also make a monthly return on Form 1012 on or before the 20th day of the month following that for which the return is made. The ownership certificates, Forms 1000 and 1001, must be forwarded to the Commissioner with the monthly return. Such of the forms as report interest from which the tax is to be withheld should be listed on the monthly return. While the forms reporting interest from which no tax is to be withheld need not be listed on the return, the number of such forms submitted should be entered in the space provided. If Form 1000 is modified to show the name and address of a fiscal or paying agent in the United States (see article 6), Forms 1012 and 1013 should be likewise modified.

Every person required to deduct and withhold any tax from income other than such bond interest shall make an annual return thereof to the collector on or before March 15 on Form 1042, showing the amount of tax required to be withheld for each nonresident alien, nonresident partnership composed in whole or in part of nonresident aliens, or nonresident foreign corporation to which income other than bond interest was paid during the previous taxable year. Form 1042 should be filed with the collector for the district in which the withholding agent is located. In every case of both classes the tax withheld must be paid on or before June 15 of each year to the collector. For penalties and additions to the tax attaching upon failure to make such returns or such payment, see sections 145 and 291 of the Act.

If a debtor corporation has designated a bank to act for it as withholding agent, and the bank has not collected any tax from the bondholders nor received any funds from the debtor corporation to pay the tax which the debtor corporation assumed in connection with its tax-free covenant bonds, the bank cannot be held liable for the tax merely by reason of its appointment as withholding agent. If a duly authorized withholding agent has become insolvent or for any other reason fails to make payment to the collector of internal revenue of money deposited with it by the debtor corporation to pay taxes, or money withheld from bondholders, the debtor corporation is no discharged of its liability under section 143 (a) (1), since the withholding agent is merely the agent of the debtor corporation.

ART. 9. *Ownership certificates in the case of fiduciaries and joint owners.*—If fiduciaries have the control and custody of more than one estate or trust, and such estates and trusts have as assets bonds of corporations and other securities, a certificate of ownership shall be executed for each estate or trust, regardless of the fact that the bonds are of the same issue. The ownership certificate should show the name of the estate or trust, in addition to the name and address of the fiduciary. If bonds are owned jointly by two or more persons, a separate ownership certificate must be executed in behalf of each of the owners.

ART. 10. *Return of income from which tax was withheld.*—The entire amount of the income from which the tax was withheld shall be included in gross income in the return made by the recipient of the income without deduction for such payment of the tax. But any tax so withheld shall be

credited against the total income tax as computed in the taxpayer's return. If the tax is paid by the recipient of the income or by the withholding agent it shall not be re-collected from the other, regardless of the original liability therefor, and in such event no penalty will be asserted against either person for failure to return or pay the tax where no fraud or purpose to evade payment is involved

ART. 11. *Withholding in the case of nonresident foreign corporations.*—A tax of 15 per cent is required to be withheld in the case of fixed or determinable annual or periodical income paid to a nonresident foreign corporation except (1) income from sources without the United States, including interest on deposits by persons carrying on the banking business paid to persons not engaged in business in the United States and not having any office or place of business therein, (2) interest upon bonds or other obligations of a corporation containing a tax-free covenant and issued before January 1, 1934, where the liability assumed by the obligor does not exceed 2 per cent of the interest, and (3) dividends.

Withholding of a tax at the rate of 2 per cent is required in the case of interest payments made to a nonresident foreign corporation, representing income from sources within the United States, paid upon corporate bonds or other obligations containing a tax-free covenant, issued before January 1, 1934, where the liability assumed by the obligor exceeds 2 per cent of the interest.

A tax of 10 per cent is required to be withheld from income from sources within the United States paid to a nonresident foreign corporation which consists of dividends (other than dividends distributed by a corporation organized under the China Trade Act, 1922, to a resident of China) except that such rate of 10 per cent shall be reduced, in the case of corporations organized under the laws of a contiguous country, to such rate (not less than 5 per cent) as may be provided by treaty with such country. Dividends paid by a foreign corporation are not, however, subject to withholding unless such corporation is engaged in trade or business within the United States or has an office or place of business therein and more than 85 per cent of the gross income of such foreign corporation for the three-year period ending with the close of its taxable year preceding the declaration of such dividends (or for such part of such period as the corporation has been in existence) was derived from sources within the United States as determined under the provisions of section 119 of the Act.

For withholding in the case of dividends distributed by a corporation organized under the China Trade Act, 1922, see articles 4 and 12.

ART. 12. *Withholding by a China Trade Act corporation.*—Dividends distributed by a corporation organized under the China Trade Act, 1922, which are treated as income from sources within the United States under the provisions of section 119 of the Act are subject to withholding at the rate of 10 per cent when paid to persons (other than residents of China) who are (1) nonresident aliens, (2) nonresident partnerships composed in whole or in part of nonresident aliens, or (3) nonresident foreign corporations. The 10 per cent rate of withholding specified in this article with respect to dividends shall be reduced in the case of shareholders who are (a) nonresident aliens residents of a contiguous country or (b) nonresident foreign corporations organized under the laws of a contiguous country, to such rate (not less than 5 per cent), as may be provided by treaty with such country.

ART. 13. *Aids to withholding agents in determining liability for withholding of tax.*—Since no withholding of tax on bond interest or other income is required in the case of a resident foreign corporation, the person paying such income should be notified by a letter from such corporation that it is not subject to the withholding provisions of the Act. The letter from the corporation shall contain the address of its office or place of business in the United States and be signed by an officer of the corporation giving his official title. Such letter of notification, or copy thereof, should be immediately forwarded by the recipient to the Commissioner of Internal Revenue, Sorting Section, Washington, D. C.

Although the burden of withholding tax from dividends is placed upon the payor corporation, or any other person (including a nominee), having the control, receipt, custody, disposal, or payment of dividends, if such payor corporation or person has no other reason to believe that the dividends are subject to withholding, the following procedure in general may be adopted:

(1) As to those stockholders whose name and style indicate that they are nonresident aliens, foreign partnerships, or foreign corporations, the tax shall be withheld in all cases if the address of any such stockholder is without the United States.

(2) If the address of such stockholders is in care of an individual, a partnership, or a corporation within the United States, the tax shall likewise be withheld, but as to any stockholder whose address is within the United States, the tax need not be withheld.

[SEAL]                                      CHAS. T. RUSSELL,
                          *Acting Commissioner of Internal Revenue.*

Approved, June 25, 1936.

HENRY MORGENTHAU, JR.,
          *Secretary of the Treasury.*

[F. R. Doc. 1015—Filed, June 26, 1936; 12:39 p. m.]

---

# DEPARTMENT OF THE INTERIOR.

## National Park Service.

### RULES AND REGULATIONS

Made, published, and approved by the Secretary of the Interior on the 18th day of June 1936, and to continue in force and effect until otherwise directed by the said Secretary.

#### GENERAL PROVISIONS

Pursuant to the authority granted to the Secretary of the Interior by the Act of August 25, 1916 (ch. 408, sec. 3, 39 Stat. 535), as amended by the Act of June 2, 1920 (ch. 218, sec. 5, 41 Stat. 731), and by the Act of March 7, 1928 (ch. 137, sec. 1, 45 Stat. 200, 235); and pursuant to the authority granted to the Secretary of War by the Act of March 2, 1933 (ch. 180, 47 Stat. 1420), and transferred to the Secretary of the Interior by Executive Order No. 6166, June 10, 1933, as interpreted by Executive Order No. 6228, July 28, 1933, under the authority of the Act of March 3, 1933 (ch. 212, sec. 403, 47 Stat. 1489, 1518); and pursuant to the authority granted to the Secretary of the Interior by various Acts of Congress relating to particular parks, monuments, and reservations: the following regulations are hereby made and published for the proper use, management, government, and protection of, and maintenance of good order in all the National Parks, National Monuments, National Military Parks, National Historical Parks, Battlefield Sites, and miscellaneous memorials which are, or hereafter may be, under the administrative jurisdiction of the National Park Service of the Department of the Interior: *Provided, however,* That these rules and regulations shall not apply to National Cemeteries or to National Capital Parks. All previous rules and regulations (except the uniform rules and regulations prescribed December 28, 1906, by the Secretaries of the Interior, Agriculture, and War, to carry out the provisions of the "Act for the Preservation of American Antiquities", approved June 8, 1906 (34 Stat. 225), and except such local subsidiary regulations as are continued in force under the provisions hereof), for such National Parks, National Monuments, National Military Parks, National Historical Parks, Battlefield Sites, and miscellaneous memorials, are hereby repealed.

*Definitions.*—The term "park", when used in these rules and regulations, unless otherwise indicated, shall be construed to include National Parks, National Military Parks, and National Historical Parks; and the term "monument," when used in these rules and regulations, unless otherwise indicated, shall be construed to include National Monuments,

Battlefield Sites, and miscellaneous memorials. The term "superintendent", when used in these rules and regulations, shall be construed to include a custodian, caretaker, or other person in charge of a National Park, National Monument, National Military Park, National Historical Park, Battlefield Site, or miscellaneous memorial.

1. *Preservation of public property, natural features and curiosities.*—The destruction, injury, defacement, removal, or disturbance in any way of any public building, sign, equipment, monument, statue, marker, or other structure, or of any tree, flower, vegetation, rock, mineral, formation, stalactite, stalagmite, phenomenon of crystallization, incrustation in any lava tube, cave, steam vent, or cone, or of any animal, bird, or other wildlife, or of any ruins or relics, or of any other public property of any kind is prohibited: *Provided,* That flowers may be gathered in small quantities when, in the judgment of the superintendent or custodian, their removal will not impair the beauty of the park or monument. Before any flowers are picked, permit must be secured from the superintendent or custodian.

Sequoia cones shall not be disturbed, or removed from any national park or monument.

No canes, umbrellas, or sticks of any kind may be taken into caves or caverns. The tossing or throwing of rocks or other material inside the caves or caverns is prohibited.

Collections for scientific or educational purposes shall be permitted only in accordance with written permits first had and obtained from the superintendent.

Bona-fide claimants or entrymen claiming or owning land reasonably adjacent to Grand Teton National Park must secure written permits before cutting any dead or down timber within the park, and are restricted to cutting such timber for firewood for their own consumption.

Visitors in Hawaii National Park may, with the permission of the park superintendent, pick and eat, or carry away, such fruits as the superintendent may designate.

2. *Camping.*—(a) No camping is permitted outside the specially designated camp sites, except when necessary in connection with trips to isolated sections of the parks and monuments.

(b) No person, party, or organization shall be permitted to camp in any public camping area in the parks or monuments more than 30 days in any calendar year.

(c) Campers shall keep their campgrounds clean. Combustible rubbish shall be burned on camp fires and all other garbage and refuse of all kinds shall be placed in garbage cans provided for the purpose. At new or unfrequented camps, garbage shall be burned or buried.

(d) Campers and others shall not wash clothing or cooking utensils in, or pollute in any other manner, the waters of the parks or monuments. Bathing in any of the streams or lakes near the regularly travelled thoroughfares in the parks and monuments is not permitted without suitable bathing clothes.

(e) Saddle, pack, or draft animals shall not be kept in or near any camping area. No such animals shall be kept on the floor of Yosemite Valley except in the operator's corral.

(f) Only in areas designated by the park superintendent may campers use any dead or fallen timber for fuel, except that Sequoia wood or bark shall not be disturbed for any purpose.

(g) The installation of permanent camping facilities by visitors is prohibited in all parks and monuments. The digging or leveling of the ground in any camp site without a ranger's permission is prohibited.

(h) Camps must be completely razed and the sites cleaned before the departure of campers. In dismantling camps, all material, such as poles, bark, planks, platforms, etc., used in construction of temporary camps must be removed, and, if combustible, must be piled on the public camp woodpiles.

(i) Campers shall not leave their camps unattended for more than 48 hours without special permission of the superintendent, obtained in advance. Camping equipment left unattended in any public camping area for 48 hours or more is subject to removal by order of the superintendant,

the expense of such removal to be paid by the person or persons leaving such equipment.

(j) No camp may be established in a park or monument and used as a base for hunting outside such park or monument.

(k) No camp shall be placed within 25 feet of any well-defined water course, water hydrant, or main road.

(l) Any article likely to frighten horses shall not be hung near a road or trail used by horses.

(m) The superintendents or custodians may, with the approval of the Director of the National Park Service, establish hours during which quiet must be maintained at any camp, and prohibit the running of motors at or near a camp during such hours.

(In Hot Springs National Park, the superintendent may establish the hours during which bathing will be permitted in the pool.)

(n) No visitors shall be permitted to camp within the canyon in Canyon de Chelly National Monument.

(o) No camping is permitted in any part of the Muir Woods National Monument, and no hikers or visitors shall enter or remain therein between one-half hour after sunset and one-half hour before sunrise.

3. *Picnicking.*—Picnicking or the eating of lunches is prohibited in restricted areas designated by the superintendent.

4. *Use of park waters.*—In Platt National Park the superintendent may, whenever it becomes necessary to do so, restrict the use of the waters of any of the springs in the park to immediate drinking purposes at such springs.

5. *Sanitation.*—(a) Garbage, papers, or refuse of any kind shall not be thrown or left on or along roads, in camping or picnic areas, or on any other park or monument lands.

(b) All comfort stations shall be used in a clean and sanitary manner.

(c) Contamination of watersheds, of water supplies, or of any water used for drinking purposes is strictly prohibited.

6. *Fires.*—Fires shall not be kindled near or on the roots of trees, dead wood, moss, dry leaves, forest mold, or other vegetable refuse, but in some open space on rocks or earth. On public campgrounds the regular fireplaces constructed for the convenience of visitors must be used. Should camp be made in a locality where no such open space exists or is provided, the dead wood, moss, dry leaves, etc., shall be scraped away to the rock or earth over an area considerably larger than that required for the fire.

Fires shall be lighted only when necessary and, when no longer needed, shall be completely extinguished, and all embers and beds smothered with earth or water, so that there remains no possibility of reignition.

Permission to burn on any cleanup operation within the parks or monuments must first be obtained in writing from the office of the superintendent or custodian, and in such cases as it is deemed advisable such burning will be under Government supervision. All costs of suppression and all damage caused by reason of loss of control of such burning operations shall be paid by the person or persons to whom such permit has been granted.

