91

# ACTS AND RESOLUTIONS

OF THE

# GENERAL ASSEMBLY

OF THE

# STATE OF GEORGIA,

PASSED IN ATLANTA, GEORGIA,

AT THE

# SESSION OF 1870.

---

## COMPILED AND PUBLISHED BY AUTHORITY.

---

ATLANTA, GEORGIA:
PRINTED BY THE PUBLIC PRINTER.
1870.

To preserve the peace and harmony of the people of this State, etc.

# TITLE XVI.

## PENAL CODE—AMENDMENTS TO.

SECTIONS.
1. Carrying deadly weapons to certain places prohibited.
2. Violation—misdemeanor—penalty.
3. Chain-gang punishment prohibited.
4. Punishment in lieu of chain-gang.

SECTIONS.
5. Section 415 of the Code changed—*nolle prosequi*.
6. All indictments, etc., submitted to a jury.

### (No. 285.)

*An Act to preserve the peace and harmony of the people of this State, and for other purposes.*

SECTION 1. *Be it enacted, etc.,* That, from and immediately after the passage of this act, no person in said State of Georgia be permitted or allowed to carry about his or her person any dirk, bowie-knife, pistol or revolver, or any kind of deadly weapon, to any court of justice, or any election ground or precinct, or any place of public worship, or any other public gathering in this State, except militia muster-grounds. <span>Carrying deadly weapons to certain places prohibited.</span> <span>Exception.</span>

SEC. 2. *Be it further enacted,* That if any person or persons shall violate any portion of the above recited section of this act, he, she or they shall be guilty of a misdemeanor, and upon conviction shall be punished by a fine of not less than twenty nor more than fifty dollars for each and every such offense, or imprisonment in the common jail of the county not less than ten nor more than twenty days, or both, at the discretion of the court. <span>Violation a misdemeanor—penalty.</span>

SEC. 3. All laws and parts of laws militating against this act are hereby repealed.

Approved October 18, 1870.

### (No. 286.)

*An Act to alter and amend section 4245 of Irwin's Revised Code, by striking out of said section the words " to work in a chain-gang on the public works," and for other purposes.*

SECTION 1. *Be it enacted, etc.,* That the words "to work in a chain-gang on the public works," which occur in fourth and fifth lines of section 4245 of Irwin's Code, be, and the same are hereby, <span>Chain-gang punishment prohibited.</span>

To repeal Section 415 of the Revised Code.

stricken from said section, and chain-gangs shall no longer exist, or be tolerated in the State of Georgia, for persons convicted of misdemeanors.

SEC. 2. *Be it further enacted,* That said section be further amend-
<span style="font-size:smaller">Punishment</span> ed, by substituting for the words herein stricken out, the words
<span style="font-size:smaller">in lieu of</span> " to work on the city or town streets, or county roads, not longer
<span style="font-size:smaller">chain-gang.</span> than six months; but in no case shall such prisoners be chained or otherwise confined in a gang, but shall be guarded."

SEC. 3. *Be it further enacted,* That all laws and parts of laws in conflict with this act be, and they are hereby, repealed.

Approved October 27, 1870.

---

(No. 287.)

*An Act to repeal section four hundred and fifteen* (415) *of Irwin's Revised Code, in relation to entering nolle prosequis, and to prescribe the mode of settlement in criminal cases.*

SECTION 1. *Be it enacted, etc.,* That section four hundred and
<span style="font-size:smaller">Section 415</span> fifteen (415) of Irwin's Revised Code of Georgia, which said section
<span style="font-size:smaller">of Code, as to nolle pros-</span> authorizes Solicitors-General in this State to enter a *nolle prose-*
<span style="font-size:smaller">equi, repeal-ed.</span> *qui* on indictments, be, and the same is hereby repealed, and no
*nolle prosequi* shall be allowed, except it be in open court, for some fatal defect in the bill of indictment, to be judged of by the court,
<span style="font-size:smaller">Judge shall</span> in which case the presiding Judge shall order another bill of in-
<span style="font-size:smaller">order sec-ond bill.</span> dictment to be forthwith submitted to the grand jury.

SEC. 2. *And be it further enacted by the authority aforesaid,* That
<span style="font-size:smaller">All indict-</span> all cases of indictments, or special presentments, shall be submit-
<span style="font-size:smaller">ments sub-mitted to</span> ted to and passed upon by the jury, under the direction of the
<span style="font-size:smaller">jury.</span> presiding Judge, unless there is a settlement thereof between the
<span style="font-size:smaller">Settle-</span> prosecutor and defendant, which settlement shall be good and
<span style="font-size:smaller">ment—when good.</span> valid only by the approval and order of the court on examination into the merits of the case.

SEC. 3. *And be it further enacted, etc.,* That all laws and parts of laws conflicting with this act be, and the same are hereby, repealed.

Approved October 28, 1870.

92

# LAWS OF MISSOURI,

PASSED AT THE SESSION OF THE

# THIRTY-SECOND GENERAL ASSEMBLY,

BEGUN AND HELD AT THE CITY OF JEFFERSON,

# WEDNESDAY, JANUARY 3, 1883.

(REGULAR SESSION.)

*BY AUTHORITY.*



JEFFERSON CITY:
STATE JOURNAL COMPANY, STATE PRINTERS.
1883.

76                          CRIMES AND CRIMINAL PROCEDURE.

*Be it enacted by the General Assembly of the State of Missouri, as follows:*

SECTION 1.   Any person or persons doing a commission business in this state who shall receive cattle, hogs, sheep, grain, cotton or other commodities consigned or shipped to him or them for sale on commission, and who shall wilfully make a false return to his or their consignor or shipper, in an account of sale or sales of any such cattle, hogs, sheep, grain, cotton or other commodities made and rendered by such person or persons for and to such consignor or shipper, either as to weights or prices, shall be guilty of a misdemeanor and shall, on conviction, be punished by imprisonment in the county jail not exceeding one year, or by a fine not exceeding five hundred dollars nor less than two hundred dollars, or by fine not less than one hundred dollars and imprisonment in the county jail not less than three months.
Approved April 2, 1883.

———

## CRIMES AND CRIMINAL PROCEDURE: CONCEALED WEAPONS.

AN ACT to amend section 1274, article 2, chapter 24 of the Revised Statutes of Missouri, entitled "Of Crimes and Criminal Procedure."

SECTION 1.   Carrying concealed weapon. etc., penalty for increased.

*Be it enacted by the General Assembly of the State of Missouri, as follows:*

SECTION 1.   That section 1274 of the Revised Statutes of Missouri be and the same is hereby amended by inserting the word "twenty" before the word "five" in the sixteenth line of said section, and by striking out the word "one" in the same line and inserting in lieu thereof the word "two," and by striking out the word "three" in the seventeenth line of said section and inserting in lieu thereof the word "six," so that said section, as amended, shall read as follows:  Section 1274.  If any person shall carry concealed, upon or about his person, any deadly or dangerous weapon, or shall go into any church or place where people have assembled for religious worship, or into any school room or place where people are assembled for educational, literary or social purposes, or to any election precinct on any election day, or into any court room during the sitting of court, or into any other public assemblage of persons met for any lawful purpose other than for militia drill or meetings called under the militia law of this state, having upon or about his person any kind of fire arms, bowie knife, dirk, dagger, slung-shot or other deadly weapon, or shall in the presence of one or more persons exhibit any such weapon in a rude, angry or threatening manner, or shall have or carry any such weapon upon or about his person when intoxicated or under the influence of intoxicating drinks, or shall directly or indirectly sell or deliver, loan or barter to any minor any such weapon, without the consent of the parent or guardian of such minor, he shall, upon conviction, be punished by a fine of not less than twenty-five nor more than two hundred dollars, or by imprisonment in the county jail not exceeding six months, or by both such fine and imprisonment.
Approved March 5, 1883.

93

# PENAL CODE

## OF

# STATE OF IDAHO,

## 1901.

Press of
**Capital** News Printing Co.,
Boise, Idaho.

person of F. a bodily injury, as while being prosecuted in the magistrate's court for displaying a deadly weapon in a rude, angry and threatening manner in the presence of others, the defendant was never in any danger of being convicted of an assault with a deadly weapon with intent to inflict bodily harm.—Territory v. Stocker, 9 Mont. 6. 22 Pac. 496.

### Section 4781.   Persons Other than Officers Carrying Certain Weapons:

It is unlawful for any person, except United States officials, officials of the State of Idaho, county officials, peace officers, guards of any jail, and officers or employees of any express company on duty, to carry, exhibit or flourish any dirk, dirk-knife, sword, sword-cane, pistol, gun or other deadly weapons, within the limits or confines of any city, town or village or in any public assembly of the State of Idaho.   Every person so doing is guilty of a misdemeanor and is punishable by fine not less than fifty dollars nor more than one hundred dollars, or by imprisonment in the county jail for a period of not less than twenty days nor more than fifty days, or by both such fine and imprisonment.

1889, 15th Ses. p. 23, Sec. 1.

### Section 4782.   Fines Provided in Preceding Section· To Whom Paid:

One half of all fines collected under the preceding Section shall be paid to the officer making the arrest, which amount shall be payment in full for his services.   The other one half shall be paid into the common School Fund of the county, after deducting the necessary costs of the prosecution of the case.

1889, 15th Ses. p. 23, Sec. 2.

### Section 4783.   Forcible Entry:

Every person using or procuring, encouraging or assisting another to use, any force or violence in entering upon or detaining any lands or other possessions of another, except in the cases and in the manner allowed by law, is guilty of a misdemeanor.

1887 R. S. Sec. 6962; 1874-5 p. 209, Sec. 570.          Forcible entry:   See Sec. 3974 C. Civ. Proc.

### Section 4784.   Taking Repossession of Land:

Every person who has been removed from any lands by process of law, or who has removed from any lands pursuant to the lawful adjudication or direction of any court, tribunal, or officer, and who afterwards unlawfully returns to settle, reside upon, or take possession of such lands, is guilty of a misdemeanor.

1887 R. S. Sec. 6963.

# CHAPTER CCXVIII.

## CRIMES AGAINST THE REVENUE AND PROPERTY OF THE STATE.

Section.
4785. Embezzlement and falsification of accounts by public officers.
4786. Officers neglecting to pay over public moneys.
4787. Public moneys defined.

Section.
4788. Certain officers refusing to pay over fine or forfeiture according to law.
4789. Refusing to give assessor list of property,

94

# SESSION LAWS

OF THE

## FIFTEENTH

# LEGISLATIVE ASSEMBLY

OF THE

## TERRITORY OF ARIZONA.

SESSION BEGUN ON THE TWENTY-FIRST DAY
OF JANUARY, A. D. 1889.

16                    LAWS OF ARIZONA.

SEC. 3.   This Act shall take effect from and after its pass-
age.

Approved March 18, 1889.

No. 12.                    AN  ACT

Concerning the Transaction of Judicial Business on Legal Holi-
days.

