## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NEW YORK

BRETT CHRISTIAN, *et al.*,

          *Plaintiffs*,

 v.

DOMINICK L. CHIUMENTO, *et al.*,

          *Defendants.*

No. 1:22-cv-695-JLS

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND REPLY IN SUPPORT OF THEIR <u>CROSS-MOTION FOR SUMMARY JUDGMENT</u>

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................. ii

INTRODUCTION ............................................................................................... 1

ARGUMENT ........................................................................................................

    I.    Plaintiffs Have Standing to Bring Both Facial and As-Applied Challenges. ............... 3

        A.  Plaintiff Christian ........................................................................... 3

            1.  All of the Parks Plaintiff Christian Discusses Are Non-Urban ............... 4

            2.  Plaintiffs Can Properly Bring Both Facial and As-Applied
                Pre-Enforcement Challenges. ................................................. 9

        B.  Organizational Plaintiffs ............................................................... 10

    II.    New York's Carry Bans at Public Parks and on Private Property
        Open to the Public are Unconstitutional. ..................................................... 13

        A.  New York's Carry Ban In Public Parks Violates the Second Amendment. .......... 14

        B.  New York's No-Carry Default Violates the Second Amendment. ....................... 20

            1.  Plaintiff Christian's Conduct Falls Within the
                Second Amendment's Plain Text ............................................ 20

            2.  No Historical Tradition Supports the No-Carry Default ........................ 21

                a.  Owner Consent Statutes Are Inapplicable. ................................. 21

                b.  Laws Regarding Discharge Are Inapposite. ............................... 26

                c.  Laws Prohibiting Firearms in Places of Public
                   Congregation Are Contradicted By Earlier History ...................... 27

    III.  Plaintiffs' Sensitive Places Framework Is Historically Grounded,
        Consistent with Precedent, and Administrable. ............................................. 28

CONCLUSION .................................................................................................. 30

## TABLE OF AUTHORITIES

**Cases**                                                                                        **Page**

*Aguayo v. Richardson*, 473 F.2d 1090 (2d. Cir. 1973) ...........................................................10, 11

*All. for Open Soc'y Int'l, Inc. v. U.S. Agency for Int'l Dev.*,
    570 U.S. 205 (2013)................................................................................................12

*All. for Open Soc'y Int'l, Inc. v. U.S. Agency for Int'l Dev.*,
    651 F.3d 218 (2d Cir. 2011).................................................................................11, 12

*Am. Psy. Ass'n v. Anthem Health Plans, Inc.*,
    821 F.3d 352 (2d Cir. 2016).......................................................................................10

*Antonyuk v. Chiumento*,
    89 F.4th 271 (2d Cir. 2023) ................................. 3, 4, 6, 8, 9, 10, 13, 14, 15, 16, 20, 21, 22

*Bldg. & Const. Trades Council of Buffalo, N.Y. & Vicinity v. Downtown Dev., Inc.*,
    448 F.3d 138 (2d Cir. 2006).......................................................................................12

*Bloate v. United States*, 559 U.S. 196 (2010) ....................................................................24

*Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786 (2011) ............................................................21

*Bucklew v. Precythe*, 587 U.S. 119 (2019) ........................................................................10

*Christian v. Nigrelli*, 642 F. Supp. 3d 393 (W.D.N.Y. 2022)...........................................13

*District of Columbia v. Heller*, 554 U.S. 570 (2008).....................................................20, 26

*Erlinger v. United States*, No. 23-370,
    2024 WL 3074427 (U.S. June 21, 2024) ...................................................................1, 19

*Espinoza v. Mont. Dep't of Revenue*, 591 U.S. 464 (2020) ................................................14

*Ex Parte Young*, 209 U.S. 123 (1908) ...............................................................................11

*Fischer v. United States*, No. 23-5572,
    2024 WL 3208034 (U.S. June 28, 2024) ....................................................................23

*Gundy v. United States*, 588 U.S. 128, 140–41 (2019)......................................................24

*Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010) .....................................................9

*Hyland v. Navient Corp.*, 48 F.4th 110 (2d Cir. 2022) .......................................................12

*Jacoby & Meyers, LLP v. Presiding Justices of the First, Second, Third and Fourth Dep'ts*,
    852 F.3d 178 (2d Cir. 2017)........................................................................................9

*Kipke v. Moore*, No. 23-cv-1293,
    2023 WL 6381503 (D. Md. Sept. 29, 2023) ................................................................22

*Koons v. Platkin*, 673 F. Supp. 3d 515 (D.N.J. 2023)........................................................21

*Lara v. Comm'r Pa. State Police*, 91 F.4th 122 (3d Cir. 2024).............................................1

*Lara v. Comm'r Pa. State Police*,
    97 F.4th 156 (3d Cir. Mar. 27, 2024)...........................................................................1

*Little Sisters of the Poor v. Pennsylvania*,
   140 S. Ct. 2367 (2020)................................................................12

*Milavetz, Gallop & Milavetz, P.A. v. United States*,
   559 U.S. 229 (2010).....................................................................9

*N.Y. Pub. Interest Rsch. Grp. v. Whitman*,
   321 F.3d 316 (2d Cir. 2003).........................................................12

*N.Y. State Nat'l Org. for Women v. Terry*,
   886 F.2d 1339 (2d Cir. 1989).......................................................12

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*,
   597 U.S. 1 (2022).................................1, 8, 9, 13, 14, 15, 16, 17, 18, 19, 20, 22, 23, 25, 27

*O'Connor v. Donaldson*, 422 U.S. 563 (1975) ................................................3

*Philadelphia Co. v. Stimson*, 223 U.S. 605 (1912) .......................................11

*Ramos v. Louisiana*, 590 U.S. 83 (2020) ...................................................14

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*,
   600 U.S. 181 (2023).......................................................................11

*Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014)..............................3

*Toilet Goods Ass'n v. Gardner*, 360 F.2d 677 (2d Cir. 1966) .......................11

*United States v. Ayala*, No. 8:22-cr-369,
   2024 WL 132624 (M.D. Fla. Jan. 12, 2024).....................................29

*United States v. Rahimi*, No. 22-915,
   2024 WL 3074728 (U.S. June 21, 2024) .....................................1, 9, 13, 14, 20

*United States v. Rahimi*, No. 23-910,
   2024 WL 3259671 (U.S. July 2, 2024) (Mem.)..................................3

*Upsolve, Inc. v. James*, 604 F. Supp. 3d 97 (S.D.N.Y. 2022)........................9

## Statute

N.Y. PENAL L. § 265.01e(2)(d) ...............................................................7

## Other Authorities

2 WILLIAM BLACKSTONE'S COMMENTARIES ON THE LAWS OF ENGLAND (1876)...........................25

*About the Sergeant at Arms*, U.S. SENATE,
   https://bit.ly/3Li1LWk..............................................................29

Catie Carberry, *What's in a name? The Evolution of the Term 'Gun'*,
   DUKE CTR. FOR FIREARMS L. (July 24, 2019), https://bit.ly/3XVO5aX...........................23

JOSEPH CHITTY, TREATISE ON THE GAME LAWS (2nd ed. 1826)..............................25

*FAQs and Answers on Hunting and Hunting-Related Activities in Response to Recent Changes to N.Y. State Firearm Laws*, N.Y. DEP'T OF ENVIRONMENTAL CONSERVATION (Sept. 1, 2022), https://on.ny.gov/3XYuGX0 ........................................7, 8

*Florida Frontiers "The Conch Republic,"* FLA. HIST. SOC'Y, https://bit.ly/3VSC9Ep .........................................22

DONALD L. GRANT, THE WAY IT WAS IN THE SOUTH: THE BLACK EXPERIENCE IN GEORGIA (2001)..................................27

THOMAS JEFFERSON, LEGAL COMMONPLACE BOOK (2019) ............................. 3

*Population of Incorporated Places in 1900*, U.S. CENSUS BUREAU (June 8, 1901), https://bit.ly/3XRqtV6 ..................................................16

ANTONIN SCALIA & BRIAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS (2012)..................................24

