UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

BRETT CHRISTIAN, *et al.*,

    *Plaintiffs*,

v.

DOMINICK L. CHIUMENTO, *et al.*,

    *Defendants*.

No. 1:22-cv-695-JLS

**PLAINTIFFS' L.R. 56(a)(2) OPPOSING STATEMENT OF MATERIAL FACTS**

Plaintiffs respectfully submit the following Opposing Statement of Material Facts to Defendants' L.R. 56(a)(2) Statement of Undisputed Material Facts.[1]

*Stiglmeier Park*

1. Stiglmeier Park is an approximately 308 acre park located in a densely populated area of Cheektowaga, New York. Barill Dec., ¶ 5.

**Plaintiffs' Response:** Admit that Stiglmeier Park is approximately 308 acres and is located in Cheektowaga, New York. Dispute that Cheektowaga, New York is "densely populated." The Barill Declaration and attached exhibits contains no evidence to support the claim that Cheektowaga is densely populated. Moreover, the U.S. Census estimates that the population per square mile in Cheektowaga is 3,027, *see* Ex. 1, *Quick Facts Cheektowaga, NY*, U.S. CENSUS, far less than a densely populated urban center such as New York City (population

---

[1] Other than those facts that relate to the standing of the parties, all of the facts related herein are so-called "legislative facts" which are not concerned with the particular facts of the parties but are rather generalized facts about the world. Fed. R. Evid. 201, Advisory Committee's Note to subdivision (a) of 1972 proposed rules; *see United States v. Hernandez-Fundora*, 58 F.3d 802, 811 (2d Cir. 1995). This Court's review of legislative facts is unrestricted.

1

density approximately 29,303), Ex. 2, *Quick Facts*, *New York City, NY*, U.S. CENSUS, or the nearby city of Buffalo (population density approximately 6,893), Ex. 3, *Quick Facts, Buffalo, NY*, U.S. CENSUS. Further, data and standards of the U.S. Census Bureau demonstrate that the area in which Stiglmeier Park is located is not "densely populated." The U.S. Census Bureau recognizes that "density levels…vary quite a bit from city to city, and even across different neighborhoods within a single city." Ex. 4, *Understanding Population Density*, U.S. CENSUS BUREAU. The Bureau therefore measures and publishes data on density at the census block level. The census block is "the smallest geographic area for which the Census Bureau tabulates data." Ex. 14, *Urban Area Criteria for the 2020 Census* at 16711 n.3, U.S. CENSUS BUREAU. According to the most recent Census, most of the park's land area is comprised of census blocks that do not meet a 425 housing unit per square mile threshold and are therefore characterized by the Bureau as "low-density." Ex. 15, Census Block Overlay Images at 1.[2] Further, many census blocks that surround the park are likewise characterized by the Bureau as "low-density." *See id.*

    2.    The Park is sandwiched between two major thoroughfares, Losson Road and Cuomo Park Boulevard, and surrounded by residential housing developments. Barill Dec., ¶ 6.

**Plaintiffs' Response**: Admit in part with the clarification that the 308 acre Stiglmeier Park is located between Losson Road and *Como* Park Boulevard. Dispute that Losson Road and Como Park Boulevard are "major thoroughfares" and "surrounded by residential housing

---

[2] Density maps were created by overlaying data files available at the website of the U.S. Census Bureau (TIGER/Line Shapefiles, U.S. CENSUS BUREAU, https://bit.ly/3zCU8Yc), which are compatible with Google Earth software, into Google Earth. Labeling of census blocks as low-density or high-density was done in accordance with U.S. Census standards as defined in *Urban Area Criteria for the 2020 Census*.

developments." The Barill Declaration cites no evidence other than a satellite map that these two roads are major thoroughfares or surrounded by residential housing developments. Losson Road is approximately three miles long and is a two-lane road with a shared third passing lane. Ex. 5, Google Maps, Losson Road Directions; Ex. 6, Losson Road Street View. Como Park Boulevard is approximately five miles long and has two lanes. Ex. 7, Google Maps, Como Park Boulevard Directions; Ex. 8, Como Park Boulevard Street View. While "major thoroughfare" is a vague phrase, neither road appears to meet this description. Additionally, while there appear to be single family homes along Losson Road and Como Park Boulevard, it is not clear that these are "residential housing developments." Ex. 6, Losson Road Street View; Ex. 8 Como Park Boulevard Street View.

