UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

BRETT CHRISTIAN, FIREARMS POLICY COALITION, INC., and SECOND AMENDMENT FOUNDATION,

Plaintiffs,

v.

STEVEN G. JAMES, in his official capacity as Superintendent of the New York State Police, and JOHN J. FLYNN, in his official capacity as District Attorney for the County of Erie,

Defendants.

No. 22-cv-00695 (JLS)

**STATE'S REPLY IN FURTHER SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

LETITIA JAMES
Attorney General
State of New York
350 Main Place, Suite 300A
Buffalo, New York 14202

Ryan L. Belka
James M. Thompson
Assistant Attorneys General
Of Counsel

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ..................................................................................... 1

ARGUMENT ..................................................................................................................... 2

I. THE SUPREME COURT'S DECISION IN RAHIMI FORECLOSES PLAINTIFFS' ATTEMPTS TO IGNORE HISTORY ........................................................................ 2

II. HISTORY AND TRADITION DEMONSTRATE THAT THE PEOPLE'S REPRESENTATIVES MAY CONSTITUTIONALLY FORBID GUNS IN PARKS ..... 4

A. Prohibitions on Guns in Public Parks are Constitutional in Both Rural and Urban Settings ........................................................................................ 4

B. Plaintiffs Cannot Manufacture Standing To Challenge "Rural Parks" ................ 6

III. HISTORY AND TRADITION DEMONSTRATE THAT OWNER CONSENT LAWS ARE CONSTITUTIONAL ........................................................................ 8

CONCLUSION ................................................................................................................. 11

# TABLE OF AUTHORITIES

## Cases

Antonyuk v. Chiumento, 89 F.4th 271 (2d Cir. 2023) ........ passim

Antonyuk v. James, 2024 WL 3259671 (U.S. July 2, 2024), ........ 1

Beatty v. Kurtz, 27 U.S. 566 (1829) ........ 9

Bianchi v. Brown, __ F. 4th __, 2024 WL 3666180 (4th Cir. Aug. 6, 2024) ........ 10

Comcast Corp. v. Nat'l Ass'n of African American-Owned Media, 589 U.S. 327 (2020) ........ 10

Dist. of Columbia v. Heller, 554 U.S. 570 (2008) ........ 3, 9

Kipke v. Moore, 695 F. Supp. 3d 638 (D.Md. 2023) ........ 6

NYSRPA v. Bruen, 597 U.S. 1 (2022) ........ passim

Or. Firearms Fed'n v. Kotek, 682 F. Supp. 3d 874 (D.Or. 2023) ........ 6

United States v. Ho, 984 F.3d 191 (2d Cir. 2020) ........ 10

United States v. Rahimi, 144 S. Ct. 1889 (2024) ........ passim

United States v. Salerno, 481 U.S. 739 (1987) ........ 4

Vidal v. Elster, 602 U.S. 286 (2024) ........ 4

Vt. Fed'n of Sportsmen's Clubs v. Birmingham, No. 23-cv-710, 2024 WL 3466482 (D.Vt. July 18, 2024) ........ 1

## Statutes

N.Y. Penal Law § 265.01-e ........ 7

## Other Authorities

NYSDEC, Frequently Asked Questions and Answers on Hunting and Hunting-Related Activities in Response to Recent Changes to New York State Firearm Laws (Sept. 1, 2022), available at https://extapps.dec.ny.gov/docs/wildlife_pdf/gunlawqanda2022.pdf. ........ 7

NYSDEC, State Land Classifications, available at https://dec.ny.gov/nature/forests-trees/dec-land-stewardship/state-land-classifications ........ 8

Patrick J. Charles, The Fugazi Second Amendment: Bruen's Text, History, and Tradition Problem and How to Fix It, 71 Clev. St. L. Rev. 623 (2023) .................................................... 9

Superintendent James[1] respectfully submits this reply memorandum of law in further support of his motion for summary judgment.

