UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK



BRETT CHRISTIAN,
FIREARMS POLICY COALITION,
INC., and SECOND AMENDMENT
FOUNDATION,

           Plaintiffs,

    v.

STEVEN G. JAMES, in his official
capacity as Superintendent of the New
York State Police, and MICHAEL J.
KEANE, in his official capacity as
District Attorney for the County of Erie,
New York,

           Defendants.

22-CV-695 (JLS)

## DECISION AND ORDER

A newly-enacted New York law makes it a felony for a concealed-carry license holder to possess a firearm on *all private property*, unless the relevant property holders actually permit such possession with a sign or by express consent. *See* N.Y. Penal L. § 265.01-d. At least as to private property open to the public (the subject of this motion), New York's restriction is unconstitutional—a result dictated by the teaching of the Supreme Court's recent cases addressing individual Americans' right to keep and bear arms.

Regulation in this area is permissible *only if* the government demonstrates that the new enactment is consistent with the Nation's historical tradition of sufficiently analogous regulations. New York fails that test here. Indeed, property

owners have the right to exclude.  But *the state* may not unilaterally exercise that right and, thereby, interfere with the long-established Second Amendment rights of law-abiding citizens who seek to carry for self-defense on private property open to the public.

Before the Court are cross motions for summary judgment.  *See* Dkt. 73 (Plaintiffs); Dkt. 77 (Defendants).  Relevant here, Plaintiffs ask this Court to enjoin enforcement of the private property restriction as to places open to the public.  *See* Dkt. 73.  For the reasons below, Plaintiffs' motion seeking that relief is GRANTED. Defendants' corresponding motion is DENIED.[1]

## BACKGROUND

### I.    THE COMPLAINT

Plaintiff Brett Christian commenced this action in September 2022, joined by institutional Plaintiffs Firearms Policy Coalition, Inc. ("FPC"), and Second Amendment Foundation ("SAF") (collectively, "Plaintiffs").  Dkt. 1.  Plaintiffs sue Defendants Steven G. James and Michael J. Keane (collectively, the "State" or "Defendants") in their official capacities—namely, as the Superintendent of the New York State Police and the Erie County District Attorney, respectively.  *See id.*[2]

---

[1] The parties' motions separately address an additional restriction as to public parks.  The Court holds these parts of the parties' motions in abeyance, pending the Second Circuit's consideration of the issue.  *See Antonyuk v. James*, 144 S. Ct. 2709 (2024) (vacating and remanding for "further consideration in light of *United States v. Rahimi*, 602 U.S. ____, 144 S.Ct. 1889, ____ L.Ed.2d ____ (2024)").

[2] James is the acting Superintendent of State Police as of April 4, 2024.  *See* Dkt. 77 at 1.  He has been substituted as a party pursuant to Fed. R. Civ. P. 25(d).

Plaintiffs challenge three provisions of New York's Concealed Carry Improvement Act ("CCIA")—a 2022 enactment that adds to the New York Penal Law various restrictions on concealed carry of firearms. *See id.* Christian, who is licensed under New York law to carry a concealed firearm, "desires to carry his firearm for self-defense purposes when going about his day-to-day life." *See id.* ¶ 43. But because of the new restrictions, he is "prevented from doing so." *Id.*

In particular, the law prevents Christian from "carry[ing] for self-defense" in "local parks or when hiking on trails," and while using "public transportation" such as "NFTA Metro Rail." *Id.* Christian is also "unable to carry his firearm on his person throughout the State because of the State's designation of private property." *Id.* ¶ 44. He claims that the State's "designation of private property, including private property which is open to the public," as a restricted location "effectively prevents" Christian from "going about his daily life" while "lawfully carrying his firearm for purposes of self-defense." *Id.*

The statute adds to the Penal Law, as relevant here:

§ 265.01-d Criminal possession of a weapon in a restricted location. 1. A person is guilty of criminal possession of a weapon in a restricted location when such person possesses a firearm, rifle, or shotgun and enters into or remains on or in private property where such person knows or reasonably should know that the owner or lessee of such property has not permitted such possession by clear and conspicuous signage indicating that the carrying of firearms, rifles, or shotguns on their property is permitted or has otherwise given express consent. . . .[3]

---

[3] Section § 265.01-d(2) provides that this restriction does not apply to, among others, persons who are "lawfully engaged in hunting activity," persons who are "police officers" as defined in the criminal procedure law, persons who are

The Complaint seeks relief under 42 U.S.C. § 1983 for deprivation of the Constitutional right to keep and bear arms. *See id.* ¶¶ 47-54. Plaintiffs seek declaratory judgment, injunctive relief, as well as fees and costs. *See id.* at 30-31 (prayer for relief).[4]

## II.   PRELIMINARY INJUNCTION MOTION

Plaintiffs moved for a preliminary injunction. Dkt. 19. Christian, a resident of Cheektowaga, New York, stated that he was "licensed to carry a handgun pursuant to New York law with a license issued by Erie County." Dkt. 19-4 ¶¶ 1, 4. But to comply with the new law, Christian was forced to disarm "constantly" in "places [he] would otherwise carry." *Id.* ¶ 12. As a result, he was "left without the ability to defend [him]self" and was "suffering diminished personal safety on a frequent and ongoing basis." *Id.*

According to Christian, prior to the enactment of the private property restriction, he "would typically bring [his] firearm with [him] on private property open to the public, including weekly visits to gas stations and monthly visits to hardware stores." *Id.* ¶ 10. He "intended to continue to do so, but for the enactment and enforcement" of this restriction. *Id.* Christian also stated that he intended to carry a firearm for self-defense in parks and on public transportation—but could not do so in light of the new restrictions. *See, e.g., id.* ¶¶ 8-9. As such, Christian sought

---

"designated peace officers," as well as "security guards" and "active-duty military personnel."

[4] Page numbers refer to the CM/ECF generated pagination in the header of each page.

to enjoin Defendants from enforcing three restrictions on concealed carry: N.Y.

Penal L. §§ 265.01-e(2)(d) (public parks); 265.01-e(2)(n) (public transportation); and

265.01-d (private property).[5] Dkt. 19.

On November 22, 2022, this Court issued a Decision and Order preliminarily

enjoining Defendants from enforcing the private property restriction (N.Y. Penal L.

§ 265.01-d) with respect to property open to the public. Dkt. 49. The Court stayed

resolution of the portions of Plaintiffs' motion addressing public parks and public

transportation. Dkt. 60.

## III.    APPEAL

Defendants appealed, Dkt. 50, and the Second Circuit affirmed in a decision

addressing the appeal "in tandem" with three other appeals of similar district court

orders. *See Antonyuk v. Chiumento*, 89 F.4th 271, 289 (2d Cir. 2023), cert. granted,

judgment vacated sub nom. *Antonyuk v. James*, 144 S. Ct. 2709 (2024).[6]

Relevant here, the Second Circuit issued a mandate on January 2, 2024,

ordering that "that the preliminary injunction enjoining enforcement of § 265.01-d

with respect to private property open to the public is AFFIRMED." *See* Dkt. 70.

The Second Circuit concluded that the State "fails to place § 265.01-d within a

---

[5] Like their motion here, Plaintiffs' motion for a preliminary injunction of the
private property restriction was limited "to the extent it applies to property that is
already open to the public." *See* Dkt. 19-1 at 13.

[6] The three other district court cases are: *Hardaway v. Nigrelli*, 639 F. Supp. 3d 422
(W.D.N.Y. 2022) (Sinatra, *J.*); *Spencer v. Nigrelli*, 648 F. Supp. 3d 451 (W.D.N.Y.
2022) (Sinatra, *J.*); and *Antonyuk v. Hochul*, 639 F. Supp. 3d 232 (N.D.N.Y. 2022)
(Suddaby, *J.*).