No lighted cigarette, cigar, pipe heel, match, or other burning material shall be thrown from any vehicle or saddle horse or dropped into any grass, leaves, twigs, tree mold, or other combustible or inflammable material.

Smoking or the building of fires on any lands within the parks or monuments may be prohibited or limited by the superintendent or custodian when, in his judgment, the hazard makes such action necessary.

All persons making trips away from established camps are required to obtain written fire permits from the nearest ranger before building camp fires.

The use of fireworks or firecrackers in the parks and monuments is prohibited, except with the written permission of the superintendent or custodian.

7. *Protection of wildlife.*—The parks and monuments are sanctuaries for wildlife of every sort, and all hunting, or the killing, wounding, frightening, capturing, or attempting to

capture at any time of any wild bird or animal, except dangerous animals when it is necessary to prevent them from destroying human lives or inflicting personal injury, is prohibited within the limits of the parks and monuments.

Unauthorized possession within a part or monument of the dead body or any part thereof of any wild bird or animal shall be prima facie evidence that the person or persons having the same are guilty of violating this regulation.

During the hunting season arrangements must be made at entrance stations to identify and transport through the parks and monuments, where necessary, the carcasses of birds or animals legally killed outside the parks and monuments. Failure to make such arrangements shall be deemed a violation of this regulation.

8. *Firearms, etc.*—Firearms, explosives, traps, seines, and nets are prohibited within the parks and monuments, except upon written permission of the superintendent or custodian. Visitors entering or traveling through the parks and monuments to places beyond shall, at entrance, report and, if required to do so, surrender all such objects in their possession to the first park or monument officer, and, in proper cases, may obtain his written permission to carry them through the park or monument sealed. Failure to obtain such written permission shall be deemed a violation of this regulation. The Government assumes no responsibility for the loss of, or damage to, any such objects so surrendered to any park or monument officer, nor are park or monument officers authorized to accept the responsibility or custody of any other property for the convenience of the visitors.

9. *Fishing.*—Persons desiring to fish in the waters of the Yosemite, Sequoia, Lassen, General Grant, Grand Canyon, Grand Teton, Acadia, Wind Cave, Great Smoky Mountains, Mammoth Cave, and Zion National Parks, and the national monuments under the jurisdiction of the National Park Service must secure a sporting fishing license, as required by the laws of the state in which such park or monument is situated. All fishing in such parks and monuments must be done in conformity with the laws of the state regarding open seasons, size of fish, and the limit of catch, except as otherwise provided in the following paragraphs, which are applicable to all parks and monuments:

Fishing with nets, seines, traps, or by the use of drugs or explosives, or for merchandise or profit, or in any other way than with hook and line, the rod or line being held in hand, is prohibited.

Fishing in particular waters may be suspended, or restricted in regard to the use of particular kinds of bait, when the superintendent or custodian, with the approval of the Director of the National Park Service, shall determine such suspension or restriction necessary and shall post such restrictions or suspensions.

The number of fish that may be taken by one person in any one day from the various lakes and streams may be regulated by the superintendent or custodian, with the approval of the Director of the National Park Service. Unless otherwise determined and posted, the number shall be limited to 10 fish. Possession of more than two days' catch by any person at any one time shall be construed as a violation of this regulation.

No fish less than six inches long may be retained, unless a different limit be determined by the superintendent with the approval of the Director of the National Park Service and posted in the particular park or monument. All fish hooked less than such limit in length shall be carefully handled with moist hands and returned at once to the water if not seriously injured. Undersized fish retained because seriously injured shall be counted in the number of fish which may be taken in one day.

The possession of live minnows, chubs, or other bait fish, or the use thereof as bait, is prohibited in all the national parks and monuments, except Acadia National Park and Fort Jefferson National Monument.

The digging of worms for bait is prohibited in all parks and monuments.

The canning or curing of fish for the purpose of transporting them out of a national park or monument is prohibited.

The possession of fishing tackle, upon or along any waters closed to fishing shall be prima facie evidence that the person or persons having such fishing tackle are guilty of unlawful fishing in such closed waters.

Fishing is prohibited in the Muir Woods National Monument.

All waters of the Shenandoah National Park are closed to fishing until further notice. This, however, shall not apply to occupants of or guests at the President's Camp on the Rapidan.

10. *Private operations.*—No person shall reside permanently in a national park or monument. No person, firm, or corporation shall engage in or solicit any business, or erect buildings in the parks or monuments without permission in writing from the Director of the National Park Service, Washington, D. C. Applications for such permission may be addressed to the Director through the superintendents and custodians of the parks and monuments.

In Mount McKinley National Park, prospectors and miners may erect necessary shelter cabins or other structures necessary in mining operations on bona fide locations in the park.

11. *Public speeches.*—No person shall make or deliver any address, speech, or sermon upon any subject whatever in Platt National Park without first obtaining a permit in writing from the superintendent, which permit the superintendent is hereby authorized to issue in proper cases and which shall designate the time and locality where such address, speech, or sermon may be given.

12. *Radios.*—The use of radios in public camps, hotels, or other buildings, or in automobiles is prohibited when audible beyond the immediate vicinity of the radio set. Radios shall not be operated to the annoyance of other persons nor so as to disturb the quiet of camps or other public places. The erection of aerials or other radio installations is prohibited.

13. *Cameras.*—Before still pictures may be taken for commercial purposes and before a motion or sound picture requiring the use of artificial or special settings, or special equipment, or involving the performance of a professional cast, may be filmed in any of the parks or monuments, authority must first be obtained, in writing, from the Secretary of the Interior. Still and motion picture cameras may be freely used by amateurs in the parks and monuments for general scenic purposes.

Superintendents may issue permits to take still and motion pictures in the parks and monuments under their supervision without such previous authorization by the Secretary of the Interior, in the following circumstances, and on condition that the permittees shall refrain from offering any gratuity of whatsoever nature to any employee of the Government in connection with the exercise of the privilege herein authorized to be granted:

1. Professional photographers and motion-picture cameramen desiring to take scenes of, or events in, the national parks as representatives of news concerns and for bona fide news publication;

2. Professional photographers and motion-picture cameramen desiring to take scenes of, or events in, the national parks, not for sale or for exhibition when paid admissions are charged, but for the purpose of stimulating general or park travel;

3. Professional photographers and motion-picture cameraman desiring to take scenes of, or events in, the national parks, for non-profit educational purposes;

4. Professional photographers desiring to take park scenes for general artistic purposes.

14. *Gambling.*—Gambling in any form, or the operation of gambling devices, whether for merchandise or otherwise, is prohibited.

15. *Advertisements.*—Private notices or advertisements shall not be posted, distributed, or displayed in the parks or monuments, excepting such as the superintendent or custodian may deem necessary for the convenience and guidance of the public.

16. *Mining claims.*—The location of mining claims on lands within the parks and monuments is prohibited, except

in Mount McKinley National Park and in Death Valley National Monument. This regulation is subject to the further exception contained in the Act of Congress approved February 14, 1931 (46 Stat. 1161), reserving to the Navajo Tribe of Indians the mineral rights in the Canyon de Chelly National Monument.

Mining in Mount McKinley National Park may be regulated by the Secretary of the Interior as to surface use of locations under the Act of January 26, 1931 (46 Stat. 1043).

Mining in Death Valley National Monument is subject to the following special regulations, which are prescribed to govern the surface use of claims therein:

(a) The claim shall be occupied and used exclusively for mineral exploration and development and for no other purpose; except that, upon written permission of the Director of the National Park Service, the surface of the claim may be used for other specified purposes, the use to be on such conditions and for such period as may be prescribed when permission is granted.

(b) The owner of the claim and all persons holding under him shall conform to all rules now prescribed or which may be made applicable by the Director of the National Park Service, governing occupancy of lands within the national monument.

(c) The use and occupancy of the surface of mining claims as prescribed above shall apply to all such claims located after the date of the Act of June 13, 1933, within the limits of the national monument as fixed by the proclamation of February 11, 1933, and to all mining claims on lands hereafter included in the National monument, located after such inclusion, so long as such claims are within the boundaries of said monument.

(d) Prospectors or miners shall not open or construct roads or vehicle trails without first obtaining a permit from the Director of the National Park Service. Applications for permits may be made through the custodian of the monument, upon submitting a map or sketch showing the location of the mining property to be served and the location of the proposed road or vehicle trail. The permit may be conditioned upon the permittee's maintaining the road or trail in a passable condition as long as it is used by the permittee or his successors.

17. *Archeologic ruins and objects.*—Visitors shall not be permitted to visit the ruins in Mesa Verde National Park nor to enter the canyon in Canyon de Chelly National Monument unless accompanied by National Park Service employees. The superintendent may waive this requirement in Mesa Verde National Park by issuing a special written permit to persons engaged in scientific studies.

Visitors shall not remove any artifacts or other objects of archeological or historical significance from the place where they may be found, nor purchase any such objects from Indians or others. Any such objects purchased or removed in violation of this regulation shall be delivered to the superintendent or his representative on demand.

18. *Lost articles.*—Persons finding lost articles, other than relics, should deposit them at the office of the superintendent or custodian, or at the nearest ranger station, leaving their own names and addresses, so that if the articles are not claimed by the owners within 60 days, they may be turned over to those who found them.

19. *Private lands.*—Owners of private lands within the limits of any park or monument are entitled to the full use and enjoyment thereof; the boundaries of such lands, however, shall be determined, and marked and defined, so they may be readily distinguished from the park or monument lands. While no limitations or conditions are imposed upon the use of private lands so long as such use does not interfere with or injure the Government lands, private owners shall provide against trespass by their livestock upon lands of the parks or monuments, and all trespasses committed will be punished to the full extent of the law. Stock may be taken over the lands of parks and monuments with the written permission and under the supervision of the superintendent or custodian, but such permission and super-

vision are not required when access to such private lands is had wholly over roads or lands not owned or controlled by the United States.

20. *Grazing.*—The running at large, herding, or grazing of livestock of any kind on the Government lands in the parks and monuments, as well as the driving of livestock over the same, is prohibited, except where authority therefor has been granted by the superintendent or custodian, with the approval of the Director of the National Park Service. The owners of livestock found improperly on the park or monument lands will be prosecuted.

The above regulation is subject to the exception contained in the provisions of the Act of Congress approved February 26, 1929 (45 Stat. 1314), relating to grazing in Grand Teton National Park, and to the exception contained in the Act of Congress approved February 14, 1931 (46 Stat. 1161), reserving to the Navajo Tribe of Indians the right to the surface use of the lands in the Canyon de Chelly National Monument for agricultural, grazing, or other purposes.

No authority may be granted for grazing in the Yellowstone National Park.

21. *Authorized operators.*—All persons, firms, or corporations holding franchises in the parks and monuments shall keep the grounds used by them properly policed and shall maintain the premises in a sanitary condition to the satisfaction of the superintendent or custodian. No operator shall retain in his employment a person whose presence in the park or monument may be deemed by the superintendent or custodian subversive to the good order and management of the park or monument.

All operators shall require each of their public contact employees to wear a metal badge with a number thereon, or other mark of identification. The name and number corresponding therewith, or the identification mark, shall be registered in the office of the superintendent or custodian. These badges must be worn in plain sight.

22. *Fraudulently obtaining accommodations.*—The obtaining of food, lodging, or other accommodations in the national parks and monuments with intent to defraud is forbidden, and such fraudulent intent will be presumed from refusal or neglect to pay therefor on demand, or payment therefor with negotiable paper on which payment is refused, or absconding without paying or offering to pay therefor, or false or fictitious showing or pretense of baggage or other property, or surreptitious removal or attempted removal of baggage.

23. *Dogs and cats.*—(a) Dogs and cats are prohibited on the Government lands in the parks and monuments, except that upon written permission of the superintendent or custodian, secured upon entrance, they may be transported over through roads by persons passing through the parks and monuments provided they are kept under leash, crated, or otherwise under restrictive control of the owner at all times while in the park or monument: *Provided, however,* That employees and others may be authorized by the superintendent or custodian to keep dogs for official purposes in the administrative area of a park or monument, and subject to such further conditions as may be determined by the superintendent or custodian.

(b) Stray dogs or cats running at large in the parks and monuments may be killed to prevent molestation of the wild-life therein.

(c) In Mount McKinley National Park, dogs may be used for hauling, with the permission of the superintendent and subject to the following rights and restrictions: In the winter, prospectors and miners may use such dogs as may be necessary for a reasonable time for heavy hauling of supplies, fuel, timber, and other objects; thereafter each person is limited to seven dogs. In the summer, no dogs are allowed except in special cases. In no case nor at any time shall litters of pups be raised in the park except by special permission of the superintendent. Persons entering the park with dogs must register at McKinley Park entrance, Katishna entrance, or the nearest ranger station, giving such information as may be required by the superintendent.

24. *Bears.*—Feeding of bears in campgrounds and populated areas is prohibited; feeding directly from the hand, touching, teasing, or molesting of bears is prohibited.

25. *Dead animals.*—All domestic or grazed animals that may die on any Government lands in the parks or monuments shall be buried immediately by the owner or person having charge of such animals, at least two feet beneath the ground, and in no case less than one-fourth mile from any camp or thoroughfare.

26. *Pack trains and saddle horse parties.*—(a) No pack train or saddle horse party shall be allowed in Crater Lake, General Grant, Glacier, Grand Canyon, Hawaii, Lassen Volcanic, Mesa Verde, Mount McKinley, Mount Rainier, Rocky Mountain, Yellowstone, Yosemite, Zion, and Bryce Canyon National Parks, unless in charge of an approved guide. Guides may be required to pass on examination prescribed by the superintendent. At the discretion of the superintendent, guides will be permitted to carry unsealed firearms. Prospectors and miners in Mount McKinley National Park are excepted from the operation of this regulation.

(b) No persons may pass through or camp in any of the national parks, except Sequoia and Grand Teton National Parks, using animals or camp equipment not hired from the authorized operators of saddle horse service, where such service is established at the park under contract with the Secretary of the Interior, unless the animals and equipment belong to a member or members of the party, and unless the other members are not renting, or in any way paying for the use of the animals or equipment, and unless the owners are not making the trip under any lease arrangement, and shall satisfy the superintendent that such are the facts.

(c) To conduct or operate, or to cause to be conducted or operated, a saddle horse party into, or to act as guide for any purpose within any of the parks mentioned in paragraph (a) of this regulation, without the written permission of the Director of the National Park Service or the superintendent of the park, is prohibited; and the person or persons so conducting, operating, or causing to be conducted or operated, or acting as guide, shall be subject to the penalties prescribed by law for a violation of these regulations.