*Be it enacted by the Legislative Assembly of the Territory of
Arizona:*

SECTION 1.   No Court of Justice shall be open, nor shall
any Judicial business be transacted on any Legal Holiday, ex-
cept for the following purposes:

1.   To give, upon their request, instructions to a Jury
when deliberating on their verdict.

2.   To receive a verdict or discharge a Jury.

3.   For the exercise of the powers of a magistrate in a
criminal action, or in a proceeding of a criminal nature; pro-
vided, that the Supreme Court shall always be open for the
transaction of business; and provided further, that injunctions,
attachments, claim and delivery and writs of prohibition may
be issued and served on any day.

SEC. 2.   All Acts and parts of Acts in conflict with this
Act are hereby repealed.

SEC. 3.   This Act shall be in force and effect from and after
its passage.

Approved March 18, 1889.

No. 13.                    AN ACT

Defining and Punishing Certain Offenses Against the Public
Peace.

*Be it Enacted by the Legislative Assembly of the Territory
of Arizona:*

SECTION 1.   If any person within any settlement, town,
village or city within this Territory shall carry on or about his
person, saddle, or in his saddlebags, any pistol, dirk, dagger,
slung shot, sword cane, spear, brass knuckles, bowie knife, or
any other kind of knife manufactured or sold for purposes of
offense or defense, he shall be punished by a fine of not less
than twenty-five nor more than one hundred dollars; and in
addition thereto, shall forfeit to the County in which he is con-
victed, the weapon or weapons so carried.

SEC. 2.   The preceding article shall not apply to a per-
son in actual service as a militiaman, nor as a peace officer

or policeman, or person summoned to his aid, nor to a revenue or other civil officer engaged in the discharge of official duty, nor to the carrying of arms on one's own premises or place of business, nor to persons traveling, nor to one who has reasonable ground for fearing an unlawful attack upon his person, and the danger is so imminent and threatening as not to admit of the arrest of the party about to make such attack upon legal process.

SEC. 3.   If any person shall go into any church or religious assembly, any school room, or other place where persons are assembled for amusement or for educational or scientific purposes, or into any circus, show or public exhibition of any kind, or into a ball room, social party or social gathering, or to any election precinct on the day or days of any election, where any portion of the people of this Territory are collected to vote at any election, or to any other place where people may be assembled to minister or to perform any other public duty, or to any other public assembly, and shall have or carry about his person a pistol or other firearm, dirk, dagger, slung shot, sword cane, spear, brass knuckles, bowie knife, or any other kind of a knife manufactured and sold for the purposes of offense or defense, he shall be punished by a fine not less than fifty nor more than five hundred dollars, and shall forfeit to the County the weapon or weapons so found on his person.

SEC. 4.   The preceding article shall not apply to peace officers, or other persons authorized or permitted by law to carry arms at the places therein designated.

SEC. 5.   Any person violating any of the provisions of Articles 1 and 3, may be arrested without warrant by any peace officer and carried before the nearest Justice of the Peace for trial; and any peace officer who shall fail or refuse to arrest such person on his own knowledge, or upon information from some credible person, shall be punished by a fine not exceeding three hundred dollars.

SEC. 6.   Persons traveling may be permitted to carry arms within settlements or towns of the Territory for one-half hour after arriving in such settlements or town, and while going out of such towns or settlements; and Sheriffs and Constables of the various Counties of this Territory and their lawfully appointed deputies may carry weapons in the legal discharge of the duties of their respective offices.

SEC. 7.   It shall be the duty of the keeper of each and every hotel, boarding house and drinking saloon, to keep posted up in a conspicuous place in his bar room, or reception room if there be no bar in the house, a plain notice to travelers to divest themselves of their weapons in accordance with Section 9 of this Act, and the Sheriffs of the various Counties

shall notify the keepers of hotels, boarding houses and drinking saloons in their respective Counties of their duties under this law, and if after such notification any keeper of a hotel, boarding house or drinking saloon, shall fail to keep notices posted as required by this Act, he shall, on conviction thereof before a Justice of the Peace, be fined in the sum of five dollars to go to the County Treasury.

SEC. 8.    All Acts or parts of Acts in conflict with this Act are hereby repealed.

SEC. 9.    This Act shall take effect upon the first day of Apr l, 1889.

Approved March 18, 1889.

---

No. 14.                    AN ACT

To Amend Paragraph 492, Revised Statutes.

*Be it Enacted by the Legislative Assembly of the Territory of Arizona:*

SECTION I.    That Paragraph 492, Chapter 5, Title 13, of the R vised Statutes, be amended so as to read as follows: "If he fail to attend in person or by deputy any term of the District Court, the Court may designate some other person to perform the duties of District Attorney during his absence from Court, who shall receive a reasonable compensation to be certified by the Court, and paid out of the County Treasury, which the Court shall by order direct to be deducted from the salary of the District Attorney, if the absence of such Attorney is not excused by such Court."

SEC. 2.    That all Acts and parts of Acts in conflict with this Act be, and the same are, hereby repealed.

SEC. 3.    That this Act shall take effect and be in force from and after its passage.

Approved March 19, 1889.

---

No. 15.                    AN ACT

To Provide for the Payment of Boards of Supervisors of the Counties within the Territory of Arizona.

*Be it Enacted by the Legislative Assembly of the Territory of Arizona:*

SECTION I.    Each member of the Board of Supervisors within this Territory shall be allowed as compensation for their services Five Dollars per day for each day's actual attendance at the sitting of said Board, at which sitting any County business is transacted; and twenty cents per mile actually traveled

95

# THE

# STATUTES OF OKLAHOMA

## 1890.

Compiled under the supervision and direction of Robert Martin,
Secretary of the Territory,

—BY—

WILL T. LITTLE,  L. G. PITMAN and R. J. BARKER,

—FROM—

The Laws Passed by the First Legislative Assembly of the Territory.

GUTHRIE, OKLAHOMA:
THE STATE CAPITAL PRINTING CO.,
PUBLISHERS.
1891.

(2430) § **6.** Every person who, with intent to extort any money or other property from another, sends to any person any letter or other writing, whether subscribed or not, expressing or implying, or adapted to imply, any threat, such as is specified in the second section of this article, is punishable in the same manner as if such money or property were actually obtained by means of such threat.

*Chap. 25.*
*Sending threatening letter.*

(2431) § **7.** Every person who unsuccessfully attempts by means of any verbal threat such as is specified in the second section of this article, to extort money or other property from another is guilty of a misdemeanor.

*Attempting to export money.*

## ARTICLE 47.—CONCEALED WEAPONS.

| SECTION. | SECTION. |
|---|---|
| 1. Prohibited weapons enumerated. | 6. Degree of punishment. |
| 2. Same. | 7. Public buildings and gatherings. |
| 3. Minors. | 8. Intent of persons carrying weapons. |
| 4. Public officials, when privileged. | 9. Pointing weapon at another. |
| 5. Arms, when lawful to carry. | 10. Violation of certain sections. |

(2432) § **1.** It shall be unlawful for any person in the Territory of Oklahoma to carry concealed on or about his person, saddle, or saddle bags, any pistol, revolver, bowie knife, dirk, dagger, slung-shot, sword cane, spear, metal knuckles, or any other kind of knife or instrument manufactured or sold for the purpose of defense except as in this article provided.

*Prohibited weapons enumerated.*

(2433) § **2.** It shall be unlawful for any person in the Territory of Oklahoma, to carry upon or about his person any pistol, revolver, bowie knife, dirk knife, loaded cane, billy, metal knuckles, or any other offensive or defensive weapon, except as in this article provided.

*Same.*

(2434) § **3.** It shall be unlawful for any person within this Territory, to sell or give to any minor any of the arms or weapons designated in sections one and two of this article.

*Minors.*

(2435) § **4.** Public officers while in the discharge of their duties or while going from their homes to their place of duty, or returning therefrom, shall be permitted to carry arms, but at no other time and under no other circumstances: *Provided, however,* That if any public officer be found carrying such arms while under the influence of intoxicating drinks, he shall be deemed guilty of a violation of this article as though he were a private person.

*Public officials, when privileged.*

(2436) § **5.** Persons shall be permitted to carry shot-guns or rifles for the purpose of hunting, having them repaired, or for killing animals, or for the purpose of using the same in public muster or military drills, or while travelling or removing from one place to another, and not otherwise.

*Arms, when lawful to carry.*

(2437) § **6.** Any person violating the provisions of any one of the foregoing sections, shall on the first conviction be adjudged guilty of a misdemeanor and be punished by a fine of not less than twenty-five dollars nor more than fifty dollars, or by imprisonment in the county jail not to exceed thirty days or both at the discretion of the court. On the second and every subsequent con-

*Degree of punishment.*

**Chap. 25.** viction, the party offending shall on conviction be fined not less than fifty dollars nor more than two hundred and fifty dollars or be imprisoned in the county jail not less than thirty days nor more than three months or both, at the discretion of the court.

<span style="float:left">Public build-<br>ings and gather-<br>ings.</span> (2438) § **7.**   It shall be unlawful for any person, except a peace officer, to carry into any church or religious assembly, any school room or other place where persons are assembled for public worship, for amusement, or for educational or scientific purposes, or into any circus, show or public exhibition of any kind, or into any ball room, or to any social party or social gathering, or to any election, or to any place where intoxicating liquors are sold, or to any political convention, or to any other public assembly, any of the weapons designated in sections one and two of this article.

<span style="float:left">Intent of per-<br>sons carrying<br>weapons.</span> (2439) § **8.**   It shall be unlawful for any person in this Territory to carry or wear any deadly weapons or dangerous instrument whatsoever, openly or secretly, with the intent or for the avowed purpose of injuring his fellow man.

<span style="float:left">Pointing<br>weapons at an-<br>other.</span> (2440) § **9.**   It shall be unlawful for any person to point any pistol or any other deadly weapon whether loaded or not, at any other person or persons either in anger or otherwise.

<span style="float:left">Violation of<br>section seven.</span> (2441) § **10.**   Any person violating the provisions of section seven, eight or nine of this article; shall on conviction, be punished by a fine of not less than fifty dollars, nor more than five hundred and shall be imprisoned in the county jail for not less than three not more than twelve months.

## ARTICLE 48.—FALSE PERSONATION AND CHEATS.

| SECTION. | SECTION. |
|---|---|
| 1. False impersonation, punishment for. | 7. False representation of charitable purposes. |
| 2. False impersonation and receiving money. | 8. Falsely representing banking corporations. |
| 3. Personating officers and others. | 9. Using false check. |
| 4. Unlawful wearing of grand army badge. | 10. Holding mock auction. |
| 5. Fines, how paid. | |
| 6. Obtaining property under false pretenses. | |

<span style="float:left">Punishment<br>for false imper-<br>sonation.</span> (2442) § **1.**   Every person who falsely personates another, and in such assumed character, either:

First.   Marries or pretends to marry, or to sustain the marriage relation toward another, with or without the connivance of such other person; or,

Second.   Becomes bail or surety for any party, in any proceeding whatever, before any court or officer authorized to take such bail or surety; or,

Third.   Subscribes, verifies, publishes, acknowledges or proves, in the name of another person, any written instrument, with intent that the same may be delivered or used as true; or,

Fourth.   Does any other act whereby, if it were done by the person falsely personated, he might in any event become liable to any suit or prosecution, or to pay any sum of money, or to incur any charge, forfeiture or penalty, or whereby any benefit might accrue to the party personating, or to any other person.