Mark R. Sigmon, *Hunting and Posting on Private Land in America*, 54 DUKE L. J. 549 (2004) ..................................................25

Mark W. Smith, *Enlightenment Thinker Cesare Beccaria and His Influence on the Founders: Understanding the Meaning and Purpose of the Second Amendment's Right to Keep and Bear Arms*, 2020 PEPP. L. REV. 71 (2020) .........................................2, 3

Joel D. Treese, *Secret Service and the Presidents*, WHITE HOUSE HIST. ASS'N (Oct. 20, 2015), https://bit.ly/3IyysgS ..................................29

Tr. of Oral Arg*., Bruen*, https://bit.ly/3WgEoTm ..........................................2

WEBSTER'S AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE (1828)..................................23

## INTRODUCTION

As emphasized in Plaintiffs' initial brief, the first question to ask in resolving a Second Amendment challenge is whether "the Second Amendment's plain text covers [the] conduct" that the challenged law restricts. *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 17 (2022). If it does, that conduct is "presumptively protect[ed]" by the Second Amendment. *Id.* Then, it becomes Defendants' burden to demonstrate that the restrictions imposed on the exercise of that conduct are consistent with "this Nation's historical tradition of firearm regulation" so as to fall outside of the Second Amendment's "unqualified command." *Id.* (cleaned up).

New York has failed to do so. The State cannot ground its prohibition on carry in public parks and at all private property open to the public (the "no-carry default") in any relevantly similar historical tradition grounded in the Founding era. *See id.*; *see also United States v. Rahimi*, No. 22-915, 2024 WL 3074728, at **5–6 (U.S. June 21, 2024); *Erlinger v. United States*, No. 23-370, 2024 WL 3074427, at *12 (U.S. June 21, 2024) (rejecting argument that state sentencing procedures in the early 19th century are probative of the original meaning of the Fifth and Sixth amendments); *see also id.* at *13 (rejecting procedures in four states as insufficient to form the kind of "uniform postratification practice" that informs the original meaning of the constitution); *Lara v. Comm'r Pa. State Police*, 91 F.4th 122, 132–34 (3d Cir. 2024) (discarding Pennsylvania's "catalogue of statutes from the mid-to-late nineteenth century, as each was enacted at least 50 years after the ratification of the Second Amendment."), *reh'g en banc denied*, 97 F.4th 156 (3d Cir. Mar. 27, 2024). Instead, the State raises several unpersuasive threshold arguments, all of which can be dismissed. First, Plaintiffs prove that they have standing to bring both facial and as-applied challenges to the challenged restrictions. Plaintiff Christian's as-applied challenge to the non-urban parks he has carried in, and would carry in but for the

State's ban, is the opposite of hypothetical. Second, pre-enforcement as-applied challenges are both routine and permissible, as the Second Circuit recognized in this very case when discussing Plaintiff Christian's challenge to the no-carry default.

When the State turns to history, it fares no better. New York largely points to disparate late-19th-century municipal regulations—some of which were established by unelected bureaucrats—to justify its carry ban in parks, and inapposite trespass and hunting restrictions to support the no-carry default. Many of the State's analogues arrive too late to be probative of the original meaning of the Second Amendment and therefore do not form a national historical tradition of banning carry in the challenged locations. Others—such as the hunting and trespass laws—are simply inapplicable when considered in their proper context.

While New York casts its bans as "straightforward, common-sense public safety measures," State Mem. of Law in Opp'n to Pls.' Mot. for Summ. J. and in Support of Cross-Mot. for Summ. J. at 2, Doc. 77-1 (May 31, 2024) ("State MSJ"), this downplays the sweeping nature of the restrictions. The no-carry default applies to all private property open to the public, and the parks restriction applies to wide swaths of land, some of which is urban and most of which is non-urban. The State also errs by suggesting that the no-carry default "ensures that owners *know* when firearms are brought onto their property." *Id.* at 3. On the contrary, while owners may know that *law-abiding* citizens are not carrying, owners will not know when criminals bring firearms on their property. *Cf.* Tr. of Oral Arg*., Bruen* at 68–70, https://bit.ly/3WgEoTm (New York lawyer admitting that criminals carry illegal guns in areas where the State's law would have banned carry by the law-abiding). The Founders would have understood that the State's bans paradoxically makes wide swaths of New York *less* safe for law-abiding citizens because criminals are not likely to follow the law. *See, e.g.*, Mark W. Smith, *Enlightenment Thinker*

*Cesare Beccaria and His Influence on the Founders: Understanding the Meaning and Purpose of the Second Amendment's Right to Keep and Bear Arms*, 2020 PEPP. L. REV. 71, 83 (2020) (explaining that the Founders were influenced by prominent Enlightenment Thinker Cesare Beccaria who wrote that gun control laws "make things worse for the assaulted and better for the assailants") ("*Beccaria's Influence*"); *see also* THOMAS JEFFERSON, LEGAL COMMONPLACE BOOK 521 (2019) (quoting this language).

The State's bans on carry in public parks and its no-carry default should be enjoined.

## ARGUMENT

### I.     Plaintiffs Have Standing to Bring Both Facial and As-Applied Challenges.

To establish standing, Plaintiffs must establish a "personal stake in the outcome of the controversy" by demonstrating an injury in fact fairly traceable to the challenged conduct of Defendants that will be redressed by a favorable decision of this Court. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (internal quotation marks omitted). All Plaintiffs have demonstrated that here.

#### A.  Plaintiff Christian

Plaintiff Christian has standing to bring both facial and as-applied challenges to the State's carry bans. The Second Circuit has already recognized that he has standing for his pre-enforcement as-applied challenge to the no-carry default. *Antonyuk v. Chiumento*, 89 F.4th 271, 380 (2d Cir. 2023). The same is true for his challenge to the State's carry ban in public parks. As a threshold matter, the Supreme Court recently granted, vacated, and remanded the pending petition for certiorari in *Antonyuk* for reconsideration in light of *United States v. Rahimi*, depriving the Second Circuit's decision of precedential effect. *See* No. 23-910, 2024 WL 3259671 (U.S. July 2, 2024) (Mem.); *O'Connor v. Donaldson*, 422 U.S. 563, 577 n.12 (1975).

This Court is therefore no longer bound by *Antonyuk*'s (preliminary) holding that the State's analogues sufficed to show a tradition of banning carry in urban parks and therefore that Plaintiffs' facial challenge to the parks provision failed. This Court could, and should, rule that New York has failed to meet its historical burden and that the parks provision is facially unconstitutional. Regardless, as Plaintiffs explain, most, if not all, of the parks at issue in this case are non-urban, and at minimum summary judgment is appropriate for Plaintiffs' as-applied challenge to non-urban parks.

### 1. All of the Parks Plaintiff Christian Discusses Are Non-Urban.

Plaintiff Christian has standing to challenge the public parks provision because the State's ban now bars him from carrying a firearm for self-defense in parks generally, and in non-urban parks specifically, where he previously carried and would intend to keep carrying. Pls.' Mem. in Support of their Mot. for Summ. J., Doc. 73-1, at 4 (Mar. 1, 2024) ("Pls.' MSJ"). He suffers injury from the "credible threat of arrest and prosecution" he faces if he carries in the parks he once frequented. *Antonyuk*, 89 F.4th at 380. His inability to carry in these locations inflicts an injury caused by New York's ban and is redressable by a favorable decision.