Moreover, wide swaths of the interior of the 308 acre park are removed from these roads and houses, even if they were major thoroughfares or surrounded by residential housing developments. *See infra*, Resp. to Fact #3.

3.  Stiglmeier Park contains the following structures and improvements: Five (5) Tennis Courts, one (1) outdoor hockey rink, two (2) full sized basketball courts, two (2) half-court basketball courts, six (6) baseball diamonds, three (3) softball diamonds, one (1) football field, fourteen (14) shelters, six (6) children's playgrounds, and various hiking and walking trails. Barill Dec., ¶ 7.

**Plaintiffs' Response**: Admit, with the clarification that most of the fields and other recreation areas are concentrated in the southeastern corner of the park, while the northern and western areas of the park are largely wooded and open areas through which nature and hiking trails pass. Ex. 1 to Barill Decl., Doc. No. 77-4; Ex. 9, Aerial View of Hiking Areas in Stiglmeier.

3

4. On May 18, 2024, Jospeh Barill went to Stiglmeier Park and observed the following: more than one hundred (100) people were using Stiglmeier Park on the morning of May 18, 2024 for various recreational activities including walking, biking, tennis, basketball, baseball, and family gatherings in the shelters and on the children's playgrounds. Barill Dec., ¶¶ 8-11.

**Plaintiffs' Response:** Plaintiffs do not have sufficient information to respond to Fact 4's specific discussion of how many people were in Stiglmeier Park on May 18, 2024, and therefore do not dispute it at this time. However, Plaintiffs note that May 18, 2024, was a Saturday (and also a holiday, Armed Forces Day), and it is reasonable to believe that there would be fewer people in the park during a weekday or during other seasons, such as the winter. Additionally, Plaintiff Christian recently went to Stiglmeier Park on the morning of Saturday, June 22, 2024 between 9:30 am and 10:15 am—roughly the same time as Mr. Barill. Suppl. Decl. of Brett Christian ¶ 4. While there, Plaintiff Christian observed few other people near the baseball diamonds section of the park. *Id.* ¶¶ 5–6. Additionally, Plaintiff Christian observed few other people on two wooded hiking trails in Stiglmeier Park. *Id.* ¶¶ 6–9. As Plaintiff Christian noted, there are other hiking trails such as the two he documented on the morning of June 20, 2024. *Id.* ¶¶ 6, 9. Plaintiff Christian's description and photographs of Stiglmeier Park's wooded areas is consistent with the map attached to Mr. Barill's declaration. Ex. 1 to Barill Decl., Doc. No. 77-4. However, it is unclear whether Mr. Barill assessed the number of people in the wooded and/or open grassy areas of the park through which nature and hiking trails pass in reaching the conclusions in this fact. In any event, Mr. Barill's observation of the number of people on one given day in the year is in no way representative of the average attendance or density of attendance in the park. As Plaintiff

4

Christian's declaration shows, attendance and density—even in the more communal recreational areas of the park—vary greatly. Suppl. Christian Decl. ¶¶ 5–9.

     5.     During those observations, Mr. Barill noted multiple marked Cheektowaga Police vehicles patrolling the park. Barill Dec., ¶ 12.

**Plaintiffs' Response**: Plaintiffs do not have sufficient information to respond to Fact 5's specific discussion of how many police vehicles were in Stiglmeier Park on May 18, 2024, and therefore do not dispute it at this time. However, Plaintiffs note that Mr. Barill did not report that he observed any controlled ingress or egress points, metal detectors, or other features of a comprehensively secured location. Additionally, when Plaintiff Christian went to Stiglmeier Park on Saturday, June 22, 2024, between 9:30 am and 10:15 am, he did not observe any police vehicles in the parking lot, or any uniformed law enforcement on the wooded hiking trails. Suppl. Christian Decl. ¶¶ 4, 6, 9.

     6.     Stiglmeier Park is an urban park as described by <u>Antonyuk</u> used for "communal spaces" or "quintessential[ly] public spaces." <u>Antonyuk</u> 89 F.4th at 362–63.