**PRELIMINARY STATEMENT**

The Supreme Court's case law "demands a test rooted in the Second Amendment's text, as informed by history," NYSRPA v. Bruen, 597 U.S. 1, 19 (2022), but Plaintiffs' attack on New York's laws is profoundly *ahistorical*. Again and again, Plaintiffs provide rationales to "summarily dismiss" history, complaining that laws are too old, see, e.g. ECF No. 81 at 14-15, too young, id. at 18, 27, too federal, id. at 27, too municipal, id. at 27, too urban, id. at 16, too rural, id. at 19, too broad, id. at 27-28, or too narrow, id. at 22-23, pushing to ignore all history in order to conclude that there is no history. That is exactly the approach that the Supreme Court rejected by an 8-to-1 margin in United States v. Rahimi, 144 S. Ct. 1889 (2024).

The Superintendent has presented a robust historical record supporting the two laws at issue in these cross-motions. On parks, the Superintendent has provided 67 examples of laws restricting firearms carriage, along with the Declaration of Professor Terence Young (and the 116 exhibits attached by Professor Young himself). On private property, the Superintendent has adduced ten examples of state laws requiring an owner's consent to carry a gun onto his or her property, and has met the test established by the Second Circuit, which called for "evidence that those terms [used in historical owner-consent laws] were in fact otherwise understood to apply to private property open to the public." Antonyuk v. Chiumento, 89 F.4th 271, 386 (2d Cir. 2023).[2]

---

[1] For ease of reading, this memorandum of law uses the same defined terms as the Superintendent's moving brief, ECF No. 77-1 (the "Superintendent Br.").

[2] While the Supreme Court vacated the Second Circuit's judgment in Antonyuk for further consideration in light of Rahimi, see 2024 WL 3259671 (U.S. July 2, 2024), the Second Circuit's analysis still at the very least "serves as persuasive authority," particularly on subjects that Rahimi "did not address." Vt. Fed'n of Sportsmen's Clubs v. Birmingham, No. 23-cv-710, 2024 WL 3466482, at *23 n.27 (D.Vt. July 18, 2024). As pertains to the appeal of the preliminary injunction motion in this action, although the Circuit considered the appeal in the same opinion as the Antonyuk matter, Plaintiffs in this case did not seek certiorari and the Supreme Court's vacatur was limited to the

Plaintiffs err in asking the Court to brush aside or ignore the State's historical showing: Rahimi emphasizes that "a challenged regulation need not be an updated model of a historical counterpart," 144 S. Ct. at 1925 (Barrett, J., concurring), and that "when legislation and the Constitution brush up against each other, a court's task is to seek harmony, not to manufacture conflict." Id. at 1903 (Roberts, C.J., for the majority).

## ARGUMENT

### I. THE SUPREME COURT'S DECISION IN RAHIMI FORECLOSES PLAINTIFFS' ATTEMPTS TO IGNORE HISTORY

In Rahimi, the Supreme Court rejected a Second Amendment challenge to the federal law disarming individuals subject to domestic violence restraining orders, deeming it a continuation of a national tradition of "disarm[ing] individuals who present a credible threat to the physical safety of others." 144 S. Ct. at 1902. The Rahimi Court provided critical guidance as to how federal courts should conduct the history-and-tradition test from Bruen, cautioning that "some courts have misunderstood the methodology of our recent Second Amendment cases," and emphasizing that a modern law does not need to be "identical to founding era regimes." Rahimi, 144 S. Ct. at 1897, 1901; see also id. at 1925 (Barrett, J., concurring) (any "test that demands overly specific analogues has serious problems."). The single-justice dissent in Rahimi followed the same mode of analysis as the Plaintiffs would have the court take here, distinguishing away one historical law after another in order to declare that "[n]ot a single historical regulation justifies the statute at issue." Id. at 1930 (Thomas, J., dissenting). But the other eight members of the court recognized that "[a]nalogical reasoning under Bruen demands a wider lens," *id.* at 1925 (Barrett, J., concurring). The Court emphasized that the correct test is "considering whether the challenged regulation is

judgment in Antonyuk itself. See 2024 WL 3259671 at *1. The Second Circuit's holding in the Christian appeal thus at least arguably remains binding authority, and at a minimum should be strongly persuasive.

consistent with the *principles* that underpin our regulatory tradition," and that a modern law need only be "relevantly similar" to be constitutional. Id. at 1898 (emphasis added).