National tradition . . . ." *Antonyuk*, 89 F.4th at 385.  And it explained that "the
State's analogues fail to establish a National tradition motivated by a similar 'how'
or 'why' of regulating firearms in property open to the public in the manner
attempted by § 265.01-d." *Id.*  Although the *Antonyuk* plaintiffs petitioned the
Supreme Court for a writ of Certiorari—which was granted—the mandate as to the
private property restriction in this case remains in effect.  *See* Dkt. 87.

IV.    **CROSS MOTIONS FOR SUMMARY JUDGMENT**

On March 1, 2024, Plaintiffs moved for summary judgment.  Dkt. 73.  They
ask this Court to "declar[e] unlawful and permanently enjoin[] Defendants from
enforcing N.Y. Penal L. §§ 265.01-e(2)(d) [public parks] and 265.01-d [private
property], with respect to places open to the public." *Id.*

Plaintiffs argue that "there is no historical tradition supporting New York's
ban on lawful firearm carry in public parks and on private property open to the
public." Dkt. 73-1 at 8.  Both "types of locations," they claim, "date back to the
Founding era, but New York will be unable to point to any relevantly similar
historical tradition of banning carry in them." *Id.*  As such, they urge the Court to
"permanently enjoin enforcement of the challenged restrictions." *Id.*

The State opposed Plaintiffs' motion and cross-moved for summary judgment.
Dkt. 77.  It maintains that the challenged restrictions are "fully constitutional" as
"straightforward, common-sense public safety measures."  Dkt. 77-1 at 12-13.
Specifically, the State argue that there is a "broad body of historical precedent for
laws prohibiting firearms in parks, in jurisdictions both urban and rural." *Id.* at 13.

And the private property restriction, it claims, is "perfectly consistent with the Nation's history and tradition of firearms regulation"—as there is a "robust historical tradition of states requiring consent to carry weapons on private property." *Id.* Indeed, according to the State, "states retain wide latitude to confront the regulatory challenges posed by modern firearms, including exercising the ability to set default rules for private property and to limit the possession of firearms in sensitive locations." *Id.* at 12.

Plaintiffs opposed the State's cross motion and replied in further support of their own motion. Dkt. 81, 82. The State also replied. Dkt. 86.[7] On September 12, 2024, the Court heard argument. *See* Dkt. 92.

## DISCUSSION

Plaintiffs' request that this Court enjoin enforcement of the private property restriction—as to places open to the public—is granted.[8] Defendants' cross motion on this issue is denied. As set forth below, the Nation's historical traditions have not countenanced such a curtailment of the right to keep and bear arms. Indeed, the right to self-defense is equally important—and equally recognized—on the vast swaths of private property open to the public across New York State.

---

[7] The parties also submitted supplemental briefing. *See* Dkt. 94, 97.

[8] The Court does not address the public parks restriction here because that issue (in the preliminary injunction posture) is currently before the Second Circuit. *See Antonyuk*, 144 S. Ct. 2709.

7

In the absence of historical tradition in support of the State's restriction, there is no genuine issue for trial. Indeed, on this record, the restriction violates the right of individuals to keep and bear arms for self-defense outside of their homes on private property open to the public. Judgment for Plaintiffs on this issue, therefore, is required.[9]

## I.   SUMMARY JUDGMENT STANDARD

Summary judgment "is appropriate when, viewing the evidence favorably to the non-movant, there is no genuine issue of material fact and the facts as to which there is no such issue warrant the entry of judgment for the moving party as a matter of law." *Wiggins v. Griffin*, 86 F.4th 987, 992 (2d Cir. 2023) (citing Fed. R. Civ. P. 56(a)). A "genuine issue exists—and summary judgment is therefore improper—where the evidence is such that a reasonable jury could decide in the non-movant's favor." *Id.* (internal citation omitted).

At summary judgment, "the movant bears the initial burden of demonstrating the absence of a genuine issue of material fact." *B Five Studio LLP v. Great Am. Ins. Co.*, 414 F. Supp. 3d 337, 339 (E.D.N.Y. 2019) (citing *Celotex Corp.*

---

[9] The Court rejects Defendants' argument that Plaintiffs improperly assert a pre-enforcement, as-applied challenge. *See* Dkt. 77-1 at 19 ("binding precedent forecloses [Plaintiffs'] ability to bring an as-applied challenge against a law that has never been applied to them"). The Second Circuit has addressed this approach in this case. *See Antonyuk*, 89 F.4th at 384 ("these Plaintiffs . . . have properly pleaded an as-applied, pre-enforcement challenge to the restricted location provision's default presumption against carriage on private property open to the public"). Moreover, the Supreme Court has also permitted pre-enforcement, as-applied challenges. *See, e.g., Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010); *Milavetz, Gallop & Milavetz, P.A. v. United States*, 559 U.S. 229 (2010).

*v. Catrett*, 477 U.S. 317, 323 (1986)).  Once the "movant meets that burden, the non-movant may defeat summary judgment only by adducing evidence of specific facts that raise a genuine issue for trial." *Id.* (citing Fed. R. Civ. P. 56(c)).  The Court "is to view all such facts in the light most favorable to the non-movant, drawing all reasonable inferences in its favor." *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)).

## II.    THE PRIVATE PROPERTY RESTRICTION

### A. The Right to Keep and Bear Arms

The Second Amendment to the Constitution, ratified in 1791, provides that "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."  U.S. Const. amend. II.  On several recent occasions, the Supreme Court has addressed this right and supplied the framework that resolves the issue here.  A thorough understanding of the Court's articulations is essential, so they are explored at length here.

### 1. *Heller*

In *Heller*, the Supreme Court held that the District of Columbia's ban on handgun possession in the home, and its prohibition against rendering any lawful home firearm operable for the purpose of immediate self-defense, both violated the Second Amendment.  *District of Columbia v. Heller*, 554 U.S. 570, 635 (2008).

The Court methodically analyzed the issue, first noting that, "[a]t the time of the founding, as now, to 'bear' meant to 'carry.'  When used with 'arms,' however, the term has a meaning that refers to carrying for a particular purpose—

confrontation." *Id.* at 584 (citations omitted). The Second Amendment, therefore, "guarantee[s] the individual right to possess and carry weapons in case of confrontation. This meaning is strongly confirmed by the historical background of the Second Amendment. We look to this because it has always been widely understood that the Second Amendment, like the First and Fourth Amendments, codified a *pre-existing* right. The very text of the Second Amendment implicitly recognizes the pre-existence of the right and declares only that it 'shall not be infringed.'" *Id.* at 592 (emphasis in original). The Court continued, "[t]here seems to us no doubt, on the basis of both text and history, that the Second Amendment conferred an individual right to keep and bear arms." *Id.* at 595.[10]

After addressing the history related to the Second Amendment's prefatory clause, the Court concluded that, "[t]hat history showed that the way tyrants had eliminated a militia consisting of all the able-bodied men was not by banning the militia but simply by taking away the people's arms, enabling a select militia or standing army to suppress political opponents. This is what had occurred in England that prompted codification of the right to have arms in the English Bill of Rights." *Id.* at 598.

---

[10] The Court noted that, "[o]f course the right was not unlimited, just as the First Amendment's right of free speech was not . . . . Thus, we do not read the Second Amendment to protect the right of citizens to carry arms for *any sort* of confrontation, just as we do not read the First Amendment to protect the right of citizens to speak for *any purpose.*" *Id.* (citation omitted) (emphasis in original).