No saddle horses shall be permitted in the Muir Woods National Monument on Sundays or holidays.

27. *Begging, soliciting, etc.*—Begging is prohibited within the parks and monuments.

Hitch-hiking is prohibited within the parks and monuments.

Drumming and soliciting within the Hot Springs National Park for any physician, surgeon, or any person publicly professing to relieve, cure, or heal, or for any bathhouse receiving water from the Hot Springs National Park, are prohibited.

28. *Disorderly conduct.*—Persons who render themselves obnoxious by disorderly conduct or bad behavior shall be subject to the punishment hereinafter prescribed for violation of these regulations, and may be summarily removed from the park or monument by the superintendent or custodian.

29. *Improper clothing.*—The wearing of bathing suits, scanty or objectionable clothing, without proper covering, is prohibited in automobiles, on bicycles, in public places, hotels, camps, lodges, villages, or stores. Proper covering is hereby defined as such covering as will be at least the equivalent of sleeveless upper shirt and shorts.

30. *Abandonment of property.*—The abandonment of any personal property in the parks and monuments is prohibited.

31. *Mountain summit climbing.*—In Mount McKinley and Mount Rainier National Parks, mountain climbing shall be undertaken only with the permission of the superintendent of the park. To insure reasonable chances of success, he shall not grant such permission until he is satisfied that all members of the party are properly clothed, equipped, and shod, are qualified physically and through previous experience to make the climb, and that the necessary supplies are carried. No individual will be permitted to start alone for the summit of Mount McKinley or Mount Rainier.

While the Government assumes no responsibility in connection with any kind of accident to mountain-climbing parties, all persons starting to ascend Mount McKinley or Mount Rainier will fill out an information blank furnished by the superintendent and shall report to him upon return. When the superintendent deems such action necessary he may prohibit all mountain climbing in the park.

32. *Reports of accidents.*—All accidents of whatever nature shall be reported as soon as possible by the person or persons involved, to the superintendent or at the nearest ranger station.

33. *Guide and elevator fees for Carlsbad caverns.*—In Carlsbad Caverns National Park, no person or persons shall be permitted to enter the caverns unless accompanied by National Park Service employees. Competent guide service is provided for the public by the Government, for which a fee of $1.50 shall be charged each person entering the caverns: *Provided,* That in proper cases and upon application made in advance, the Director of the National Park Service may authorize admission without charge for service to persons from reputable educational institutions for the purpose of prosecuting class work or studies, or to persons under the support and care of charitable institutions and their attendants. No charge shall be made for children 16 years of age, or under, when accompanied by adults taking responsibility for their safety and orderly conduct while in the caverns.

For the use of the elevator in the caverns, a fee of $0.50 in each direction shall be charged each person using the same, except children between the ages of five and twelve years, for which half-fare, or $0.25 in each direction shall be charged. No charge for this service shall be made for children five years of age, or under, when accompanied by adults assuming responsibility for their safety.

34. *Guide and elevator fees for Wind Cave.*—In Wind Cave National Park, no person or persons shall be permitted to enter the cave, unless accompanied by National Park Service employees. Competent guide service is provided for the public by the Government for which a fee of 75¢ shall be charged each adult person entering the cave. The 75¢ fee for adults shall include the use of the elevator: *Provided,* That, in proper cases and upon application made in advance, the Director of the National Park Service may authorize admission without charge for guide and elevator service to persons from reputable educational institutions for the purpose of prosecuting class work or studies, or to persons under the support and care of charitable institutions and their attendants.

Children 16 years of age, or under, when accompanied by adults taking responsibility for their safety and orderly conduct while in the cave shall be charged 25¢ each, including the use of the elevator, except children between the ages of five and twelve years who shall be charged 15¢ each, including the use of the elevator. No charge whatever shall be made for children five years of age, or under, when accompanied by adults assuming responsibility for their safety.

35. *Carrying of firearms by park employees.*—The superintendent or custodian of a park or monument may, in his discretion, permit the carrying of firearms by employees under his administrative jurisdiction when such possession is deemed necessary in the performance of official duties.

36. *Guide fees for Lehman Caves.*—In Lehman Caves National Monument, no person or persons shall be permitted to enter the caves unless accompanied by National Park Service employees. Competent guide service is provided for the public by the Government, for which a fee of $0.50 shall be charged each person entering the caves, except that when a group of ten or more persons over 16 years of age is guided through the caves at one time, the fee shall be $0.25 for each person: *Provided,* That in proper cases and upon application made in advance, the Director of the National Park Service may authorize admission without charge for guide service to persons from reputable educational institutions for the purpose of prosecuting class work or studies, or to persons under the support and care of charitable institutions and their attendants. No charge shall be made for children 16 years of age, or under, when accompanied by adults assuming responsibility for their safety and orderly conduct while in the caves.

TRAFFIC

37. *Travel on trails.*—Pedestrians on trails shall remain quiet when saddle or pack animals are passing.

Persons traveling on the trails of the parks or monuments, either on foot or on saddle animals, shall not make short cuts, but shall confine themselves to the main trails. Any or all roads and trails in the parks and monuments may be closed to public use by order of the superintendent or custodian when, in his judgment, conditions make travel thereon hazardous or dangerous, or when such action is necessary to protect the parks or monuments.

Motorcycles shall not be operated upon trails.

38. *Travel on roads.*—(a) Saddle horses, pack trains, and horse-drawn vehicles have right-of-way over motor-propelled vehicles at all times.

(b) Horseback travel over automobile roads is prohibited except where such travel is necessary for ingress to and egress from privately owned property in the parks or monuments, or incidental to authorized trail trips.

(c) Pack trains and saddle horse parties are prohibited from using oil surfaced roads. Where, in emergencies, it becomes necessary for such pack trains or saddle horse parties to travel along oil surfaced roads, such travel shall be confined to the unoiled shoulders of the roads.

(d) All vehicles shall be equipped with lights for night travel. At least one light must be carried on the left front side of all horse-drawn vehicles in a position so as to be visible from both front and rear.

(e) Any person or persons riding saddle animals, or leading animals of any kind through any tunnel, shall display a light upon the approach of any vehicle.

(f) No vehicles may be operated in the parks or monuments outside the roadways or designated parking areas.

(g) Load and weight limitations shall be those prescribed from time to time by the superintendents or custodians, and shall be complied with by the operators of all vehicles using the roads of the parks and monuments. Schedules showing weight limitations for the different roads may be seen at the offices of the superintendents and custodians and at ranger stations at the park entrances.

(h) There shall not be operated or moved upon any road within the boundaries of any national park or monument any vehicle of any kind the face of wheels or tracks of which are fitted with flanges, ribs, clamps, cleats, lugs, spikes, or any device which may tend to injure the roadway. This regulation applies to all rings or flanges upon guiding or steering wheels on any such vehicle, but it shall not be construed as preventing the use of ordinary detachable tire or skid chains.

(i) The superintendent or custodian may, with the approval of the Director of the National Park Service, establish the hours during which any of the roads within the parks and monuments shall be open to the public, and the direction of travel thereon. Information regarding such hours and direction of travel may be had upon application at the office of the superintendent or custodian, or at the ranger stations.

(j) In Acadia National Park, no motor vehicles are permitted on any road specially marked, designated, or constructed for horse-drawn vehicular traffic except for general road and roadside maintenance, repair and construction purposes, fire fighting, or in case of accident.

39. *Automobiles.*—The parks and monuments where common carrier service is established under authorization and supervision of the Government are open to automobiles operated for pleasure but not to those carrying passengers who are paying, either directly or indirectly, for the use of machines (excepting, however, automobiles used by transportation lines operating under Government franchise). Any person operating an automobile in contravention of the provisions of this regulation shall be deemed guilty of its violation.

40. *Motor trucks and busses.*—Motor trucks and busses are admitted to the parks and monuments under the same conditions as automobiles, except that the superintendents or custodians may establish limits of size, weight, and capacity, which limits may vary, according to the different roads, tunnels, and bridges. No motor trucks are permitted in Acadia National Park, except those used in connection with road maintenance or other authorized park projects.

Commercial truck trailers will be required to secure permits at entrance stations to use park roads.

Trucking over roads in the parks and monuments which are officially posted indicating no trucking is allowed shall be a violation of these regulations.

41. *Motorcycles.*—Motorcycles are admitted to the parks and monuments under the same conditions as automobiles and are subject to the same regulations, so far as they are applicable.

42. *Permits.*—Where required, no motor vehicle may be operated in the national parks without a permit, which is good only in the park or parks for which issued. The permit must be carried in the car and exhibited to the park rangers on request.

*Exceptions.*—Regulations No. 37, 38, 39, and 40 are not applicable to traffic on the Mineral King Road in Sequoia National Park or on the Kennedy Creek cut-off in Glacier National Park.

43. *Fees.*—Fees for automobile permits are as follows:

| | |
|---|---|
| Crater Lake National Park | $1.00 |
| Glacier National Park | 1.00 |
| Grand Canyon National Park | 1.00 |
| Lassen Volcanic National Park | 1.00 |
| Mesa Verde National Park | 1.00 |
| Mount Rainier National Park | 1.00 |
| Sequoia and General Grant National Parks | 1.00 |
| Yellowstone National Park | 3.00 |
| Yosemite National Park | 2.00 |
| Zion National Park | 1.00 |

Fees for motorcycle permits are as follows:

| | |
|---|---|
| Crater Lake National Park | $1.00 |
| Glacier National Park | 1.00 |
| Grand Canyon National Park | 1.00 |
| Lassen Volcanic National Park | 1.00 |
| Mesa Verde National Park | 1.00 |
| Mount Rainier National Park | 1.00 |
| Sequoia and General Grant National Parks | 1.00 |
| Yellowstone National Park | 1.00 |
| Yosemite National Park | 1.00 |
| Zion National Park | 1.00 |

No fee shall be charged residents of Coconino County, Arizona, or Kanab, Utah, entering Grand Canyon National Park, nor residents of Washington and Kane Counties, Utah, or residents of that part of Coconino County, Arizona, lying north and west of the Colorado River, entering Zion National Park, in the conduct of their usual occupation or business.

44. *Entrances.*—Automobiles, trucks, and other vehicles permitted in the parks and monuments may enter and leave by such entrances and between such hours as shall be determined by the superintendent or custodian with the approval of the Director of the National Park Service, and indicated by official signs posted for that purpose.

All vehicles shall come to a full stop at entrance stations.

45. *Speed.*—Automobiles and other vehicles shall be so operated as to be under the safe control of the driver at all times. The speed shall be kept within such limits as may be necessary to avoid accidents. Speed of automobiles and other vehicles except ambulances and Government cars on emergency trips is limited to 35 miles per hour on all roads in the parks and monuments unless a different limit is determined by the superintendent or custodian with the approval of the Director of the National Park Service, and indicated by official signs posted for that purpose.

46. *Teams.*—When teams, saddle horses, or pack trains approach, motor vehicles shall be so manipulated as to allow safe passage for the other party. In no case shall motor vehicles pass such animals on the road at a greater speed than 10 miles per hour, or in such a manner or with such noise as to frighten them.

47. *Right-of-way.*—Any vehicle traveling slowly on any of the roads in the parks or monuments, when overtaken by a faster-moving motor vehicle, and upon suitable signal from

such overtaking vehicle, shall move to the right to allow a safe passage.

When automobiles going in opposite directions meet on a grade, the ascending machine has the right-of-way, and the descending machine shall be backed or otherwise handled as may be necessary to enable the ascending machine to pass in safety.

48. *Following vehicles.*—Except in slow-moving traffic, a vehicle shall not follow another vehicle closer than 50 feet, nor closer than 15 feet at any time.

49. *Clutches and gears.*—No motor vehicle shall be operated on any highway with clutch disengaged or gear out of mesh except for the purpose of changing or shifting gears or stopping or while being towed, or when such vehicle is equipped with commercial free-wheeling devices.

50. *Lights.*—All motor vehicles except motorcycles shall be equipped with two headlights and one or more red taillights, the headlights to be of sufficient brilliancy to insure safety in driving at night, and all lights shall be kept lighted after sunset when the vehicle is on a road, and at all times when passing through unlighted tunnels. Headlights shall be dimmed when meeting other vehicles, riding or driving animals, or pedestrians.

51. *Sounding horn.*—The horn shall be sounded on approaching sharp curves or other places where the view ahead is obstructed, or before passing other vehicles or pedestrians, or, if necessary, before passing riding or driving animals.

52. *Muffler cut-outs.*—Muffler cut-outs shall be kept closed at all times within the limits of the parks and monuments.

53. *Accidents—stop-overs.*—If vehicles stop because of accident or for any other reason, they shall be immediately parked in such a way as not to interfere with travel on the road.

54. *Parking.*—The superintendent may limit the time allowed for parking in any parking area upon the posting of signs indicating such limit.

55 *Traffic signs.*—Drivers of all vehicles shall comply with the directions of all official traffic signs posted in the the parks or monuments.

56. *Intoxication.*—No person who is under the influence of intoxicating liquor or narcotic drugs shall operate or drive a motor-driven vehicle of any kind on the roads of the parks or monuments.

### LOCAL SUBSIDIARY REGULATIONS

Subsidiary regulations necessary to cover local situations and promulgated under general provisions contained in these regulations will be published in the FEDERAL REGISTER and may be seen at the headquarters of the parks or monuments in which they are operative.

All subsidiary regulations promulgated under general provisions contained in the Rules and Regulations approved by the Secretary of the Interior June 6, 1935, are hereby continued in force and effect until amended or repealed.

### PENALTIES

(a) Any person who violates any of the foregoing rules or regulations in regard to any park or monument not specified in paragraph (b) hereof shall be deemed guilty of a misdemeanor and shall be punished by a fine of not more than $500 or imprisonment for not exceeding six months, or both.

(b) Any person who knowingly and willfully violates any of the foregoing rules or regulations in regard to any of those national military parks, battlefield sites, national monuments, or miscellaneous memorials transferred to the jurisdiction of the Secretary of the Interior from that of the Secretary of War by Executive Order No. 6166, June 10, 1933, and enumerated in Executive Order No. 6228, July 28, 1933, shall be deemed guilty of a misdemeanor and punished by a fine of not more than $100 or imprisonment for not more than three months, or by both such fine and imprisonment.