96

2. That which fortifies and defends from assault; that which secures safety.

RAM'PART, *v. t.* To fortify with ramparts. [*Not in use.*]                                    *Shak.*

RAM'PION, *n.* [from *ramp.*] The name of several plants; as the *common esculent rampion*, a species of Campanula; the *crested rampion*, a species of Lobelia; the *horned rampion*, a species of Phyteuma.
*Fam. of Plants.*

RAMP'IRE, *n.* The same as *rampart*; but obsolete.

RAM'SONS, *n.* A plant, a species of Allium.
*Fam. of Plants.*

RAN, the *pret.* of *run.* In old writers, open robbery.                                    *Lambard.*

RANCES'CENT, *a.* [L. *ranceo*, to be rank.] Becoming rancid or sour.                *Encyc.*

RANCH, *v. t.* [corrupted from *wrench.*] To sprain; to injure by violent straining or contortion. [*Not used.*]
*Dryden. Garth.*

RAN'CID, *a.* [L. *rancidus*, from *ranceo*, to be rank. This is the Eng. *rank*, luxuriant in growth.]
Having a rank smell; strong scented; sour; musty; as *rancid* oil.                *Arbuthnot.*

RANCID'ITY, } *n.* The quality of being
RAN'CIDNESS, } rancid; a strong, sour scent, as of old oil.

The *rancidity* of oils may be analogous to the oxydation of metals.                *Ure.*

RAN'COR, *n.* [L. from *ranceo*, to be *rank.*]
1. The deepest malignity or spite; deep seated and implacable malice: inveterate enmity. [*This is the strongest term for enmity which the English language supplies.*]
It issues from the *rancor* of a villain.   *Shak.*

2. Virulence; corruption.                *Shak.*

RAN'COROUS, *a.* Deeply malignant; implacably spiteful or malicious; intensely virulent.

So flam'd his eyes with rage and *ranc'rous* ire.                                    *Spenser.*

*Rancorous* opposition to the gospel of Christ.
*West.*

RAN'COROUSLY, *adv.* With deep malignity or spiteful malice.

RAND, *n.* [G. D. Dan. *rand*, a border, edge, margin, brink; from shooting out, extending.]
A border; edge; margin; as the *rand* of a shoe.

RAN'DOM, *n.* [Norm. Sax. *randun*; Fr. *randonnée*, a rapid course of water; *random*, a gushing.]
1. A roving motion or course without direction; hence, want of direction, rule or method; hazard; chance; used in the phrase, *at random*, that is, without a settled point of direction; at hazard.
2. Course; motion; progression; distance of a body thrown; as the furthest *random* of a missile weapon.                *Digby.*

RAN'DOM, *a.* Done at hazard or without settled aim or purpose; left to chance; as a *random* blow.
2. Uttered or done without previous calculation; as a *random* guess.

RAN'DOM-SHOT, *n.* A shot not directed to a point, or a shot with the muzzle of the gun elevated above a horizontal line.
*Mar. Dict.*

RAN'DY, *a.* Disorderly; riotous. [*Not used or local.*]                                *Grose.*

RANE, } *n.* [Sax. *hrana*; Fr. *renne*;
RANEDEER, } D. *rendier*; G. *rennthier*;
Basque, *orcña* or *orina*; so named probably from *running.* The true spelling is *rane.*]
A species of deer found in the northern parts of Europe and Asia. He has large branched palmated horns, and travels with great speed. Among the Laplanders, he is a substitute for the horse, the cow, the goat and the sheep, as he furnishes food, clothing and the means of conveyance. This animal will draw a sled on the snow more than a hundred miles in a day.                *Encyc.*

RAN'FORCE, *n.* The ring of a gun next to the vent.                                    *Bailey.*
[I do not find this word in modern books.]

RANG, the old *pret.* of *ring.* [*Nearly obsolete.*]

RANGE, *v. t.* [Fr. *ranger*; Arm. *rencqa*, *rangein*; W. *rhenciaw*, from *rhenc*, *reng*, rank, which see.]
1. To set in a row or in rows; to place in a regular line, lines or ranks; to dispose in the proper order; as, to *range* troops in a body; to *range* men or ships in the order of battle.
2. To dispose in proper classes, orders or divisions; as, to *range* plants and animals in genera and species.
3. To dispose in a proper manner; to place in regular method; *in a general sense.*
*Range* and *arrange* are used indifferently in the same sense.
4. To rove over; to pass over.
Teach him to *range* the ditch and force the brake.                                    *Gay.*
[This use is elliptical, *over* being omitted.]
5. To sail or pass in a direction parallel to or near; as, to *range* the coast, that is, *along the coast.*

RANGE, *v. i.* To rove at large; to wander without restraint or direction.
As a roaring lion and a *ranging* bear.   *Prov.* xxviii.
2. To be placed in order; to be ranked.
'Tis better to be lowly born,
And *range* with humble livers in content—
*Shak.*
[In this sense, *rank* is now used.]
3. To lie in a particular direction.
Which way thy forests *range*—   *Dryden.*
We say, the front of a house *ranges* with the line of the street.
4. To sail or pass near or in the direction of; as, to *range* along the coast.

RANGE, *n.* [Fr. *rangée.* See *Rank.*] A row; a rank: things in a line; as a *range* of buildings; a *range* of mountains; *ranges* of colors.                                    *Newton.*
2. A class; an order.
The next *range* of beings above him are the immaterial intelligences—        *Hale.*
3. A wandering or roving; excursion.
He may take a *range* all the world over.
*South.*
4. Space or room for excursion.
A man has not enough *range* of thought—
*Addison.*
5. Compass or extent of excursion; space taken in by any thing extended or ranked in order; as the *range* of Newton's thought. No philosopher has embraced a wider *range.*

Far as creation's ample *range* extends.
*Pope.*
6. The step of a ladder. [Corrupted in popular language to *rung.*]            *Clarendon.*
7. A kitchen grate.            *Bacon. Wotton.*
8. A bolting sieve to sift meal.
9. In *gunnery*, the path of a bullet or bomb, or the line it describes from the mouth of the piece to the point where it lodges; or the whole distance which it passes. When a cannon lies horizontally, it is called the right level, or point blank range; when the muzzle is elevated to 45 degrees, it is called the utmost range. To this may be added the ricochet, the rolling or bounding shot, with the piece elevated from three to six degrees.   *Encyc. Mar. Dict.*

RANGED, *pp.* Disposed in a row or line; placed in order; passed in roving; placed in a particular direction.

RANGER, *n.* One that ranges; a rover; a robber. [*Now little used.*]        *Spenser.*
2. A dog that beats the ground.        *Gay.*
3. In *England*, a sworn officer of a forest, appointed by the king's letters patent, whose business is to walk through the forest, watch the deer, present trespasses, &c.                                    *Encyc*

RANGERSHIP, *n.* The office of the keeper of a forest or park.

RANGING, *ppr.* Placing in a row or line; disposing in order, method or classes; roving; passing near and in the direction of.

RANGING, *n.* The act of placing in lines or in order; a roving, &c.

RANK, *n.* [Ir. *ranc*; W. *rhenc*; Arm. *rencq*; Fr. *rang*, a row or line; It. *rango*, rank, condition; Port. Sp. *rancho*, a mess or set of persons; D. Dan. G. *rang.* In these

words, *n* is probably casual; Ar. ᎥᏔ

to set in order; Heb. Ch. ערך id. Class Rg. No. 13. 47. See also No. 18. 20. 21. 27. 46. The primary sense is probably to *reach*, to *stretch*, or to pass, to stretch along. Hence *rank* and *grade* are often synonymous.]
1. A row or line, applied to troops; a line of men standing abreast or side by side, and as opposed to *file*, a line running the length of a company, battalion or regiment. Keep your *ranks*; dress your *ranks.*

Fierce fiery warriors fight upon the clouds
In *ranks* and squadrons and right form of war.                                    *Shak.*
2. *Ranks*, in the plural, the order of common soldiers; as, to reduce an officer to the *ranks.*
3. A row; a line of things, or things in a line; as a *rank* of osiers.            *Shak.*
4. Degree; grade; *in military affairs*; as the *rank* of captain, colonel or general; the *rank* of vice-admiral.
5. Degree of elevation in civil life or station; the order of elevation or of subordination. We say, all *ranks* and orders of men; every man's dress and behavior should correspond with his *rank*; the highest and the lowest *ranks* of men or of other intelligent beings.
6. Class; order; division; any portion or number of things to which place, degree or order is assigned. Profligate men, by

97

THE

# L A W S

OF

# M A R Y L A N D, - *General ...*

WITH

## THE CHARTER,

## THE BILL OF RIGHTS,

## THE CONSTITUTION OF THE STATE,

### AND ITS ALTERATIONS,

## THE DECLARATION OF INDEPENDENCE,

### AND

## THE CONSTITUTION OF THE UNITED STATES,

### AND ITS AMENDMENTS;

#### WITH A GENERAL

# I N D E X.

#### IN THREE VOLUMES.

REVISED BY

## VIRGIL MAXCY.

## VOLUME I.

### Baltimore,

PUBLISHED BY PHILIP H. NICKLIN & CO.

## 1811.

Digitized by Google

*October,*
*1728.*

Proceedings
to be the
same.

the act of 1715, and in the 2d and 3d sections of this act, were repeal-
ed by 1796, ch. 67, with a saving of the rights of any *persons to such
issue before acquired.

**IV.** AND BE IT FURTHER ENACT D, *by the authority afore-
said, by and with the advice and consent aforesaid,* That the
same method of proceeding to judgment, upon any matter
within this act, be the same as is prescribed by the act, en-
titled, An act relating to servants and slaves.

Vide list of acts relating to negroes and slaves, 1715, ch. 44.

## CHAP. VII.

### An ACT to encourage the destroying of wolves, crows and squirrels.

Three squir-
rels scalps
or crows
heads to be
produced for
each taxable
yearly, be-
fore laying
the levies, to
some county
magistrate,
who shall
destroy the
same, and
give certifi-
cates.