New York challenges this simple logic by misrepresenting the nature of the parks where Plaintiff Christian would carry but for the State's ban. Most, if not all, are properly classified as "wilderness parks, forests, and reserves" for which the Second Circuit specifically "doubt[ed] that there is historical support for the regulation of firearms[.]" *Antonyuk*, 89 F.4th at 356; *see also id.* at 362 (suggesting that non-urban parks are those "not primarily designed for peaceable assembly"). Start with 308-acre Stiglmeier Park. While the State portrays it as a "quintessential[ly] urban park" between "two thoroughfares," State MSJ at 15, its description is misleading. The Barill Declaration cites no evidence other than a satellite map that these two

roads are major thoroughfares or surrounded by residential housing developments. Losson Road is approximately three miles long and is a two-lane road with a shared third passing lane. Pls.' SUF Resp., Ex. 5, Google Maps, Losson Road Directions; Pls.' SUF Resp., Ex. 6, Losson Road Street View. Similarly, Como Park Boulevard is approximately five miles long and has two lanes. Pls.' SUF Resp., Ex. 7, Google Maps, Como Park Boulevard Directions; Pls.' SUF Resp., Ex. 8, Como Park Boulevard Street View. While "major thoroughfare" is a vague phrase, neither road appears to qualify. Additionally, while there appear to be single family homes along Losson Road and Como Park Boulevard, it is not clear that these are "residential housing developments." Pls.' SUF Resp., Ex. 6, Losson Road Street View; Pls.' SUF Resp., Ex. 8 Como Park Boulevard Street View. Moreover, wide swaths of the interior of the 308 acre park are removed from these roads and houses, even if they were major thoroughfares or surrounded by residential housing developments. Finally, while the State asserts (without citation) that several of the parks Plaintiff Christian discusses are in "condensed population centers," State MSJ at 15, census data reveals the opposite, *see* Pls.' SUF Resp., Ex. 15, Census Block Overlay. Harris Hill State Forest Area in particular is in a completely rural area. *See id.* at 2.

The State's evidence about the interior of Stiglmeier Park is also insufficient. While the Barill Declaration discusses that the park contains baseball and softball diamonds, tennis courts, shelters, and more, State MSJ at 15, it barely discusses that most of the park is wooded hiking and walking trails. Indeed, most of the fields, diamonds, and other recreation areas are concentrated in the southeastern corner of the park, while the northern and western areas of the park are largely wooded and open areas through which nature and hiking trails pass. Ex. 1 to Barill Decl., Doc. No. 77-4; Pls.' SUF Resp. Ex. 9, Aerial View of Hiking Areas in Stiglmeier.

Plaintiff Christian recently went to Stiglmeier Park on the morning of Saturday, June 22,

2024 between 9:30 am and 10:15 am—roughly the same time as Mr. Barill. Suppl. Decl. of Brett Christian ¶ 4. While there, Plaintiff Christian observed few other people near the baseball diamonds section of the park. *Id.* ¶¶ 5–6. Plaintiff Christian also observed few other people on two wooded hiking trails in Stiglmeier Park. *Id.* ¶¶ 6–9. As Plaintiff Christian noted, there are other hiking trails similar to the two he documented on the morning of June 20, 2024. *Id.* ¶¶ 6, 9. Plaintiff Christian's description and photographs of Stiglmeier Park's wooded areas are consistent with the map attached to Mr. Barill's declaration. Ex. 1 to Barill Decl., Doc. No. 77-4. However, it is unclear whether Mr. Barill assessed the number of people in the wooded or open grassy areas of the park through which nature and hiking trails pass in reaching his conclusions. In any event, Mr. Barill's observation of the number of people on one given day in the year is in no way representative of the average attendance or density of attendance in the park. Attendance and density—even in the more communal recreational areas of the park—vary greatly. Suppl. Christian Decl. ¶¶ 5–9. What is clear is that wide swaths of Stiglmeier Park are wooded areas akin to "wilderness parks, forests, and reserves," *Antonyuk*, 89 F.4th at 356.

The Clarence Bike Path and Shoreline Trial also are non-urban. While the State claims that these paths bisect "urban" parks, it fails to prove that fact by showing that either location is crowded or a place of public assembly. Moreover, Plaintiff Christian's understanding is that the West Shore Trail segment of Shoreline Trail is *itself* subject to the State's carry ban in public parks based on prominent signage along the trail. Suppl. Christian Decl. ¶ 10. Nor have Defendants provided sufficient evidence that the parks along the eight mile Shoreline Trail qualify as "urban." Because the Shoreline Trail also passes through and along areas that are not crowded public spaces, *e.g.*, Suppl. Christian Decl. ¶ 11, it is akin to the non-urban parks *Antonyuk* defined as "commons" and "wilderness areas." 89 F.4th at 362.

6

Finally, the Harris Hill State Forest Area also is non-urban. The State claims that its carry ban does not apply to this park. State MSJ at 16. In support, the State cites guidance documents and sources stating that *hunting* is permissible in Harris Hill State Forest. *See id.* But Plaintiff Christian does not want to hunt, he wants to carry for self-defense. And while the State's carry ban exempts "the forest preserve as defined in subdivision six of [§] 9-0101 of the [E]nvironmental [C]onservation [L]aw," N.Y. PENAL L. § 265.01e(2)(d), that section in turn defines "forest preserve" as "the lands owned or hereafter acquired by the state within the county of Clinton, except the towns of Altona and Dannemora, and the counties of Delaware, Essex, Franklin, Fulton, Hamilton, Herkimer, Lewis, Oneida, Saratoga, Saint Lawrence, Warren, Washington, Greene, Ulster and Sullivan." The Harris Hill State Forest where Plaintiff Christian wishes to carry is within Chautauqua County, not one of the enumerated counties. Additionally, the phrase "forest preserve" exempts "lands within the limits of any village or city," and at least part of Harris Hill State Forest is within the border the towns of Ellington and Gerry. Pls.' SUF Resp., Ex. 12, Harris Hill State Forest; Pls.' SUF Resp. Ex. 13, Map of Harris Hill State Forest. There is no basis for concluding that Harris Hill State Forest Area is exempt from the State's carry ban.

While Defendants invoke § 9-0501 of the Environmental Conservation Law, that is not the section cited in PL § 265.01e(2)(d) that creates an exemption. Moreover, § 9-0501 refers to "reforestation areas" not "forest preserve," which are distinct phrases. While the State appears to permit hunting in State Forests, State MSJ at 16, there is no indication that carry for other lawful purposes (including self-defense) is permitted in Harris Hill State Forest. In fact, the guidance document New York cites undercuts its reasoning. *See FAQs and Answers on Hunting and Hunting-Related Activities in Response to Recent Changes to N.Y. State Firearm Laws,*

N.Y. Dep't of Environmental Conservation (Sept. 1, 2022), https://on.ny.gov/3XYuGX0. While it clarifies that mere possession of firearms is acceptable in Adirondacks and Catskills Parks (which are specifically exempted by § 9-0101(6)(b) of the Environmental Conservation Law—and the former of which Christian no longer relies on for standing), it discusses only hunting rights when speaking about all other parks. Even if this guidance supported the State's reading, it cannot trump the plain text of the State's law. And the fairest reading of that text is that the State exempts only *some* forest preserve lands from its carry ban based on the county in which they are located. Harris Hill State Forest is not within one of those counties and parts of it overlap with town boundaries.

Finally, this Court should not credit or otherwise rely on Defendants' expert's definition of what makes a park "urban." *See* Expert Rep. of Prof. Terence Young, Doc. 77-3 (May 31, 2024) ("Young Rep."). For starters, the Second Circuit has defined the relevant terms. *See Antonyuk*, 89 F.4th at 362 (distinguishing between "fairs, markets, [and] the new, urban parks of the mid-19th century" which are "quintessential and often-crowded public spaces" and "commons," "wilderness areas," "forests," and "spaces held by the community for shared utilitarian purposes"). Additionally, Defendants' expert advances the view that modern parks did not emerge until the late 19th century as part of a "Romantic ideology," *see, e.g.*, *id.* at 3, 12–14, rendering any firearms restrictions in them necessarily unmoored from any Founding-era tradition and thus insufficient. Moreover, that the parks where Plaintiff Christian has carried and intends to continue carrying are non-urban is readily apparently from observation and the evidence submitted in this case. *See* Suppl. Decl. of Brett Christian; Ex. 1 to Barill Decl.; Pls.' SUF Resp., Exs. 1-13. Expert evidence is simply not necessary, despite the State's contention otherwise. State MSJ at 12 n.3. As the Supreme Court has repeatedly made clear, *Bruen*'s

analogical inquiry is the task of lawyers and judges, not experts. *See Bruen*, 597 U.S. at 25 n.6; *see generally Rahimi*, 2024 WL 3074728.