**Plaintiffs' Response**: Dispute. As a threshold matter, the Supreme Court recently granted, vacated, and remanded the pending petition for certiorari in *Antonyuk* for reconsideration in light of *United States v. Rahimi*, depriving the Second Circuit's decision of precedential effect. *See* Orders, https://bit.ly/3LbDVeV; *J.B. O'Connor v. Donaldson*, 422 U.S. 563, 577 n.12 (1975). This Court is therefore no longer bound by *Antonyuk*'s (preliminary) holding that the State's analogues sufficed to show a tradition of banning carry in urban parks and therefore that Plaintiffs' facial challenge to the parks provision failed.

In any event, *Antonyuk* describes urban parks as "quintessential and often-crowded public spaces" akin to fairs and markets. 89 F.4th at 362. Defendants have not provided sufficient

5

evidence that Stiglmeier Park meets that definition, especially given that large swaths of the park is wooded nature and hiking trails. Ex. 1 to Barill Decl., Doc. No. 77-4; Ex. 9, Aerial View of Hiking Areas in Stiglmeier; Suppl. Christian Decl. ¶¶ 6–9. Because the 308 acre park contains many wooded nature and hiking trails, it is akin to the rural parks *Antonyuk* defined as "commons" and "wilderness areas." 89 F.4th at 362 (calling Adirondack Park, which contains forests, farmland, towns and villages, mountains and valleys, lakes, ponds, rivers, and public forest, a rural park). Notably, the Second Circuit suggested that Adirondacks Park could still qualify as a rural park even if it contains "towns and villages." *See id.* Cheektowaga, which contains Stiglmeier Park, classifies itself as a "town" not a city or urban center, Ex. 10, Town of Cheektowaga Website, and is considered a suburb of the city of Buffalo, New York, Ex. 11, Cheektowaga Suburb of Buffalo. Finally, Plaintiffs' contention that Stiglmeier is an urban park is in tension with their argument in Fact 2 that the park is in a residential area. Additionally, this "fact" relates to the analysis of history as it informs the meaning of the text of the Second Amendment. The analysis of history is not a factual inquiry but a *legal* one. *See N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 25 n.6 (2022) ("The job of judges is not to resolve historical questions in the abstract; it is to resolve *legal* questions presented in particular cases or controversies. That 'legal inquiry is a refined subset' of a broader 'historical inquiry' and it relies on 'various evidentiary principles and default rules' to resolve uncertainties." (quoting W. Baude & S. Sachs, *Originalism and the Law of the Past*, 37 L. & Hist. Rev. 809, 810–11 (2019))). *Bruen* itself dealt with historical claims not as findings of fact but as part of its legal analysis.

<u>Harris Hill State Forest</u>

7. Unlike Stiglmeier, Harris Hill is a State Forest and is not a "public park" as defined by PL § 265.01e(2)(d). Belka Decl., ¶ 96.

**Plaintiffs' Response:** Admit that Harris Hill is a State Forest. The remainder of the "fact" is a conclusion of law, and PL § 265.01e(2)(d) speaks for itself. Moreover, Harris Hill State Forest is *not* exempt from the State's carry ban. While PL § 265.01e(2)(d) exempts "the forest preserve as defined in subdivision six of Environmental Conservation Law § 9-0101," that section in turn defines "forest preserve" as "the lands owned or hereafter acquired by the state within the county of Clinton, except the towns of Altona and Dannemora, and the counties of Delaware, Essex, Franklin, Fulton, Hamilton, Herkimer, Lewis, Oneida, Saratoga, Saint Lawrence, Warren, Washington, Greene, Ulster and Sullivan." The Harris Hill State Forest where Plaintiff Christian wishes to carry for self-defense is within Chautauqua County, which is not one of the enumerated counties. Additionally, "forest preserve" exempts "lands within the limits of any village or city," and at least part of Harris Hill State Forest is within the border the towns of Ellington and Gerry. Ex. 12, Harris Hill State Forest; Ex. 13, Map of Harris Hill State Forest. Therefore, it is reasonable for Plaintiff Christian to believe that the Harris Hill State Forest Area is not exempt from the State's carry ban. While Defendants invoke § 9-0501 of the Environmental Conservation Law, that is not the section cited in PL § 265.01e(2)(d) that creates an exemption. Moreover, § 9-0501 refers to "reforestation areas" not "forest preserve," which are distinct phrases. The fairest reading of the plain text of New York's laws is that the State exempts only *some* forest preserve lands from its carry ban based on the county in which they are located, but Harris Hill State Forest is not within one of those counties.