As Justice Barrett observed in her concurring opinion, one such tradition is the "'sensitive places' principle that limits the right to public carry." Id. at 1926 (Barrett, J., concurring) (citing Bruen, 597 U.S. at 30-31); see also id. at 1923 (Kavanaugh, J., concurring) ("laws forbidding the carrying of firearms in sensitive places such as schools and government buildings" are "presumptively constitutional"). As explained in prior filings and below, the Parks and Private Property provisions of the CCIA are "consistent with the principles that underpin our regulatory tradition," id. at 1898—both the overarching principles that firearms may be prohibited in sensitive places and that an individual's right to bear arms does not extend onto other people's property, and with more granular principles, including the principles that deadly weapons may be kept out of crowded public forums, locations with children or other vulnerable populations, and locations designated by the People for calm and peaceful recreation.

Rahimi also establishes that there is no basis to arbitrarily cut off what historical sources may be considered. Although the Rahimi Court declined to settle the "ongoing scholarly debate on whether courts should *primarily* rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868 when defining its scope," 144 S. Ct. at 1898 n.1 (emphasis added) (quoting Bruen, 597 U.S. at 37), the Court's Second Amendment precedent puts to rest any suggestion that 19th-century history can be ignored. See Dist. of Columbia v. Heller, 554 U.S. 570, 605 (2008) ("We now address how the Second Amendment was interpreted from immediately after its ratification through the end of the 19th Century."); accord Rahimi, 144 S. Ct. at 1924 (Barrett, J., concurring) ("In Bruen, the Court took history beyond the founding era, considering gun regulations that spanned the 19th century."). Moreover, in cases from this year's

term involving interpretation of the original meaning of other constitutional provisions, the Court considered late-19th and even 20th century sources in determining the history and tradition that elucidates the Constitution's meaning. See Vidal v. Elster, 602 U.S. 286, 301-06 (2024); id. at 308 n.4 (discussing Vidal as an application of Bruen's "history-focused approach[] to constitutional scrutiny"); see also Antonyuk, 89 F.4th at 304 ("the prevailing understanding of the right to bear arms in 1868 and 1791 are both focal points of our analysis").

Rahimi also emphasized the very high bar that applies to facial Second Amendment challenges like this one. The Court explained that a facial challenge "is the 'most difficult challenge to mount successfully,' because it requires a [challenger] to 'establish that no set of circumstances exists under which the [law] would be valid.'" Rahimi, 144 S. Ct. at 1898 (quoting United States v. Salerno, 481 U.S. 739, 745 (1987)). In other words, if a law "is constitutional in *some* of its applications," a facial challenge must fail. Id. (emphasis added). Because the Parks and Private Property laws are (at the very least) constitutional in at least some of their applications, Plaintiffs' pre-enforcement facial challenge fails. See also Superintendent Br. at 7-9.

## II. HISTORY AND TRADITION DEMONSTRATE THAT THE PEOPLE'S REPRESENTATIVES MAY CONSTITUTIONALLY FORBID GUNS IN PARKS

### A. Prohibitions on Guns in Public Parks are Constitutional in Both Rural and Urban Settings

For as long as there have been parks, there have been laws and regulations forbidding firearms in them, and these regulations have applied in both urban and rural spaces. The Superintendent has provided 67 examples of such regulations, see Belka Dec. Exs. 12-87, along with the Expert Declaration of Professor Terence Young and the 116 exhibits attached to it. Plaintiffs would have the Court rule that each of these laws was always unconstitutional, notwithstanding the complete absence of legal challenges or historical sources calling their lawfulness into question. See ECF No. 73-1 at 28. It is difficult to imagine a more ahistorical

approach, or one more at odds with the Supreme Court's jurisprudence. Cf. Rahimi, 144 S. Ct. at 1912 (Kavanaugh, J., concurring) (explaining that "History, not policy, is the proper guide" and that "[w]hen properly applied, history helps ensure that judges do not simply create constitutional meaning out of whole cloth." (quotation omitted)).