Indeed, founding-era debate with respect to the right to keep and bear arms, "as with other guarantees in the Bill of Rights, was not over whether it was desirable (all agreed that it was) but over whether it needed to be codified in the Constitution." *Id.* It was understood "across the political spectrum that the right helped to secure the ideal of a citizen militia, which might be necessary to oppose an oppressive military force if the constitutional order broke down." *Id.* at 599.[11]

Like most rights, "the right secured by the Second Amendment is not unlimited . . . . [the right is] not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id.* at 626 (citations omitted). And although the Court indicated that it was not then undertaking "an exhaustive historical analysis" of the full scope of the Second Amendment, nothing in the Court's "opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws

---

[11] The Court continued, "[i]t is therefore entirely sensible that the Second Amendment's prefatory clause announces the purpose for which the right was codified: to prevent elimination of the militia. The prefatory clause does not suggest that preserving the militia was the only reason Americans valued the ancient right; most undoubtedly thought it even more important for self-defense and hunting. But the threat that the new Federal Government would destroy the citizens' militia by taking away their arms was the reason that right—unlike some other English rights—was codified in a written Constitution. Justice BREYER's assertion that individual self-defense is merely a 'subsidiary interest' of the right to keep and bear arms . . . (dissenting opinion), is profoundly mistaken. He bases that assertion solely upon the prologue—but that can only show that self-defense had little to do with the right's *codification*; it was the *central component* of the right itself." *Id.* (internal citation omitted) (emphasis in original).

imposing conditions and qualifications on the commercial sale of arms.  We identify these presumptively lawful regulatory measures only as examples; our list does not purport to be exhaustive." *Id.* at 626-27, 627 n.26.[12]

Striking down the handgun ban, and cementing the notion that the Second Amendment exists as a bulwark against attempts by governments to erode the right to self-defense, the Court concluded that, "the inherent right of self-defense has been central to the Second Amendment right.  The handgun ban amounts to a prohibition of an entire class of 'arms' that is overwhelmingly chosen by American society for that lawful purpose." *Id.* at 628-29 (footnote, citation, and internal quotations omitted).

The Court also addressed D.C.'s additional requirement "that firearms in the home be rendered and kept inoperable at all times.  This makes it impossible for citizens to use them for the core lawful purpose of self-defense and is hence unconstitutional." *Id.* at 630.[13]

---

[12] The Court also recognized another important limitation on the right, namely, that "the sorts of weapons protected were those 'in common use at the time.'  We think that limitation is fairly supported by the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" *Id.* at 627 (citations omitted).

[13] The Court spoke to the very importance of the right when it rejected Justice Breyer's dissenting criticism of the Court's "declining to establish a level of scrutiny for evaluating Second Amendment restrictions.  [Justice Breyer] proposes . . . a judge-empowering 'interest-balancing inquiry' that 'asks whether the statute burdens a protected interest in a way or to an extent that is out of proportion to the statute's salutary effects upon other important governmental interests.'" *Id.* at 634.  In response, the Court wrote, "[w]e know of no other enumerated constitutional right whose core protection has been subjected to a freestanding 'interest-balancing' approach.  The very enumeration of the right takes out of the hands of

And finally, acknowledging the problem of handgun violence in the country, the Court concluded that, "[t]he Constitution leaves the District of Columbia a variety of tools for combating that problem, including some measures regulating handguns . . . . *But the enshrinement of constitutional rights necessarily takes certain policy choices off the table.* These include the absolute prohibition of handguns held and used for self-defense in the home. Undoubtedly some think that the Second Amendment is outmoded in a society where our standing army is the pride of our Nation, where well-trained police forces provide personal security, and where gun violence is a serious problem. That is perhaps debatable, but what is not debatable is that it is not the role of this Court to pronounce the Second Amendment extinct." *Id.* at 636 (internal citations omitted) (emphasis added).

      2. *McDonald*

Two years later, the Court ruled that the Second Amendment applies as well to state governments by operation of the Fourteenth Amendment's Due Process Clause. *McDonald v. City of Chicago*, 561 U.S. 742, 750, 754, 791 (2010). There, the Court noted *Heller's* holding "that the Second Amendment protects the right to keep and bear arms for the purpose of self-defense." *Id.* at 791.

---

government—even the Third Branch of Government—the power to decide on a case-by-case basis whether the right is really worth insisting upon. A constitutional guarantee subject to future judges' assessments of its usefulness is no constitutional guarantee at all. Constitutional rights are enshrined with the scope they were understood to have when the people adopted them, whether or not future legislatures or (yes) even future judges think that scope too broad." *Id.* at 634-35. The Second Amendment "is the very product of an interest balancing by the people—which Justice BREYER would now conduct for them anew." *Id.* at 635.

To answer the next question whether "the Second Amendment right to keep and bear arms is incorporated in the concept of due process[, the Court analyzed] whether the right to keep and bear arms is fundamental to *our* scheme of ordered liberty or . . . whether this right is deeply rooted in this Nation's history and tradition." *Id.* at 767 (emphasis in original) (internal quotation marks and citations omitted). Without hesitation, the Court answered the question in the affirmative: "*Heller* points unmistakably to the answer. *Self-defense is a basic right*, recognized by many legal systems from ancient times to the present day, and in *Heller,* we held that individual self-defense is 'the *central component*' of the Second Amendment right." *Id.* (citations and footnote omitted) (initial emphasis added and second emphasis in original).

The Court continued, "citizens must be permitted 'to use [handguns] for the core lawful purpose of self-defense.'" *Id.* (alteration in original) (quoting *Heller* at 630). And "the Framers and ratifiers of the Fourteenth Amendment counted the right to keep and bear arms among those fundamental rights necessary to our system of ordered liberty." *Id.* at 778. The Court rejected any attempt "to treat the right recognized in *Heller* as a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees . . . ." *Id.* at 780.

Public safety concerns are no reason to alter the Constitutional analysis. The *McDonald* Court made it clear that, "[t]he right to keep and bear arms . . . is not the only constitutional right that has controversial public safety implications. All of the

14

constitutional provisions that impose restrictions on law enforcement and on the

prosecution of crimes fall into the same category." *Id.* at 783.

      3. *Bruen*

The Supreme Court returned to the Second Amendment two years ago,

invalidating the "proper cause" requirement in New York's conceal-carry licensing

regime. *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022).

Starting where it left off in *Heller* and *McDonald*, the Court recognized that "the

Second and Fourteenth Amendments protect the right of an ordinary, law-abiding

citizen to possess a handgun in the home for self-defense." *Id.* at 1. Next, the Court

held that the Second and Fourteenth Amendments also "protect an individual's

right to carry a handgun for self-defense *outside the home*." *Id.* (emphasis added).

The issue remaining, then, was whether New York's licensing regime

respected that right. And the Court concluded that it did not. *Id.* Specifically,

"[b]ecause the State of New York issues public-carry licenses only when an

applicant demonstrates a special need for self-defense . . . the State's licensing

regime violates the Constitution." *Id.*

*Bruen* offers much to the disposition of this motion. A close examination is

necessary, and follows.

In the years since *Heller* and *McDonald*, the Courts of Appeals had developed

a "two-step" framework for analyzing Second Amendment cases, which combined

history with a means-end scrutiny. *Id.* at 17. *Bruen* expressly rejected that

approach at the outset. *Id.* at 17-18. Instead, the Court set forth the proper test:

"when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct.  To justify its regulation, the government may not simply posit that the regulation promotes an important interest.  Rather, *the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation.*  Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command." *Id.* at 24 (citation and internal quotation omitted) (emphasis added).  In other words, "the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* at 19.[14]

Highlighting the importance of the right, the Court stated that, "[i]f the last decade of Second Amendment litigation has taught this Court anything, it is that federal courts tasked with making such difficult empirical judgments regarding firearm regulations under the banner of 'intermediate scrutiny' often defer to the determinations of legislatures.  But while that judicial deference to legislative interest balancing is understandable—and, elsewhere, appropriate—*it is not*

---

[14] The Court acknowledged that, "'[h]istorical analysis can be difficult; it sometimes requires resolving threshold questions, and making nuanced judgments about which evidence to consult and how to interpret it.' *McDonald*, 561 U.S. at 803–804, (Scalia, J., concurring).  But reliance on history to inform the meaning of constitutional text—especially text meant to codify a *pre-existing* right—is, in our view, more legitimate, and more administrable, than asking judges to make difficult empirical judgments about the costs and benefits of firearms restrictions, especially given their lack [of] expertise in the field." *Id.* at 25 (internal quotation marks and citation omitted) (emphasis and alteration in original).