Approved: June 18, 1936.

HAROLD L. ICKES,
*Secretary of the Interior.*

[F. R. Doc. 1006—Filed, June 26, 1936; 10:40 a. m.]

## DEPARTMENT OF AGRICULTURE.

### Agricultural Adjustment Administration.

ORDER TERMINATING OPERATION OF LICENSE FOR MILK— ATLANTA, GEORGIA, SALES AREA

Whereas, W. R. Gregg, Acting Secretary of Agriculture of the United States of America, acting under the provisions of the Agricultural Adjustment Act, as amended, for the purpose and within the limitations therein contained, and pursuant to the applicable general regulations issued thereunder, did, on the 15th day of November 1934, issue under his hand and the official seal of the Department of Agriculture a License for Milk—Atlanta, Georgia, Sales Area, effective the 1st day of December 1934, which license was subsequently amended on August 12, 1935, and suspended on the 25th day of January 1936, said suspension being effective on and after 12:01 a. m., January 27, 1936; and

Whereas, the Secretary of Agriculture has determined to terminate the said license, as amended;

Now, therefore, the undersigned, acting under the authority vested in the Secretary of Agriculture under the terms and conditions of the said act, as amended, and pursuant to the applicable general regulations issued thereunder, hereby terminate the said license, as amended.

In witness whereof, H. A. Wallace, Secretary of Agriculture of the United States of America, has executed this Order of Termination in duplicate, and has hereunto set his hand and caused the official seal of the Department of Agriculture to be affixed in the city of Washington, District of Columbia, this 25th day of June 1936, and hereby declares that this termination shall be effective on and after 12:01 a. m. July 1, 1936.

[SEAL]                                        H. A. WALLACE,
*Secretary of Agriculture.*

[F. R. Doc. 1012—Filed, June 26, 1936; 11:58 a. m.]

## FEDERAL TRADE COMMISSION.

Commissioners: Charles H. March, Chairman; Garland S. Ferguson, Jr., Ewin L. Davis, W. A. Ayres, Robert E. Freer.

[File No. 21–267]

IN THE MATTER OF APPLICATION FOR TRADE PRACTICE RULES FOR THE SCHOOL SUPPLIES AND EQUIPMENT DISTRIBUTING INDUSTRY

NOTICE OF OPPORTUNITY TO BE HEARD

This matter now being before the Federal Trade Commission under its Trade Practice Conference procedure, in pursuance of the Act of Congress approved September 26, 1914, (38 Stat. 717; 15 USCA, Section 41);

Opportunity is hereby extended by the Federal Trade Commission to any and all persons affected by or having an interest in the proposed trade practice rules for the School Supplies and Equipment Distributing Industry to present to the Commission their views upon the same, including suggestions or objections, if any. For this purpose they may, upon application to the Commission, obtain copies of the proposed rules. Communications of such views should be made to the Commission not later than Wednesday, July 15, 1936. Opportunity for oral hearing will be afforded July 15, 1936, at 10 a. m., Room 101, Federal Trade Commission Building, 815 Connecticut Avenue, Washington, D. C., to such persons as may desire to appear, and who have made prior written or telegraphic request to be heard orally. All briefs or other communications received concerning the proposed rules will become part of the public record subject to inspection by interested parties. After giving due consideration to such suggestions or objections as may be received concerning the rules proposed by the industry, the Commission will proceed to their final consideration.

By the Commission.

[SEAL]                                        OTIS B. JOHNSON, *Secretary.*

Entered June 24, 1936.

[F. R. Doc. 1007—Filed, June 26, 1936; 11:15 a. m.]

*United States of America—Before Federal Trade Commission*

At a regular session of the Federal Trade Commission, held at its office in the City of Washington, D. C., on the 24th day of June A. D. 1936.

Commissioners: Charles H. March, Chairman; Garland S. Ferguson, Jr., Ewin L. Davis, William A. Ayres, Robert E. Freer.

[Docket No. 2329]

IN THE MATTER OF A. KIMBALL COMPANY, ET AL.

ORDER APPOINTING EXAMINER AND FIXING TIME AND PLACE FOR TAKING TESTIMONY

This matter being at issue and ready for the taking of testimony, and pursuant to authority vested in the Federal Trade Commission, under an Act of Congress (38 Stat. 717; 15 U. S. C. A., Section 41),

It is ordered that John L. Hornor, an examiner of this Commission be, and he hereby is, designated and appointed to take testimony and receive evidence in this proceeding and to perform all other duties authorized by law.

It is further ordered that the taking of testimony in this proceeding begin on Monday, July 13, 1936, at nine o'clock in the forenoon of that day, eastern standard time, at Room No. 313, United States Post Office, 9th Street, Philadelphia, Pennsylvania.

Upon completion of testimony for the Federal Trade Commission, the Examiner is directed to proceed immediately to take testimony and evidence on behalf of the respondent. The Examiner will then close the case and make his report.

By the Commission.

[SEAL]                          OTIS B. JOHNSON, *Secretary.*

[F. R. Doc. 1008—Filed, June 26, 1936; 11:15 a. m.]

---

*United States of America—Before Federal Trade Commission*

At a regular session of the Federal Trade Commission, held at its office in the City of Washington, D. C., on the 24th day of June A. D. 1936.

Commissioners: Charles H. March, Chairman; Garland S. Ferguson, Jr., Ewin L. Davis, W. A. Ayres, Robert E. Freer.

[Docket No. 2767]

IN THE MATTER OF INTERNATIONAL ART COMPANY, A CORPORATION, ET AL.

ORDER APPOINTING EXAMINER AND FIXING TIME AND PLACE FOR TAKING TESTIMONY

This matter being at issue and ready for the taking of testimony, and pursuant to authority vested in the Federal Trade Commission, under an Act of Congress (38 Stat. 717; 15 U. S. C. A., Section 41),

It is ordered that W. W. Sheppard, an examiner of this Commission, be, and he hereby is, designated and appointed to take testimony and receive evidence in this proceeding and to perform all duties authorized by law.

It is further ordered that the taking of testimony in this proceeding begin on Wednesday, July 8, 1936, at ten o'clock in the forenoon of that day, in room 424 of the Federal Trade Commission building, 815 Connecticut Avenue NW., Washington, D. C.

Upon completion of testimony for the Federal Trade Commission, the examiner is directed to proceed immediately to take testimony and evidence on behalf of the respondent. The Examiner will then close the case and make his report.

By the Commission.

[SEAL]                          OTIS B. JOHNSON, *Secretary.*

[F. R. Doc. 1009—Filed, June 26, 1936; 11:16 a. m.]

---

*United States of America—Before Federal Trade Commission*

At a regular session of the Federal Trade Commission, held at its office in the City of Washington, D. C., on the 24th day of June A. D. 1936.

Commissioners: Charles H. March, Chairman; Garland S. Ferguson, Jr., Ewin L. Davis, William A. Ayres, Robert E. Freer.

[Docket No. 2826]

IN THE MATTER OF CHARLES N. MILLER COMPANY, A CORPORATION

ORDER APPOINTING EXAMINER AND FIXING TIME AND PLACE FOR TAKING TESTIMONY

This matter being at issue and ready for the taking of testimony, and pursuant to authority vested in the Federal Trade Commission, under an Act of Congress (38 Stat. 717; 15 U. S. C. A., Section 41),

It is ordered that Miles J. Furnas, an examiner of this Commission, be, and he hereby is, designated and appointed to take testimony and receive evidence in this proceeding and to perform all other duties authorized by law.

It is further ordered that the taking of testimony in this proceeding begin on Monday, July 13, 1936, at one o'clock in the afternoon of that day, eastern standard time, at Court Room No. 4, Federal Building, Boston, Massachusetts.

Upon completion of testimony for the Federal Trade Commission, the Examiner is directed to proceed immediately to take testimony and evidence on behalf of the respondent. The Examiner will then close the case and make his report.

By the Commission.

[SEAL]                          OTIS B. JOHNSON, *Secretary.*

[F. R. Doc. 1010—Filed, June 26, 1936; 11:16 a. m.]

---

## INTERSTATE COMMERCE COMMISSION.

### ORDER

RECORDING AND REPORTING OF STEAM RAILWAY ACCIDENTS

At a Session of the Interstate Commerce Commission, Division 4, held at its office in Washington, D. C., on the 8th day of June A. D. 1936.

The subject of the recording and reporting of steam railway accidents being under consideration:

*It is ordered,* That the order of October 24, 1935, requiring the keeping of a special record of accidents to employees and a monthly report of such accidents, be and it is hereby amended by extending the period for the recording and the reporting thereof to December 31, 1936.

By the Commission, division 4.

[SEAL]                          GEORGE B. MCGINTY, *Secretary.*

[F. R. Doc. 1011—Filed, June 26, 1936; 11:57 a. m.]

---

## SECURITIES AND EXCHANGE COMMISSION.

### SECURITIES ACT OF 1933

CONTRACTS WITH UNITED STATES GOVERNMENT

The Securities and Exchange Commission, acting pursuant to authority conferred upon it by the Securities Act of 1933, as amended, particularly Sections 7 and 19 (a) thereof, and finding that the information specified in Schedule A of the Act which is permitted by the rule hereby adopted to be omitted from any registration statement in respect of a specified class of issuers is inapplicable to such class, and that disclosure fully adequate for the protection of investors is otherwise required to be included in the registration statement; and that any information not specified in Schedule A which is required by such rule to be set forth in the registration statement is necessary and appropriate in the public interest and for the protection of investors; and that the rule hereby adopted is necessary to carry out the provisions

of the Act and is necessary and appropriate in the public interest and for the protection of investors, hereby adopts the following rule under the Securities Act of 1933:

RULE 581. *Contracts with United States Government.*— (a) Notwithstanding any particular provision in any form for registration or instruction pertaining thereto, the registrant need not file as an exhibit to the registration statement a copy of any contract as to which all the following conditions are satisfied:

(1) The contract is one to which the United States is a party, and involves the constructing or supplying of equipment or materials, or the furnishing of experimental facilities, services, or information for the Army, Navy, Marine Corps, or Coast Guard in connection with the national defense;

(2) A copy of the contract is on file with an executive department of the United States; and

(3) The registrant has been notified in writing that such executive department has administratively determined that the subject of such contract relates to and affects the national defense and that disclosure thereof would be contrary to the public interest.

The registrant shall file as an exhibit to the registration statement, in lieu of the copy of the contract omitted pursuant to this paragraph, a copy of each notification received from such executive department with respect to the filing of copies of the contract or of information as to its terms.

(b) Notwithstanding any particular provision in any form for registration or instruction pertaining thereto, the registrant need not, in answering any item in the form for registration calling for a summary of the terms of any contract of the type described in paragraph (a), furnish any information as to any terms of the contract relating directly or indirectly to any of the following subjects as to which the registrant has been notified in writing that the executive department, with which a copy of the contract is on file, has administratively determined that such subjects relate to and affect the national defense and that disclosure thereof would be contrary to the public interest:

(1) Quantity of equipment or materials to be constructed or supplied;

(2) Designations of type, descriptions, specifications, deliveries, tests, or guarantees of performance with respect to such equipment or materials; or

(3) Nature and extent of experimental facilities, services, or information to be furnished.

The answer to the item shall include a statement in approximately the following form:

Information as to certain terms of the contract(s) has been omitted pursuant to the Rules and Regulations of the Securities and Exchange Commission, the registrant having been notified that the _____ Department (naming the executive department) has determined that such information relates to and affects the national defense and that disclosure thereof would be contrary to the public interest. Such notification is filed as Exhibit _____.

(c) Public disclosure will not be made of the contents of any notification filed pursuant to paragraph (a), or of any portion of the information as to the terms of the contract required to be furnished notwithstanding the provisions of paragraph (b), if the Commission determines that such disclosure would impair the value of the contract and is not necessary for the protection of investors. In any case where the registrant desires the Commission to make such a determination, the procedure set forth in Rule 580 shall be followed, except that there shall be filed, in lieu of the three copies of the contract or portion thereof required by paragraph (b) (i) of such Rule, three copies of the notification and three copies of the information as to the terms of the contract which the registrant desires to keep undisclosed, all clearly marked "Confidential."

The foregoing rule shall be effective immediately upon publication.

By the Commission.

[SEAL]                    FRANCIS P. BRASSOR, *Secretary.*

[F. R. Doc. 1014—Filed, June 26, 1936; 12:37 p. m.]

---

*United States of America—Before the Securities and Exchange Commission*

At a regular session of the Securities and Exchange Commission held at its office in the City of Washington, D. C., on the 25th day of June A. D. 1936.

[File No. 32-23]

IN THE MATTER OF THE DECLARATION OF SOUTHWESTERN DEVELOPMENT COMPANY

NOTICE OF OPPORTUNITY FOR HEARING AND ORDER DESIGNATING OFFICER TO CONDUCT PROCEEDINGS

A declaration under Section 7 (a) of the Public Utility Holding Company Act of 1935 having been duly filed with this Commission whereby the Southwestern Development Company proposes to issue to the Guaranty Trust Company of New York promissory notes payable within five years, pursuant to an agreement to renew and extend an existing and matured indebtedness of approximately $6,300,000.

It is ordered, that the matter be set down for opportunity for hearing on the 10th day of July 1936, at 10:00 o'clock in the forenoon of that day at Room 726-C, Securities and Exchange Building, 1778 Pennsylvania Avenue NW., Washington, D. C.; and

It is further ordered, that John H. Small, an officer of the Commission, be and he hereby is designated to preside at such hearing, and authorized to adjourn said hearing from time to time, to administer oaths and affirmations, subpoena witnesses, compel their attendance, take evidence and require the production of any books, papers, correspondence, memoranda or other records deemed relevant or material to the inquiry, and to perform all other duties in connection therewith authorized by law; and

It is further ordered, that any interested state, state commission, state securities commission, municipality, or other political subdivision of a state, or any representative of interested consumers or security holders, or any other person, desiring to be admitted as a party in this proceeding or to offer evidence in this matter, shall give notice of such intention to the Commission, such notice to be received by the Commission not later than July 5, 1936.

Upon the completion of the taking of testimony in this matter, the officer conducting said hearing is directed to close the hearing and make his report to the Commission.

By the Commission.