BE IT ENACT D, *by the right honourable the* **Lord Proprie-**
*tary, by and with the advice and consent of his lordship's
Governor, and the Upper and Lower Houses of Assembly, and
the authority of the same,* That from and after the commence-
ment of this act, every master, mistress, owner of a family,
or single taxable, in the several and respective counties with-
in this province, shall be, and are by this act obliged, yearly,
(at some time before the laying their county levies,) to pro-
duce to some one of the justices of their county, three squir-
rel scalps, or crows heads, for every taxable person they shall
pay levy for that year, and the justices of the peace, before
whom such squirrels scalps, or crows heads, shall be brought,
shall be, and is hereby obliged to destroy such squirrels scalps,
and crows heads, as shall be so produced to him, to prevent
their being produced a second time, and give such person a
certificate under his hand, certifying the number of squirrels
scalps and crows heads such persons brought before him,
which certificate, the person obtaining the same shall lay be-
fore the justices of their county, at the time of the laying their
county levy ; and the justices shall then cause a list of the
taxables of their county to be laid before them, in order from
thence to compare the number of taxables each person pays
in the county, with the certificates produced, that thereby it
may be found what persons have complied with this act, and
who have failed therein.

Penalty for
not produ-
cing, the
three scalps
&c. required.

**II.** AND BE IT FURTH R ENACTED, *by the authority,* ad-
*vice and consent aforesaid,* That every person that shall fall
short of producing a certificate of squirrels scalps or crows
heads, in proportion to their taxables, according to the direc-
tions of this act, the justices of the several and respective coun-
ty courts within this province, at the time of laying the
county levy, are hereby empowered and required, for each
squirrel scalp, or crows head, such person shall fall short, in
manner aforesaid, to levy upon such person the sum of two

Digitized by Google

**BENEDICT LEONARD CALVERT,** Esq. Governor.   187

pounds of tobacco, to be upon execution, and collected by the    *October,*
sheriff of the county in the same manner as the public and    1728.
county levies are, to be applied towards defraying the coun-
ty charge.

   **III.** AND BE IT FURTHER ɴACTED, *by the authority, advice*   Allowance
*and consent aforesaid,* That every person that shall bring to   for scalps,
any justice of the peace within this province the heads or   over
scalps of any more squirrels or crows than the three for each   and above
taxable by this act required, shall, for every such head or scalp,   the three
be allowed in the county levy where such squirrel or crow was   per taxable
killed, the sum of two pounds of tobacco, and the justice of the
peace before whom such heads or scalps shall be brought, is
hereby required to give the person bringing the same a certifi-
cate thereof, and cause the said heads and scalps to be burnt, or
otherwise destroyed ; provided always, that no person whatso-
ever shall be entitled to any allowance for any squirrels or
crows heads or scalps, without first making oath (or affirma-
tion, if a quaker,) or otherwise make appear, that such squir-
rels or crows were killed after the commencement of this act,
and in the county where the allowance is prayed.

    The three preceding sections are repealed as far as they relate to
squirrels, as to all the counties, except Montgomery, Allegany, Caroline,
Harford and Washington, by 1769, ch. 16, 1770, ch. 14, and 1774, ch. 5.
    The two first are repealed as far as they relate to crows, as to all the
counties except Harford, Washington and Allegany, and the third so far
as it relates to crows, has no operation except in Allegany. Vide 1769,
ch. 16. 1770, ch. 14. 1774, ch 5. 1795, ch. 3. 1796, ch. 39. 1797, ch. 22.
1803, ch. 96. 1804, ch. 35. and 1807, ch. 71.
    IV. & V. These sections related to wolves, but as other acts have
since been passed upon the subject, they have now no operation, and
are therefore omitted. Vide 1788, ch. 4. 1790, ch. 8. 1797, ch. 6. 1798
ch. 4 22.

   **VI.** AND BE IT FURTHER ENACT D, *by the authority advice*   Commence-
*and consent aforesaid,* That this act shall commence from the fif-   ment of this
teenth day of December next after the end of this session of   act, and
assembly, and that thenceforth all laws heretofore made, in re-   repeal of
lation to wolves, squirrels and crows, be and are hereby repeal-   former laws.
ed, abrogated, and made null and void.

   **VII.** AND BE IT FURTHER ENACTED, *by the authority, ad-*   Penalty on
*vice and consent aforesaid,* That every person that shall, during   persons hun-
the continuance of this act, presume upon any pretence what-   ting within
soever, to come to hunt with guns or dogs within any enclosed   inclosures,
grounds, islands, peninsulas or necks, fenced across from wa-   islands &c.
ter to water, without leave or licence from the proprietors there-   without
of first had and obtained, shall, for every such offence, for-   leave.
feit and pay to the party grieved the sum of two hundred pounds
of tobacco, to be recovered before a single magistrate, in the
same manner as small debts now are recoverable, any law,
statute or usage to the contrary notwithstanding.

     Vide list of acts relating to crows, 1807, ch. 71.

98

# ACTS

OF

# THE STATE OF TENNESSEE,

PASSED BY THE

## THIRTY-NINTH GENERAL ASSEMBLY.

## 1875.

PUBLISHED BY AUTHORITY.

NASHVILLE:

TAVEL, EASTMAN & HOWELL, PRINTERS TO THE STATE.

1875.

213

## CHAPTER CXXVI.

AN ACT to provide for the changing of County Lines, and vesting the power in the County Courts, and to repeal Section 4 of an Act entitled "An Act to change the county line between the counties of Hawkins and Hamblen, between Monroe and Loudon, between Warren and Van Buren, and between Hawkins and Hamblen.

SECTION 1. *Be it enacted by the General Assembly of the State of Tennessee,* That all of an Act entitled "An Act to provide for the changing of County Lines, and vesting the power in the County Courts," passed March 25th, 1873, be, and the same is hereby repealed.

Passed March 23, 1875.

LEWIS BOND,
*Speaker of the House of Representatives.*
THOMAS H. PAINE,
*Speaker of the Senate.*

Approved March 24, 1875.

JAMES D. PORTER,
*Governor.*

———

## CHAPTER CXXVII.

AN ACT for the preservation of game and birds.

SECTION 1. *Be it enacted by the General Assembly of the State of Tennessee,* That hereafter it shall not be lawful for any person to hunt or kill any deer in any county hereinafter designated, from the first day of March to the first day of September in each year. *(marginal note: Not lawful to hunt deer, when.)*

SEC. 2. *Be it further enacted,* That it shall not be lawful for any person to hunt, kill, or capture, from the 1st day of March until 15th day of September in each year, any game bird, as pheasant, grouse, quail, partridge, lark, woodcock, or snipe, nor wild turkey, from 1st of May until 15th of September, nor at any time to kill or capture any of the birds of song, as the mocking-bird, thrush, robin, or oriole, or any birds known to destroy insects, as the sparrow, blue bird, woodpecker, or yellow hammer; *(marginal note: Game birds & birds' nests.)*

214

nor shall it be lawful for any person at any time to destroy the nests or eggs of any of the above named birds.

SEC. 3. *Be it further enacted,* That any person found guilty of violating any of the provisions in the foregoing Sections of this Act, he, she, or they, shall be subject to be fined as follows: For each deer hunted or killed, $10; for each wild turkey killed, $5; for every pheasant, quail, partridge, or other of the above named birds, $2.50, and the same for every bird's nest robbed or destroyed, or any animal or bird captured, bought, or sold, or offered for sale, or for any turkey or partridge caught in a pen or net, at any season of the-year.

*Penalty for violation of above.*

SEC. 4. *Be it further enacted,* That Justices of the Peace shall have full jurisdiction to try all cases arising under this Act, provided nothing herein contained shall be so construed as to prohibit appeals, under the usual requirements, in such cases.

*Justices have jurisdiction.*

SEC. 5. *Be it further enacted,* That all prosecutions for any of these offenses shall be in the name of the State, and in all cases of conviction and recovery the fine shall be equally divided between the prosecutor, who, in all cases, shall be the owner or person occupying the land at the time whereon the violation may occur, and the county, and the part due the county, shall be paid over to the County Trustee, and held as a part of the school fund of said county; and upon failure to secure said fine, the person so offending shall be imprisoned in the county jail or work-house, as provided in other cases of misdemeanor, until he, or she, or they, may have worked out said fine and costs; *Provided, however,* that any Justice of the Peace, or other court trying the cause, who may have good and satisfactory reason to believe that the prosecution is frivolous or malicious, they are hereby authorized and directed to tax such prosecutors with the costs.

*Fines, how paid and disposed of.*

SEC. 6. *Be it further enacted,* That the provisions of the foregoing Section of this Act shall apply to the counties of Henry, Dyer, Giles, Maury, Davidson, Madison, Hamilton, Bedford, and Wilson.

*Counties to which applicable.*

SEC. 7. *Be it further enacted,* That it shall be unlawful for any person in this State to hunt, trap, or net game of any kind, or birds, or destroy the nests thereof on the land of another, except by express permission of the owner or agent first had and obtained, where such owner, by himself or agent, shall have posted notices in one or more conspicuous places on the north, south, east, and west boundaries of his or their lands, which notices shall

*Unlawful to hunt or trap game without permission of owner of land.*

215

be painted or printed on boards or planks, securely nailed to trees or posts; and any person violating the provisions of this Section, either by hunting or killing game or birds, or trapping, or netting, or destroying the nests of the same, or shall deface, or knock or pull down said notices, or any of them, shall, for each offense, be fined not less than $2.50 nor more than $5, the same to be recovered and distributed as provided in the fourth and fifth Sections of this Act. *Fine.*

SEC. 8. *Be it further enacted,* That this Act take effect from and after its passage, the public welfare requiring it.

Passed March 23, 1875.

LEWIS BOND,
*Speaker of the House of Representatives.*

THOMAS H. PAINE,
*Speaker of the Senate.*

Approved March 24, 1875.

JAMES D. PORTER,
*Governor.*

————

## CHAPTER CXXVIII.

AN ACT for the benefit of Emily L. Herron.

SECTION 1. *Be it enacted by the General Assembly of the State of Tennessee,* That the marriage solemnized between George H. Herron, late private in Company G, 62d Illinois Volunteers, and Mrs. Emily L. Millsworth, of Obion county, on the 25th day of October, 1862, be, and the same is hereby declared to have been legal and valid.

SEC. 2. *Be it further enacted,* That this Act take effect from and after its passage, the public welfare requiring it.

Passed March 23, 1875.

LEWIS BOND,
*Speaker of the House of Representatives.*

THOMAS H. PAINE,
*Speaker of the Senate.*

Approved March 24, 1875.

JAMES D. PORTER,
*Governor.*

99

of the States Attorneys to see that the provisions of this act are enforced in their respective counties, and they shall prosecute all offenders on receiving information of the violation of any of the provisions of this act; and it is made the duty of sheriffs, deputy sheriffs, constables and police officers to inform against and prosecute all persons whom there is probable cause to believe are guilty of violating any of the provisions of this act, one-half the amount recovered in any penal action under the provisions of this act shall be paid to the person filing the complaint in such action, and the remaining one-half to the school fund of the township in which this act has been violated.

**9.**  LIMITATION.] § 9.  All prosecutions under this act shall be commenced within three months from the time such offense was committed and not afterwards.

**10.**  REPEAL.] § 10.  All acts and parts of acts in conflict herewith are hereby repealed.

*549]    HUNTING ON INCLOSURES OF OTHERS.