## 2.  Plaintiffs Can Properly Bring Both Facial and As-Applied Pre-Enforcement Challenges.

New York is incorrect that Plaintiffs can only bring pre-enforcement facial challenges. *See* State MSJ at 7–8. First, the Second Circuit stated in this very case that Plaintiffs properly pleaded an as-applied, pre-enforcement challenge to the no-carry default. *Antonyuk*, 89 F.4th at 384 (citing Compl. ¶ 37, Doc. 1). If such a challenge were proscribed, the Circuit would have said so. Second, New York's reliance on *Jacoby & Meyers, LLP v. Presiding Justices of the First, Second, Third and Fourth Dep'ts*, 852 F.3d 178 (2d Cir. 2017), is misplaced. *Jacoby & Meyers* merely mentioned in passing that because Plaintiffs sued before they had been charged with a violation of the law, their claim was better characterized as facial. 852 F.3d at 184. Moreover, in doing so, *Jacoby & Meyers* cited a line of cases holding that pre-enforcement *vagueness* challenges are necessarily facial. *See id.* (citing *N.Y. State Rifle & Pistol Ass'n v. Cuomo*, 804 F.3d 242, 265 (2d Cir. 2015), citing *Richmond Boro Gun Club, Inc. v. City of New York*, 97 F.3d 681, 686 (2d Cir. 1996)). The Second Circuit has not established the categorical rule that pre-enforcement as-applied challenges are disfavored, let alone prohibited, in cases outside of the void-for-vagueness context.

For good reason. Any such holding would be in significant tension with Supreme Court precedent, which "has eschewed any such bright line rule," *Upsolve, Inc. v. James*, 604 F. Supp. 3d 97, 108 (S.D.N.Y. 2022), and routinely recognizes that pre-enforcement challenges can be as-applied, *see, e.g.*, *Milavetz, Gallop & Milavetz, P.A. v. United States*, 559 U.S. 229, 248–49 & n.7 (2010) (analyzing a pre-enforcement challenge as an as-applied one); *Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010) (same). Additionally, the Supreme Court has

recognized that because the "line between facial and as-applied challenges can sometimes prove amorphous," these classifications affect only the "breadth of the remedy" rather than the "substantive rule of law necessary to establish a constitutional violation." *Bucklew v. Precythe*, 587 U.S. 119, 138–39 (2019) (collecting cases). In other words, regardless of whether Plaintiffs' claims are purely facial, or are as-applied (as the Second Circuit has already recognized at least for the no-carry default, *see Antonyuk*, 89 F.4th at 384), that fact bears only on the remedy this Court issues, not on whether the State's bans are unconstitutional.

### B. Organizational Plaintiffs

The Organizational Plaintiffs, Firearms Policy Coalition, Inc. ("FPC") and the Second Amendment Foundation ("SAF") have standing to sue to assert the rights of their members, one of whom is a named Plaintiff in this lawsuit. While FPC and SAF recognize that the Second Circuit has held that organizations do not have a *cause of action* under § 1983 to assert the rights of their members, Pls.' MSJ at 4 n.3, both the Supreme Court and the Second Circuit have recognized that organizations have Article III *standing* to assert the rights of their members and can in fact assert them in a case like this one.

In holding that organizations cannot bring § 1983 claims to assert the rights of their members, the Second Circuit has used the label of standing. *See, e.g.*, *Aguayo v. Richardson*, 473 F.2d 1090, 1099–100 (2d. Cir. 1973). But that is imprecise and does not mean that organizations do not have standing in the Article III sense. Instead, what the Circuit has decided is that organizational plaintiffs do not "ha[ve] a cause of action under the statute" to assert the rights of their members. *Am. Psy. Ass'n v. Anthem Health Plans, Inc.*, 821 F.3d 352, 359 (2d Cir. 2016) (quoting *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 128 (2014)) (explaining that statutory standing is a misleading descriptor and that the absence of a

valid cause of action does not implicate subject-matter jurisdiction). Thus, while Circuit precedent forecloses the argument that FPC and SAF have a cause of action under § 1983 to assert the rights of their members,[1] precedent supports the conclusion that they have Article III standing to press the constitutional claims of their members advanced under 28 U.S.C. § 1331. *See, e.g.*, *Aguayo*, 473 F.32d at 1099. In other words, while binding precedent establishes that organizations do *not* have a cause of action on behalf of their members under Section 1983, binding precedent also establishes that organizations *can* assert the rights of their members in an equitable action founded directly on the federal constitution. This precedent ultimately is based on the reasoning of *Ex Parte Young*, 209 U.S. 123 (1908), the reasoning that also provides the basis for official-capacity suits against federal officials for constitutional violations, which themselves are not covered by Section 1983. *See Philadelphia Co. v. Stimson*, 223 U.S. 605, 621 (1912) (applying the reasoning of *Ex parte Young* to suit against federal official); *see also Toilet Goods Ass'n v. Gardner*, 360 F.2d 677, 683 n.6 (2d Cir. 1966).

FPC and SAF meet the established requirements for asserting the rights of their members. The Supreme Court has held that an association has standing to sue on behalf of its members when: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 199 (2023) (quoting *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)). So too the Second Circuit, which has echoed these requirements in finding that organizations have Article III standing to assert the rights of their members. *See, e.g.*, *All. for*

---

[1] Plaintiffs reserve the right to challenge this holding before the appropriate court. *See* Pls.' MSJ at 4 n.3.

11

*Open Soc'y Int'l, Inc. v. U.S. Agency for Int'l Dev.*, 651 F.3d 218, 228 (2d Cir. 2011), *aff'd sub nom.*, 570 U.S. 205 (2013); *N.Y. Pub. Interest Rsch. Grp. v. Whitman*, 321 F.3d 316, 325 (2d Cir. 2003); *Bldg. & Const. Trades Council of Buffalo, N.Y. & Vicinity v. Downtown Dev., Inc.*, 448 F.3d 138, 144 (2d Cir. 2006).

Here, FPC and SAF are "indisputably [] voluntary membership organization[s] with identifiable members," *Students for Fair Admissions*, 600 U.S. at 201, one of whom is Plaintiff Christian. Because Plaintiff Christian has standing to sue, the first prong of the associational standing inquiry is met. Additionally, the interests that FPC and SAF seek to protect in this lawsuit—namely the right of law-abiding individuals to carry peaceably for self-defense in parks and private property open to the public, *see, e.g.*, Compl. at 5–7, Doc. 1 (Sept. 13, 2022)—are germane to the organizations' purposes. *Cf. N.Y. State Nat'l Org. for Women v. Terry*, 886 F.2d 1339, 1349 (2d Cir. 1989) (second prong of the *Hunt* test satisfied where pro-abortion organization repeatedly alleged that it is dedicated to assuring a constitutional right to abortions). Finally, the cause of action alleged and relief requested do not require the participation of individual members because FPC and SAF "seek[] a purely legal ruling without requesting that the federal court award individualized relief to its members." *Downtown Dev., Inc.*, 448 F.3d at 150 (clarifying that the third prong of *Hunt* generally excludes claims for damages).

Regardless, it is well-established that so long as one named Plaintiff can demonstrate injury, causation, and redressability, the Court need not inquire into the standing of the other Plaintiffs. *Hyland v. Navient Corp.*, 48 F.4th 110, 117–18 (2d Cir. 2022); *Little Sisters of the Poor v. Pennsylvania*, 140 S. Ct. 2367, 2379 n.6 (2020). For all the reasons just discussed, Plaintiff Christian has done so.