8. State Forests, like Harris Hill, are typically large acreages acquired for forest regeneration, watershed protection and development of forest products such as timber – along with kindred recreational purposes including, but not limited to, hunting. Belka Decl., ¶ 97.

**Plaintiffs' Response**: Admit.

9. The State Forest enabling statute, Environmental Conservation Law § 9-0501, requires that these Forests "shall consist… of not less than five hundred acres of contiguous lands, which shall be forever devoted to the planting, growth and harvesting of such trees as shall be deemed by the commissioner best suited for the lands to be reforested." ECL § 9-0501(1). Belka Decl., ¶ 98.

**Plaintiffs' Response**: This is not a fact, but rather a statement of the law. The State's laws speak for themselves. Moreover, as noted in Plaintiffs' Response to Fact 8, § 9-0501 refers to "reforestation areas" not "forest preserve," which are distinct terms. Only "forest preserves" as specifically defined in New York law are exempt from the State's carry ban in public parks.

10. Harris Hill State Forest, specifically, encompasses 2,271 acres dedicated to timber protection, recreational use, watershed protection and wildlife. https://dec.ny.gov/places/harris-hill-state-forest; Belka Decl., ¶ 99.

**Plaintiffs' Response:** Admit. Plaintiffs' also note that the Census characterizes Harris Hill State Forest and nearly all of its surrounding areas as rural. Ex. 15 Census Block Overlay at 2.

11. Carriage (or related activities like hunting or target shooting) is not prevented in State Forests. Belka Decl., ¶ 100.

**Plaintiffs' Response**: Admit that hunting is permitted in State Forests, including in Harris Hill State Forest. Dispute that carriage for other lawful purposes, including for self-defense, is permitted in state forests—including Harris Hill—that do not fall within the carefully-delineated "forest preserve" exemption. As discussed in Plaintiffs' response to Fact 7, only certain state parks qualify as "forest preserves" that are exempt from the State's ban on carry in public parks. While hunting appears to be permitted in the Harris Hill State Forest website, the plain language of the law challenged in this case instructs that carry for all other purposes,

8

including self-defense, is not permitted. *See* Pls.' Resp. to Fact 7.

      12.    The ability to carry firearms is clear from the Harris Hill State Forest website, as the top featured activity suggested is hunting. See https://dec.ny.gov/places/harris-hill-state-forest. Belka Decl., ¶ 101.

**Plaintiffs' Response:** Admit insofar as the source states that hunting is permitted in Harris Hill State Forest. Dispute that the ability to carry firearms in the Harris Hill State Forest for other purposes is clear from this source or the plain text of the law challenged in this case. *See* Pls.' Resp. to Fact 7.

*Shoreline Trail*[3]

      26.    Observation of the Shoreline Trail via https://empiretrail.ny.gov/buffalo-rochester/buffalo-tonawanda identifies the following parks it bisects:

- Elliot Creek Park (https://www3.erie.gov/parks/ellicott-creek)
    - Nineteen (19) retable picnic shelters, two (2) rentable buildings, nine (9) children's playgrounds, tennis/pickleball courts, six (6) restroom facilities, soccer/football fields, cricket fields, an eighteen (18) hole disc golf course, boat/kayak launch
- Niawanda Park (https://www.tonawandacity.com/residents/parks.php)
    - Rentable banquet hall, band shell (concert venue), bathrooms, playground, picnic tables (850,000 people pass through a year per City of Tonawanda Parks, Niagara Greenway study)
        - Veteran's Memorial Park (https://www.tonawanda.ny.us/youth-parks-recreation/veterans-memorial.html)
            - Six (6) rentable shelters, bathroom facilities, children's playgrounds, volleyball courts
        - Isle View Park (https://www3.erie.gov/parks/isle-view)
            - Rentable gazebo, overlook gazebo, two (2) children's playgrounds, picnic tables, boat launch
- Black Rock Canal Park (https://www3.erie.gov/parks/black-rock-canal)
    - Dog park, boat launch, pedestrian bridge
- Buffalo Harbor State Park (https://parks.ny.gov/parks/buffaloharbor/details.aspx)
    - Slip marina, boat launch, small watercraft launches, fish cleaning station,

---

[3] Defendants' numbering in their statement of facts inexplicably jumps from number 12 to number 26. Plaintiffs use the same numbering as Defendants to avoid confusion.

restrooms, pedestrian pier and boardwalk, children's playgrounds, two (2) covered pavilions. Belka Decl., ¶ 103.