Even where Plaintiffs are forced to acknowledge the existence of parks laws "in small towns and rural areas," they nonetheless ask the Court to ignore the examples (which are not in any way limited to the four they specify) as too "localized." Id. at 19. Their logic is a circle: any law from "small towns and rural areas" will necessarily come from areas that are diffuse and have small populations, and the small populations allow Plaintiffs to dismiss the laws as unrepresentative. Cf. Antonyuk, 89 F.4th at 339 ("Disqualifying proffered analogues based only on strict quantitative measures such as population size absent any other indication of historical deviation would turn Bruen into the very 'regulatory straightjacket' the Court warned against."). And Plaintiffs do not credibly dispute that firearms were banned in National Parks as soon as the National Parks were created, do not dispute that the National Parks are rural or wilderness areas, do not dispute that the National Park system was federal land where the Second Amendment applied directly, and do not adduce a single iota of historical evidence that our forebears considered the prohibition on firearms to be unconstitutional, or even debated the proposition. Cf. Bruen, 597 U.S. at 30 (where "we are [] aware of no disputes regarding the lawfulness of such prohibitions" we "therefore can assume it settled that these locations were 'sensitive places' where arms carrying could be prohibited consistent with the Second Amendment.").

Plaintiffs have largely avoided making any historical showing of their own and largely decline to address Professor Young's findings. See, e.g., ECF No. 81 at 8 (asserting only that the Court "should not credit" on Dr. Young's definition of what makes a park "urban," and that his

history is too "unmoored from any Founding-era tradition and thus insufficient.").[3] Dr. Young explains why parks as such are a late-19th century innovation, and demonstrates why Founding-era public spaces are not public parks as we understand them. For instance, Plaintiffs point to Bowling Green in New York City as a Founding era public park, ECF No. 73-1 at 21, but Dr. Young addresses Bowling Green's history, noting that it was a marketplace, a public well, and only became a recreation site once it was privately owned. Young Dec. ¶ 18. And "rural, more isolated state parks were not established in significant numbers until after the ratification of the Fourteenth Amendment," Kipke v. Moore, 695 F. Supp. 3d 638, 655 (D.Md. 2023); see Young Dec. ¶¶ 38-42, 49-54, making Plaintiffs' demand for a "Founding-era tradition" particularly inappropriate. See Bruen, 597 U.S. at 27 (cases involving social and technological changes "require a more nuanced approach"); Rahimi, 144 S. Ct. at 1897-98 ("the Second Amendment permits more than just those regulations identical to ones that could be found in 1791.").

American law and tradition demonstrate that "restriction on firearms in parks is consistent with historical firearm regulation," in both urban and rural spaces. Kipke, 695 F. Supp. 3d at 654-55. New York's prohibition on guns in these spaces for peaceful recreation should be upheld.

**B. Plaintiffs Cannot Manufacture Standing To Challenge "Rural Parks"**

Plaintiffs' challenge to the law prohibiting guns in rural public parks fails for lack of standing. The Second Circuit has already found that New York's law "has a plainly legitimate sweep as to urban parks," Antonyuk, 89 F.4th at 356, and Plaintiff Christian has not demonstrated an intention to carry in any rural park where firearms are prohibited. As to Stiglmeier Park, Plaintiffs quibble with the characterization of the Park, asking the Court to take a myopic view of

[3] Plaintiffs also have evidentiary problems, having attempted to place into the record a large body of inadmissible hearsay sources as "legislative facts," without following the Federal Rules of Evidence. See ECF No. 82 at 1 n.1; cf. Or. Firearms Fed'n v. Kotek, 682 F. Supp. 3d 874, 885-86 & n.2 (D.Or. 2023) (rejecting documents with "legislative facts" as "inadmissible hearsay" that "deserve no weight in this [Second Amendment] case").

the park, literally from close up, ECF No. 82-10 at 2, in order to find corners of the park which are not full of sports facilities, children's playgrounds, or shelters used for family picnics sandwiched between busy roads and neighborhoods. See Barill Dec. Ex. 2. But not every part of an urban park needs to be consistently occupied in order for a park to be urban. The evidence set forth in the Barill Declaration demonstrates that Stiglmeier is a park within town limits designed for and used as a communal recreation space – a quintessential urban park where carriage is prohibited.

As to the Clarence Bike Path and the Shoreline Trial, the Superintendent has argued that these bike paths are in urban settings, the paths are not parks, and that the law challenged does not prohibit Plaintiff Christian from carriage along these paths. Superintendent Br. at 16. Plaintiffs counterintuitively insist that bike paths are parks and proffer evidence of two signs along the Clarence Bike Path[4] which state "No Motorized Vehicles" and in smaller font that park rules apply. Suppl. Christian Decl. ¶ 10. Smaller, and nearly impossible to see as presented by Plaintiffs, are the actual Town of Clarence[5] Bike Path Rules: "no trespassing dusk to dawn, no unauthorized motor vehicles, no hunting, no alcoholic beverages, no trespassing on private property, no glass bottles, dog leash and cleanup law in effect." Id. Nothing listed on these signs indicates that Plaintiff Christian is prohibited from carriage along these paths.