*deference that the Constitution demands here.*"  *Id.* at 26 (emphasis added).  The

Second Amendment, the Court continued, "'is the very *product* of an interest

balancing by the people' and it 'surely elevates above all other interests the right of

law-abiding, responsible citizens to use arms' for self-defense.  It is this balance—

struck by the traditions of the American people—that demands our unqualified

deference."  *Id.* (citation omitted) (emphasis in original).

After setting this high bar, the Court supplied additional guidance.  The

applicable test "requires courts to assess whether modern firearms regulations are

consistent with the Second Amendment's text and historical understanding.  In

some cases, that inquiry will be fairly straightforward.  For instance, when a

challenged regulation addresses a general societal problem that has persisted since

the 18th century, the lack of a distinctly similar historical regulation addressing

that problem is relevant evidence that the challenged regulation is inconsistent

with the Second Amendment."  *Id.*  Likewise, "if earlier generations addressed the

societal problem, but did so through materially different means, that also could be

evidence that a modern regulation is unconstitutional.  And if some jurisdictions

actually attempted to enact analogous regulations during this timeframe, but those

proposals were rejected on constitutional grounds, that rejection surely would

provide some probative evidence of unconstitutionality."  *Id.* at 26-27.

Addressing the case before it, the Court noted that "New York's proper-cause

requirement concerns the same alleged societal problem addressed in *Heller*:

'handgun violence,' primarily in 'urban area[s].'  Following the course charted by

*Heller*, we will consider whether 'historical precedent' from before, during, and even after the founding evinces a comparable tradition of regulation. And, as we explain below, we find no such tradition in the historical materials that respondents and their *amici* have brought to bear on that question." *Id.* at 27 (internal citations to *Heller* omitted).[15]

The Court next considered the "sensitive places" doctrine, which addresses areas where weapons have historically been prohibited. The Court first referenced *Heller's* "discussion of 'longstanding' 'laws forbidding the carrying of firearms in sensitive places such as schools and government buildings.'" *Id.* at 30 (citation omitted). The Court noted that, "[a]lthough the historical record yields relatively few 18th- and 19th-century 'sensitive places' where weapons were altogether prohibited—*e.g.,* legislative assemblies, polling places, and courthouses—we are also aware of no disputes regarding the lawfulness of such prohibitions. *See* D. Kopel & J. Greenlee, The 'Sensitive Places' Doctrine, 13 CHARLESTON L. REV. 205, 229–236, 244–247 (2018); *see also* Brief for Independent Institute as *Amicus Curiae*

---

[15] The Court acknowledged that, while the "historical analogies here and in *Heller* are relatively simple to draw, other cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach. The regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868." *Id.* The Court continued, "[f]ortunately, the Founders created a Constitution—and a Second Amendment—"intended to endure for ages to come, and consequently, to be adapted to the various crises of human affairs." *McCulloch v. Maryland*, 4 Wheat. 316, 415, 4 L.Ed. 579 (1819) (emphasis deleted). Although its meaning is fixed according to the understandings of those who ratified it, the Constitution can, and must, apply to circumstances beyond those the Founders specifically anticipated." *Id.* at 27-28.

11–17.  We therefore can assume it settled that these locations were 'sensitive places' where arms carrying could be prohibited consistent with the Second Amendment.  And courts can use analogies to those historical regulations of 'sensitive places' to determine that modern regulations prohibiting the carry of firearms in *new* and analogous sensitive places are constitutionally permissible." *Id.* (emphasis in original).

Rejecting New York's broad "sensitive places" argument, the Court went on to state that, "[a]lthough we have no occasion to comprehensively define 'sensitive places' in this case, we do think respondents err in their attempt to characterize New York's proper-cause requirement as a 'sensitive-place' law.  In their view, 'sensitive places' where the government may lawfully disarm law-abiding citizens include all 'places where people typically congregate and where law-enforcement and other public-safety professionals are presumptively available.'  It is true that people sometimes congregate in 'sensitive places,' and it is likewise true that law enforcement professionals are usually presumptively available in those locations. But expanding the category of 'sensitive places' simply to all places of public congregation that are not isolated from law enforcement defines the category of 'sensitive places' far too broadly.  Respondents' argument would in effect exempt cities from the Second Amendment and would eviscerate the general right to publicly carry arms for self-defense that we discuss in detail below." *Id.* at 30-31 (internal citations omitted).

With the rules and analytical tools articulated, the Court applied them to New York's proper-cause requirement, noting that the petitioners were two ordinary, law-abiding adult citizens and, as such, were part of "the people" whom the Second Amendment protects. *Id.* at 31. Neither party disputed that handguns are weapons in common use today for self-defense. *Id.* As such, the Court turned to whether the plain text of the Second Amendment protects the individuals' proposed course of conduct, namely, "carrying handguns publicly for self-defense." *Id.* at 31. The Court had "little difficulty concluding that it does," noting that "[n]othing in the Second Amendment's text draws a home/public distinction with respect to the right to keep and bear arms." *Id.* at 32. The Second Amendment guarantees the individual right to possess and carry weapons in case of confrontation. *Id.* (citing *Heller*). And the right to "bear arms" refers to the right to carry for self-defense. *Id.* (citing *Heller*).

The Court then reasoned that the right to "bear" naturally encompasses public carry. *Id.* "Most gun owners do not wear a holstered pistol at their hip in their bedroom or while sitting at the dinner table. Although individuals often 'keep' firearms in their home, at the ready for self-defense, most do not 'bear' (*i.e.*, carry) them in the home beyond moments of actual confrontation. To confine the right to 'bear' arms to the home would nullify half of the Second Amendment's operative protections." *Id.*

The Court continued, "[m]oreover, confining the right to 'bear' arms to the home would make little sense given that self-defense is 'the *central component* of the

[Second Amendment] right itself.'" *Id.* (quoting *Heller*, 554 U.S. at 599). *See also McDonald*, 561 U.S. at 767. After all, "the Second Amendment guarantees an 'individual right to possess and carry weapons in case of confrontation,' *Heller*, 554 U.S. at 592, and confrontation can surely take place outside the home." *Id.* at 33. "*Many Americans hazard greater danger outside the home than in it. The text of the Second Amendment reflects that reality.* The Second Amendment's plain text thus presumptively guarantees petitioners Koch and Nash a right to 'bear' arms in public for self-defense." *Id.* (citation omitted) (emphasis added).

With that resolved, the Court next evaluated whether the State met its burden to show that its proper-cause requirement is consistent with the Nation's historical tradition of firearm regulation. Only "if [the State] carr[ies] that burden can [it] show that the pre-existing right codified in the Second Amendment, and made applicable to the States through the Fourteenth, does not protect petitioners' proposed course of conduct." *Id.* at 33-34.

Rejecting the State's historical arguments, the Court reasoned that, "[t]hroughout modern Anglo-American history, the right to keep and bear arms in public has traditionally been subject to well-defined restrictions [evaluated at length in the opinion] governing the intent for which one could carry arms, the manner of carry, or the exceptional circumstances under which one could not carry arms. But apart from a handful of late-19[th]-century jurisdictions, the historical record compiled by [the State] *does not demonstrate a tradition of broadly*

*prohibiting the public carry of commonly used firearms for self-defense.*" *Id.* at 38 (emphasis added).

Nor is there any such historical tradition "limiting public carry only to those law-abiding citizens who demonstrate a special need for self-defense . . . . We conclude that [the State has] *failed to meet [its] burden to identify an American tradition justifying New York's proper-cause requirement.* Under *Heller*'s text-and-history standard, the proper-cause requirement is therefore unconstitutional." *Id.* (emphasis added). The Court later noted that "the history reveals a consensus that States could *not* ban public carry altogether." *Id.* at 52 (emphasis in original).