[SEAL]                    FRANCIS P. BRASSOR, *Secretary.*

[F. R. Doc. 1016—Filed, June 26, 1936; 12:54 p. m.]

---

*United States of America—Before the Securities and Exchange Commission*

At a regular session of the Securities and Exchange Commission held at its office in the City of Washington, D. C., on the 26th day of June A. D. 1936.

[File 36-22]

IN THE MATTER OF THE APPLICATION OF THE MIDDLE WEST CORPORATION

NOTICE OF OPPORTUNITY FOR HEARING AND ORDER DESIGNATING TRIAL EXAMINER

An application having been duly filed with this Commission by The Middle West Corporation, pursuant to Section 10(a) (1) of the Public Utility Holding Company Act of 1935, for approval of the acquisition of 9,000 shares of $3 Cumulative Preferred Stock, without par value, of Copper District Power Company, which securities applicant proposes to acquire, at the price of $45 per share, in exchange for $405,000 principal amount of 5% notes payable of said Copper District Power Company now held by applicant;

It is ordered, that the matter be set down for hearing on July 13, 1936, at two o'clock in the afternoon of that day, at Room 1101, Securities and Exchange Building, 1778 Pennsylvania Avenue, NW., Washington, D. C.; and

It is further ordered, that Charles S. Lobingier, an officer of the Commission, be and he hereby is designated to preside

at such hearing, and authorized to adjourn said hearing from time to time, to administer oaths and affirmations, subpoena witnesses, compel their attendance, take evidence, and require the production of any books, papers, correspondence, memoranda or other records deemed relevant or material to the inquiry, and to perform all other duties in connection therewith authorized by law; and

It is further ordered, that any interested state, state commission, state securities commission, municipality, or other political subdivision of a state, or any representative of interested consumers or security holders, or any other person desiring to be admitted as a party in this proceeding or to offer evidence in this matter, shall give notice of such intention to the Commission, such notice to be received by the Commission not later than July 8, 1936.

Upon the completion of the taking of testimony in this matter, the officer conducting said hearing is directed to close the hearing and make his report to the Commission.

By the Commission.

[SEAL]          FRANCIS P. BRASSOR, *Secretary.*

[F. R. Doc. 1013—Filed, June 26, 1936; 12:37 p. m.]

---

### *United States of America—Before the Securities and Exchange Commission*

At a regular session of the Securities and Exchange Commission held at its office in the City of Washington, D. C., on the 26th day of June A. D. 1936.

[File No. 32–24]

IN THE MATTER OF THE APPLICATION OF THE NARRAGANSETT ELECTRIC COMPANY

NOTICE OF OPPORTUNITY FOR HEARING AND ORDER DESIGNATING TRIAL EXAMINER

An application, pursuant to Section 6 (b) of the Public Utility Holding Company Act of 1935, having been filed with this Commission by The Narragansett Electric Company, a subsidiary of a registered holding company, to exempt, from the provisions of Section 6 (a), the issue and sale of $34,000,000 principal amount of First Mortgage Bonds, Series A, 3½%, due July 1, 1966, the proceeds of such issue to be applied on or about July 22, 1936, toward the payment of $34,000,000 of notes evidencing bank loans made on June 25, 1936, under a bank credit agreement dated May 28, 1936.

It is ordered that the matter be set down for hearing on the 13th day of July 1936, at 2:30 p. m., at the Securities and Exchange Commission, 1778 Pennsylvania Avenue NW., Washington, D. C., and

It is further ordered that John H. Small, an officer of the Commission, be and he hereby is designated to preside at such hearing and is authorized to adjourn said hearing from time to time, to administer oaths and affirmations, subpoena witnesses, compel their attendance, take evidence and require the production of any books, papers, correspondence, memoranda, or other records deemed relevant or material to the inquiry, and to perform all other duties in connection therewith authorized by law; and

It is further ordered that any interested state, state commission, state securities commission, municipality, or other political subdivision of a state, or any representative of interested consumers or security holders, or any other person, desiring to be admitted as a party in this proceeding or to offer evidence in this matter, shall give notice of such intention to the Commission. It is requested that all such notices shall be delivered to the Commission by mail or telegraph not later than July 10, 1936.

Upon the completion of the taking of testimony in this matter, the officer conducting said hearing is directed to close the hearing and make this report to the Commission.

By the Commission.

[SEAL]          FRANCIS P. BRASSOR, *Secretary.*

[F. R. Doc. 1017—Filed, June 26, 1936; 1:47 p. m.]

---

*Tuesday, June 30, 1936*        No. 77

## PRESIDENT OF THE UNITED STATES.

### EXECUTIVE ORDER

MODIFICATION OF EXECUTIVE ORDER NO. 6910 OF NOVEMBER 26, 1934, AS AMENDED, WITHDRAWING PUBLIC LANDS IN CERTAIN STATES

By virtue of and pursuant to the authority vested in me by the act of June 25, 1910, ch. 421, 36 Stat. 837, as amended by the act of August 24, 1912, ch. 369, 37 Stat. 497, it is ordered that Executive Order No. 6910 of November 26, 1934, as amended, temporarily withdrawing all public lands in certain States for classification and other purposes, be, and it is hereby, modified to the extent necessary to enable the Secretary of the Interior to withdraw the following-described tracts of public land for reclamation purposes under and pursuant to the provisions of section 3 of the act of June 17, 1902, ch. 1093, 32 Stat. 388:

#### CALIFORNIA

*Mount Diablo Meridian*

T. 33 N., R. 2 W.:
  Sec. 4, lots 1, 2, 3, 5, 6, 7, 8, S½N½, and SE¼;
  Sec. 6, SE¼;
T. 34 N., R. 2 W.:
  Sec. 23, NE¼NE¼;
  Sec. 30, lots 1, 2, E½NW¼, and W½E½;
T. 33 N., R. 3 W.:
  Sec. 6, NE¼SE¼ and SW¼SE¼;
  Sec. 8, E½NE¼, SW¼NE¼, and SE¼;
  Sec. 10, N½SE¼ and SE¼SE¼;
  Sec. 12, NE¼NE¼, W½SW¼, SE¼SW¼, NE¼SW¼, and S½SE¼;
T. 34 N., R. 3 W.:
  Sec. 6, N½NE¼ and S½SE¼;
  Sec. 14, NW¼NW¼;
  Sec. 15, lots 1, 2, 3, 4, and 6, NE¼, NE¼NW¼, SE¼NW¼, N½SW¼SE¼, N½NE¼SE¼, SE¼NE¼SE¼, and NE¼SE¼SE¼;
  Sec. 20, N½NE¼, SW¼NE¼, NW¼SE¼, and W½;
  Sec. 21, lot 12 and W½NW¼;
  Sec. 22, E½ and S½SW¼;
  Sec. 26, E½ and SW¼;
  Sec. 30, N½NE¼;
  Sec. 34, SW¼;
T. 35 N., R. 3 W.:
  Sec. 32, NE¼NE¼NE¼, S½NE¼NE¼, S½NE¼, S½NW¼, and NE¼SE¼;
T. 33 N., R. 4 W.:
  Sec. 1, lots 9, 10, 11, and 12;
  Sec. 2, lot 1 and 4;
  Sec. 20, SD¼NW¼ and lot 1;
T. 34 N., R. 4 W.:
  Sec. 4, NW¼NW¼, NE¼, N½SE¼, and SE¼SE¼;
  Sec. 6, lots 2, 3, S½NE¼, and SE¼NW¼;
  Sec. 10, NE¼;
  Sec. 12, NE¼SE¼ and S½S½;
  Sec. 16, N½NE¼ and W½;
  Sec. 20, N½NE¼, SE¼NE¼ and N½NW¼;
  Sec. 23, N½SE¼;
  Sec. 24, all;
  Sec. 23, W½NE¼ and NW¼;
  Sec. 30, lots 1, 2, 3, 4, NW¼, W½SW¼, and SE¼SW¼;
T. 35 N., R. 4 W.:
  Sec. 28, W½NE¼, W½, and SE¼;
  Sec. 30, N½½NW¼;
T. 33 N., R. 5 W.:
  Sec. 4, lots 1, 2, 3, 4, 6, 7, 8, E½ lot 9, E½ lot 11, and lot 12, SW¼NW¼SW¼, N½SW¼NW¼ and W½SW¼SW¼;
  Sec. 8, NE¼, N½NW¼, SE¼NW¼, E½SW¼, and lots 1, 2, and 3;
  Sec. 9, NE¼, NW¼NW¼NW¼, E½SE¼NW¼, W½NE¼SW¼, and N½N½SE¼;
  Sec. 14, N½N½SE¼NW¼, SW¼NW¼, N½SW¼, N½SW¼, and SW¼SW¼;
  Sec. 17, lots 2, 3, and 8;
  Sec. 20, lots 1, 2, 3, 4, 6, 7, NE¼NE¼, SE¼SE¼, and W½SW¼;
T. 33 N., R. 6 W.:
  Sec. 4, lot 3, and SE¼NW¼;
  Sec. 6, N½, SW¼, and N½SE¼;
  Sec. 7, lots 1, 2, 4, 6, 7, 8, 9, 10, and 11;
  Sec. 12, SE¼;
  Sec. 14, SE¼;
  Sec. 22, NE¼, N½NW¼, SW¼SW¼, N½SE¼, SE¼SE¼, and lots 1 to 9 incl.;

36

# TUESDAY, MARCH 16, 1858.

### REGULAR MEETING—3 P. M.

#### PRESENT :

Commissioner Gray,                    Commissioner Fields,
        "         Dillon,                    "         Green,
        "         Russell,                   "         Strong,
        "         Butterworth,               "         Hogg.
        "         Hutchins,

On motion, the reading of the minutes of the previous meeting was dispensed with.

On motion of Mr. BUTTERWORTH, it was

*Resolved,* That the Annual Report of this Board to the Common Council, dated January 30, 1858, be printed as one of the documents of this Board.

As follows :

*Ayes*—Messrs Dillon, Butterworth, Gray, Fields, Green, Strong, Hogg—7.

On motion of Mr. DILLON, the ordinances recommended by the Superintendent were adopted, as follows :

"Be it ordained by the Commissioners of the Central Park :

All persons are forbidden

To enter or leave the Park except by the gateways.

To climb or walk upon the wall.

To turn cattle, horses, goats or swine into the Park.

To carry fire-arms or to throw stones or other missiles within it.

To cut, break, or in any way injure or deface the trees, shrubs, plants, turf, or any of the buildings, fences, bridges, or other constructions upon the Park ;

Or to converse with, or in any way hinder those engaged in its construction.

Digitized by Google

**167**

All persons offending against these ordinances shall be deemed guilty of misdemeanor, and be punished, on conviction before the Mayor, Recorder, or any magistrate of the city of New York. by a fine not exceeding fifty dollars; and, in default of payment, by imprisonment not exceeding thirty days."

Visitors may obtain all necessary information and directions from the police.

The business offices and the police station of the Park are on Fifth avenue at Seventy-ninth street."

Mr. DILLON also moved the adoption of the following:

*Ordered,* That the Superintendent cause these ordinances to be posted on the Park, in such number and manner as he may deem advisable.

*Ordered,* That it be published for ten days in the Daily Times, Tribune, Sun, and Staats Zeitung.

Which was carried, as follows:

*Ayes*—Messrs. Dillon, Butterworth, Gray, Fields, Green, Strong, Hogg—7.

A communication from the Chief Engineer, submitting a report on " A Comprehensive Plan of Drainage " of the Park, accompanied by a map of the same, was received.

Mr. DILLON moved that the report be printed and referred to the Committee on Draining and Sewerage.

Which was carried, as follows:

*Ayes*—Messrs. Dillon, Butterworth, Gray, Fields, Green, Strong, Hogg—7.

A report from the Chief Engineer, announcing the completion of the sectional and drainage maps of the Park, and the discharge of all persons directly employed by him, was referred to the Executive Committee.

A communication from the same, as to a plan for receiving within the limits of the Park the waste water from the present and new reservoirs, was also referred to the Executive Committee.

A communication from Thomas F. Webb, as to furnishing blasting powder for the Park, was also referred to the same committee.

Digitized by Google

168

The following communication was received from A. W. Craven, Esq., of the Croton Aqueduct Board, and on motion of Mr. Dillon ordered to be engrossed in the minutes of the Board :

CROTON AQUEDUCT DEPARTMENT,

Engineer's Office, March 2d, 1858.

Gentlemen,—I beg leave to acknowledge the receipt of a note from your Board, through Mr. Hart, dated February 16th, and to apologise for not replying to it more promptly.

The questions asked, and the answers thereto, are as follows :

" 1st. What is the height of the Reservoir on the line of Fifth avenue at 41st street, excluding the railing ?"

The top of the wall, exclusive of the railing, and also exclusive of the projections at the corners and over the gateway, is 119 feet above mean tide and 39 feet above the curb of Forty-first street. The height of water when the Reservoir is full is four feet below this level, or 115 feet above mean tide.

" 2d. Will the top of the wall of the new Reservoir be on a level with the top of that now built in Seventy-ninth street ? "

These heights are intended to be precisely the same.

" 3d. Could not the height of the wall be reduced in the Reservoir now built and in the new one, and if so, how much, and yet answer all the purposes of the Reservoir ? "

The height of water in these Reservoirs could not be reduced without greatly impairing the efficiency of our water distribution throughout the city, and the height of the wall could not be reduced with safety without a corresponding reduction in the high-water level.

I have the honor to be, very respectfully,

Your obedient servant,

A. W. CRAVEN,

Chief Engineer.

To the Commissioners of the Central Park, New York.

The monthly report of the Superintendent was read and ordered on file.

A petition of Norman Ewen, late Surveyor and Engineer of the third division Central Park Survey, to be allowed his pay,

169

at the rate of $1500 per annum, from May 1st to November 13th, 1857, was read and referred to the Auditing Committee.

Mr. FIELDS moved to take up the special order, being the election to fill the vacancy caused by the resignation of Mr. Cooley, in pursuance of the notice given by Mr. Strong, at the meeting of February 16, 1858.

The ayes and nays being called for upon the motion, it was carried, as follows :

*Ayes*—Messrs. Dillon, Russell, Gray, Hutchins, Fields, Green, Strong, Hogg—8.

*Nay*—Mr. Butterworth—1.