AN ACT to prohibit persons from hunting within the inclosures of others, without leave. [Approved April 15, 1871. In force July 1, 1871. L. 1871-2, p. 486.]

**11.**  NOT TO HUNT WITHOUT CONSENT.] § 1.  *Be it enacted by the People of the State of Illinois, represented in the General Assembly,* That it shall be unlawful for any person or persons to hunt with gun, dog or net, within the inclosed grounds or lands of another, without first obtaining from the owner, agent or occupant of such inclosed grounds or lands, his, her or their permission so to do.

**12.**  PENALTY—SUIT.] § 2.  Any person or persons violating section one of this act shall be deemed guilty of a misdemeanor, and may be prosecuted in the name of the People, before any justice of the peace, or by indictment or information in any court in the county where said misdemeanor was committed; and in all such prosecutions the owner or owners, or persons in possession of said inclosures, shall not be required to prove title to the inclosures in controversy.

**13.**  FINES.] § 3.  Any person convicted of violating section one of this act shall be fined in a sum not less than $3, and not exceeding $100.  All fines collected by virtue of this act shall be paid into the common school fund of the township in which the offense is committed.

AN ACT to provide for an additional remedy for the protection of game, and for the protection of deer, wild fowl and birds, and for the appointment of game wardens and defining the powers and duties of the same.  Approved June 27, 1885.  In force July 1, 1885.  L. 1885, Legal News Ed. p. 164.

**14.**  APPOINTMENT OF WARDENS—SALARY.] § 1.  *Be it enacted by the People of the State of Illinois, represented in the General Assembly*:  That the governor of the State shall appoint three game wardens, one from each of the three largest cities in the State, whose term of office shall be for two years from the time of taking effect of this act or until their successor or successors are appointed; said game wardens shall receive no salary from the State for their services, but shall receive a portion of the fines and proceeds of sale as hereinafter provided.

**15.**  DUTY OF GAME WARDENS—PROSECUTIONS.] § 2.  It shall be the duty of such game wardens to prosecute persons and corporations having in their possession game, deer, wild fowl and birds contrary to law, as hereinafter provided, and also to enforce the game laws of this State.

**16.**  GAME IN POSSESSION CONTRARY TO LAW MAY BE SEIZED—WARRANT.] § 3.  If said game wardens or either of them has reason to believe or does believe, that any person or corporation has in his or their possession, contrary to law, any game, deer, wild fowl or bird, it shall be the duty of such game wardens to go before any justice of the peace in the county and make affidavit of that fact; said justice shall thereupon issue a search warrant against the person or corporation so complained of, directed to any constable of the county, commanding him to proceed at once and search for said game, deer, wild fowl, or bird, and upon finding the same, to seize and take possession of the same and keep it until further ordered by the justice; said constable shall also read said warrant to the owner or person in whose possession said game, deer, wild fowl or bird is found.

Said warrant shall be substantially as follows:

LLMC DIGITAL

100

```
 1          UNITED STATES DISTRICT COURT

 2          WESTERN DISTRICT OF NEW YORK

 3          -----------------------------------------------

 4          BRETT CHRISTIAN, FIREARMS POLICY COALITION,
            INC., and SECOND AMENDMENT FOUNDATION,
 5
                   Plaintiffs,
 6
            -vs-          Civil Action No. 22-cv-00695 (JLS)
 7
            STEVEN A. NIGRELLI, in his official capacity as
 8          Superintendent of the New York State Police,
            and JOHN J. FLYNN, in his official capacity as
 9          District Attorney for the County of Erie,

10                 Defendants.
            -----------------------------------------------
11                      Examination Before Trial of BRETT

12          CHRISTIAN, held before Brooklyn Morton, Notary

13          Public, at Phillips Lytle, LLP, One Canalside,

14          125 Main Street, Buffalo, New York, on November

15          16th, 2022, commencing at 1:00 p.m. and ending

16          at 5:00 p.m., pursuant to notice.

17

18

19

20

21

22

23

24

25
```

1       **A P P E A R A N C E S**

2       APPEARING FOR THE PLAINTIFFS:

3                       **PHILLIPS LYTLE, LLP**
                        **BY: SAM WILLIAMS, ESQ.**
4                       One Canalside
                        125 Main Street
5                       Buffalo, New York 14203
                        (716) 847-8400
6
        APPEARING REMOTELY FOR THE PLAINTIFFS:
7
                        **PHILLIPS LYTLE, LLP**
8                       **BY: NICOLAS J. ROTSKO, ESQ.**
                        One Canalside
9                       125 Main Street
                        Buffalo, New York 14203
10                      (716) 847-8400

11      APPEARING FOR THE DEFENDANTS:

12                      **STATE OF NEW YORK**
                        **OFFICE OF THE ATTORNEY GENERAL**
13                      **LETITA JAMES**
                        **BY: RYAN L. BELKA, ESQ.**
14                      **ASSISTANT ATTORNEY GENERAL**
                        Main Place Tower
15                      350 Main Street
                        Buffalo, New York 14202
16                      (716) 853-8400

17

18

19

20

21

22

23

24

25

<pre>
 1                    W I T N E S S E S

 2        WITNESS      EXAMINATION              PAGE

 3

 4        BRETT CHRISTIAN

 5                     BY MR. BELKA          5, 131

 6                     BY MR. ROTSKO         122

 7

 8

 9                    E X H I B I T S

10        EXHIBIT      DESCRIPTION             PAGE

11        1   NFTA subway ticket              48

12        2   Declaration                     117

13        3   New York State concealed carry
              license application             119
14
          4   List of firearms               120
15

16

17

18

19

20

21

22

23

24

25
</pre>

**DEPAOLO CROSBY REPORTING SERVICES, INC.**
135 Delaware Avenue, Suite 301, Buffalo, New York  14202
716-853-5544

30

—BRETT CHRISTIAN - 11/16/2022—

1    Q. Do you have any reason to believe that your
2       membership lapsed with regard to the Second
3       Amendment between the years 2013 and
4       August 2022?
5    A. I don't believe so.
6    Q. In your mind if there is a lapse in membership
7       in either of these two organizations, it was
8       due to ineffective mail carrying?
9    A. Correct.
10   Q. What is your reasoning to believe that there's
11      a possibility of ineffective mail carrying
12      between the years 2013 and August 2022?
13   A. I have lived at different addresses throughout
14      the time.
15   Q. That's it?
16   A. Yes.
17   Q. Okay.  As it relates to the sections of the
18      CCIA that you have challenged related to
19      private property, have you been arrested under
20      that provision?
21   A. As of currently today, I have not been
22      arrested.
23   Q. Have you been approached by law enforcement to
24      arrest you for violations of the CCIA
25      regarding the sections on private property?

-- BRETT CHRISTIAN - 11/16/2022 --

1    A. As of today, I have not.

2    Q. Have you been arrested related to the sections

3       relating to New York State Parks that you have

4       challenged under the CCIA?

5    A. As of today, I have not.

6    Q. Have you been approached by law enforcement to

7       enforce the New York State Parks provisions of

8       the CCIA?

9    A. As of today, I have not.

10   Q. Have you been arrested related to the public

11      transportation sections of the CCIA that you

12      have challenged in this lawsuit?

13   A. As of today, I have not.

14   Q. And have you been approached by law

15      enforcement regarding the public

16      transportation sections of the CCIA that you

17      have challenged in this lawsuit?

18   A. As of today, I have not.

19   Q. When you say "as of today," you mean from the

20      beginning of the world until today, correct?

21   A. That's correct.  I do not have a crystal ball.

22      I don't know what tomorrow may bring and I do

23      not wish to guess at the future.

24   Q. All right.  Do you recall the testimony about

25      reviewing the words in your declaration that

--- BRETT CHRISTIAN - 11/16/2022 ---

1     that the discussion about the ticket is
2     accurate.
3           MR. BELKA:  I accept.  Thanks for
4     creating an accommodation because it's unusual.
5           MR. ROTSKO:  I can't figure out how to
6     get that up on WebEx.
7
8     BY MR. BELKA:
9  Q. An NFTA Light Rail ticket has been placed in
10    front of you.  It's Exhibit 1 to your
11    deposition.  Do you see it?
12 A. I do.
13 Q. What's the date on that Light Rail ticket?
14 A. It was this past Sunday, the 13th.
15 Q. You are downtown today.  You didn't take the
16    Light Rail; is that right?
17 A. Correct.
18 Q. Okay.  What car did you drive to get downtown
19    today?
20 A. My 2023 Honda HR-V.
21 Q. Do you have a gun on you?
22 A. I do not.
23 Q. Why not?
24 A. The CCIA prevents me from doing so.
25 Q. Is that because Phillips Lytle prevented you

```
 1            from bringing a concealed weapon onto their
 2            property?
 3       A.  I was unable to bring one with me on person
 4            because I have never been in this building
 5            before and I don't know what signs are posted
 6            on the property.  And if I brought it with me,
 7            I would have already entered the property
 8            before I would see the signs and, thus, I
 9            would have broken the law.  So without having
10            that definitive knowledge of it as explicitly
11            stated on a sign that it is allowed, I chose
12            to leave it at home.
13       Q.  These are your lawyers.  You could have called
14            ahead and asked what their concealed carry
15            policy is, correct?
16       A.  Correct.
17       Q.  Do you own a phone?
18       A.  I do.
19       Q.  Do you know how to use it?
20       A.  Yes.
21       Q.  Do you think you could have used your phone to
22            acquire that information from your lawyers?
23       A.  I am unsure because I don't know who the
24            property owner is and the way that it reads, I
25            would have to first figure out who the
```

-------- BRETT CHRISTIAN - 11/16/2022 --------

1        property owner is.  And with the timeframe of
2        I did not know weeks or months in advance of
3        the exact location, I wasn't able to in time
4        determine that.
5   Q.   When did you first learn about this
6        deposition?
7   A.   I learned that it may be a thing that would
8        need to happen roughly, approximately a couple
9        weeks ago.  However, the exact date, time,
10       this is the address at this time, be here,
11       that was -- the address was provided this
12       morning to me.  The time was provided to me on
13       Monday.
14  Q.   Have you ever called your lawyers -- this has
15       nothing to do with attorney-client.
16            Have you ever called your lawyers to ask
17       them a question?
18  A.   Yes.
19  Q.   Do you feel like you need permission to call
20       your lawyers?
21  A.   No, I do not.
22  Q.   Could you have called your lawyers and asked
23       the policy about concealed carry in the
24       building you would have been entering today?
25  A.   Yes.  That could have been a possibility.