II.    **New York's Carry Bans at Public Parks and on Private Property Open to the Public are Unconstitutional.**

As Plaintiffs laid out in their moving papers, several methodological considerations should guide this Court's assessment of New York's historical evidence. *See* Pls.' MSJ at 6–9. First, the key starting point for any historical tradition of regulation is the Founding era. *See id.* at 6 (collecting cases). Second, historical analogues must be relevantly similar in "how" and "why" they burden the right to self-defense. *See id.* at 8. Third, any such analogues must be "representative" to constitute a tradition, meaning they must be widespread rather than localized. *See id.*; *see also Christian v. Nigrelli*, 642 F. Supp. 3d 393, 407 (W.D.N.Y. 2022) ("[T]he notion of 'tradition' is the opposite of one-offs, outliers, or novel enactments."). While the Second Circuit at times credited territorial or municipal restrictions that it found consistent with earlier tradition, *see Antonyuk*, 89 F.4th at 359–60, Plaintiffs respectfully disagree that such restrictions should carry any weight at all. *Bruen* categorically held that all territorial laws—not merely the set that it analyzed—are afforded "little weight" because they were "localized" and "short lived," covered "miniscule territorial populations," and were "rarely subject to judicial scrutiny." 597 U.S. at 67–69. In any event, neither the Supreme Court nor the Second Circuit has suggested that territorial or municipal restrictions completely unmoored from any Founding-era tradition can carry the day.

The Supreme Court recently reaffirmed these guiding principles. In *United States v. Rahimi*, it evaluated whether an individual subject to a domestic violence restraining order for posing a credible threat to his intimate partner could be disarmed consistent with the Second Amendment. 2024 WL 3074728, at *5. The Court located a historical tradition "[s]ince the Founding" that supported disarmament. *See id.*; *see also id.* at *7–9 (discussing widespread Founding-era surety laws that were "[w]ell entrenched in the common law" and prohibitions on

going armed offensively, which were also incorporated into the common law at the Founding). And it reaffirmed that any modern law must be "'relevantly similar' to laws that our tradition is understood to permit, 'apply[ing] faithfully the balance struck by the founding generation to modern circumstances." *Id.* at *6 (quoting *Bruen*, 597 U.S. at 29 & n.7). In other words, the Court reaffirmed the *Bruen* test in all respects.

### A.  New York's Carry Ban In Public Parks Violates the Second Amendment.

Plaintiffs' prediction that New York cannot show any tradition of banning carry in any of the Colonial- and Founding-era parks that Plaintiffs identified has come to pass. *See* Pls.' MSJ at 20 (collecting sources describing early parks).[2] While New York leans heavily on *Antonyuk*'s finding that firearms could be regulated in "public forums and quintessentially crowded places," State MSJ at 8–9 (quoting *Antonyuk*, 89 F.4th at 356), it fails to show that any of the parks where Plaintiff Christian has carried, and would carry but for the ban, fit within those categories. Indeed, all are properly classified as "wilderness parks, forests, and reserves" for which the Second Circuit specifically "doubt[ed] that there is historical support for the regulation of firearms[.]" *Antonyuk*, 89 F.4th at 356.

Moreover, as Plaintiffs explained in their moving papers, the Second Circuit's use of analogues from "often-crowded public squares" and "fairs[] [and] markets" to support the parks restriction at the preliminary-injunction stage was flawed. Pls.' MSJ at 22. Specifically, the Second Circuit rooted its tradition in the 1328 Statute of Northampton, *Antonyuk*, 89 F.4th at

---

[2] The State raises a threshold objection that Plaintiffs impermissibly rely on hearsay sources. *See* State MSJ at 12 n.3. Not so. Plaintiffs cite a plethora of Colonial- and Founding-era statutes to support their arguments. These are the same types of sources that the Supreme Court relies on in constitutional cases generally, and Second Amendment cases specifically. *See e.g.*, *Bruen*, 597 U.S. at 39–70; *Rahimi*, 2024 WL 3074728, at *7–9; *Ramos v. Louisiana*, 590 U.S. 83, 89–91 (2020); *Espinoza v. Mont. Dep't of Revenue*, 591 U.S. 464, 481 (2020).

362–63, which *Bruen* unequivocally held "has little bearing on the Second Amendment adopted in 1791" for several reasons, chief among them that it confirmed and echoed the common law "affray" tradition that individuals cannot go armed with evil intent to terrify others. 597 U.S. at 40–41. Northampton and its analogs in the early states have no bearing on "the right of the general population to peaceable public carry." *Id.* at 50–51. And as we have explained, the Founding-era statute from North Carolina that *Antonyuk* relied on as not including as an element that carrying be done in a terrifying manner *did not exist*. Pls.' MSJ at 22–23. The Second Circuit's analysis was preliminary, a key aspect of its reasoning has been undermined, and the decision now has no precedential effect.

Nor is the State correct that sensitive places "fall outside the textual scope of the Second Amendment." State MSJ at 9. To the extent any carry restrictions in specific locations are constitutional, such restrictions must be rooted in this Nation's historical tradition of regulation. *See Bruen*, 597 U.S. at 17. In other words, regulations throughout history limit the scope of the Second Amendment, but not its plain textual sweep.

New York begins its historical analysis by advancing the ahistorical claim that "public parks were in their infancy . . . during the late 19th century," and suggesting that public parks did not exist before that time. State MSJ at 10. This is simply untrue. Pls.' MSJ at 20 (collecting sources describing early parks). In any event, it does not give the State license to *begin* its historical tradition in the late-19th century—an analytical move that neither the Supreme Court nor the Second Circuit has endorsed in any of its recent Second Amendment jurisprudence.

Next consider New York's analogues. They have "several serious flaws even beyond their temporal distance from the founding." *Bruen*, 597 U.S. at 66. First, the State relies almost exclusively on municipal ordinances from cities (several of which are from territories). State

MSJ at 10–11. As noted, *Bruen* found "localized" territorial restrictions insufficient to demonstrate a national tradition of regulation. 597 U.S. at 67. The same logic applies here. According to the 1900 census, more than 10,000 municipalities existed at the time, *Population of Incorporated Places in 1900*, U.S. CENSUS BUREAU (June 8, 1901), https://bit.ly/3XRqtV6, so these few local, outlier regulations cannot be probative of "this Nation's historical tradition of firearm regulation." 597 U.S. at 17. While the Second Circuit at times credited territorial or municipal restrictions that it found consistent with earlier tradition, *see Antonyuk*, 89 F.4th at 359–60, it did not suggest that such restrictions could carry the day if they were not grounded in *any* earlier tradition—a fact that New York makes pellucid by stating that no public parks existed prior to the late-19th-century. In any event, even if the restrictions in particular *cities* were viable analogues, New York makes no effort to show that restrictions in St. Louis, Philadelphia, and various other locales are relevantly similar to the parks that Plaintiff Christian frequents, which are indisputably non-urban, *see supra* Part I.A.1; *see also Antonyuk*, 89 F.4th at 359 (crediting municipal restrictions as establishing a tradition of regulation in "urban public parks specifically").

These municipal ordinances are inapt analogs for other reasons. For starters, it is not clear that some of these were even duly *enacted* by the peoples' representatives. Take the Central Park source. It appears to have been adopted by a vote of a few park commissioners, not by a legislative body. Belka Decl., Ex. 12; *id.*, Ex. 36 (listing commissioner names); *see also* Young Rep. at 14–15. So too the Prospect Park, Fairmount Park, and St. Paul Park sources. Young Rep., Ex. 4; Belka Decl., Ex. 13; *id.*, Ex. 47. Though Bruen speaks in terms of "regulations" of firearms, its discussion of the relevant history in America refers only to the common law and legislation voted on by the people's representatives as being relevant to that determination;

nowhere does it consider rules issued by unelected administrators.

Next, the State's municipal restrictions often apply only to individual parks *within* a municipality, *see, e.g.*, Belka Decl., Ex. 12 (Central Park); *id.*, Ex. 13 (Fairmount Park); *id.*, Ex. 15 (Detroit's Belle Isle Park); *id.*, Ex. 20 (Brandon Park), *id.*, Ex. 23 (Penn's Common park), and were often coupled with restrictions on shooting animals, *see, e.g.*, *id.*, Ex. 13 ("No persons shall carry fire-arms, or shoot birds in [Fairmount] Park[.]"); *id.*, Ex. 20 (similar); *id.*, Ex. 47 (similar). Thus, they are not relevantly similar in "how" and "why" they burden Plaintiffs' Second Amendment rights either.