**Plaintiffs' Response:** Plaintiffs do not have sufficient information to respond to Fact 26, and therefore do not dispute it at this time. Plaintiffs note that Defendants did not identify the number of people present in the parks along this trail, and that those numbers most likely vary based on the season, day of the week, and other factors, such as the weather. The mere presence of structures at a location or the average number of people passing through these areas per year does not suffice to designate them "quintessentially crowded" such that they qualify as "urban" parks.

Additionally, the most recent images of Ellicott Creek Park available on Google Earth, which were taken during daylight hours in September of 2017, show the parking lot and the grounds of the park to have very few cars or people. Ex. 16, Google Earth Images, at 1–2. And the most recent images of Niawanda Park available, taken during daylight hours in July of 2023, show the parking lot and the grounds of the park to have very few cars or people. *Id.* at 2–3. Similarly, the most recent images of Veteran's Memorial Park available, taken during daylight hours in July of 2023, show the parking lot and the grounds of the park to have very few cars or people. *Id.* at 5–7. Additionally, the most recent images of Isle View Park available on the same platform, which were taken during daylight hours in September of 2007, show the parking lot and the grounds of the park to have very few cars or people. *Id.* at 8. Further, all the above parks are situated entirely within census blocks which the U.S. Census Bureau has classed as "low-density" in its most recent Census, and many of these parks have a high proportion of "low-density" census blocks in their surrounding environs. Ex. 15, Census Block Overlay, at 3–6.

27. These parks along the Shoreline Trial have the earmarks of the "well-established and representative tradition of regulating firearms in public forums and quintessentially crowded places, enduring from medieval England to Reconstruction America and beyond"; "regulating

restrooms, pedestrian pier and boardwalk, children's playgrounds, two (2) covered pavilions. Belka Decl., ¶ 103.

**Plaintiffs' Response:** Plaintiffs do not have sufficient information to respond to Fact 26, and therefore do not dispute it at this time. Plaintiffs note that Defendants did not identify the number of people present in the parks along this trail, and that those numbers most likely vary based on the season, day of the week, and other factors, such as the weather. The mere presence of structures at a location or the average number of people passing through these areas per year does not suffice to designate them "quintessentially crowded" such that they qualify as "urban" parks.

Additionally, the most recent images of Ellicott Creek Park available on Google Earth, which were taken during daylight hours in September of 2017, show the parking lot and the grounds of the park to have very few cars or people. Ex. 16, Google Earth Images, at 1–2. And the most recent images of Niawanda Park available, taken during daylight hours in July of 2023, show the parking lot and the grounds of the park to have very few cars or people. *Id.* at 2–3. Similarly, the most recent images of Veteran's Memorial Park available, taken during daylight hours in July of 2023, show the parking lot and the grounds of the park to have very few cars or people. *Id.* at 5–7. Additionally, the most recent images of Isle View Park available on the same platform, which were taken during daylight hours in September of 2007, show the parking lot and the grounds of the park to have very few cars or people. *Id.* at 8. Further, all the above parks are situated entirely within census blocks which the U.S. Census Bureau has classed as "low-density" in its most recent Census, and many of these parks have a high proportion of "low-density" census blocks in their surrounding environs. Ex. 15, Census Block Overlay, at 3–6.

27. These parks along the Shoreline Trial have the earmarks of the "well-established and representative tradition of regulating firearms in public forums and quintessentially crowded places, enduring from medieval England to Reconstruction America and beyond"; "regulating

firearms in often-crowded public forums is 'part of the immemorial custom' of this nation." Antonyuk 89 F.4th at 358-361.  Belka Decl., ¶ 104.

**Plaintiffs' Response**: Dispute. Defendants have not provided any evidence that the parks along the Shoreline trail are "quintessentially crowded places." *See* Resp. to Fact No. 26. Moreover, as displayed in Plaintiff Christian's Supplemental Declaration, the trail also passes through wooded areas that are not crowded. Suppl. Christian Decl. ¶ 11. Additionally, this "fact" relates to the analysis of history as it informs the meaning of the text of the Second Amendment. The analysis of history is not a factual inquiry but a *legal* one. *See Bruen*, 597 U.S. at 25 n.6 ("The job of judges is not to resolve historical questions in the abstract; it is to resolve *legal* questions presented in particular cases or controversies. That 'legal inquiry is a refined subset' of a broader 'historical inquiry' and it relies on 'various evidentiary principles and default rules' to resolve uncertainties." (quoting W. Baude & S. Sachs, *Originalism and the Law of the Past*, 37 L. & Hist. Rev. 809, 810–11 (2019))). *Bruen* itself dealt with historical claims not as findings of fact but as part of its legal analysis.