Plaintiffs also argue that Harris Hill State Forest is a non-urban park. [ECF No. 81] at 12-13. Defendants agree that the State Forest is non-urban, but the area falls outside the scope of Penal Law § 265.01-e(2)(d) because a State Forest is not a park, and Plaintiffs acknowledge that hunting is explicitly permitted there.[6] ECF No. 81 at 7. Plaintiffs appear confused between a "State Forest," like Harris Hill, and the "Forest Preserve," a separate designation under New York

---

[4] No evidence of similar signage exists along the Shoreline trail.
[5] Ultimately, the status of the bike path is a matter for the Town of Clarence, which is not a party to this case.
[6] In addition, DEC guidance document states that "[t]arget shooting is lawful on State Forest properties unless otherwise posted as prohibited." See https://extapps.dec.ny.gov/docs/wildlife_pdf/gunlawqanda2022.pdf.

State law that covers public lands specifically within the Adirondack and Catskill Parks. See NYSDEC, State Land Classifications, available at https://dec.ny.gov/nature/forests-trees/dec-land-stewardship/state-land-classifications. Ultimately, this is a distinction without a difference: firearms are not prohibited in either setting, and Plaintiffs have not proven that they are. Cf. Rahimi, 144 S. Ct. at 1903 (courts adjudicating Second Amendment challenges must not "focus[] on hypothetical scenarios where [a law] might raise constitutional concerns").

## III. HISTORY AND TRADITION DEMONSTRATE THAT OWNER CONSENT LAWS ARE CONSTITUTIONAL

Plaintiffs are mistaken to argue that "the Second Circuit has already held that the owner consent statutes New York cites do not support a tradition of banning carry on private property open to the public." ECF No. 81 at 21. This misrepresents both the law (which "bans" nothing, but merely ensures that owners can *know* and *decide* before guns are brought onto their premises) and the Second Circuit's holding, which "assume[d]" that New York's analogues were sufficient to establish a tradition, but found that "[a]s it has been developed thus far, the historical record indicates that 'land,' 'improved or inclosed land,' and 'premises and plantations' would have been understood to refer to private land not open to the public." Antonyuk, 89 F.4th at 384, 386. The Circuit noted that the holding was a preliminary one and called for "evidence that those terms were in fact otherwise understood to apply to private property open to the public." Id. at 386.

On summary judgment, New York demonstrated through citations to 18th and 19th century legal authorities that each of those terms was used to refer to forms of private property open to the public. "Land" was used to refer to taverns, public cattle pens, inns, wharves, grocery stores, and commercial enterprises. ECF No. 77-1 at 24-25. "Improved land" included stores, dairies, schoolhouses, warehouses, wharves, and mills. Id. at 25-26. "Inclosed land" included public squares, taverns, inns, stores, city points, gambling dens, and (in a Supreme Court opinion) a

church, graveyard, and schoolhouse. Id. at 27-28; see Beatty v. Kurtz, 27 U.S. 566, 567 *et seq.* (1829). "Premises" included taverns, "public house[s]," gardens, grocery and dry goods stores, churches, and graveyards. ECF No. 77-1 at 28-29. Even private "plantations" included areas open to the public, such as taverns, rope-walks, and gambling establishments. Id. at 29-30. Dictionary definitions from the time, including in the same sources Justice Scalia relied on in Heller, likewise show that these legal terms included private property open to the public. See id. at 21-29.