The Court's analysis of one part of the historical record is noteworthy. "To summarize: The historical evidence from antebellum America does demonstrate that *the manner* of public carry was subject to reasonable regulation. Under the common law, individuals could not carry deadly weapons in a manner likely to terrorize others. Similarly, although surety statutes did not directly restrict public carry, they did provide financial incentives for responsible arms carrying. Finally, States could lawfully eliminate one kind of public carry—concealed carry—so long as they left open the option to carry openly. None of these historical limitations on the right to bear arms approach New York's proper-cause requirement because none operated to prevent law-abiding citizens with ordinary self-defense needs from carrying arms in public for that purpose." *Id.* at 59-60.

Moving to another historical period, the Court noted that, even "during Reconstruction the right to keep and bear arms had limits. But those limits were

consistent with a right of the public to peaceably carry handguns for self-defense." *Id.* at 62. Rejecting the relevance of an outlier law and state-court decisions, the Court stated that it "will not give disproportionate weight to a single state statute and a pair of state-court decisions. As in *Heller*, we will not 'stake our interpretation of the Second Amendment upon a single law, in effect in a single [State], that contradicts the overwhelming weight of other evidence regarding the right to keep and bear arms for defense' in public." *Id.* at 65-66 (citation omitted).

In conclusion, the Court reiterated that the Second Amendment is not a second-class right subject to lesser rules. *Id.* at 70. The Court indicated that it knew of "no other constitutional right that an individual may exercise only after demonstrating to government officers some special need. That is not how the First Amendment works when it comes to unpopular speech or the free exercise of religion. It is not how the Sixth Amendment works when it comes to a defendant's right to confront the witnesses against him. And it is not how the Second Amendment works when it comes to public carry for self-defense." *Id.* In sum, then, "New York's proper-cause requirement violates the Fourteenth Amendment in that it prevents law-abiding citizens with ordinary self-defense needs from exercising their right to keep and bear arms." *Id.* at 71.

    4. *Rahimi*

In *United States v. Rahimi*, 602 U.S.___, 144 S. Ct. 1889 (2024), the Court rejected a challenge to 18 U.S.C. § 922(g)(8), which "prohibits an individual subject to a domestic violence restraining order from possessing a firearm if that order

includes a finding that he 'represents a credible threat to the physical safety of [an] intimate partner,' or a child of the partner or individual." 144 S. Ct. at 1894 (quoting 18 U.S.C. § 922(g)(8)).

The Court discussed *Bruen*'s framework, stating: "In *Bruen*, we directed courts to examine our 'historical tradition of firearm regulation' to help delineate the contours of the right." *Id.* at 1897 (quoting *Bruen*, 597 U.S. at 17). "We explained that if a challenged regulation fits within that tradition, it is lawful under the Second Amendment. We also clarified that when the Government regulates arms-bearing conduct, as when the Government regulates other constitutional rights, it bears the burden to 'justify its regulation.'" *Id.* (quoting *Bruen*, 597 U.S. at 24).

The Court continued: "the Second Amendment permits more than just those regulations identical to ones that could be found in 1791." *Id.* And a "court must ascertain whether the new law is 'relevantly similar' to laws that our tradition is understood to permit, 'apply[ing] faithfully the balance struck by the founding generation to modern circumstances.'" *Id.* at 1898 (quoting *Bruen*, 597 U.S. at 29). Moreover,

> [w]hy and how the regulation burdens the right are central to this inquiry. For example, if laws at the founding regulated firearm use to address particular problems, that will be a strong indicator that contemporary laws imposing similar restrictions for similar reasons fall within a permissible category of regulations. Even when a law regulates arms-bearing for a permissible reason, though, it may not be compatible with the right if it does so to an extent beyond what was done at the founding. And when a challenged regulation does not precisely match its historical precursors, it still may be analogous enough to pass constitutional muster. The law must comport with the principles

underlying the Second Amendment, but it need not be a 'dead ringer' or a 'historical twin.'

*Id.* (internal citations and quotation marks omitted). Against this backdrop, the Court held that, "[w]hen an individual poses a clear threat of physical violence to another, the threatening individual may be disarmed." *Id.* at 1901. And "[i]ts prohibition on the possession of firearms by those found by a court to present a threat to others fits neatly within the tradition the surety and going armed laws represent." *Id.*

## B. New York's Restriction on Private Property Open to the Public is Unconstitutional

The State's criminal enactment barring carrying of arms on private property open to the public violates the Constitution.

Christian is an ordinary, law-abiding citizen to whom the Second Amendment applies. As it did for the petitioners in *Bruen,* the Second Amendment's plain text thus presumptively guarantees Christian's right to "bear" arms for self-defense on private property outside of his own home. *See Antonyuk*, 89 F.4th at 383 ("We agree with the district court that, to the extent the restricted location provision applies to private property open to the public, the regulated conduct falls within the Second Amendment right to carry firearms in self-defense outside the home").

To "justify its regulation," therefore, the State "must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 17, 24. *See also Rahimi*, 144 S. Ct. at 1896. Only then may the

Court "conclude that the individual's conduct falls outside the Second Amendment's unqualified command." *Bruen,* 597 U.S. at 17, 24 (internal citation and quotation marks omitted). *See also Antonyuk,* 89 F.4th at 384 ("the district court properly placed the burden on the State to demonstrate § 265.01-d's consistency with a well-established and representative National tradition").

The State maintains that there is "extensive historical support spanning the colonial era to Reconstruction and beyond that forbade carrying guns onto others' property without their permission." Dkt. 77-1 at 32.[16] But the State fails, on this historical record, to demonstrate that the challenged restriction is "consist[ant] with a well-established and representative National tradition." *Antonyuk,* 89 F.4th at 384.

### 1. Overview

This Court's analysis of the State's proffered enactments is guided by fundamental principles for interpreting legal texts. Specifically, under the "fair reading method," the Court "determin[es] the application of a governing text to given facts on the basis of how a reasonable reader, fully competent in the language, would have understood the text at the time it was issued." *See* A. Scalia & B. Garner, Reading Law 33 (2012). This "endeavor requires aptitude in language, sound judgment," and the "suppression of personal preference regarding the

---

[16] Indeed, the Second Circuit instructs—guided by *Bruen*—that "time periods in close proximity to 1791 and 1868 are . . . relevant to our analysis." *Antonyuk,* 89 F.4th at 304. But it recognized that, "the farther we depart from these key dates, the greater the chance we stray from the original meaning of the constitutional text." *Id.*

outcome." *Id.* It also "requires an ability to comprehend the *purpose* of the text . . . ." *Id.* (emphasis in original).

The Court must also construe each proffered enactment as a whole. *Id.* at 167. This entails consideration of "the entire text, in view of its structure and of the physical and logical relation of its many parts." *Id.* And "[c]ontext is a primary determination of meaning." *Id.* Indeed, a "legal instrument typically contains many interrelated parts that make up the whole." *Id.* And the "entirety of the document thus provides the context for each of its parts." *Id.* As such, the statutory construction is a "holistic endeavor." *Id.* at 168 (citations omitted).

As discussed below, a fair reading of the historical enactments reveals that the proffered enactments are not "analogous enough" to the State's new restriction on private property open to the public to "pass constitutional muster." *Bruen,* 597 U.S. at 30. Each of these historical enactments—considered holistically and in context—burdened law-abiding citizens' rights for "different reasons" and/or "to a significantly lesser extent" than the challenged restriction here. *Antonyuk,* 89 F.4th at 385.

The State, moreover, has not met its burden of showing continuity or endurance (of any sort) over time. The enactments—considered together—are a far cry from a *tradition* supporting a universal ban of firearms on all property open to the public. And the Supreme Court instructs that "the bare existence of . . . localized restrictions cannot overcome the overwhelming evidence of an otherwise

enduring American tradition permitting public carry." *Bruen*, 597 U.S. at 67.  For

these reasons, discussed in detail below, the State fails to meet its burden.