Mr. RUSSELL offered the following :

*Resolved*, That it is inexpedient at the present meeting to go into an election, to fill the vacancy in the Board occasioned by the resignation of Mr. Cooley.

Lost.

Mr. FIELDS moved that the Board now go into ballot.

Carried, as follows :

*Ayes*—Messrs. Dillon, Gray, Hutchins, Fields, Green, Strong, Hogg—7.

*Nays*—Messrs. Russell, Butterworth—2.

The Chair appointed as tellers Messrs. Green and Butterworth.

The Board then proceeded to ballot, with the following result :

For August Belmont.................... 7
  " George Bancroft..... ............. 1
  Blank ............................ 1

On motion of Mr. RUSSELL, the election of Mr. Belmont was declared unanimous.

On motion of Mr. HUTCHINS, the Vice-President was requested to communicate to Mr. Belmont his election to the Board.

Mr. STRONG moved that when the Board adjourn it be to Tuesday next at 1 o'clock.—Carried.

On motion of Mr. RUSSELL, the Clerk was directed to prepare a calendar of unfinished business for the use of the Board, at each stated meeting.

The Board then adjourned.

Digitized by Google

37

No. 1019.

## A Supplement

To an act, entitled "An Act to Incorporate the Farmers' Coal and Iron Company," approved the seventeenth day of April, Anno Domini one thousand eight hundred and sixty-six.

SECTION 1. *Be it enacted by the Senate and House of Representatives of the Commonwealth of Pennsylvania in General Assembly met, and it is hereby enacted by the authority of the same,* That said company shall have the power and authority to build a bridge across the Susquehanna river, so that the same may be a toll and railroad bridge, and charge and receive tolls for crossing the same.

*Authorized to construct bridge.*

SECTION 2. That it shall be lawful for any other chartered company to subscribe to the capital stock of this company or to loan the said company money.

*Other corporations may subscribe to capital stock.*

SECTION 3. That said company shall have the right to extend their railroad and branches, and cross at grade the tracks of any railroads now made or hereafter to be made, in such manner as to connect with any other railroads or to any landings on any canal or slack-water navigation.

*May extend railroad, &c.*

ELISHA W. DAVIS,
Speaker of the House of Representatives.

JAMES L. GRAHAM,
Speaker of the Senate.

APPROVED—The fourteenth day of April, Anno Domini one thousand eight hundred and sixty-eight.

JNO. W. GEARY.

———

No. 1020.

## A Supplement

To an act, entitled "An Act appropriating ground for public purposes in the city of Philadelphia," approved the twenty-sixth day of March, Anno Domini one thousand eight hundred and sixty-seven.

SECTION 1. *Be it enacted by the Senate and House of Representatives of the Commonwealth of Pennsylvania in General Assembly met, and it is hereby enacted by the authority of the same,* That the boundaries of the Fairmount park, in the city of Philadelphia, shall be the following, to wit: Beginning at a point in the north-easterly line of property, owned and occu-

*Boundaries of Fairmount park defined.*

pied by the Reading Railroad Company, near the city bridge over the river Schuylkill at the falls, where said north-easterly line is intersected by the line dividing property of H. Duhring from that of F. Stoever and T. Johnson ; extending from thence in a south-westerly direction upon said dividing line and its prolongation to the middle of the Ford road ; from thence by a line passing through the south-east corner of Forty-ninth and Lebanon streets to George's run ; thence along the several courses of said run to a point fourteen hundred and eighty-seven and a half feet from the middle of the Pennsylvania railroad, measured at right angles thereto ; thence by a straight line through the north-east corner of Forty-third and Hancock streets to the northerly side of Girard avenue, near Fortieth street ; thence by the said northerly side of Girard avenue to the easterly side of the Junction railroad, as now used ; thence by the said easterly side of the Junction railroad and the Pennsylvania railroad to the north side of Haverford street ; thence by the northerly side of said Haverford street to the westerly side of Bridgewater street ; thence by said Bridgewater street to the north line of Bridge street ; thence by said Bridge street to the west abutment of the Suspension bridge ; thence by the north-westerly side of the Suspension bridge and Callowhill street to the angle in said street, on the south-westerly side of Fairmount basin ; thence by the northerly side of Callowhill and Biddle streets to the westerly side of Twenty-fifth street ; thence by the said Twenty-fifth street to the south-westerly side of Pennsylvania avenue ; thence by the south-westerly side of Pennsylvania avenue to the west side of Thirty-third street ; thence along the westerly side of Thirty-third street to the south-westerly line of Ridge avenue ; thence along said Ridge avenue to the south-westerly line of South Laurel Hill cemetery, (north of Huntingdon street;) thence by and along said property line to such a distance from the shore line of the river Schuylkill as will permit the location of a carriage road one hundred feet wide upon its margin ; thence along said river shore and its several courses, as may be most practicable, at the same distance as above specified, (provided said distance shall not exceed one hundred and fifty feet,) to a point opposite the intersection of the Ridge turnpike and School lane ; thence northwardly to a point on the south-westerly side of said turnpike road, opposite to the south-easterly side of School lane ; thence by the south-westerly side of the Ridge turnpike road and to its several courses to the south-easterly side of the Wissahickon creek ; thence by the several courses of the said south-easterly side of Wissahickon creek to the Schuylkill river ; thence across the water-course of said river to the north-easterly line of the Reading Railroad Company's property, as now occupied and in use at the city boundary line ; thence along said north-easterly line as now occupied and used by said railroad company, to the place of beginning, excepting nevertheless thereout the several water works and their appurtenances which are included within these boundaries, and such uses of the premises immediately adjacent to the same, and such other portions of

the ground as are described in the plan, as the city of Philadelphia may from time to time require for the purposes of its water department.

SECTION 2. That there shall be laid out and constructed a road of easy and practicable grades extending from the intersection of the northerly line of the park by Belmont avenue, on the westerly side of the river Schuylkill, to the head of Roberts hollow, and thence along said hollow and the river Schuylkill to the foot of City avenue, laid out, with the ground contiguous thereto for ornamentation, of such width, and so constructed as the commissioners of Fairmount park, appointed under authority of the act of the general assembly of the commonwealth, may determine: and such road and its contiguous ground are hereby declared to be a part of the aforesaid park; and said park commissioners are hereby authorized and required to ascertain, by a proper survey, the limits thereof, which survey they shall file in the survey department of the city of Philadelphia; and it shall also be the duty of said park commissioners to appropriate the shores of the Wissahickon creek, on both sides of the same, from its mouth to the Paul's Mill road, and of such width as may embrace the road now passing along the same; and may also protect the purity of the water of said creek, and by passing along the crest of the heights which are on either side of said creek, may preserve the beauty of its scenery; the said park commissioners are hereby authorized and required to cause a proper survey to be made of said grounds upon the Wissahickon, and to file said survey in the survey department of the city of Philadelphia; and the grounds and creek hereby appropriated, are declared to be a part of Fairmount park. *Road to be laid out. Road and contiguous ground declared part of park. Park commissioners to appropriate shores of Wissahickon creek. To cause surveys of grounds to be made out and filed.*

SECTION 3. That the title to and ownership of the ground within said boundaries shall be vested in the city of Philadelphia, excepting therefrom so much as shall be required by the Schuylkill Navigation Company, the Philadelphia and Reading, the Junction and Connecting Railroad Companies, for the execution of their franchises as now provided by law. *Title to ground within aforesaid boundaries, vested in city.*

SECTION 4. So much of the ground as was embraced in the act to which this is a supplement, approved the twenty-sixth day of March, one thousand eight hundred and sixty-seven, and is not included in the above boundaries, is hereby released from all claim of title by the said city, with the same effect as if it had never been included. *Claim of city to portion of ground embraced in former act, released.*

SECTION 5. That all the grounds taken within the boundaries of the Fairmount park, by the first section of this act, shall be subject to all the powers and control given by the act to which this is a supplement to the city of Philadelphia; and the park commissioners, designated by or appointed under said act, and the owners of all ground taken for the park, and others interested therein, shall be compensated as in said act is directed and provided. *Grounds subject to control of park commissioners. Owners to be compensated.*

SECTION 6. The said commissioners shall have power and authority, from time to time, to vacate any street or road within the boundaries of the park, (excepting Girard avenue,) and to open for public use such other roads, avenues and streets therein as they may deem necessary. *Commissioners may vacate streets, &c.*

1086                        LAWS OF PENNSYLVANIA,

**Councils to cause alteration of plans of survey of certain wards, &c.**

SECTION 7. The councils of the city of Philadelphia shall cause, under the supervision of the department of surveys, such alterations of the plan of survey of the Twenty-fourth ward as lies between Fairmount park, as by this act established, the Pennsylvania railroad and the City avenue, and of the contiguous parts of the Twentieth and Twenty-eighth wards as may become necessary or expedient by reason of the extension as aforesaid of the limits of the Fairmount park, and cause the same to be established in manner as now provided by law for revising or laying out plans of survey in and for the city of Philadelphia; and shall lay out an avenue as **Avenue to be laid out as a boundary of park,** one of the streets of the city, of the width of not less than one hundred feet, as a boundary of the park, on the southwest, west and north-west sides thereof, extending from Girard avenue to the river Schuylkill, at or near the Falls bridge, and also upon the eastern side of the river from the intersection of Pennsylvania avenue and Thirty-third street northward along the boundary of said park to the river Schuylkill.

**Jurisdiction of commissioners, how far to extend.**

SECTION 8. The jurisdiction of the commissioners of the park shall extend to the breadth of the footway next the park, in all avenues or streets which shall bound upon the park, and they shall direct the manner in which such footways shall be laid out, curbed, paved, planted and ornamented, which footways shall not be less than twenty feet in width on any avenue or street of the width of one hundred feet, and of like proportion upon any street or avenue of a greater or less width, unless otherwise directed by the commissioners.

**Compensation for buildings.**

SECTION 9. The said park commissioners or jury, who shall assess the compensation to the owners for the ground taken, shall ascertain and make compensation for buildings as well as the ground taken; but all buildings and machinery and fixtures not required by the park commission shall be removed by the owners thereof whenever payment of the compensation awarded them shall be made or tendered to them, and upon such payment or tender the park commissioners shall **Proceedings where owners or lessees of ground taken cannot be found** forthwith take possession of the premises; if any owner or lessee of ground taken cannot be found, notice of the taking and valuation of his land shall be given by advertisement in two daily papers published in Philadelphia six times, and in the Legal Intelligencer twice, and the amount awarded in such case to the owner or lessee shall remain in the city treasury until such owner shall produce the decree of the court having jurisdiction in the premises, ordering the said moneys to be paid to him or his legal representatives.

**Commissioners and jury may make partial or special reports.**

SECTION 10. The said commissioners and jury may make partial or special reports from time to time to the court as they may be ready to do so, and the court may act upon such reports separately, and the powers of the jury shall continue, unless limited by the court or they be required by the court to make report, until they shall have reported on all the cases on which they have been appointed, although a term or terms of the courts shall have intervened; and jurors, not to exceed six in number, may be appointed upon one or more cases according to the order of the court made; and whenever any report of the said commissioners or of the jury shall have been

confirmed by the court, the valuation made shall be forthwith payable by the city of Philadelphia.

SECTION 11. The city of Philadelphia shall be authorized and required to raise, by loans from time to time, such sums of money as shall be necessary to make compensation for all grounds heretofore taken or to be taken for said Fairmount park, and for the laying out and construction thereof for public use, for the permanent care and improvement thereof, and for all culverts and other means for preserving the Schuylkill water pure for the use of the citizens of said city, and shall annually assess taxes for keeping in repair and good order the said park, and shall also provide for the payment of the interest on all said loans and the usual sinking fund for the redemption thereof. *City to effect compensation for grounds taken, &c.*

SECTION 12. The said park commissioners shall from time to time appoint such officers, agents and subordinates as they may deem necessary for the purposes of this act and the act to which this is a supplement, and they shall prescribe the duties and the compensation to be paid them; and so much of the second section of the act to which this is a supplement, as requires that the secretary shall be chosen from the commissioners, be and the same is hereby repealed. *Commissioners to appoint officers, agents, &c.*

SECTION 13. It shall be lawful for said park commissioners to acquire title to the whole or any tract of land, part of which shall fall within the boundaries mentioned in the first section of this act, and to take conveyance thereof in the name of the city of Philadelphia; and such part thereof as shall lie beyond or within the said park limits again to sell and convey in absolute fee simple to any purchaser or purchasers thereof by deeds, to be signed by the mayor under the seal of the city, to be affixed by direction of councils, either for cash or part cash, and part to be secured by bond and mortgage to the city, paying all cash into the city treasury: *Provided*, That the proceeds of such sales shall be paid into the sinking fund for the redemption of the loan created under the provisions of this act: *Provided also*, That no commissioner nor any officer under the park commission shall in any wise be directly or indirectly interested in any such sale of lands by the commissioners as aforesaid; and if any commissioner or officer aforesaid shall act in violation of this proviso, he shall, if a commissioner, be subject to expulsion, if an officer, to be discharged by a majority of votes of the board of park commissioners, after an opportunity afforded of explanation and defence. *May acquire and sell lands situate in part within boundaries mentioned. Proviso. Proviso.*

SECTION 14. The said board of commissioners shall annually hereafter, in the month of December, make to the mayor of the city of Philadelphia a report of their proceedings and a statement of their expenditures for the preceding year. *To make report to mayor annually.*

SECTION 15. The said park commissioners shall have exclusive power to lease from year to year all houses and buildings within the park limits, which may be let without prejudice to the interests and purposes of the park by leases, to be signed by their president and secretary, and to collect the rents and pay them into the city treasury. *May lease houses, &c., within park limits.*

**Buildings erected on grounds by boat clubs, &c., relative to.** SECTION 16. All houses and buildings now built or to be built on any part of the park grounds, by or for boat or skating clubs, or zoological or other purposes, shall be taken to have rights subordinate to the public purposes intended to be subserved by acquiring and laying out the park, and shall be subject to the regulations of said park commissioners under licenses, which shall be approved by the commission and signed by the president and secretary, and will subject them to their supervision and to removal or surrender to the city whensoever the said commissioners may require.

**Commissioners may accept property upon trusts.** SECTION 17. The said park commissioners shall have power to accept in the name and behalf of the city of Philadelphia devises, bequests and donations of lands, moneys, objects of art and natural history, maps and books, or other things, upon such trusts as may be prescribed by the testator or donor: *Provided,* Such trusts be satisfactory to the commission and compatible with the purposes of said park.