1    Q. And do you think your lawyers would have told
2       you the correct information as to their policy
3       on concealed carry today?
4    A. Yes.  I believe they would have.
5    Q. As it relates to public transportation, you
6       note that you take the NFTA Metro Rail, which
7       I have referred to as the NFTA Light Rail,
8       when traffic or events downtown made driving
9       impractical.  Do you recall that testimony?
10   A. Yes, I do.
11   Q. In your mind, when does traffic make driving
12      downtown impractical?
13   A. Monday through Friday and when major events
14      like Sabres games, Taste of Buffalo and events
15      such as those are going on, traffic is quite
16      heavy at those times.
17   Q. How do you know traffic is heavy on Monday
18      through Friday during Sabres games?
19   A. I have previously been to Sabres games.
20      Either work -- the company that I work for has
21      provided tickets for events as well as through
22      the week I have made trips down here to go to
23      either the Erie County Clerks's Office for
24      adding an amendment or removing an amendment
25      to my permit or to stop in to ask

------- BRETT CHRISTIAN - 11/16/2022 -------

1    Q. But in Buffalo on the NFTA system, right?

2    A. Correct.

3    Q. Approximately when did you become licensed to

4       carry a firearm in the State of New York?

5    A. Approximately somewhere between two to

6       three years ago for a New York State concealed

7       carry license.

8    Q. Did you have some other type of pistol permit

9       prior to the concealed carry permit that you

10      acquired two to three years ago?

11   A. No, I did not.

12   Q. How old are you?

13   A. 40.  I feel old for saying that.

14   Q. Do you know at what age you can begin to have

15      a pistol permit in New York State?

16   A. There's two answers to that.  For 99 percent

17      of people it is 21.  I believe members of the

18      U.S. Military that are active and serving can

19      get one between 18 and 21, but I don't know

20      anybody that ever has.

21   Q. And you are not an active member of the U.S.

22      Military?

23   A. I am not.

24   Q. So the earliest you could have received some

25      type of pistol permit in New York State is 21?

-BRETT CHRISTIAN - 11/16/2022-

1    A. Correct.
2    Q. And is it fair to say from the ages of 21 to
3       37 you did not have any type of New York State
4       pistol permit?
5    A. Yes.
6    Q. When you applied for your concealed carry
7       permit two to three years ago, was it granted?
8    A. Yes.
9    Q. Did you have any guns that were registered
10      with New York State at the time you received
11      your concealed carry permit?
12   A. I had no pistols because there's no way to
13      acquire, own, possess one in New York without
14      one.  I have lived in New York my whole life.
15      For long guns I did not acquire any long guns
16      that would have required SAFE Act registration
17      when the SAFE Act took effect.  So I had
18      nothing that was registered then that was
19      required per the law.
20   Q. So prior to having the concealed carry
21      license, you did own and possess firearms?
22   A. Long guns, correct.
23   Q. How many long --
24          MR. ROTSKO:  Objection.  Just to be
25      clear on the terminology, when we say

DEPAOLO CROSBY REPORTING SERVICES, INC.
135 Delaware Avenue, Suite 301, Buffalo, New York  14202
716-853-5544

-BRETT CHRISTIAN  -  11/16/2022-

1          "firearms," are we using the Penal Code
2          definition of firearms?
3              MR. BELKA:  I am about to drill down a
4          little bit.  Is that okay?  Why don't you just
5          object to vagueness or something?  Just say
6          Belka didn't define firearms, he's awful.  Just
7          put it on the record.  We will keep going.
8              MR. ROTSKO:  Please don't put on the
9          record that I said that Mr. Belka is awful.
10         That was him.  Go ahead, Ryan.
11
12         BY MR. BELKA:
13     Q.  Okay.  Between the ages of 21 and 37 you
14         didn't own any pistols?
15     A.  That's correct.
16     Q.  You had no pistol permit in the State of New
17         York?
18     A.  Correct.
19     Q.  At approximately the age of 37 you acquired a
20         concealed carry permit?
21     A.  Correct.
22     Q.  Or concealed carry license?
23     A.  License.
24     Q.  Okay.  After which you acquired some pistols?
25     A.  That's correct.

--- BRETT CHRISTIAN - 11/16/2022 ---

1          Uncle John passed away, I want to say
2          approximately -- without looking at his
3          obituary, maybe a year ago, if not a little
4          sooner.
5     Q.   But it doesn't sound like there's many future
6          trips in the plans to Upstate New York to
7          visit Melissa?
8     A.   To that specific region, no.  Because I have
9          more transitioned to publicly accessible
10         regions where if a property owner passes away,
11         I suddenly wouldn't lose the right or the
12         ability to access that area.
13    Q.   Do you believe that the property owner should
14         have the right to tell you not to access their
15         property if you are carrying a weapon?
16              MR. ROTSKO:  Objection.  Calls for
17         speculation.
18    Q.   You still have to answer.
19    A.   Oh, okay.  I didn't know.  It would be up to
20         the -- I believe it would be up to the
21         property owner to tell me that they don't want
22         to, not tell me that I am allowed to.
23    Q.   But you believe that a private property owner
24         can prevent you from carriage on their land?
25    A.   Yes.  If they were to ask me.

---

BRETT CHRISTIAN - 11/16/2022

---

1    Q. Okay.  Do you think you should be able to

2       enter their land and not disclose that you are

3       concealing a weapon?

4            MR. ROTSKO:  Objection to relevance.

5       You can answer.

6            THE WITNESS:  Can you repeat it, please?

7

8                 (The question was read.)

9

10           THE WITNESS:  Yes.  Unless they ask me.

11

12      BY MR. BELKA:

13   Q. Brett, is it your belief that you can come to

14      my house and conceal a weapon on my property

15      and not disclose that you are doing so?

16   A. Yes.  Unless you ask me to leave, and then I

17      should leave immediately.

18           MR. ROTSKO:  Objection.  Just for

19      clarification, are we asking for philosophical

20      beliefs here or are you asking whether he --

21      are you asking him for a legal conclusion or

22      his preference?

23           MR. BELKA:  I am asking the least

24      objectionable of those questions.  I am not

25      going to clarify.  The record is going to be

---

---BRETT CHRISTIAN  -  11/16/2022---

1    Q.  And why do you feel -- strike that.

2            Why did you feel it necessary to cancel

3        your trip to the Adirondack Park because of

4        the CCIA?

5    A.  To get to the Adirondacks it's approximately 5

6        hours and 15 minutes of travel time, 6 hours

7        and 15 minutes of travel time if you don't go

8        the thruway.  Sometimes the side roads are

9        nice, slower pace, less traffic.  So with the

10       way the CCIA is, the way it is written in

11       black and white which is what I believe to be

12       the law, if I was to go on the trip, bring

13       with me my pistol and I am carrying it because

14       it is easier to keep it in a holster on your

15       person, less likelihood of getting it stolen

16       because you left it somewhere, I would have to

17       know in advance every restaurant that I may

18       decide to get food at or every gas station.

19       And then if I ended up instead of bringing a

20       sleeping bag and sleeping in the car as I

21       sometimes do, if I went the route of this time

22       I will get a hotel, knowing all the property

23       owner's policies ahead to be compliant and

24       legal, it -- too daunting, if you will.

25   Q.  Your declaration to me implies that you

—— BRETT CHRISTIAN  -  11/16/2022 ——

1        thought that the CCIA applied to the
2        Adirondack Park.  Was that your understanding
3        at the time you signed your declaration?
4    A.  When I signed it at the time, that was my full
5        belief.  However, New York State political
6        leaders have said now that it doesn't apply,
7        but I don't see anything in writing.  So I am
8        unsure of New York State Government's stance
9        in that regard.
10   Q.  You understand it has been represented in this
11       lawsuit that the CCIA does not apply to
12       Adirondack Park, right?
13   A.  That's what I have heard.  However, when I go
14       to the Penal Code and I look it up, I haven't
15       seen the legislature make any changes, make
16       any addendums, amendments, corrections in that
17       regard.  And I have to believe the law
18       enforcement has no legal obligation to protect
19       me.
20           Their duty is to enforce the law and
21       catch criminals per the Supreme Court case
22       that happened out of Ohio.  I want to say
23       Akron.  I don't remember the exact name.  I
24       would have to look it up, but because of that
25       I would have to believe any law enforcement

```
 1              professional whether they are New York State
 2              Park rangers, DEC, if they are New York State
 3              Police, local sheriff, local town, they would
 4              go by this is what's written as the law, this
 5              is, therefore, what we must enforce if someone
 6              is violating it.
 7         Q.   So at least as it relates to the Adirondack
 8              Park, the statement of political leaders on
 9              how the CCIA applies is not enough for you?
10         A.   Correct.  Let me add --
11         Q.   No.
12         A.   Okay.  Sorry.
13         Q.   Actually, sorry.  You should be able to add.
14              Go ahead.  I didn't mean to cut you off.
15         A.   If I were to go ahead and go there and carry
16              and a law enforcement professional were to
17              observe me and stop me and question me and
18              find that I was carrying, I don't believe that
19              they would find it a sufficient defense or
20              justification to say, well, the Governor or
21              the Attorney General of New York or the head
22              of the State Police has said this --
23         Q.   Right.
24         A.   -- you know, in a TV interview.  Much like
25              people I know now that are going through the
```

-BRETT CHRISTIAN  -  11/16/2022-

```
 1            permitting process, the way the law is written
 2            it says everybody needs the new training
 3            requirement and other requirements.  To have,
 4            again, politicians who are elected
 5            representatives and heads of various
 6            departments say, well, we only interpret that
 7            or we only mean it applies to downstate
 8            counties like Suffolk, Nassau, Westchester and
 9            the boroughs and New York City, again, I look
10            at it and I tell people they can say what they
11            want but what's actually written in the law,
12            that's the standard you are held to and this
13            is what it says currently.
14       Q.   Right.  So in the case of Adirondack Park,
15            right, you would not be comforted by the
16            statements of political leaders or the leader
17            of the State Police that Adirondack Park is
18            not -- that we are not going to enforce the
19            CCIA in Adirondack Park, right?
20       A.   Correct.
21       Q.   What kind of plans did you make to go to
22            Adirondack Park in the period of time around
23            Thanksgiving 2022?  What firm plans did you
24            make?
25       A.   I had firm plans, definitive plans.  My plans
```

1    Q. Because you wouldn't work Sunday?

2    A. Sunday, correct.

3    Q. But either way you didn't make this trip

4       despite political leaders and the

5       representations that have been made in this

6       case because that's not enough for you to be

7       assured that the CCIA wouldn't be enforced in

8       Adirondack Park?

9    A. Correct.

10          MR. BELKA:  Okay.  Let's take a break.

11       Five minutes.

12

13          (Recess was taken.)

14

15       BY MR. BELKA:

16    Q. One of the paragraphs in your declaration

17       mentions that you would sometimes walk in

18       local parks.  Do you recall that statement?

19    A. Yes.

20    Q. I mean, I will read it to you.  "Carry my

21       firearm for self-defense while walking in

22       local parks or when hiking on trails in

23       largely wooded and marshy areas a few times

24       each month."  Do you recall that?