These municipal laws also deserve skeptical treatment for another reason; they often barred the exercise of other constitutional rights, such as freedom of speech or assembly, rendering them poor models of constitutionality. For example, the 1858 Central Park regulation barred "conversing with construction workers." Belka Decl., Ex. 36. And a regulation governing Fairmount Park in Pennsylvania similarly barred "indecent language" and public gatherings or meetings for political purposes. *Id.*, Ex. 13; *see also id.*, Ex. 20 (similar restriction governing Brandon Park in Pennsylvania). Just as the Supreme Court rejected various analogues in *Bruen* that were unconstitutional for other reasons, this Court should do the same here. *See Bruen*, 597 U.S. at 127 (rejecting reliance on regulations "designed or enforced in a [racially] discriminatory manner"); *see also id.* at 63 n.26 (rejecting reliance on analogue because it also violated the Constitutional right to a jury trial).

Second, the State discusses only three restrictions applicable to entire state park systems—a 1905 Minnesota law, a 1917 Wisconsin law, and a 1921 North Carolina law. State MSJ at 11; Belka Decl., Exs., 27, 32, 33. The Wisconsin and North Carolina prohibitions are clearly aimed at preventing hunting so they are not relevantly similar in "why" they burden the

right to carry. Belka Decl., Ex. 32 (prohibition is within "General Restrictions on Hunting"); *id.*, Ex. 33 (prohibition is within "An Act to Protect Animals and Game in Parks…"). In any event, *Bruen* made clear that three state restrictions—let alone three so far removed from the Founding—are insufficient to support a national historical tradition of regulation, even if they were relevantly similar. *Bruen*, 597 U.S. at 46.

Third, while New York offers analogues specific to non-urban parks, none help form a relevantly similar tradition rooted in the Founding era. In fact, most are restrictions that national parks adopted between 1897 and 1936. State MSJ at 17–18; Belka Decl., Exs. 34–35. As the State recognizes, however, these laws were not flat bans, but rather allowed guns if the owner obtained permission, *see, e.g.*, Belka Decl., Ex. 34 at 3–4 (Yellowstone), 9–10 (Sequoia), 15–16 (Yosemite), 25 (Mesa Verde), 28–29 (Crater Lake), which was sometimes granted for self-defense purposes, *see, e.g.*, *id.* at 16 (discussing Yosemite example in which tourist parties consisting mainly of women were permitted revolvers). Because these bans allowed for exceptions, they are not relevantly similar to the State's flat ban on carry in non-urban public parks because "how" they burden the right differs. Nor are these analogues similar in "why" they burden the right to self-defense. By their plain text, all restricted carry in conjunction with protecting *wildlife* from hunters and poachers. *See, e.g.*, Belka Decl., Ex. 34. This conclusion is bolstered by the fact that other hunting gear in addition to firearms had to be surrendered upon entering the park (unless permission was obtained). *See, e.g.*, *id.*, Ex. 34 at 9 ("Visitors entering or traveling through the park to places beyond, shall, at entrance, report and surrender all firearms, traps, seines, nets, or explosives in their possession to the first park officer."). The Yosemite park superintendent makes this point in the clearest terms possible: "The carrying of firearms in the Yosemite National Park, or any national park, means that the person so carrying

them is on a hunting trip[.]" *Id.*, Ex. 34 at 16. In short, these restrictions are dissimilar both in "how" and "why" they burden the general right to peaceable carry in public.

Next, New York points again to several municipal laws in small towns and rural areas restricting carry in parks. State MSJ at 19; Belka Decl., Ex. 29 (1910 City of Staunton, Virginia), Ex. 40 (1915 City of Danville, Illinois), Ex. 57 (1906 Neligh, Nebraska), Ex. 64 (1922, City of Olean, New York). Such "localized" restrictions are unpersuasive for all of the same reasons already discussed. *See supra*; *see also Bruen*, 597 U.S. at 67. Even if they were persuasive, four municipal restrictions from the early 20th century in non-urban areas hardly suffice to form a national historical tradition of regulation that can inform the original meaning of the right. *Bruen*, 597 U.S. at 46; *Erlinger*, 2024 WL 3074427, at *13.

Finally, New York pivots to non-binding, pre-*Bruen* caselaw, State MSJ at 12–13, which is unpersuasive because it does not engage in the historical inquiry that *Bruen* demands before declaring a location sensitive. The State also discusses the alleged "recognized purpose[s] of sensitive places," namely promoting the free exercise of other constitutional rights and enabling "calm reflection." State MSJ at 13. Tellingly, it cites no primary sources or historical analogues to derive these supposed purposes. *See id.* Moreover, the first category would sweep in virtually any public place given the wide variety of spaces where individuals may exercise constitutional rights. Any sidewalk or other location where a New Yorker speaks or petitions would automatically become "sensitive," which plainly cannot be the rule after *Bruen* recognized a "general right to publicly carry arms for self-defense." 597 U.S. at 31. Indeed, the State cites an article recognizing that parks have "immemorially" been open to the public for the purpose of communicating and assembling, *see* State MSJ at 13 (citing Darrell A.H. Miller, *Constitutional Conflict and Sensitive Places*, 28 WM. & MARY BILL RTS. J. 459, 475 (2019)); *accord* Pls.' MSJ

at 20–21—undercutting its prior assertion that parks did not exist before the late 19th-century. Worse, both of the State's "purposes" are ahistorical because they ignore the wealth of Colonial- and Founding-era statutes permitting (and sometimes requiring) carry in churches, Pls.' MSJ at 14–15—where First Amendment rights are exercised and calm reflection occurs.

### B. New York's No-Carry Default Violates the Second Amendment.

#### 1. Plaintiff Christian's Conduct Falls Within the Second Amendment's Plain Text.

New York is incorrect that Plaintiff Christian's conduct—carrying a handgun for lawful purposes on private property open to the public—does not fall within the Second Amendment's plain text. State MSJ at 4. As Plaintiffs have explained, the Second Amendment's text admits of no locational limits and requires only the allegation that a Plaintiff is an American citizen who plans to carry in public. Pls.' MSJ at 5; *Bruen*, 597 U.S. at 31–32; *see also Rahimi*, 2024 WL 3074728, *5. The State is therefore incorrect that the plain text is "more complex than mere possession" and requires something more. State MSJ at 4.

It also follows directly from *Heller* and *Bruen* that the Second Amendment's plain text protects carrying at private businesses open to the public. To "bear" simply means to "carry," which "naturally encompasses public carry" for self-defense. *District of Columbia v. Heller*, 554 U.S. 570, 580–82, 584 (2008); *Bruen*, 597 U.S. at 28, 32. Because "confrontation can surely take place outside the home"—including in businesses and other private property open to the public—it follows that as a textual matter the right to carry firearms extends to private property open to the public. *Bruen*, 597 U.S. at 33. The Second Circuit agrees. *See Antonyuk*, 89 F.4th at 383.

Grasping at straws, the State invokes the Eleventh Circuit's decision in *GeorgiaCarry.Org*. State MSJ at 20. The problem is that the Second Circuit already found this

case "inapplicable" because Plaintiffs here properly pled an as-applied, pre-enforcement challenge to the no-carry default. *Antonyuk*, 89 F.4th at 384 (citing Compl. ¶ 37, Doc. 1). The State attempts one final sleight of hand, suggesting that the no-carry default is not state action at all. State MSJ at 20. This argument is easily dismissed. New York is using its sovereign authority to set a no-carry default rule backed by criminal penalties. *See Koons v. Platkin*, 673 F. Supp. 3d 515, 613 (D.N.J. 2023) ("The [no-carry default] is thus state action insofar as the State is construing the sound of silence. While landowners can ratify or depart from that default, it is the State that is presumptively excluding firearms from private property in the first instance."). Laws like New York's "do not enforce [a property owner's] authority over [property]; they impose *governmental* authority, subject only to a [property owner's] veto." *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 795 n.3 (2011) (emphasis in original).