28. These parks bisected by the Shoreline Trial are the "communal" and "quintessential public spaces" embodied by urban parks identified in Antonyuk 89 F.4th at 362-63. Belka Decl., ¶ 105.

**Plaintiffs' Response**: Dispute. *Antonyuk* describes urban parks as "quintessential and often-crowded public spaces" akin to fairs and markets. 89 F.4th at 362. Defendants have not provided sufficient evidence that the parks along the eight mile Shoreline Trail meet that definition. Because the Shoreline Trail also passes through and along areas that are not crowded public spaces, *e.g.*, Suppl. Christian Decl. ¶ 11; Resp. to Fact #26, they are akin to the rural parks *Antonyuk* defined as "commons" and "wilderness areas." 89 F.4th at 362 (calling Adirondack

11

Park, which contains forests, farmland, towns and villages, mountains and valleys, lakes, ponds, rivers, and public forest, a rural park). Additionally, this "fact" relates to the analysis of history as it informs the meaning of the text of the Second Amendment. The analysis of history is not a factual inquiry but a *legal* one. *See Bruen*, 597 U.S. at 25 n.6 ("The job of judges is not to resolve historical questions in the abstract; it is to resolve *legal* questions presented in particular cases or controversies. That 'legal inquiry is a refined subset' of a broader 'historical inquiry' and it relies on 'various evidentiary principles and default rules' to resolve uncertainties." (quoting W. Baude & S. Sachs, *Originalism and the Law of the Past*, 37 L. & Hist. Rev. 809, 810–11 (2019))). *Bruen* itself dealt with historical claims not as findings of fact but as part of its legal analysis.

*Clarence Bike Path*

29. Similar to the Shoreline Trail, Plaintiff fails to identify, but alludes to, certain parks which are bisected by the "Clarence Bike Path"… "which are actually two trails running from Amherst [New York] off of Transit Road and into Clarence." Belka Decl., ¶¶ 106 and 132, Ex. 100; Christian Depo., 85:7-14.

**Plaintiffs' Response**: Dispute. Plaintiff Christian's understanding is that the West Shore Trial segment of Shoreline Trail is subject to the State's carry ban in public parks based on prominent signage along the trail. Suppl. Christian Decl. ¶ 10. The portion of the Clarence Bike Path that Plaintiff Christian has used, and would intend to use in the future if he could carry, passes through Main Street Town Park. *Id.*

30. Those trials are colloquially known as the "Peanut Line" and the "West Shore Trial." Belka Decl., ¶ 107, Exhibit 79.

**Plaintiffs' Response**: Admit.

31. Along the Peanut Line, observation demonstrates that the Peanut Line only

bisects a single park, Memorial Park, which contains children's playgrounds, nine (9) soccer fields, three (3) multipurpose fields, four (4) softball fields, four (4) baseball diamonds and restroom facilities. Belka Decl., ¶ 108.

**Plaintiffs' Response**: Plaintiffs do not have sufficient information to respond to Fact 31, and therefore do not dispute it at this time.

32.  Along the West Shore Trial, although Plaintiff fails to identify the specific parks along the Clarence Bike Path at issue, observation demonstrates that the West Shore Line bisects only a single park, Main Street Town Park, which contains three (3) rentable pavilions with capacity for 410 individuals, office and maintenance buildings, community pool, a clubhouse, a concert shell (audience capacity 1200), children's playgrounds, four (4) baseball diamonds, two tennis courts, basketball courts, horseshoe pits, and volleyball courts. Belka Decl., ¶ 109.

**Plaintiffs' Response**: Admit, with the clarification that Main Street Town Park is the park Plaintiff Christian would pass through while on the Clarence Bike Path. Main Street Town Park is situated within census blocks which the U.S. Census Bureau has classed as "low-density" in its most recent Census, and the park has a high proportion of "low-density" census blocks in its surrounding environs. Ex. 15, Census Block Overlay at 7.