That is the showing the Second Circuit asked for in Antonyuk. Plaintiffs now acknowledge that it is "uncontroversial" that "some businesses open to the public sit on 'land,'" and that "courts have used the term 'enclosed' or 'premises' to refer to places open to the public." ECF No. 81 at 25-26 (italics omitted). Nevertheless, they ask the Court to engage in circular reasoning, arguing that even though the language used in these laws was understood to refer to places open to the public, "[b]ecause owner consent was required, these lands were *not* open to the public." Id. at 24. Plaintiffs would then have the Court dismiss the history as merely covering "trespassing." But it is the Plaintiffs who are ignoring the plain terms of these statutes: even where an owner or lessee consents for the public to enter onto his or her land, he does not necessarily consent for the public to enter onto his or her land *with a gun*.[7] Likewise, Plaintiffs' invocation of the common law of trespass (and the common-law prohibition on hunting on enclosed private lands) underscores that these laws cannot be hand-waved away as hunting-only statutes. Federal courts interpreting

[7] To the extent that Plaintiffs fault New York for not adducing enforcement history for these statutes – despite the fact that "[t]he reality is that most instances of legal enforcement . . . were done at the local level, and, as a result, the records of enforcement have either been lost to time or are woefully incomplete," Patrick J. Charles, The Fugazi Second Amendment: Bruen's Text, History, and Tradition Problem and How to Fix It, 71 Clev. St. L. Rev. 623, 657 (2023) – the Second Circuit did not require New York to do so, noting that its test could be satisfied by "evidence that those terms were in fact otherwise understood to apply to private property open to the public *or* that the statutes were in practice applied to private property open to the public." Antonyuk, 89 F.4th at 386 (emphasis added). New York has provided evidence for the former proposition, utilizing the same textualist sources and methods that Justice Scalia utilized in Heller. See 554 U.S. at 581 *et seq.* Notably, Plaintiffs have produced no evidence whatsoever that these laws were understood to exclude private property open to the public from their clear textual sweep, nor provided any evidence of their own as to how these laws were enforced.

statutes will "generally presume that [legislatures] legislate[] against the backdrop of the common law," Comcast Corp. v. Nat'l Ass'n of African American-Owned Media, 589 U.S. 327, 335 (2020), and it makes little sense for legislatures to enact statutes using straightforward terms like "carry any gun or hunt," Belka Dec. Ex. 2, "carry any Gun on any Lands not his own," Belka Dec. Ex. 5, or "carry firearms," Belka Dec. Ex. 7, to refer only to hunting activity already prohibited by the common law. See United States v. Ho, 984 F.3d 191, 201-02 (2d Cir. 2020) ("When the language of the statute is clear, our inquiry is complete and the language controls." (ellipsis omitted)).

Plaintiffs take the same flawed approach to historical laws forbidding discharge on private property and laws forbidding weapons carriage altogether in categories of private property open to the public, asking the Court either to interpret the laws in ways contrary to their plain meaning or asking the Court to retroactively overrule historical laws despite no historical evidence that they were ever thought to be unconstitutional at the time. That is exactly contrary to the way the Supreme Court has instructed courts to evaluate history. See Rahimi, 144 S. Ct. at 1903; Bruen, 597 U.S. at 30 (even "relatively few" sources support a law's constitutionality where "we are [] aware of no disputes regarding the lawfulness of such prohibitions").

A clear-eyed view of history demonstrates that laws requiring an owner's knowledge and consent to carry a gun onto his or her property are fully "consistent with the Nation's historical tradition of firearm regulation." Rahimi, 144 S. Ct. at 1896 (quoting Bruen, 597 U.S. at 24). There is no reason to believe that prior generations of Americans would have viewed enacting owner-consent laws as "beyond the reach of our nation's democratic processes." Bianchi v. Brown, __ F. 4th __, 2024 WL 3666180, at *1 (4th Cir. Aug. 6, 2024). Indeed, they enacted several such statutes, and Plaintiffs have adduced no evidence that the laws were ever found unconstitutional, or arbitrarily limited in scope.

**CONCLUSION**

The Superintendent respectfully requests that the Court grant his cross-motion for summary judgment, dismiss the Complaint in its entirety and with prejudice, and grant such other and further relief as it deems just and proper.

Dated: Buffalo, New York
August 16, 2024

LETITIA JAMES
Attorney General
State of New York

By: */s/ Ryan L. Belka*
RYAN L. BELKA
Assistant Attorney General
350 Main Place, Suite 300A
Buffalo, NY 14202
(716) 853-8440
Ryan.Belka@ag.ny.gov

JAMES M. THOMPSON
Special Counsel
28 Liberty Street, 18th Floor
New York, NY 10005
(212) 416-6556
James.Thompson@ag.ny.gov