2.  <u>Founding-Era Enactments</u>

The State identifies a handful of founding-era enactments: Maryland in 1715,

Pennsylvania in 1721, New Jersey in 1722, New York in 1763, New Jersey in 1771,

and Massachusetts in 1789.  *See* Dkt. 77-1 at 31-33.  As explored below, the

proffered enactments are not "relatively similar" to the restriction here—which

creates a default rule prohibiting concealed carry on *all* private property open to the

public under the guise of "public safety"—in terms of "how and why" they

"burden[ed] a law-abiding citizen's right to armed self-defense."  *See Bruen*, 597

U.S. at 29; Dkt. 77-1 at 12.[17]  None is a "proper analogue" for New York's restriction

on private property open to the public.[18]

------

[17] The Second Circuit considered several of these enactments in *Antonyuk*—namely,
Pennsylvania in 1721, New Jersey in 1722, New York in 1763, and Maryland in
1715—and concluded that they were "explicitly motivated by a substantially
different reason (deterring unlicensed hunting) than the restricted location
regulation (preventing gun violence)."  *See Antonyuk*, 89 F.4th at 384-86.

[18] It also bears noting that several of the historical enactments are further limited
to "guns," which seemingly excludes regulation of handguns.  *See* WEBSTER'S
AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE (1828) (defining "gun" as: "An
instrument consisting of a barrel or tube of iron or other metal fixed in a stock, from
which balls, shot or other deadly weapons are discharged by the explosion of
gunpowder.  The larger species of guns are called cannon; and the smaller species
are called muskets, carbines, fowling pieces, etc.  *But one species of fire-arms, the
pistol, is never called a gun.*") (emphasis added).

### a. *Maryland in 1715*

A 1715 Maryland enactment prohibited anyone that had been convicted of certain crimes, or that was "of evil fame, or a vagrant, or dissolute liver," from "shoot[ing], kill[ing] or hunt[ing], or to be seen to carry a gun, upon any person's land, whereon there shall be a seated plantation, without the owner's leave, having been once before warned . . . ." *See* Dkt. 77-6 at 4.

The enactment applied only to the specified groups of people. *See id.* It also governed carry of "guns" *only* on plantations, as opposed to *all* private property across the state that is open to the public. *See Koons v. Platkin*, 673 F. Supp. 3d 515, 621 (D.N.J. 2023) ("the Maryland law . . . applied to plantations alone"). Moreover, read as a whole, the enactment "appears to have been designed to prevent poaching." *Id.* Indeed, the text specifies the "why"—namely, that its purpose was to "prevent the abusing, hurting, or worrying of any stock of hogs, cattle or horses . . . ." *See* Dkt. 77-6 at 4. In addition, the enactment "required prior notice for a firearm carrier to be found in violation of the law." *Id.* And the penalty for violation appears to have been a civil fine. *See id.* (". . .shall forfeit and pay one thousand pounds of tobacco . . . .). This enactment is a far cry from the one at issue in this case.

### b. *Pennsylvania in 1721*

A 1721 Pennsylvania enactment made it unlawful "to carry any gun or hunt on the improved or [e]nclosed lands of any plantation other than his own, unless he

ha[d] license or permission from the owner of such lands or plantation. . . ." *See id.* at 9.

Again, this enactment, by its terms, was far more limited in scope than New York's current restriction. It "specifically applie[d] to the improved or enclosed lands of a plantation, not private property more generally." *Koons*, 673 F. Supp. 3d at 620. As for "un[e]nclosed lands" and "the woods," the restriction applied only to people who did not own "fifty acres of land," and were not "otherwise qualified." *See* Dkt. 77-6 at 10.

The Pennsylvania enactment, moreover, was "aimed at preventing the damages and inconveniencies caused by persons carrying guns and presuming to hunt on other people's land." *Antonyuk*, 89 F.4th at 385 (internal citation omitted). Indeed, by its text, the law sought "to prevent the killing of deer out of season, and against carrying of guns or hunting by persons not qualified." Dkt. 77-6 at 8.

The act further prohibited "shoot[ing] at or kill[ing] with a firearm any pigeon, dove, partridge, or other fowl in the open streets of the city of Philadelphia, or in the gardens, orchards, and [e]nclosures adjoining upon and belonging to any of the dwelling houses with the limits of the said city . . . ." *Id.* at 10. As such, there was no prohibition on carriage generally—rather, only a particular *use* of firearms in specifically enumerated locations. The enactment is also not sufficiently analogous to New York's current restriction—either as to the "why" or the "how" of the restrictions.

30

### c. *New Jersey in 1722*

A 1722 New Jersey enactment (nearly identical to the Pennsylvania enactment) made it unlawful for anyone "to carry any Gun or hunt on the improved or [e]nclosed Lands of any Plantation other than his own," unless he had license or permission from the owner of such lands or plantation. *See id.* at 15. Again, given its limited scope as to geography and conduct, this enactment is not aligned with the State's broad restriction in terms of the "how" and "why" metrics contemplated by *Bruen.*

### d. *New York in 1763*

A 1763 New York enactment provided that nobody "other than the Owner, Proprietor, or Possessor, or his or her white Servant or Servants," shall "carry, shoot, or discharge any Musket, Fowling-Piece, or other Fire-Arm whatsoever, into, upon, or through any Orchard, Garden, Cornfield, or other [e]nclosed Land whatsoever, within the City of New York, or the Liberties thereof, without License in Writing first had and obtained for that Purpose from such Owner, Proprietor, or Possessor . . . ." *See id.* at 20.

Like the enactments discussed above, the land impacted by this law was limited—it only applied to enclosed lands of the City of New York, including in orchards, gardens, and cornfields. *See id.* At the same time, the law prohibited "passing through" such lands as well—even without firearms. *See id.* In this way, the enactment was broader *and* narrower than the restriction here.

31

Further, read in context, the law addresses bothersome hunting, and does not bar carriage in any way like the statue at issue here.  Indeed, the Second Circuit concluded that this enactment—like the 1721 Pennsylvania statute and 1722 New Jersey statue—was "aimed at preventing the damages and inconveniencies caused by persons carrying guns and presuming to hunt on other people's land." *Antonyuk*, 89 F.4th at 385 (citation omitted).  *See also Koons*, 673 F. Supp. 3d at 620 ("New York's law seeks to prohibit hunting on the enclosed lands of the City of New York, including in orchards, gardens, and cornfields").

   e.  *New Jersey in 1771*

The State relies heavily on a 1771 New Jersey enactment that begins with a statement of purpose recognizing that previous laws "for the Preservation of Deer and other Game, and to prevent trespassing with Guns, Traps and Dogs, have, by Experience, been found insufficient . . . ."  *See* Dkt. 93-1 at 1-2.  (And the repealer language in Section 18 is similar.  *See id.* at 5).

This enactment spans four single-spaced pages among eighteen sections.  It addressed various topics, including hunting seasons, the sale of deerskins and venison, and trapping.  It forbade a person "to hunt or watch for Deer with a Gun, or set in any Dog or Dogs to drive Deer, or any other Game, on any Lands not his own, and for which the Owner . . . pays Taxes, or is in his lawful Possession, unless he hath License or Permission in Writing from the Owner or Owners or legal Possessor."  *See id.* § 2.  And it further provided that a person is subject to penalties if that person stands watching with a gun "within two Hundred Yards of any Road

. . . for shooting at Deer driven by Dogs . . . ." *See id.* § 16. The law, by its terms, was enacted "to prevent trespassing with Guns" and to "regulat[e] the Size of Traps." *See id.* § 18.