**Proviso.**

**Debts to bind commissioners, how created.** SECTION 18. None of the park commissioners nor any person employed by them shall have power to create any debt or obligation to bind said board of commissioners, except by the express authority of the said commissioners at a meeting duly convened.

**Management, &c., of park** SECTION 19. The said park commissioners shall have the power to govern, manage, lay out, plant and ornament the said Fairmount park, and to maintain the same in good order and repair, and to construct all proper bridges, buildings, railways and other improvements therein, and to repress all disorders therein under the provisions hereinafter contained.

**May license laying down of passenger railways.** SECTION 20. That the said park commissioners shall have authority to license the laying down and the use for a term of years from time to time of such passenger railways as they may think will comport with the use and enjoyment of the said park by the public, upon such terms as said commissioners may agree, all emoluments from which shall be paid into the city treasury.

**Rules and regulations.** SECTION 21. The said park shall be under the following rules and regulations, and such others as the park commissioners may from time to time ordain:

I. No person shall turn cattle, goats, swine, horses or other animals loose into the park.

II. No person shall carry fire arms or shoot birds in the park or within fifty yards thereof, or throw stons or other missiles therein.

III. No one shall cut, break, or in anywise injure or deface the trees, shrubs, plants, turf, or any of the buildings, fences, structures or statuary, or foul any fountains or springs within the park.

IV. No person shall drive or ride therein at a rate exceeding seven miles an hour.

V. No one shall ride or drive therein upon any other than upon the avenues and roads.

VI. No coach or vehicle used for hire shall stand upon any part of the park for the purpose of hire, nor except in waiting for persons taken by it into the park, unless, in either case, at points designated by the commission.

VII. No wagon or vehicle of burden or traffic shall pass through the park, except upon such road or avenue as shall be designated by the park commissioners for burden transportation.

VIII. No street railroad car shall come within the lines of the park without the license of the park commission.

IX. No person shall expose any article for sale within the park without the previous license of the park commission.

X. No person shall take ice from the Schuylkill within the park without the license of the said commission first had, upon such terms as they may think proper.

XI. No threatening, abusive, insulting or indecent language shall be allowed in the park.

XII. No gaming shall be allowed therein, nor any obscene or indecent act therein.

XIII. No person shall go in to bathe within the park.

XIV. No person shall fish or disturb the water-fowl in the pool or any pond, or birds in any part of the park, nor discharge any fire-works therein, nor affix any bills or notices therein.

XV. No person shall have any musical, theatrical or other entertainment therein without the license of the park commissioners.

XVI. No person shall enter or leave the park except by such gates or avenues as may be for such purpose arranged.

XVII. No gathering or meeting of any kind assembled through advertisement shall be permitted in the park without the previous permission of the commission, nor shall any gathering or meeting for political purposes in the park be permitted under any circumstances.

XVIII. That no intoxicating liquors shall be allowed to be sold within said park.

SECTION 22. Any person who shall violate any of said rules and regulations, and any others which shall be ordained by the said park commissioners for the government of said park, not inconsistent with this act and the laws and constitutions of this state and United States, the power to ordain which rules and regulations is hereby expressly given to said commissioners, shall be guilty of a misdemeanor, and shall pay such fine as may be prescribed by said park commissioners, not to exceed five dollars for each and every violation thereof, to be recovered before any alderman of said city, as debts of that amount are recoverable; which fines shall be paid into the city treasury: *Provided,* That if said park commissioners should license the taking of ice in said park, or the entry of any street railroad car therein, or articles for sale, or musical entertainments, it may be with such compensation as they may think proper, to be paid into city treasury: *And provided,* That any person violating any of said rules and regulations shall be further liable to the full extent of any damage by him or her committed, in trespass or other action; and any tenant or licensed party who shall violate the said rules, or any of them, or consent to or permit the same to be violated on his or her or their premises, shall forfeit his or her or their lease or license, and shall be liable to

*Penalty for violating rules and regulations.*

*Proviso.*

*Proviso.*

69

be forthwith removed by a vote of the park commission; and every lease and license shall contain a clause making it cause of forfeiture thereof for the lessee or party licensed to violate or permit or suffer any violation of said rules and regulations, or any of them; it shall be the duty of the police appointed to duty in the park, without warrant, forthwith to arrest any offender against the preceding rules and regulations whom they may detect in the commission of such offence, and to take the person or persons so arrested forthwith before a magistrate having competent jurisdiction.

**Profits realized, to be paid into city treasury.**

SECTION 23. All rents, license, charges and fees, all fines, proceeds of all sales, except of lands purchased, and profits of whatsoever kind, to be collected, received or howsoever realized, shall be paid into the city treasury as a fund to be exclusively appropriated by councils for park purposes, under the direction of said commission: *Provided*, That moneys or property given or bequeathed to the park commissioners upon specified trusts shall be received and receipted for by their treasurer, and held and applied according to the trusts specified.

**Proviso.**

**Councils may approve approaches to park.**

SECTION 24. That the councils of the city of Philadelphia be and they are hereby authorized to widen and straighten any street laid upon the public plans of said city, as they may think requisite to improve the approaches to Fairmount park.

**Act not to affect proceedings pending in court.**

SECTION 25. That nothing in this act contained shall suspend or affect any proceeding pending in court under any existing law, but the same shall be proceeded in as if this act had not been passed.

**Damages, how ascertained, &c.**

SECTION 26. The damages for ground and property taken for the purpose of this act shall be ascertained, adjusted and assessed in like manner as is prescribed by the act to which this is a supplement.

**Commissioners to employ park force to maintain order.**

SECTION 27. The said park commissioners shall employ, equip and pay a park force adequate to maintain good order therein and in all houses thereupon; which force shall be subject to the orders of the mayor upon any emergency, and so far as said force shall consist of others than the hands employed to labor in the park, it shall be appointed and controlled as the other police of the city.

**City solicitor to appoint additional assistant.**

SECTION 28. There shall be an additional assistant appointed by the city solicitor, whose duty it shall be, under the direction of the city solicitor, to attend to the assessments of damages, and to such other business of a legal nature connected with the park as said commissioners may require.

GEO. T. THORN,
Speaker of the House of Representatives pro tem.

JAMES L. GRAHAM,
Speaker of the Senate.

APPROVED—The fourteenth day of April, Anno Domini one thousand eight hundred and sixty-eight.

JNO. W. GEARY.

38

2d copy    Dept.   CH. S.

Mar. 18.

41

# LAWS AND ORDINANCES

GOVERNING THE

# VILLAGE OF HYDE PARK

TOGETHER WITH ITS

## CHARTER AND GENERAL LAWS

AFFECTING MUNICIPAL CORPORATIONS; SPECIAL ORDINANCES AND
CHARTERS UNDER WHICH CORPORATIONS HAVE VESTED RIGHTS
IN THE VILLAGE. ALSO, SUMMARY OF DECISIONS OF THE
SUPREME COURT RELATING TO MUNICIPAL CORPO-
RATIONS, TAXATION AND ASSESSMENTS.

---

PRINTED AND PUBLISHED BY

AUTHORITY OF THE PRESIDENT AND BOARD OF TRUSTEES

OF THE VILLAGE OF HYDE PARK.

---

REVISED AND ARRANGED

By CONSIDER H. WILLETT,

VILLAGE ATTORNEY.

CHICAGO
HISTORICAL
SOCIETY

HYDE PARK:
1876.

Case 1:22-cv-00695-JLS  Document 77-9  Filed 05/31/24  Page 175 of 190



172 AND 174 CLARK STREET.

FEB 4    1915

§ 2. The bonds authorized to be issued by the act of which this is amendatory and supplemental, may be issued, sold, and the proceeds applied for acquiring said lands, and for any and all purposes in the said act mentioned. Said bonds shall be retired and canceled as fast as the money for that purpose can be obtained, by the collection of the money due upon the special assessment provided for in section seven of the act hereinbefore mentioned, and a sufficient amount of any bonds that may be issued by the city of Chicago under any law now in force or hereinafter enacted, and received oy said commissioners, shall be applied to the purpose of retiring the bonds authorized by said act.

§ 3. The ninth section of said act is hereby so amended that the words "during the current year," shall read "during the next succeeding year."

§ 4. That the twelfth section of said act be and the same is hereby amended so as to read as follows: The said commissioners, or either of them, may be removed from office by the judge of the circuit court of Cook county, upon the petition presented to him in term time, or in vacation, by one hundred freeholders of said towns of South Chicago, Hyde Park and Lake, if it shall appear after hearing proof before said judge, that the said commissioners, or either of them, have been guilty of misdemeanor or malfeasance in office under this act ; and if the said judge shall remove any one or more of said commissioners from office for any cause before the expiration of their term of office, he is hereby authorized and empowered to fill the vacancy or vacancies thus created by appointing other commissioners in their place, who shall serve during the unexpired terms of the commissioners so removed.

§ 5. The commissioners to be appointed under said act are hereby vested with the same powers and duties as are conferred by said act in relation to lands designated for parks, over all streets running longitudinally along and adjoining any and all of the proposed parks, or strips of land designated in said original act, as are conferred by said act in relation to such parks and strips of land, as may be necessary to improve and keep in repair the same, in connection with the said parks or strips of land without obstructing the fences or other structures, free access to the said streets from existing roads and streets, and by owners of land abutting on the same.

§ 6. The elections held in the towns of South Chicago, Hyde Park and Lake, on the twenty-third day of March, A. D. 1869, under and by virtue of the eighteenth section of the act to which this is an amendment, are hereby legalized and confirmed, and said act shall be held and deemed to have been regularly and legally adopted by the legal voters of said towns, and shall remain in full force and effect, and shall be liberally construed in all courts, with a view to carry out and enforce the intent and meaning of the same.

§ 7. This act is hereby declared a public act, and shall take effect and be in force from and after its passage.

## SOUTH PARK ORDINANCES.

Whereas, by an act of the general assembly of the State of Illinois, entitled an act to provide for the location and maintenance of a park for the towns of South Chicago, Hyde Park and Lake, it is provided as follows, to-wit :

"The said board shall have full and exclusive powers to govern, manage and direct said park ; to lay out and regulate the same ; to pass ordinances for the regulation and government thereof ; to appoint such engineers, surveyors, clerks, and other officers, including a police force, as may be necessary ; to define and prescribe their respective duties and authority ; to fix the amount of their compensation ; and, generally, in regard to said park, they shall possess all the powers and authority now by law conferred upon or possessed by the common council of the city of Chicago, in respect to public squares and places in said city."

*Therefore, be it ordained by the South Park Commissioners as follows:*

§ 1. The said park, which is under the management and direction of the South Park Commissioners, shall be, and the same is hereby designated, as the South Park.

§ 2. No person shall, without the consent of the superintendent, play at ball, cricket, or any other game or play whatever, in said park.

§ 3. No person shall climb or walk upon any wall or fence of said park.

§ 4. Cattle, horses, goats, swine, or other animals, or domestic fowls, shall not be turned into said park, or allowed to run at large therein.

§ 5. No dog or bitch, or domestic fowl, belonging to any officer or employee of said commissioners residing within the limits of said park, shall be permitted to run at large.

§ 6. All persons are forbidden to carry fire arms, or to throw stones or other missiles within said park. All persons are forbidden to cut, break, or in any way injure or deface the trees, shrubs, plants, turf, or any of the buildings, fences, bridges, or other construction or property within or upon said park.

§ 7. No person shall converse with, or in any manner hinder those engaged in constructing or repairing said park.

§ 8. No animal shall be driven or ridden in said park, at a rate of speed exceeding eight miles per hour.

§ 9. No vehicle, or horse, or other animal, shall be permitted on the foot walks, the same being assigned exclusively to pedestrians ; nor shall any vehicle, or horse or other animal of burden, go or be taken upon any part of said park, except upon the carriage drives and upon such places as are appropriated for carriages at rest.

§ 10. No vehicles or animals shall be permitted to stand upon the drive or carriage roads of said park, or of any part thereof, to the obstruction of the way, or the inconvenience of travel ; nor shall any person solicit passengers within said park without consent of the board.

§ 11. No person shall, within said park, expose for sale any article or thing, nor shall any hawking or peddling be allowed therein.

§ 12. No omnibus, wagon, cart, dray, truck, or other vehicle for carrying goods, merchandise, manure, or other articles, except such as are engaged in repairing or constructing said park, shall be allowed to enter the same.

§ 13. No language, abusive, insulting, obscene, or calculated to occasion a breach of the peace, shall be permitted in said park, nor shall persons tell fortunes, play at any game of chance, at any table or instrument, be drunk, or do any indecent acts therein.

Case 1:22-cv-00695-JLS  Document 77-6  Filed 05/31/24  Page 178 of 190

§ 14. No person shall bathe or fish, or go or send, or ride any animals into the waters of said park, nor shall any person disturb any fish, fowl or other animals kept therein, or throw or place any article or thing into the waters or upon the grounds thereof.

§ 15. No person shall discharge, or set, or touch off, or enkindle, or operate any manner of fire, or fireworks in the said park.

§ 16. No person shall, in the said park, post or fix any notice or bill ; nor shall such be posted or fixed on any tree, fence, or any place therein.

§ 17. No person shall, in the said park, play any musical instrument, nor carry or display any flags, banners, transparencies, or target.

§ 18. No band or company shall be permitted to parade, drill, or perform any movements, evolutions or ceremony in said park without the consent of the park commissioners.

§ 19. No funeral procession, or hearse carrying a deceased body, shall be in the said park permitted.

§ 20. No horse or other animal shall be permitted to go upon any grass or lawn, nor shall any person be permitted to go thereon except where the word " common " shall be posted to indicate the permission so to do.

§ 21. Any member of the South Park police shall have power to arrest, and commit for examination, any person who shall not, when directed, desist from any violation thereof.

§ 22. Any person who shall disobey, or neglect, fail, or refuse to comply with this ordinance, or any section thereof, except when otherwise herein provided, shall, on conviction thereof, pay a fine of not less than *five*, or more than one hundred dollars.

§ 23. The police force of said South Park Commissioners, shall consist of one captain, three sergeants, and such number of policemen as shall from time to time be appointed, and they shall hold their respective offices during the pleasure of the park commissioners. The captain of police shall have the general charge of the police force, subject to such rules and regulations as shall from time to time be established, and it shall be his duty to report to the commissioners, in writing, the delinquency of any member of the police force, and may suspend any such member, until such delinquency shall be acted upon by the commissioners.