25    A. Yes.

─── **BRETT CHRISTIAN** - 11/16/2022 ───

```
1    Q. Okay.  Similar to failing to provide the dates
2       on which you would have made your trip to the
3       Adirondacks, you don't mention which local
4       parks you would carry for in self-defense.  Is
5       that fair?
6    A. Yes.
7    Q. Okay.  Can you tell me what local parks you
8       are referring to in your declaration?
9    A. Yes.  The primary ones, but not all of them,
10      are Stiglmeier Park in Cheektowaga because of
11      being close to where I live, parts of the
12      Clarence Bike Path which are actually two
13      trails running from Amherst off of Transit
14      Road into Clarence.  If you remember the bike
15      path rapist, that's where that stuff happened.
16      The other one would be there's a Shoreline
17      Trail running from the north side of Buffalo
18      where Sheridan Drive approximately hits the
19      190 and it runs up through where -- or sorry,
20      where Sheridan Drive hits the 290, sorry.  And
21      that runs from there up to -- or I am getting
22      my roads confused.  I am sorry.
23          The 190 goes around Buffalo.  Where
24      Sheridan Drive hits the 190 and it runs from
25      there down to where the bridges going to Grand
```

---

-BRETT CHRISTIAN - 11/16/2022-

1          available when you need gas.  I am not as
2          picky as long as it's name brand.
3     Q.  Okay.  You also refer to monthly visits to
4          hardware stores.
5     A.  Yes.
6     Q.  What hardware stores are you referring to in
7          your declaration?
8     A.  Primarily, Valu hardware stores.
9     Q.  And that's Valu with no E?
10    A.  Yes.
11    Q.  It's mostly for her (indicating).
12              What Valu hardware store?  Like where is
13         it located?
14    A.  There is one within minutes of where I live.
15         It's off of George Urban Boulevard and Dick
16         Road in a plaza across from Wegmans.
17    Q.  Primarily is that the hardware store you are
18         referring to in your declaration?
19    A.  Yes.
20    Q.  Okay.  And it is your position that that Valu
21         on George Urban and Dick Road does not have
22         conspicuous signage that allows you to
23         concealed carry on their property, right?
24    A.  Yes.
25    Q.  Have you inquired as to whether or not that

---

**DEPAOLO CROSBY REPORTING SERVICES, INC.**
135 Delaware Avenue, Suite 301, Buffalo, New York  14202
716-853-5544

-------- BRETT CHRISTIAN - 11/16/2022 --------

```
 1          Valu hardware store allows you to concealed
 2          carry?
 3     A.   I have asked the cashier.  They did not want
 4          to give an answer because of reasons that I do
 5          not know.
 6     Q.   Is it because the cashier is the wrong person
 7          to ask?  I am legitimately asking that
 8          question.
 9     A.   When I have been there, I have seen manager --
10          I have seen everybody working the cashier and
11          I don't know what everybody's job title is.
12     Q.   Okay.  Other than asking the cashier, have you
13          made any other efforts to inquire as to the
14          policy at Valu as it relates to concealed
15          carry?
16     A.   I tried calling their corporate number to find
17          out, and the person I spoke to did not want to
18          give an answer.  They said they simply defer
19          to New York State and local law enforcement.
20     Q.   By not having conspicuous signage according to
21          the law, isn't Valu giving you an answer as to
22          their position on concealed carry?
23     A.   Yes.
24     Q.   And what is that answer as you understand it?
25     A.   That it is not allowed.
```

----------- BRETT CHRISTIAN  -  11/16/2022 -----------

1    Q. Okay.  And do you believe that as a property

2       owner, Valu can tell you not to conceal carry

3       on their property?

4    A. Yes.  If they communicate it to me directly,

5       personally.

6    Q. But not through signage?

7    A. If they were to post a sign saying

8       specifically that's not allowed, but to have

9       nothing posted at all is vague.  And again if

10      a police officer were to come, what exactly is

11      in writing posted that would justify what I am

12      or am not doing.

13    Q. Valu can allow you to concealed carry on their

14      property by posting conspicuous signage,

15      correct?

16    A. They could, correct.

17    Q. They have not done that, correct?

18    A. Correct.

19    Q. And in New York that means that you are not

20      allowed to concealed carry on Valu's property,

21      right?

22    A. Correct.

23    Q. And having spoken to the cashier and called

24      the corporate number, you have no indications

25      otherwise that they want you to concealed

---

1        carry on their property, correct?

2    A. Correct.

3    Q. And you think that the only way they should

4        disallow you from concealed carry on their

5        property is if they say it to you directly?

6            MR. ROTSKO:  Objection.

7    Q. You still have to answer.

8    A. Not in the sense of saying it verbally, but it

9        should be explicitly posted and written much

10       like a no trespassing sign or no parking sign

11       or in Buffalo the various you can park from

12       this time to this time but not this time where

13       it's very black and white, so that way the

14       common man would understand and it would make

15       sense.

16    Q. But you understand.  You know what it means

17       when Valu fails to post conspicuous signage

18       permitting you to concealed carry.  You know

19       that means you are prohibited, right?

20    A. Correct.

21    Q. Another paragraph in your declaration is about

22       the difficulties of travel and trying to find

23       the conspicuous signage.  Do you recall that

24       paragraph?

25    A. Yes.

---

BRETT CHRISTIAN  -  11/16/2022

---

1          and lock it and then throw a blanket over it.

2          Again, prying eyes.  I don't want to have

3          theft.  I take it very serious.

4     Q.  And where is it located in your -- this

5          storage unit, where is it located in your

6          Honda HR-V?

7     A.  In my HR-V it is in the cargo area behind the

8          rear seat.  You open the tailgate to access

9          that area.

10    Q.  Oh, because the Honda HR-V is kind of like a

11         pickup truck?

12    A.  That's an SUV.  It is smaller than an Equinox,

13         a CR-V.

14    Q.  Oh, so when you say lift up the tailgate, you

15         mean like the very back portion?

16    A.  The back cargo hatch, like the rear hatch of a

17         Station Wagon.

18    Q.  You note in your declaration that people might

19         be uncomfortable if they see you disabling

20         your firearm in your car.

21    A.  Yes.

22    Q.  Do you remember that?

23    A.  Yes.

24    Q.  On what do you base that other people might be

25         concerned with your disabling of the firearm

---

1        by the tailgate of your HR-V?

2    A.  I base it upon the action I would have to go

3        through to comply, which is pull over on the

4        side of the road before entering the property,

5        get out of the driver's door, walk to the

6        back, put the tailgate up.  Then I would have

7        to first draw the pistol from a holster, I

8        would have to eject the magazine while the gun

9        is pointed in a safe direction, which in that

10       case would be straight at the ground.  I would

11       have to eject a live round, then store the

12       firearm and lock it up.  In doing that,

13       looking at New York State Law, one thing that

14       worries me is New York State Law seems to have

15       provisions for publicly displaying or having

16       out in public a firearm while hunting.  A

17       firearm meaning all guns.

18            The other thing they seem to have is if

19       you are at the gun range or a gun club, some

20       sort of sport target shooting of some type,

21       everything else seems that a police officer

22       can interpret it as brandishing because you

23       are displaying it in public.  The other thing

24       to look at for the common person in New York,

25       all the time you see in the police blotter

---

BRETT CHRISTIAN - 11/16/2022

1          throughout the state people calling the cops
2          on other people because they think so-and-so
3          had a gun, but it was an umbrella.  They think
4          so-and-so had a gun, but it was a cellphone.
5          People in New York, as opposed to what I found
6          in my travels in other states, they tend to be
7          more skittish, more scared of guns.
8                  So based upon that in my experience, I
9          would worry that either a police officer
10         driving by and here is a person on the side of
11         a public road that has a handgun in their
12         hands and there's a live round coming out or a
13         mother with her two kids driving down the road
14         might feel scared by that because it's being
15         displayed in public.  I have always felt
16         concealed means it's concealed.  It is not
17         openly waved about, if you will.
18    Q.   Isn't it the same if the private property
19         prevents you from carrying on their property?
20         You still have to go and store your firearm,
21         right?
22    A.   Yes.
23    Q.   So if they prevent you by conspicuous signage
24         or they prevent you because the law says that
25         there is no conspicuous signage and that

---

-------- BRETT CHRISTIAN  -  11/16/2022 --------

```
 1          prevents you, the process of disabling your
 2          firearm is going to be the same?
 3    A.  Correct.
 4    Q.  Have you ever seen other people at the
 5          tailgate of their car not disabling a firearm?
 6    A.  Most people that I have talked to either say
 7          they intend to ignore the law, which is not
 8          how we have a law-abiding society.
 9    Q.  I am going to cut you off just because it's
10          not an answer to the question, okay?
11    A.  Okay.
12    Q.  The question is:  Have you ever seen other
13          people at the rear of their car with a
14          tailgate doing anything other than disarming a
15          weapon?
16    A.  No, I have not.
17    Q.  You have never seen somebody load groceries in
18          the back of a car?
19    A.  Oh, I thought you meant have I -- I have seen
20          people at the back of a vehicle loading cargo,
21          yes.
22    Q.  Right.  Okay.  Like 99 percent of the time
23          somebody is at the back of their car, they are
24          doing something other than disarming their
25          weapon, right?
```

1    A. Yes.

2    Q. So sitting at the back of your car, okay,

3       doing something in the back of your car is not

4       necessarily suspicious in and of itself,

5       right?

6    A. Not always, no.

7    Q. How long does it take you to disarm and store

8       your firearm?

9    A. If I had to estimate an approximation of time

10      because I have never timed it, it would be

11      somewhere between 30 to 40 seconds.

12          MR. BELKA:  Okay.  We are going to take

13      a break to deal with an annoying sound.  One

14      second.  Off the record.

15

16              (Recess was taken.)

17          (The question and answer were read.)

18

19   BY MR. BELKA:

20   Q. One of the other areas that your declaration

21      addresses is when traveling the private

22      property provisions of the CCIA prevent you

23      from taking bathroom breaks.  Do you recall

24      that?

25   A. Yes.

-BRETT CHRISTIAN - 11/16/2022-

1    A. Yes.
2    Q. So sitting at the back of your car, okay,
3       doing something in the back of your car is not
4       necessarily suspicious in and of itself,
5       right?
6    A. Not always, no.
7    Q. How long does it take you to disarm and store
8       your firearm?
9    A. If I had to estimate an approximation of time
10      because I have never timed it, it would be
11      somewhere between 30 to 40 seconds.
12          MR. BELKA:  Okay.  We are going to take
13      a break to deal with an annoying sound.  One
14      second.  Off the record.
15
16          (Recess was taken.)
17        (The question and answer were read.)
18
19    BY MR. BELKA:
20    Q. One of the other areas that your declaration
21       addresses is when traveling the private
22       property provisions of the CCIA prevent you
23       from taking bathroom breaks.  Do you recall
24       that?
25    A. Yes.