### 2. No Historical Tradition Supports the No-Carry Default.

#### a. Owner Consent Statutes Are Inapplicable.

The Second Circuit has already held that the owner consent statutes New York cites do not support a tradition of banning carry on private property open to the public. *Antonyuk*, 89 F.4th at 385. It was correct to do so. The 1721 Pennsylvania statute, 1722 New Jersey statute, and 1763 New York statute were "explicitly motivated by a substantially different reason (deterring unlicensed hunting)." *Id.* And it recognized that the 1715 Maryland statute prohibited only convicted criminals from carrying on the land of others. *See id.* The Second Circuit also found that "how" these analogues burden Second Amendment rights is different because they prevent carry on *private lands* closed to the public, not on private land *open* to the public. *See id.* These findings led the Second Circuit to roundly reject these analogues: "No matter how expansively we analogize, we do not see how a tradition of prohibiting illegal hunting on

private lands supports prohibiting the lawful carriage of firearms for self-defense on private property open the public." *Id.* This Court should hold the same, in line with every other court to consider such a provision post-*Bruen*. *See* Pls.' MSJ at 19.

New York also cites four laws enacted generations after the Founding from Louisiana, Florida, Texas, and Oregon. State MSJ at 22. These laws flunk the relevantly similar analogue test too. The 1866 Texas law prohibited the carrying of firearms onto the "inclosed premises or plantation of any citizen," Belka Decl., Ex. 7, and the 1865 Louisiana law prohibited carry on plantations without consent, *id.*, Ex. 6. The 1865 Florida law (enacted before Florida's readmission to the Union, *see Florida Frontiers "The Conch Republic,"* FLA. HIST. SOC'Y, https://bit.ly/3VSC9Ep) similarly prohibited people from hunting or entering "the enclosed land or premises of another without the permission of the owner." *Id.*, Ex. 80. And all three statutes were part of those states' discriminatory Black Codes enacted before they were readmitted to the Union, and thus should be dismissed as unpersuasive. *See, e.g.*, *Kipke v. Moore*, No. 23-cv-1293, 2023 WL 6381503, at *13 (D. Md. Sept. 29, 2023); *Bruen*, 597 U.S. at 58 (concluding that two discriminatory statutes were "surely too slender a reed on which to hang a historical tradition"). These laws were not models of constitutionality for other reasons, too. For example, the 1866 Texas law also prohibited "loud and vociferous talking [and] swearing" in any public place, which violates the First Amendment. Belka Decl., Ex. 7. Finally, the 1893 Oregon law—doubly unpersuasive because of its great distance from the Founding—specifically references "trespass[ing] upon any enclosed premises or lands[.]" *Id.*, Ex. 8.

New York tries to salvage these analogues by arguing that their text is not limited to hunting. State MSJ at 22–23. It does so by divorcing particular words and phrases (such as "carry" and "carry a gun") from the statutes as a whole. *See id.* The State thus ignores the well-

settled rule that statutory text must be read in context. *See, e.g.*, *Fischer v. United States*, No. 23-5572, 2024 WL 3208034, at *4 (U.S. June 28, 2024). The fairest reading of the State's owner consent laws is that they are aggravated trespassing statutes prohibiting carrying guns on private land where an individual was not authorized to be in the first place, and all with the goal of combating unlawful hunting. This is evident from the substantive provisions, which make repeated references to hunting, the season for deer, and preserving the rights of property owners to hunt on their own land. *E.g.*, Belka Decl., Exs. 1–4.

Additionally, these laws (other than New York's) also only refer to long guns, not handguns. This is evident from the fact that they ban only "guns." As Noah Webster explained in 1828, "one species of fire-arms, the pistol, is never called a gun." *Gun*, WEBSTER'S AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE (1828). Colonial era statutes confirm that pistols were not referred to as "guns." Pennsylvania's 1721 law banned carry of *guns* on enclosed plantations but shooting *with a firearm* any fowl in the open streets of Philadelphia. Belka Decl., Ex. 2. The Maryland and New Jersey laws similarly referred only to "guns." *Id.*, Exs, 1, 3. As these examples show, the difference between naming "guns" and omitting "pistols" is significant. *See* Catie Carberry, *What's in a name? The Evolution of the Term 'Gun'*, DUKE CTR. FOR FIREARMS L. (July 24, 2019), https://bit.ly/3XVO5aX. Thus, the statutes New York cites not only were targeted at trespassers, but also banned *only* long guns. This reaffirms that these statutes relate to hunting and imposed a materially different burden on law-abiding citizens. Even if these laws were relevantly similar to New York's no-carry default, they are insufficiently numerous to form a national historical tradition of firearm regulation. *Bruen*, 597 U.S. at 46.

New York next argues that the plain meaning of the terms "land" "improved or inclosed

land" and "premises [and] plantations" can be read expansively to cover property open to the public. State MSJ at 24. As a threshold matter, it is extraordinarily difficult to square this argument with the plain text of these statutes—which clearly prohibits *trespassing* on another's land. Belka Decl., Ex. 1 (referencing hunting on "any person's land . . . without the owner's leave"), Ex. 2 (proscribing hunting on others' lands "without license or permission obtained from the owner or owners of such lands"), Ex. 3 (same), Ex. 4 (same), Ex. 80 (same). No matter how broadly one reads the terms "land," "improved or inclosed land" and "premises in plantations" in isolation, New York cannot escape that the plain terms of these statutes reference owner consent to enter the lands at issue. Because owner consent was required, these lands were *not* open to the public. At bottom, New York's argument violates a basic textualist principle, which is that the meaning of words and phrases must be understood in context. The Supreme Court "has long refused to construe words 'in a vacuum'" and has explained that "statutory interpretation [i]s a holistic endeavor which determines meaning by looking not to isolated words, but to text in context[.]" *Gundy v. United States*, 588 U.S. 128, 140–41 (2019); *Bloate v. United States*, 559 U.S. 196, 205 n.9 (2010) (criticizing dissent for relying on "a dictionary definition of two isolated words" which "does not account for the governing statutory context"); *see also* ANTONIN SCALIA & BRIAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 356 (2012) ("Adhering to the *fair meaning* of the text (the textualist's touchstone) does not limit one to the hyperliteral meaning of each word in the text . . . . The full body of a text contains implications that can alter the literal meaning of individual words."). New York's overly expansive reading of these terms does violence to the rest of the statute's plain meaning. What is more, New York has not pointed to a *single* instance in which one of these statutes was enforced against an individual carrying a firearm in a business open to

the public. That should sink New York's efforts. *See Bruen*, 597 U.S. at 58 n.25.

New York also fails to recognize that these statutes are part of a tradition, stretching to early America, that permitted hunting only on the *unenclosed* and *unimproved* lands of others. *See* Mark R. Sigmon, *Hunting and Posting on Private Land in America*, 54 DUKE L. J. 549, 555–58 (2004) (collecting early state court cases and state constitutional provisions); *see also* JOSEPH CHITTY, TREATISE ON THE GAME LAWS 31 (2nd ed. 1826) (clarifying that while the common law sometimes allowed pursuit of noxious animals onto others' land "it was always held to be unlawful to enter the [enclosed] land of another, without his consent" to hunt and that doing so "was subject to an action of trespass"). Indeed, Blackstone explained that a riot at common law occurred when "three or more actually do an unlawful act of violence, either with or without a common cause or quarrel; as, if they beat a man, *or hunt and kill game in another's park, chase, warren, or liberty*[.]" 2 WILLIAM BLACKSTONE'S COMMENTARIES ON THE LAWS OF ENGLAND at *146 (1876) (citing 3 Inst. 176.) (emphasis added). Hunting on another's land was thus more egregious an act of violence than the already-illegal act of ordinary trespass. The laws New York cites echo this tradition by prohibiting hunting and trespassing with guns on the *enclosed* or *improved* lands of others. In other words, they simply reinforced the pre-existing norm.

Finally, New York errs in suggesting that case law supports its expansive reading of these terms. First consider its case involving "land." State MSJ at 24–25. These cases simply use "land" in its general sense of a part of the earth's surface. *See id.* (collecting cases). They stand merely for the uncontroversial proposition that some businesses open to the public sit on "land," not that the term as used in New York's statutes necessarily includes areas open to the public. Additionally, there is no indication that any of the buildings other than stores on "improved" or

25

"enclosed" lands were systematically open to the general public. *See id.* at 26–27. That courts have used the term "enclosed" or "premises" to *refer* to places open to the public does not mean that those terms have the same meaning in the statutes that New York offers. Indeed, as already explained, text and context suggest that they do not.