33.  These parks bisected by the lines of the Clarence Bike Path have the earmarks of the "well-established and representative tradition of regulating firearms in public forums and quintessentially crowded places, enduring from medieval England to Reconstruction America and beyond"; "regulating firearms in often-crowded public forums is 'part of the immemorial custom' of this nation." Antonyuk 89 F.4th at 358-361. Belka Decl., ¶ 110.

**Plaintiffs' Response**: Dispute. Defendants have not provided any evidence that the parks along the Clarence Bike Path, or the Bike Path itself, are "quintessentially crowded places." Moreover,

as displayed in Plaintiff Christian's Supplemental Declaration, the trail (on which "Park Rules Apply") also passes through wooded areas that are not crowded. Suppl. Christian Decl. ¶ 10. In fact, the West Shore Trail was previously the site of a series of violent attacks. Pls.' SUF ¶ 12. Additionally, Main Street Town Park is located entirely within low-density census blocks, and the park has a high proportion of "low-density" census blocks in its surrounding environs. Ex. 15, Census Block Overlay at 7. Finally, this "fact" relates to the analysis of history as it informs the meaning of the text of the Second Amendment. The analysis of history is not a factual inquiry but a *legal* one. *See Bruen*, 597 U.S. at 25 n.6 ("The job of judges is not to resolve historical questions in the abstract; it is to resolve *legal* questions presented in particular cases or controversies. That 'legal inquiry is a refined subset' of a broader 'historical inquiry' and it relies on 'various evidentiary principles and default rules' to resolve uncertainties." (quoting W. Baude & S. Sachs, *Originalism and the Law of the Past*, 37 L. & Hist. Rev. 809, 810–11 (2019))). *Bruen* itself dealt with historical claims not as findings of fact but as part of its legal analysis.

      34.    These parks are the "communal" and "quintessential public spaces" embodied by urban parks identified in Antonyuk 89 F.4th at 362-63. Belka Decl., ¶ 111.

**Plaintiffs' Response:** Dispute. *Antonyuk* describes urban parks as "quintessential and often-crowded public spaces" akin to fairs and markets. 89 F.4th at 362. Defendants have not provided sufficient evidence that the parks along the Clarence Bike Path, or the Bike Path itself, meets that definition, especially given Plaintiff Christian's observation of the Path. Suppl. Christian Decl. ¶ 10. Because these parks contain areas that are not crowded public spaces, they are akin to the rural parks *Antonyuk* defined as "commons" and "wilderness areas." 89 F.4th at 362 (calling Adirondack Park, which contains forests, farmland, towns and villages, mountains and valleys, lakes, ponds, rivers, and public forest, a rural park). Additionally, this "fact" relates to the analysis of history as

it informs the meaning of the text of the Second Amendment. The analysis of history is not a factual inquiry but a *legal* one. *See Bruen*, 597 U.S. at 25 n.6 ("The job of judges is not to resolve historical questions in the abstract; it is to resolve *legal* questions presented in particular cases or controversies. That 'legal inquiry is a refined subset' of a broader 'historical inquiry' and it relies on 'various evidentiary principles and default rules' to resolve uncertainties." (quoting W. Baude & S. Sachs, *Originalism and the Law of the Past*, 37 L. & Hist. Rev. 809, 810–11 (2019))). *Bruen* itself dealt with historical claims not as findings of fact but as part of its legal analysis.

Dated:  July 15, 2024                                          Respectfully submitted,

/s/ David H. Thompson
*Attorney for Plaintiffs*

David H. Thompson                                              Nicolas J. Rotsko
Peter A. Patterson                                             FLUET
COOPER & KIRK, PLLC                                            1751 Pinnacle Drive, Suite 1000
1523 New Hampshire Avenue, N.W.                                Tysons, VA 22102
Washington, D.C. 20036                                         (703) 590-1234 x 210
(202) 220-9600                                                 (703) 590-0366 (fax)
(202) 220-9601 (fax)                                           nrotsko@fluet.law
dthompson@cooperkirk.com
ppatterson@cooperkirk.com

**CERTIFICATE OF SERVICE**

      I hereby certify that on July 15, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the Western District of New York by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

                                            /s/David H. Thompson
                                            David H. Thompson