Among all of this then lies the cited provision about any person carrying a gun "on any Lands not his own." *Id.* § 1. Read as a whole, however, the New Jersey enactment addresses poaching, hunting, trapping, and trespass. And like the enactments already discussed, it excluded certain classes of people, and implicated "unimproved Lands." *See id.* § 6. In context, and taken as a whole, the law does not bar carriage to any extent similar to the current New York provision at issue here. (And there is nothing to suggest that it is any sort of gun control legislation. Indeed, the extent of any "gun safety" regulation is set forth in Section 10, which appears to address spring- or other self-firing guns. *See id.* § 10.) These few words deep within an enactment focused on hunting, poaching, trapping, and trespassing certainly help to prove no "tradition" relevant to New York's new private property inversion. And the same would be true even if this part about carrying any gun on any lands not his own were enacted in isolation. Even in that hypothetical case, its outlier status would reveal that no tradition exists.

### f. *Massachusetts in 1780*

A 1780 Massachusetts enactment applied to several islands in Dukes County, making it unlawful to "be seen with any gun or guns" unless one has "the special license of the proprietors of the said islands, or shall be able to [show] sufficient reason therefor." *See* Dkt. 93-2 at 3. The Commonwealth indicated that "great

numbers of sheep and deer have been killed and other damages sustained" by "gunners and hunters" on the Islands. *See id.* at 2-3.

The "Massachusetts law was . . . designed to prevent 'gunning' and 'hunting' and applied to relatively uninhabited islands in the Commonwealth, where 'few persons residing on said Islands cannot give proper security to the stock [of sheep and deer] thereon.'" *Koons*, 673 F. Supp. 3d at 620 (citation omitted). *See* Dkt. 93-2 at 2-3 (". . . there have been of late great depredations made by gunners and hunter [on certain islands] . . . which great numbers of sheep and deer have been killed . . . [and] whereas the few persons residing on said islands cannot give proper security to the stock thereon . . . ."). And the law *exempted* people from the restriction if they could demonstrate sufficient justification for a license to carry. *See id.* ("except such as shall have the special license of the proprietors of the said islands, or shall be able to show sufficient reason therefor"). This law, too, is no analog to New York's current restriction.[19]

g. *Founding-Era Summary*

In sum, none of the proffered founding-era enactments, fairly read, burdened the individual's right to carry firearms in the same way, to the same extent, or for the same reasons as the restriction here—which imposes a default rule banning

---

[19] The State also references a 1702 Virginia enactment, which prohibits any person from "shoot[ing], hunt[ing] or rang[ing] upon the lands and tenements, or fish or fowl in any creeks or waters included within the lands of any other person or persons without [license] for the same, first obtained of the owner and proprietor thereof . . . ." *See* Dkt. 77-1 at 41-42; Dkt. 77-15 at 18. The enactment, by its terms, clearly regulates hunting.

firearms on *all* private property open to the public for "whatever reason and regardless of the nature of the land at issue." *See Koons*, 673 F. Supp. 3d at 621. Nor are the "why" and "how" metrics even remotely *similar*. As the Second Circuit observed in *Antonyuk,* "[n]o matter how expansively we analogize, we do not see how a tradition of prohibiting illegal hunting on private lands supports prohibiting the lawful carriage of firearms for self-defense on private property open the public." 89 F.4th at 385.

Finally, the notion of a "tradition" is the opposite of one-offs, outliers, or novel enactments. And "[t]radition" requires "continuity." *See Washington v. Glucksberg,* 521 U.S. 702, 723 (1997); *Tradition*, The American Heritage Dictionary of the English Language (5th ed. 2011).[20]   The State fails to show any relevant tradition.

### 3.  Reconstruction-Era Enactments

The State also points to various Reconstruction-era enactments passed between 1869 and 1890 in a handful of states, arguing that they are "historical analogues" because they "sought to accomplish similar goals in similar ways—including on private property open to the public." *See* Dkt. 77-1 at 41-45. These enactments do not alter the outcome here. Like the founding-era enactments discussed above, the Reconstruction-era enactments are not "relevantly similar" to

---

[20] The *Bruen* Court rejected several outliers and was looking for a "broad tradition" of states "meaningfully restrict[ing] public carry." *Bruen*, 597 U.S. at 70. And it noted that courts are "not obliged to sift the historical materials for evidence to sustain" the challenged statute—as "that is [the State's] burden. *Id.* at 60.

the restriction here in terms of "how" or "why" they burden the right to carry

firearms for self-defense. *See Bruen*, 597 U.S. at 29.

According to the State, "the newly-reintegrated Southern states, under

federal supervision, re-enacted their fundamental laws." Dkt. 77-1 at 33. The State

identifies the following examples: Louisiana in 1865, Florida in 1865, Texas in 1866,

and Oregon in 1893. *See id.* And it argues that these enactments are "direct

analogues" for challenged restriction here. *See id.* at 41.

But these enactments imposed nothing resembling a default rule prohibiting

carry on all private property open to the public. Rather, the historical record

demonstrates that, like the founding-era enactments, these too were limited in

scope and/or generally aimed at regulating hunting or trespass on private property.

*See* Dkt. 77-6 at 33 (1865 Louisiana) ("it shall not be lawful for any person or

persons to carry fire-arms on the premises or plantations of any citizen, without the

consent of the owner or proprietor, other than in lawful discharge of a civil or

military order . . ."); Dkt. 77-14 at 61 (1865 Florida) (". . . it shall not be lawful for

any person to hunt or range with a gun within the enclosed land or premises of

another without the permission of the owner . . . ."); Dkt. 77-6 at 40 (1866 Texas)

("It shall not be lawful for any person to discharge any gun, pistol, or firearms

. . . on, or across any public square, street, or alley, in any city or town in this state

. . . ."); *id.* at 47 (1893 Oregon) ("It shall be unlawful for any person, other than an

officer on lawful business, being armed with a gun, pistol, or other firearm, to go or

trespass upon any enclosed premises or lands without the consent of the owner

. . . ."). They do not, therefore, resemble in any way the broad prohibition of the lawful carriage of firearms for self-defense on private property open the public.[21]

The State also cites several additional Reconstruction-era enactments, which it broadly categorizes as (1) regulating discharge of firearms (Indiana in 1873, Rhode Island in 1883, Maryland in 1811); or (2) prohibiting firearms in places of public congregation (Tennessee in 1869, Texas in 1870, Georgia in 1870, Indiana in 1889, Missouri in 1883, Idaho in 1889, Arizona in 1889, and Oklahoma in 1890). *See* Dkt. 77-1 at 41-45. The State concedes that these are not "direct analogues" for the restriction here. *See id.* at 41. Indeed, by their terms, they serve different purposes. They lend no support for the State's restriction.

Moreover, the Reconstruction-era enactments—when considered with the founding-era enactments—do not demonstrate any *tradition* at all. Here, the cited enactments are also of unknown or limited duration, and the State has not demonstrated *endurance over time*. To the extent *any* "tradition" at all can be discerned from this amalgam of enactments, it would relate to regulation of hunting

---

[21] The State urges this Court to adopt a "broader interpretation" of certain terms appearing throughout the enactments—such as "land," "improved or [e]nclosed land," and "premises or plantations." Dkt. 77-1 at 35. But hyper-granular definitions of words and phrases do not alter their meaning *in context* and *in relation* to neighboring words and phrases—and thereby do not help meet the State's burden. The historical enactments, by their terms, generally prohibit trespass on another's land. And no matter how broadly certain words and phrases are read in isolation, the State cannot escape *contextual* meaning. The State, moreover, has not identified a single instance in which one of its proffered historical enactments was enforced against an individual carrying a firearm on private property open to the public.

and trespassing with guns on enclosed or improved lands of others.  *See* Mark R.

Sigmon, *Hunting and Posting on Private Land in America*, 54 DUKE L.J. 549, 555–

58 (2004) (collecting early state court cases and state constitutional provisions);

JOSEPH CHITTY, TREATISE ON THE GAME LAWS 31-32 (2nd ed. 1826) (clarifying that,

while the common law sometimes allowed pursuit of noxious animals onto others'

land, "it was always held to be unlawful to enter the [enclosed] land of another,

without his consent" to hunt and that doing so "was subject to an action of

trespass").  The historical record, to be sure, does not "support the broader tradition

the State urges." *Antonyuk*, 89 F.4th at 385.