§ 24. The several members of the police force, when on duty, shall devote their time and attention to discharge of the duties of their station according to the ordinance, rules, and regulations and directions of the superintendent, and it shall be their duty, to the best of their ability, to preserve order, peace, and quiet, and to enforce the laws and the ordinances of said commissioners, and they shall not engage in conversation with an employée of the park during working hours, except in the line of duty ; they shall have power to arrest any persons in the park found in the act of violating any law or ordinance, or abetting and aiding in any such violation, and shall take all such persons so arrested, as follows, to-wit : when the offense is committed in that portion of the park situated in the town of Hyde Park, to some justice or magistrate in Hyde Park ; when the offense is committed in that portion of the park situated in the town of Lake, to some justice or magistrate in said town of Lake ; and when the offense

is committed in that portion of the park situated in the town of South Chicago, to some justice of the peace in said town of South Chicago.

§ 25.    Whoever, in said park, shall resist any member of the police force in the discharge of his duty, or shall in any way interfere with, or hinder or prevent him from discharging his duty, as such member, or shall offer or endeavor to do so ; and whoever shall in any manner assist any person in custody of any member of the police force to escape, or attempt to escape, from such custody, or shall rescue, or attempt to rescue, any person in custody, shall be fined not less than five dollars, or more than one hundred dollars.

§ 26.    The superintendent, in cases of emergency, is hereby authorized and empowered to appoint special policemen, and such special policemen shall have the same power and authority of regular policemen, provided the appointment of such special policeman shall in no case continue for a period exceeding twenty-four hours.

§ 27.    The sergeant of police shall perform the duties of the captain when the latter shall be absent from duty.

§ 28.    The police force shall be uniformed as follows : Gray frock coat, pants and vest, and cap with brass buttons, and black cord on leg of the pants.

§ 29.    Any person who shall falsely represent or personate any of the members of the police force, or who shall maliciously, with intent to deceive, use or imitate any of the signs, signals, or devices adopted and used by the police department, or shall wear in public the uniform adopted as the police uniform, after having been removed or suspended, shall be subject to a fine of not less than five dollars nor more than one hundred.

§ 30.    These ordinances shall take effect and be in force from and after the 19th day of November, 1875.

39

# THE

# MUNICIPAL CODE

OF

# CHICAGO:

COMPRISING THE

LAWS OF ILLINOIS RELATING TO THE CITY OF CHICAGO,

AND THE

# ORDINANCES OF THE CITY COUNCIL;

CODIFIED AND REVISED

BY

## EGBERT JAMIESON AND FRANCIS ADAMS.

PUBLISHED BY AUTHORITY OF THE CITY COUNCIL.

CHICAGO:

BEACH, BARNARD & CO., LEGAL PRINTERS.

1881.

Ovd 83
C 4d
881

Case 1:22-cv-00695-JLS  Document 77-9  Filed 05/31/24  Page 183 of 190

person who shall be convicted of any such breach shall be adjudged to pay a fine of not less than three dollars nor more than one hundred dollars.

1683. In every prosecution brought for a violation of any ordinance of the city of Chicago, where the offense charged is one punishable under the laws of the State of Illinois as a misdemeanor, the court or magistrate trying the cause may upon conviction in lieu of the fine imposed by the ordinance or in addition thereto, cause the offender to be imprisoned in the house of correction for a period not exceeding three months.

1684. All the printed books containing the revised ordinances shall be deposited with the city comptroller. He shall deliver one copy thereof to each officer of the city, and to such other persons as the city council may direct.

1685. The mayor shall have power to extend to or reciprocate courtesies of other cities, by presenting to them a copy of the revised ordinances bound at the expense of the city in such manner as to him may seem suitable.

## Article XLIII.

### Parks and Public Grounds.

1686. The several public parks, squares and grounds in the city of Chicago, shall be known and designated by the names applied thereto respectively on the map of the city of Chicago published by J. Van Vechten and Snyder in the year 1877.

1687. It shall be the duty of the commissioner of public works to superintend all inclosed public grounds and keep the fences thereof in repair, the walks in order and the trees properly trimmed and improve the same according to plans approved by the city council. He shall likewise cause printed or written copies of prohibitions of this article to be posted in the said grounds or parks.

1688. No person shall enter or leave any of the public parks of the city of Chicago except by their gateways; no person shall climb or walk upon their walls or fences.

1689. Neither cattle, horses, goats, swine or other animals, except as herein provided, shall be turned into any one of the said parks by any person.

1690. All persons are forbidden to carry firearms or to throw stones or other missiles within any one of the public parks. All persons are forbidden to cut, break or in any way injure or deface

Case 1:22-cv-00695-JLS   Document 77-9   Filed 05/31/24   Page 184 of 190

the trees, shrubs, plants, turf or any of the buildings, fences, bridges or other construction or property within or upon any of the said parks.

1691.   No person shall converse with or in any way hinder those engaged in their construction.

1692.   No person shall expose any article or thing for sale upon any of said parks, except such person shall have been previously licensed by the commissioner of public works, nor shall any hawking or peddling be allowed therein.

1693.   No threatening, abusive, insulting or indecent language shall be allowed in any part of either of the said parks whereby a breach of the peace may be occasioned.   No person shall be allowed to tell fortunes or play at any game of chance at or with any table or instrument of gaming, nor to do therein any obscene or indecent act.

1694.   In case of any emergency where life or property is endangered, all persons if required so to do by the superintendent or any of his assistants, shall remove from the portion of either of said parks specified by the superintendent or his assistants and remain off the same until permission is given to return.

1695.   The commissioner of public works may direct that any of the entrances to the public parks be closed at any time.

1696.   No person shall bathe or fish in, or go or send or ride any animal in any of the waters of either of the said public parks, nor disturb any of the fish, water fowl or other birds in any of said parks, or any deer, sheep or other animal belonging to and preserved therein, nor throw or place any article or thing in the waters within either of said parks.

1697.   No person shall post or otherwise affix any bills, notice or other paper upon any structure or thing within either of said parks nor upon any of the gates or inclosures thereof.

1698.   No person shall without the consent of the commissioner of public works, play upon any musical instrument nor shall any person take into or carry or display in the said public parks any flag, banner, target or transparency.   No military or target company civic or other shall be permitted to parade, drill or perform therein any military or other evolutions or movements.   Nor shall any fire engine, hook and ladder truck, hose cart or other machine on wheels commonly used for the extinguishing of fires be allowed on any part of said parks without the previous consent of the commissioner of public works.

Case 1:22-cv-00695-JLS   Document 77-9   Filed 05/31/24   Page 185 of 190

1699. No person other than employes shall light, make or use any fire thereon.

1700. No person shall go upon the grass, lawn or turf of the parks except when and where the word " common " is posted, indicating that persons are at liberty at that time and place to go on the grass.

1701. Any member of the city police shall have power to arrest any person who shall not desist from any violation hereof when directed, and cause him to be committed for examination.

1702. The foregoing sections of this article so far as applicable shall apply to all the public squares of the city of Chicago.

1703. Any person who shall violate any or either of the provisions of this or any section or clause or any provision of any section thereof, or who shall neglect or fail or refuse to comply with any or either of the requirements thereof, shall on conviction pay a fine of not less than five dollars nor more than one hundred dollars.

## ARTICLE XLIV.

### *Pawnbrokers and Loanbrokers or Keepers of Loan Offices.*

1704. The mayor may from time to time grant licenses to such persons as shall produce to him satisfactory evidence of their good character to exercise or carry on the business of a pawnbroker, or of a loanbroker or keeper of a loan office; and no person shall exercise or carry on the business of a pawnbroker, loanbroker or keeper of a loan office without being duly licensed, under the penalty of one hundred dollars for each day he or she shall exercise or carry on said business without such license.

1705. Any person who loans money on deposit or pledge of personal property or other valuable thing, or who deals in the purchasing of personal property or other valuable thing on condition of selling the same back again at a stipulated price, is hereby defined and declared to be a pawnbroker.

1706. Every person receiving such license shall pay therefor the sum of one hundred and fifty dollars for the use of the city.

1707. Every person so licensed shall at the time of receiving such license, enter with two sufficient sureties into a joint and several bond to the city of Chicago in the penalty of five hundred dollars, conditioned for the due observance of all such ordinances of the city council as may be passed or in force respecting pawnbrokers and loanbrokers or keepers of loan offices, at any time during the continuance of such license.

40

# THE REVISED

# ORDINANCES

### OF THE

# CITY OF DANVILLE,



## PUBLISHED BY AUTHORITY OF THE CITY COUNCIL,



### REVISED AND ARRANGED BY

# MANN, CALHOUN & FRAZIER.

DANVILLE, ILL.:
BOWMAN & FREESE, BOOK AND JOB PRINTERS.

1883.

Case 1:22-cv-00091-JLS   Document 77-8   Filed 05/31/24   Page 188 of 190

# GENERAL INCORPORATION LAW

## OF

# CITIES AND VILLAGES.

OCT 13 1915

Case 1:22-cv-00585-JLS  Document 77-4  Filed 06/11/24  Page 189 of 190

# CHAPTER XIX.

## PARKS.

SECTION.

1. Committee on public grounds, etc. to have charge.
2. Entering Parks, etc.—Climbing on fences.
3. Turning animals into park, etc.
4. Firearms—Shooting—fire works prohibited.
5. Injury to trees, grass, buildings.
6. Selling, hawking, peddling, etc. forbidden.
7. Bathing, fishing, etc. prohibited.

SECTION.

8. Abusive, profane language, etc. prohibited.
9. Gaming, etc. prohibited.
10. Intoxicated persons, indecent or unlawful acts.
11. Fires in parks forbidden.
12. Carriages on turf, etc.— hitching horses to trees, etc.
13. Throwing stones, rubbish, etc. in parks.
14. Posting bills, etc. forbidden.

COMMITTEE ON PUBLIC GROUNDS, ETC., TO HAVE CHARGE OF PARKS.] § 1. It shall be the duty of the committee on Public Grounds and Buildings to superintend all inclosed public grounds or parks in said city, and keep the fences thereof in repair, the walks in order, the trees properly trimmed, and to improve the same according to plans approved by the city council.

PENALTY FOR LEAVING PARK EXCEPT AT GATEWAYS—CLIMBING ON FENCE, ETC.] § 2. Whoever shall enter or leave any of the public parks of this city except by their gateways, or shall walk or climb upon any of the fences inclosing, or in the same, shall be fined not less than one dollar nor more than ten dollars for each offense.

TURNING ANIMALS INTO PARK PROHIBITED.] § 3. Whoever shall turn any cattle, horses, goats, swine or other animals into any park of said city, or permit the same, or any of them, to run therein, shall be fined not less than three dollars, nor more than fifty dollars, for each offense.

FIRE-ARMS AND FIRE-WORKS FORBIDDEN.] § 4. Whoever shall carry any fire-arms into said parks, or shall fire off or discharge the same in, or into said parks, or any of them ; or whoever shall shoot, fire or discharge any kind of fire-works therein, shall be fined not less than one dollar nor more than one hundred dollars, for each offense.

INJURY TO TREES, GRASS, BUILDINGS, ETC.] § 5. Whoever shall cut, break or injure in any way any tree, shrub or plant, in any such park ; or shall cut, tramp, or injure in any way the turf or grass therein, or shall walk or lie upon the grass at any place where placards are posted directing persons to keep off, or not to walk upon the same ; or shall cut, mark, deface or in any way injure any of the buildings, fences, bridges, or other constructions, or property of any kind, in any such park, shall be fined not less than one dollar, nor more than one hundred dollars for each offense.

Case 1:22-cv-00699-JLS  Document 77-9  Filed 05/31/24  Page 190 of 190

SELLING, HAWKING OR PEDDLING FORBIDDEN.] § 6. Whoever shall sell, or offer to sell, any article or thing, in any such park, or shall hawk or peddle any article or thing therein, or attempt so to do, shall be fined not less than three dollars, nor more than one hundred dollars.

BATHING—FISHING, ETC., PROHIBITED.] § 7. Whoever shall bathe, fish in, or ride or drive any animal in the waters of any such park, or throw any rubbish or garbage or other thing into any stream or waters of such park, shall be fined not less than three dollars, nor more than ten dollars.

ABUSIVE LANGUAGE, ETC.] § 8. Whoever shall use any threatening, abusive, insulting, profane, or indecent language in any part of any such park, shall be fined not less than three dollars, nor more than one hundred dollars.

GAMING, ETC., PROHIBITED.] § 9. Whoever shall gamble for money or other valuable thing, or anything representing or intended to represent money, or other thing of value, or shall play at any game of chance, or at or with any table, instrument or device of gaming, in any part of any such park, shall be fined not less than five dollars, nor more than two hundred dollars for each offense.

INTOXICATED PERSONS—INDECENT OR UNLAWFUL ACTS.] § 10. Whoever shall be found in any such park in an intoxicated condition, or shall resort to such park for any indecent, or unlawful purpose ; or shall be guilty of any indecent, obscene, vulgar, improper or unlawful act while there, shall be fined not less than five dollars, nor more than two hundred dollars.

FIRES IN PARK PROHIBITED.] § 11. Whoever, except employees, or laborers in such park, shall light or make any fire in said parks, shall be fined not less than three dollars, nor more than one hundred dollars.

DRIVING CARRIAGES, ETC., ON TURF—HITCHING HORSES TO TREES.] § 12. Whoever shall drive any carriage or vehicle of any kind, or any horse or other animal upon the grass, lawn or turf, of any such park, or shall hitch a horse to any of the shrubs or trees therein, shall be fined not less than one dollar, nor more than fifty dollars for each offense.

THROWING STONES, RUBBISH, ETC., IN PARKS.] § 13. Whoever shall throw any stones into, or in such parks, or shall throw or place any rubbish or garbage of any kind therein, or shall leave or place any bottle, cans, paper, or scraps of any kind therein, shall be fined not less one dollar, nor more than twenty-five dollars for each offense.

POSTING BILLS, ETC., FORBIDDEN.] § 14. Whoever shall post, or otherwise affix any bills, notice or other paper, upon any fence, tree, bridge, building or other structure therein, shall be fined not less than three dollars.