1          changes took effect if they permitted the
2          lawful, for licensed permit holders, carrying
3          of concealed firearms on their property.  With
4          both of those again I don't know the ranking
5          level, that would be the word I would select,
6          of the employee.  They both said that they
7          were declining to comment at this time.  I
8          would have to talk to a corporate location and
9          track down somebody in corporate.  Not a
10         specified person, but someone in corporate.
11    Q.  And did you do that?
12    A.  I tried, got bounced around, could not get
13         definitive answers.  Answers in the sense
14         either explicit, on-the-record verbal
15         permission or explicit, on-the-record written
16         permission.
17    Q.  Did you ever go to those locations and see
18         whether or not there was conspicuous signage?
19    A.  I have.
20    Q.  Okay.  And if you went to those locations, did
21         you see conspicuous signage?
22    A.  At Tops and Wegmans, the stores that I have
23         been to do not have anything posted saying
24         that it is allowed.
25    Q.  And so pursuant to New York State Law, what

─── BRETT CHRISTIAN  -  11/16/2022 ───

1       did that communicate to you?
2    A. That communicated to me that it would be a
3       violation of law to bring onto the property a
4       firearm.
5    Q. Right.  So at the time you saw no conspicuous
6       signage on Tops and Wegmans, you knew that you
7       were not allowed to concealed carry on their
8       properties?
9    A. Yes.  Once I went on the property.  I decided
10      to, when I made my next shopping trip, to not
11      carry at all, leave it at home because I did
12      not know what was going to happen and pulling
13      a firearm out in public to me is unsafe if you
14      are doing it at all.  So I went without and
15      that's when I see that there's nothing posted.
16   Q. All right.  And your calling ahead to Cabela's
17      on Walden to determine their policy on
18      carriage, what did you say to them and what
19      did they say to you?
20   A. I asked them if they permit lawful permit
21      holders to carry concealed on their person on
22      their property.  Cabela's said as long as you
23      follow New York State Law, not threatening
24      people, not waving it about, not trying to
25      commit a crime, that they do have signage

---
BRETT CHRISTIAN - 11/16/2022
---

1       have any other questions right now, although I

2       do reserve my right to re-cross if need be.

3

4       REEXAMINATION BY BY MR. BELKA:

5   Q.  Very briefly.  How old were you on

6       January 30th, 2020, when you received your

7       concealed carry license -- or strike that.

8             How old were you on January 30th, 2020,

9       when you applied for your concealed carry

10      license?

11  A.  Approximately, between 37 to 38 years of age.

12  Q.  Right.  So just as shorthand I am going to

13      refer to you as being 36 as prior to your

14      receiving your concealed carry license.  Would

15      that be accurate?

16  A.  Yes.

17  Q.  Up until the time that you were 36 years old

18      and you could not conceal carry, how many

19      times did you walk in Stiglmeier Park?

20  A.  Less frequently.  It would have been maybe one

21      to two times a year.

22  Q.  So is it fair to say that upon receipt of your

23      concealed carry license, you increased the

24      frequency in which you walked in Stiglmeier

25      Park from one to two times a year to two to

-BRETT CHRISTIAN - 11/16/2022-

```
 1          three times a month?

 2     A.  Yes.

 3     Q.  When you were 36, again that's prior to you

 4          receiving your concealed carry license, how

 5          many times a week did you walk on the Clarence

 6          Bike Path?

 7     A.  Less frequent.  Approximately two to three

 8          times a year.

 9     Q.  And is it fair to say that upon receiving your

10          concealed carry license you increased the

11          number of times you walked on the Clarence

12          Bike Path from two to three times a year to

13          two to three times a week?

14     A.  Yes.

15     Q.  When was the bike path rapist?  Approximately

16          what year in Buffalo?

17     A.  I don't remember the exact year.

18     Q.  My mother is law enforcement and was one of

19          the individuals who sat as a dummy in order to

20          catch the bike path rapist, and my wife was

21          pretty young at the time so I am going to go

22          like sometime in the 1980s.  Does that sound

23          right?

24     A.  Without looking it up, I would defer to that

25          then.
```

-------- BRETT CHRISTIAN  -  11/16/2022 --------

1    Q. But it was a pretty long time ago, a couple of
2       decades at least?
3    A. Yes.
4    Q. Okay.  And the aggressive wild turkeys, have
5       you ever had cause to use your weapon from the
6       time you received your concealed carry permit
7       until September 1st, 2022, in order to prevent
8       wild turkey attacks?
9    A. Under Article 35 it has never gotten to the
10      point where I would need to use it.
11   Q. What's Article 35?
12   A. New York State Article 35 on the use of deadly
13      force when it is justified in relation to
14      protecting human life.
15   Q. That's for discharge of firearms, right?
16   A. Relating to the discharge of firearms, I
17      believe would be under the use of deadly
18      force.
19   Q. Okay.  Did you ever wave your handgun at the
20      wild turkeys?
21   A. No.
22   Q. Did the concealed carry effect the wild
23      turkey's aggressiveness when you were on the
24      Clarence Bike Path?
25   A. I cannot speculate on their motivations.

-------- DEPAOLO CROSBY REPORTING SERVICES, INC. --------
135 Delaware Avenue, Suite 301, Buffalo, New York  14202
716-853-5544

---

BRETT CHRISTIAN - 11/16/2022

```
 1    Q. Right.  Okay.  So when you were 36, again this
 2       is before you get the concealed carry permit,
 3       how many times a month did you go to the
 4       Harris Hill State Lands?
 5    A. Before I got the permit?
 6    Q. Before.
 7    A. It would have been one to two times a year.
 8    Q. And is it fair to say upon receiving your
 9       concealed carry permit that the amount of time
10       you visited the Harris Hill State Lands
11       increased from one to two times a year to one
12       time a month?
13    A. Yes.  On average.
14    Q. When you were 36 did you ever go to Valu Home
15       Centers?
16    A. Yes.
17    Q. Prior when you were 36 did you go to Valu Home
18       Centers less frequently than you did after
19       your receipt of your concealed carry license?
20    A. Yes.
21    Q. So when you received your concealed carry
22       license, you went to Valu more often than you
23       had done prior?
24    A. Yes.
25    Q. Did you have any less need for hardware
```

---

1          supplies before and after you received your

2          concealed carry license?

3     A.   No.

4     Q.   As it relates to Delta Sonic, prior to -- when

5          you were 36 -- strike all of that.

6               When you were 36 and going to Delta

7          Sonic, did you go less frequently at 36 than

8          you did after you received your concealed

9          carry permit?

10    A.   Yes.  I was driving less.

11    Q.   You were driving less?

12    A.   Before I got my permit, I didn't drive as much

13         as after I got my permit.  So I wasn't using

14         as much gas.

15    Q.   What was the motivating factor for driving

16         more?

17    A.   To experience the outdoors of New York State.

18    Q.   But only while concealed carrying?

19    A.   I would carry when I had my permit before

20         September 1st.  I would carry wherever the law

21         allowed and whenever the law allowed.

22    Q.   But not when you were 36 because when you were

23         36 you had no concealed carry permit?

24    A.   Yes.  So then when I was 36 there would be

25         many instances I simply wouldn't do things

-------------------------- BRETT CHRISTIAN  -  11/16/2022 --------------------------

```
 1           because I wouldn't be able to guarantee my
 2           safety.
 3     Q.  You sat in your home as a 36-year-old man,
 4           okay, and did not experience the world
 5           including going to Delta Sonic, okay, until
 6           you received your concealed carry license?
 7     A.  Not -- let me back up here.
 8                 MR. ROTSKO:  Objection.
 9                 MR. BELKA:  I want you to answer that
10           question.
11                 MR. ROTSKO:  Yes.  You can answer the
12           question.
13                 MR. BELKA:  Read it back.
14
15                 (The question was read.)
16
17                 THE WITNESS:  I would not -- so I worked
18           long hours.  I don't have usually a 9:00 to
19           5:00 day.  A lot of times I will have a 7:00 or
20           8:00 a.m. day until 6:00, 7:00, 8:00, 9:00,
21           10:00 at night.  If it's 8 o'clock at night and
22           I am leaving work and I needed to run to the
23           store in winter when it gets dark out, there's
24           times I would go shopping after I got my
25           permit.  Wegmans used to be 24 hours before
```

—— **BRETT CHRISTIAN   -   11/16/2022** ——

1        COVID did its thing.  I would go grocery

2        shopping at midnight, 1:00 in the morning.  I

3        am leaving work; it's convenient.  I don't have

4        to worry about my safety.  I can stop at, you

5        know, Delta Sonic at 8:45 at night before they

6        close on a Friday night, Saturday night.  I can

7        get gas; I don't have to worry, and I can go to

8        any Delta Sonic that I wanted.  I could go to

9        any Wegmans I wanted, any Tops.  Now, for

10       example, the Tops up from me on Union Road, the

11       Wegmans up from me on Union Road.

12            Like I have seen at work, the criminal

13       element seems to be more emboldened with the

14       bail reform.  I worry that there is now a

15       greater likelihood of having a bad encounter

16       and my attitude is, don't put yourself in what

17       you would consider to be an unsafe situation.

18       I don't feel free to go to the grocery store

19       whenever they are open.  I now prefer to go

20       early in the morning when most people are

21       asleep on a Sunday morning.

22

23       BY MR. BELKA:

24    Q. This question is not about now.  This question

25       is about when you were 36 or prior to having a

1              concealed carry license to the period in which

2              you had a concealed carry license.  Did you go

3              to Delta Sonic less frequently before you had

4              your concealed carry license as opposed to

5              when you had your concealed carry license?

6      A. I made less stops.

7              MR. ROTSKO:  Objection.  Asked and

8              answered.

9      Q. You still have to answer.

10     A. I made less stops because I simply was not

11             driving as much.

12     Q. Because you were going fewer locations because

13             you didn't have a concealed carry permit?

14     A. Correct.

15     Q. You can count on three fingers the amount of

16             times you have concealed carried after the

17             implementation of the CCIA.  What are those

18             three times?

19     A. When I went to Cabela's and I recently added a

20             new handgun and a more suitable bear caliber.

21             That was recently a few weeks ago.

22     Q. When you say bear caliber, B-E-A-R?

23     A. B-E-A-R.

24     Q. Okay.

25     A. When I went to Wolcott Guns on Walden to use

---

BRETT CHRISTIAN  -  11/16/2022

1          the shooting range at a gun store and there
2          were two trips there:  One to buy ammo and one
3          to use the gun store -- or gun range.  Sorry.
4      Q.  Those are the three, Cabela's, Wolcott and
5          Wolcott?
6      A.  Correct.
7              MR. BELKA:  That's all for me unless you
8          have anything else, Nick.
9              MR. ROTSKO:  I do not have anything
10         else.
11             MR. BELKA:  The deposition has ended.  I
12         only want a PDF.
13             MR. ROTSKO:  PDF is sufficient for us as
14         well.
15             MR. BELKA:  And billing me.  Nick, are
16         you okay if the exhibits are attached to the
17         transcript, copies of the exhibits?
18             MR. ROTSKO:  Yes.
19
20         (Deposition concluded at 5:00 p.m.)
21
22
23
24
25

---