### b. Laws Regarding Discharge Are Inapposite.

New York next turns to laws prohibiting discharging a gun on another's property without consent. State MSJ at 30–31. These laws are not relevantly similar to the no-carry default in "how" or "why" they burden the right to self-defense for obvious reasons. For starters, like the laws just discussed, these laws involve *private* lands and were geared at hunting. Belka Decl., Exs. 86–88. The Indiana law is particularly obvious, prohibiting "hunting or shooting with any kind of firearm or firearms, on inclosed lands, without the consent of the owner or occupant thereof." *Id.*, Ex. 87. Additionally, because these laws prohibit discharging a weapon on private lands to prevent illegal hunting, they do not resemble New York's ban, which applies broadly to all law-abiding citizens who merely wish to *carry* firearms into a location for lawful purposes. *See id.*, Exs. 86–88. New York thus errs when it states that these laws had the "same functional and legal effect" as the no-carry default. State MSJ at 31.

New York's citation to *Heller* to support the relevance of these laws is especially inapt. *See id.* While New York states that the discharge laws lacked self-defense exceptions, *Heller* itself found it "implausible" that discharge laws "would have been enforced against a citizen acting in self-defense[.]" 554 U.S. at 633. And New York has presented no evidence of any prosecutions under the discharge laws for individuals using self-defense, which is further evidence they are inapt analogues.

### c.  Laws Prohibiting Firearms in Places of Public Congregation Are Contradicted By Earlier History.

New York also cannot rely on an alleged tradition of laws prohibiting firearms in places of public congregation beginning in the late 19th century. State MSJ at 32–33. This is so because a robust Colonial- and Founding-era tradition exists of permitting (and sometimes requiring) firearms in various public assemblies, such as meetings and worship services. Pls.' MSJ at 14–15 (collecting sources). The State's outlier analogues from the postbellum South and the territories *contradict* this earlier tradition and thus are not persuasive. *Bruen*, 597 U.S. at 36.

Additionally, given the political turmoil present in the post-Civil-War South, laws from that era and region are unlikely to be probative of the Second Amendment's original meaning, much less a "National" tradition. Other features of these laws also render them inapt analogues. For example, the 1870 Georgia law was only selectively enforced. *See* DONALD L. GRANT, THE WAY IT WAS IN THE SOUTH: THE BLACK EXPERIENCE IN GEORGIA 122 (2001) (no enforcement against white supremacists who intimidated at polling places); *Bruen*, 597 U.S. at 127 (rejecting reliance on regulations "designed or enforced in a [racially] discriminatory manner"). The 1889 Arizona and 1890 Oklahoma laws are both territorial restrictions, which *Bruen* expressly said are not probative because they were "transitory" and "temporary." 597 U.S. at 67–69. And the 1901 Idaho law is so far removed from the Founding that it cannot possibly form a historical tradition. *See id.* This Court may also summarily dismiss New York's local ordinances, because *Bruen* rejected reliance on "localized" restrictions. *Id.* at 67.

Indeed, if these laws were probative, they would effectively "eviscerate the general right to publicly carry arms for self-defense[,]" *Bruen*, 597 U.S. at 31, as New York acknowledges, State MSJ at 33 (noting that these laws "prohibited [carry] altogether"). That simply cannot be the rule, especially given the contradictory Colonial- and Founding-era tradition of permitting

carry in places of public assembly.

### III. Plaintiffs' Sensitive Places Framework Is Historically Grounded, Consistent with Precedent, and Administrable.

In its latest pronouncement on the Second Amendment, the Supreme Court noted that under *Bruen*'s test, "the appropriate analysis involves considering whether the challenged regulation is consistent with the principles that underpin the Nation's regulatory tradition." 2024 WL 3074728, at *1. In pinpointing the unifying feature of comprehensive security that underlies the Supreme Court's recognition of polling places, courthouses, and legislatures as sensitive, Pls.' MSJ at 12–13, Plaintiffs do just that. Several of the State's analogues *support* Plaintiffs' security theory. For example, several of the parks in which firearms were restricted had armed guards. *E.g.*, Belka Decl., Ex. 30 (Central Park); Young Decl. ¶ 30 (discussing "force of Park Keepers"). Still others appeared to have controlled ingress and egress points, sometimes monitored by park officials. Belka Decl., Exs, 26, 29, 34, 40 (fines imposed if people did not leave through the gateways). The problem for New York is that none of the modern parks where Plaintiff Christian wants to carry have these features. They are thus disanalogous to the State's proffered examples.

The State stumbles out of the gate by arguing that Plaintiffs' theory is inconsistent with *Bruen*'s alleged designation of schools and government buildings as sensitive. State MSJ at 34. While *Bruen* cited *Heller*'s earlier suggestion (in dicta) that "schools and government buildings" potentially could be considered "sensitive places[,]" *Bruen* highlighted firearm regulation only at three specified places (founding-era legislatures, courthouses, and polling places) and instructed courts to "use analogies to *those* historical regulations of 'sensitive places'" when assessing the constitutionality of firearm restrictions at modern locations. 597 U.S. at 30 (emphasis added). It makes little sense to say that *Bruen*'s list of three specific types

of government buildings is a conclusion that all government buildings are sensitive. *Accord United States v. Ayala*, No. 8:22-cr-369, 2024 WL 132624, at \*11 (M.D. Fla. Jan. 12, 2024). Moreover, as Plaintiffs have explained, Founding-era restrictions tied to schools were limited in how they burdened Second Amendment rights and only applied to students. Pls.' MSJ at 13 (collecting sources). And there was a particular reason why schools could legally disarm students: they historically exercised *in loco parentis* authority over them. *See id.* at 13–14.

New York also claims that polling places were not traditionally secured locations. State MSJ at 35. Plaintiffs' historical sources suggest otherwise. Pls.' MSJ at 12 (naming six Colonial and Founding-era state laws). While New York cites pre-*Bruen* precedents, State MSJ at 34–35, these can be dismissed because they predate *Bruen* and thus did not engage in the analogical reasoning now required. *See, e.g.*, *id.* (citing *Bonidy v. U.S. Postal Serv.*, 790 F.3d 1125, 1128 (10th Cir. 2015) (concluding, based only on *Heller*'s mention of "government buildings," that firearms could be banned in post offices, and alternatively, applying now-unavailable "intermediate scrutiny")).

Finally, the State is also incorrect that some indisputably sensitive places lacked security. While it points to the U.S. Capitol and the White House, State MSJ at 35, its arguments are misleading. The U.S. Capitol had doorkeepers and sergeants at arms since its inception. *About the Sergeant at Arms*, U.S. SENATE, https://bit.ly/3Li1LWk. Additionally, guards were posted at the White House "gates and front doors and the White House grounds were patrolled by a day guard and [] night watchmen" since the beginning of the White House's operation. Joel D. Treese, *Secret Service and the Presidents*, WHITE HOUSE HIST. ASS'N (Oct. 20, 2015), https://bit.ly/3IyysgS.

**CONCLUSION**

For the reasons discussed above, Plaintiffs respectfully request that the Court deny the State's motion for summary judgment and grant Plaintiffs' motion for summary judgment.


Dated:  July 15, 2024                                    Respectfully submitted,

                                                         /s/ David H. Thompson
                                                         *Attorney for Plaintiffs*


David H. Thompson                                        Nicolas J. Rotsko
Peter A. Patterson                                       FLUET
COOPER & KIRK, PLLC                                      1751 Pinnacle Drive, Suite 1000
1523 New Hampshire Avenue, N.W.                          Tysons, VA 22102
Washington, D.C. 20036                                   (703) 590-1234 x 210
(202) 220-9600                                           (703) 590-0366 (fax)
(202) 220-9601 (fax)                                     nrotsko@fluet.law
dthompson@cooperkirk.com
ppatterson@cooperkirk.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 15, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the Western District of New York by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

<u>/s/ David H. Thompson</u>
David H. Thompson

31