Finally, even if the State's collection of Reconstruction-era enactments

could—*separately* from the founding-era enactments—be read as creating some sort

of emergent tradition, that could not alter the outcome here.  *Bruen* made it clear

that, "to the extent later history contradicts what the text says, the text controls."

597 U.S. at 36.  Thus, "post-ratification adoption or acceptance of laws that are

inconsistent with the original meaning of the constitutional text obviously cannot

overcome or alter that text." *Id.* (internal citation and quotation marks omitted).

As discussed, "the Second and Fourteenth Amendments protect an individual's

right to carry a handgun for self-defense outside the home." *Id.* at 10 (citing *Heller*,

554 U.S. at 570; *McDonald* 561 U.S. at 742).  And, on this historical record, that

right is equally recognized on private property open to the public.  The cited

Reconstruction-era enactments, therefore, can serve only as "mere confirmation of

what the Court thought had already been established." *Id.* at 37 (internal citation omitted).[22]

### 4.  The State Fails to Meet its Burden

The State has not established that its sweeping prohibition of carriage on private property open to the public "is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Bruen,* 597 U.S. at 19.  New York's current statute addresses a societal problem that has persisted since the founding—namely, interpersonal firearm violence.  But the State fails to identify a single relevantly analogous law *addressing that problem*.  Instead, the State proffers a collection of enactments aimed at regulating hunting, poaching, and trespassing essentially in relation to the homestead.  The proffered analogues were framed on different "why" concerns, and certainly had no "how" methodologies that remotely resemble the State's expansive private property inversion challenged here.

Indeed, to the extent that the problem of such interpersonal violence *was*, historically, addressed in the law, it was done through other means—such as surety laws and other laws discussed in *Heller*, *Bruen*, and *Rahimi*.  And such laws imposed a *far less onerous* burden than the State's current restriction.

---

[22] New York's restriction also finds no analog in any recognized "sensitive place." *See Bruen,* 597 U.S. at 30.  Indeed, "legislative assemblies, polling places, and courthouses" are civic locations sporadically visited, where a bad-intentioned armed person could disrupt key functions of democracy.  Legislative assemblies and courthouses, further, are typically secured locations, where uniform lack of firearms is generally a condition of entry, and where government officials are present and vulnerable to attack.  Such features are absent from the vast majority of public places that ordinary citizens frequent as part of day-to-day life.

In sum, much of the land in New York is held privately and much of that is open to the public. It encompasses various businesses, hotels, parking lots and garages, grocery stores, pharmacies, medical offices, hospitals, cemeteries, malls, sports and entertainment venues, and so on. These are places that people, exercising their rights, frequent *every day* when they move around *outside their homes*. Confrontation for self-defense is certainly possible in these places. The State's restriction "functionally creates a universal default presumption against carrying firearms in public places, seriously burdening lawful gun owners' Second Amendment rights." *Antonyuk*, 89 F.4th at 386. And that "burden is entirely out of step with that imposed by the proffered analogues[.]" *Id.*

The Constitution *requires* that individuals be permitted to use handguns for the core lawful purpose of self-defense. *McDonald*, 561 U.S. at 767. And it protects that right *outside the home*. *Bruen*, 597 U.S. at 33. Nothing in the Nation's history or traditions closes the door on that right *across all private property* open to the public. New York's exclusion, therefore, violates "the general right to publicly carry arms for self-defense." *Id.* at 31 This is one of the policy choices taken "off the table" by the Second Amendment. *Heller*, 554 U.S. at 636.

For the reasons addressed above, New York's restriction "violates the Fourteenth Amendment by preventing law-abiding citizens with ordinary self-defense needs from exercising their right to keep and bear arms." *Bruen*, 597 U.S.

at 71. Plaintiffs' request to enjoin enforcement of the private property restriction as to private property open to the public is granted.[23]

## III.    STAY PENDING APPEAL

The State requests a fourteen-day stay pending appeal. *See* Dkt. 97 at 3. That request is denied. The factors "relevant to granting a stay pending appeal are the applicant's 'strong showing that he is likely to succeed on the merits,' irreparable injury to the applicant in the absence of a stay, substantial injury to the nonmoving party if a stay is issued, and the public interest." *Uniformed Fire Officers Ass'n v. de Blasio*, 973 F.3d 41, 48 (2d Cir. 2020) (citing *Nken v. Holder*, 556

---

[23] Defendants argue that the organizational Plaintiffs (FPC and SAF) lack standing. *See* Dkt. 77-1 at 17 (citing *Connecticut Citizens Def. League, Inc. v. Lamont*, 6 F.4th 439 (2d Cir. 2021)). Indeed, under Second Circuit caselaw, it "is the law of this Circuit that an organization does not have standing to assert the rights of its members in a case brought under 42 U.S.C. § 1983." *Nnebe v. Daus*, 644 F.3d 147, 156 (2d Cir. 2011). And Plaintiffs recognize that "Circuit precedent forecloses the argument that FPC and SAF have a cause of action under § 1983 to assert the rights of their members." Dkt. 81 at 16. But they "reserve the right to challenge this holding." *Id. See also* Dkt. 94, 97. This Court, however, need not decide the issue of organizational standing. It is undisputed that Plaintiff Christian has standing. *See* Dkt. 95 at 9 ("we would concur with Mr. Bergstrom, that . . . Plaintiff Christian should be the only person with standing"). And for "federal courts to have jurisdiction . . . only one named plaintiff need have standing with respect to each claim." *Comer v. Cisneros*, 37 F.3d 775, 788 (2d Cir. 1994) (citing *Village of Arlington Heights v. Metropolitan Hous. Dev. Corp.*, 429 U.S. 252, 263–64 (1977)). *See also Kwong v. Bloomberg*, 723 F.3d 160, 162n.4 (2d Cir. 2013) ("Because we are persuaded that the individual plaintiffs have standing, we need not address the standing arguments, left unresolved by the District Court, regarding the two organizational plaintiffs").

U.S. 418, 434 (2009)). The first two factors "are the most critical, but a stay is not a matter of right, even if irreparable injury might otherwise result, it is an exercise of judicial discretion, and the party requesting a stay bears the burden of showing that the circumstances justify an exercise of that discretion." *Id.* (internal citation and quotation marks omitted).

Here, a stay pending appeal is not warranted. As discussed above, Plaintiffs' constitutional rights are violated absent an injunction. The State has not established irreparable injury in the absence of a stay. The preliminary injunction has been in place since November 22, 2022. *See* Dkt. 49. The balance of hardships and public interest weigh in favor of Plaintiffs, also as discussed above. Finally, it is *Plaintiffs* who have demonstrated success on the merits.

## CONCLUSION

For the reasons above, it is hereby:

ORDERED that Plaintiffs' [73] motion is GRANTED with respect to the State's restriction on private property open to the public. Defendants' [77] motion is DENIED as to this issue; and it is further

ORDERED that Defendants and their officers, agents, servants, employees, and all persons in concert or participation with them who receive notice of this Order are permanently enjoined, effectively immediately, from enforcing N.Y. Pen. L. § 265.01-d with respect to private property open to the public, and their regulations, policies, and practices implementing it; and it is further

ORDERED that the remaining aspects of the parties' motions at Dkt. 73 and

Dkt. 77—including as to the public parks restriction (N.Y. Penal L. § 265.01-

e(2)(d))—are held in abeyance pending further order from this Court; and it is

further

ORDERED that Defendants' request for a stay pending appeal is DENIED.


SO ORDERED.

Dated:        October 10, 2024
              Buffalo, New York

                                    _____
                                    JOHN L. SINATRA, JR.
                                    UNITED STATES DISTRICT JUDGE